**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ALISHEA KINGDOM
Reg. 13131-089
FCI Fairton
P.O. Box 420
Fairton, NJ 08320

SOLO NICHOLS
Reg. 16212-040
FCI Tallahassee
P.O. Box 5000
Tallahassee, FL 32314

JAS KAPULE
Reg. 97856-298
FCI Waseca
P.O. Box 1731
Waseca, MN 56093

*on behalf of themselves and all persons
similarly situated*,

       *Plaintiffs*

   vs.

DONALD J. TRUMP, in his official capacity
as President of the United States,
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

PAMELA J. BONDI, in her official capacity
as Attorney General of the United States,
950 Pennsylvania Avenue NW
Washington, D.C. 20530

WILLIAM W. LOTHROP, in his official
capacity as Acting Director of the Federal
Bureau of Prisons,
320 First St NW
Washington, D.C. 20534

CHRISTOPHER A. BINA, in his official

Case No. 1:25-cv-00691

1

capacity as Assistant Director for the Health
Services Division of the Federal Bureau of
Prisons,
320 First St NW
Washington, D.C. 20534

DANA R. DIGIACOMO, in her official
capacity as Acting Assistant Director of the
Reentry Services Division of the Federal
Bureau of Prisons,
320 First St NW
Washington, D.C. 20534

SHANE SALEM, in his official capacity as
Assistant Director of the Correctional
Programs Division of the Federal Bureau of
Prisons,
320 First St NW
Washington, D.C. 20534

                    *Defendants*.

---

### CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
(Trump Administration and BOP's categorical ban on gender-affirming health care for people
with gender dysphoria in the custody of the Federal Bureau of Prisons)

Plaintiffs Alishea Sophia Kingdom, Solo Nichols, and Jas Kapule ("Plaintiffs"),[1] by and through their attorneys, bring this action on their own behalf and on behalf of a class of those similarly situated pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, and allege as follows.

## INTRODUCTION

1.     Plaintiffs and the putative class they seek to represent are currently incarcerated in the custody of the Federal Bureau of Prisons ("BOP"). Plaintiffs have all been diagnosed with gender dysphoria, a serious medical condition characterized by clinically significant distress resulting from the incongruence between a person's gender identity and the sex they were designated at birth. BOP has been providing them with gender-affirming medical treatment and accommodations to address their gender dysphoria.  But Plaintiffs, and those similarly situated to them, now have lost or face the imminent loss of this care that has been essential to their health because of BOP's implementation of Executive Order 14168, entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," issued by Defendant Trump on January 20, 2025. ("EO 14168" or "the EO").[2] EO 14168 mandates an across-the-board ban on such gender-affirming health care for individuals in BOP custody, regardless of the impact on their health.

2.     Gender dysphoria is a serious condition. Absent treatment, it can impair an individual's ability to function and cause depression, anxiety, self-harm, and suicidality.

3.     For years, BOP has had a formal internal health care policy governing the treatment

---

[1] Plaintiffs are transgender and as such use their chosen names wherever possible. For identification purposes, Alishea Sophia Kingdom's legal name is Joshua Mueller, and her BOP register number is 13131-089; Solo Nichols's legal name is Latasha Nichols, and his BOP register number is 16212-040; and Jas Kapule's legal name is Jasmine Kapule, and his BOP register number is 97856-298.

[2] Exec. Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).

of gender dysphoria which, in accordance with well-accepted protocols for treating this condition, provided for gender-affirming medical interventions including hormone therapy and surgeries when indicated for a patient, as well as clothing, commissary, and other accommodations to allow individuals to live consistently with their gender identity (collectively, "gender-affirming health care").

4.      Plaintiffs have all been diagnosed with gender dysphoria by BOP clinicians, who have prescribed hormone therapy and provided accommodations to address their gender dysphoria.

5.      The gender-affirming health care they were receiving afforded Plaintiffs relief from the distress of gender dysphoria and significantly improved their mental health.

6.      EO 14168 takes aim generally at so-called "gender ideology"—or what it calls "the false claim that males can identify as and thus become women and vice versa." EO § 2(f).  Section 3(e) of the EO directs agencies to "remove all . . . policies . . . that promote or otherwise inculcate gender ideology," and to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology," and Section 3(g) prohibits the use of federal funds "to promote gender ideology." Section 4(c) of the EO, which focuses on BOP, requires BOP to "revise[] its policies concerning medical care to be consistent with" the EO and specifically prohibits the use of federal funds for "any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex."

7.      BOP issued two memoranda implementing EO 14168. The first, issued on February 21, 2025, is entitled "Compliance with Executive Order 'Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government'," (attached to the Complaint as Exhibit A), and prohibits the purchase of "any items that align with transgender ideology," such as chest binders and hair removal devices; prohibits granting requests for other accommodations to address gender dysphoria such as "undergarments that do not align with an inmate's biological sex"; and mandates that BOP staff members "must refer to individuals" with

2

"pronouns that correspond to their biological sex".[3] *See* Ex. A. On February 28, 2025, BOP issued a second memorandum entitled "Executive Order 14168 Compliance," (attached to the Complaint as Exhibit B), which states that "[c]onsistent with Executive Order (EO) 14168 . . . no Bureau of Prisons funds are to be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." The two memoranda are referred to collectively as the "Implementing Memoranda."

8.    As a result of EO 14168 and BOP's Implementing Memoranda, Plaintiffs have already had their hormone therapy and/or access to accommodations discontinued, causing anxiety, thoughts of suicide and self-harm, sleeplessness, lethargy, and mood swings.

9.    Defendants Lothrop and Bina are legally responsible for ensuring that health care provided to incarcerated people in BOP custody is in accordance with constitutional standards.

10.    Defendants' withdrawal and denial of gender-affirming health care to treat Plaintiffs' serious medical needs, based on a blanket ban and without any individualized medical determination, violates the Eighth Amendment of the U.S. Constitution. And by targeting transgender people for the denial of medical treatment, Defendants' actions violate the right to equal protection guaranteed by the Fifth Amendment of the U.S. Constitution. Defendants' denial of medical care and gender-affirming accommodations needed to address Plaintiffs' gender dysphoria violates the Rehabilitation Act of 1973. Furthermore, Defendants' actions implementing the mandates of EO 14168 §§ 4(c), 3(e), & 3(g) violate the Administrative Procedure Act ("APA") both because they are unconstitutional, and because the decision to categorically discontinue gender-affirming health care regardless of medical need is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.

11.    Plaintiffs and the putative class they represent seek injunctive and declaratory relief to set aside the unlawful Implementing Memoranda, remediate Defendants' violations of their civil

---

[3] The February 21, 2025 memorandum also suspended "all transgender-specific programming," pat search accommodations, and the Transgender Executive Council (a body that provided guidance on the care of transgender people in the custody of BOP).

3

and constitutional rights, and to preserve or restore their access to gender-affirming health care that they depend on for their health.

## JURISDICTION AND VENUE

12. Plaintiffs bring this suit under the Fifth and Eighth Amendments of the U.S. Constitution, the Rehabilitation Act of 1973, and the APA. The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1346. Plaintiffs seek declaratory and injunctive relief for Defendants' violations of Plaintiffs' civil rights.

13. Venue is appropriate in the District of the District of Columbia under 28 U.S.C. § 1391(e) because the events giving rise to the claims occurred in this District and Defendants are headquartered in this District.

## PARTIES

### Class of Incarcerated People

14. Plaintiffs bring this action on their own behalf and on behalf of a class of those similarly situated pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

15. The class is defined as: "All persons who are or will be incarcerated in the custody of BOP who are or will be diagnosed with gender dysphoria or meet the criteria for a gender dysphoria diagnosis and who are receiving, or would receive, gender-affirming health care absent such care being proscribed by EO 14168 and the Implementing Memoranda."

16. As defined, the class meets all the requirements of Rule 23(a).

17. The class is so numerous that joinder of all members is impracticable. Upon information and belief, at least 2,000 people incarcerated in the custody of BOP will lose access to hormone therapy and accommodations to address their gender dysphoria due to BOP's implementation of EO 14168.

18. Additional class members will become incarcerated in the custody of BOP in the future. They will not receive gender-affirming health care even if they meet the criteria for a diagnosis of gender dysphoria and such care is medically indicated for them. Regardless of need,

treatment will be denied because of Defendants' enforcement of the blanket ban on gender-affirming health care in EO 14168.

19.     There are questions of law or fact common to the class. If Defendants are permitted to enforce EO 14168, then all members of the class will be subject to a common harm: the cessation of their gender-affirming health care and/or an inability to obtain gender-affirming health care necessary to treat their gender dysphoria. All members seek the same relief: an injunction preventing enforcement of EO 14168, as applied to BOP medical care and accommodations, and the Implementing Memoranda. This lawsuit also presents common questions of law, including whether Defendants' enforcement of EO 14168 and the Implementing Memoranda violate the Fifth and Eighth Amendments of the U.S. Constitution and the Rehabilitation Act, and whether BOP's Implementing Memoranda violate the APA.

20.     Plaintiffs' claims are typical of those of the class. They are all transgender incarcerated people who have been diagnosed by BOP clinicians with gender dysphoria, and to whom BOP has provided, and would continue to provide, gender-affirming health care if it were not prohibited by EO 14168 and the Implementing Memoranda.

21.     Plaintiffs are adequate representatives of the class. They do not have conflicts with other members of the class, they seek the same relief as other members of the class, and they will represent the class fairly and adequately.

22.     The class representatives are also adequately represented by counsel. Counsel includes lawyers from the American Civil Liberties Union Foundation, Transgender Law Center, and ACLU Foundation of the District of Columbia. Counsel have extensive experience litigating class actions in federal courts, including civil rights lawsuits on behalf of transgender people and incarcerated people.

23.     The requirements of Rule 23(b)(2) are met because Defendants have acted, or will act, on grounds generally applicable to the class, and final injunctive relief and declaratory relief are appropriate respecting the class as a whole. BOP has issued memoranda implementing EO

5

14168. Additionally, BOP health care staff have notified Plaintiffs and putative class members that their hormone therapy and accommodations have been or will be discontinued as a result of EO 14168 and the Implementing Memoranda. Defendants Bondi, Lothrop, Bina, DiGiacomo, and Salem will follow EO 14168's blanket prohibition on gender-affirming health care at BOP facilities.

**Named Plaintiffs**

24.     **Named Plaintiff Alishea Sophia Kingdom** is a 34-year-old transgender woman with gender dysphoria incarcerated at Federal Correctional Institution ("FCI")-Fairton, in Fairfield Township, New Jersey. She has been receiving hormone therapy in BOP custody since 2016, as well as female-designated clothing and commissary items. BOP stopped her hormone therapy on January 26, 2025, and has informed her that she will no longer receive female-designated clothing or commissary items. Hormone therapy and gender-affirming clothing and commissary items have been critical to her health.

25.     **Named Plaintiff Solo Nichols** is a 40-year-old transgender man with gender dysphoria incarcerated at FCI-Tallahassee, in Tallahassee, Florida. In BOP custody, Mr. Nichols has had access to gender-affirming accommodations including chest binders, boxers, and commissary items since 2018, and he has been prescribed hormone therapy by BOP health care providers since 2021. Mr. Nichols has been receiving mixed messages about when his hormone therapy will be ended and has received one reduced dose of treatment. Hormone therapy and gender-affirming clothing and commissary items have been critical to his health.

26.     **Named Plaintiff Jas Kapule** is a 35-year-old transgender man with gender dysphoria incarcerated at FCI-Waseca in Waseca, Minnesota. He has been receiving hormone therapy and access to gender-affirming accommodations—including a chest binder, boxers, and commissary items—to treat his gender dysphoria since 2022. BOP staff have told Mr. Kapule that once his testosterone prescription runs out he will not receive any additional hormone treatments, and that he can no longer receive a chest binder through laundry services or purchase binders or

boxers at the commissary. Hormone therapy and gender-affirming clothing and commissary items have been critical to his health.

**Defendants**

27.    Defendant Donald J. Trump is the President of the United States. He issued EO 14168 on January 20, 2025 and is responsible for overseeing its implementation. He is sued in his official capacity.

28.    Defendant Pamela J. Bondi is the Attorney General of the United States. She oversees the U.S. Department of Justice, including BOP, and is responsible for the enforcement and implementation of EO 14168 in federal prisons. She is sued in her official capacity.

29.    Defendant William W. Lothrop is the Acting Director of BOP. The Acting Director of BOP is responsible for the enforcement and implementation of EO 14168 in federal prisons. He is sued in his official capacity.

30.    Christopher A. Bina is the Assistant Director of the Health Services Division of BOP. He issued BOP's February 28, 2025, memorandum titled "Executive Order 14168 Compliance." He is sued in his official capacity.

31.    Dana R. DiGiacomo is the Acting Assistant Director of the Reentry Services Division of BOP. She co-issued BOP's February 21, 2025, memorandum titled "Compliance with Executive Order 'Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government'." She is sued in her official capacity.

32.    Shane Salem is the Assistant Director of the Correctional Programs Division of BOP. He co-issued BOP's February 21, 2025, memorandum titled "Compliance with Executive Order 'Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government'." He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### The Diagnosis and Treatment of Gender Dysphoria

33.    "Gender identity" is a person's internal sense of belonging to a particular gender.

Everyone has a gender identity, and a person's gender identity is durable and cannot be altered voluntarily or changed through therapy or medical intervention.

34.    A person's gender identity usually matches the sex they were designated at birth based on their external genitalia.[4] But transgender people have a gender identity that differs from their sex designated at birth. A transgender man is someone who was designated a female sex at birth but has a male gender identity. A transgender woman is someone who was designated a male sex at birth but has a female gender identity.

35.    While being transgender itself is not a disorder, the incongruence between one's gender identity and sex designated at birth can cause clinically significant distress for transgender people.

36.    According to the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders, Fifth Edition, Text Revision ("DSM-5-TR"), "gender dysphoria" is the diagnostic term for the condition experienced by some transgender people of clinically significant distress resulting from the lack of congruence between their gender identity and their sex designated at birth. To be diagnosed with gender dysphoria, the incongruence must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.[5]

37.    Gender dysphoria is a serious condition which, if left untreated, causes serious physical and psychological harm. Symptoms of untreated gender dysphoria can include, but are not limited to, anxiety, depression, eating disorders, socially-isolating behavior, self-harm, and suicidality.

38.    The widely accepted approach to the treatment of gender dysphoria aims to resolve the distress associated with the incongruence between a transgender person's designated sex at

---

[4] The terms "sex designated at birth" or "sex assigned at birth" are more precise than the term "biological sex" because there are many biological sex characteristics, and they do not always align with each other.
[5] Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, Text Revision F64.0 (5th ed. 2022).

birth and their gender identity by enabling the individual to live consistently with their gender identity.   This can involve social transition (such as dressing, styling one's hair, and using a name and pronouns that match one's gender identity); hormone treatment to masculinize or feminize the body; and various surgeries to change primary and/or secondary sex characteristics.

39.     Clinical practice guidelines for the treatment of gender dysphoria have been published by the World Professional Association for Transgender Health ("WPATH") and the Endocrine Society. WPATH is a professional organization of medical and mental health professionals focused on transgender health care and has been issuing these guidelines since 1979. The current version, the Standards of Care for the Health of Transgender and Gender Diverse People, Version 8 ("WPATH SOC 8") was published in 2022.[6] The Endocrine Society, which is a professional association of endocrinologists, first issued guidelines for the treatment of gender dysphoria in 2011 and updated the guidelines in 2017.[7]

40.     These guidelines are supported by all major medical and mental health associations in the United States, including but not limited to the American Medical Association, the American Psychiatric Association, and the American Psychological Association.

41.     While psychotherapy can be important to support individuals with gender dysphoria, psychotherapy is not a substitute for medical treatment of gender dysphoria for those for whom it is indicated. There are no psychotherapeutic modalities that have been shown to alleviate gender dysphoria.

42.     The efficacy of gender-affirming health care—social transition, hormone therapy, and surgeries—in alleviating gender dysphoria is well-documented in decades of peer-reviewed research and clinical experience.

---

[6] Eli Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int. J. of Transgender Health S1 (2022), available at https://wpath.org/publications/soc8/.

[7] See Wylie C. Hembree et al., *Endocrine Treatment of Gender Dysphoric/Gender Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. of Clinical Endocrinology & Metabolism 3869 (2017), available at https://www.endocrine.org/,clinical-practice-guidelines/gender-dysphoria-gender-incongruence.

43.     Gender-affirming hormone therapy and surgeries are also well-documented to be safe and have low risks that are comparable to the risks associated with other types of medical treatments.

44.     The well-accepted protocols for treatment of gender dysphoria set forth in the WPATH and Endocrine Society guidelines apply in institutional settings, including prisons, jails, and other carceral facilities. *See* WPATH SOC 8, chapter 11; *see also* National Commission on Correctional Health Care, Position Statement: Transgender and Gender Diverse Health Care in Correctional Settings 3 (2020) ("The clinical decision making to initiate or advance hormone medication treatment or candidacy for surgical interventions while incarcerated or upon release needs to be based on individual medical need, risks and benefits, analysis of alternatives, ruling out contraindications, accepted standards of care, and a thorough informed-consent process.").

45.     Withdrawing gender-affirming health care from or denying such care to individuals for whom it is medically indicated puts them at risk of significant harm to their health. For those who have seen this health care alleviate their gender dysphoria, withdrawing care can be expected to result in a return of the symptoms they were previously experiencing. Some of the effects of hormone therapy are reversible, so discontinuing that treatment would cause transgender men to lose masculinization and transgender women to lose feminization of their features, exacerbating their gender dysphoria. Suddenly discontinuing the use of hormone therapy can also lead to physical symptoms like headaches, hot flashes, and spikes in blood pressure. The withdrawal of accommodations that allow people to dress and otherwise live consistently with their gender identity would likewise worsen symptoms of gender dysphoria.

Treatment of People with Gender Dysphoria in BOP Custody Prior to the EO

46.     It is BOP policy to "provide[] essential medical, dental, and mental health (psychiatric) services in a manner consistent with accepted community standards for a correctional environment."[8]

---

[8] Fed. Bureau of Prisons, *Medical Care* (Mar. 2025), https://perma.cc/B299-3YAR.

47.     Until Defendant Trump's issuance of EO 14168 on January 20, 2025, and BOP's implementation of that EO, people incarcerated in BOP facilities who were diagnosed with gender dysphoria were provided treatments based upon individualized patient medical need. Prior to January 20, 2025, Plaintiffs and putative class members received treatment in accordance with well-accepted medical protocols, including the WPATH guidelines, which included gender-affirming medical treatments and accommodations as indicated for their medical needs.

48.     For example, BOP's June 2023 Clinical Guidance for "Gender-Affirming Care of Transgender and Gender Nonbinary Persons" ("2023 BOP Clinical Guidance"), states that it was updated to "more closely align with community standards."[9] The 2023 version of this document updated BOP's previous Clinical Guidance from December 2016, entitled "Medical Management of Transgender Inmates" ("2016 BOP Clinical Guidance").[10]

49.     Consistent with BOP policy, prior to EO 14168 and BOP's implementation of the EO, BOP's provision of gender-affirming health care to incarcerated people was based upon individualized medical need. *See* 2016 BOP Clinical Guidance, at 6 ("Healthcare for [transgender] individuals requires a multidisciplinary approach. . . . The treatment and management of the [transgender] individual requires individualized care guided by treatment goals to allow for successful transition through education, counseling, real-life experience, medical evaluation, hormone treatment, and in some cases, sex reassignment surgery."); 2023 BOP Clinical Guidance, at 5 ("A patient-centered multidisciplinary team approach is recommended for managing issues associated with the incarceration of [transgender] individuals. . . . It is important to have a system in place to allow for individualized treatment. Individuals requesting care for gender dysphoria should have access to a diverse range of treatment services. Patient-centered care explores

_____

[9] Fed. Bureau of Prisons, *Gender-Affirming Care of Transgender and Gender Nonbinary Persons* (June 2023), at i. These clinical guidelines were previously publicly available on the BOP website but were taken down as a result of EO 14168. The guidelines are now archived on a perma-CC website at https://perma.cc/U5UT-S9PN.

[10] Fed. Bureau of Prisons, *Medical Management of Transgender Inmates* (Dec. 2016), https://perma.cc/K7RQ-8NTU.

individualized therapeutic options, which may vary from person to person.").

50.    The 2023 BOP Clinical Guidance explains that "[g]ender-affirming health care involves supporting individuals through social, psychological, behavioral, or medical (including hormonal treatment or surgery) treatments—to support and affirm an individual's experienced gender identity." *Id.* at 4. It also notes that "appropriate gender-affirming care, including medical and surgical care, can lessen psychiatric symptoms" associated with gender dysphoria. *Id.*

51.    Pursuant to the 2016 and 2023 BOP Clinical Guidance, BOP had a Transgender Clinical Care Team comprised of "physicians (primary care and psychiatrists), pharmacists, and social workers devoted to advocating and advancing the treatment options for this population. The team provides education and the tools to institutional staff to develop clinical treatment plans for the [transgender] and gender nonbinary population." *Id.* at 1.

52.    Until Defendant Trump's issuance of EO 14168 on January 20, 2025, and BOP's implementation of the EO, BOP had a Transgender Utilization Review Advisory Group comprised of "physicians, psychiatrists, pharmacists, and social workers assigned by the Medical Director to provide clinical review of gender-confirming surgical requests." *Id.*

53.    BOP's "Transgender Offender Manual," initially issued in 2017 and updated on January 13, 2022, provided for individualized assessment for hormone therapy and other medical treatment in accordance with the BOP Clinical Guidance and also set forth the clothing and commissary policies applicable to incarcerated transgender people, as well as additional non-health care policies and practices in place related to the supervision of transgender incarcerated people.[11] As with health care needs, clothing, commissary items, and other accommodations were provided "based on an individualized assessment." 2022 Transgender Offender Manual at 12.

54.    Until Defendant Trump's issuance of EO 14168 on January 20, 2025, and BOP's implementation of the EO, BOP had a Transgender Executive Council, which was "the agency's

---

[11] Shortly after the issuance of EO 14168, all references to the 2022 Transgender Offender Manual were removed from the BOP website. A perma-CC version of the manual is available at https://perma.cc/4BP6-YWRP.

official decisionmaking body on all issues affecting the transgender population," including for individuals' gender confirmation surgery, and met "a minimum of monthly to offer advice and guidance on unique measures related to treatment and management needs of transgender inmates and/or inmates with [gender dysphoria]." *Id.* at 4.

Executive Order 14168's Categorical Denial of Gender-Affirming Health Care for Transgender
People in BOP Custody and BOP's Implementation of the EO

55.     On January 20, 2025, just hours after his inauguration, Defendant Trump issued EO 14168, titled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."[12]

56.     The stated purpose of the EO was to protect women from "men [who] self-identify as women . . . gain[ing] access to intimate single-sex spaces and activities designed for women," which the EO says "fundamentally attack[s] women by depriving them of their dignity, safety, and well-being."  The EO's title reflects this purpose of purportedly protecting women.

57.     The EO opposes "gender ideology," which it defines as "the false claim that males can identify as and thus become women and vice versa," and prohibits federal funds that "promote gender ideology," addressing a range of contexts.  EO 14168 was one of a slew of anti-transgender Executive Orders issued by Defendant Trump in his first days and weeks in office.[13]

---

[12] Exec. Order No. 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).

[13] *See, e.g.*, Exec. Order No. 14148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025) (rescinding several Biden administration orders that recognized rights of transgender people in schools, the workplace, housing, health care, and other settings, consistent with the Supreme Court's decision in *Bostock v. Clayton County*); Exec. Order No. 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025) (banning transgender people from serving in the U.S. military, accusing transgender servicemembers of expressing a "false" gender identity, and stating that being transgender "conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life."); Exec. Order 14187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025) (ordering the federal government to withhold all federal funding from any institution that provides gender-affirming care to people under the age of 19); Exec. Order No. 14190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025) (banning K-12 schools in the U.S. from recognizing youth's identities by using names or pronouns

58.     Section 4(c) of EO 14168 directs the Attorney General to "ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with [the EO]" and ensure that "no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex."

59.     Section 4(c) categorically bans gender-affirming health care for people incarcerated in BOP facilities, regardless of medical necessity, or the fact that they were already being provided such care by BOP clinicians and depending on such care for their health.

60.     Section 4(c) prohibits BOP health care providers from evaluating and treating gender dysphoria on a patient-centered individualized basis, according to their professional judgment.

61.     Section 3(e) of the EO directs all agencies to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology," and to "cease issuing such statements, policies, regulations, forms, communications or other messages." It also directs agency "forms that require an individual's sex" to "list male or female," prohibiting such forms from "request[ing] gender identity," and directs agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology."

62.     Section 3(g) of the EO states that "Federal funds shall not be used to promote gender ideology."

63.     Upon information and belief, on or about January 31, 2025, BOP scrubbed its website of the Transgender Offender Manual, replacing the page with a link that redirects to a page reading that "This content is temporarily unavailable as we implement the Executive Order on 'Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the

_____

that align with their gender, threatening teachers who do not comply with criminal prosecution under laws banning sexual exploitation of minors and practicing medicine without a license); Exec. Order No. 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg.9279 (Feb. 5, 2025).

14

Federal Government'" as seen below:[14]



64.     On information and belief, on or about January 31, 2025, BOP facilities posted a digital bulletin on a system available to incarcerated people announcing the disbanding of the Transgender Executive Council (TEC), described above in Paragraph 54.

65.     On February 21, 2025, Defendants BOP Reentry Services Division Acting Assistant Director Dana R. DiGiacomo and Correctional Programs Division Assistant Director Shane Salem issued a memorandum implementing the EO with the exception of the application to medical treatments, citing a nationwide temporary restraining order that had been in effect.[15] Exhibit A. Among other directives issued in the implementing memo, BOP expressly prohibits the purchase of "any items that align with transgender ideology," such as chest binders and hair removal devices; prohibits the granting of requests for other accommodations such as "undergarments that do not align with an inmate's biological sex"; and mandates that BOP staff members "must refer to individuals" with "pronouns corresponding to their biological sex."

---

[14] *See* https://perma.cc/6Z8P-KKQ4.

[15] The nationwide temporary restraining order has been replaced with a preliminary injunction that applies only to the specific named Plaintiffs involved in the case in which the temporary restraining order was issued.

66.    On February 28, 2025, BOP Health Services Division Assistant Director Chris A.

Bina issued another implementing memorandum, which states in full:

> Consistent with Executive Order (EO) 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, no Bureau of Prisons funds are to be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.
>
> This policy is to be implemented in a manner consistent with applicable law including the Eighth Amendment.

Exhibit B.

67.    Both Implementing Memoranda were directed to all BOP Chief Executive Officers,

and the February 25, 2025, memorandum also cc'ed the BOP Executive Team, Health Services

Division Employees, Clinical Directors, and Health Services Administrators. The Implementing

Memoranda represent BOP's directives enforcing EO 14168's blanket prohibition of gender-

affirming health care at BOP facilities.

<u>The Impact of EO 14168 and BOP's Implementing
Memoranda on Named Plaintiffs</u>

68.    **Plaintiff Alishea Sophia Kingdom,** is a 34-year-old transgender woman

incarcerated at FCI – Fairton, in Fairfield Township, New Jersey. She has been incarcerated since

2014, and anticipates being incarcerated until 2028.

69.    As early as age 8, Ms. Kingdom knew she was a girl. She preferred "girls'" toys,

would wear "girls'" clothes when she could, and when she first learned that her body was not the

same as other girls, she felt distressed, confused, and knew something was not right. Her mother

believed Ms. Kingdom was either gay or too feminine, would tell her to act like a boy, and would

send her to group homes and mental health facilities in hopes that Ms. Kingdom would become

more masculine.

70.    As she went through puberty, Ms. Kingdom began experiencing symptoms of

gender dysphoria: she felt severe anxiety, would have panic attacks when she noticed facial hair,

would feel physically sick when thinking about her body masculinizing, and was often unable to

sleep at night.

71.    As a teenager, Ms. Kingdom started going by the name "Alishea Sophia," and wore long hair, makeup, and typically feminine clothes whenever possible.

72.    Ms. Kingdom was diagnosed with gender dysphoria by BOP clinicians in 2016. That same year, BOP clinicians determined that hormone therapy was medically indicated for her to treat her gender dysphoria, and she received hormone therapy from then until January 26, 2025. She was also able to access bras, panties, and gender-affirming commissary items.

73.    Hormone therapy and access to feminine-typical clothing and commissary items reduced her symptoms of gender dysphoria and greatly improved her health and well-being. While receiving this treatment, Ms. Kingdom stopped experiencing panic attacks, her anxiety was controlled, and she was able to get a full night's sleep. Hormone therapy has feminized Ms. Kingdom's body: she has breasts, her body fat has redistributed to her hips and buttocks, and she grows significantly less facial and body hair. And access to feminine-typical clothing and commissary items further enabled her to live consistently with her female gender identity.

74.    On January 26, 2025, Ms. Kingdom had an appointment to receive her hormone therapy, but FCI-Fairton staff told her that, because of President Trump's Executive Order, they would no longer provide hormone therapy to treat gender dysphoria for transgender people at FCI-Fairton. Ms. Kingdom has not been provided this prescribed treatment for her gender dysphoria since then.

75.    FCI-Fairton staff have also informed Ms. Kingdom that BOP will no longer provide her bras or panties and that she may no longer purchase gender-affirming commissary items.

76.    Losing the effects of hormone therapy and seeing her appearance masculinize over time will cause Ms. Kingdom severe and irreparable harm. She is experiencing anxiety and panic attacks, insomnia, mood swings, and thoughts of self-harm and suicide as her body reacts to the change in hormone levels and her gender dysphoria worsens.

77.    Last year, Ms. Kingdom went before the Transgender Executive Council (TEC) for

review for surgery to further alleviate her gender dysphoria. With the shutdown of the TEC, there is now no avenue for her to access gender-affirming surgery. She was due to be reevaluated for surgery by the TEC this month. This causes Ms. Kingdom extreme distress, and she now frequently considers self-castration.

78.    **Plaintiff Solo Nichols** is a transgender man incarcerated at FCI-Tallahassee, in Tallahassee, Florida.

79.    He has been incarcerated by BOP since 2013 and anticipates being incarcerated until August 8, 2029.

80.    From a young age, Mr. Nichols has known himself to be male and would ask others to refer to him as a boy. He was in fifth grade when he first explained to a friend that he was a boy. Mr. Nichols socially transitioned and started wearing a chest binder and exclusively masculine-typical clothing around age 15.

81.    Since 2018, BOP has recognized him as transgender, and allowed him access to chest binders, boxers, and other gender-affirming commissary items.

82.    In 2021, BOP clinicians diagnosed Mr. Nichols with gender dysphoria. They prescribed him testosterone starting in mid-2021. He has been receiving this treatment ever since.

83.    Mr. Nichols' hormone therapy and accommodations have reduced his symptoms of gender dysphoria, and greatly improved his health and well-being. Before starting hormone therapy, Mr. Nichols had been prescribed 13 different psychiatric medications since his teenage years. None of those medications were effective in treating his gender dysphoria and resultant anxiety, racing thoughts, and irritability. Testosterone is the only treatment that has managed to control those symptoms.

84.    Before Defendant Trump issued EO 14168, BOP's medical director and system-wide Transgender Utilization Review Advisory Group (TURAG) had approved Mr. Nichols for gender-affirming surgery, a double mastectomy to masculinize his chest. He was awaiting consultation with a surgeon when EO 14168 was issued. The BOP's enforcement of the EO

precludes his surgery.

85.    On February 12, 2025, Mr. Nichols was provided half of his regular dose of testosterone. FCI Tallahassee staff informed him that his next dose would be further reduced and would be his last. Mr. Nichols has not had any recent bloodwork, physical examination, or mental health evaluations that could have informed this decision about his medical treatment. Mr. Nichols is aware of three other transgender men who also received reduced doses of testosterone that day, under similar circumstances.

86.    After receiving a reduced dose of testosterone, Mr. Nichols experienced lethargy and mood swings. On Friday, February 21, 2025, FCI Tallahassee staff changed course, and informed Mr. Nichols and other transgender men that they would again be receiving their full doses.

87.    On February 26, FCI Tallahassee staff told him that the transgender men in the facility would be given the full amount of their prescribed doses, "as long as the restraining order lasts."

88.    Withdrawing Mr. Nichols from hormone therapy, denying him the mastectomy, and rescinding the accommodations he was receiving has already caused and will continue to cause Mr. Nichols severe and irreparable harm.

89.    **Plaintiff Jas Kapule** is a transgender man incarcerated at FCI-Waseca in Waseca, Minnesota. He is 35 years old. He has been incarcerated since 2020 and anticipates being incarcerated until July 5, 2028.

90.    Mr. Kapule knew he was a boy as a child but struggled to understand and accept himself. He began to live and present as a man starting at the age of 18 and began to feel more like himself after doing so.

91.    Mr. Kapule was diagnosed with gender dysphoria by BOP clinicians in 2022. He has been provided hormone therapy and access to accommodations—including a chest binder, boxers, and other gender-affirming commissary items—by BOP to treat his gender dysphoria since

2022. He receives testosterone every two weeks. His hormone therapy has reduced his symptoms of gender dysphoria, and made an enormous improvement to his health and well-being. Being able to wear boxers and a chest binder has also helped to reduce his dysphoria.

92.     Mr. Kapule has been told by BOP staff that once his testosterone prescription runs out, it will not be refilled. He finds this prospect devastating—he is finally in a place where he feels emotionally stable thanks to receiving appropriate care. Mr. Kapule particularly fears the return of his menstrual cycle if he is taken off of testosterone, as that caused him great distress each month before he was able to access care.

93.     On or about February 24, 2025, BOP staff informed Mr. Kapule that he could no longer receive a chest binder through laundry services or purchase binders or boxers at the commissary. He has not worn panties or bras in years and the idea of wearing those feminine-typical items makes him deeply uncomfortable and exacerbates his gender dysphoria.

94.     In 2024, Mr. Kapule was evaluated by a BOP psychologist for gender-affirming chest surgery and the Transgender Executive Council recommended initiating a surgical referral. Following the Executive Order, Mr. Kapule was told by Assistant Warden Davis that his surgery was no longer being evaluated and was on indefinite hold.

95.     Mr. Kapule fears he will soon lose access to all of his care for gender dysphoria. He can feel his depression and anxiety increasing and is worried about the feelings of hopelessness that he used to have before his gender-affirming care started.

## CLAIMS FOR RELIEF
### COUNT 1

**Challenge to EO 14168 as Applied to BOP Medical Care and Accommodations and the Implementing Memoranda**

**Eighth Amendment of the United States Constitution**

**Against All Defendants in Their Official Capacities**

96.     Under the Eighth Amendment, Defendants must provide incarcerated people adequate and necessary health care that meets accepted standards of care and practice within the

medical community. The Eighth Amendment prohibits deliberate indifference by government officials to incarcerated persons' serious medical needs. An official who has knowledge of an incarcerated person's need for medical care that would place the incarcerated person at substantial risk of serious harm if not treated, and who denies, delays, or otherwise interferes with the provision of health care, is deliberately indifferent.

97.    Plaintiffs have been diagnosed with the serious medical condition of gender dysphoria, which causes them serious clinical distress, and which, without medically necessary treatment, will predictably result in serious and irreparable physical and psychological harm to Plaintiffs.

98.    Plaintiffs and putative class members have serious medical needs for hormone therapy and other gender-affirming health care for their gender dysphoria, including accommodations that enable them to dress and otherwise live consistently with their gender identity. The EO's and Implementing Memoranda's blanket termination of this medical treatment and accommodations for all Plaintiffs and putative class members, without regard to their individual medical needs, violates the accepted and applicable community standards of care for the treatment of gender dysphoria, and subjects Plaintiffs and putative class members to substantial risk of serious harm.

99.    Withdrawing Plaintiffs' and putative class members' gender-affirming health care contravenes their health care providers' professional medical judgment, which had been made based on an assessment of patients' individualized medical needs, and in accordance with the accepted and applicable community standards of care. EO 14168 and the Implementing Memoranda establish a blanket prohibition that denies medically necessary treatment to Plaintiffs and putative class members, without consideration of any independent medical judgment formed by health care providers, in violation of the Eighth Amendment's prohibition on cruel and unusual punishments.

100.    By denying Plaintiffs and putative class members medically necessary treatment

21

for their gender dysphoria, Defendants have caused and will continue to cause them harm by withholding effective treatment for an objectively serious medical condition.

101.    Defendants' deliberate actions of denying medically necessary care for Plaintiffs and putative class members has caused or will cause them serious physical and psychological harm, and puts them at grave risk for worsening physical and psychological symptoms.

102.    Defendants have acted, and continue to act, with deliberate indifference to Plaintiffs' serious medical needs, and to the substantial risk of serious harm to Plaintiffs.

103.    As a result of Defendants' actions described herein, in the absence of injunctive relief, Plaintiffs will continue to suffer irreparable harm.

### COUNT 2
**Challenge to EO 14168 as Applied to BOP Medical Care and Accommodations and the Implementing Memoranda**
**Fifth Amendment of the United States Constitution – Equal Protection**
**Against All Defendants in Their Official Capacities**

104.    The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." The Supreme Court has held that the Due Process Clause includes a guarantee against the United States of equal protection of the laws equivalent to that guaranteed against the States by the Equal Protection Clause of the Fourteenth Amendment.

105.    EO 14168, as applied to BOP medical care and accommodations, and the Implementing Memoranda violate the Fifth Amendment's equal protection guarantee.

106.    EO 14168 and the Implementing Memoranda facially classify based on sex and transgender status.

107.    EO 14168 declares that it is federal policy to recognize only two sexes, defining "sex" as "an individual's immutable biological classification as either male or female," determined based on the type of reproductive cell an individual, at the time of conception, is expected to produce. And it mandates that BOP "revise[] its policies concerning medical care to be consistent with this order" and prohibits BOP from expending any federal funds on any "medical procedure,

treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." E.O. 14168 §§ 2(a) & 4(c). It also directs agencies, including BOP, to "remove all . . . policies . . . that promote or otherwise inculcate gender ideology," and to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology," and prohibits the use of federal funds "to promote gender ideology." *Id.* §§ 3(e) & 3(g).

108.    EO 14168 and the Implementing Memoranda operate through facial sex classification, with a person's sex, as defined by the EO, determining whether they may receive certain medical treatments or accommodations.

109.    By targeting for prohibition treatment prescribed "for the purpose of conforming an inmate's appearance to that of the opposite sex," and funding for any policies or accommodations "promot[ing]" the "claim that males can identify as and thus become women and vice versa," the EO and the Implementing Memoranda also facially classify based on sex by enforcing sex stereotypes. *Id.* §§ 2(f), 3(g), 4(c).

110.    Under the Equal Protection Clause, sex classifications are subject to heightened scrutiny and are presumptively unconstitutional.

111.    EO 14168 and the Implementing Memoranda also facially classify based on transgender status. They deny medical treatments and accommodations to individuals because they are transgender.

112.    Discrimination based on transgender status is sex discrimination subject to heightened scrutiny.

113.    Transgender status discrimination is subject to heightened scrutiny for the additional reason that transgender status is a quasi-suspect class warranting heightened scrutiny.

114.    There is no legitimate purpose or basis for the EO's and the Implementing Memoranda's categorical ban on gender-affirming health care for people with gender dysphoria in BOP custody.

115.    Prohibiting gender-affirming medical care and accommodations for individuals in

BOP custody is not substantially related to the EO's stated purpose of protecting women from "men [who] self-identify as women . . . gain[ing] access to intimate single-sex spaces and activities designed for women"; nor is it even rationally related to that purpose. *Id.* § 1. Nor is this prohibition of such care substantially related to any important government interest, or rationally related to any legitimate government interest. Accordingly, EO 14168, as applied to BOP medical care and accommodations, and the Implementing Memoranda violate the right to equal protection guaranteed by the Fifth Amendment.

116.    EO 14168 and the Implementing Memoranda are motivated by discriminatory animus and are unconstitutional under any level of scrutiny.

117.    EO 14168, as applied to BOP medical care and accommodations, and the Implementing Memoranda are causing and will cause irreparable harm to Plaintiffs and the putative class, including serious physical, psychological, and emotional harm, distress, and mental anguish.

**COUNT 3**

**Challenge to EO 14168 as Applied to BOP Medical Care and Accommodations and the Implementing Memoranda**

**Rehabilitation Act of 1973, Section 504**

**Against All Defendants in Their Official Capacities**

118.    Plaintiffs have a current diagnosis of gender dysphoria as well as a record of gender dysphoria that is known to BOP officials.

119.    Gender dysphoria is a serious medical condition that qualifies as a disability.

120.    BOP is an executive agency that falls within the definition of a covered public entity that is responsible for providing benefits, services, and programs to all individuals in its custody.

121.    EO 14168 and the Implementing Memoranda categorically ban medical treatments and accommodations for people in BOP custody if the treatments and accommodations are provided to "conform[] an inmate's appearance to that of the opposite sex." That describes treatment for gender dysphoria. Thus, treatments and accommodations are banned only if they are

24

prescribed to treat gender dysphoria. This disparate treatment of Plaintiffs and putative class members based upon their gender dysphoria diagnosis discriminates against them based upon disability.

122.    EO 14168 and the Implementing Memoranda discriminate based on disability by excluding people with gender dysphoria, including Plaintiffs and putative class members, from accessing certain medical treatments and accommodations that are provided to other people in BOP custody, solely based on their diagnosis.

123.    Accordingly, EO 14168, as applied to BOP medical care and accommodations, and the Implementing Memoranda violate Section 504 of the Rehabilitation Act of 1973. The failure to provide accommodations to Plaintiffs and putative class members based upon their gender dysphoria diagnosis discriminates against them based upon disability.

**COUNT 4**

**Challenge to the Implementing Memoranda**
**Administrative Procedure Act, 5 U.S.C. §§ 500-596 & 706**
**Contrary to Constitutional Right, Power, Privilege or Immunity**
**Against Agency Defendants**

124.    The APA, 5 U.S.C. §§ 500-596 & 706, provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity . . . ." 5 U.S.C. § 706(2)(B).

125.    BOP has taken concrete steps to implement EO 14168 by issuing the Implementing Memoranda.

126.    The Implementing Memoranda constitute final agency action. The Implementing Memoranda represent the consummation of the agency's decision-making process: they were issued by agency leadership and do not contemplate any further consideration by the agency prior to implementation and enforcement. Rather than merely clarifying its existing duties, the Implementing Memoranda determine the rights of Plaintiffs and BOP's obligations to Plaintiffs, both of which, as explained within, have direct and immediate legal consequences for the

25

Plaintiffs.

127.    Pursuant to the Implementing Memoranda, BOP will no longer provide gender-affirming health care for Plaintiffs and the putative class members, even when such care is medically indicated. Regardless of need, treatment and accommodations will be denied because of Defendants' enforcement of the policies outlined in the Implementing Memoranda.

128.    Actions taken by BOP to enforce the mandates of EO 14168 and the Implementing Memoranda are causing and will continue to cause irreparable harm to Plaintiffs and the putative class, including serious physical, psychological, and emotional harm, distress, and mental anguish.

129.    For the reasons described in the preceding claims, and incorporated here, BOP's policies and agency actions taken under EO 14168 are "contrary to constitutional right, power, privilege, or immunity," and therefore must be held unlawful and set aside. 5 U.S.C. § 706(2)(B). In particular, as detailed above, those actions violate the Eighth Amendment and the right to equal protection guaranteed by the Fifth Amendment of the Constitution.

## <u>COUNT 5</u>
**Challenge to the Implementing Memoranda**
**Administrative Procedure Act, 5 U.S.C. §§ 500-596 & 706**
**Arbitrary and Capricious, Unlawful, and Unconstitutional Agency Action**
**Against Agency Defendants**

130.    The APA, 5 U.S.C. §§ 500-596 & 706, provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . ." 5 U.S.C. § 706(2)(A).

131.    BOP has taken concrete steps to implement EO 14168 by issuing the Implementing Memoranda.

132.    The Implementing Memoranda constitute final agency action. The Implementing Memoranda represent the consummation of the agency's decision-making process: they were issued by agency leadership and do not contemplate any further consideration by the agency prior to implementation and enforcement.   Rather than merely clarifying its existing duties, the

26

Implementing Memoranda determine the rights of Plaintiffs and BOP's obligations to Plaintiffs, both of which, as explained within, have direct and immediate legal consequences for the Plaintiffs.

133.    Actions taken by BOP to enforce the mandates of EO 14168 and the Implementing Memoranda are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), for multiple independent reasons.

134.    The challenged agency actions are arbitrary and capricious, and an abuse of discretion because they are unsupported by any reasoned explanation:

    a.    The Agency Defendants have provided no meaningful explanation for its prohibition and denial of access to medically indicated treatment for gender dysphoria, including hormone therapy, surgery, and accommodations, and the withholding of funding for "any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." In fact, the Implementing Memoranda contain BOP's directives without any explanation for the policies beyond compliance with EO 14168, which itself provides no reasoned explanation or support for its mandates.

    b.    The Agency Defendants have failed to explain what alternatives, if any, were considered to address any potential legitimate interests that the policies implementing EO 14168 could serve, nor does EO 14168 do so.

    c.    The Agency Defendants provide no explanation for their denial of access to gender-affirming health care and accommodations to people experiencing gender dysphoria or for treating people with gender dysphoria differently than any other person with a medically recognized diagnosis, nor does EO 14168 do so.

    d.    The Agency Defendants provide no explanation for their withholding of funding for medically indicated treatment of gender dysphoria or for allocating funding for the treatment of gender dysphoria differently than any other medically recognized

diagnosis, nor does EO 14168 do so.

e.   Relatedly, the Agency Defendants have failed to explain why the status quo ante—
which the Bureau of Prisons implemented for years prior to EO 14168—was in any
way flawed, let alone sufficiently flawed to warrant this abrupt and substantial
change, nor does EO 14168 do so.

f.   The Agency Defendants have failed to explain why they are withdrawing from
individuals in BOP custody medical treatment that BOP medical providers have
deemed medically necessary for them.

135.   Further, the challenged agency actions are arbitrary, capricious, and an abuse of
discretion because they are irrational and unreasonable:

a.   BOP's policies implementing EO 14168 as outlined in the Implementing
Memoranda represent a prohibition on medically indicated gender-affirming health
care for incarcerated people in BOP custody, people who rely exclusively on BOP
to provide medical care. Such a prohibition contradicts current scientific and
medical understandings of the required standard of care for individuals with gender
dysphoria.

b.   Section 4(c) of EO 14168, which seeks to prohibit treatment prescribed "for the
purpose of conforming an inmate's appearance to that of the opposite sex," as
enforced by the Implementing Memoranda's proscriptions against access to
medically indicated treatment and social accommodation and the use of "Bureau of
Prisons funds . . . for any medical procedure, treatment, or drug for the purpose of
conforming an inmate's appearance to that of the opposite sex," is not based on
scientific or medical knowledge or evidence. To the contrary, it reverses, without
explanation, BOP's longstanding formal internal health care policies governing the
treatment of gender dysphoria which, in accordance with well-accepted protocols
for treating this condition, provided for gender-affirming medical interventions

28

including hormone therapy and surgeries when indicated for a patient, as well as clothing, grooming, and other accommodations.

136.    Pursuant to EO 14168 as executed by BOP in the Implementing Memoranda, BOP will no longer provide gender-affirming health care for Plaintiffs and putative class members, even when such care is medically indicated. Regardless of need, treatment and accommodations will be denied because of Defendants' enforcement of the blanket ban initiated by BOP's change in policy.

137.    Actions taken by BOP to enforce the mandates of EO 14168 and the Implementing Memoranda are causing and will continue to cause irreparable harm to Plaintiffs and the putative class, including serious physical, psychological, and emotional harm, distress, and mental anguish.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court grant the following relief:

(A)    Issue a judgment under 28 U.S.C. §§ 2201-02 declaring that EO 14168 and the Implementing Memoranda violate Plaintiffs' rights under the Fifth and Eighth Amendments to the United States Constitution, the Rehabilitation Act of 1973, and that the Implementing Memoranda violate the Administrative Procedure Act, for the reasons and on the Counts set forth above;

(B)    Enter preliminary and permanent injunctive and declaratory relief, including but not limited to setting aside both Implementing Memoranda issued by BOP as unlawful; enjoining Defendants, including their contractors, employees, and agents, from enforcing the Implementing Memoranda or EO 14168 as applied to medical care and accommodations for Plaintiffs and putative class members incarcerated in the custody and control of BOP; ordering Defendants, their contractors, employees, and agents, to provide and continue providing Plaintiffs and Class members gender-affirming health care, in accordance with BOP practice immediately prior to EO 14168 being issued by Defendant Trump on January 20, 2025; and declaring unconstitutional Defendants' practices in denying Plaintiffs and Class Members

adequate and necessary medical treatment;

(C)    Provisionally and permanently certify the Class;

(D)    Award Plaintiffs' their costs and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412, 5 U.S.C. § 504, and 42 U.S.C. § 12205, and any other applicable source of law; and

(E)    Grant any other and further relief this Court deems just, proper, and appropriate.

Dated: March 10, 2025

David C. Fathi, Wash. 24893[†]
Maria V. Morris, D.C. 1697904
Elisa C. Epstein, Ill. 6349195[†]
American Civil Liberties Union Foundation
915 15th Street, N.W.
Washington, D.C. 20005
Tel: 202-393-4930
dfathi@aclu.org
mmorris@aclu.org
eepstein@aclu.org

[†]*Not admitted in D.C.; practice limited to federal courts. Pro hac vice application forthcoming.*

Corene T. Kendrick, Cal. 226642**
American Civil Liberties Union Foundation
425 California St., Ste. 700
San Francisco, CA 94104
Tel: 202-393-4930
ckendrick@aclu.org

Li Nowlin-Sohl**
(admitted only in Washington state)
Leslie Cooper*
Shana Knizhnik, DDC Bar ID. 120840
James D. Esseks**
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212-549-2500
lnowlin-sohl@aclu.org
lcooper@aclu.org
sknizhnik@aclu.org
jesseks@aclu.org

Respectfully submitted,

*/s/ Michael Perloff*
Michael Perloff, D.C. Bar No. 1601047
Aditi Shah*
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
mperloff@acludc.org
ashah@acludc.org

*Not admitted in DC; practice limited to matters before federal courts and D.C. agencies.*

Shawn Thomas Meerkamper**
California State Bar No. 296964
shawn@transgenderlawcenter.org
Megan Z. F. Noor**
California Bar No. 359480
megan@transgenderlawcenter.org
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Phone: (510) 587-9696

Lynly S. Egyes**
New York Bar No. 4838025
lynly@transgenderlawcenter.org
Milo Inglehart**
New York Bar No. 5817937
milo@transgenderlawcenter.org
TRANSGENDER LAW CENTER
594 Dean Street, Suite 11
Brooklyn, NY 11238
Phone: (510) 587-9696

** *Pro hac vice application forthcoming.*

*Counsel for plaintiffs and the proposed class*

30