**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALISHEA KINGDOM, et al., | Case No. 1:25-cv-00691-RCL |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

**MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION A PRELIMINARY INJUNCTION, TO STAY
AGENCY ACTION, AND FOR PROVISIONAL CLASS CERTIFICATION**

# Table of Contents

INTRODUCTION ..................................................................................................................3

STATEMENT OF FACTS ....................................................................................................6

    I.    Background on Gender Dysphoria...........................................................................6

    II.    EO 14168 and the Implementing Memoranda Strip Plaintiffs and Proposed Class Members of Medically Necessary Health Care for Gender Dysphoria, Placing Them at Substantial Risk of Serious Harm. ............................9

        A.    BOP's Treatment of Individuals with Gender Dysphoria Prior to the Executive Order. ..................................................................................9

        B.    BOP's Treatment of Individuals with Gender Dysphoria Since the Executive Order and Implementing Memoranda.....................................12

        C.    Consequences of Defendants' Conduct for Plaintiffs.............................15

            1.    Alishea Sophia Kingdom .............................................................15

            2.    Solo Nichols.................................................................................16

            3.    Jas Kapule ...................................................................................18

ARGUMENT .......................................................................................................................19

    I.    Plaintiffs Are Entitled to Preliminary Injunctive Relief and a Stay Under the APA..................................................................................................................20

        A.    Plaintiffs Are Likely to Succeed on the Merits........................................20

            1.    Plaintiffs are Likely to Succeed on Their Eighth Amendment Claims. ......................................................................20

                 a.    Incarcerated People Challenging Conditions of Confinement Under the Eighth Amendment Must Show a Substantial Risk of Serious Harm to Which Government Officials are Deliberately Indifferent...........20

                 b.    The BOP's Blanket Ban on Gender-Affirming Health Care Demonstrates Deliberate Indifference to Plaintiffs' Serious Health Needs and Places Them at Substantial Risk of Serious Harm.......................22

            2.    Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims. ....................................................................................27

        B.    Plaintiffs Will Be Irreparably Harmed Absent an Injunction and/or Stay. ...........................................................................................................30

        C.    The Balance of Hardships and Public Interest Favor Granting an Injunction. .................................................................................................32

    II.    No Bond Should Be Required..................................................................................33

    III.    Provisional Class Certification For Emergency Relief Purposes is Warranted..............................................................................................................34

CONCLUSION....................................................................................................................35

## INTRODUCTION

This Motion seeks to prevent irreparable injury inflicted by the federal government's dangerous denial of necessary health care to transgender people with gender dysphoria who are incarcerated in the custody of the Federal Bureau of Prisons ("BOP"), following President Trump's issuance of Executive Order 14168 (the "Executive Order" or "EO 14168") on January 20, 2025, and the BOP's implementation of EO 14168, which categorically preclude gender-affirming medical care and accommodations for these individuals regardless of their medical need for this care and the impact on their health.

Plaintiffs and the class they seek to represent are in BOP custody and have been diagnosed with gender dysphoria, a serious medical condition characterized by clinically significant distress resulting from the incongruence between a person's gender identity and sex they were designated at birth. Untreated gender dysphoria can cause depression, anxiety, post-traumatic stress disorder, self-harm, and suicidality. Well-accepted evidence-based protocols for the treatment of gender dysphoria include supporting social transition—whereby an individual dresses and otherwise lives consistently with their gender identity—and hormone therapy to bring one's physical features into alignment with their gender identity. Social transition and hormone therapy have been shown to greatly alleviate the distress of gender dysphoria and improve mental health.

Prior to President Trump's issuance of the Executive Order, Plaintiffs received treatment for their gender dysphoria in accordance with BOP's formal internal health care policies, which followed the well-established clinical protocols for treating this condition. Among other things, Plaintiffs received gender-affirming hormone therapy that BOP health care providers deemed medically necessary for them, as well as accommodations such as clothing and other items that enabled them to live and express themselves in a manner consistent with their gender identity. Plaintiffs received such treatment for years and have depended on it for their health, and they are not

alone. As detailed in Plaintiffs' concurrently filed Motion for Class Certification, according to the BOP, there are approximately 2,000 transgender people who are incarcerated in federal prisons.

The Executive Order declares that "[f]ederal funds shall not be used to promote gender ideology," which it defines as "the false claim that males can identify as and thus become women and vice versa," and directs the Attorney General to "ensure that the Bureau of Prisons revises its policies concerning medical care" so that "no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex."[1] On February 21, 2025, BOP issued a memorandum entitled "Compliance with Executive Order 'Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government.'" Dkt. 1-1. In the memo, BOP Chief Executive Officers are directed to cease the purchase of "any items that align with transgender ideology," such as chest binders and hair removal devices; to prohibit granting requests for other accommodations to address gender dysphoria such as "undergarments that do not align with an inmate's biological sex"; and to mandate that all BOP staff members "must refer to individuals" with "pronouns corresponding to their biological sex." *Id.* The second memorandum, entitled "Executive Order 14168 Compliance," was issued by BOP on February 28, 2025. That memo was again addressed to all Chief Executive Officers and stated:

> Consistent with Executive Order (EO) 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, no Bureau of Prisons funds are to be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.

Dkt. 1-2.

Since the issuance of the Executive Order and these two memoranda (the "Implementing Memoranda"), BOP health care staff have withdrawn hormone treatment from, or have stated that

---

[1] Exec. Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615, §§ 2(f), 3(g), 4(c) (Jan. 20, 2025).

it will be imminently discontinued for, Plaintiffs and other putative class members. Plaintiffs have also been told they can no longer access gender-affirming accommodations, such as undergarments that accord with their gender identity, and chest binders.

This Court has recently reviewed EO 14168's application to transgender prisoners and found it likely infirm under the Eighth Amendment, such that preliminary relief as to several individual plaintiffs was warranted. *See Doe v. McHenry*, No. 1:25-CV-286-RCL, 2025 WL 388218, at *6 (D.D.C. Feb. 4, 2025) (temporarily enjoining, among other provisions, Section 4(c) of Executive Order 14168); *Doe v. Bondi*, No. 1:25-CV-286-RCL, 2025 WL 596653, at *2 (D.D.C. Feb. 24, 2025) (extending the injunction to several other named plaintiffs). The same conclusion applies to this case, which raises a similar challenge on behalf of a proposed class of all individuals in BOP custody impacted by the implementation of the Executive Order. Specifically, Defendants' categorical withdrawal and denial of gender-affirming health care—including the hormone treatment at issue in *McHenry* and accommodations to enable them to live consistently with their gender identity (collectively, "gender-affirming health care")—to transgender people with gender dysphoria regardless of their individualized medical need is paradigmatic deliberate indifference to a serious medical need, in violation of the Eighth Amendment. Denying this care to Plaintiffs and the members of the putative class places them at substantial risk of serious, irreparable harm and Defendants should be preliminarily enjoined from withholding it.

Plaintiffs are also entitled to immediate relief on a second, independent ground: The BOP's arbitrary, capricious, and unconstitutional actions implementing the mandates of EO 14168 violate the Administrative Procedure Act ("APA"). This violation of law justifies a preliminary injunction as well. Further, under 5 U.S.C. § 705, the Court can and should stay enforcement of the Implementing Memoranda.

To preserve the status quo as it existed before the Executive Order and issuance of the

Implementing Memoranda, and to prevent the unlawful infliction of irreparable harm, Plaintiffs seek emergency relief to preserve or restore Plaintiffs' access to gender-affirming hormone therapy and accommodations. They further ask the Court to provisionally certify the class, and to preserve or restore the unnamed class-members' access to the same.[2]

## STATEMENT OF FACTS

### I.     Background on Gender Dysphoria

The term "gender identity" is a well-established concept in medicine, referring to "a person's deeply felt, inherent sense of being a girl, woman, or female; a man, or male; a blend of male or female; or an alternative gender." Declaration of Dr. Dan H. Karasic, M.D. ("Karasic Decl.") ¶ 36 (citing American Psychological Association, 2015, at 834).

At birth, infants are typically assigned a sex, either male or female, based on the appearance of external genital characteristics. Sex has many factors though, such as chromosomes, hormones, gonads, and gender identity. These factors are not always in alignment, and gender identity does not always align with sex assigned at birth. *Id*. ¶¶ 32-37. Transgender people, who make up approximately 0.6% of the United States population age 13 or older, have a gender identity that differs from their sex assigned at birth. *Id*. ¶¶ 42-43.

Being transgender is widely accepted as a variation in human development and is not considered a mental illness. However, for many transgender people, the incongruence between gender identity and sex assigned at birth results in gender dysphoria,[3] a serious medical condition characterized by clinically significant distress and/or impairment in social, occupational, or other important areas of functioning. *Id*. ¶ 44-51.

---

[2] Plaintiffs do not seek at this time a preliminary injunction with respect to the Executive Order and Implementing Memoranda's prohibition of gender-affirming surgery.

[3] The diagnosis of Gender Dysphoria is described in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM). The current version, known as the *Fifth Edition, Text Revision* (DSM-5-TR), was released in 2022. *Id*. ¶ 48.

Without treatment, gender dysphoria can cause depression, anxiety, self-harm, and suicidality, and can impair a person's ability to function in all aspects of life, including in school, work, and family and other personal relationships. However, gender dysphoria is amenable to treatment, and the prevailing treatment for it is highly effective. With access to medically indicated care that enables them to live according to their gender identity, transgender people with gender dysphoria can experience significant and sometimes complete relief. *Id*. ¶¶ 50-52.

The well-accepted standards of care for treatment of gender dysphoria are set forth in clinical practice guidelines issued by the World Professional Association for Transgender Health (WPATH) and the Endocrine Society.[4] *Id*. ¶¶ 53-61. The protocols set forth in these guidelines are endorsed by the major professional medical and mental health associations in the United States, including the American Medical Association, the American Psychiatric Association, the American Psychological Association, the American College of Obstetrics and Gynecology, and the American College of Physicians, among others. They are also relied upon by clinicians treating patients with gender dysphoria. *Id*. ¶ 62.

Under the WPATH and Endocrine Society guidelines, the overarching goal of treatment is to eliminate the distress of gender dysphoria by helping the patient live consistently with their gender identity by aligning the individual patient's presentation and body with their gender identity. This includes supporting social transition—where a patient dresses, uses pronouns, and otherwise lives in accordance with one's gender identity. Bringing one's presentation into alignment with their gender identity can help them see themselves and be recognized and treated by others consistently with their gender identity, which can help alleviate gender dysphoria. *Id*.,

---

[4] The current versions of these clinical practice guidelines are: Eli Coleman et al., Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, 23 Int. J. of Transgender Health (2022); Wylie C. Hembree et al., Endocrine Treatment of Gender Dysphoric/Gender Incongruent Persons: An Endocrine Society Clinical Practice Guideline, 102 J. of Clinical Endocrinology & Metabolism 3869 (2017). Karasic Decl., Ex B.

¶¶ 63-65, 72.

While social transition alone can adequately address gender dysphoria for some people, many individuals with gender dysphoria cannot obtain relief without also receiving medical interventions to align the body with their gender identity. In accordance with the WPATH and Endocrine Society guidelines, medical interventions to treat adults with gender dysphoria may include, among other things, hormone therapy—testosterone for transgender men and estrogen and testosterone suppression for transgender women. *Id*. ¶¶ 66-68.

There is a substantial body of research and decades of clinical experience establishing that gender-affirming hormone therapy is effective in treating gender dysphoria. Medical treatment for gender dysphoria has been studied for over half a century, and there is substantial evidence that it improves quality of life and measures of mental health. There is also substantial evidence that the risks of these treatments are low and manageable, and comparable to the type of risks that exist in many other medical treatments. *Id*. ¶¶ 73-78.

For patients for whom gender-affirming medical care is indicated, no alternative treatments have been demonstrated to be effective. As documented by leading medical authorities, efforts to try to change a person's gender identity are not only ineffective, but can cause harm and are considered unethical. *Id*. ¶¶ 39, 70. And psychotherapy alone has not been shown to be an effective treatment. *Id*. ¶¶ 81, 83.

Denying patients with gender dysphoria the ability to socially transition or obtain gender-affirming medical care where indicated predictably will lead to significant deterioration in mental health. It will not only prolong their gender dysphoria, but also cause additional distress and pose other significant health risks, such as depression, anxiety, suicidal ideation, self-harm, and increased substance use. Some individuals try to self-treat by attempting to self-castrate or remove breasts. *Id*. ¶¶ 80-85.

Research and clinical experience specifically show the harms to incarcerated individuals with gender dysphoria who have not been able to receive necessary treatment, including attempts at self-castration and suicidality. *Id*. ¶¶ 84-85.

For individuals with gender dysphoria who have socially and medically transitioned, forcing them to detransition by withdrawing hormone therapy and the ability to socially transition would be expected to cause severe negative decompensation. *Id*. ¶¶ 72, 85.

**II.** **EO 14168 and the Implementing Memoranda Strip Plaintiffs and Proposed Class Members of Medically Necessary Health Care for Gender Dysphoria, Placing Them at Substantial Risk of Serious Harm.**

**A.** **BOP's Treatment of Individuals with Gender Dysphoria Prior to the Executive Order**

It is BOP policy to provide "essential medical, dental, and mental health (psychiatric) services in a manner consistent with accepted community standards for a correctional environment."[5] Prior to the issuance of EO 14168, under BOP's formal internal health care policies, people incarcerated in BOP facilities who were diagnosed with gender dysphoria received gender-affirming health care based on individualized patient need in accordance with well-accepted medical protocols, including the WPATH guidelines. Declaration of Dr. Cathy Thompson ("Thompson Decl."), ¶¶ 20, 26-28 & Exs. B & C. In accordance with these BOP clinical guidance policies concerning the care of transgender people, which were first promulgated in 2016[6] and periodically updated, BOP provided incarcerated people diagnosed with gender dysphoria with gender-affirming health care when clinically indicated for them. *Id*. ¶¶ 27-28, 33,

---

[5] *See* Federal Bureau of Prisons, *Medical Care*, https://www.bop.gov/inmates/custody_and_care/medical_care.jsp.

[6] *See* Fed. Bureau of Prisons, Medical Management of Transgender Inmates (Dec. 2016), https://perma.cc/K7RQ-8NTU.

38; *id.*, Ex. C[7] at 9 ("Gender-affirming health care involves supporting individuals through social, psychological, behavioral, or medical (including hormonal treatment or surgery) treatments—to support and affirm an individual's experienced gender identity."). The most recent update to the protocols aimed to more "closely align with community standards," *id.*, Ex. C at i, and notes that "[p]roper medical practice necessitates that all cases are evaluated on an individual basis and that treatment decisions are patient-specific." *Id.*, title page.

BOP's "Transgender Offender Manual," initially issued in 2017 and updated in March 2018 and January 2022, likewise provided for individualized assessment for hormone therapy and other treatment in accordance with BOP clinical guidance policies and also set forth the clothing and commissary policies applicable to incarcerated transgender people, as well as additional non-health care policies and practices in place related to the supervision of transgender incarcerated people. *Id.* ¶¶ 28-38 & Ex. B.[8]

To implement these policies, BOP had a Transgender Clinical Care Team comprised of physicians, pharmacists, and social workers. *Id.* ¶ 33, Ex. B at 1. It also had a Transgender Executive Council, which was the "decisionmaking body on all issues affecting the transgender population." *Id.,* Ex. B at 4. Membership on this body included both senior correctional leaders from the BOP's Women and Special Populations Branch as well as the senior psychologist, psychiatrist, security expert, and medical administrator in the agency. *Id.* ¶ 31.

These protocols for the care of transgender incarcerated people remained in force until the Executive Order was issued. *Id.* ¶ 39.

---

[7] The most recent BOP clinical guidance policy was issued in 2023.  Shortly after EO 14168, the 2023 policy was removed from the BOP website; however, it is archived on a perma-CC website at https://perma.cc/U5UT-S9PN. *Id.* ¶ 33.

[8] Shortly after the issuance of EO 14168, the 2022 Transgender Offender Manual was removed from the BOP website; however, it is archived on a perma-CC website at https://perma.cc/4BP6-YWRP. *Id.* ¶ 28 n. 14.

According to Dr. Cathy Thompson, who was the Acting National Psychology Services Administrator of the BOP prior to her retirement in late 2023 and served as the most senior agency psychologist on the Transgender Executive Council, the BOP's policies were "consistent with the law and medical standards," and "served not only as a guide for BOP, but for other systems because [they were] effective." *Id.* ¶ 43. She explained:

> Gender affirming care was consistently available when indicated, and transgender people were afforded greater opportunities for engagement and positive programming that reduced psychological distress, reduced sexual victimization, increased personal and institutional safety, and improved reentry outcomes. Agency policies direct consistent practice across all components and are reinforced by positive outcomes, and the [Transgender Offender Manual] was no different.

*Id.*, at ¶ 38.

Dr. Thompson noted that before BOP implemented these policies, "transgender individuals in BOP custody were more likely to require services to manage mental health crises than incarcerated individuals who are not transgender. In cases of severe gender dysphoria, risks included attempts at self-surgery and suicide." *Id.*, at ¶ 27. These all create safety concerns "not only for people who are transgender, but for everyone who works or is incarcerated in the entire system." *Id.* at ¶ 44.   Thus, Dr. Thompson concluded:

> BOP's former approach of providing gender affirming health care when indicated, as well as accommodations that support social transition under the [Transgender Offender Manual], was effective in maintaining transgender individuals' health and promoting institutional safety. Providing this care improves the agency goals of security and rehabilitation. Prohibiting such care undermines these goals.

*Id.* ¶ 45.

According to the government, there were 1,488 transgender women and 710 transgender men in BOP custody as of February 20, 2025. *See McHenry*, 1:25-cv-00286, Dkt. 52-1 at ¶ 5. With the policies and committees discussed above in place, transgender people with gender dysphoria

in BOP custody received gender-affirming health care when clinically indicated, including hormone therapy and access to clothing and commissary items that accorded with their gender identity. Thompson Decl., ¶ 28-38; Declaration of Alishea Sophia Kingdom ("Kingdom Decl.") ¶¶ 8-11; Declaration of Solo Nichols ("Nichols Decl.") ¶¶ 6-9; Declaration of Jas Kapule ("Kapule Decl.") ¶¶ 5-8.

### B.   BOP's Treatment of Individuals with Gender Dysphoria Since the Executive Order and Implementing Memoranda

Hours after his inauguration on January 20, 2025, President Trump issued EO 14168, entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." The Executive Order is aimed at what it calls "gender ideology", which it defines as "the false claim that males can identify as and thus become women and vice versa." EO 14168 § 2(f).  It mandates that "[f]ederal funds shall not be used to promote gender ideology." *Id.* § 3(g); *see also* § 3(e) (directing all agencies to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology," and to "cease issuing such statements, policies, regulations, forms, communications or other messages."). Most relevant here, § 4(c) of the Executive Order directs the Attorney General to "ensure that the Bureau of Prisons revises its policies concerning medical care" so that "no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex."[9]

---

[9] The Executive Order was only one of several actions by the Trump administration targeting transgender people. On the same day President Trump issued the Executive Order, he rescinded several Biden Administration orders recognizing the rights of transgender people in schools, the workplace, housing, healthcare, and other settings. These Biden Administration orders were consistent with the Supreme Court's decision in *Bostock v. Clayton County*, which held that Title VII of the Civil Rights Act of 1964 prohibits discrimination based on sexual orientation.[9]*See Bostock*, 590 U.S. 644 (2020). Over the following two weeks, President Trump issued additional executive orders targeting transgender people. *See* Exec. Order No. 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025) (banning transgender people from

On February 21, 2025, Defendants BOP Reentry Services Division Acting Assistant Director Dana R. DiGiacomo and Correctional Programs Division Assistant Director Shane Salem issued a memorandum implementing EO 14168 with the exception of the application to medical treatments, citing a nationwide temporary restraining order issued by this Court that had been in effect. Dkt. 1-1. Among other directives issued in the February 21 implementing memorandum, BOP expressly prohibits the purchase of "any items that align with transgender ideology," such as chest binders and hair removal devices; prohibits the granting of requests for other accommodations such as "undergarments that do not align with an inmate's biological sex"; and mandates that BOP staff members "must refer to individuals" with "pronouns that correspond to their biological sex." *Id*.

After the issuance of the Executive Order, the 2023 BOP Clinical Guidance and the Transgender Offender Manual were removed from the BOP website. These pages were replaced with a link that redirects to a page stating that "This content is temporarily unavailable as we implement the Executive Order on 'Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government.'"[10]

On February 28, 2025, BOP Health Services Division Assistant Director Chris A. Bina

---

serving in the U.S. military, accusing transgender servicemembers of expressing a "false" gender identity, and stating that being transgender "conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life"); Exec. Order 14187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025) (ordering the federal government to withhold all federal funding from any institution that provides gender-affirming care to people under the age of 19); Exec. Order No. 14190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025) (banning K-12 schools in the U.S. from recognizing youth's identities by using names or pronouns that align with their gender and threatening teachers who do not comply with criminal prosecution under laws banning sexual exploitation of minors and practicing medicine without a license); Exec. Order No. 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025) (seeking to ban transgender women from competing in women's athletic events, and characterizing transgender women's participation in sports as "demeaning, unfair, and dangerous").

[10] *See* https://www.bop.gov/policy/policy_forms_unavailable.jsp.

issued another implementing memorandum, which states in full:

> Consistent with Executive Order (EO) 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, no Bureau of Prisons funds are to be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.
>
> This policy is to be implemented in a manner consistent with applicable law including the Eighth Amendment.

Dkt. 1-2.

EO 14168 and the Implementing Memoranda ban transgender people incarcerated in BOP facilities from accessing gender-affirming health care, regardless of medical necessity. By banning gender-affirming health care, the BOP prohibits its health care providers from evaluating and treating gender dysphoria on a patient-centered individualized basis, according to their professional judgment. And it mandates withdrawal of care from individuals for whom BOP medical staff deemed such treatment to be clinically indicated.

Since the Executive Order and the Implementing Memoranda, Plaintiffs and others in BOP custody have been deprived of medically necessary health care for gender dysphoria. *See* Kingdom Decl. ¶¶ 12-22; Nichols Decl. ¶¶ 11-20; Kapule Decl. ¶¶ 9-15.

Dr. Dan Karasic, a psychiatrist, opined, based on the scientific research and his more than 30 years of clinical experience treating thousands of transgender patients, that "[d]enying patients with gender dysphoria the ability to socially transition or obtain gender-affirming medical care where indicated predictably will lead to significant deterioration in mental health," including depression, anxiety, self-harm—including self-castration, and suicidality.  Karasic Decl. ¶ 82.

And in the expert opinion of Dr. Thompson, the categorical ban on gender-affirming health care set forth in EO 14168 and the Implementing Memoranda is not only inconsistent with medical standards, it can "cause significant harm and danger." *Id.* ¶ 44. As she explained, based on her

years of experience at BOP:

> [D]enying hormone therapy and access to other accommodations and treatments for gender dysphoria will bring about the return of the dysphoric symptoms, potentially causing attempts to self-castrate, self-harm, suicide, and aggression. All of these create safety concerns not only for people who are transgender, but for everyone who works or is incarcerated in the entire system. And with BOP's staffing crisis, there simply are not enough clinicians to manage the increased suicide watches and crisis, which could be deadly.
>
> [...]
>
> BOP has the responsibility of managing and treating everyone in its custody, which means individuals with all sorts of health issues and conditions, including people who have gender dysphoria. . . .
>
> Prisons that support individual needs are safer and have fewer crises. I have grave concerns about the well-being of transgender individuals in BOP custody and the continued safe operations within BOP, should its ban on providing individualized care to transgender persons continue.

*Id.* ¶¶ 44, 46-47.

### C.    Consequences of Defendants' Conduct for Plaintiffs

#### 1.    Alishea Sophia Kingdom

Plaintiff Alishea Sophia Kingdom is a 34-year-old transgender woman presently incarcerated at Federal Correctional Institution, Fairton ("FCI Fairton") in New Jersey. Kingdom Decl. ¶ 1. As early as age 7, Ms. Kingdom knew she was a girl. *Id.* ¶ 2. She preferred "girls'" toys, and when she first learned that her body was not the same as other girls, she felt sad and upset because she knew she was a girl, too. *Id.* ¶ 2. Her mother believed Ms. Kingdom was either gay or too feminine, would tell her to act like a boy, and sent her to group homes and mental health facilities starting around the age of 10 in hopes that Ms. Kingdom would become more masculine. *Id.* ¶ 3.

As she went through puberty, Ms. Kingdom began experiencing symptoms of gender dysphoria: she felt severe anxiety, would have panic attacks when she noticed facial hair, would feel

physically sick when thinking about her body masculinizing, and was often unable to sleep at night. As a teenager, Ms. Kingdom came out as a transgender woman and wore long hair, makeup, and typically feminine clothes whenever possible. *Id*. ¶¶ 4-5.

Ms. Kingdom has been in BOP custody since she was 23 years old. *Id*. ¶ 7. She was diagnosed with gender dysphoria by BOP clinicians in 2016. That same year, BOP clinicians prescribed her hormone therapy, and she was approved to get gender-affirming commissary items like women's undergarments and cosmetics. *Id*. ¶¶ 8-9. Hormone therapy and access to feminine-typical clothing and commissary items reduced her symptoms of gender dysphoria and greatly improved her health and well-being. *Id*. ¶ 10.

On January 26, 2025, Ms. Kingdom had an appointment to receive her hormone therapy, but FCI Fairton staff told her that, because of EO 14168, they would no longer provide hormone therapy to treat gender dysphoria for transgender people at FCI Fairton. Ms. Kingdom has not been provided this prescribed treatment for her gender dysphoria since then. *Id*. ¶¶ 12, 16, 19-21. FCI Fairton has also removed all gender-affirming commissary items that transgender women previously had access to. *Id*. ¶ 13. Losing the effects of hormone therapy will cause Ms. Kingdom severe and irreparable harm. Indeed, in the past several weeks alone, Ms. Kingdom has experienced anxiety and panic attacks, insomnia, mood swings, and thoughts of self-harm and suicide as her body reacts to the change in hormone levels and her gender dysphoria worsens. *Id*. ¶¶ 21-22.

## 2.   Solo Nichols

Plaintiff Solo Nichols is a 40-year-old transgender man currently incarcerated at Federal Correctional Institution, Tallahassee ("FCI Tallahassee") in Florida. Nichols Decl. ¶ 1.  He has been incarcerated by BOP since 2013 and anticipates being incarcerated until August 8, 2029. *Id*. ¶ 5. From a young age, Mr. Nichols has known himself to be male and would ask others to refer to him as a boy. He was in fifth grade when he first explained to a friend that he was a boy. Mr.

Nichols socially transitioned and started wearing a chest binder and exclusively masculine-typical clothing around age 15. *Id*. ¶¶ 2-4.

Since 2018, BOP has recognized him as transgender, and allowed him access to chest binders, boxers, and other gender-affirming commissary items. *Id.* ¶ 6. In 2021, BOP clinicians diagnosed Mr. Nichols with gender dysphoria and prescribed him hormone therapy, which he has been receiving ever since. *Id.* ¶ 7. Mr. Nichols' hormone therapy and accommodations have reduced his symptoms of gender dysphoria and greatly improved his health and well-being. Before starting hormone therapy, Mr. Nichols had been prescribed 13 different psychiatric medications since his teenage years. None of those medications were effective in treating his gender dysphoria and resultant anxiety, racing thoughts, and irritability. Testosterone is the only treatment that has managed to control those symptoms. *Id.* ¶ 8.

On February 12, 2025, Mr. Nichols was provided half of his regular dose of testosterone. FCI Tallahassee staff informed him that his next dose would be further reduced and would be his last. Mr. Nichols has not had any recent bloodwork, physical examination, or mental health evaluations that could have informed this decision about his medical treatment. Mr. Nichols is aware of three other transgender men who also received reduced doses of testosterone that day, under similar circumstances. *Id*. ¶¶ 13-15.

After receiving a reduced dose of testosterone, Mr. Nichols experienced fatigue and mood swings. *Id*. ¶ 16. On Friday, February 21, 2025, FCI Tallahassee staff changed course, and informed Mr. Nichols and other transgender men that they would again be receiving their full doses. On February 26, FCI Tallahassee staff told him that the transgender men in the facility would be given the full amount of their prescribed doses, but only as long as "the restraining order is up." *Id*. ¶ 17. The same week, FCI Tallahassee staff told Mr. Nichols they would no longer provide, and he would no longer be able to purchase, boxers or chest binders. *Id*. ¶ 19. Mr. Nichols

is very scared to live without hormone therapy and feels extremely anxious about the physical and mental health effects he will experience. *Id.* ¶ 18.

3.    Jas Kapule

Plaintiff Jas Kapule is a 35-year-old transgender man currently incarcerated at the Federal Correctional Institution, Waseca ("FCI Waseca") in Minnesota. Kapule Decl., ¶ 1. He has been incarcerated since 2020 and anticipates being incarcerated until July 5, 2028. *Id.* ¶ 4. Mr. Kapule knew he was a boy as a child. He struggled with dysphoria, experiencing depression. He began to live and present as a man starting at the age of 18. *Id.* ¶¶ 2-3. He still struggled with dysphoria, and if he had known about using hormones to treat gender dysphoria, he would have started then. *Id.* ¶ 3.

Mr. Kapule was diagnosed with gender dysphoria by BOP clinicians in 2022 and began receiving hormone therapy, which he has been receiving since then. *Id.* ¶ 5. Since around the same time, he has also been able to access commissary items that match his gender identity, such as chest binders and men's underwear. *Id.* ¶ 7. Mr. Kapule's access to hormone therapy has reduced his gender dysphoria and made an enormous improvement in his health and well-being, lifting his lifelong depression. Likewise, being able to wear boxers and a chest binder has also helped to ameliorate the symptoms arising from Mr. Kapule's dysphoria. *Id.* ¶¶ 6-7.

After the Executive Order was issued, Mr. Kapule was told by BOP staff that once his testosterone prescription runs out, it will not be refilled. *Id.* ¶ 9. On or about February 24, 2025, BOP staff also informed Mr. Kapule that he could no longer receive a chest binder through laundry services or purchase binders or boxers at the commissary. *Id.* ¶ 12. The prospect of losing the medication that allows him to live as his true self and being forced to detransition has put him in a very bad place mentally. Mr. Kapule particularly fears the return of his menstrual cycle if he is

taken off of testosterone, as that caused him great distress each month before he was able to access care. *Id.* ¶ 13.

## ARGUMENT

Fed. R. Civ. P. 65 authorizes courts to issue a preliminary injunction to preserve the status quo pending resolution of the underlying litigation. Fed. R. Civ. P. 65; *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969). Similarly, the APA authorizes courts to "postpone the effective date of an agency action or to preserve status or rights pending conclusion" of APA proceedings, "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. "Motions to stay agency action pursuant to these provisions are reviewed under the same standards used to evaluate requests for interim injunctive relief." *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010) (citing *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C.Cir. 1985)). To obtain a preliminary injunction, plaintiffs must establish that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2009). Courts employ a "sliding-scale" approach to weighing these factors, which "allow[s] that a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011); *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016). The balance of equities and public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs have established all of these factors and are therefore entitled to preliminary injunctive relief under Fed. R. Civ. P. 65 as well as a stay of enforcement of the Implementing Memoranda under 5 U.S.C. § 705.

I.    **Plaintiffs Are Entitled to Preliminary Injunctive Relief and a Stay Under the APA.**

    A.    **Plaintiffs Are Likely to Succeed on the Merits.**

        1.    Plaintiffs are Likely to Succeed on Their Eighth Amendment Claims.

"Underlying the Eighth Amendment is the fundamental premise that [incarcerated people] are not to be treated as less than human beings." *Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir. 1979). Thirty years later, the Supreme Court reaffirmed this principle:

> As a consequence of their actions, prisoners may be deprived of rights that are fundamental to liberty. Yet the law and the Constitution demand recognition of certain other rights. Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.

*Brown v. Plata*, 563 U.S. 493, 510 (2011) (citations and internal quotation omitted).

Defendants violate Plaintiffs' Eighth Amendment rights by imposing a blanket ban on any gender-affirming health care, without regard to individualized need for such care. The Executive Order, as implemented by BOP, places Plaintiffs at substantial risk of serious harm, and Defendants are deliberately indifferent to that risk of harm. Accordingly, Plaintiffs are likely to succeed on the merits of this claim.

        a.    *Incarcerated People Challenging Conditions of Confinement Under the Eighth Amendment Must Show a Substantial Risk of Serious Harm to Which Government Officials are Deliberately Indifferent.*

When challenging conditions of confinement under the Eighth Amendment, incarcerated people must satisfy a two-part test. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The first, "objective" prong requires showing that a person "is incarcerated under conditions posing a substantial risk of serious harm." *Id*. The second, "subjective" prong requires showing a government official "ha[s] a sufficiently culpable state of mind . . . of deliberate indifference to inmate health or safety." *Id*.

Under the objective prong, incarcerated people must provide evidence of harms that deprive them of the "minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. These necessities include "food, clothing, shelter, medical care and reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 32 (1993).[11]

Under the subjective prong of *Farmer*, deliberate indifference "l[ies] somewhere between the poles of negligence . . . and purpose or knowledge . . . " *Farmer*, 511 U.S. at 836. Put another way, deliberate indifference "is the equivalent of recklessly disregarding" a "substantial risk of serious harm." *Id*. Though the "Eighth Amendment requires consciousness of a risk," *id.* at 840, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official failed to act despite his knowledge of a substantial risk of serious harm," *id.* at 842, and "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that it was obvious." *Id*. Circumstantial evidence may be sufficient to establish deliberate indifference even without direct evidence of what prison officials knew or thought. *Id.* at 842-43.

In an injunctive case, such as this one, prison officials' knowledge of the risk is not at issue, as the litigation itself puts them on notice. *See Hadix v. Johnson*, 367 F.3d 513, 526 (6th Cir. 2004) ("If [prison] conditions are found to be objectively unconstitutional, then that finding would also satisfy the subjective prong because the same information that would lead to the court's conclusion was available to the prison officials"). Moreover, in an injunctive case, unlike a damages action, plaintiffs do not seek to impose individual liability on the defendants, but rather sue them in their

---

[11] In assessing whether a risk of harm violates "contemporary standards of decency," courts rely on federal and state practices, as well as scientific studies. *See Hall v. Florida*, 572 U.S. 701, 709-10 (2014) (holding that it was "proper to consider the psychiatric and professional studies" to resolve an Eighth Amendment claim); *Graham v. Florida*, 560 U.S. 48, 62 (2010) (looking to federal and state practices to resolve Eighth Amendment claim); *Spain*, 600 F.2d at 200 ("[W]hen confronting the question whether penal confinement in all its dimensions is consistent with the constitutional rule, the court's judgment must be informed by current and enlightened scientific opinion as to insure good physical and mental health for prisoners.").

official capacity and seek a court order to remedy the problem. *See Hutto v. Finney*, 437 U.S. 678, 699 (1978) (holding that an injunctive suit is, for practical purposes, a suit against the state); *Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985) (same). Thus, the focus on deliberate indifference is "broader and more generalized" than in damages cases, with an emphasis on the "combined acts or omissions" of government officials. *See Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). Liability can be premised on "'repeated examples of negligent acts which disclose a pattern of conduct . . . ' or by showing 'systemic or gross deficiencies in . . . procedures.'" *French v. Owens*, 777 F.2d 1250, 1254 (7th Cir. 1985) (*quoting Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980), *cert denied* 450 U.S. 1041 (1981)).

Finally, "[t]hat the Eighth Amendment protects against future harm to inmates is not a novel proposition." *Helling*, 509 U.S. at 33. In an injunctive case, plaintiffs need not show actual physical harm; rather, the Constitution is violated by an unreasonable *risk* of harm. *Id*. at 33, 34 (holding that it "would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them"); *see also Brown*, 563 U.S. at 531-32 ("Even prisoners with no present physical or mental illness may become afflicted, and all prisoners [] are at risk so long as the State continues to provide inadequate care. . . .").

        b.    *The BOP's Blanket Ban on Gender-Affirming Health Care Demonstrates Deliberate Indifference to Plaintiffs' Serious Health Needs and Places Them at Substantial Risk of Serious Harm.*

The Eighth Amendment's prohibition on "cruel and unusual punishments" extends to the failure to provide incarcerated people with minimally adequate health care. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *see also Brown,* 563 U.S. at 510-11 ("Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners

of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society").

Under the *Farmer* and *Estelle* analysis, the objective prong of the deliberate indifference analysis is met when an incarcerated person shows that they have "a known, serious medical condition." *Bernier v. Allen*, 38 F.4th 1145, 1151 (D.C. Cir. 2022). The subjective component requires that government officials had "knowledge of the serious medical need and recklessly disregarded the excessive risk to inmate health or safety from that risk." *Id.* (quoting *Anderson v. Dist. of Columbia,* 810 F. Appx. 4, 6 (D.C. Cir. 2020); *Baker v. Dist. of Columbia,* 326 F.3d 1302, 1306 (D.C. Cir. 2003)).

Plaintiffs meet the objective component. This Court and many others have recognized gender dysphoria as a serious medical condition. *See, e.g., Farmer v. Hawk*, 991 F.Supp. 19, 25 (D.D.C. 1998), *rev'd in part on other grounds sub nom. Farmer v. Moritsugu*, 163 F.3d 610 (D.C. Cir. 1998) (citing *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995); *Phillips v. Mich. Dep't of Corrs.*, 731 F. Supp. 792 (W.D. Mich. 1990), *aff'd*, 932 F.2d 969 (6th Cir. 1991); *White v. Farrier*, 849 F.2d 322 (8th Cir. 1988); *Meriwether v. Faulkner*, 821 F.2d 408 (7th Cir. 1987); and *Supre v. Ricketts*, 792 F.2d 958 (10th Cir. 1986)); *Edmo v. Corizon, Inc.*, 935 F.3d 769, 785 (9th Cir. 2019); *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2013); *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000). The Executive Order's categorical ban on federally funded gender-affirming health care precludes all treatment for this serious condition, including Plaintiffs' prescribed hormone therapy and other care, as Plaintiffs and class members are wholly dependent upon Defendants for the provision of their health care.

Plaintiffs' challenge to the blanket ban on gender-affirming health care for individuals with gender dysphoria also satisfies the subjective prong. Defendants plainly knew the necessity of providing gender-affirming care to people with gender dysphoria for whom it is clinically

indicated: Prior to the Executive Order, BOP policy required it and BOP doctors ordered it. Indeed, this was the case throughout Defendant Trump's first administration.

But even if Defendants lacked subjective awareness of the risk, this case is one where the consequences of Defendants' action are obvious. "[R]efusal to provide timely, available, and appropriate treatment for a known, serious medical condition posing excessive risk to an inmate's health or safety [constitutes] deliberate indifference in violation of the Eighth Amendment." *Bernier*, 38 F.4th at 1151. One cornerstone of minimally adequate prison health care is that incarcerated people receive necessary and appropriate medications, and courts repeatedly have held that prison systems' failure to provide needed medication constitutes deliberate indifference to serious health care needs. *See, e.g.*, *Board v. Farnham*, 394 F.3d 469, 484 (7th Cir. 2005) (asthma inhaler); *Sullivan v. Cnty. of Pierce*, No. 98-35399, 2000 WL 432368, at *1-2 (9th Cir. Apr. 21, 2000) (reversing and remanding for reconsideration of deliberate indifference where a jail detainee did not receive his HIV medication for at least two days); *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999) (officials' failure to provide prisoner with already prescribed pain medication for the pain of cancer and cancer treatment "borders on the barbarous"); *Steele v. Shah*, 87 F.3d 1266, 1269-70 (11th Cir. 1996) (deliberate indifference can be found in abrupt and unsupported discontinuation of medications); *Thomas v. Kippermann,* 846 F.2d 1009, 1010-11 (5th Cir. 1988) (noting that the plaintiff's claim was viable "if he told jail authorities that he needed his prescribed medication . . . and if they did not have him examined or otherwise adequately respond to his requests").

A blanket ban on gender-affirming health care—including hormone therapy and accommodations for social transition such as alternative undergarments and commissary items—regardless of individual medical need constitutes deliberate indifference. Indeed, over the past few weeks, this Court has held, and twice reaffirmed, that the Executive Order's categorical ban on

gender-affirming health care likely violated the Eighth Amendment. *See McHenry*, 1:25-cv-00286, Dkt. 23 (issuing temporary restraining order, enjoining this component of the Executive Order), Dkt. 44 (preliminary enjoining the same provision), Dkt. 55 (extending the preliminary injunction to cover additional plaintiffs).

Accordingly, like this Court in *McHenry*, courts around the country have held that blanket bans on gender-affirming health care—including both hormone treatment and accommodations— violate the Eighth Amendment. The Eleventh Circuit recently held in the context of blanket bans on gender-affirming health care for incarcerated people that "responding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate is the very definition of 'deliberate indifference.'" *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266-67 (11th Cir. 2020). Similarly, in *Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011), the Seventh Circuit held that a state law that barred hormone therapy and sex reassignment surgery as possible treatments for incarcerated people with gender dysphoria facially violated the Eighth Amendment. And in *De'Lonta*, 330 F.3d at 630, the Fourth Circuit held that an incarcerated person with gender dysphoria stated a claim for deliberate indifference where the prison system withheld hormone therapy under a blanket policy prohibiting such treatment and not based on the medical judgment of qualified providers. *See also Meriwether*, 821 F.2d at 410, 413 (reversing district court's dismissal of case claiming the Michigan Department of Corrections had a blanket ban on any gender-affirming care, as the plaintiff had stated a claim that this blanket denial of treatment violated the Eighth Amendment); *Hicklin v. Precynthe*, No. 16-CV-01357, 2018 WL 806764, at *13 (E.D. Mo. Feb. 9, 2018) (granting preliminary injunction after concluding plaintiff is "likely to succeed on the merits as to her Eighth Amendment claim that Defendants were deliberately indifferent by failing to provide her with hormone therapy, 'gender-affirming' canteen items, and

permanent hair removal to treat her serious medical of gender dysphoria"); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 248-50 (D. Mass. 2012) (recognizing that women's undergarments and canteen items can be medically necessary to address gender dysphoria of incarcerated transgender woman); *Barrett v. Coplain*, 292 F. Supp. 2d 281, 286 (D.N.H. 2003) ("A blanket policy that prohibits a prison's medical staff from making a medical determination of an individual inmate's medical needs [for treatment related to gender identity disorder] and prescribing and providing adequate care to treat those needs violates the Eighth Amendment."); *see generally Colwell v. Bannister*, 763 F.3d 1060, 1063 (9th Cir. 2014) ("the blanket, categorical denial of medically indicated [treatment] solely on the basis of an administrative policy ... is the paradigm of deliberate indifference").

To provide constitutionally adequate health care, prisons must provide treatment that meets "[a]ccepted standards of care and practice within the medical community." *Edmo,* 935 F.3d 757, 786; *Howell v. Evans*, 922 F.2d 712, 719 (11th Cir. 1991) ("[T]he contemporary standards and opinions of the medical profession also are highly relevant in determining what constitutes deliberate indifference to medical care."); *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) (holding that the incarcerated plaintiff could "prove his case by establishing that [his] course of treatment, or lack thereof, so deviated from professional standards that it amounted to deliberate indifference"). As detailed above at Sections I, II(A) and II(C) of the Statement of Facts, and in the Declaration of Dr. Thompson, the gender-affirming health care that BOP provided to transgender incarcerated people prior to the issuance of the Executive Order comported with community and contemporary standards of treatment for gender dysphoria. As this Court previously concluded, and several others have held, to deny such care is unconstitutional. Plaintiffs have therefore shown that they are likely to succeed on the merits of their Eighth Amendment claim, and an injunction is warranted.

2.      Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims.

A president's Executive Order is not subject to the APA, but an agency's actions implementing such an order are. *See O.A. v. Trump*, 404 F. Supp. 3d 109, 147 (D.D.C. 2019) ("The Court, moreover, need not pause over the fact that presidential actions are not themselves subject to APA review . . . . The fact that the Rule defines those who are ineligible for asylum by reference 'to a presidential proclamation or other presidential order' . . . does not insulate the Rule from APA review. . . ."); *Hawaii v. Trump*, 878 F.3d 662, 680–81 (9th Cir. 2017) (explaining that once an agency has "consummated" its implementation of a presidential directive such that "legal consequences will flow," the agency's action is final and reviewable under the APA), *rev'd on other grounds*, 585 U.S. 667 (2018).

The APA entitles "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . to judicial review thereof." 5 U.S.C. § 702. To be reviewable, the agency action must be "final," meaning it "must mark the consummation of the agency's decision-making process . . . . [and] must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citations omitted). The APA requires a reviewing court to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706.

The Implementing Memoranda constitute final agency action. The memoranda are the consummation of BOP's decision-making process for implementing the mandates of EO 14168. Both of the memoranda were issued by high-ranking members of BOP leadership and were addressed directly to all BOP Chief Executive Officers. By their express terms, the Implementing Memoranda dictate specific changes in BOP policy that directly impact the rights of transgender

people in BOP custody to access gender-affirming health care. Specifically, the February 28 memorandum cuts off all BOP funding "for any medical procedure, treatment, or drug" related to gender-affirming health care without consideration of medical necessity. Dkt. 1-2. Similarly, the February 21 memorandum expressly prohibits the procurement or provision of gender-affirming accommodations, such as access to undergarments, chest binders, or other items that were previously available to people with gender dysphoria in BOP facilities. Dkt. 1-1. These policy changes do not contemplate any further consideration by the agency prior to implementation and enforcement. As such, the Implementing Memoranda meet the *Bennett* test for final agency action. *See Bennett*, 520 U.S. at 177–78.

The Implementing Memoranda violate the APA on multiple independent grounds. First and foremost, the APA requires courts to set aside unconstitutional agency action, and here, BOP's implementation of the Executive Order violates the Eighth Amendment for the reasons discussed above. Specifically, the Memoranda categorically ban federal funding for gender-affirming health care, thereby denying treatment for a serious medical condition to those for whom such treatment is medically indicated. The APA requires the Court to set aside such unconstitutional agency action.

The Implementing Memoranda should also be set aside because the actions are arbitrary and capricious. For one thing, neither the Implementing Memoranda, nor the Executive Order they purport to implement, provide a reasoned explanation for denying gender-affirming health care to transgender people experiencing gender dysphoria in BOP custody regardless of their medical need for such care. "The APA 'requires agencies to engage in reasoned decisionmaking.'" *Nw. Immigrant Rts. Project v. United States Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 70 (D.D.C. 2020) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905, 207 L. Ed. 2d 353 (2020)). BOP fails to provide any bases for its actions beyond

reference to EO 14168 in either of the Implementing Memoranda. That leaves EO 14168 to supply the Court with justification for the BOP's actions, yet it also provides no reasoned explanation for its blanket prohibition and denial of access to the proscribed treatments. Instead, the Executive Order is directed at opposing "gender ideology," which it defines as "the false claim that males can identify as and thus become women and vice versa," and prohibits the recognition of transgender people's gender identity in a wide range of contexts.[12] Section 4(c) of EO 14168, which requires the Attorney General to ensure that "no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex," is just another provision that opposes "gender ideology" and the Executive Order offers no medical evidence or reasoning to support the discontinuation of gender-affirming health care. BOP's implementation of the Executive Order is therefore demonstrably arbitrary and capricious because they have advanced no "rational connection between the facts found and the choice made." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 2025 WL 485324, at *5 (D.D.C. Feb. 13, 2025).

Additionally, "[a]gency action is arbitrary and capricious if the agency offers insufficient reasons for treating similar situations differently." *Love v. Bureau of Prisons*, No. 24-CV-2571 (APM), 2025 WL 105845, at *12 (D.D.C. Jan. 15, 2025) (internal quotation marks omitted) (citing *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 216 (D.C. Cir. 2013)). Again, neither the Implementing Memoranda nor EO 14168 provide any explanation—let alone a reasoned one—for treating people with gender dysphoria or allocating funding for the treatment of gender dysphoria

---

[12] For example, the Executive Order mandates changes to policies concerning government-issued identification, including passports, to require that they "reflect the holder's sex, as defined [by the Executive Order," as "an individual's immutable biological classification" determined at conception, EO 14168 §§ 2, 3(d), and rescinds policy allowing transgender people to access shelters that accord with their gender identity. § 2(b).

differently than any other person with a medically recognized serious condition requiring specific treatments and accommodations.

Compounding this lack of basic reasoning is BOP's abject failure to address its complete reversal from its prior policy of providing gender-affirming health care consistent with current medical understandings of the standard of care for the treatment of gender dysphoria. When changing prior policy, an agency must "supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970); *Nw. Immigrant Rts. Project.*, 496 F. Supp. 3d at 70 ("[I]f the rule departs from the agency's previous position, the agency must explain why it does so.") (citing *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009)). Here, the new policy directly contradicts BOP's prior policy of providing gender-affirming health care, which people in BOP custody with gender dysphoria have come to rely on for their health and wellbeing. BOP's complete failure to explain the reversal of policy, or to consider Plaintiffs' reliance interest in continuing to receive care provided under the prior policy is definitively arbitrary and capricious. *Id.* at 515 (holding "[i]t would be arbitrary or capricious to ignore such matters"); *AIDS Vaccine Advoc. Coal.*, 2025 WL 485324, at *5 (agency action implementing Executive Order was arbitrary and capricious "given the [agency's] apparent failure to consider immense reliance interests").

### B. Plaintiffs Will Be Irreparably Harmed Absent an Injunction and/or Stay.

To obtain a preliminary injunction, Plaintiffs must demonstrate that irreparable injury "is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. Irreparable injury results where damages cannot adequately compensate for the loss if the injunction is denied. *Conservation Law Found. v. Ross* (D.D.C. 2019) 422 F. Supp. 3d 12, 34 (preliminary injunction appropriate where "remedies available at law, such as monetary damages, are inadequate to compensate for that

injury."); *National Senior Citizens Law Center, Inc. v. Legal Services Corp.* (D.D.C. 1984) 581 F. Supp. 1362, 1372 (injunction appropriate where money damages could not adequately compensate for plaintiff's injuries).

Here, this standard is met. Plaintiffs have either already had their medically necessary gender-affirming hormone therapy and/or accommodations discontinued due to the BOP's implementation of the Executive Order or have been notified that this health care that they currently receive will be discontinued imminently. Denying gender-affirming hormone therapy and accommodations has caused or will imminently cause, and will continue to cause, irreparable injuries, including the exacerbation of their gender dysphoria and increased risk of depression, anxiety, self-harm (including attempts to self-castrate), and suicidality. Karasic Decl. ¶¶ 72, 83-86, Kingdom Decl. ¶¶ 21-22 (experiencing symptoms including anxiety, panic attacks, and thoughts of self-harm and suicide since care has been withdrawn).[13] *See Edmo,* 935 F.3d at 797-98 ("severe, ongoing psychological distress" and a "high risk of self-castration and suicide" constitute irreparable harm). Without an injunction, Plaintiffs will also suffer irreparable harm via the deprivation of their constitutional rights. *See Davis v. Dist. of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) (holding that "a prospective violation of a constitutional right constitutes irreparable injury"); *Edmo*, 935 F.3d at 798 (deprivation of one's "constitutional right to adequate medical care is sufficient to establish irreparable harm."). Indeed, this Court recently held in *McHenry*, 2025 WL 388218, at *5, that plaintiffs, transgender women in the custody of BOP, had "straightforwardly demonstrated" that irreparable harm would follow if their request for a TRO enjoining enforcement of EO 14168 was denied.

---

[13] The harms associated with withholding medically necessary care to treat gender dysphoria are extensively detailed in Dr. Karasic's declaration. Plaintiffs' personal experiences of these harms are detailed in their respective declarations.

**C.    The Balance of Hardships and Public Interest Favor Granting an Injunction.**

The last two factors—balance of hardships and the public interest—also favor granting an injunction. In their balance of hardships analysis, courts must consider the hardships to plaintiffs if their request for an injunction is denied, as well as the hardships to defendants if the injunction is granted. *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Where, as here, "the Government is the opposing party," the last two factors "merge": "the government's interest is the public interest." *Nken,* 556 U.S. at 435. In assessing these factors, courts also consider "the impacts of the injunction on nonparties." *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 84 (D.D.C. 2020).

The balance of hardships strongly favors Plaintiffs. Absent an injunction that enjoins enforcement of the Implementing Memoranda and the Executive Order's ban on gender-affirming health care, the harm Plaintiffs have suffered and will continue to suffer will be significant. Every day without access to the necessary gender dysphoria treatment will cause Plaintiffs significant distress and negatively impact their mental health, as well as increase the risk of suicidality and self-harm. Further, Plaintiffs have shown a strong likelihood of success on their Eighth Amendment claim, and "a prospective violation of a constitutional right constitutes irreparable injury." *Davis,* 158 F.3d at 1346.

On the other side of the scale, Defendants will not suffer any harm from abiding by their constitutional duty to provide medically necessary health care to Plaintiffs and the proposed class; "the [government's] responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992). *See, e.g., Gammett v. Idaho State Bd. of Corrs*., No. CV05–257, 2007 WL 2186896, at *15-16 (D. Idaho July 27, 2007) (balance of harms "sharply" favored plaintiff, who would experience extreme mental harm, including suicide attempts, without gender-affirming treatment, while defendants did

not allege that they would suffer harm from providing such treatment). BOP has been providing this care for years and continuing such care while the litigation proceeds will not cause any harm to Defendants. And in any event, being required to uphold its constitutional obligation to provide adequate medical care is not a "harm" suffered by the government. *Porretti v. Dzurenda*, 2020 WL 2857498 (D. Nev., May 31, 2020); *aff'd,* 11 F.4th 1037, 1047 (9th Cir. 2021).

Finally, the public interest strongly weighs in favor of Plaintiffs. The public has an interest in ensuring the continued dignity of incarcerated individuals, and "'[i]nherent in that dignity is the recognition of serious medical needs, and their adequate and effective treatment' pursuant to the Eighth Amendment's mandated standard of care." *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). It is "always in the public interest to prevent the violation of a party's constitutional rights." *Banks v. Booth*, 468 F. Supp. 3d 101, 124 (D.D.C. 2020) (internal citations omitted); *see also Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc) ("It is well-established that the public interest favors protecting constitutional rights."). Indeed, this Court has already concluded that "it is hard to cognize of any public interest in the immediate cessation" of hormone therapy being received by people in BOP custody. *McHenry*, 2025 WL 388218, at *5.

## II.    <u>No Bond Should Be Required.</u>

Fed. R. Civ. P. 65(c) vests the district court with broad discretion to determine the appropriate amount of an injunction bond, including no bond at all. *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020). Here, because Plaintiffs seek an injunction of unconstitutional conduct by a government entity, and because there is no risk of monetary harm to Defendants if they are eventually found to be wrongfully enjoined, the FRCP 65(c) bond is neither appropriate nor necessary in this case and should be waived.

**III.    Provisional Class Certification For Emergency Relief Purposes is Warranted.**

For purposes of granting emergency relief, this Court should provisionally certify the class as defined in Plaintiffs' motion for class certification: "All persons who are or will be incarcerated in the custody of BOP who are or will be diagnosed with gender dysphoria or meet the criteria for a gender dysphoria diagnosis and who are receiving, or would receive, gender-affirming health care absent such care being proscribed by EO 14168 and the Implementing Memoranda." Dkt. 8.

"Plaintiffs . . . need only provisional class certification in order for the Court to grant their preliminary injunction" as to the class. *Damus v. Nielsen*, 313 F. Supp. 3d 317, 329 (D.D.C. 2018). The Rule 23 inquiry remains the same; the Court's analysis is merely tempered "by the understanding that such certifications may be altered or amended before the decision on the merits." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 179–80 (D.D.C. 2015) (quotation marks omitted). Courts in this circuit routinely grant provisional class certification for purposes of entering injunctive relief. *See, e.g., Charles H. v. District of Columbia*, 2021 WL 2946127, at *14 (D.D.C. June 16, 2021); *P.J.E.S. by and through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 522 (D.D.C. 2020); *Damus*, 313 F. Supp. 3d at 335; *Kirwa v. U.S. Dept. of Def.*, 285 F. Supp. 3d 21, 44 (D.D.C. 2017).

Plaintiffs' motion for class certification and accompanying exhibits, Dkt. 8, incorporated herein by reference, demonstrate that the proposed class satisfies the requirements of Rule 23(a) and (b)(2). The class is sufficiently numerous, as there were over 2,000 transgender individuals in BOP custody as of January 10, 2025. It satisfies the commonality requirement given the key legal issues common to the class, including but not limited to the constitutionality of the Executive Order and BOP's Implementing Memoranda. It satisfies the typicality requirement, as Plaintiffs' claims arise from the same conduct responsible for putative class members' claims: Defendants' enforcement of the Executive Order and BOP's Implementing Memoranda. Provisional class certification under Rule 23(b)(2) is appropriate because the Executive Order and Implementing Memoranda apply to

all putative class members, and the injunctive relief Plaintiffs seek would benefit the whole class. Lastly, Plaintiffs' counsel are qualified to serve as counsel for the provisionally certified class. For these reasons the class should, at minimum, be provisionally certified and preliminary relief accorded to its members.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for a Preliminary Injunction, to Stay Agency Action, and For Provisional Class Certification.

A proposed order is attached.

Dated: March 17, 2025

Respectfully submitted,

David C. Fathi†
Maria V. Morris, D.C. 1697904
Elisa C. Epstein†
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, N.W.
Washington, D.C. 20005
Tel: 202-393-4930
dfathi@aclu.org
mmorris@aclu.org
eepstein@aclu.org
† *Not admitted in D.C.; practice limited to*
*federal courts. Pro hac vice application*
*forthcoming.*

Corene T. Kendrick**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California St., Ste. 700
San Francisco, CA 94104
Tel: 202-393-4930
ckendrick@aclu.org

Li Nowlin-Sohl**
(admitted only in Washington state)
Leslie Cooper**
Shana Knizhnik, DDC Bar ID 120840
James D. Esseks**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: 212-549-2500
lnowlin-sohl@aclu.org
lcooper@aclu.org
sknizhnik@aclu.org
jesseks@aclu.org

/s/ Michael Perloff
Michael Perloff, D.C. Bar No. 1601047
Aditi Shah*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
Tel: 202-457-0800
mperloff@acludc.org
ashah@acludc.org
*\*Not admitted in DC; practice limited to*
*matters before federal courts and D.C.*
*agencies.*

Shawn Thomas Meerkamper**
shawn@transgenderlawcenter.org
Megan Z. F. Noor**
megan@transgenderlawcenter.org
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Tel: 510-587-9696

Lynly S. Egyes**
Lynly@transgenderlawcenter.org
Milo Inglehart**
milo@transgenderlawcenter.org
TRANSGENDER LAW CENTER
594 Dean Street, Suite 11
Brooklyn, NY 11238
Tel: 510-587-9696

** *Pro hac vice application forthcoming.*

*Counsel for plaintiffs and the proposed class*

## **CERTIFICATE OF SERVICE**

  I hereby certify that, on this 17th day of March 2025, I served the foregoing MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION A PRELIMINARY INJUNCTION, TO STAY AGENCY ACTION, AND FOR PROVISIONAL CLASS CERTIFICATION and the exhibits and declarations cited therein by emailing a copy to Defendants' counsel, John Robinson, listed below. Mr. Robinson provided written consent to receive email service on behalf of Defendants on March 17, 2025.

John Robinson
U.S. Department of Justice
John.J.Robinson@usdoj.gov
(202) 616-8489


    */s/ Michael Perloff*
    Michael Perloff