# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ALISHEA KINGDOM, *et al.*,

        Plaintiffs,

   v.

DONALD J. TRUMP, *et al.*,

        Defendants.

Civil Docket No. 1:25-cv-691

# DEFENDANTS' RESPONSE TO PLAINTIFFS'
# MOTION FOR A PRELIMINARY INJUNCTION, TO STAY AGENCY
# ACTION, AND FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 3

A.    BOP's Provision of Medical Care ................................................................ 3

B.    The Executive Order and BOP's Implementation ............................................ 5

C.    Plaintiffs' Allegations .............................................................................. 6

LEGAL STANDARD ........................................................................................... 8

ARGUMENT ....................................................................................................... 8

I.     PLAINTIFFS NEED TO FIRST EXHAUST ADMINISTRATIVE
       REMEDIES .................................................................................................. 8

II.    PLAINTIFFS HAVE NOT DEMONSTRATED A LIKELIHOOD OF
       SUCCESS ON THE MERITS ...................................................................... 11

       A.    Plaintiffs Are Unlikely to Succeed on their Eighth Amendment
             Claim ............................................................................................ 11

       B.    Plaintiffs Are Unlikely to Succeed on their APA Claim ...................... 19

III.   PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM ....... 21

IV.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR
       DEFENDANTS ............................................................................................ 23

V.     THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR CLASS
       CERTIFICATION ...................................................................................... 23

       A.    Plaintiffs Cannot Satisfy Rule 23(a)'s Requirements .......................... 24

       B.    Certification Under Rule 23(b) Is Not Warranted .............................. 28

VI.    UNDER THE PLRA, ANY INJUNCTIVE RELIEF MUST BE LIMITED
       TO THE NAMED PLAINTIFFS AND EXTEND NO FURTHER THAN
       NECESSARY ............................................................................................... 31

VII.   THE PRESIDENT IS IMMUNE FROM INJUNCTIVE RELIEF ................. 34

CONCLUSION ................................................................................................... 34

# TABLE OF AUTHORITIES

## Cases

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997) ................................................................................ 26, 27

*Azor-El v. City of New York,*
    No. 20-3650 (KPF), 2024 WL 4326921 (S.D.N.Y. Sept. 27, 2024) ........................ 30

*\*Bernier v. Allen,*
    38 F.4th 1145 (D.C. Cir. 2022) ..................................................................... *passim*

*Board v. Farnham,*
    394 F.3d 469 (7th Cir. 2005) ............................................................................ 16

*Booth v. Churner,*
    532 U.S. 731 (2001) ..................................................................................... 9, 10

*Borum v. Brentwood Vill., LLC,*
    324 F.R.D. 1 (D.D.C. 2018) ............................................................................. 29

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh,*
    295 F.3d 28 (D.C. Cir. 2002) ....................................................................... 14, 15

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ........................................................................................ 32

*California v. U.S. Bureau of Land Mgmt.,*
    277 F. Supp. 3d 1106 (N.D. Cal. 2017) ............................................................... 32

*Cayuga Nation v. Zinke,*
    302 F. Supp. 3d 362 (D.D.C. 2018) .................................................................... 20

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ..................................................................... 20, 21

*Columbia Gulf Transmission v. FERC,*
    106 F.4th 1220 (D.C. Cir. 2024) ....................................................................... 19

*Common Cause v. Trump,*
    506 F. Supp. 3d 39 (D.D.C. 2020) ..................................................................... 14

*ConverDyn v. Moniz,*
  68 F. Supp. 3d 34 (D.D.C. 2014) ............................................................ 20

*Damus v. Nielsen,*
  313 F. Supp. 3d 317 (D.D.C. 2018) ......................................................... 26

*Doe v. McKenry,*
  --- F. Supp. 3d ---, No. 1:25-cv-286-RCL, 2025 WL 388218 (D.D.C.
  Feb. 4, 2025) ........................................................................... 8, 10, 13

*Doe 2 v. Trump,*
  319 F. Supp. 3d 539 (D.D.C. 2018) ......................................................... 33

*Edmo v. Corizon, Inc.,*
  949 F.3d 489 (9th Cir. 2020) ............................................................ 15, 17

*\*Eknes-Tucker v. Governor of Alabama,*
  114 F.4th 1241 (11th Cir. 2024) ............................................................ 17

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) ....................................................................... 20

*\*Estelle v. Gamble,*
  429 U.S. 97 (1976) ........................................................... 11, 12, 13, 21

*Eubanks v. Billington,*
  110 F.3d 87 (D.C. Cir. 1997) ............................................................... 29

*Farmer v. Brennan,*
  511 U.S. 825 (1994) ....................................................................... 11

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ....................................................................... 20

*Franklin v. Massachusetts,,*
  505 U.S. 788 (1992) ....................................................................... 33

*Gen. Tel. Co. of Sw. v. Falcon,*
  457 U.S. 147 (1982) ....................................................................... 23

*Gibson v. Collier,*
  920 F.3d 212 (5th Cir. 2019) ........................................................... 17, 18

*Hanson v. District of Columbia,*
  120 F.4th 223 (D.C. Cir. 2024) .............................................................. 8

*Hoffer v. Sec'y, Fla. Dep't of Corr.*,
  973 F.3d 1263 (11th Cir. 2020) ...................................................................... 11, 12

*Husky Mktg. & Supply Co. v. FERC*,
  105 F.4th 418 (D.C. Cir. 2024) ............................................................................ 19

*In re Integra Realty Res., Inc.*,
  354 F.3d 1246 (10th Cir. 2004) ........................................................................... 27

*Jones v. Bock*,
  549 U.S. 199 (2007) ........................................................................................ 2, 8, 9

*Kadel v. Folwell*,
  100 F.4th 122 (4th Cir. 2024)........................................................................ 15, 22

*Kaemmerling v. Lappin*,
  553 F.3d 669 (D.C. Cir. 2008) ............................................................................. 10

*Keohane v. Fla. Dep't of Corr. Sec'y*,
  952 F.3d 1257 (11th Cir. 2020) ............................................................... 12, 17, 18

*Kosilek v. Spencer*,
  774 F.3d 63 (1st Cir. 2024).......................................................................... 12, 17

*Kress v. CCA of Tennessee, LLC*,
  694 F.3d 890 (7th Cir. 2012) ............................................................................... 25

*Lamb v. Norwood*,
  899 F.3d 1159 (10th Cir. 2018) ........................................................................... 12

*Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*,
  216 F.3d 577 (7th Cir. 2000) ............................................................................... 29

*Lightfoot v. District of Columbia*,
  273 F.R.D. 314 (D.D.C. 2011) ....................................................................... 23, 29

*McCarthy v. Madigan*,
  503 U.S. 140 (1992) ................................................................................................ 9

*Mississippi v. Johnson*,
  71 U.S. 475 (1866) ................................................................................................ 33

*Money v. Pritzker*,
  453 F. Supp. 3d 1103 (N.D. Ill. 2020) ................................................................ 30

*Nat. Res. Def. Council v. DOE,*
    362 F. Supp. 3d 126 (S.D.N.Y. 2019) ..................................................................... 32

*Nat'l Ass'n of Home Builders v. EPA,*
    682 F.3d 1032 (D.C. Cir. 2012) ................................................................................ 20

*Nat'l Mining Ass'n v. Jackson,*
    768 F. Supp. 2d 34 (D.D.C. 2011) ........................................................................... 20

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) ............................................................................... 33

*Nez Perce Tribe v. Kempthorne,*
    No. 06-2239 (JR), 2008 WL 11408458 (D.D.C. Dec. 1, 2008)................................ 30

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................................................... 8

*Ortiz v. Fireboard Corp.,*
    527 U.S. 815 (1999) ................................................................................................. 28

*Ramirez v. U.S. Immigr. & Customs Enf't,*
    338 F. Supp. 3d 1 (D.D.C. 2018) ............................................................................ 23

*Ross v. Blake,*
    578 U.S. 632 (2016) .............................................................................................. 9, 10

*Rouse v. Plantier,*
    182 F.3d 192 (3d Cir. 1999)..................................................................................... 25

*Sabata v. Nebraska Dep't of Corr. Servs.,*
    337 F.R.D. 215 (D. Neb. 2020) ............................................................................... 25

*Sampson v. Murray,*
    415 U.S. 61 (1974) ................................................................................................... 32

*Sherley v. Sebelius,*
    689 F.3d 776 (D.C. Cir. 2012) ................................................................................ 19

*Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso,*
    543 F.3d 597 (10th Cir. 2008) ................................................................................. 29

*Sissel v. Wormuth,*
    77 F.4th 941 (D.C. Cir. 2023)................................................................................. 19

*Smith v. Hodge Unit Staff & Admin.*,
  No. 6:23CV268, 2024 WL 5346411 (E.D. Tex. Dec. 6, 2024) ................................. 18

*Starbucks Corp. v. McKinney*,
  144 S. Ct. 1570 (2024) ............................................................................................. 32

*Sullivan v. Cnty. of Pierce*,
  216 F.3d 1084 (9th Cir. 2000) ................................................................................. 16

*Torres v. Del Toro*,
  No. 1:21-cv-306-RCL, 2021 WL 4989451 (D.D.C. Oct. 7, 2021) ...................... 29, 30

*United States v. Salerno*,
  481 U.S. 739 (1987) .................................................................................................. 13

*VanDerStok v. Garland*,
  633 F. Supp. 3d 847 (N.D. Tex. 2022) .................................................................... 32

*\*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ....................................................................................... *passim*

*Washington State Grange v. Washington State Republican Party*,
  552 U.S. 442 (2008) ...................................................................................... 13, 14, 22

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................................................... 8

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ................................................................................. 21

*Woodford v. Ngo*,
  548 U.S. 81 (2006) ...................................................................................................... 9

## STATUTES

5 U.S.C. § 705.................................................................................................................. 32

5 U.S.C. § 706.................................................................................................................. 18

18 U.S.C. § 3626............................................................................................... 3, 27, 28, 31

18 U.S.C. § 4042............................................................................................................... 3

42 U.S.C. § 1997e.............................................................................................................. 8

**RULES**

Fed. R. Civ. P. 23 ................................................................................... *passim*

**LEGISLATIVE MATERIALS**

Nathan James, Cong. Rsch. Serv., *Health Care for Federal Prisoners* (2020) ............ 3

**REGULATIONS**

28 C.F.R. Part 549 ................................................................................... 3

28 C.F.R. §§ 542.13-.15 ........................................................................... 9

Exec. Order No. 14168,
   90 Fed. Reg. 8615 (Jan. 20, 2025).................................................... *passim*

**OTHER AUTHORITIES**

The Cass Review, *Independent Review of Gender Identity Services for Children
   and Young People: Final Report* (April 2024),
   https://perma.cc/D728-LUM8.................................................................. 16

## INTRODUCTION

Plaintiffs are three inmates in the custody of the Federal Bureau of Prisons ("BOP") who have been diagnosed with gender dysphoria. They challenge BOP's implementation of an Executive Order directing BOP to ensure that (1) "no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex," and (2) the Executive Order is "implemented consistent with applicable law." Exec. Order No. 14168, §§ 4(c), 8(b), 90 Fed. Reg. 8615 (Jan. 20, 2025). A BOP memorandum specifies that BOP shall implement the Executive Order "consistent with . . . the Eighth Amendment." ECF No. 1-2.

Plaintiffs have moved for a preliminary injunction and for class certification, contending that BOP's implementation of the Executive Order constitutes cruel and unusual punishment under the Eighth Amendment. They do so on the purported basis that BOP "categorically preclude[s]" hormone medication and other accommodations for Plaintiffs and others like them "regardless of [the inmates'] medical need for this care and the impact on their health." Pls.' Mem. 1. Plaintiffs also contend that BOP's policy violates the Administrative Procedure Act (APA) because the supposed categorical denial of such care is arbitrary and capricious and not sufficiently explained.

Neither a preliminary injunction nor class certification is warranted because Plaintiffs' claims rest on the flawed premise that BOP has categorically prohibited the provision of hormone medication to inmates with gender dysphoria. As the attached declaration from BOP's Assistant Director of the Health Services Division explains, all three Plaintiffs are currently receiving hormone medication, as are approximately 630 other inmates who have an associated medical diagnosis of gender dysphoria. Bina Decl. ¶¶ 14, 17, 20, 22. This fact is fatal to Plaintiffs' motion for several reasons.

*First*, if and when hormone medication is discontinued for Plaintiffs, they would need to first grieve the denial of care administratively because the Prison Litigation Reform Act (PLRA) requires that they exhaust administrative remedies before suing. The Supreme Court has made clear that exhaustion is mandatory under the PLRA. *Jones v. Bock*, 549 U.S. 199, 211 (2007). This requirement applies even if Plaintiffs believe exhaustion would be futile and even if Plaintiffs are bringing constitutional claims. To be sure, in a different case, this Court found that exhaustion would not have yielded any relief. But that too was based on a flawed interpretation of the Executive Order as requiring BOP to withhold hormone medication without regard to an inmate's individual medical condition and associated medical needs.

*Second*, Plaintiffs are unlikely to succeed in showing that BOP has been deliberately indifferent to their serious medical needs in violation of the Eighth Amendment. BOP medical providers continue to assess each inmate's medical condition on an individualized basis and to provide any necessary medical care, which may include hormone medication, when determined to be appropriate to address a serious medical need. While the Executive Order prohibits the provision of such medication to conform an inmate's appearance to that of the opposite sex, it also explicitly requires BOP to implement the Order in a manner consistent with the Eighth Amendment. Thus, not only does Plaintiffs' as-applied challenge fail because Plaintiffs continue to receive hormone medication, but they also cannot meet the burden for a facial challenge. The latter requires a showing that there are no set of circumstances under which BOP's policy would be valid. Plaintiffs' failure to meet that burden is particularly apparent given the ongoing scientific and medical debate over the necessity and efficacy of hormone medication as a treatment for gender dysphoria.

*Third*, Plaintiffs' Administrative Procedure Act claim is unlikely to succeed for the same fundamental reason—the claim is premised on an incorrect assumption that

BOP has categorically banned hormone medication for inmates with gender dysphoria regardless of any serious medical need. BOP has not. And it is not arbitrary and capricious for BOP to implement the President's policy directive in a manner consistent with applicable law, even if Plaintiffs disagree with the policy.

*Fourth*, the Court should not certify a class because the claims of putative class members are not susceptible to resolution on a class-wide basis. Whether the provision of any medication to an inmate is necessary to address a serious medical need is an individualized determination that turns on the inmate's specific medical condition and circumstances. Plaintiffs therefore cannot satisfy the "commonality," "typicality," and "adequacy of representation" requirements of Rule 23(a); nor can they satisfy the separate requirements of Rule 23(b). Certifying a class under the circumstances would also contravene the PLRA's requirement that any prospective relief be narrowly drawn, extend no further than necessary, and be the least intrusive means necessary to correct the violation of the Federal right. *See* 8 U.S.C. § 3626. Indeed, BOP must have the flexibility to adjust its provision of medical care on an ongoing basis to address the medical needs of the individual inmates.

Accordingly, the Court should deny Plaintiffs' motions for a preliminary injunction and for class certification.

## BACKGROUND

### A.    BOP's Provision of Medical Care

BOP operates 122 prisons across the country, with approximately 155,000 inmates in its custody. *See generally* Nathan James, Cong. Rsch. Serv., *Health Care for Federal Prisoners* (2020). Under 18 U.S.C. § 4042(a), BOP is responsible for "the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." BOP's provision of medical care is largely guided by regulations and policy statements. *See, e.g.*, 28 C.F.R. Part 549; Program Statement

(PS) 6010.05, Health Services Administration (attached as Ex. 1 to Declaration of Chris Bina).

BOP's Health Services Division is responsible for "deliver[ing] medically necessary health care to inmates effectively[,] in accordance with proven standards of care[,] without compromising public safety concerns inherent in the Bureau's overall mission." *Id.* § 1; *see also* Bina Decl. ¶ 9.  Providing medical care within a correctional environment "presents unique challenges not encountered by practitioners elsewhere." PS 6010.05 § 2; Bina Decl. ¶ 8.  While there may sometimes be tension between medical and correctional guidelines, BOP's policy statement provides that "conflicts related to medical care should be resolved, as far as practical, in favor of medicine." PS 6010.05 § 2.  To that end, the Health Services Division relies on certain "core principles," including "[a]ll inmates have value as human beings and deserve medically necessary health care" and that "[s]tandards of care for inmates will employ proven treatment strategies, generally supported by outcome data." *Id.* § 2(b).  Each inmate is individually evaluated and given a treatment plan consistent with his or her medical needs.  Bina Decl. ¶ 13.  For that reason, inmates with the same diagnosis may receive different treatment plans depending on the individual clinical need.  *Id.*

BOP's Medical Director possesses delegated authority for medical oversight, guidance, and privileges for all clinical activities related to the physical and psychiatric care of inmates, and "is the final health authority for all clinical issues." PS 6010.05 § 2(a).  Each BOP institution is responsible for providing medically necessary treatment to the inmates under the supervision of the institution's clinical director.  PS 6010.05 § 14; Bina Decl. ¶ 10.  This includes assessment and treatment for a wide range of mental health issues.  *See generally* PS 5310.16, 5310.17, 6010.03, 6340.04.  BOP also provides prescription medications to inmates.  Bina Decl. ¶ 14.  This has included, for some individuals, hormone medication.  *Id.*  BOP is currently

providing hormone medication to 628 of the 1,028 inmates diagnosed with gender dysphoria. *Id.* ¶¶ 7, 14.

**B.    The Executive Order and BOP's Implementation**

On January 20, 2025, the President issued an Executive Order titled, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." The Executive Order provides that "[i]t is the policy of the United States to recognize two sexes, male and female," Exec. Order No. 14168, § 2, 90 Fed. Reg. at 8615, that "'sex' shall refer to an individual's immutable biological classification as either male or female," *id.* § 2(a), and that "'[s]ex' is not a synonym for and does not include the concept of 'gender identity,'" *id.* The Executive Order further requires all federal agencies to enforce laws in a manner that "protect men and women as biologically distinct sexes," *id.* § 3(b), and to use the term "sex" and not "gender" in all applicable Federal policies and documents, *id.* § 3(c). Further, section 4(c) of the Executive Order provides:

> The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.

Finally, the Executive Order requires that "it shall be implemented consistent with applicable law and subject to the availability of appropriations." *Id.* § 8(b).

On February 21, 2025, BOP issued a memorandum implementing the Executive Order. *See* ECF No. 1-1. The memorandum provides in relevant part that:

- Staff should refer to individuals by their legal name or pronouns corresponding to their biological sex.

- No appropriated funds should be used to purchase "accommodations" for trans-identifying individuals, such as "binders, stand-to-pee devices, hair removal devices, etc."

- Requests for clothing accommodations (such as undergarments that do not align with an inmate's biological sex) will not be issued, but "previously purchased commissary items by inmates may remain in their possession."

- The Transgender Executive Council would be renamed to the "Special Populations Oversight Committee" (SPOC), which would continue to "review designations and conduct case-by-case assessments, in consideration of and adherence to [the Prison Rape Elimination Act]," but would no longer refer individuals "for gender affirming surgeries."

*Id.* at 1–2. The memorandum emphasized that "[t]he safety and mental health of the individuals affected remain a top priority," and that it was "critical that these changes [be] carried out with the utmost care and sensitivity." *Id.* at 2.

On February 28, 2025, the Assistant Director of BOP's Health Services Division issued a second memorandum regarding compliance with the Executive Order. ECF No. 1-2. The memorandum provides that consistent with the Order, "no Bureau of Prisons funds are to be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmates' appearance to that of the opposite sex." *Id.* It further provides that "[t]his policy is to be implemented in a manner consistent with applicable law[,] including the Eighth Amendment." *Id.*

## C.    Plaintiffs' Allegations

On March 7, 2025, Plaintiffs filed this action on behalf of themselves and a putative class of purportedly similarly situated individuals, contending that the Executive Order and BOP's two implementing memoranda violate (i) the Eighth Amendment, (ii) the Fifth Amendment's Equal Protection Guarantee, (iii) the Rehabilitation Act, and (iv) the Administrative Procedure Act.

Plaintiff Alishea Kingdom has been in BOP custody since 2016, was diagnosed with gender dysphoria shortly before entering BOP custody, and has received hormone medication since. Compl. ¶ 24; Kingdom Decl. ¶ 8, ECF No. 7-4. Kingdom alleges that BOP stopped providing hormone medication on January 26, 2025. Kingdom Decl. ¶ 12. As explained in the attached Bina declaration, however, BOP has since resumed Kingdom's hormone medication. Bina Decl. ¶ 17.

Plaintiff Solo Nichols has been in BOP custody since 2013. Nichols was diagnosed with gender dysphoria in 2021 and has received hormone medication since. Pls.' Mem. 16–17. Nichols alleges that BOP provided only a half dose of hormone medication injection on February 12, 2025, but that BOP informed Nichols on February 21 that the medication "would be restored to [the] full dosage." Nichols Decl. ¶ 17, ECF No. 7-5. Since February 26, Nichols has received the full dosage of hormone medication. Bina Decl. ¶ 23.

Plaintiff Jas Kapule has been in BOP custody since 2020. Kapule was diagnosed with gender dysphoria in 2022 and has received hormone medication since. Pls.' Mem. 18. Kapule does not allege that BOP has ever discontinued hormone medication. Kapule is currently receiving hormone medication. Bina Decl. ¶ 20.

In addition to asserting their own claims, the three named Plaintiffs also seek to represent the interests of a class defined as:

> All persons who are or will be incarcerated in the custody of BOP who are or will be diagnosed with gender dysphoria or meet the criteria for a gender dysphoria diagnosis and who are receiving, or would receive, gender-affirming health care absent such care being proscribed by EO 14168 and the Implementing Memoranda.

Compl. ¶ 15.

On March 17, 2025, Plaintiffs moved for a preliminary injunction and to stay BOP's implementing memoranda, relying only on their Eighth Amendment and APA claims, ECF No. 7, and seeking to require Defendants to "provide and continue providing Plaintiffs and members of the proposed class gender-affirming hormone therapy and accommodations in accordance with BOP policy and practice immediately prior to . . . January 20, 2025," ECF No. 7-7 at 2. Plaintiffs "do not seek at this time a preliminary injunction with respect to the Executive Order and Implementing Memoranda's prohibition of gender-affirming surgery." Pls.' Mem. 6 n.2. Plaintiffs also moved for class certification, including for emergency relief purposes. *Id.*; ECF No. 8.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain such extraordinary relief, a plaintiff "must show (1) 'he is likely to succeed on the merits,' (2) 'he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in his favor,' and (4) issuing 'an injunction is in the public interest.'" *Hanson v. District of Columbia*, 120 F.4th 223, 253 n.11 (D.C. Cir. 2024) (quoting *Winter*, 555 U.S. at 20). Where, as here, the defendants are government entities or official sued in their official capacities, the balance of equities and the public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

## I. PLAINTIFFS NEED TO FIRST EXHAUST ADMINISTRATIVE REMEDIES

As a threshold matter, Plaintiffs' claims are premature because Plaintiffs are currently receiving hormone medication. If and when Plaintiffs are denied hormone medication in the future, they would have to grieve any such denial before proceeding in court. The Prison Litigation Reform Act ("PLRA") provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in jail, prison, or other correctional facility until such administrative remedies as available are exhausted.

42 U.S.C. § 1997e(a). The Supreme Court has emphasized "that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones*, 549 U.S. at 211. "Not even facially meritorious constitutional claims are exempt, nor are claims that the inmate believes—rightly or wrongly—to be futile." *Doe v. McKenry*, --- F. Supp. 3d ---, No. 1:25-cv-286-RCL, 2025 WL 388218, at *3 (D.D.C. Feb. 4, 2025). So long as administrative remedies are "available," "a court may not excuse a failure to exhaust" under the PLRA, "even to take [special]

circumstances into account." *Ross v. Blake*, 578 U.S. 632, 638–39 (2016). A procedure is "available" even if it cannot provide "the remedial action an inmate demands"; prison officials need only have "authority to take some action in response to a complaint." *Booth v. Churner*, 532 U.S. 731, 736 (2001).

Exhaustion of administrative remedies "serves two main purposes." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). "First, exhaustion protects 'administrative agency authority[,]' giv[ing] an agency 'an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court.'" *Id.* (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)). "Second, exhaustion promotes efficiency." *Id.* "Even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Id.*

Here, Plaintiffs are currently receiving hormone medication. They cannot claim to have "complete[d] the administrative review process in accordance with the applicable procedural rules" as to any future denial of such medication. *Jones*, 549 U.S. at 218. BOP's Administrative Remedy Program has four levels: (i) aggrieved individuals must first attempt an informal resolution with unit staff, then (ii) submit an administrative remedy request to the Warden, then (iii) appeal to BOP's Regional Director, and then, (iv) if necessary, appeal to BOP's General Counsel. *See* 28 C.F.R. §§ 542.13-.15. The Court should not allow Plaintiffs to short-circuit the administrative process and seek an injunction based on a hypothetical future unconstitutional denial of medication. At a minimum, requiring exhaustion here would "produce a useful record for subsequent judicial consideration," *Woodford*, 548 U.S. at 89, as the Court would have before it precisely what medication was stopped for which inmates, what symptoms (if any) resulted, and what steps BOP took to ensure the health and safety of the inmate. Without such a record, the Court lacks

the critical facts to assess Plaintiffs' assertion that BOP has acted with deliberate indifference to a serious medical need. *See infra* Section II.A.

In *Doe v. McHenry*, No. 1:25-CV-286-RCL, 2025 WL 388218 (D.D.C. Feb. 4, 2025), this Court held that those plaintiffs' similar claims nonetheless fell within a "narrow exception" to the exhaustion requirement—namely that the administrative remedies were not "available" because they "operate[] as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at *3 (quoting *Ross*, 578 U.S. at 642). That was because, in the Court's view, "the text of the Executive Order plainly requires the BOP to . . . withhold the prescribed hormone therapy drugs." *Id.*

As explained above, however, BOP has continued to provide hormone medication to Plaintiffs and approximately 630 other inmates with gender dysphoria. Bina Decl. ¶¶ 14, 17, 20, 22. Thus, it is not the case that, if hormone medication were discontinued for one of the Plaintiffs, BOP would be "unable or consistently unwilling" to reconsider its decision to discontinue hormone medication for that Plaintiff. *Ross*, 578 U.S. at 643. And even if BOP decided not to provide hormone medication to any of the Plaintiffs, prison officials would still have the authority to take "some action" in response to an administrative complaint, *Booth*, 532 U.S. at 736, by, for example, prescribing an alternative treatment to address Plaintiffs' health concerns. *See* Bina Decl. ¶ 15. This case is thus unlike the case cited by this Court in *Doe*—*Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008)—where BOP "could not articulate a single possible way the prison's administrative system could provide relief or take any action at all in response to Kaemmerling's claim that collecting his DNA would violate his statutory and constitutional rights." 553 F.3d at 675–76.

Of course, BOP also could decide to stop hormone medication due to Plaintiffs' individual medical condition and circumstances. For instance, if, in a BOP medical

10

provider's judgment, side effects from the hormone medication made it unsafe to continue for any of the Plaintiffs, BOP would stop the medication. A factual record from the administrative process would be important in that circumstance as well. In any event, as noted above and discussed more fully below, BOP must implement the Executive Order in a manner consistent with the Eighth Amendment. To the extent Plaintiffs believe that medical care might be withheld in a manner that violates the Eighth Amendment, the PLRA requires that BOP be given the opportunity to address that issue in the first instance.

## II.   PLAINTIFFS HAVE NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS

### A.   Plaintiffs Are Unlikely to Succeed on their Eighth Amendment Claim

Plaintiffs must meet a stringent test to establish likelihood of success on their Eighth Amendment claim. The Eighth Amendment forbids the "inflict[ion]" of "cruel and unusual punishments." U.S. Const. amend. VIII. The Supreme Court has held that the Eighth Amendment is meant to prohibit "unnecessary and wanton infliction of pain," which is "repugnant to the conscience of mankind." *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976). To meet that high standard, a plaintiff must demonstrate "deliberate indifference to serious medical needs." *Id.* at 106; *see also Bernier v. Allen*, 38 F.4th 1145, 1151 (D.C. Cir. 2022) (plaintiff must show refusal to provide appropriate treatment for a "known, serious medical condition").

The deliberate indifference standard involves both an "objective" and a "subjective" inquiry. *Bernier*, 38 F.4th at 1151. An official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The D.C. Circuit has emphasized that "[m]ere inadvertent or negligent failures to provide care do not amount to deliberate indifference." *Id.*; *see*

*also Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020) ("[D]eliberate indifference is *not* a constitutionalized version of common-law negligence." (citation omitted)). Rather, Plaintiffs must show that BOP officials "had subjective knowledge of [a] serious medical need and recklessly disregarded the excessive risk to inmate health or safety from that risk." *Bernier*, 38 F.4th at 1151.

Moreover, the Constitution does not require BOP to provide "the most effective treatment," and the question is not whether the Court, if it were charged with Plaintiffs' care, would provide the care that they are seeking. *Hoffer*, 973 F.3d at 1271–72; *see also Bernier*, 38 F.4th at 1159 (Silberman, J., concurring) ("A federal prison is not a Johns Hopkins Hospital."). Instead, the question is whether the prison's provision of medical care is "so reckless—so conscience-shocking—that it violates the Constitution." *Hoffer*, 973 F.3d at 1272; *see also Kosilek v. Spencer*, 774 F.3d 63, 96 (1st Cir. 2024) (en banc) (Eighth Amendment "proscribes only medical care so unconscionable as to fall below society's minimum standards of decency"). Finally, "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [fails to] support a claim of cruel and unusual punishment." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020); *see also Lamb v. Norwood*, 899 F.3d 1159, 1162 (10th Cir. 2018) ("We have consistently held that prison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants.").

For the reasons explained below, Plaintiffs cannot meet that demanding standard here.

> **1.    Plaintiffs are unlikely to show that BOP's policy on the provision of hormone medication as applied to them violates the Eighth Amendment.**

Most critically, all three Plaintiffs are currently receiving hormone medication. *See* Bina Decl. ¶¶ 17, 20, 22. Plaintiffs therefore cannot show that there is a "serious

medical need" that is not being reasonably addressed, *Estelle*, 429 U.S. at 106, or that any BOP official "recklessly disregarded" an excessive risk to their health, *Bernier*, 38 F.4th at 1151. For that reason alone, Plaintiffs' motion for a preliminary injunction should be denied.

Nor do Plaintiffs face an imminent risk that care to address a "serious medical need," *Estelle*, 429 U.S. at 105, will be denied. In *Doe*, this Court found that the Executive Order "affords the BOP no discretion . . . to continue providing hormonal therapy" to the plaintiffs in that case. 2025 WL 388218, at *5. The Court apparently assumed that all hormone medication provided to treat gender dysphoria is "for the purpose of conforming an inmate's appearance to that of the opposite sex," Exec. Order No. 14168, § 4(c), regardless of the inmate's individual medical condition. As BOP's current practice demonstrates, however, that assumption is incorrect. BOP is providing hormone medication to Plaintiffs and hundreds of other inmates with gender dysphoria.

### 2. Plaintiffs are unlikely to show that BOP's policy on hormone medication is facially unconstitutional.

Insofar as Plaintiffs bring a facial challenge, they are not likely to meet the heavy burden of "establish[ing] that no set of circumstances exists under which the [policy] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), or that the law lacks a "plainly legitimate sweep," *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450–51 (2008).

To begin, facial challenges "are disfavored for several reasons." *Washington State Grange*, 552 U.S. at 450. "Claims of facial invalidity often rest on speculation," and "raise the risk of premature interpretation of [policies] on the basis of factually barebones records." *Id.* (citation omitted). Facial challenges "also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate

a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (citation omitted). "Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 451.

All these considerations apply with particular force here. Plaintiffs and some 630 inmates are currently receiving hormone medication, Bina Decl. ¶¶ 14, 17, 20, 22, and Plaintiffs' request for class-wide injunction "rest[s] on [the] speculation" that such medication would be stopped categorically. *Washington State Grange*, 552 U.S. at 450. That is, Plaintiffs ask this Court to rule on a constitutional issue "in advance of the necessity of deciding it." *Id.* And their proposed class-wide injunction would prevent a policy directed by the President from "being implemented in a manner consistent with the Constitution." *Id.* at 451. Importantly, the Executive Order provides that it "shall be implemented consistent with applicable law," Exec. Order § 8(b), and BOP's February 28 memorandum likewise emphasized that any implementation needs to comply with the Eighth Amendment. ECF No. 1-2. The BOP policy is thus facially valid.

The D.C. Circuit rejected a similar facial challenge to an Executive Order in *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). There, the President directed that "to the extent permitted by law," no federal agency could require or prohibit bidders from entering into a project labor agreement. *Id.* at 29. The D.C. Circuit held that the President had constitutional authority to issue the Executive Order, pointing out that the Executive Order "direct[ed] [agencies] how to proceed in administering federally funded projects, but only '[t]o the extent permitted by law.'" *Id.* at 33. The court concluded that "[t]he mere possibility that some agency might make a legally suspect decision" did not justify an injunction, as the policy was so far being implemented in a lawful manner. *Id.*; *see also Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020)

14

(Katsas. J.) ("We cannot ignore these repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing the memorandum."). If an agency did contravene the law "in a particular instance," then "an aggrieved party [could] seek redress through any of the procedures ordinarily available to it." *Allbaugh*, 295 F.3d at 33.

BOP is likewise implementing the Executive Order consistent with the Eighth Amendment, and BOP medical providers are currently providing hormone medication to Plaintiffs based on their individual medical conditions and associated medical needs. The "possibility" that BOP might deny hormone medication to some hypothetical inmate in the future based on the Executive Order does not provide a basis to issue an injunction. *Id.* at 33. Rather, if the agency did deny hormone medication, the "aggrieved party may seek redress through any of the [ordinary] procedures." *Id.* Accordingly, the Court should deny Plaintiffs' motion on this basis alone. *See, e.g.*, Order Denying Mot. for Prelim. Inj. at 10, *Keohane v. Dixon*, No. 4:24-cv-00434 (N.D. Fla. Dec. 27, 2024), ECF No. 55 (rejecting challenge to alleged ban on hormone medication for inmates where prison stated that it would provide "constitutionally adequate care").

Indeed, the Court should be especially hesitant to issue an unnecessary constitutional ruling now given "that there is an ongoing debate over" the necessity and efficacy of treatments for gender dysphoria. *Kadel v. Folwell*, 100 F.4th 122, 176 (4th Cir. 2024) (Richardson, J., dissenting). As Judge Wilkinson observed in *Kadel*, "emerging gender dysphoria treatments," such as "cross-sex hormones," are "matters of significant scientific debate and uncertainty." *Id.* at 193 (Wilkinson, J., dissenting); *see Edmo v. Corizon, Inc.*, 949 F.3d 489, 490 (9th Cir. 2020) (O'Scannlain, J., dissenting) (calling treatment for gender dysphoria "a new, rapidly changing, and highly controversial area of medical practice"). For example, a recent comprehensive report in the United Kingdom found that while deaths by suicide in trans-identifying

15

individuals are tragically above the national average, there is "no evidence that gender-affirmative treatments reduce this." The Cass Review, *Independent Review of Gender Identity Services for Children and Young People: Final Report* at 195 (April 2024), perma.cc/D728-LUM8.

In contending that BOP's policy is facially unconstitutional, Plaintiffs make generalized allegations about the symptoms of gender dysphoria and the alleged potential benefits of hormone medication. *See* Pls.' Mem. 7–8. To support these allegations, Plaintiffs rely primarily on the declaration of Dr. Dan Karasic, who in turn relies on standards issued by the World Professional Association of Transgender Health (WPATH). *See* ECF No. 7-2 ¶¶ 11–13. But Plaintiffs cannot rely on such generalized allegations about the potential benefits of hormone medication to establish an Eighth Amendment violation. Rather, as explained above, Plaintiffs must identify a *particular* risk of serious harm that BOP officials know of but are recklessly disregarding. *See Bernier*, 38 F.4th at 1151.

The cases Plaintiffs cite underscore the need for particularized allegations of harm to establish an Eighth Amendment violation. *See* Pls.' Mem. 24. For example, in *Board v. Farnham*, 394 F.3d 469 (7th Cir. 2005), the plaintiff alleged that prison officials knew that withholding his asthma inhaler was leading to "severe breathing difficulties," as he had to be taken to the emergency room on two separate occasions and was placed on a breathing machine for the first time in his life. 394 F.3d at 484. Prison officials nevertheless refused to provide the plaintiff with an inhaler, making a "conscious decision not to act when they easily could have." *Id.* at 485; *see also, e.g.*, *Sullivan v. Cnty. of Pierce*, 216 F.3d 1084 (9th Cir. 2000) (plaintiff alleged that prison officials refused to provide AIDS medication even though they knew inmate was "in the final stage of AIDS," was "in dire need of that medication," and "had to remain in strict compliance with [his] regimen at all times and without exception").

16

The generalized evidence cited by Plaintiffs is at least debatable because it relies extensively on the WPATH standards, which judges have found "do not reflect medical consensus" and are not "politically neutral." *Gibson v. Collier*, 920 F.3d 212, 222–23 (5th Cir. 2019); *see also Kosilek*, 774 F.3d at 88 ("Prudent medical professionals . . . reasonably differ in their opinions regarding [WPATH's] requirements."); *Edmo*, 949 F.3d at 508 (Bumatay, J., dissenting) ("[A]s recognized by numerous federal courts, the WPATH standards are not accepted as medical consensus.").

For example, in *Edmo*, Judge O'Scannlain described the WPATH standards as "merely criteria promulgated by a controversial private organization with a declared point of view." *Id.* at 497 (O'Scannlain, J., dissenting). He found that they reflect "a policy preference" and follow from an "ethical principle," not "extensive clinical experience." *Id.* at 498 (citation omitted); *see also Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1249 (11th Cir. 2024) (Lagoa, J., concurring in the denial of en banc) (noting that internal WPATH documents revealed that "WPATH officials are aware of the risks of cross-sex hormones and other procedures yet are mischaracterizing and ignoring information about those risks"); *id.* at 1261 ("[R]ecent revelations indicate that WPATH's lodestar is ideology, not science."); *id.* ("[I]n one communication, a contributor to WPATH's most recent Standards of Care frankly stated, '[o]ur concerns, echoed by social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits.'"); *id.* at 1268 ("[A] March 2024 leak of documents and audio recordings suggests that WPATH is not genuine in its claim that these treatments are safe, effective, and well understood, particularly for minors.").

In *Edmo*, Judge O'Scannlain further found that the WPATH standards "lack the evidence-based grading system that characterizes archetypal treatment

guidelines, such as the Endocrine Society's hormone therapy guidelines." *Edmo*, 949 F.3d at 498. For that reason, the nine dissenting judges in *Edmo* concluded that "conformity to WPATH is not the test of constitutionally acceptable treatment of gender dysphoria." *Id.* at 500; *see also Otto v. City of Boca Raton*, 981 F.3d 854, 869 (11th Cir. 2020) ("[I]nstitutional positions [of even medical organizations] cannot define the boundaries of constitutional rights."). Indeed, WPATH's guidelines themselves make clear that the standards are simply "recommendations" that are "flexible," "adaptable," and "may [be] modif[ied]." WPATH Standards of Care S3, S6 (8th ed.) Accordingly, the WPATH guidelines at best reflect a "simple difference in medical opinion," which "fails to support a claim of cruel and unusual punishment." *Keohane*, 952 F.3d at 1266.

The cases Plaintiffs cite in support of the facial unconstitutionality of BOP's policy are inapposite. *See* Pls.' Mem. 25. In *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257 (11th Cir. 2020), the court never reached the merits of the inmate's challenge to the prison's "freeze-frame" policy—whereby an inmate's treatment for gender dysphoria was determined by the treatment she was receiving at the time of incarceration, rather than by the current, individualized medical needs—because the challenge was moot. *Id.* at 1263, 70. To be sure, the court suggested in *dictum* that a policy that prohibited "any treatment that an inmate hadn't received prior to her incarceration, without regard to (or any exception for) medical necessity" could be deliberately indifferent. *Id.* at 1266–67. But the court's *dictum* is irrelevant here. The correctional facility in *Keohane* had conceded that the plaintiff's gender dysphoria constituted a "serious medical need" and that hormone medication was "medically necessary to treat that need." *Id.* at 1263–64. *Keohane* merely questioned arbitrary blanket bans that ignore the inmate's individualized medical needs, which is not the case here. Moreover, not all blanket bans are necessarily unconstitutional. *Cf. Gibson*, 920 F.3d at 216 ("The dissent suggests that a blanket ban is

18

unconstitutional—and that an individualized assessment is required. But that defies common sense. To use an analogy: If the FDA prohibits a particular drug, surely the Eighth Amendment does not require an individualized assessment for any inmate who requests that drug.").

### 3. Any denial of accommodations is unlikely to constitute an Eighth Amendment violation

Finally, Plaintiffs seek an injunction requiring BOP to provide "accommodations" to the putative class members. Plaintiffs are presumably referring to BOP's February 21 memorandum, which prohibits using BOP funds to purchase items such as "binders, stand-to-pee devices, hair removal devices, etc." for inmates identifying with the opposite sex. The memorandum also provides that clothing accommodations (such as undergarments that do not align with an inmate's sex) will no longer be issued, but previously purchased commissary items by inmates may remain in their possession. Plaintiffs cite no authority holding that the Eighth Amendment requires prisons to provide these items, and several courts have held that it does not. *See, e.g.*, *Smith v. Hodge Unit Staff & Admin.*, No. 6:23CV268, 2024 WL 5346411, at *5 (E.D. Tex. Dec. 6, 2024) (collecting cases), *report and recommendation adopted*, No. 6:23-CV-268-JDK-KNM, 2025 WL 254780 (E.D. Tex. Jan. 21, 2025); *Fisher v. Fed. Bureau of Prisons*, 484 F. Supp. 3d 521, 534 (N.D. Ohio 2020). Thus, Plaintiffs are unlikely to succeed on this claim either.

### B. Plaintiffs Are Unlikely to Succeed on their APA Claim

Plaintiffs are also unlikely to succeed on their APA claim that BOP acted arbitrarily and capriciously. 5 U.S.C. § 706(2)(A). Plaintiffs acknowledge that "[a] president's Executive Order is not subject to the APA," but they contend that BOP's "actions implementing such an order are." Pls.' Mem. 27. Even in an ordinary APA case that does not involve a Presidential directive, the APA's "arbitrary and capricious" standard "is highly deferential and presumes the validity of agency

19

action." *Sissel v. Wormuth*, 77 F.4th 941, 947 (D.C. Cir. 2023); *see also Husky Mktg. & Supply Co. v. FERC*, 105 F.4th 418, 421 (D.C. Cir. 2024) (arbitrary and capricious review "is deferential and narrow in scope."). As a result, a court reviewing agency action under the arbitrary-and-capricious standard "may not substitute its own judgment for that of the agency." *Columbia Gulf Transmission v. FERC*, 106 F.4th 1220, 1230 (D.C. Cir. 2024).

Plaintiffs make three arguments under the APA, none of which is persuasive. *First*, Plaintiffs contend that the policy is contrary to law because it is unconstitutional. Defendants have explained above why the policy is constitutional.

*Second*, Plaintiffs contend that BOP failed to "provide a reasoned explanation" for banning all hormone medication to individuals with gender dysphoria, "regardless of [the inmates'] need for such care." Pls.' Mem. 28. They further contend that BOP failed to provide an explanation "for treating people with gender dysphoria . . . differently than" others with a serious medical condition requiring treatment. *Id.* at 29–30. As Defendants have explained, however, BOP is currently providing hormone medication to Plaintiffs and hundreds of other inmates, and it is implementing the Executive Order consistent with the Eighth Amendment. Accordingly, the premise of Plaintiffs' APA claim—that BOP has banned hormone medication for those suffering from gender dysphoria—is incorrect.

Moreover, BOP did explain the reason for its policy in its February 28 memorandum—namely, it was acting to be "consistent with [the] Executive Order." ECF No. 1-2. Indeed, BOP was required to take such action. *See Sherley*, 689 F.3d at 784. And the Executive Order itself explains the reasons for the policy. *See, e.g.*, Exec. Order §§ 1, 2. Plaintiffs may disagree with those reasons, Pls. Mem. 29, but mere "disagreement is not a sufficient basis for this Court to overturn an agency decision under the APA." *Cayuga Nation v. Zinke*, 302 F. Supp. 3d 362, 370 (D.D.C. 2018).

*Third*, Plaintiffs contend that Defendants violated the APA because they failed to explain the change in policy. *See* Pls.' Mem. 30. The only change in policy here is that to the extent BOP previously was providing any medical procedure, treatment, or drug "for the purpose of conforming an inmate's appearance to that of the opposite sex," it will no longer do so. Exec. Order § 4(c). But "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). The Supreme Court has made clear that agency action is not subject to a heightened or more searching standard of review simply because it represents a change in policy. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009). Rather, the core requirement is simply that the agency "display awareness that it *is* changing position." *Id.* at 515; *see also Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1037 (D.C. Cir. 2012) ("[A]n agency's view of what is in the public interest may change, either with or without a change in circumstances."). As noted, the Executive Order articulates why the Executive has changed its policy. Plaintiffs' disagreement with the new policy is insufficient to show that the policy is arbitrary and capricious, let alone warranting the extraordinary relief of a preliminary injunction.

## III.  PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM

Plaintiffs have also failed to "demonstrate irreparable harm," which is "grounds for refusing to issue a preliminary injunction, even if the other three factors . . . merit such relief." *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). "In this Circuit, a litigant seeking a preliminary injunction must satisfy 'a high standard' for irreparable injury." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46 (D.D.C. 2014) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). Plaintiffs must demonstrate that they face an injury that is "both certain and great; it must be actual and not theoretical." *Wis. Gas Co. v. FERC*, 758 F.2d

669, 674 (D.C. Cir. 1985).  And the injury must be "of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm," and not just "merely feared as liable to occur at some indefinite time."  *Id.* (citations and quotation marks omitted).

Here, Plaintiffs have not demonstrated a likelihood of irreparable harm, largely for reasons already discussed.  BOP has not categorically banned the provision of hormone medication to inmates with gender dysphoria.  Each of the Plaintiffs is currently receiving hormone medication to address their individual medical condition and associated medical needs, and there is no reason to believe that the hormone medication will be imminently stopped.  (Indeed, BOP recently engaged in individualized assessments of Plaintiffs Kingdom and Nichols and determined to resume their prior hormone medication, and BOP has never discontinued Plaintiff Kapule's medication.  Bina Decl. ¶¶ 17, 20, 23.)  Nor have Plaintiffs demonstrated that they face certain, irreparable harm if hormone medication were discontinued.  As discussed before, BOP evaluates each inmate individually to determine a treatment plan consistent with the inmate's particular medical needs.  Thus, patients with the same diagnosis may receive different treatment plans depending on their individual clinical needs.  Indeed, of the approximately 1,028 inmates with a diagnosis of gender dysphoria, only approximately 628 are receiving hormone medication.  Bina Decl. ¶¶ 7, 14.  Moreover, BOP must act consistently with the Eighth Amendment and may not stop any medication if such medication is needed to address a "serious medical need."  *Estelle*, 429 U.S. at 106.

For the same reasons that Plaintiffs cannot rely on generalized allegations to establish an Eighth Amendment violation, Plaintiffs likewise cannot rely on such allegations to establish irreparable harm.  Plaintiffs do not contend that hormone medication is medically necessary for all individuals with gender dysphoria.  And Plaintiff's declarant, Dr. Karasic, does not assert that he has examined Plaintiffs or

concluded that hormone medication is necessary to treat gender dysphoria in all cases. *See* Karasic Decl. ¶ 66 (noting that medical interventions to treat adults with gender dysphoria "may include" hormone medication, "based on a patient's individual needs").

## IV.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR DEFENDANTS

As discussed above, there is an ongoing national debate about the necessity and efficacy of treatments for gender dysphoria. The President, as the head of the Executive Branch with ultimate responsibility for the operation of its prisons, has determined that federal funds should not be used to conform an inmate's appearance to that of the opposite sex. There is a strong public interest in deferring to the democratic process and allowing "laws embodying the will of the people" to be implemented "in a manner consistent with the Constitution." *Washington State Grange*, 552 U.S. at 451. A preliminary injunction, by contrast, would improperly "ignor[e] the fair-minded debate about the medical necessity and efficacy of the treatments the plaintiffs seek." *Kadel*, 100 F.4th at 206 (Quattlebaum, J., dissenting).

## V.  THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

The Court should not provisionally certify a class. *See* Pls.' Mem. 34; ECF No. 8. Under Federal Rule of Civil Procedure 23, a plaintiff must demonstrate four prerequisites before a class may be certified: (i) numerosity, (ii) commonality, (iii) typicality, and (iv) adequacy of representation. *See* Fed. R. Civ. P. 23(a). If the named putative class representatives can satisfy all four Rule 23(a) prerequisites, they must then satisfy one of the requirements of Rule 23(b). The Court must "conduct a 'rigorous analysis' to ensure that all the requirements of class certification are satisfied." *Lightfoot v. District of Columbia*, 273 F.R.D. 314, 323 (D.D.C. 2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160-61 (1982)). "The burden of

proving each of the requisite elements of Rule 23 is on the party seeking certification, and the failure to prove any element precludes certification." *Ramirez v. U.S. Immigr. & Customs Enf't*, 338 F. Supp. 3d 1, 43 (D.D.C. 2018).

### A.    Plaintiffs Cannot Satisfy Rule 23(a)'s Requirements

The "commonality" and "typicality" requirements of Rule 23(a) "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 n.5 (2011). The two provisions "tend to merge." *Gen. Tel. Co. of Sw.*, 457 U.S. at 157 n.13.

To meet these two requirements, it is not enough to show that the complaint "raises common 'questions'" or that the putative class members "have all suffered a violation of the same provision of law." *Wal-Mart*, 564 U.S. at 349–50 (citation omitted). Rather, the "claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution." *Id.* at 350. In other words, "[w]hat matters to class certification is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (cleaned up). "Without some glue holding the alleged *reasons* for [the challenged decisions] together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer . . . ." *Id.* at 352. Thus, a class may be certified only if plaintiffs and putative class members share claims that "depend upon a common contention," which in turn "must be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350.

Although Plaintiffs assert that they are entitled to class-wide injunctive relief compelling BOP to provide class members "gender-affirming hormone therapy and accommodations," ECF No. 7-7 at 2, the Court cannot resolve Plaintiffs' claims on a class-wide basis. Whether any medication or accommodation must be provided to an inmate to address a serious medical need is an individualized determination by a medical provider that turns on the inmates' specific circumstances. *See* Bina Decl. ¶ 13. Because those circumstances differ from inmate to inmate, the claims of putative class members are not susceptible to resolution on a class-wide basis.

For example, as explained, Plaintiffs' Eighth Amendment claim turns on objective and subjective factors, including whether an inmate has a serious medical need, whether a prison official knew about that need, and whether the official recklessly disregarded an excessive risk of harm. *See Bernier*, 38 F.4th at 1151. But the medical needs of the proposed class—consisting of all inmates "who are or will be diagnosed with gender dysphoria or meet the criteria for a gender dysphoria diagnosis," Compl. ¶ 15—are not uniform. Some members of the purported class might contend that they require hormone medication or particular accommodations; others may have never received such medication or accommodations. BOP's knowledge of the medical needs of each proposed class member will also vary by inmate. In some cases, BOP might know about a medical need because of the inmate's prior medical history. In other cases, BOP might not be aware of the need, particularly if an inmate has not yet received a gender dysphoria diagnosis. And in cases where BOP officials were aware of a medical need, how BOP responds to that need will also vary from case to case. As noted, even inmates with the same diagnosis may be offered different medical treatment based on the individual clinical need. Accordingly, the "truth or falsity" of any putative class members' contention that he or she has been denied care to address a serious medical need could not possibly be resolved "in one stroke." *Wal-Mart*, 564 U.S. at 350.

Courts have expressly rejected the theory that prisoners with the same medical diagnosis necessarily have a common Eighth Amendment claim. In *Rouse v. Plantier*, 182 F.3d 192, 198 (3d Cir. 1999), the Third Circuit reversed the district court's summary judgment in favor of a class of diabetic prisoners who raised an Eighth Amendment medical care claim. *Id.* at 194, 198 (Alito, J.). The court noted that "not all insulin-dependent diabetics require the same level of medical care," *id.* at 198, and that it was therefore "possible that conduct that violates the Eighth Amendment rights of the unstable [diabetics] may not violate the constitutional rights of the stable [diabetics]," *id.* at 199. As the court observed, "the Eighth Amendment right of a prisoner to be free from deliberate indifference to his or her serious medical needs" is one that "obviously varies depending on the medical needs of the particular prisoner." *Id.*; *see also, e.g.*, *Kress v. CCA of Tennessee, LLC*, 694 F.3d 890, 893 (7th Cir. 2012) (affirming district court decision denying class certification because "[c]laims of inadequate medical care by their nature require individual determinations, as the level of medical care required to comport with constitutional and statutory standards will vary depending on each inmate's circumstances"); *Sabata v. Nebraska Dep't of Corr. Servs.*, 337 F.R.D. 215, 262, 268 (D. Neb. 2020) (denying class certification of inmates bringing Eighth Amendment medical care claim on commonality and typicality grounds because proposed class members had "such disparate medical needs that the questions are neither common nor resolved by a single classwide answer").

Plaintiffs do not wrestle with these fundamental issues with a class-wide approach. They do not acknowledge that some putative class members may never have received hormone medication, or that different class members may have received different accommodations. They simply argue that commonality is satisfied because they have identified "a single alleged practice—a blanket policy prohibiting certain health care from even being considered—that provides the basis for every

class member's injury." ECF No. 8 at 7. But, as discussed, BOP does not have a "blanket" policy on the provision of hormone medication to inmates with general dysphoria. Instead, BOP evaluates each inmate "individually" in formulating a treatment plan based on the inmate's clinical needs. Bina Decl. ¶ 13. Moreover, even if BOP were enforcing a blanket policy, the Eighth Amendment inquiry would still vary from inmate to inmate, depending on the inmates' specific, serous medical needs, BOP's knowledge of the risk, and BOP's actions to address the risk. Indeed, even Plaintiffs acknowledge that "each class member's treatment plan for gender dysphoria is individualized." ECF No. 8 at 9.

Plaintiffs do not cite any cases in support of their commonality and typicality arguments that involved Eighth Amendment claims, let alone claims alleging deliberate indifference to a serious medical need. *See id.* at 7–9. In all the cases Plaintiffs cite, the plaintiffs were able to identify an injury for every plaintiff stemming from the challenged policy. *See, e.g.*, *Damus v. Nielsen*, 313 F. Supp. 3d 317, 330 (D.D.C. 2018) (each proposed class member had suffered the same "concrete injury"—detention by ICE after having been denied parole). Here, by contrast, whether any class member has or will suffer an injury depends on an individualized inquiry that is not susceptible to class-wide adjudication.

For similar reasons, Plaintiffs cannot meet Rule 23(a)'s adequacy requirement because Plaintiffs' individual medical conditions and any necessary care to address Plaintiffs' serious medical needs are unlikely to be identical to that of the putative class members. Under such circumstances, they are unlikely to be able to adequately represent the interests of the putative class members. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997) (class representative must "possess the same interest and suffer the same injury" as the class members).

Because the putative class members' claims cannot be determined in a "single stroke," *Wal-Mart,* 564 U.S. at 350, Plaintiffs cannot meet the requirements of Rule 23(a).

### B.    Certification Under Rule 23(b) Is Not Warranted

Even if Plaintiffs' claims could be resolved on a class-wide basis, class certification under Rule 23(b) would still be unwarranted.  Plaintiffs contend that they satisfy the requirements for certification under Rules 23(b)(1)(A), 23(b)(1)(B), and 23(b)(2).  None of these subsections provides a basis for certifying the class.

#### 1.    Rule 23(b)(1)(A)

Rule 23(b)(1)(A) applies where separate actions would create a risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." This rule "takes in cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)." *Amchem*, 521 U.S. at 614 (citation omitted).  For a class to be certified under Rule 23(b)(1)(A), there must be "more than the mere possibility that inconsistent judgments and resolutions of identical questions of law would result if numerous actions are conducted instead of one class action."  *In re Integra Realty Res., Inc.,* 354 F.3d 1246, 1263–64 (10th Cir. 2004).

Here, there is no risk of inconsistent adjudications creating "incompatible standards of conduct" for BOP.  That is because, as explained in more detail below, the Prison Litigation Reform Act requires any injunctive relief be limited to the plaintiffs only.  *See* 18 U.S.C. § 3626(a); *see also* Prelim. Inj. at 4, *Doe v. McHenry*, No. 25-cv-286-RCL (D.D.C. Mar. 19, 2025), ECF No. 68 (restricting preliminary injunction to named plaintiffs).  Accordingly, even if this Court and another court were to reach inconsistent decisions about BOP's legal obligations, those decisions

would only be binding as to the named plaintiffs before each respective court. BOP would simply comply with each court's decision as it relates to the individual plaintiffs before that court. There is thus no risk of separate actions creating "incompatible" standards for BOP.

2.     Rule 23(b)(1)(B)

Rule 23(b)(1)(B) applies where separate actions would create a risk of "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Typically, certification under this rule is based on a "limited fund" theory, where certification is proper because the putative class members' only source of legal recovery comes from a limited fund. *See, e.g.*, *Ortiz v. Fireboard Corp.*, 527 U.S. 815, 834–38 (1999). Other examples include "suits brought to reorganize fraternal-benefit societies; . . . actions by shareholders to declare a dividend or otherwise to fix [their] rights; . . . and actions charging a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class of beneficiaries." *Id.* at 834.

Rule 23(b)(1)(B) has no applicability here. Again, under the PLRA, if class members proceed with separate actions, any injunctive relief in such actions must be limited to the named plaintiffs only. *See* 18 U.S.C. § 3626(a). Accordingly, an adjudication of one plaintiff's claim would not be dispositive or preclusive of another plaintiff's claim, or impair their ability to protect their interests. If this Court were to conclude in this case that Plaintiffs' claims lack merit, for example, other putative class members would still be free to file their own claims. Res judicata and collateral estoppel would not apply because those putative class members are not a party to this litigation. Nor would *stare decisis* apply to the holdings of a district court. Accordingly, this is not the type of case where adjudication of Plaintiffs' claims would impair other class members' rights as a practical matter.

3.    Rule 23(b)(2)

Certification under Rule 23(b)(2) is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Rule 23(b)(2) encompasses two basic requirements: (1) "the party opposing the class must have acted, refused to act, or failed to perform a legal duty on grounds generally applicable to all class members," and (2) "final relief of an injunctive nature or a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, must be appropriate."  *Torres v. Del Toro*, No. 1:21-cv-306-RCL, 2021 WL 4989451, at *5 (D.D.C. Oct. 7, 2021) (cleaned up); *see also Lightfoot*, 273 F.R.D. at 329.  In addition, Rule 23(b)(2) "operates under the presumption that the interests of the class members are cohesive."  *Borum v. Brentwood Vill., LLC*, 324 F.R.D. 1, 19 (D.D.C. 2018) (quoting *Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577, 580 (7th Cir. 2000)); *see also Eubanks v. Billington*, 110 F.3d 87, 94 (D.C. Cir. 1997) ("[A]ssumptions of homogeneity and class cohesiveness . . . underlie (b)(2) certification.").

A class is cohesive where "the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members."  *Lemon*, 216 F.3d at 580.  Thus, certification under Rule 23(b)(2) "is generally inappropriate in actions raising significant individual liability or defense issues."  *Lightfoot*, 273 F.R.D. at 329 (footnote omitted).  Nor does it apply when class members "would be entitled to a *different* injunction or declaratory judgment against the defendant."  *Wal-Mart*, 564 U.S. at 360.  Rather, class relief must be "indivisible," premised on "conduct . . . that . . . can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Id.* (citation omitted); *see also Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008) (Gorsuch, J.) (Rule 23(b)(2) does not apply where "redressing

30

the class members' injuries requires time-consuming inquiry into individual circumstances or characteristics of class members or groups of class members").

Plaintiffs' proposed class does not satisfy Rule 23(b)(2) because BOP has not acted on grounds "generally applicable to all class members." *Torres*, 2021 WL 4989451, at *5. Rather, as noted, BOP conducts individualized assessments to address the medical needs of inmates in its custody. Bina Decl. ¶ 13. Moreover, Plaintiffs cannot satisfy the cohesiveness requirement because, as discussed, whether any Eighth Amendment violation occurred will turn on an individualized inquiry into the factual circumstances of each putative class member. Based on the fact-bound nature of the inquiry under the deliberative-indifference standard, BOP's conduct could not be found to violate the Eighth Amendment "as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360; *see also, e.g.*, *Nez Perce Tribe v. Kempthorne*, No. 06-2239 (JR), 2008 WL 11408458, at *6 (D.D.C. Dec. 1, 2008) (finding Rule 23(b)(2) inapplicable where "differences in the circumstances and histories of the tribes that plaintiffs seek to represent make common fund, classwide relief unthinkable"); *Azor-El v. City of New York*, No. 20-3650 (KPF), 2024 WL 4326921, at *12 (S.D.N.Y. Sept. 27, 2024) (denying Rule 23(b)(2) certification where injunctive relief requiring medical monitoring of class members would require "highly individualized" inquiry based on each class member's unique circumstances); *Money v. Pritzker*, 453 F. Supp. 3d 1103, 1111 (N.D. Ill. 2020) (denying provision certification under Rule 23(b)(2) because relief turned on "inmate-specific inquiry" that was unsuitable for class-wide relief).

## VI.  UNDER THE PLRA, ANY INJUNCTIVE RELIEF MUST BE LIMITED TO THE NAMED PLAINTIFFS AND EXTEND NO FURTHER THAN NECESSARY

Although the Court should not issue any injunctive relief for the reasons explained above, if it is inclined to do so, it should adhere to PLRA's restrictions. Under the PLRA, "[p]rospective relief in any civil action with respect to prison

conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1). As to preliminary injunctive relief specifically, such relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means . . . to correct that harm." *Id.* § 3626(a)(2). Indeed, Plaintiffs tacitly acknowledge that they alone cannot obtain a nationwide injunction, given their assertion that the Court must "provisionally certify the class . . . for purposes of emergency relief." ECF No. 7, at 1. Moreover, "[p]reliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under [18 U.S.C. § 3626(a)(1)] for the entry of prospective relief and makes the order final before the expiration of the 90-day period." *Id.* Any order granting prospective or preliminary relief would need to comply with these provisions of the PLRA.

Specifically, any preliminary injunction should apply to the named Plaintiffs only. A broader nationwide injunction would transgress not only Article III principles, but also the PLRA's specific requirement that relief be "narrowly drawn" and "extend no further than necessary to correct the harm the court finds requires preliminary relief." *Id.* § 3626(a)(2). Consistent with this requirement, the Court has correctly limited the preliminary injunctions issued in the related *Doe*, *Jones*, and *Moe* cases to the named plaintiffs only. *See, e.g.*, Prelim. Inj. at 4, *Doe v. McHenry*, No. 25-cv-286-RCL (D.D.C. Mar. 19, 2025), ECF No. 68. The Court thus should reject Plaintiffs' request that the Court generally enjoin Defendants from enforcing Executive Order 14168 or BOP's implementing memoranda, ECF No. 7-7, without limiting such relief to the named Plaintiffs.

The fact that Plaintiffs request a "stay" under the APA does not compel a different outcome. As an initial matter, the request for a stay is moot. Section 705 allows an agency to postpone the effective date of its own action pending judicial

review. 5 U.S.C. § 705. And "on such conditions as may be required and to the extent necessary to prevent irreparable injury," it also allows a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending" the court's review. *Id.* No postponement is available here because, according to Plaintiffs, the agency has already taken the action at issue. *See* Pls.' Mem. 27–28 (arguing that agency has already taken "final" action); *see also VanDerStok v. Garland*, 633 F. Supp. 3d 847, 863 (N.D. Tex. 2022) ("While [§ 705] might authorize a Court to 'postpone the effective date' of an unlawful agency action in a particular context, the Final Rule at issue here took effect [already]."); *Nat. Res. Def. Council v. DOE*, 362 F. Supp. 3d 126, 151 (S.D.N.Y. 2019); *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal. 2017).

In any event, § 705 does not require a nationwide remedy. There is no pre-APA tradition of district courts granting nationwide stays (as opposed to preliminary injunctions) of agency rules, and in enacting Section 705, Congress did not intend to create any new remedies. Rather, section 705 "was primarily intended to reflect existing law," not "to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). The Supreme Court recently instructed that "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity." *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024). And one such principle of "equity jurisprudence," is that any court-ordered relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (emphasis added). Accordingly, a nationwide § 705 stay is improper.

Finally, any injunction should be clear that it does not require BOP to provide sex-reassignment surgery. Although Plaintiffs disclaim seeking any intent to seek

33

such an injunction currently, Pls.' Mem. 6 n.2, their proposed order does not include a carve-out for surgery, ECF No. 7-7. Instead, Plaintiffs' proposed order seeks to broadly enjoin Defendants from "enforcing Executive Order 14168 as applied to medical care and accommodations . . . and from enforcing the BOP's memoranda implementing Executive Order 14168." *Id.* at 2.

## VII.   THE PRESIDENT IS IMMUNE FROM INJUNCTIVE RELIEF

Although Plaintiffs seek an injunction against the President, *see* ECF No. 7-7, federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Franklin*, 505 U.S. at 802–03 (quoting *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866)); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("[C]ourts do not have jurisdiction to enjoin [the President] . . . and have never submitted the President to declaratory relief."). The President therefore is immune from injunctive relief, and the Court should dismiss him as a defendant. *See Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) (dismissing the President "as a party to this case").

## CONCLUSION

The Court should deny Plaintiffs' motions for a preliminary injunction and for class certification.

Dated: March 28, 2025                    Respectfully submitted,

                                         YAAKOV M. ROTH
                                         Acting Assistant Attorney General

                                         JEAN LIN
                                         Special Litigation Counsel

                                         /s/ *John Robinson*
                                         JOHN ROBINSON (Bar No. 1044072)
                                         ELIZABETH B. LAYENDECKER
                                         ALEX YUN
                                         Trial Attorneys
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L. Street, NW
                                         Washington D.C. 20005
                                         (202) 616-8489
                                         john.j.robinson@usdoj.gov