UNITED STATES DISTRICT COURT
DISTRICT OF THE DISTRICT OF COLUMBIA

ALISHEA KINGDOM, *et al.*,          )
                                    )
            Plaintiffs,             )
                                    )
      v.                            )          No. 1:25-cv-00691-RCL
                                    )
DONALD J. TRUMP, *et al.*,          )
                                    )
            Defendants.             )

**AMICUS BRIEF OF INDIANA, IDAHO, AND 22 OTHER STATES
IN SUPPORT OF DEFENDANTS**

RAUL R. LABRADOR
Attorney General of Idaho

ALAN HURST
Solicitor General

MICHAEL A. ZARIAN
Deputy Solicitor General

Office of Idaho Attorney General
700 W. Jefferson St.
Boise, ID 83720
Tel: (208) 334-2400
Email: alan.hurst@ag.idaho.gov

THEODORE E. ROKITA
Attorney General of Indiana

JAMES A. BARTA (DC Bar 1032613)
Solicitor General

JENNA M. LORENCE
Deputy Solicitor General

Office of the Indiana Attorney General
IGC South, Fifth Floor
Indianapolis, Indiana 46204
Tel: (317) 232-0709
Fax: (317) 232-7979
Email: James.Barta@atg.in.gov

*Counsel for Amici States*
*(additional counsel listed in addendum)*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION AND INTEREST OF AMICI STATES ........................................................ 1

ARGUMENT ....................................................................................................................... 2

I.      The Controversial Drugs and Procedures to Which Plaintiffs Demand Access Are Squarely Within Policymakers' Authority To Regulate ........................................................ 2

      A.      The Constitution vests politically accountable policymakers with authority to regulate medicine, particularly in areas of uncertainty ............................................ 2

      B.      Cross-sex hormones and sex-change surgeries are precisely the type of controversial practices subject to regulation by accountable policymakers ............ 4

II.     Prisoners Do Not Have a Greater Right to Drugs and Procedures Than Free Citizens ....... 9

      A.      The Eighth Amendment does not limit policymakers' traditional authority ........... 9

      B.      The Eighth Amendment does not strip policymakers of discretion to make categorical judgments ............................................................................................. 11

CONCLUSION .................................................................................................................... 13

# TABLE OF AUTHORITIES

**CASES**

*Abigail All. for Better Access to Dev. Drugs v. von Eschenbach*,
  495 F.3d 695 (D.C. Cir. 2007) ........................................................................3, 4

*Barr v. Pearson*,
  909 F.3d 919 (8th Cir. 2018) ........................................................................11

*Barsky v. Bd. of Regents of Univ.*,
  347 U.S. 442 (1954) ........................................................................................2

*Bernier v. Obama*,
  201 F.Supp.3d 87 (D.D.C. 2016) ..................................................................11

*Bucklew v. Precythe*,
  587 U.S. 119 (2019) ......................................................................................10

*City of Grants Pass v. Johnson*,
  603 U.S. 520 (2024) ..................................................................................9, 13

*Dent v. West Virginia*,
  129 U.S. 114 (1889) ........................................................................................2

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ........................................................................................4

*Eknes-Tucker v. Governor of Ala.*,
  80 F.4th 1205 (11th Cir. 2023) .....................................................................13

*Eknes-Tucker v. Governor of Ala.*,
  114 F.4th 1241 (11th Cir. 2024) ......................................................................8

*Estelle v. Gamble*,
  429 U.S. 97 (1976) ........................................................................................10

*Furman v. Georgia*,
  408 U.S. 238 (1972) ........................................................................................9

*Gibson v. Collier*,
  920 F.3d 212 (5th Cir. 2019) ..........................................................4, 11, 12

*Gonzales v. Carhart*,
  550 U.S. 124 (2007) ........................................................................................3

*Gonzales v. Raich*,
  545 U.S. 1 (2005) ............................................................................................3

CASES [CONT'D]

*Hawker v. People of N.Y.*,
　170 U.S. 189 (1898) ..................................................................................................2

*Hawley v. Evans*,
　716 F. Supp. 601 (N.D. Ga. 1989) ..........................................................................12

*Hoffer v. Sec'y, Fla. Dep't of Corr.*,
　973 F.3d 1263 (11th Cir. 2020) .........................................................................11, 12

*Hudson v. McMillian*,
　503 U.S. 1 (1992) .....................................................................................................10

*Ingraham v. Wright*,
　430 U.S. 651 (1977) ...................................................................................................9

*Johnson v. Dominguez*,
　5 F.4th 818 (7th Cir. 2021) ......................................................................................11

*Johnson v. Doughty*,
　433 F.3d 1001 (7th Cir. 2006) .................................................................................10

*K.C. v. Individual Members of the Med. Licensing Bd. of Ind.*,
　121 F.4th 604 (7th Cir. 2024) .............................................................................9, 13

*Kansas v. Hendricks*,
　521 U.S. 346 (1997) ...............................................................................................3, 4

*Kosilek v. Spencer*,
　774 F.3d 63 (1st Cir. 2014) ................................................................................4, 11

*L.W. v. Skrmetti*,
　83 F.4th 460 (6th Cir. 2023) ...................................................................................13

*Lambert v. Yellowley*,
　272 U.S. 581 (1926) ...................................................................................................2

*Marshall v. United States*,
　414 U.S. 417 (1974) ...................................................................................................4

*Robinson v. California*,
　370 U.S. 660 (1962) ...................................................................................................3

*Snipes v. DeTella*,
　95 F.3d 586 (7th Cir. 1996) .....................................................................................10

CASES [CONT'D]

*Washington v. Glucksberg*,
    521 U.S. 702 (1997)..................................................................................2

*Watson v. Maryland*,
    218 U.S. 173 (1910)..................................................................................2

*Whalen v. Roe*,
    429 U.S. 589 (1977)..................................................................................3

*Minnesota ex rel. Whipple v. Martinson*,
    256 U.S. 41 (1921)....................................................................................3

*Wilson v. Seiter*,
    501 U.S. 294 (1991)................................................................................10

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. VIII...............................................................................9

**OTHER AUTHORITIES**

Alice A. White et al., *Potential Immunological Effects of Gender-Affirming*
    *Hormone Therapy in Transgender People—an Unexplored Area of Research,*
    13 Therapeutic Advances in Endocrinology & Metabolism 1 (2022).....................8

Amicus Brief of the State of Alabama, *United States v. Skrmetti*, No. 23-477 (Oct.
    15, 2024) .................................................................................................8

Anderson et al., *Gender Dysphoria and Its Non-Surgical and Surgical*
    *Treatments,* 10 Health Psych. Rsch. (2022)................................................9

Bishop et al., *Pain and Dysfunction Reported After Gender-Affirming Surgery: A*
    *Scoping Review*, 103 PTJ: Physical Therapy & Rehab. J. 1 (2023) .........................6

Bränström & Pachankis, *Letter to the Editor*, 177 Am. J. Psychiatry 769 (2020) .......5

Bränström et al., *Reduction in Mental Health Treatment Utilization Among*
    *Transgender Individuals after GenderAffirming Surgeries: A Total Population*
    *Study*, 177 Am. J. Psychiatry 727 (2020)...................................................5

Dahlen et al., *International Clinical Practice Guidelines for Gender*
    *Minority/Trans People: Systematic Review and Quality Assessment,* 11 BMJ
    Open 1 (2021) ..........................................................................................6

Daniel Jackson, *Suicide-Related Outcomes Following Gender-Affirming*
    *Treatment: A Review,* 15(3) Cureus 11–13 (2023) .......................................7

iv

OTHER AUTHORITIES [CONT'D]

Darios Getahun et al., 169(8) *Cross-Sex Hormones and Acute Cardiovascular
    Events in Transgender Persons: A Cohort Study*, Annals of Internal Medicine
    205 (2018)...................................................................................................................8

Dhejne et al., *Long-Term Follow-Up of Transsexual Persons Undergoing Sex
    Reassignment Surgery: Cohort Study in Sweden,* 6 PLoS One 1 (2011)................................6

Djordjevic et al., *Reversal Surgery in Regretful Male-to-Female Transsexuals
    after Sex Reassignment Surgery,* 13  J. Sex Med. 1000 (2016)...................................6

Dunford et al., *Genital Reconstructive Surgery in Male to Female Transgender
    Patients: A Systematic Review of Primary Surgical Techniques, Complication
    Profiles, and Functional Outcomes from 1950 to Present Day,* Eur. Urol.
    Focus 1 (2020) ...........................................................................................................5

Gender Dysphoria and Gender Reassignment Surgery, National Coverage
    Analysis Decision Memo, 2016, https://www.cms.gov/medicare-coverage-
    database/view/ncacal-decision-memo.aspx?proposed=N&NCAId=282 ...........................4, 5

Giovanni Corso et al., *Risk and Incidence of Breast Cancer Risk in Transgender
    Individuals: A Systematic Review and Meta-Analysis,* 32(3) European J.
    Cancer Prevention 207 (2023) ....................................................................................8

H. Cass, *Independent Review of Gender Identity Services for Children and Young
    People: Final Report* 133 (2024)................................................................................8

Haupt et al., *Antiandrogen or estradiol treatment or both during hormone therapy
    in transitioning transgender women*, 11 Cochrane Database of Systematic
    Reviews, Art. No. CD013138 (2020) ..........................................................................6

Jose O. Sanetellan-Hernandez et al., 14 *Multifocal Glioblastoma and Hormone
    Replacement Therapy in a Transgender Female,* Surgical Neurology Int'l 106
    (2023)..........................................................................................................................7

Kellan E. Baker, et al., *Hormone Therapy, Mental Health, and Quality of Life
    Among Transgender People: A Systematic Review,* 5 J. Endocrine Soc. 1
    (2021)..........................................................................................................................7

Kenny Rodriguez-Wallberg et al., *Reproductive Health in Transgender and
    Gender Diverse Individuals: A Narrative Review to Guide Clinical Care and
    International Guidelines,* 24(1) Int'l J. Transgender Health 7 (2023) .......................8

Khobe Chandran et al., *A Transgender Patient with Prostate Cancer: Lessons
    Learnt*, 83 European Urology 379 (2023)...................................................................7

v

OTHER AUTHORITIES [CONT'D]

Lindqvist et al., *Quality of Life Improves Early after Gender Reassignment Surgery*, 40 Eur. J. Plastic Surgery 223 (2017)..........................................................................5

Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners,* 50 Archives of Sexual Behav. 3353 (2021)......................................................6

Naomi E. Gutkind et al., *Idiopathic Intracranial Hypertension in Female-to-Male Transgender Patients on Exogenous Testosterone Therapy,* 39(5) Ophthalmic Plastic & Reconstructive Surgery 449 (2023) ............................................................8

Rakesh R. Gurrala et al., *The Impact of Exogenous Testosterone on Breast Cancer Risk in Transmasculine Individuals*, 90(1) Annals of Plastic Surgery 96 (2023)....................7

Talal Alzahrani et al., *Cardiovascular Disease Risk Factors and Myocardial Infarction in the Transgender Population,* 12(4) Circulation: Cardiovascular Quality & Outcomes (2019)................................................................................7

Vianney Andzembe et al., 46(2) *Branch Retinal Vein Occlusion Secondary to Hormone Replacement Therapy in a Transgender Woman*, 46 J. Fr. Ophtalmologie 148 (2023) ............................................................................7

## INTRODUCTION AND INTEREST OF AMICI STATES

Across the country, medical professionals and policymakers are engaged in intense dialogue over how to address surging cases of gender dysphoria. Some groups, like plaintiffs and their experts, advocate for treating discomfort with one's body by altering a person's physical appearance through invasive sex-change surgeries and risky hormone doses. Others urge a more measured approach. They argue that physicians should address gender dysphoria with non-invasive psychotherapy. Whatever the wisdom of these competing approaches, the Constitution does not constrain the federal government and States to take one side of the debate or the other. The Constitution leaves policy choices about best medical practices to politically accountable policymakers, who are best positioned to weigh the safety, efficacy, and ethics of different approaches.

Plaintiffs would have the federal judiciary take the decision out of policymakers' hands because one set of experts relying on guidelines from the World Professional Association of Transgender Health (WPATH) insist that surgeries and hormones are the answer. But nothing in the Eighth Amendment's text or history allows prisoners to demand whatever medical interventions they desire. Nor does anything in its text or history privilege the views of medical interest groups above policymakers' reasonable medical judgments. And the Eighth Amendment certainly does not appoint federal courts to be the referees of robust, ongoing debates within the medical community. As sovereigns who have long regulated medicine to protect public health and safety, amici States have an interest in protecting their authority, including for the prisoners in their care. They urge the Court to reject plaintiffs' request for an injunction requiring the government to provide trans-identifying prisoners with sex-change surgeries and cross-sex hormones.

## ARGUMENT

I.  **The Controversial Drugs and Procedures to Which Plaintiffs Demand Access Are Squarely Within Policymakers' Authority to Regulate**

A.  **The Constitution vests politically accountable policymakers with authority to regulate medicine, particularly in areas of uncertainty**

Background constitutional principles make clear that the responsibility for deciding whether to permit access to drugs and procedures lies with politically accountable policymakers. As decision after decision from the Supreme Court establishes, regulating the practice of medicine is "a vital part of a state's police power." *Barsky v. Bd. of Regents of Univ.*, 347 U.S. 442, 449 (1954). "The power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as in its judgment will secure or tend to secure them against the consequences of ignorance and incapacity, as well as of deception and fraud." *Dent v. West Virginia*, 129 U.S. 114, 122 (1889). "[T]here is no right to practice medicine which is not subordinate to the police power of the states." *Lambert v. Yellowley*, 272 U.S. 581, 596 (1926).

As a result, state policymakers have authority to adopt a wide variety of health, safety, and ethical regulations for "all professions concerned with heath." *Barsky*, 347 U.S. at 449. "[F]or the protection of society," state policymakers may bar unlicensed persons from practicing medicine. *Dent*, 129 U.S. at 122–23. State policymakers may adopt requirements to ensure that physicians have the requisite "[c]haracter" and "knowledge of diseases" to apply remedies "safely." *Hawker v. People of N.Y.*, 170 U.S. 189, 193–94 (1898); *see Watson v. Maryland*, 218 U.S. 173, 176 (1910). And state policymakers may adopt measures to "protect[] the integrity and ethics of the medical profession." *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997).

State policymakers' authority extends to regulating drugs and procedures as well. It "is, of course, well settled that the State has broad police powers in regulating the administration of drugs

2

by the health professions." *Whalen v. Roe*, 429 U.S. 589, 603 n.30 (1977). As the Supreme Court has observed, "[t]he right" of States "to regulate the administration, sale, prescription and use of dangerous and habitforming drugs" in "the interest of the public health and welfare" is "so manifest" that it cannot be "called into question." *Robinson v. California*, 370 U.S. 660, 664 (1962) (quoting *Minnesota ex rel. Whipple v. Martinson*, 256 U.S. 41, 45 (1921)). Indeed, lawmakers have regulated drugs based on "the risks associated with both drugs safety and efficacy" since colonial times. *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 703 (D.C. Cir. 2007) (en banc); *see id.* at 704 (citing examples).

And since the Civil War era, Congress has layered federal regulations of drugs and procedures on top of state regulations. *See Abigail All.*, 495 F.3d at 704–05. To cite but a few examples, Congress has "required that drug manufacturers provide proof that their products were safe before they could be marketed" and that the Federal Food and Drug Administration "only approve drugs deemed effective for public use." *Id.* at 705. Congress has prohibited the interstate cultivation, transportation, and sale of marijuana, including for medical purposes. *See Gonzales v. Raich*, 545 U.S. 1, 12–13 (2005). And Congress has prohibited physicians from using certain surgical procedures for abortions. *See Gonzales v. Carhart*, 550 U.S. 124, 140–43 (2007). In short, our Nation's history and traditions demonstrate that judgments about the safety, necessity, and costs of drugs and procedures are for politically accountable policymakers to make.

That some, or even many, medical professionals may disagree with policymakers' choices does not "tie [policymakers'] hands." *Kansas v. Hendricks*, 521 U.S. 346, 360 n.3 (1997). The Supreme Court "has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Carhart*, 550 U.S. at 163. In fact, "it is precisely

where such disagreement exists that legislatures have been afforded the widest latitude." *Hendricks*, 521 U.S. at 360 n.3. As the en banc D.C. Circuit has explained, "[o]ur Nation's history and traditions have consistently demonstrated that the democratic branches are better suited [than the courts] to decide the proper balance between uncertain risks and benefits of medical technology, and are entitled to deference in doing so." *Abigail All.*, 495 F.3d at 713. Or put another way, the "normal rule" is that federal courts must "defer" to the judgments of politically accountable policymakers "'in areas fraught with medical and scientific uncertainties.'" *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 274 (2022) (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)).

**B.    Cross-sex hormones and sex-change surgeries are precisely the type of controversial practices subject to regulation by accountable policymakers**

Deference to policymakers is particularly appropriate with respect to policies regarding gender dysphoria. As two courts of appeals have observed, a "robust and substantial good faith disagreement divid[es]" the medical community over whether physicians should address gender dysphoria by cutting off or surgically altering healthy body parts to make a person look more like the opposite sex. *Gibson v. Collier*, 920 F.3d 212, 220 (5th Cir. 2019); *see Kosilek v. Spencer*, 774 F.3d 63, 76 (1st Cir. 2014) (en banc) (noting testimony from Johns Hopkins physicians that there are "many people in the country who disagree with" WPATH's surgical recommendations). The ethics of cutting off or mutilating healthy tissue is questionable. And medical review after review demonstrates that sex-change surgeries carry real risks while providing no proven benefit.

Consider a few examples. In 2016, the Centers for Medicare and Medicaid Services reviewed studies considering the effectiveness of sex-change surgeries. Gender Dysphoria and Gender Reassignment Surgery, National Coverage Analysis Decision Memo, 2016,

4

https://www.cms.gov/medicare-coverage-database/view/ncacal-decision-memo.aspx?pro-posed=N&NCAId=282. Of the hundreds of sources reviewed and cited, only six provided useful information regarding surgery. The four best-designed of those six studies "did not demonstrate clinically significant changes or differences in psychometric test results after" surgery. *Id.* A few years later, authors who set out to prove that surgery provides mental-health benefits were forced to retract their study after a re-analysis of their data showed "no advantage of surgery." Bränström et al., *Reduction in Mental Health Treatment Utilization Among Transgender Individuals after GenderAffirming Surgeries: A Total Population Study*, 177 Am. J. Psychiatry 727, 734, Correction (2020). What is more, the authors then conceded that there is "a lack of sufficient knowledge to provide evidence-based treatment recommendations" for persons with gender dysphoria. Bränström & Pachankis, *Letter to the Editor*, 177 Am. J. Psychiatry 769, 769 (2020).

Similar concessions are found throughout the literature. A meta-analysis of "all studies published on genital [] surgery from 1950" to 2020 concluded that the "evidence for [post-surgical] complications and functional outcomes is of low level." Dunford et al., *Genital Reconstructive Surgery in Male to Female Transgender Patients: A Systematic Review of Primary Surgical Techniques, Complication Profiles, and Functional Outcomes from 1950 to Present Day*, Eur. Urol. Focus 1, 5–6 (2020). Other studies have suggested that at patients' quality of life immediately after surgery improves—but then concede that, if the window is expanded to five years post-surgery, quality of life has returned to the preoperative level. Lindqvist et al., *Quality of Life Improves Early after Gender Reassignment Surgery*, 40 Eur. J. Plastic Surgery 223, 224–25 (2017). As one study summarizes, "[t]he quality of current guidelines" for addressing gender dysphoria is "un-

clear" because they "tend[] to lack methodological rigour and rely on patchier, lower-quality primary research." Dahlen et al., *International Clinical Practice Guidelines for Gender Minority/Trans People: Systematic Review and Quality Assessment*, 11 BMJ Open 1, 2, 6 (2021).

Indeed, some studies indicate that those who undergo life-altering surgeries later regret their decision and suffer serious complications. *See, e.g.*, Djordjevic et al., *Reversal Surgery in Regretful Male-to-Female Transsexuals after Sex Reassignment Surgery*, 13 J. Sex Med. 1000 (2016); Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 Archives of Sexual Behav. 3353 (2021). One review reports that, in the few studies that actually collected information about post-surgery pain, patients reported incontinence, vaginal stenosis, vaginal prolapse, and pain. Bishop et al., *Pain and Dysfunction Reported After Gender-Affirming Surgery: A Scoping Review*, 103 PTJ: Physical Therapy & Rehab. J. 1, 6 (2023). And especially troubling is a 2011 study showing that postoperative trans-identifying patients remained suicidal after surgery at a much higher rate—19.1 times higher—than a control population. Dhejne et al., *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*, 6 PLoS One 1, 6 (2011). That study "found substantially higher rates of overall mortality, death from cardiovascular disease and suicide, suicide attempts, and psychiatric hospitalizations in sex-reassigned transsexual individuals compared to a healthy control population." *Id.* at 7.

The evidence supporting the effectiveness of hormone therapy to treat gender dysphoria is likewise weak. A 2020 systematic review of available studies "found insufficient evidence to determine the efficacy or safety of hormonal treatment approaches for transgender women in transition"—it concluded that "[t]he evidence is very incomplete, demonstrating a gap between current clinical practice and clinical research." Haupt et al., *Antiandrogen or estradiol treatment or both*

*during hormone therapy in transitioning transgender women*, 11 Cochrane Database of Systematic Reviews, Art. No. CD013138, at 2, 11 (2020). Another systematic review of studies concluded that it was "impossible to draw conclusions about the effects of hormone therapy on death by suicide" because of the "low" "strength of evidence." Kellan E. Baker, et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, 5 J. Endocrine Soc. 1, 12–13 (2021). Indeed, one study found that incidence of mental healthcare visits for suicidality *increased* following the initiation of cross-sex hormones. Daniel Jackson, *Suicide-Related Outcomes Following Gender-Affirming Treatment: A Review*, 15(3) Cureus 11–13 (2023).

And like sexual reassignment surgeries, there are significant risks accompanying hormones therapy. Evidence shows that males who are treated with estrogen have twenty-two times the likelihood to develop breast cancer,[1] an increased risk of prostate[2] and other cancers,[3] an increased risk of retinal vein occlusion,[4] a higher risk of strokes,[5] and a potential risk of autoimmune

---

[1] *See* Rakesh R. Gurrala et al., *The Impact of Exogenous Testosterone on Breast Cancer Risk in Transmasculine Individuals*, 90(1) Annals of Plastic Surgery 96 (2023).

[2] *See* Khobe Chandran et al., *A Transgender Patient with Prostate Cancer: Lessons Learnt*, 83 European Urology 379 (2023).

[3] *See* Jose O. Sanetellan-Hernandez et al., 14 *Multifocal Glioblastoma and Hormone Replacement Therapy in a Transgender Female*, Surgical Neurology Int'l 106 (2023).

[4] *See* Vianney Andzembe et al., 46(2) *Branch Retinal Vein Occlusion Secondary to Hormone Replacement Therapy in a Transgender Woman*, 46 J. Fr. Ophtalmologie 148 (2023).

[5] *See* Talal Alzahrani et al., *Cardiovascular Disease Risk Factors and Myocardial Infarction in the Transgender Population*, 12(4) Circulation: Cardiovascular Quality & Outcomes (2019).

disorders.[6] Females treated with testosterone may experience infertility,[7] pseudotumor cerebri,[8] an earlier onset of breast cancer,[9] and an increased risk of heart attacks.[10]

Of course, there are some interest groups like the World Professional Association of Transgender Health (WPATH)—the group on whose recommendations plaintiffs rely, *see* Dkt. 7-1 at 7—that promote surgeries and hormones for gender dysphoria. "But recent revelations indicate that WPATH's lodestar is ideology, not science." *Eknes-Tucker v. Governor of Ala.*, 114 F.4th 1241, 1261 (11th Cir. 2024) (Lagoa, J., concurring in denial of rehearing en banc). A "contributor to WPATH's most recent Standards of Care frankly stated, '[o]ur concerns, echoed by the social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits.'" *Id.*; *see* Amicus Brief of the State of Alabama, *United States v. Skrmetti*, No. 23-477 (Oct. 15, 2024) (cataloguing internal documents showing that WPATH routinely ignored the evidence, silenced scholars who questioned its guidelines, and censuring members who go public with their concerns). Simply put, WPATH's guidelines "overstate[] the strength of the evidence." H. Cass, *Independent Review of Gender Identity Services for Children and Young People: Final Report* 133 (2024),

---

[6] *See* Alice A. White et al., *Potential Immunological Effects of Gender-Affirming Hormone Therapy in Transgender People—an Unexplored Area of Research*, 13 Therapeutic Advances in Endocrinology & Metabolism 1 (2022).

[7] *See* Kenny Rodriguez-Wallberg et al., *Reproductive Health in Transgender and Gender Diverse Individuals: A Narrative Review to Guide Clinical Care and International Guidelines*, 24(1) Int'l J. Transgender Health 7 (2023).

[8] *See* Naomi E. Gutkind et al., *Idiopathic Intracranial Hypertension in Female-to-Male Transgender Patients on Exogenous Testosterone Therapy*, 39(5) Ophthalmic Plastic & Reconstructive Surgery 449 (2023).

[9] *See* Giovanni Corso et al., *Risk and Incidence of Breast Cancer Risk in Transgender Individuals: A Systematic Review and Meta-Analysis*, 32(3) European J. Cancer Prevention 207 (2023).

[10] *See* Darios Getahun et al., 169(8) *Cross-Sex Hormones and Acute Cardiovascular Events in Transgender Persons: A Cohort Study*, Annals of Internal Medicine 205 (2018).

https://webarchive.nationalarchives.gov.uk/ukgwa/20250310143933mp_/https://cass.independ-
ent-review.uk/wp-content/uploads/2024/04/CassReview_Final.pdf.

To summarize, both surgical and hormone-based interventions for gender dysphoria are
fraught with serious risks and uncertain to deliver any benefits. Meanwhile, there are non-surgical,
non-hormone related interventions that have been shown to address gender dysphoria effec-
tively—specifically, "[s]ocial support and psychotherapy are widely recognized approaches."
*K.C. v. Individual Members of the Med. Licensing Bd. of Ind.*, 121 F.4th 604, 610–11 (7th Cir.
2024) (citing Anderson et al., *Gender Dysphoria and Its Non-Surgical and Surgical Treatments*,
10 Health Psych. Rsch., at 4 (2022)). This is precisely the sort of situation where policymakers
should have the greatest leeway to protect public health and safety, especially where medical or-
ganizations have continued to misrepresent the true risk profile of these treatments.

## II.    Prisoners Do Not Have a Greater Right to Drugs and Procedures Than Free Citizens

What is true outside the prison context is true within it—decisions about controversial
drugs and procedures are for the democratic branches of state and federal governments to make.
So policymakers may constitutionally decide to provide trans-identifying prisoners with psycho-
therapy instead of sex-change surgeries and cross-sex hormones.

### A.    The Eighth Amendment does not limit policymakers' traditional authority

The Eighth Amendment does not give prisoners greater access to drugs and procedures
than free citizens. To the contrary, it bars only the infliction of "cruel and unusual punishments."
U.S. Const. amend. VIII. Rooted in the English Bill of Rights, that prohibition was adopted "to
ensure that the new Nation would never resort" to "certain barbaric punishments" like "disembow-
eling, quartering, public dissection, and burning alive." *City of Grants Pass v. Johnson*, 603 U.S.
520, 542 (2024); *see Ingraham v. Wright*, 430 U.S. 651, 664 (1977); *Furman v. Georgia*, 408 U.S.

238, 259 (1972) (Brennan, J., concurring). As early commentators explained, the Eighth Amendment ruled out "the use of the rack or the stake," or "breaking on the wheel, flaying alive, rending asunder with horses, maiming, mutilating, and scourging to death." *Bucklew v. Precythe*, 587 U.S. 119, 131 (2019) (cleaned up). The Eighth Amendment was meant to bar "long disused (unusual) forms of punishment that intensified the sentence of death with a (cruel) superaddition of terror, pain, or disgrace." *Id.* at 133.

Although the Supreme Court has announced that the Eighth Amendment prevents prison officials from showing "deliberate indifference to serious medical needs of prisoners," the Court has made clear that this does not mean "that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 102–05 (1976). The "Constitution is not a medical code that mandates specific medical treatment." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). The Eighth Amendment does not give prisoners "unqualified access to health care," *Hudson v. McMillian*, 503 U.S. 1, 9 (1992), nor does it permit prisoners to "demand specific care." *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Deliberate indifference requires more than a showing that a "physician has been negligent" or has committed "[m]edical malpractice." *Estelle*, 429 U.S. at 106. To demonstrate deliberate indifference, a prisoner must show that the deprivation is objectively serious and that prison officials "act[ed] with a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). A showing of subjective intent is important because "the Eighth Amendment bans only cruel and unusual *punishment*." *Id.* at 300. Punishments require "a deliberate act intended to chastise or deter." *Id.*

This means that "[p]rison officials are not . . . 'deliberately indifferent to an inmate's serious medical need when a physician prescribes a different method of treatment than requested by

the inmate.'" *Bernier v. Obama*, 201 F.Supp.3d 87, 93 (D.D.C. 2016). As one appellate court explains, a "'constitutional violation exists only if *no* minimally competent professional would have so responded under those circumstances.'" *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021) (emphasis added). Or as another put it, "[t]here is no intentional or wanton deprivation of care if a genuine debate exists within the medical community about the necessity or efficacy of that care." *Gibson*, 920 F.3d at 220; *see also Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1272–73 (11th Cir. 2020) (similar). A "difference of opinion over matters of expert medical judgment" simply "fails to rise to the level of a constitutional violation." *Barr v. Pearson*, 909 F.3d 919, 921–22 (8th Cir. 2018). Because "[n]othing in the Constitution mechanically gives controlling weight to one set of professional judgments," *Kosilek*, 774 F.3d at 96, prisoners cannot usurp policymaker's traditional authority to resolve debates that divide the medical community, *Gibson*, 920 F.3d at 220. Prisoners have no Eighth Amendment right to demand risky, expensive, and controversial surgeries and hormones.

## B. The Eighth Amendment does not strip policymakers of discretion to make categorical judgments

Plaintiffs repeatedly stress that the ban on sex-change surgeries and cross-sex hormones is "categorical." Dkt. 7-1 at 24. But there is nothing in the text or history of the Eighth Amendment that bars policymakers from making the same categorical judgments regarding medical care for prisoners that policymakers make in other health-related contexts. As the Fifth Circuit explained in upholding a policy against providing sex-change surgeries to any prisoners with gender dysphoria, the Food and Drug Administration makes "categorical judgments about what medical treatments may and may not be made available to the American people." *Gibson*, 920 F.3d at 225. But suppose an inmate "seeks a form of medical treatment . . . favored by some doctors" even if it is "not [yet] . . . approved by the FDA"? *Id.* Can the inmate "challenge this deprivation" under the

Eighth Amendment on the theory that "it is a categorical prohibition on medical treatment, rather than an individualized assessment? Surely not." *Id.* There is no basis in text, original understanding, or precedent "to conclude that a medical treatment may be categorically prohibited . . . yet require individualized assessment under the Eighth Amendment." *Id.*

Other courts have likewise recognized that, when "[t]he attitude in the scientific community towards [a treatment] is one of uncertainty," prisons may create "uniform policies" even if they "differ[] in some ways from the standards of other reputable agencies." *Hawley v. Evans*, 716 F. Supp. 601, 602–03 (N.D. Ga. 1989) (denying Eighth Amendment challenge to uniform policy limiting certain HIV treatments). That is because "as long as [a State's] prison system is abiding by reasonable medical practices, the issue of whether to permit a prisoner to be treated with experimental drugs . . . is the 'exclusive prerogative' of the state." *Id.* at 603. So long as policymakers are providing some type of medical care, courts "are hard-pressed to find that [the State] has acted in so reckless and conscience-shocking a manner as to have violated the Constitution." *Hoffer*, 973 F.3d at 1273 (upholding a prison policy categorically prohibiting certain prisoners from receiving a particular treatment for Hepatitis C). That is true even if "the adequacy of that care is the subject of genuine, good-faith disagreement between healthcare professionals." *Id.*

To hold it unconstitutional for policymakers to make categorical judgments would transfer policymakers' traditional authority over drugs and procedures to individual prison doctors. Consider how plaintiffs' theory would play out in the 27 States that have enacted laws or policies banning sex-change surgeries and cross-sex hormones for minors. If plaintiffs are correct that the Eighth Amendment prohibits "categorical" judgments regarding prisoners' medical treatment, then prison officials in those States must allow individual doctors to determine whether incarcerated minors should receive surgeries and hormones that free citizens cannot access. That outcome

cannot possibly be correct. As the Sixth, Seventh, and Eleventh Circuits have ruled in upholding state bans on gender-transition procedures for minors, "federal courts do not mediate medical debates." *K.C.*, 121 F.4th at 634; *see L.W. v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023) (deferring to "States' assessment of [medical] risks and the right response to those risks"), *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (2024); *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1225 (11th Cir. 2023) (similar). That principle applies with the same force in the prison context as outside it.

In effect, plaintiffs ask this Court to recreate the same problem that the Supreme Court corrected in *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024). There, the Ninth Circuit had expanded the Eighth Amendment to short-circuit the democratic process as it relates to homelessness. *Id.* at 524. The Ninth Circuit's decision did not encourage "'productive dialogue' and 'experimentation' through our democratic institutions." *Id.* at 556 (citation omitted). Instead, under the decision, courts froze their own preferences and rules in place by judicial "fiat." *Id.* (citation omitted). And those rules only "produced confusion," given that the issuing courts were "removed from realities on the ground." *Id.* Worse still, those rules "interfered with 'essential considerations of federalism,' taking from the people and their elected leaders difficult questions traditionally" reserved to them. *Id.* (citation omitted). The same can be said here. People naturally disagree over the best policy responses to addressing gender dysphoria and caring for prisoners' needs. But "in our democracy, that is their right." *Id.* at 560. Nothing in the Eighth Amendment's text or history changes that foundational principle.

## CONCLUSION

The Court should deny the motion for a preliminary injunction.

Respectfully submitted,

RAUL R. LABRADOR
Attorney General of Idaho

Alan Hurst
Solicitor General

Michael A. Zarian
Deputy Solicitor General

Office of Idaho Attorney General
700 W. Jefferson St.
Boise, ID 83720
Tel: (208) 334-2400
Email: alan.hurst@ag.idaho.gov

THEODORE E. ROKITA
Indiana Attorney General

/s/ James A. Barta
James A. Barta (D.C. Bar 1032613)
Solicitor General

Jenna M. Lorence
Deputy Solicitor General

Office of the Indiana Attorney General
302 W. Washington St.
Indiana Government Center South, 5th Floor
Indianapolis, IN 46204-2770
Phone:  (317) 232-0709
Fax:  (317) 232-7979
Email: James.Barta@atg.in.gov

*Counsel for Amici States*
*(additional counsel listed in addendum)*

14

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
State of Alabama

TREG TAYLOR
Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

CHRISTOPHER M. CARR
Attorney General
State of Georgia

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW H. WRIGLEY
Attorney General
State of North Dakota

DAVID A. YOST
Attorney General
State of Ohio

GENTNER F. DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

KEN PAXTON
Attorney General
State of Texas

DEREK BROWN
Attorney General
State of Utah

JASON MIYARES
Attorney General
Commonwealth of Virginia

JOHN B. MCCUSKEY
Attorney General
State of West Virginia

BRIDGET HILL
Attorney General
State of Wyoming