**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ALISHEA KINGDOM, *et al.*; | |
| *Plaintiffs*, | Case No. 1:25-cv-00691-RCL |
| v. | |
| DONALD J. TRUMP, *et al.*; | |
| *Defendants*. | |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY
INJUNCTION, TO STAY AGENCY ACTION, AND FOR PROVISIONAL CLASS
CERTIFICATION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 3

    I.     Defendants Mischaracterize the Record. ............................................................ 4

          A.     Defendants' Concessions Confirm What Their Policies Make Clear: Gender-Affirming Accommodations and Hormones Are Banned. ............................................................................................... 4

          B.     Defendants' Execution of the EO and Implementing Memoranda Illustrate the Actual and Imminent Denial of Plaintiffs' Treatments. .......................................................................................... 7

    II.    Plaintiffs Are Entitled to Preliminary Injunctive Relief and a Stay Under the APA. ............................................................................................................. 10

          A.     Plaintiffs Are Likely to Succeed on Their Eighth Amendment Claims. ................................................................................................. 10

               1.     The EO and Implementing Memoranda Seriously Harm Plaintiffs and Place Them at Substantial Risk of Further Serious Harm...... 11

               2.     The Accepted Community Standard of Care for Gender Dysphoria Includes Hormone Therapy and Social Transition ...................... 16

          B.     Plaintiffs are Likely to Succeed on Their APA Claims .......................... 18

          C.     Plaintiffs Satisfy the Remaining Preliminary Injunction Factors ........... 20

    III.   The Requested Relief is Not Precluded by the PLRA or Presidential Immunity. ........................................................................................................ 22

          A.     Plaintiffs' Claims Are Not Barred by PLRA Exhaustion Requirements ...................................................................................... 22

          B.     Plaintiffs' Requested Remedy Is Proper. ............................................. 24

          C.     Presidential Immunity Is Not Applicable .............................................. 25

CONCLUSION ................................................................................................................. 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AIDS Vaccine Advoc. Coal. v. United States Dep't of State*,
2025 WL 485324 (D.D.C. Feb. 13, 2025) ...............................................................................19

*Arizona v. Su*,
121 F.4th 1 (9th Cir. 2024) .....................................................................................................19

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015)................................................................................................................25

*Banks v. Booth*,
459 F. Supp. 3d 143 (D.D.C. 2020) ........................................................................................24

*Banks v. Booth*,
468 F. Supp. 3d 101 (D.D.C. 2020) ........................................................................................22

*Banks v. York*,
515 F. Supp. 2d 89 (D.D.C. 2007) ..........................................................................................23

*Berry v. Peterman*,
604 F.3d 435 (7th Cir. 2010) ..................................................................................................16

*Boyle v. Bessent*,
2025 WL 509519 (D. Me. Feb. 14, 2025) ..............................................................................18

*Bradley v. Puckett*,
157 F.3d 1022 (5th Cir. 1998) ................................................................................................14

*Brown v. Plata*,
563 U.S. 493 (2010)....................................................................................................11, 12, 24

*Building & Construction Trades Department, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) ....................................................................................................6

*Chandler v. Fed. Bureau of Prisons*,
226 F. Supp. 3d 1 (D.D.C. 2016)............................................................................................23

*City and Cnty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ..............................................................................................6, 7

*City of Mesquite v. Aladdin's Castle, Inc.*,
455 U.S. 283 (1982)..................................................................................................................9

*Clement v. Calif. Dep't of Corr.*,
  364 F.3d 1148 (9th Cir. 2004) ................................................................24

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ................................................................................25

*Colwell v. Bannister*,
  763 F.3d 1060 (9th Cir. 2014) ................................................................12

*Common Cause v. Trump*,
  506 F. Supp. 3d. 39 (D.D.C. 2020) .......................................................6, 7

*Cummings v. Roberts*,
  628 F.2d 1065 (8th Cir. 1980) ................................................................14

*DL v. Disrict of Columbia*,
  302 F.R.D. 1 (D.D.C. 2013) .....................................................................8

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) ................................................................................25

*Davis v. District of Columbia*,
  158 F.3d 1342 (D.C. Cir. 1998) .............................................................21

*Doe v. McHenry*,
  2025 WL 388218 (D.D.C. Feb. 4, 2025) ...................................... *passim*

*Ecknes-Tucker v. Governor of Alabama*,
  114 F.4th 1241 (11th Cir. 2024) .............................................................17

*Edmo v. Corizon*,
  949 F.3d 489 (9th Cir. 2020) ..................................................................17

*Edmo v. Corizon, Inc.*,
  935 F.3d 757 (9th Cir. 2019) ..................................................................17

*Estelle v. Gamble*,
  429 U.S. 97 (1976) .............................................................................11, 16

*Farmer v. Brennan*,
  511 U.S. 828 (1994) ................................................................................11

*Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*,
  937 F.3d 764 (7th Cir. 2019) ....................................................................7

*Fields v. Smith*,
  653 F.3d 550 (7th Cir. 2011) .......................................................13, 16, 24

*Fisher v. Fed. Bureau of Prisons*,
    484 F. Supp. 3d 521 (N.D. Ohio 2020)............................................................15, 16

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985)........................................................................................20

*Fletcher v. Menard Corr. Ctr.*,
    623 F.3d 1171 (7th Cir. 2010) ........................................................................22

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992)........................................................................................25

*Gibson v. Collier*,
    920 F.3d 212 (5th Cir. 2019) ..........................................................................17

*Gomez v. Trump*,
    485 F. Supp. 3d 145 (D.D.C. 2020) ...................................................18, 19, 20

*Gordon v. Schilling*,
    937 F.3d 348 (4th Cir. 2019) ..........................................................................12

*Helling v. McKinney*,
    509 U.S. 25 (1993)..........................................................................................12

*Hemmings v. Gorczyk*,
    134 F.3d 104 (2d Cir. 1998)...........................................................................14

*HIAS, Inc. v. Trump*,
    985 F.3d 309 (4th Cir. 2021) ............................................................................7

*Hicklin v. Precynthe*,
    2018 WL 806764 (E.D. Mo. Feb. 9, 2018)....................................................15

*Jackson v. Dis. of Columbia*,
    254 F.3d 262 (D.C. Cir. 2001) ........................................................................22

*Johnson v. Hardin Cnty.*,
    908 F.2d 1280 (6th Cir. 1990) ........................................................................14

*Jones v. Bock*,
    549 U.S. 199 (2007)........................................................................................23

*Jones v. Bondi*,
    2025 WL 923117 (D.D.C. Feb. 24, 2025) ......................................................22

*Kadel v. Folwell*,
    100 F.4th 122 (4th Cir. 2024) ...................................................................16, 17

*Kaemmerling v. Lappin*,
  553 F.3d 669 (D.C. Cir. 2008) ........................................................................22

*Kaufman v. Carter*,
  952 F. Supp. 520 (W.D. Mich. 1996) ...............................................................14

*Keohane v. Fla. Dep't of Corr.*,
  952 F.3d 1257 (11th Cir. 2020) ........................................................................15

*Keohane v. Fla. Dep't of Corr.*,
  No. 18-14096 (11th Cir. Nov. 19, 2018)...........................................................15

*Klein v. Wexford Health Sources, Inc.*,
  2019 WL 2435850 (N.D. Ill. June 11, 2019) ....................................................13

*Kosilek v. Spencer*,
  774 F.3d 63 (1st Cir. 2014) .........................................................................15, 17

*Lavender v. Lampert*,
  242 F. Supp.2d 821 (D. Or. 2002) ....................................................................14

*Leach v. Shelby Cnty. Sheriff*,
  891 F.2d 1241 (5th Cir. 1989) ..........................................................................14

*Loughrin v. United States*,
  573 U.S. 351 (2014)...........................................................................................24

*McPherson v. Lamont*,
  457 F.Supp.3d 67 (D. Conn. 2020)....................................................................23

*Miller v. King*,
  384 F.3d 1248 (11th Cir. 2004), *vacated and superseded on other grounds*,
  449 F.3d 1149 (11th Cir. 2006) ........................................................................14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983).............................................................................................20

*Nat'l Treasury Emps. Union v. Nixon*,
  492 F.2d 587 (D.C. Cir. 1974) ..........................................................................25

*Nken v. Holder*,
  556 U.S. 418 435 (2009).....................................................................................21

*Panama Refining Co. v. Ryan*,
  293 U.S. 388 (1935)...........................................................................................25

*PFLAG, Inc. v. Trump*,
  2025 WL 685124 (D. Md. Mar. 4, 2025).........................................................6, 7

*Robinson v. Labrador*,
    747 F.Supp.3d 1331 (D. Idaho 2024) .................................................................14

*Roe v. Elyea*,
    631 F.3d 843 (7th Cir. 2011) ............................................................................12

*Ross v. Blake*,
    578 U.S. 632 (2016).........................................................................................23

*Shomberg v. United States*,
    348 U.S. 540 (1955)...........................................................................................6

*Smith v. Hodge Unit Staff & Admin*,
    2024 WL 5346411 (E.D. Tex. Dec. 6, 2024).....................................................15

*Soneeya v. Spencer*,
    851 F. Supp. 2d 228 (D. Mass. 2012) ..............................................................15

*Tex. & Pac. Ry. Co. v. Abilene Cotton Oil Co.*,
    204 U.S. 426 (1907)...........................................................................................7

*Trump v. Hawaii*,
    585 U.S. 667 (2018).........................................................................................25

*United States v. Ore. St. Med. Soc.*,
    343 U.S. 326 (1952)...........................................................................................8

*United States v. Salerno*,
    481 U.S. 739 (1987).........................................................................................13

*United States v. W. T. Grant Co.*,
    345 U.S. 629 (1953).........................................................................................21

*VanDerStok v. Garland*,
    633 F. Supp. 3d 847 (N.D. Tex. 2022) .............................................................18

*Washington State Grange v. Washington State Republican Party*,
    552 U.S. 442 (2008).........................................................................................13

*White v. Napoleon*,
    897 F.3d 103 (3d Cir. 1990).............................................................................16

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).............................................................................................21

*Youngstown, Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952).........................................................................................25

**Statutes**

5 U.S.C. § 705 ................................................................................................................18

5 U.S.C. § 706(2)(B) ......................................................................................................18

18 U.S.C. § 3626(a)(1)(A) .............................................................................................24

18 U.S.C. § 3626(a)(2) ...................................................................................................24

INA .................................................................................................................................25

Inmate Sex Change Prevention Act ...............................................................................24

Prison Litigation Reform Act ...........................................................................................3

**Other Authorities**

28 C.F.R. § 542.18 .........................................................................................................23

First Amendment ............................................................................................................13

Eighth Amendment ................................................................................................. *passim*

E.O. 14168 § 4(c) .........................................................................................................1, 5

E.O. 14187 § 2(c) ...........................................................................................................10

EO 14168 .........................................................................................................................6

EO § 1 ............................................................................................................................20

EO § 8(b) ..........................................................................................................................5

Executive Order 14168 .....................................................................................................1

## INTRODUCTION

More important than what Defendants say in their opposition is what they do *not* say. They do not say that plaintiffs or the putative class members will continue to receive their medically necessary hormone therapy. They do not say that hormone therapy has been restored for all putative class members. And they do not say that people with gender dysphoria can obtain medically necessary gender-affirming accommodations.

They do not say these things because there is nothing they can say: The record conclusively establishes that Defendants have categorically banned access to gender-affirming health care—including accommodations and hormones—and that, to the extent some incarcerated people are currently receiving hormone therapy, their access is precarious, as BOP is providing it in response to ongoing litigation, and Defendants do not dispute that at least one facility has said that hormone therapy will end once current prescriptions run out. ECF 7-6. ¶ 9 (hereinafter "Kapule Decl.").

This policy follows directly from Executive Order 14168 and the February 2025 memoranda implementing it. E.O. 14168 § 4(c); ECF 1-1 (hereinafter "DiGiacomo Memo"); ECF 1-2 (hereinafter "Bina Memo"). As noted, there is no dispute that those policies proscribe access to accommodations. And, as this Court has held on four occasions, "[t]he plain text of the Executive Order affords BOP no discretion… to continue providing hormonal therapy to help [individuals] conform physically to their non-birth sex." *Doe v. McHenry*, No. 1:25-CV-00286, Dkt. 23, at *9 (D.D.C. Feb. 4, 2025); *id.*, Dkt. 44 at 2; *id.*, Dkt. 55 at 2, 4; *id.*, Dkt. 68.

Defendants' arguments, which focus almost entirely on access to hormone therapy, prove that the fifth time is not the charm. Their latest tack is to assert that BOP is providing "any necessary medical care," including hormone therapy, to people with gender dysphoria and that Plaintiffs' claims are "premised on an incorrect assumption" about what BOP has done. ECF 36

at 10 (hereinafter "Resp.").[1] This serves as the foundation for Defendants' arguments on exhaustion, the Eighth Amendment, the APA, and irreparable harm. But Plaintiffs have made no "assumption": As this Court has repeatedly held, the text of the Executive Order is clear; the Implementing Memoranda are plain as well. Under all of them, BOP cannot pay for hormone treatments or gender-affirming accommodations.

Moreover, although Defendants assert that they are currently providing some individuals hormone therapy, their statements focus on conduct occurring after this Court's temporary restraining order enjoining the prohibition on hormone treatment and Plaintiffs filed this class action lawsuit. They do not dispute that BOP had previously been withdrawing individuals from hormone therapy based on the EO and Implementing Memoranda, and that at least one facility has advised that treatment will stop once supplies run out. The record shows that Defendants' recent conduct reflects nothing more than an attempt to avoid liability. Indeed, Plaintiff Kingdom's doctor told her that decisions about hormone therapy had been "out of [his] hands"; that he did not agree with the decision to terminate hormones; and stated, in the context of restoring her hormones, that "this *Kingdom* case" was causing problems and treatment resumed only after a conversation with lawyers. ECF 47-1 ¶ 2 (hereinafter "Kingdom Supp. Decl."). This sort of gamesmanship only highlights the threats to crucial medications.

Once Defendants' policies are properly understood, their defenses of them crumble. On the constitutional claim, Defendants do not appear to contest that categorically denying hormones violates the Eighth Amendment. Indeed, Defendants imply that because the Bina Memo requires implementing the EO in accordance with the Eighth Amendment, it *must* be read to permit the provision of hormones when medically necessary. Resp. at 10, 12–15. This reading of the memo is wrong and conflicts with Defendants' application of it; however, it shows that Defendants

---

[1] When referring to Defendants' response brief, Plaintiffs use the pagination supplied by ECF.

effectively concede that the law does not permit a categorical ban on hormone therapy. Defendants do not make the same concession on accommodations, but their failure to offer any evidence contradicting Dr. Karasic's expert declaration regarding the medical necessity of gender-affirming accommodations for individuals with gender dysphoria dooms their defense.

On the APA, Defendants assert that the EO, without more, justifies their policies. But reliance on an executive order alone does not satisfy the APA. Defendants fail to provide any administrative record, any explanation of reasoned decision-making, or any rationale for their policy change beyond pointing to the EO—which, itself, does not contain anything close to the rationale necessary to satisfy arbitrary and capricious review.

On irreparable harm, Defendants' plainly unlawful conduct has deprived Plaintiffs and putative class members of gender-affirming accommodations necessary to treat their gender dysphoria and exposes Plaintiffs to a serious risk of losing access to the hormone therapy that BOP doctors have determined is clinically indicated for them and that they depend on for their health and well-being.

Defendants' arguments on presidential immunity, exhaustion, and the scope of the remedy are similarly meritless: Plaintiffs do not seek to enjoin the President; administrative remedies were unavailable and Defendants fail to meet their burden for an affirmative defense under the PLRA; and the proposed relief is well-within the scope of what courts can order a prison system to do.

On this record, a preliminary injunction and stay of agency action should issue.

## ARGUMENT

Defendants' arguments all rest on the premise that BOP is providing "any necessary medical care" to people with gender dysphoria. Resp. at 10. As such, Plaintiffs first outline the current state of affairs for people with gender dysphoria in BOP custody (Part I) and then explain why Defendants' arguments on the preliminary injunction elements fail given that reality (Part II).

Finally, Plaintiffs address Defendants' attempt to evade liability based on meritless arguments on exhaustion, immunity, and remedy (Part III).

## I.    Defendants Mischaracterize the Record.

### A.    Defendants' Concessions Confirm What Their Policies Make Clear: Gender-Affirming Accommodations and Hormones Are Banned.

Start with the points where there is no dispute or the record is uncontroverted. Defendants do not contest that they categorically ban people with gender dysphoria from acquiring gender-affirming accommodations. Nor could they given that the DiGiacomo Memo (at 2-3) forbids using "appropriated funds" to buy "any items that align with transgender ideology (e.g., binders, stand-to-pee devices, hair removal devices, etc.)."

Moreover, although Defendants imply that individuals can continue using accommodations previously procured, Resp. at 27, the record shows that, in many facilities, BOP officials are preventing that too. Defendants do not dispute Plaintiff Kapule's testimony that transgender men at FCI Waseca are now forbidden from wearing boxers and are no longer permitted to receive or purchase chest binders, Kapule Decl. ¶ 12. Similarly, on February 24, the warden at FCI Seagoville informed all transgender women that the facility would be confiscating dresses and undergarments previously given to them, ECF 47-5 ¶ 3 (Satyagrahi Decl.); and on February 27, BOP officials at FMC Carswell confiscated boxers and chest binders that had been previously issued to transgender men, including at least one chest binder issued through the medical supply department, ECF 47-6 ¶ 6 (hereinafter "DiCiesare Decl."). Defendants do not address the consequences of their ban on accommodations, let alone offer countervailing expert evidence to contest Dr. Karasic's sworn expert testimony about the necessity of such accommodations for people with gender dysphoria. ECF 7-2 ¶¶ 27, 28, 30, 64, 80 (hereinafter "Karasic Decl.").

Defendants' concessions on hormone therapy access are similarly damning. They admit that "the Executive Order prohibits the provision of [hormone] medication to conform an inmate's

appearance to that of the opposite sex," Resp. at 10, but assert that BOP retains authority to provide medically necessary hormone therapy as a treatment for gender dysphoria, *id*. at 21, 23. This distinction demonstrates a profound misunderstanding of why hormones are prescribed for people experiencing gender dysphoria. The medication "alleviates gender dysphoria by conforming an individual's body to be consistent with their gender identity." ECF 47-4 ¶ 10 (hereinafter "Suppl. Karasic Decl."). Thus, hormone therapy to "conform [one's] appearance to that of the opposite sex" is medically necessary hormone therapy. *Id.* When Defendants concede that they categorically ban hormone treatments that conform individuals' "appearance to that of the opposite sex," they admit that they categorically ban hormone treatment for gender dysphoria, full stop.

That, of course, is what the plain text of the EO and the Bina Memo require. Per the EO, "[T]he Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are used for *any medical procedure, treatment, or drug* for the purpose of conforming an inmate's appearance to that of the opposite sex." EO 14168 § 4(c) (emphasis added). BOP's most recent implementing memo contains a materially identical provision. *See* Bina Memo. These bans apply squarely to hormone therapy, which, when used to treat gender dysphoria, have the very purpose the bans govern. The same is true of gender-affirming care more generally: its overarching goal is to "eliminate the distress of gender dysphoria by aligning an individual patient's body and presentation with their internal sense of self," Karasic Decl. ¶ 80—that is, to allow people to "conform [their] appearance to that of the opposite sex," Bina Memo at 1.

Defendants cannot save their policies by emphasizing boilerplate savings clauses in the EO and the Bina Memo. The EO declares that it "shall be implemented consistent with applicable law," EO § 8(b); the Bina Memo requires the EO to be executed in a manner that complies "with the Eighth Amendment;" and according to Defendants, these statements make the policies "facially

valid." *See Resp.* at 22. However, as another court interpreting EO 14168 noted, "[t]here are no magic words that can override an executive order's plain meaning." *PFLAG, Inc. v. Trump*, No. CV 25-337-BAH, 2025 WL 685124, at *18 (D. Md. Mar. 4, 2025). The savings clauses must be "read in their context, and they cannot be given effect when the Court, by rescuing the constitutionality of a measure, would override clear and specific language." *City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018) (citing *Shomberg v. United States*, 348 U.S. 540, 547–48 (1955)).

Here, the plain language of the EO's operative provision inherently contravenes "applicable law": it categorically bans access to any treatment that conforms a person's appearance to a sex different than the sex they were assigned at birth, and, as such, constitutes a categorical ban that violates the Eighth Amendment. *See McHenry*, Dkt. 23 at 9; *see also* ECF 7-1 at 25-26 (hereinafter "Pls.' Mem.") (listing cases holding that the Eighth Amendment requires providing hormone treatment to people with gender dysphoria when medically indicated). BOP officials have told Plaintiffs and putative class members at facilities throughout the country that they will terminate their hormones due to the EO, *see* Kapule Decl. ¶ 9; DiCiesare Decl. ¶ 3; Satyagrahi Decl. ¶ 5, and, as to several individuals, acted on that threat by temporarily withholding or reducing hormones, *see* Nichols Decl. ¶¶ 13, 14; Kingdom Decl. ¶ 12 Unlike the directives at issue in the cases Defendants cite (Resp. at 22-23), here there is more than a "mere possibility that some agency might make a legally suspect decision." *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (rejecting challenge to executive order that neither required nor prohibited a specific action, where plaintiffs merely raised possibility of unlawful agency implementation); *see also Common Cause v. Trump*, 506 F. Supp. 3d 39, 47, 53 n.8 (D.D.C. 2020) (similarly finding that claims against memorandum announcing "general policy" with "open-ended instruction to take 'appropriate' action" were unripe because no adverse action

had yet been taken). In contrast, the EO and Implementing Memoranda "unambiguously command[] action," and as such the "savings clause[s] do[] not and cannot override [their] meaning." *City & Cnty. of S.F.*, 897 F. 3d at 1240. Consequently, the government cannot "immunize the Order from review through a savings clause which, if operational, would nullify the 'clear and specific' substantive provisions of the Order." *HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021) (quoting *City & Cnty. of S.F.*, 897 F.3d at 1239); *see also Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 775 (7th Cir. 2019) ("[A]cts 'cannot be held to destroy themselves' through savings clauses." (quoting *Tex. & Pac. Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 446 (1907)); *PFLAG*, 2025 WL 685124, at *18; *cf. Common Cause*, 506 F. Supp. 3d at 53 n.8 (agreeing that "laws (or executive orders) 'cannot be held to destroy themselves through saving clauses,'" but finding that the memorandum at issue did "not command any action that a savings clause purports to negate" (quoting *FTC*, 937 F.3d at 775)).

### B. Defendants' Execution of the EO and Implementing Memoranda Illustrate the Actual and Imminent Denial of Plaintiffs' Treatments.

Defendants urge the Court to judge them on the way they have implemented their policies, *see* Resp. at 9, but such an assessment only illustrates their wrongdoing. As noted previously, it is undisputed that Defendants have banned previously accessible accommodations. With respect to hormone therapy, Defendants' assertion that all is well is not well-taken. Defendants do not dispute Plaintiff Kapule's testimony that a BOP official at FCI Waseca told him he will no longer receive hormones after his current prescription expires. Kapule Decl. ¶ 9. And, while Defendant Bina's carefully worded declaration states that Plaintiff Kapule "continues to receive hormone medication," it says nothing about what happens when his prescription runs out. Bina Decl. ¶ 20. As of April 3, Plaintiff Kapule remains of the understanding that he will not receive more. ECF 47-3 ¶ 3 (hereinafter "Supp. Kapule Decl."). Other putative class members at different facilities face similar predicaments. *See* DiCiesare Decl. ¶ 3 (stating that BOP officials at FCI Carswell have

"consistently" told him that they will terminate hormones due to the EO); Satyagrahi Decl. ¶ 5 (declaring that BOP staff have stated "consistently," and as recently as March 24, that the EO means that hormone therapy for gender dysphoria "will be ended" at FCI Seagoville).

Defendants defend their conduct by emphasizing the number of people receiving hormone treatment as of March 27—weeks after this Court issued its first order in *McHenry* and Plaintiffs filed this lawsuit. Bina Decl. ¶ 7. As is often the case, Defendants' response to litigation or judicial orders says little about what will happen when the judicial prodding ceases. *See, e.g.*, *United States v. Ore. St. Med. Soc.*, 343 U.S. 326, 333 (1952) ("It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption."); *see also DL v. District of Columbia*, 302 F.R.D. 1, 18-19 (D.D.C. 2013) (rejecting city defendant's argument it faced no liability for civil rights violations when any reforms had "occurred because of pressures placed by this lawsuit").

Viewed in its entirety, Defendants' approach to hormone therapy demonstrates the precariousness of Plaintiffs' access to that treatment. On January 26, 2025, BOP health care staff terminated Plaintiff Kingdom's hormones, as well as the hormones for all other transgender women at FCI-Fairton, and told her it was "because of President Trump's Executive Order." Kingdom Decl. ¶ 12. In mid-February, health care staff invoked the EO in explaining to Plaintiff Nichols why BOP was halving, and planning to terminate, the testosterone treatment provided to him and three other putative class members. ECF 7-6 ¶ 14 (hereinafter "Nichols Decl."). Similarly, in late February, health care staff cited the EO when informing Plaintiff Kapule that he would stop receiving testosterone once his current prescription ran out. Kapule Decl. ¶ 9.[2]

---

[2] Other evidence tells a similar story. Immediately upon entry of the EO, BOP also took steps to eliminate its internal mechanisms for providing hormone therapy. Pls.' Mem. at 10. These are facts that Defendants' do not dispute or address in their opposition.

To the extent Defendants have restored (or not yet discontinued) Plaintiffs' hormone therapy, the record shows that their conduct arose not from a change of heart but rather this Court's orders in *McHenry* and this lawsuit itself. The DiGiacomo Memo is explicit on this point. It references the first order in *McHenry*, stating: "On February 4, 2025, a nation-wide restraining order was issued which temporarily prohibits Bureau of Prisons (BOP) from implementing portions of the EO. Accordingly, the BOP will continue to provide medical and mental health care, as provided prior to the executive order, to the transgender population." DiGiacomo Memo at 1. Defendants' post-litigation conduct offers no basis to infer, as they imply, that Plaintiffs will continue to receive hormone therapy going forward under their policies, let alone preclude injunctive relief. *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n.10 (1982).

Indeed, Plaintiffs' experiences show that BOP is basing hormone access on litigation risk rather than the conclusions of BOP's doctors. Plaintiff Nichols' doctor told him that she disagreed with the decision to discontinue hormones but his was nonetheless halved without any prior medical evaluation. Nichols Decl. ¶¶ 11, 13-14; ECF 47-2 ¶ (hereinafter "Supp. Nichols Decl."). The day the DiGiacomo memo issued, health care staff informed Plaintiff Nichols that BOP would resume his hormone treatment, but only until "the restraining order is up." Nichols Decl. ¶ 17. BOP made this decision without conducting any medical evaluation. Supp. Nichols Decl. ¶ 4.

Despite the DiGiacomo Memo and Defendants' apparent perception that they were under a nationwide injunction, BOP denied Plaintiff Kingdom's hormone treatment until March 13, Bina Decl. ¶ 17, nearly six weeks after first terminating her care, and *three days* after Plaintiff filed this lawsuit. This timing was no accident. Plaintiff Kingdom's doctor explained that the reason treatment resumed was because "'the *Kingdom* case' was causing problems" and that the decision to restart hormones occurred after "speaking with lawyers." Supp. Kingdom Decl. ¶ 2. More generally, Plaintiff Kingdom's doctor informed her that the "decision to end hormone therapy at

FCI Fairton was "out of his hands" and he had not agreed with that decision." *Id.* A doctor at a different facility made a similar statement to another putative class member. DiCiesare Decl. ¶ 4 ("My doctor has told me that he does not know when my hormone therapy will be ended. He has said that the decision isn't his and he is waiting for instructions from his superiors.").

This context makes the omissions in Defendant Bina's declaration all the more concerning. He does not promise that BOP will continue providing hormone therapy when medically necessary, only that it "will continue to . . . provide any necessary care," without stating whether hormone therapy fits within that category. Bina Decl. ¶ 7. The EO makes clear it does not. And Defendant Trump—the author of the EO—has made it quite clear that, in his view, it does not, having referred to hormone therapy and other forms of gender affirming treatments as "chemical and surgical mutilation." E.O. 14187, Protecting Children from Chemical and Surgical Mutilation § 2(c). Moreover, Defendant Bina states that there are 1,028 people with gender dysphoria in BOP's custody, but only 628 of them currently receive hormone treatment. Bina Decl. ¶¶ 7, 14. Defendants provide no information about its reasons for not providing hormones to 400 people with gender dysphoria, or whether any were receiving hormones prior to the EO. Given these gaps, Defendant Bina's declaration offers nothing but cold comfort.

In sum, the record establishes that Plaintiffs and putative class members have no ability to procure accommodations and face grave threats to their ability to continue receiving hormone therapy. The Court's intervention is needed to ensure Plaintiffs and putative class members receive their constitutionally mandated medical care.

## II.     Plaintiffs Are Entitled to Preliminary Injunctive Relief and a Stay Under the APA.

### A.     Plaintiffs Are Likely to Succeed on Their Eighth Amendment Claims.

Plaintiffs have shown a strong likelihood of success on their Eighth Amendment claims based upon the EO and Implementing Memoranda's imposition of a blanket ban on gender-affirming health care. The constitutional violation at issue here is the ongoing harm and substantial

risk of harm created by Defendants' sweeping prohibition on the provision of gender-affirming health care to all incarcerated people with gender dysphoria; that Defendants have temporarily restored or not yet cut off Plaintiffs' hormone therapy does not negate the substantial *risk* of harm.

With respect to hormone therapy, Defendants concede that denying medically necessary hormone therapy for the treatment of gender dysphoria violates the Eighth Amendment, but try to split hairs to argue that that is not what the EO and Implementing Memoranda do. *See supra*, Part I. As for accommodations, they make the baseless argument that medical accommodations are somehow carved out of the Eighth Amendment's protections of medically necessary care. Defendants further contend that gender-affirming health care is not proven to be necessary or effective, yet offer no expert testimony to rebut the expert declaration of Dr. Karasic about the widespread recognition of the necessity and efficacy of this care.

As detailed previously in Plaintiffs' Memorandum of Points and Authorities and below, federal courts across the country have found that blanket bans on gender-affirming health care constitute deliberate indifference to the medical needs of incarcerated individuals with gender dysphoria in violation of the Eighth Amendment. Pls.' Mem. at 23, 25-26. Plaintiffs have amply shown that they will likely succeed on the merits of their Eighth Amendment claims.

### 1.    The EO and Implementing Memoranda Seriously Harm Plaintiffs and Place Them at Substantial Risk of Further Serious Harm

The government has an "obligation to provide medical care for those whom it is punishing by incarceration," and a failure to meet that obligation can constitute an Eighth Amendment violation. *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976); *see also Brown v. Plata*, 563 U.S. 493, 510-11 (2010). In an injunctive class action challenging prison conditions under the Eighth Amendment, the question is whether defendants, acting with deliberate indifference, expose incarcerated people to a "substantial *risk* of serious harm." *Farmer v. Brennan*, 511 U.S. 828, 828 (1994) (emphasis added). "That the Eighth Amendment protects against future harm to inmates is

not a novel proposition," *Helling v. McKinney*, 509 U.S. 25, 33 (1993), and "it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." *Id*. at 34; *see also Plata*, 563 U.S. at 531-32 ("Even prisoners with no present physical or mental illness . . . are at risk so long as the State continues to provide inadequate care"). Here, Plaintiffs have abundantly shown that they— and other transgender incarcerated people—are experiencing serious harm from the EO and Implementing Memoranda and face imminent additional harm. *See supra* Part I; *see also* Pls.' Mem. at 12–19.

Across-the-board policies denying or severely limiting entire categories of health care to incarcerated people on grounds unrelated to the patient's individual medical needs are paradigmatic examples of deliberate indifference. *See* Pls.' Mem. at 25-26 (collecting cases related to gender-affirming care). An illustrative example outside the realm of gender-affirming care is *Colwell v. Bannister*, 763 F.3d 1060 (9th Cir. 2014). There, the plaintiff challenged the Nevada Department of Correction's so-called "one eye policy" that denied any surgical treatment for prisoners with cataracts or other vision impairments that placed them at risk of permanent blindness, so long as the patient had at least one functional eye with correctible vision. *Id.* at 1063. The Ninth Circuit noted that "[t]his is not a case in which there is a difference of medical opinion about which treatment is best for a particular patient. Nor is this a case of ordinary medical mistake or negligence." *Id.* at 1068. Rather, the Ninth Circuit held, it was undisputed that the incarcerated patient was denied treatment "solely because of an administrative policy, even in the face of medical recommendations to the contrary.… This is the very definition of deliberate indifference." *Id.*; *see also Gordon v. Schilling*, 937 F.3d 348, 351, 358-59 (4th Cir. 2019) (finding that a challenge to a categorical policy prohibiting Hepatitis C treatment based on a prisoner's release date raised a deliberate indifference claim); *Roe v. Elyea*, 631 F.3d 843, 861-63 (7th Cir. 2011)

(affirming district court finding prison policy categorically prohibiting treatment of Hepatitis C based on the length of prisoners' sentences was deliberately indifferent); *Klein v. Wexford Health Sources, Inc.*, No. 16-C-8818, 2019 WL 2435850, at *10 (N.D. Ill. June 11, 2019) (challenge to a "one good ear" policy denying tympanoplasty repair because the incarcerated patient "could still hear from his left ear even if he experienced pain, discomfort, and complete right ear deafness" could support a finding of deliberate indifference).

Defendants cite to *United States v. Salerno*, 481 U.S. 739, 745 (1987), for the proposition that to prevail on their Eighth Amendment health care claim, Plaintiffs have the "heavy burden of 'establish[ing] that no set of circumstances exists under which the [policy] would be valid.'" Resp. at 21 (quoting *Salerno*) (alterations in Defendants' brief). This case is inapposite. *Salerno* has absolutely nothing to do with the robust body of law interpreting the Eighth Amendment's prohibition on cruel and unusual punishments in the context of medical care, Pls.' Mem. at 20-23, and Defendants cite no cases in which *Salerno* has been applied in the Eighth Amendment conditions of confinement context.[3]

But in any event, other courts have found that categorical bans on gender affirming care are facially unconstitutional. In *Fields v. Smith*, 653 F.3d 550, 557 (7th Cir. 2011), the Seventh Circuit struck down the Wisconsin Legislature's passage of a bill that categorically banned the provision of gender-affirming health care to transgender incarcerated people. The Court of Appeals dismissed the State's argument that it could constitutionally limit the discretion of physicians to outlaw a medical procedure, noting that the State had provided no medical evidence to show that hormone therapy was not an effective treatment for gender dysphoria. *Id*. at 556-57; *see also*

---

[3] Defendants' reliance upon *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51 (2008) is equally misplaced. Resp. 36 at 13-14. Defendants cite to the Supreme Court's uncontroversial recitation in that case of the legal test used in First Amendment facial challenges, *id*., but like *Salerno*, that case is in no way relevant to the Eighth Amendment deliberate indifference standard.

*Robinson v. Labrador*, 747 F.Supp.3d 1331, 1341-42 (D. Idaho 2024) (granting preliminary injunction on behalf of transgender incarcerated people enjoining a legislative act that prohibited gender-affirming health care).

Additionally, there is nothing about gender-affirming accommodations provided as part of social transition to address gender dysphoria that warrants carving them out from the general rule that blanket bans on treatment without considering individual medical need constitute deliberate indifference in violation of the Eighth Amendment. Under the Eighth Amendment, prison officials must provide incarcerated people with serious health care needs not only necessary medications and surgeries but also the medical devices, supplies, assistive devices, and equipment that such patients need. *See, e.g., Miller v. King*, 384 F.3d 1248, 1261-62 (11th Cir. 2004) (allegations of denial of leg braces, orthopedic shoes, and urinary catheters raised an Eighth Amendment claim), *vacated and superseded on other grounds*, 449 F.3d 1149 (11th Cir. 2006); *Bradley v. Puckett*, 157 F.3d 1022, 1025-26 (5th Cir. 1998) (denial for two months of a shower chair raised an Eighth Amendment claim); *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998) (denial of crutches raised an Eighth Amendment claim); *Johnson v. Hardin Cnty.*, 908 F.2d 1280, 1284 (6th Cir. 1990) (denial of crutches supported a finding of deliberate indifference); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1243-44 (5th Cir. 1989) (failure to provide catheter supplies, a hospital mattress, and other medical supplies raised an Eighth Amendment claim); *Cummings v. Roberts*, 628 F.2d 1065, 1068 (8th Cir. 1980) (denial of personal hygiene products to a patient confined to a hospital bed raised a constitutional claim); *Lavender v. Lampert*, 242 F. Supp.2d 821, 843, 849 (D. Or. 2002) (failure to provide orthopedic footwear supported Eighth Amendment claim); *Kaufman v. Carter*, 952 F. Supp. 520, 526 (W.D. Mich. 1996) (failure to provide bilateral amputee with rubbing alcohol to clean his prosthetic legs and Ace bandages to maintain the size of his leg stumps, resulting in an inability to use his prostheses, raised an Eighth Amendment claim).

This is no different from the supplies needed for social transition, a recognized treatment for gender dysphoria. Karasic Decl. ¶¶ 64-65. *See also Fisher*, 484 F. Supp. 3d at 528 (changes in gender expression and role are part of treatment for gender dysphoria); *Kosilek*, 774 F.3d at 89 (noting that "feminine clothing and accessories" and electrolysis were treatment for gender dysphoria and led to a marked improvement in plaintiff's mental health); *Hicklin v. Precynthe*, No. 16-CV-01357, 2018 WL 806764, at *13 (E.D. Mo. Feb. 9, 2018) (granting preliminary injunction after concluding plaintiff likely to succeed on her Eighth Amendment claim "that Defendants were deliberately indifferent by failing to provide her with hormone therapy, 'gender-affirming' canteen items, and permanent hair removal to treat her serious medical [sic] of gender dysphoria"); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 248-50 (D. Mass. 2012) (recognizing that women's undergarments and canteen items can be medically necessary to address gender dysphoria).

The two cases Defendants cite to the contrary are not persuasive. *Smith v. Hodge*—decided on an uncontested motion for summary judgment against a pro se plaintiff—relied on a misreading of *Keohane v. Florida Department of Corrections* as supporting a banket ban on gender-affirming accommodations regardless of medical need. Resp. at 27 (citing *Smith v. Hodge Unit Staff & Admin*, No. 6:23-CV-268, 2024 WL 5346411 (E.D. Tex. Dec. 6, 2024)). In *Keohane*, the court rejected plaintiff's Eighth Amendment challenge of the denial of access to female grooming and clothing standards because it found that plaintiff's doctors determined she did not have a medical need for these accommodations; it did not hold that a blanket ban is permissible, despite the government's request that it do so. *See Keohane v. Fla. Dep't of Corr.*, 952 F.3d 1257, 1274–75 (11th Cir. 2020); Brief for Appellant, at 49, *Keohane v. Fla. Dep't of Corr.*, No. 18-14096 (11th Cir. Nov. 19, 2018). Defendants' reliance on *Fisher v. Fed. Bureau of Prisons* is also misplaced, as the court in *Fisher* found no Eighth Amendment violation where a transgender woman was provided female panties and commissary items, but was denied access to specific brands. Resp. at

27 (citing *Fisher v. Fed. Bureau of Prisons*, 484 F. Supp. 3d 521 (N.D. Ohio 2020)). The *Fisher* court did not suggest that a blanket ban on such accommodations would be constitutional.

### 2. The Accepted Community Standard of Care for Gender Dysphoria Includes Hormone Therapy and Social Transition

As detailed at length in Plaintiffs' Memorandum of Points and Authorities, federal courts across the country have recognized that the accepted community standard of treatment for gender dysphoria among incarcerated people includes hormone treatment and social transition. *See* Pls.' Mem. at 23, 25-26. And the relevant legal standard for this medical care—as is the case for all health care in prisons—is the commonly accepted community standard of care. *Id.* at 26.[4] It is the undisputed expert testimony of Dr. Karasic that there is a substantial body of research and decades of clinical evidence showing that gender-affirming hormone therapy and social transition are effective in treating gender dysphoria, and there are no alternative evidence-based treatments that are a substitute for gender-affirming medical care when indicated. Karasic Decl., ¶¶ 73-78, 81. He further testifies that there is no serious debate within the medical community that hormone therapy is an effective treatment. Suppl. Karasic Decl. ¶ 6.

Defendants, relying only on dissenting judicial opinions, assert that banning hormone therapy is not an Eighth Amendment violation because there is an "'ongoing debate" and controversy over the necessity and efficacy of hormone therapy for gender dysphoria. *See* Resp. at 23. Defendants' argument is unfounded. In *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024), the

---

[4] Defendants insinuate that any care, even ineffective or subpar care, insulates them from constitutional challenge. *See* Resp. at 20. But again, this is not a matter of a difference of medical opinion about the treatment of an individual; this is a challenge to a blanket policy. And even in individual cases, the provision of "'easier and less efficacious treatment' for an objectively serious medical condition can still amount to deliberate indifference for purposes of the Eighth Amendment." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (*quoting Estelle*, 429 U.S. at 104 & n.10); *see also Fields*, 653 F.3d at 556 ("Surely, had the Wisconsin legislature passed a law that DOC inmates with cancer must only be treated with therapy and pain killers, this court would have no trouble concluding that the law was unconstitutional. Refusing to provide effective treatment for a serious medical condition serves no valid penological purpose and amounts to torture"); *White v. Napoleon*, 897 F.3d 103, 109 (3d Cir. 1990) (Eighth Amendment claim stated when a prison doctor provided treatment that he knew was ineffective).

en banc majority noted that the district court rejected defendants' characterization of hormone therapy and found that North Carolina had not provided "evidence that gender-dysphoria treatments are ineffective." 100 F.4th at 156. And in *Edmo v. Corizon*, 949 F.3d 489 (9th Cir. 2020) (where Defendants quote the dissent from the denial of rehearing en banc, Resp. at 23, 25-26) the Panel decision noted that it was undisputed that the gender affirming medical care at issue could be medically necessary treatment for gender dysphoria; the issue was whether it was medically necessary *for that particular plaintiff*. Indeed, several of the cases cited by Defendants recognized that hormone therapy is an appropriate treatment for gender dysphoria—*see Edmo v. Corizon, Inc.*, 935 F.3d 757, 795 (9th Cir. 2019); *Kosilek v. Spencer*, 774 F.3d 63, 89 (1st Cir. 2014); *Gibson v. Collier*, 920 F.3d 212, 216 (5th Cir. 2019).

Defendants' attempt to discredit WPATH's guidelines for the treatment of gender dysphoria is a distraction[5] because it is not just WPATH that recognizes hormone therapy and social transition as effective treatment for gender dysphoria; this is recognized by *all* major medical groups in the United States, Karasic Decl. ¶ 78; Supp. Karasic Decl. ¶ 11, and there is no serious debate within the medical community about the efficacy of hormone therapy to treat gender dysphoria. Supp. Karasic Decl. ¶ 6. In any case, Defendants' assertions about WPATH are rejected in the undisputed declaration of Dr. Karasic.[6]

---

[5] Defendants cite to a concurrence in *Eckness-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1249 (11th Cir. 2024), suggesting that leaked WPATH documents demonstrate the lack of reliability of WPATH. Resp. at 25. That opinion cites an activist's attempt to discredit WPATH based on cherry-picked, out of context fragments of communications among WPATH members. *See* Supp. Karasic Decl. ¶ 12.

[6] An amicus brief filed by a number of states claims that hormone therapy is a "controversial practice" and that psychotherapy is a widely recognized alternative to gender-affirming medical care, but these assertions are simply untrue and not supported by the studies referenced. *See* Supp. Karasic Decl. ¶¶ 7–8. The state amici also cite risks of hormone therapy, but those risks exist for other well-accepted medical treatments and are largely the same risks that exist when testosterone or estrogen therapy is used for any purpose. *See* Karasic Decl. ¶ 75.

In sum, Plaintiffs have shown that they are likely to prevail on their Eighth Amendment claim that the EO and Implementing Memoranda's blanket prohibition of hormone therapy and accommodations for social transition constitute deliberate indifference to a serious medical need.

### B.    Plaintiffs are Likely to Succeed on Their APA Claims

Defendants' cursory response to Plaintiffs' APA claims is also unavailing. As an initial matter, Defendants' argument that Plaintiffs' stay request is moot because Defendants have already taken action ignores established law. The APA authorizes courts to "postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings," 5 U.S.C. § 705, with no temporal limits. "Though it may seem odd to speak of 'staying' the effective date of a rule already in effect, [c]ourts—including the Supreme Court—routinely stay already-effective agency action." *Boyle v. Bessent*, No. 2:24-CV-00081-SDN, 2025 WL 509519, at *4 n.5 (D. Me. Feb. 14, 2025) (cleaned up); *Gomez v. Trump*, 485 F. Supp. 3d 145, 203 (D.D.C. 2020) ("§ 705's grant of power to 'issue all necessary and appropriate process' includes the power to compel agency inaction when necessary 'to preserve status or rights pending conclusion' of the action."). Two of the cases Defendants cite are inapposite, as they involve an agency invoking § 705 to stay its own rule promulgated by notice-and-comment rulemaking that was already in effect—effectively changing its own rule without again invoking the notice-and-comment procedures. Further, *VanDerStok v. Garland*, 633 F. Supp. 3d 847, 863 (N.D. Tex. 2022) is an unpersuasive departure from an overwhelming judicial consensus.

Defendants fare no better on the merits. For reasons discussed above, they are wrong to assert that the Implementing Memoranda are not "contrary to constitutional right," 5 U.S.C. § 706(2)(B). With respect to the arbitrary and capricious claim, Defendants admit that the only justification for their actions is the EO, essentially conceding that they did not consider anything outside of the EO in implementing its directives, but asserting that the policy changes cannot be

arbitrary because the President commanded them. Resp. at 28-29. Yet agency action does not satisfy the APA simply because the President demands it. *See Gomez*, 485 F. Supp. at 194. To hold otherwise "would allow presidential administrations to issue agency regulations that evade APA-mandated accountability by simply issuing an executive order first." *Arizona v. Su*, 121 F.4th 1, 15 (9th Cir. 2024). Accordingly, this Court has expressly rejected the notion that agencies can use a just-following-orders defense to insulate arbitrary and capricious conduct. *See AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, No. 1:25-CV-00400-AHA, 2025 WL 485324, at *1-2, *5 (D.D.C. Feb. 13, 2025) (holding plaintiffs likely to succeed on claim that federal agencies acted arbitrarily and capriciously in implementing an executive order directing an immediate pause on all congressionally appropriated foreign aid where the agencies failed to provide a reasoned explanation or consider all the relevant factors).

The BOP's complete failure to ground the Implementing Memoranda in any modicum of evidence (it has provided no administrative record), consider any "relevant factors," or even identify a coherent rationale more than establishes arbitrariness and capriciousness. To the extent Defendants defend their Implementing Memoranda based on the rationale supplied by the EO itself, they gain no traction. Indeed, Defendants cannot even make this argument with a straight face: Rather than point the Court to a coherent rationale in the EO, Defendants state simply that "the Executive Order itself explains the reasons for the policy" and "the Executive Order articulates why the Executive has changed its policy." Resp. at 28–29. In actuality, the EO does nothing of the sort. It does not consider the extensive research documenting the necessity of hormones, accommodations, and other forms of gender-affirming care; it does not consider reliance interests; nor does it address the threats to prison safety that arise when people lose access to crucial treatments. Instead, the sole predicate for the EO's ban on these treatments is its assertion

that to acknowledge the existence of transgender people somehow threatens women and "the validity of the entire American system." EO § 1.

The Implementing Memoranda—and the EO they rely on—do not reflect a consideration of the "relevant factors" or any semblance of "reasoned decisionmaking"—thereby demonstrating their arbitrariness and capriciousness. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 31, 42, 52 (1983) (holding agency's recission of an automotive safety standard arbitrary and capricious on a far more comprehensive administrative record); *see Gomez*, 485 F. Supp. at 194 (finding under similar circumstances that "[t]he Administrative Record reveals no justification for" an immigration policy change that was therefore arbitrary and capricious); *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review…to the agency decision based on the record the agency presents to the reviewing court.") (internal citation omitted).

Defendants' remaining arguments on the APA claim mischaracterize Plaintiffs' arguments, the record, or both. Plaintiffs' claims do not rely on a mere disagreement with the President's stated rationales for directing a blanket ban on gender-affirming health care, Resp. at 28-29, but rather the Implementing Memoranda's failure to ground themselves in any reasoned explanation. Defendants also suggest that they need not justify a new policy because they are continuing to provide hormones as they did before. This ignores the current denial of accommodations and, as discussed above, the imminent risk of hormone therapy being discontinued despite defendants' counsel's attempt to characterize BOP's practices and policies differently from what they are: A drastic break with past protocols that causes serious harm to people with gender dysphoria.

## C.    Plaintiffs Satisfy the Remaining Preliminary Injunction Factors

Plaintiffs plainly satisfy the second prong of the preliminary injunction analysis. For the reasons discussed previously, Plaintiffs have suffered a violation of their constitutional rights,

which necessarily constitutes irreparable injury. *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998).

Additionally, and independently, Plaintiffs are experiencing and will continue to experience severe emotional harm from the loss of their accommodations and likely loss of hormone therapy. Defendants do not dispute the severe distress arising from Plaintiffs' inability to access accommodations. *See* Resp. at 30-31; *see also* Karasic Decl. ¶¶ 27, 28, 30, 64, 80 (explaining the importance of accommodations). With respect to hormone therapy, Defendants again emphasize that Plaintiffs are currently receiving this treatment, Resp. at 30-31; however, the question is whether "irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original); *see also United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) ("[T]he court's power to grant injunctive relief survives discontinuance of the illegal conduct" because "[t]he purpose of an injunction is to prevent future violations. . . ." (cleaned up)). For the reasons discussed previously, *see* Part I, *supra*, Plaintiffs' access to hormone therapy is precarious. Plaintiffs, through their declarations and the testimony of Dr. Karasic, have explained in detail the harms that will befall them and the putative class members if they are denied hormone therapy. Pls.' Mem. at 31. Defendants do not refute these harms, and their carefully worded statements about the current state of affairs provide no relief. Resp. at 30.

The final two factors, the balance of the hardships and the public interest, which merge when the government is the defendant, *Nken v. Holder*, 556 U.S. 418 435 (2009), favor Plaintiffs as well. Plaintiffs ask only that Defendants return to policies they had in place for years before the current EO. In addition to promoting prison safety, *see* Thompson Decl. ¶¶ 42-45, those prior policies protected Plaintiffs from severe health consequences and upheld their constitutional rights. To justify not restoring the status quo, Defendants cite inapposite case law observing that facial challenges to *statutes* undermine the democratic process. Resp. at 31. This principle says nothing

about the public interest or executive orders. Ultimately, "[t]here is no harm to the Government when a court prevents unlawful practices" and it is "always in the public interest to prevent the violation of a party's constitutional rights." *Banks v. Booth*, 468 F. Supp. 3d 101, 124 (D.D.C. 2020) (internal citations omitted).

## III.    The Requested Relief is Not Precluded by the PLRA or Presidential Immunity.

### A.    Plaintiffs' Claims Are Not Barred by PLRA Exhaustion Requirements

Defendants argue that the Court should deny relief because Plaintiffs failed to exhaust administrative remedies. Resp. at 16-19. This argument fails for three independent reasons.

*First*, as Defendants concede, this Court has already concluded that remedies are unavailable to federal prisoners challenging the EO's effect on their hormone therapy, because "[t]he text of the Executive Order plainly requires the BOP to . . . withhold the prescribed hormone therapy drugs." *Doe v. McHenry*, No. 1:25-CV-286-RCL, 2025 WL 388218 (D.D.C. Feb. 4, 2025), at 3 (citing *Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008)). The Court should adhere to its prior ruling. *See Jones v. Bondi*, No. 1:25-CV-401-RCL, 2025 WL 923117 at 1* (D.D.C. Feb. 24, 2025) ("The Court has reviewed the parties' filings and determines that the same reasoning from the Court's TRO order in *Doe v. McHenry* applies here").

*Second*, exhaustion is not required when the grievance system is too slow to provide relief before the threatened harm comes to pass. "If a prisoner has been placed in imminent danger of serious physical injury by an act that violates his constitutional rights, administrative remedies that offer no possible relief in time to prevent the imminent danger from becoming an actual harm can't be thought available." *Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173 (7th Cir. 2010); *see also Jackson v. Dis. of Columbia*, 254 F.3d 262, 268 (D.C. Cir. 2001) (the PLRA does not "foreclose[e] courts from exercising their traditional equitable power to issue injunctions to prevent irreparable injury pending exhaustion of administrative remedies").

The BOP administrative remedy process has four steps, Resp. at 17, and can take up to 160 days, depending on BOP's actions, 28 C.F.R. § 542.18.[7] Here, the EO was issued on January 20, 2025. Six days later, on January 26,[8] BOP abruptly stopped Ms. Kingdom's hormone treatment and removed all gender-affirming commissary items, Kingdom Decl. ¶¶ 12–13; BOP reduced Mr. Nichols' hormone dose on February 12, Bina Decl. ¶ 23, and implemented new restrictions and prohibitions regarding chest binders and boxers in the last week of February, Kapule Decl. ¶ 12; Nichols Decl. ¶ 19. Because it was not possible to complete the administrative remedy process before they suffered the harms and threatened harms, remedies were unavailable and exhaustion is not required. *See Ross v. Blake*, 578 U.S. 632, 648 (2016) (an "inmate need exhaust only such administrative remedies as are 'available'"); *McPherson v. Lamont*, 457 F.Supp.3d 67, 81 (D. Conn. 2020) (administrative remedies unavailable in the context of COVID-19 when it took 105 days to complete the four-step administrative remedy process).

*Finally*, "failure to exhaust is an affirmative defense under the PLRA," *Jones v. Bock*, 549 U.S. 199, 216 (2007), which "the defendants have the burden of pleading and proving." *Chandler v. Fed. Bureau of Prisons*, 226 F. Supp. 3d 1, 6 (D.D.C. 2016). A defendant asserting non-exhaustion can carry that burden by, for example, submitting affidavits and exhibits establishing the existence of an administrative remedy program and that review of all of the plaintiff's grievances shows that he failed to exhaust administrative remedies. *See Banks v. York*, 515 F. Supp. 2d 89, 116 (D.D.C. 2007). Here, by contrast, Defendants submit no affidavits, documents, or any other evidence in support of their contention that Plaintiffs have not exhausted

---

[7] For step two, the facility warden has 20 days to respond, which can be extended to 40 days; for step three, the Regional Director has 30 days to respond, which can be extended to 60 days; for step four, the General Counsel has 40 days to respond, which can be extended to 60 days.
[8] Defendant Bina says that Ms. Kingdom's hormones were stopped on February 12, Bina Decl. ¶ 17, but which date is correct does not impact Plaintiffs' argument here.

administrative remedies. Accordingly, they have failed to carry their burden of proof, and their exhaustion argument must be rejected.

      **B.**    **Plaintiffs' Requested Remedy Is Proper.**

Citing no case law, Defendants assert that the PLRA bars any preliminary injunctive relief that extends beyond the three named plaintiffs. Resp. at 39-40. They rely on 18 U.S.C. § 3626(a)(1)(A), which provides that prospective relief "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." But as Defendants concede, preliminary injunctive relief is governed by § 3626(a)(2), which does not include the "particular plaintiff or plaintiffs" language, requiring only that relief shall "extend no further than necessary to correct the harm the court finds requires preliminary relief." "[W]hen Congress includes particular language in one section of a statute but omits it in another—let alone in the very next provision—this Court presumes that Congress intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (internal quotation marks, brackets omitted).

Even if the "particular plaintiff or plaintiffs" language applied to the instant motion—and it does not—that language has never been construed to bar class-wide relief in appropriate cases. Indeed, in *Plata*, the Supreme Court found that a class-wide grant of injunctive relief satisfied the "particular plaintiff or plaintiffs" requirement. 563 U.S. at 531-21. *See also Fields*, 653 F.3d at 558-59 & n.4 (rejecting contention that district court violated "particular plaintiff or plaintiffs" requirement by enjoining Inmate Sex Change Prevention Act in its entirety, although no class was certified); *Clement v. Calif. Dep't of Corr.*, 364 F.3d 1148, 1152-54 (9th Cir. 2004) (similar); *Banks v. Booth*, 459 F. Supp. 3d 143, 161-63 (D.D.C. 2020) (granting class-wide temporary restraining order in putative class action challenging jail conditions without ruling on class certification motion). The PLRA poses no bar to the class-wide preliminary relief Plaintiffs seek here.[9]

---

[9] Regarding Plaintiffs' other remedy sought—provisional class certification—Plaintiff addresses Defendants' arguments in their separate reply in support of their motion for class certification.

### C.    Presidential Immunity Is Not Applicable

Defendants assert that "[t]he President is immune from injunctive relief," Resp. at 42, relying upon the plurality opinion in *Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992). But there is no question that this Court can review the lawfulness of presidential actions like the EO and its implementation. *See, e.g., Trump v. Hawaii*, 585 U.S. 667, 675–76 (2018) (reviewing President's authority under the INA to issue proclamation); *Dames & Moore v. Regan*, 453 U.S. 654 (1981) (reviewing President Carter's executive order ending the Iranian hostage crisis); *Youngstown, Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (reviewing constitutionality of President Truman's executive orders); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) (reviewing validity of an executive order issued by President Roosevelt). This power is grounded in the "long history of judicial review of illegal executive action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

Defendants do not dispute this Court's jurisdiction to review and enjoin BOP's actions implementing the EO. While Plaintiffs do not seek to enjoin the President, the Court should not dismiss him as a defendant. Such action is premature at the preliminary injunction stage, and at a minimum declaratory relief is available against him. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998) (suggesting that declaratory judgment against the President could redress plaintiff's injuries); *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (concluding that court had jurisdiction to issue writ of mandamus against the President but "opt[ing] instead" to issue declaration).

### CONCLUSION

For the reasons stated, Plaintiffs' motion for a preliminary injunction and stay of agency action should be granted.

Dated: April 4, 2025

Respectfully submitted,

/s/ Michael Perloff

David C. Fathi (*pro hac vice*)†
Maria V. Morris, D.C. Bar No. 1697904
Elisa C. Epstein, Ill. (*pro hac vice*)†
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, N.W.
Washington, D.C. 20005
Tel: 202-393-4930
dfathi@aclu.org
mmorris@aclu.org
eepstein@aclu.org
† *Not admitted in D.C.; practice limited to*
*federal courts.*

Michael Perloff, D.C. Bar No. 1601047
Aditi Shah, D.C. Bar No. 90033136††
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
mperloff@acludc.org
ashah@acludc.org
††*Admission to DDC Bar pending*

Corene T. Kendrick (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California St., Ste. 700
San Francisco, CA 94104
Tel: 202-393-4930
ckendrick@aclu.org

Shawn Thomas Meerkamper**
California State Bar No. 296964
shawn@transgenderlawcenter.org
Megan Z. F. Noor**
California Bar No. 359480
megan@transgenderlawcenter.org
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Phone: (510) 587-9696

Li Nowlin-Sohl (*pro hac vice*)
(admitted only in Washington state)
Leslie Cooper (*pro hac vice*)
Shana Knizhnik, DDC Bar ID 120840
James D. Esseks*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212-549-2500
lnowlin-sohl@aclu.org
lcooper@aclu.org
sknizhnik@aclu.org
jesseks@aclu.org

Lynly S. Egyes (*pro hac vice*)
New York Bar No. 4838025
Lynly@transgenderlawcenter.org
Milo Inglehart (*pro hac vice*)
New York Bar No. 5817937
milo@transgenderlawcenter.org
TRANSGENDER LAW CENTER
594 Dean Street, Suite 11
Brooklyn, NY 11238
Phone: (510) 587-9696

\* *Pro hac vice application forthcoming.*
\*\**Pro hac vice application pending*
*Counsel for plaintiffs and the proposed class*

26