### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALISHEA KINGDOM, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | Civ. A. No. 25-691 (RCL) |

### DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE

Defendants, by and through counsel, respectfully respond to the Court's Order to Show Cause why the Warden of the Federal Correctional Institution-Butner ("FCI-Butner') and certain specifically named officers at FCI-Butner should not be held in civil contempt for allegedly violating the Protective Order the Court issued on February 29, 2025, prohibiting Defendants from retaliating against inmates for participating in this litigation.  Show Cause Order (ECF No. 128).

Plaintiffs have not satisfied their burden.  First, the order is not "clear and unambiguous." *Armstrong v. Exec. Off. of the Pres.*, 1 F.3d 1274, 1289 (D.C. Cir. 1993) (per curiam) (cleaned up); *see* Prot. Ord. (ECF No. 124); Defs. Recon. Mot..  As Defendants explain in their forthcoming Motion for Reconsideration of the Protective Order, among other deficiencies, the order lacks the specificity required by Federal Rule of Civil Procedure 65(d) and the Prisoner Litigation Reform Act ("PLRA") , extends beyond the legal contours of retaliation and harassment, and is overly broad such that it risks chilling staff at the Federal Bureau of Prisons ("BOP") from taking legitimate disciplinary or other actions.  Defs. Recon. Mot.

Second, Plaintiffs have not established by clear and convincing evidence that the accused officers violated the Protective Order, even if broadly construed.  *See Armstrong*, 1 F.3d at 1289.

As explained in the Declarations of Scott Garland, Warden (Ex. 1), John Vonville, Office of Internal Affairs ("OIA") Supervisory Management Analyst (Ex. 2), Nicholas Bell, FCI-Butner Unit Manager (Ex. 3), and Khristy Robinson, Federal Correctional Complex-Butner Assistant Health Services Administrator (Ex. 4), the retaliation allegations that give rise to Plaintiffs' contempt motion are not substantiated. *Infra* at 7-11. BOP has not retaliated against inmates Pinson or Moreno for participating in this case. The accused officials accordingly should not be held in contempt of Court. Indeed, as Defendants explained in their Motion for Reconsideration of the Protective Order, this process has demonstrated that inmates like Pinson, who is "a prodigious litigator," *Pinson v. Dep't of Justice,* 964 F.3d 65, 67 (D.C. Cir. 2020), "having filed more than 100 civil actions and appeals across the nation" at least as of 2014, *Pinson v. Samuels*, 761 F.3d 1, 3 (D.C. Cir. 2014), are able to interfere with prison administration and discipline by requiring the accused officials to account for their actions on an emergency basis in response to false allegations.

## BACKGROUND

Since June 3, 2025, the Court has preliminarily enjoined BOP from enforcing its memoranda implementing Executive Order 14168 ("EO") as to cross-sex hormones and social accommodations for inmates with Gender Dysphoria. PI Order (ECF No. 68). The Court certified a class of "all persons who are or will be incarcerated in the custody of the BOP facilities, with a current diagnosis of gender dysphoria or who receive such a diagnosis in the future" and ordered BOP to provide hormones and social accommodations to class members in accordance with BOP's pre-EO policy. *Id.* Currently, there are close to 800 class members. Defs. Stat. Rep. (ECF No. 108) at 1.

On February 19, 2026, the Court held an injunction compliance status hearing.  Based on allegations of retaliation by three inmates including Pinson, the Court adopted Plaintiffs' proposed protective order that Plaintiffs presented for the first time during the hearing.  That Protective Order prohibits BOP from taking any action "that harass[es], intimidate[s], or otherwise retaliate[s] against witnesses who have provided or will in the future provide the Court information, either via oral testimony or written statements."  Prot. Ord. (ECF No. 124) at 3.  It also prohibits "actions that harass, intimidate, or otherwise retaliate against people incarcerated in BOP custody who have filed or will file grievance alleging non-compliance with this Court's Preliminary Injunction, or who have contacted or will contact Plaintiffs' counsel or this Court alleging noncompliance with the Preliminary Injunction."  *Id.*  Moreover, the Order states, "This prohibition includes action which could reasonably be viewed as having a chilling effect on witness testimony by utilizing group punishments, or action against other prisoners who could in turn blame or target the witnesses."  *Id.* at 4.

On February 25, 2026, Plaintiffs filed an emergency motion for an order to show cause why Defendants should not be held in contempt of the Protective Order.  Pls. Show Cause Mot. (ECF No. 127).  The motion asserted more allegations of retaliation from Pinson and another inmate Moreno, who is not a member of the class.  *Id.*  Pinson alleges that BOP was stopping Pinson's cross-sex hormones, and that prison officials conducted an inappropriate strip search, mishandled Pinson's legal documents, improperly extended Pinson's segregated detention, and threatened Pinson for continuing to submit declarations to the Court in this litigation.  *Id.* at 2, 3-4; Pinson 2/24/26 Decl. (ECF No. 127-1).  Pinson also alleges that an officer told Moreno that he was being held in solitary confinement because he talked to class counsel.  Pls. Show Cause Mot. (ECF No. 127) at 2, 4-5; Pinson 2/24/26 Decl. (ECF No. 127-1) ¶ 9.  Moreno, however, does not

allege this in his own declaration. Moreno Decl. (ECF No. 127-2). Moreno instead alleges that, in retaliation for witnessing how BOP was purportedly treating Pinson, BOP has been delaying a decision on "false incident reports" involving him and Pinson. Moreno Decl. (ECF No. 127-2) at ¶¶ 17-18.

The Court held a hearing on February 26, 2026, during which government counsel represented that there had been no discontinuation of Pinson's cross-sex hormones and that BOP's Office of Internal Affairs ("OIA") is otherwise investigating Pinson's allegations of officer misconduct in accordance with BOP policy. Hearing Tr. (Feb. 26, 2026) at 6-7; *see* Ex. 2 (Vonville Decl.), ¶¶ 4, 6 (listing five open OIA investigations concerning Pinson's recent allegations of misconduct and one that has already been closed because Pinson's charges "were not sustained"); BOP Program Statement 1210.25 (Office of Internal Affairs). The Court nevertheless issued an order to show cause why the accused officials, including the Warden, should not be held in civil contempt. Show Cause Ord. (ECF No. 128).

In response to Plaintiffs' allegations, Defendants are submitting the Declarations from Warden Garland (Ex. 1), John Vonville of OIA (Ex. 2), Nicholas Bell, Unit Manager (Ex. 3), and Khristy Robinson, Assistant Health Services Administrator (Ex. 4). Collective, these declarations explain that the allegations of retaliation that give rise to Plaintiffs' emergency contempt motion are false. BOP has not retaliated against inmates Pinson or Moreno for participating in this case.

Warden Garland's Declaration states, inter alia, that Pinson's continued detention in the Secure Mental Health Unit ("SMHU") was due to Pinson's continued disciplinary infractions, including diversion of prescribed Suboxone (February 22, 2026) and sending fabricated emails from other inmates' accounts (February 25, 2026); Pinson's hormones were not being terminated; and that the alleged strip search by a male officer, placement in an unkept cell, and mishandling

of legal papers were not true.  Ex. 1 (Garland Decl.).  OIA's Vonville explains that OIA has opened

six investigations in response to Pinson's recent allegations of misconduct and OIA has already

closed one of them because Pinson's allegations "were not sustained."  Ex. 2 (Vonville Decl.), ¶¶

4, 6.  The others "remain open because not all investigative activities have been completed, and

the outcome of the case[s] ha[ve] not been established."  *Id.* ¶ 5.  Bell, the Manager of the Unit

Team that is assigned to Pinson, lists seven disciplinary charges that have been sustained against

Pinson since October 17, 2025, including one on February 22, 2026, for possessing drugs

(manipulating prescribed Suboxone), the day before Pinson expected to be returned to the General

Population from the SMHU.  Ex. 3 (Bell Decl.) ¶¶ 16-17.  Assistant Health Services Administrator

Robinson states that Pinson has consistently received hormones as prescribed by BOP medical

providers, and the "providers will continue to provide Pinson with the above prescribed

medications."  Ex. 4 (Robinson Decl.) ¶¶ 6, 8, 9, 11.

## LEGAL STANDARD

"The party moving for civil contempt faces a heavy burden."  *Potter v. Dist. of Columbia*,

126 F.4th 720, 723 (D.C. Cir. 2025).  "[C]ivil contempt will lie only if the putative contemnor has

violated an order that is clear and unambiguous, and the violation [is] proved by clear and

convincing evidence."  *Armstrong*, 1 F.3d at 1289 (cleaned up) (vacating district court's contempt

finding).  "In light of the [contempt] remedy's extraordinary nature, courts rightly impose it with

caution."  *Joshi v. Prof'l Health Servs., Inc.,* 817 F.2d 877, 879 n.2 (D.C. Cir. 1987).

## ARGUMENT

Plaintiffs have failed to carry their burden as to both civil contempt requirements: (1) a "clear and unambiguous" order that the accused officials supposedly violated, and (2) proof of a violation by "clear and convincing evidence." *Armstrong*, 1 F.3d at 1289.

### I.        The Protective Order Is Unclear and Ambiguous.

The Protective Order that the Butner officials supposedly violated is not "clear and unambiguous." *Id.* As the Supreme Court has explained:

> The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid.

*Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967) (discussing Federal Rule of Civil Procedure ("Rule") 65(d) regarding injunctions and reversing finding of civil contempt for alleged violation of vague decree); *see also Common Cause v. Nuclear Reg. Comm'n*, 674 F.2d 921, 927 (D.C. Cir. 1982) (reversing contempt finding because the injunction violated the Rule 65(d) specificity requirement and thus "failed to give adequate notice" of the prohibited activity). That is, an injunction still must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). In the context of federal prisons, Congress has also specifically required that any prospective relief regarding prison conditions be narrowly drawn. 18 U.S.C. § 3626(a).

The Order on which the show cause order is based is not "clear and unambiguous." *Armstrong*, 1 F.3d at 1289. The Order is just the opposite; it is overbroad, vague, and contravenes the specificity requirements of the Prison Litigation Reform Act ("PLRA") and Rule 65(d). *See* Defs. Recon. Mot. at 13-16; 18 U.S.C. § 3626(a); Fed. R. Civ. P. 65(d)(1).

As Defendants discuss in their reconsideration motion (which Defendants incorporate fully herein), the Protective Order, among other deficiencies, vaguely describes the prohibited conduct, and does not specify any causal nexus between the protected activity and the adverse action against the inmate.  Recon. Mot. at 13-16.  In summary, the Protective Order is a broad "obey the law" injunction that does "not adequately inform a defendant of its obligations."  *M.G. through Garcia v. Armijo*, 117 F.4th 1230, 1249 (10th Cir. 2024); *see also Tincher v. Noem*, 164 F.4th 1097, 1099 (8th Cir. 2026) ("[d]irections not to retaliate . . . are simply commands to obey the law, which are not specific enough" under Rule 65(d)) (cleaned up); *Reid v. Buttigieg*, Civ. A. No. 20-1262 (TJK), 2023 WL 2184549, at \*9 (D.D.C. Feb. 23, 2023) (the government "already must refrain from illegal retaliation"; "[t]he Court cannot issue an obey-the-law injunction" against retaliation). Because the Protective Order lacks the requisite specificity, it "fail[s] to give adequate notice," *Common Cause*, 674 F.2d at 927, and the Court thus should not hold the accused officials in contempt for violating such an Order.

The Protective Order's deficiencies have real world and potentially disastrous consequences in the very dangerous and delicate carceral environment, given that the threat of contempt for violating the overbroad and unspecific order could chill legitimate discipline and deter other appropriate treatment of inmates.  This puts the safety and security of inmates and officers in jeopardy and improperly interferes with prison administration.  In other words, the threat of contempt based on the flawed Protective Order is literally the "potent" and "deadly" "weapon" that the Supreme Court warned about.  *Int'l Longshoremen's Ass'n*, 389 U.S. at 76.

## II.    Plaintiffs Failed Their Burden to Prove a Violation.

Even if the Protective Order satisfied the clear and unambiguous requirement (which it does not), Plaintiffs have failed to carry their burden of showing by clear and convincing evidence

that a violation of the Order occurred.  "In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred."  *Breen v. Tucker*, 821 F. Supp. 2d 375, 383 (D.D.C. 2011) (cleaned up).

Pinson alleges that BOP was stopping Pinson's cross-sex hormones, and that prison officials conducted an inappropriate strip search, mishandled Pinson's legal documents, improperly extended Pinson's segregated detention, and threatened Pinson to stop submitting documents to the court.  Pls. Show Cause Mot. (ECF No. 127) at 2, 3-4; Pinson 2/24/26 Decl. (ECF No. 127-1).  Pinson also alleges that an officer told Moreno that Moreno was being held in solitary confinement because he talked to class counsel.  Pls. Show Cause Mot. (ECF No. 127) at 2, 4-5.  Moreno, however, does not allege this in his own declaration.  Moreno Decl. (ECF No. 127-2) ¶ 9.  Moreno instead alleges that, in retaliation for witnessing BOP's treatment of Pinson, BOP has been delaying a decision on "false incident reports" involving him and Pinson.  Moreno Decl. (ECF No. 127-2) at ¶¶ 17-18.  But Plaintiffs are not moving for contempt based on this alleged retaliatory act against Moreno.  Pls. Show Cause Mot. (ECF No. 127) at 2, 4-5.  That is not surprising because the Discipline Hearing Officer had expunged the incident report on February 20, 2026.  Ex. 3 (Bell Decl.) ¶ 17.  The lieutenant also denies asking Moreno if he was talking to Pinson's lawyers.  Ex. 1 (Garland Decl.) ¶ 19.

What remains of Plaintiffs' emergency show cause motion, therefore, are allegations of retaliation by Pinson, who is characterized by the D.C. Circuit as "a prodigious litigator," *Pinson*, 964 F.3d at 67, "having filed more than 100 civil actions and appeals across the nation" at least as of 2014, *Pinson*, 761 F.3d at 3.  Pinson's allegations of retaliation are contradicted by the Declarations of Warden Garland (Ex. 1), OIA Supervisory Management Analyst Vonville (Ex. 2),

Unit Manager Bell (Ex. 3), and Assistant Health Services Administrator Robinson (Ex. 4), as well as by BOP's disciplinary and medical records.

First, Pinson alleges continued detention in the SMHU in retaliation for submission of declarations in this case. Pinson 2/25/25 Decl. (ECF No. 127-1) ¶ 3. Pinson states that SMHU detention was supposed to end on February 23, 2026. *Id.* But as Unit Manger Bell explained, on the day before the planned release to the general population, Pinson was charged with misusing drugs by manipulating prescribed Suboxone. Ex. 3 (Bell Decl.), attachment. Pinson states that the "substance" was not Pinson's and Pinson "honestly had no idea [Pinson's cellmate] had it." Pinson 2/25/25 Decl. (ECF No. 127-1) ¶ 8. But the investigator sustained the charge after examining the evidence, including video documenting Pinson's conduct. Ex. 3 (Bell Decl.), attachment. This matter is currently pending final hearing before the institution's Discipline Hearing Officer.

Warden Garland explained that Pinson's "continued housing in SMHU was necessary due to the pending investigation and processing of the incident report" involving diversion of the prescribed Suboxone. Ex. 1 (Garland Decl.) ¶ 19. Additionally, on February 25, 2026, Pinson was issued an incident report for "lying or falsifying a statement and mail abuse, disrupt monitoring." *Id.* ¶ 71. Essentially, Pinson was sending fabricated emails under the names of other inmates alleging that they observed staff "forcibly removing [Pinson] from the cell, stripping the inmate, threatening the inmate, reading the inmate's legal materials, and placing the inmate in an unsanitary cell." *Id.* The emails sent by Pinson claimed that the inmates observed staff "threaten[ing] [Pinson's] safety and attempted to intimidate [Pinson] regarding communication with a federal judge." *Id.* The Warden determined that based on interviews conducted of the named officers, this infraction "further warrants continued housing in the SMHU pending hearing

by the Discipline Hearing Officer." *Id.* ¶ 19.  The continued detention was not in retaliation for

Pinson's declarations or because of involvement in this case, but for valid disciplinary reasons.

Second, Pinson alleges being told on February 20, 2026, that BOP was terminating

Pinson's estrogen injections "immediately," purportedly in retaliation for declarations Pinson

submitted in this case.  Pinson 2/25/25 Decl. (ECF No. 127-1) ¶ 4.  But as the Assistant Health

Services Administrator Robinson stated, Pinson "has consistently received the prescribed Estradiol

injections every 14 days, to include the most recent dose administration on February 25, 2026."

Ex. 4 (Robinson Decl.) ¶ 6; *see also id.*, attachment (medication administration record showing

injection on February 25).  Likewise, contrary to Pinson's representation that medical providers

told Pinson that Spironolactone was being discontinued, Robinson stated that Pinson has received

the medication on a consistent basis, including through the date of her declaration, February 26,

2026.  *Id.* ¶ 8, 9; *see also id.*, attachment (medication administration records showing daily tablet

through February 26, 2026).  As to the continuation of hormones for Pinson, Robinson stated, "In

accordance with guidance from BOP's Office of General Counsel signed on February 19, 2026

[guidance following issuance of new Gender Dysphoria treatment policy], BOP medical providers

will continue to provide Pinson with the above prescribed medications and there are no current

plans to discontinue the prescribed medications so long as they remain clinically appropriate." *Id.*

¶ 11.  Warden Garland confirmed that based on the interviews conducted, a physician never went

to Pinson's cell to present the Gender Dysphoria treatment policy, let alone tell Pinson that

Pinson's hormones were being terminated.  Ex. 1 (Garland Decl.) ¶ 19.

Third, as to the alleged incident on February 22, 2026 (strip search, placement in an unkept

cell, and mishandling of legal papers), Pinson 2/25/25 Decl. (ECF No. 127-1) ¶¶ 5, 7, Warden

Garland's Declaration explains that, on that date, a nurse informed a lieutenant that Pinson was

diverting prescribed Suboxone; a camera review was conducted that confirmed the infraction; Pinson and Pinson's cellmate willingly submitted to hand restraints and were removed from the cell to a shower stall; and a female officer conducted a visual search of Pinson. Ex. 1 (Garland Decl.) ¶ 19. "At no time did [a male officer] view Pinson naked, and at no time did anyone order Pinson to lift Pinson's breasts multiple times or spread Pinson's buttocks, these directions were given one time only in accordance with policy." *Id.* Further, the lieutenant denies saying demeaning remarks about the Court and further states that "there was not urine and feces in the cell they moved Pinson into, and all of Pinson's property and legal papers were stacked neatly in the cell on the bunk and desk." *Id.* As noted above, Pinson was caught sending fabricated emails under the names of other inmates to support the unsubstantiated claims emanating from the February 22 incident. *Supra* at 9.

Plaintiffs thus have not "demonstrated a reasonable certainty that a violation [of the Protective Order] occurred." *Breen*, 821 F. Supp. 2d at 383 (cleaned up). The overwhelming evidence shows that BOP has not retaliated against Pinson for Pinson's involvement in this case. Indeed, the only information that Pinson provides to try to connect these incidents to Pinson's participation in this case is a single comment made by a single officer. Pinson 2/25/25 Decl. (ECF No. 127-1) ¶ 6. The evidence, however, establishes that BOP has legitimately disciplined Pinson for repeated infractions of BOP rules that are aimed at protecting the safety and security of the inmates and facility employees. This is not unlawful retaliation. *See Aref v. Holder*, 774 F. Supp. 2d 147, 169 (D.C. Cir. 2011) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)) ("To satisfy the causation link," the inmate must establish "that his or her [pursuit of a First Amendment right] was the 'but for' cause of the defendants' retaliatory action."). Pinson, as well as Moreno, fall

well short of establishing with "reasonable certainty" that the alleged incidents happened at all, let

alone as retaliation against Pinson because of participation in this case.

## CONCLUSION

For these reasons, Defendants respectfully request that the Court vacate the Order to Show

Cause.


Dated: March 3, 2026                         Respectfully submitted,

                                             BRETT A. SHUMATE
                                             Assistant Attorney General

                                             JEAN LIN
                                             Special Litigation Counsel

                                             /s/ *M. Jared Littman*
                                             M. JARED LITTMAN
                                             ALEXANDER J. YUN
                                             ELIZABETH B. LAYENDECKER
                                             Trial Attorneys
                                             U.S. Department of Justice
                                             Civil Division, Federal Programs Branch
                                             1100 L. Street, NW
                                             Washington D.C. 20005
                                             (202) 451-7478
                                             Jared.Littman2@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALISHEA KINGDOM, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | Civ. A. No. 25-691 (RCL) |

**[PROPOSED] ORDER**

Upon consideration of Defendants' Response to Order to Show Cause, and any response thereto, it is hereby **ORDERED** that the Order to Show Cause (ECF No. 128) is hereby **VACATED**.


DATED:                                    _____

Royce C. Lamberth
United States District Judge