**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ALISHEA KINGDOM, *et al.*, <br><br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br><br> Defendants. | Civ. A. No. 25-691 (RCL) |

**DEFENDANTS' MOTION FOR RECONSIDERATION
OF THE "PROTECTIVE ORDER" OF FEBRUARY 19, 2026**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................ 4

I.  PRELIMINARY INJUNCTION OF JUNE 3, 2025........................................................... 4

II.  THREE INMATES ALLEGE RETALIATION FOR PARTICIPATION IN THIS
CASE ................................................................................................................................. 4

III.  THE COURT'S ENTRY OF THE NATIONWIDE PROTECTIVE ORDER................. 6

LEGAL STANDARD..................................................................................................................... 8

ARGUMENT .................................................................................................................................. 9

I.  THE INMATES' RETALIATION ALLEGATIONS ARE
UNSUBSTANTIATED. ................................................................................................... 9

A.  Former Inmate Dye's Retaliation Allegations Are Unsubstantiated. ................. 10

B.  Inmate Meskill's Retaliation Allegations Are Unsubstantiated.......................... 10

C.  Inmate Pinson's Retaliation Allegations Are Unsubstantiated............................ 11

II.  THE PROTECTIVE ORDER IS LEGALLY DEFECTIVE. .......................................... 15

A.  The Protective Order Fails to Comply with Rule 65(d)...................................... 15

B.  The Protective Order Fails to Comply with PLRA's Requirements.................... 16

CONCLUSION............................................................................................................................. 22

## TABLE OF AUTHORITIES

Cases

*Aref v. Holder*,
   774 F. Supp. 2d 147 (D.C. Cir. 2011) ..................................................................... 17

*Bailey v. Fed. Bureau of Prisons*,
   Civ. A. No. 24-1219 (PLF), 2024 WL 3219207 (D.D.C. June 28, 2024) ............................. 19

*Black v. Dist. of Columbia*,
   134 F. Supp. 2d 255 (D.D.C. 2015) ..................................................................... 14

*Hartman v. Moore*,
   547 U.S. 250 (2006) ..................................................................... 17

*Hoffer v. Fl. Dep't of Corr.*,
   973 F.3d 1263 (11th Cir. 2020) ..................................................................... 9

*In re Navy Chaplaincy*,
   512 F. Supp. 2d 58 (D.D.C. 2007) ..................................................................... 8

*Jones v. Bock*,
   549 U.S. 199 (2007) ..................................................................... 2

*Meritor Savings Bank v. Vinson*,
   477 U.S. 57 (1986) ..................................................................... 18

*M.G. through Garcia v. Armijo*,
   117 F.4th 1230 (10th Cir. 2024) ..................................................................... 15

*Nat'l Ctr. for Mfg. Scis. v. Dep't of Def.*,
   199 F.3d 507 (D.C. Cir. 2000) ..................................................................... 8

*Pinson v. U.S. Dep't of Just.*,
   964 F.3d 65 (D.C. Cir. 2020) ..................................................................... 1

*Pinson v. Samuels*,
   761 F.3d 1 (D.C. Cir. 2014) ..................................................................... 1

*Reid v. Buttigieg*,
   Civ. A. No. 20-1262 (TJK), 2023 WL 2184549 (D.D.C. Feb. 23, 2023) ............................. 16

*Ross v. Blake*,
   578 U.S. 632 (2016) ..................................................................... 22

*Schmidt v. Lessard*,
   414 U.S. 473 (1974) ..................................................................... 15

*Tincher v. Noem*,
   164 F.4th 1097 (8th Cir. 2026) ..................................................................... 16

*Toolasprashad v. Bureau of Prisons*,
   286 F.3d 576 (D.C. Cir. 2002) ..................................................................... 18

*Twelve John Does v. District of Columbia*,
   117 F.3d 571 (D.C. Cir. 1997) ..................................................................... 2, 9, 14, 17

*United States v. Sec'y, Fl. Dep't of Corr.*,
   778 F.3d 1223 (11th Cir. 2015) ........................................................................... 9

*Univ. of Tex. SW. Med. Ctr. v. Nassar*,
   570 U.S. 338 (2013) ........................................................................................... 17

*Woodford v. Ngo*,
   548 U.S. 81 (2006) ............................................................................................. 22

<u>Statutes</u>

18 U.S.C. § 3626(a) ......................................................................................... *passim*

18 U.S.C. § 3626(g)(2) ........................................................................................... 16

<u>Federal Rules of Civil Procedure</u>

Fed. R. Civ. P. 26(b)(2) ........................................................................................... 8

Fed. R. Civ. P. 26(c)(1) ........................................................................................... 8

Fed. R. Civ. P. 54(b) ............................................................................................... 8

Fed. R. Civ. P. 65(d) ..................................................................................... 8, 9, 15

<u>Other Authorities</u>

8A Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 2036 (3d ed. 2010) ............................. 8

Executive Order 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ....................................... 4

Program Statement 1210.25, Office of Internal Affairs, Fed. Bureau of Prisons
   (Aug. 1, 2023) ............................................................................................ 3, 7, 21

Program Statement 1330.18, Administrative Remedy Program, Fed. Bureau of Prisons
   (Jan. 6, 2014) ..................................................................................................... 21

## INTRODUCTION

Defendants, by and through counsel, respectfully move for reconsideration of the Court's Order Granting Plaintiffs' Motion for a Protective Order (the "Protective Order"), ECF No. 124. The Federal Bureau of Prisons ("BOP") takes Plaintiffs' allegations of retaliation against certain class members for their participation in this litigation very seriously and is committed to thoroughly investigating all such allegations that have arisen and might arise in future. The Protective Order that the Court issued in response to those allegations, however, is unwarranted and overbroad.

As discussed below, the Protective Order was premised on three inmates' unsubstantiated allegations of retaliation. The attached declarations of Scott Garland, Warden, Federal Correctional Institution – Butner ("FCI-Butner") (Ex. 1), Dr. Kori Petty, Psy.D., Chief Psychologist, FCI Talladega (Ex. 2), Nicholas Bell, FCI-Butner Unit Manager (Ex. 3), and John Vonville, Office of Internal Affairs ("OIA") (Ex. 4), refute any alleged "retaliation" by supposedly depriving the complaining inmates of cross-sex hormones or otherwise mistreating them. And yet, primarily due to the unsubstantiated allegations of a single inmate Pinson, who is characterized by the D.C. Circuit as "a prodigious litigator," *Pinson v. Dep't of Justice,* 964 F.3d 65, 67 (D.C. Cir. 2020), "having filed more than 100 civil actions and appeals across the nation" at least as of 2014, *Pinson v. Samuels*, 761 F.3d 1, 3 (D.C. Cir. 2014), the Court has so far held an emergency motion hearing, issued an impromptu Temporary Restraining Order, and required BOP (including specified Warden and BOP officers) to show cause why they should not be held in civil contempt of the Protective Order. But the evidence shows that BOP did not mistreat Pinson, let alone in retaliation for Pinsons' participation in this case.

Specifically, BOP placed Pinson in the Secure Mental Health Unit ("SMHU") because of Pinson's repeated infractions, including possessing drugs by manipulating prescribed Suboxone (a

drug for treating addiction), engaging in sexual acts with another inmate, and sending fabricated emails from other inmates' accounts to try to substantiate Pinson's retaliation allegations. *Supra* at 11-13. And BOP revoked Pinson's transfer to a halfway house because the frequency with which Pinson needed crisis interventions and mental health treatment was beyond the capabilities of the halfway house, not because of Pinson's participation in this case. *Supra* at 14.

Moreover, the Protective Order is inconsistent with law, its deficiencies put the safety and security of inmates and officers in jeopardy, and it improperly interferes with prison administration. Although characterized as a "protective order"—a term the Court adopted based on Plaintiffs' proposal—the Order is in the nature of an injunction that provides prospective relief with the threat of contempt. Yet, the Order, essentially an "obey the law" injunction, fails to comply with the specificity requirement of Federal Rule of Civil Procedure ("Rule") 65(d). Not only does it stray from the requisite legal elements for establishing retaliation and harassment, but it also opens the door to claims by class members who subjectively believe that any negative treatment was due to their participation in this litigation—a danger the D.C. Circuit has warned against. *See Twelve John Does v. District of Columbia*, 117 F.3d 571, 577 (D.C. Cir. 1997).

The Protective Order is also contrary to the requirements of the Prison Litigation Reform Act ("PLRA"), which are designed to lessen the burden on prison administration, including burden posed by inmates' frivolous allegations. For example, without the screening mechanisms of the PLRA insulating BOP from the deluge of frivolous prisoner claims (e.g., administrative exhaustion and the three-strikes frivolous filing rule), the Protective Order is subject to abuse, and the need to address nonmeritorious retaliation allegations will divert BOP's resources and inhibit BOP's ability to focus on legitimate claims. Indeed, the Protective Order has already resulted in BOP "being haled into court" in short order without an opportunity to fully investigate the retaliation

allegations. *See Jones v. Bock*, 549 U.S. 199, 203 (2007). Illustrative of this concern is the fact that the Court's February 26 Order to Show Cause—for an account of BOP's officers' conduct in response to new allegations lodged for the first time the evening before—requires BOP to deviate from the established reporting, interviewing, and evidence gathering process for BOP's Office of Internal Affairs ("OIA") to investigate such conduct. *See* BOP Program Statement 1210.25, Office of Internal Affairs (discussing OIA's responsibility to investigate all BOP employee misconduct).

For all these reasons, the Court should grant Defendants' motion and vacate the Protective Order. Defendants will of course double their efforts to resolve any concerns raised by class counsel as to any alleged retaliation or harassment. Indeed, as Defendants previously explained in the related context of alleged noncompliance with the June 2025 preliminary injunction, Defendants were able to address the vast majority of non-compliance allegations (about 90%). Defs' Stat. Rep. (ECF No. 108) at 1-2. In the over 200 days following the issuance of the preliminary injunction, there were only about a dozen allegations of non-compliance that remained to be resolved from the nearly 800 class members. *Id.* In all other instances, the inmates' allegations were promptly resolved; were determined to be untrue, or were the consequences of routine prison administrative difficulties, such as commissary ordering delays or shortages. *Id.* This process of resolving class members' complaints of noncompliance should apply equally to allegations of retaliation and harassment for participating in this litigation.

Pursuant to Local Rule 7(m), Defendants conferred with class counsel about this motion. Counsel opposes.

## BACKGROUND

### I.  Preliminary Injunction of June 3, 2025

Since June 3, 2025, the Court has preliminarily enjoined BOP from enforcing its memoranda implementing Executive Order 14168 ("EO") as to cross-sex hormones and social accommodations for inmates with Gender Dysphoria.  PI Order (ECF No. 68).  The Court certified a class of "all persons who are or will be incarcerated in the custody of the BOP facilities, with a current diagnosis of gender dysphoria or who receive such a diagnosis in the future" and ordered BOP to provide hormones and social accommodations to class members in accordance with BOP's pre-EO policy.  *Id.*  Currently, there are close to 800 class members.  Defs. Stat. Rep. (ECF No. 108) at 1.

### II.  Three Inmates Allege Retaliation for Participation in This Case

On November 24, 2025, the Court requested status reports addressing whether BOP was complying with the preliminary injunction.  ECF No. 101.  In Plaintiffs' status report of December 22, 2025, three inmates, all of whom were class members at the time (Pinson, Dye, and Meskill), allege that BOP retaliated against them for complaining about BOP's purported non-compliance with the injunction.  Pls. Stat. Rep. (ECF No. 107) at 9-10.  In a reply filed on February 17, 2026, Plaintiffs made additional allegations of retaliation.  Pls. Stat. Rep. Reply (ECF No. 121) at 7-8.

#### A.  Former Class Member Dye

Dye alleges that unidentified BOP staff threatened not to release Dye from prison because Dye filed a grievance concerning BOP's alleged non-compliance with the preliminary injunction and because Dye attempted to contact class counsel about the non-compliance.  Pls. Stat. Rep. (ECF No. 107) at 10; ECF No. 107-3 (Dye Decl.) ¶ 13.  BOP released Dye three weeks later, on

January 7, 2026—thirteen days in advance of Dye's two-year sentence because of good conduct time credit that BOP applied to Dye's sentence.  Ex. 3 (Bell Decl.) ¶ 6; *id.* at Attach. 1.

B.  Inmate Meskill

Meskill alleges temporary withholding of hormones following the injunction in retaliation for a declaration Meskill submitted in May 2025 in support of Plaintiffs' preliminary injunction motion.  Pls. Stat. Rep. (ECF No. 107) at 10; *see* Meskill 5/8/25 Decl. (ECF No. 59-1).  Meskill states that when inquiring about restarting hormones following the injunction, the Health Services Administrator informed Meskill that BOP would not restart them at that time because of the potential negative side effects from drug interactions with another drug (Trazadone) that Meskill was prescribed.  Meskill 10/31/25 Decl. (ECF No. 107-11) ¶¶ 4-5.  Meskill is nevertheless "concerned" that the prior declaration "is part of the reason why I have not been allowed to restart hormone therapy."  *Id.* ¶ 14.  As class counsel's declaration indicates, BOP restarted Meskill's hormones in early December 2025.  Noor Decl. (ECF No. 107-1) ¶ 21.

C.  Inmate Pinson

Pinson alleges that after moving to intervene in this case in September 2025, ECF No. 86, BOP put Pinson's email account on an "investigation hold," officers assaulted Pinson, and BOP housed Pinson in solitary confinement.  Pls' Stat. Rep. (ECF No. 107) at 9-10; Pinson Decl. (ECF No. 107-2) ¶¶ 10-19.  In Plaintiffs' status report reply submitted on February 17, 2026, Pinson further alleges that BOP revoked Pinson's transfer to a halfway house on December 18, 2025, and that revocation was purportedly because Pinson had a phone call with counsel on December 15, 2025, about Pinson's declaration completed on that same day for this case.  Pls. Stat. Rep. Reply (ECF No. 121) at 7-8.  Pinson also alleges being moved to the SMHU on January 20, 2026, because Pinson refused to sign a document that BOP staff purportedly asked

Pinson to execute. *Id.* at 8. The document was allegedly intended to permit BOP to withdraw Pinson's prior declarations filed in this case complaining about BOP's alleged non-compliance with the preliminary injunction. *Id.*

### III.    The Court's Entry of the Nationwide Protective Order

On February 19, 2026, the Court held a status hearing, during which Plaintiffs provided a declaration for the first time from an inmate (Goodall), stating that an officer's allegations against Pinson that allegedly led to Pinson's move to the SMHU were false. Goodall Decl. ¶ 12.

At the hearing, Plaintiffs also presented for the first time a proposed "Protective Order." Plaintiffs proposed that the Court order BOP to "take no action that harass[es], intimidate[s], or otherwise retaliate[s] against witnesses who have provided or will in the future provide the Court information, either via oral testimony or written statements." Proposed Prot. Ord. (ECF No. 124) at 3. The proposed order also sought to prohibit "actions that harass, intimidate, or otherwise retaliate against people incarcerated in BOP custody who have filed or will file grievance alleging non-compliance with this Court's Preliminary Injunction, or who have contacted or will contact Plaintiffs' counsel or this Court alleging noncompliance with the Preliminary Injunction." *Id.* The proposed order stated, "This prohibition includes action which could reasonably be viewed as having a chilling effect on witness testimony by utilizing group punishments, or action against other prisoners who could in turn blame or target the witnesses." *Id.* at 4. Plaintiffs also proposed language tracking the requirements of the PLRA that the order is narrowly drawn, extends no further than necessary, is the least intrusive means to correct the harm, and that substantial weight was given to adverse impacts on public safety and operation of the criminal justice system. *Id.* at 3.

6

Shortly after the hearing concluded, and before Defendants had an opportunity to respond to Plaintiffs' proposal, the Court adopted Plaintiffs' proposed order without modification, granting Plaintiffs the prospective relief they sought. Prot. Ord. (ECF No. 124).

Within less than a week, on February 25, 2025, Plaintiffs filed an emergency motion for an order to show cause why Defendants should not be held in contempt for violating the Protective Order. ECF No. 127. The motion alleged more allegations of retaliation from Pinson and another inmate, who is not a class member. *Id.* The Court held a hearing the next day, during which government counsel represented that Pinson's cross-sex hormones were not discontinued as alleged and that BOP's OIA is otherwise investigating Pinson's allegations of officer misconduct in accordance with BOP policy. Hearing Tr. (Feb. 26, 2026) at 6-7; *see* Ex. 4 (Vonville Decl.) ¶¶ 4, 6 (listing five open OIA investigations concerning Pinson's recent allegations of misconduct and one that has been closed already because Pinson's charges "were not sustained"); BOP Program Statement 1210.25, Office of Internal Affairs. The Court repeatedly admonished government counsel for not personally investigating Pinson's allegations and for not personally talking to the Warden and the officers accused of retaliation, Hearing Tr. (Feb. 26, 2026) at 8-13, which would have interfered with OIA's investigatory function. The Court also granted Plaintiffs' impromptu request for a temporary restraining order requiring Defendants to prepare a "detailed plan of steps they plan to take to protect Pinson [and another inmate] from further retaliation," with which BOP has complied by, inter alia, temporarily reassigning the alleged offending officers, Ex. 1 (Garland Decl.) at 25-31. The Court also issued an order to show cause why the Warden and certain officers accused by Pinson of retaliation should not be held in contempt of the Protective Order. ECF No. 128.

# LEGAL STANDARD

A district court may revise its own interlocutory decisions "at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Fed. R. Civ. P. 54(b). Reconsideration of an interlocutory decision is available "as justice requires." *In re Navy Chaplaincy*, 512 F. Supp. 2d 58, 61 (D.D.C. 2007). The court should grant a reconsideration motion when the moving party presents "new facts or clear errors of law which compel the court to change its prior position." *Nat'l Ctr. for Mfg. Scis. v. Dep't of Def.*, 199 F.3d 507, 511 (D.C. Cir. 2000).

As an initial matter, although the Court adopted Plaintiffs' proposed characterization of the February 19 Order as a "protective order," the Order is not a protective order as that term is used by the Federal Rules of Civil Procedure. Typically, such orders are confined to matters of discovery. *See* 8A Fed. Prac. & Proc. Civ. § 2036 (3d ed.) ("Grounds for Protective Orders") ("Rule 26(c) was adopted as a safeguard for the protection of parties and witnesses in view of the almost unlimited right of discovery given by Rule 26(b)(1)."); *see, e.g.*, Fed. R. Civ. P. 26(b)(2) ("On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost."); Fed. R. Civ. P. 26(c)(1) ("A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending—or as an alternative on matters relating to a deposition, in the court for the district where the deposition will be taken.") Here, the Protective Order provides Plaintiffs with prospective relief that proscribes BOP's conduct unrelated to discovery and a quick path to contempt and sanctions motion practice if they are dissatisfied. The Protective Order thus is in the nature of a prospective injunction and requires compliance with Rule 65(d). It is insufficient to say that the Order is merely a way for the Court

to assure compliance with its preliminary injunction; those matters are typically dealt with by courts on motions seeking compliance, not the entry of a new prophylactic order with additional terms, as is the case here.

In any event, because the Protective Order provides "prospective relief . . . with respect to prison conditions," it is governed by the PLRA's requirement that it be "narrowly drawn," extend "no further than necessary" to address the harm, and be the "least intrusive means" to correct the harm. 18 U.S.C. § 3626(a); *see also Hoffer v. Fl. Dep't of Corr.*, 973 F.3d 1263, 1278 (11th Cir. 2020) (quoting *U.S. v. Sec'y, Fl. Dep't of Corr.*, 778 F.3d 1223, 1228 (11th Cir. 2015)) (the PLRA requires "'particularized findings that each requirement imposed by the preliminary injunction satisfies each of the need-narrowness-intrusiveness criteria'"). It must also comply with the PLRA's requirement that "the Court give substantial weight to any adverse impact on public safety or the operation of the criminal justice system." 18 U.S.C. § 3626(a). The Protective Order itself acknowledges the applicability of those requirements by stating that it complies with all of them.

## ARGUMENT

The Court should grant this reconsideration motion and vacate the Protective Order because the Court evidently relied on Plaintiffs' allegations of retaliation in issuing the Order and Defendants have now presented facts demonstrating that those allegations are unsubstantiated. Moreover, the Protective Order does not comply with either the PLRA or Rule 65(d).

## I.    The Inmates' Retaliation Allegations Are Unsubstantiated.

The three inmates' allegations that underly the nationwide Protective Order are unsubstantiated, which is a sufficient basis by itself to vacate the Protective Order. *See Twelve John Does*, 117 F.3d at 577 (vacating district court's order prohibiting prison officials from

retaliating against any of the six movant inmates or the 1,100 or so inmates who signed a supporting petition, because there was lack of evidentiary support for claims of retaliation).

    A.  <u>Former Inmate Dye's Retaliation Allegations Are Unsubstantiated.</u>

       Dye alleges that unidentified BOP staff threatened not to release Dye from prison because Dye filed a grievance concerning alleged non-compliance with the June 2025 preliminary injunction and attempted to contact class counsel concerning such alleged non-compliance. Pls. Stat. Rep. (ECF No. 107) at 10; ECF No. 107-3 (Dye Decl.) ¶ 13. Dye has not even identified the "staff" who allegedly made such statements nor provided any other substantiating evidence, such as a declaration from another inmate who heard these statements. ECF No. 107-3 (Dye Decl.) ¶ 13. BOP also released Dye three weeks later, on January 7, 2025, without any delay—thirteen days in advance of Dye's two-year sentence because of good conduct time credit that BOP applied to Dye's sentence. Ex. 3 (Bell Decl.) ¶ 6; *id.* at Attach. 1. In light of this evidence, Dye's unsubstantiated allegation about a retaliatory threat is doubtful and certainly not a foundation for the nationwide Protective Order.

    B.  <u>Inmate Meskill's Retaliation Allegations Are Unsubstantiated.</u>

       Meskill alleges temporary withholding of hormones following the June 2025 preliminary injunction in retaliation for a May 2025 declaration Meskill submitted in support of Plaintiffs' preliminary injunction motion. Pls. Stat. Rep. (ECF No. 107) at 10; *see* Meskill 5/8/25 Decl. (ECF No. 59-1). But Meskill admits that when inquiring about restarting hormones following the injunction, the Health Services Administrator informed Meskill that BOP would not restart them at that time because of the potential negative side effects from drug interactions with another drug (Trazadone) that Meskill was prescribed. Meskill 10/31/25 Decl. (ECF No. 107-11) ¶¶ 4-5. The most Meskill is able to say is that Meskill is "concerned" that the prior declaration "is part of the

reason why I have not been allowed to restart hormone therapy." *Id.* ¶ 14.  Meskill provides no evidence of this "concern[]," and indeed, Meskill's own declaration contradicts it.  *Id.* ¶¶ 4-5.  Meskill's unsubstantiated "concern" expressed in the declaration of October 31, 2025, also preceded and did not account for the restarting of Meskill's hormones soon thereafter, in early December 2025.  Noor Decl. (ECF No. 107-1) ¶ 21.  Meskill did not submit an updated declaration despite the change in circumstances.

The Chief Psychologist at FCI Talladega and Meskill's treating psychologist, Dr. Petty, submitted a declaration explaining that, "At no time was the psychology care provided to the Plaintiff a result of retaliation.  Each time Plaintiff was referred to psychology services, [Meskill] received appropriate care for [Meskill's] condition."  Ex. 2 (Petty Decl.) ¶ 10.  As Dr. Petty described, any delay in restarting Meskill on hormones following the injunction was because Psychology Services was actively treating Meskill's depression and self-harm behavior and was assessing whether Meskill met the criteria for a Gender Dysphoria diagnosis. *Id.* ¶¶ 4-6.  Following consultations in October and November 2025, Dr. Petty diagnosed Meskill with Gender Dysphoria on November 25, 2025, *id.* ¶¶ 7-9, and as Meskill admits, BOP restarted Meskill's hormones in early December 2025, Noor Decl. (ECF No. 107-1) ¶ 21.

In light of this evidence, Meskill's retaliation allegations are unsubstantiated and cannot be the basis for the nationwide Protective Order.

C.  Inmate Pinson's Retaliation Allegations Are Unsubstantiated.

Pinson alleges that after moving to intervene in this case in September 2025, ECF No. 86, BOP put Pinson's email account on an "investigation hold," officers assaulted Pinson, and BOP housed Pinson in solitary confinement.  Pls' Stat. Rep. (ECF No. 107) at 9-10; Pinson Decl. (ECF No. 107-2) ¶¶ 10-19.  BOP responded that these actions were not retaliatory but were for valid

disciplinary reasons.  Defs. Stat. Rep. (ECF No. 108) at 6-7.  Indeed, as the attached declarations explain, Pinson has been disciplined for numerous documented infractions.  Ex. 3 (Bell Decl.) ¶¶ 16-17.  For example, Pinson's loss of email privileges was due to Pinson's refusal to relocate cells—not because Pinson moved to intervene in this case.  Ex. 1 (Garland Decl.) ¶ 24; Ex. 3 (Bell Decl.), Attach. 12 (fifteen-day loss of email).

Similarly, Pinson's placement in the SMHU on several occasions was not because Pinson moved to intervene but because Pinson threatened a staff member, interfered with security devices, and possessed drugs by manipulating prescribed Suboxone.  Ex. 3 (Bell Decl.), Attachs. 15, 16.  Indeed, Pinson was released from the SMHU on December 17, 2025.  Ex. 1 (Garland Decl.) ¶¶ 15-16, 55. Pinson, however, returned to the SMHU about one month later pending disciplinary proceedings for engaging in sexual acts with Moreno, *id.* ¶¶ 57-58, 91(d), (e); Ex. 3 (Bell Decl.), Attach. 10—not because Pinson refused to sign a document that BOP staff purportedly asked him to execute to withdraw declarations Pinson filed in this case, Ex. 1 (Garland Decl.) ¶ 91(c), (d).  BOP never asked Pinson to withdraw the prior declarations.  *Id.*

Pinson was then scheduled to be released from the SMHU on February 23, 2025, but the day before the expected release, Pinson was observed diverting prescribed Suboxone, and thus, "continued housing in SMHU was necessary due to the pending investigation and processing of the incident report."  *Id.* ¶ 91(p).  Additionally, on February 25, 2026, Pinson was issued an incident report for "lying or falsifying a statement and mail abuse, disrupt monitoring."  *Id.* ¶ 71.  Essentially, Pinson was sending fabricated emails under the names of other inmates alleging that they observed staff "forcibly removing [Pinson] from the cell, stripping the inmate, threatening the inmate, reading the inmate's legal materials, and placing the inmate in an unsanitary cell."  *Id.*  The emails drafted by Pinson claimed that the inmates observed staff "threaten[ing] [Pinson's] safety

12

and attempted to intimidate the inmate regarding communication with a federal judge." *Id.* The Warden determined, based on interviews of witnesses, that this infraction "further warrants continued housing in the SMHU pending hearing by the Discipline Hearing Officer." *Id.* ¶ 91(p).

As to the alleged incidents on October 17, 2025, during which officers allegedly assaulted Pinson, Pinson 12/15/25 Decl. (ECF No. 107-2) ¶¶ 12-14, they are unsubstantiated. On October 17, 2025, Pinson was seen coloring over and blocking the cell camera, and then Pinson punched the camera at least three times with the right hand. Ex. 1 (Garland Decl.) ¶ 25. When Pinson refused to leave the cell after being told of a cell change and being assigned a cellmate (as opposed being single-celled), an "immediate use of force was implemented" to remove Pinson. *Id.* ¶ 27. The involved lieutenant explained that as he was attempting to place Pinson in hand restraints through the cell door's opening, Pinson pulled away from him. *Id.* ¶ 91(a). The lieutenant maintained control of Pinson's right wrist due to there being a restraint on the right wrist and no restraint on the left wrist yet. *Id.* Pinson continued pulling away from the lieutenant, who did not want to release the hand restraints because Pinson would then have a weapon in the cell if he did. *Id.*

Contrary to Pinson's allegations that no wrist treatment was provided until October 23, Pinson was provided acetaminophen on the date of the incident (three times per day as needed for fourteen days) and was examined by medical providers twice. Ex. 1 (Garland Decl.) ¶¶ 28, 29. On October 20, Pinson received x-rays showing a fractured right pinky for which Pinson was provided a splint. *Id.* ¶ 32. Also, the Captain denies Pinson's allegations that he made remarks about the Court, looked at Pinson naked in the shower, threatened Pinson's halfway house transfer, or ordered or witnessed a digital cavity search. *Id.* ¶ 91(d); *see* Pinson 12/15/25 Decl. (ECF No. 107-2) ¶¶ 13, 16, 17.

13

In Plaintiffs' status report reply submitted on February 17, 2026, Pinson further alleged that BOP revoked a transfer to a halfway house on December 18, 2025, and that the revocation was purportedly because Pinson had a phone call with counsel on December 15, 2025, about Pinson's declaration completed on that same day for this case.  Pls. Stat. Rep. Reply (ECF No. 121) at 7-8.  But BOP revoked Pinson's transfer before it even knew about the declaration, which was not filed until December 22, 2025 (four days after the alleged revocation of the transfer).  Indeed, the decision to revoke the transfer actually occurred weeks earlier, on November 20, 2025, at a Multidisciplinary Committee Care Coordination Meeting.  Ex. 1 (Garland Decl.) ¶¶ 48-51.  It is thus "temporally impossible" for the declaration to be the but-for cause of the revocation, contrary to what Pinson contends.  *See Black v. Dist. of Columbia*, 134 F. Supp. 2d 255, 263 (D.D.C. 2015) (causal connection "temporally impossible" when the alleged retaliatory conduct preceded the protected action).

Additionally, the committee "determined that Pinson was not appropriate for [Residential Reentry Center] placement at that time, as Pinson continued to require frequent crisis interventions and the presence of mental health providers beyond routinely scheduled sessions."  Ex. 1 (Garland Decl.) ¶ 51.  "The committee determined that the level of care needed was not likely present at the [Residential Reentry Center]," and "[a]s [a] result of the committee's decision, Pinson's [Residential Reentry Center] placement was cancelled."  *Id.* ¶¶ 51, 52.

In light of this evidence, Pinson's retaliation allegations are unsubstantiated and cannot serve as a basis for the nationwide Protective Order.

In sum, because there is no evidentiary basis for the Protective Order, the Court should vacate the Order.  *Twelve John Does*, 117 F.3d at 577 (vacating ban on retaliation against inmates because "the complete absence of factual support for the ban in the record is a fatal deficiency").

II.    **The Protective Order Is Legally Defective.**

The Court's Protective Order is legally defective on numerous fronts.

A.    **The Protective Order Fails to Comply with Rule 65(d)**

To begin, the Protective Order fails to comply with Rule 65(d), which requires an injunction to "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). As the Supreme Court has explained, "the specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). The rule embodies the elementary due process requirement of notice, and the drafting standard established by Rule 65(d) is that an ordinary person reading the court's order should be able to ascertain exactly what conduct is proscribed. *Id.* ("Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.").

To be sure, BOP staff already cannot retaliate against inmates for exercising their rights. Indeed, to cite the example of the facility where Pinson is housed, the Warden "categorically reject[s] the proposition that the facilities under [his] supervision have or permit a policy of retaliation against inmates who complain about any noncompliance with any court order," and there is a process for investigating and disciplining offending officers. Ex. 1 (Garland Decl.) ¶ 9. But that does not mean that an injunction that requires a defendant not to retaliate—i.e., to follow the law—would satisfy Rule 65(d). Rather, "[i]njunctions simply requiring defendants to obey the law are too vague" because "such injunctions do not adequately inform a defendant of its obligations." *M.G. through Garcia v. Armijo*, 117 F.4th 1230, 1249 (10th Cir. 2024); *see also*

15

*Tincher v. Noem*, 164 F.4th 1097, 1099 (8th Cir. 2026) ("[d]irections not to retaliate . . . are simply commands to obey the law, which are not specific enough" under Rule 65(d)) (cleaned up); *Reid v. Buttigieg*, Civ. A. No. 20-1262 (TJK), 2023 WL 2184549, at *9 (D.D.C. Feb. 23, 2023) (the government "already must refrain from illegal retaliation"; "[t]he Court cannot issue an obey-the-law injunction" against retaliation). The Protective Order, which essentially requires Defendants to follow the law, thus is an improper injunction under Rule 65(d).

## B.    The Protective Order Fails to Comply with PLRA's Requirements

The Protective Order also violates the PLRA. Under the PLRA, prospective relief "in any civil action with respect to prison conditions" must be narrowly drawn, extend no further than necessary, and be the least intrusive means to correct the harm. 18 U.S.C. § 3626(a).[1] Additionally, substantial weight must be given to adverse impacts on public safety and operation of the criminal justice system. *Id.*

Here, the terms of the Protective Order are broad and unspecific, and the threat of contempt necessarily imposes a chilling effect on BOP's legitimate discipline or other treatment of not only inmate class members but also any other inmates who purport to provide information about alleged non-compliance with the June 2025 preliminary injunction to class counsel or the Court. The Protective Order also improperly interferes with prison administration because, through class counsel, Pinson and other inmates like Pinson are able to haul Defendants to Court to address allegations of retaliation, without the need to go through BOP's grievance procedures and without allowing BOP the opportunity to investigate claims of officer misconduct in accordance with BOP

---

[1]    "[T]he term 'civil action with respect to prison conditions' means any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison." 18 U.S.C. § 3626(g)(2).

policy.  As the D.C. Circuit recognized when it vacated a district court order prohibiting District of Columbia prisons from retaliating against inmates for participating in litigation against the District, "a ban on retaliation plainly does impact the management of the prison."  *Twelve John Does*, 117 F.3d at 578-79.  "Every act adverse to one of the protected parties (here, almost the entire prison population) creates at least a *risk* of contempt proceedings whose outcome would turn on elusive questions of motivation."  *Id.* (rejecting class counsel's argument—that "a ban on retaliation . . . has nothing to do with the management of the prison" because it purportedly "bars only retaliatory conduct that would be illegal in any event").

The below discussion demonstrates in more detail that the Protective Order violates each of the PLRA requirements in 18 U.S.C. § 3626(a).

The Protective Order is overly broad in at least three respects.  First, it does not require any causal nexus between the protected activity and the adverse action against the inmate.  Instead, the Protective Order forbids BOP from "harass[ing], intimidat[ing], or otherwise retaliat[ing] against" inmates who engage in protected behavior (provide information to the Court or allege non-compliance).  Prot. Ord. (ECF No. 124) at 3.  The Protective Order thus requires only (a) protected behavior, and (b) harassment, intimidation, or retaliation; but there must also be a "causation link." *Aref v. Holder*, 774 F. Supp. 2d 147, 169 (D.C. Cir. 2011) ("To satisfy the causation link," the inmate must establish "that his or her [pursuit of a First Amendment right] was the 'but for' cause of the defendants' retaliatory action." (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)); *see also Univ. of Tex. SW. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) (plaintiff making Title VII retaliation claim "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer").  The Protective Order fails to recognize this essential element of retaliation—the "but for" causation between the inmate's protected conduct and BOP's alleged

17

retaliatory action.  This opens the door to class members' ability to complain that any discipline or other treatment they receive violates the Protective Order, putting BOP officers at risk of contempt of Court and thus has a corresponding chilling effect on BOP's ability to impose discipline for infractions and to keep inmates and staff safe.  *See generally* Ex. 5 (Norris Decl.)

The allegations of inmate Meskill, upon whose allegation the Protective Order is premised, are a good illustration.  Although Meskill acknowledged that BOP's temporary decision not to restart Meskill's hormones was due to the potential negative side effects from drug interactions with another drug (Trazadone), Meskill 10/31/25 Decl. (ECF No. 107-11) ¶¶ 4-5, Meskill purportedly was "concerned" that a declaration Meskill submitted in this case was "part of the reason why I have not been allowed to restart hormone therapy." *Id.* ¶ 14.  This type of speculation is far from enough to establish retaliation, and yet, it supported the issuance of the Protective Order, opening the door to allowing similar speculations to be lodged against BOP and requiring BOP's immediate response under the threat of contempt.  Indeed, the Protective Order effectively provides inmates a blank check to defy BOP regulations, as any corrective measures attempted by the BOP could be subject to claims of intimidation, harassment, or retaliation.

Second, the Protective Order is overbroad because it does not define what kind of treatment would amount to impermissible harassment or intimidation.  Under the law, it is not enough for a plaintiff to allege subjectively that the treatment they are experiencing constitutes harassment. Rather, the conduct must objectively have that effect.  *See Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002) (permitting inmate's First Amendment harassment claims only if challenged conduct is "likely to deter a person of ordinary firmness from that exercise"); *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 64 (1986) (permitting Title VII harassment claims where challenged conduct is "sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment").  The Protective Order, however, prohibits "harass[ment]" or intimidat[ion]" without tethering those concepts to either Defendants' intent or any objective standards, thus subjecting BOP to contempt proceedings for inmates' subjective feelings of harassment or intimidation

Third, the Protective Order is overbroad because, not only does it proscribe BOP conduct as against the approximately 800 inmates who are in the class, it also subjects BOP to contempt proceedings even when the alleged retaliatory act is against "other prisoners."  Prot. Ord. (ECF No. 124) at 4.  In particular, the Protective Order extends to "group punishments, or actions against other prisoners" that "could reasonably be viewed as having a chilling effect on witness testimony."  *Id.*  The contours of this expansive view of retaliation are unclear, but they certainly exceed the "strict" retaliation causation standard that require a tight "but for" connection between a complainant's exercise of legal rights and the retaliatory conduct.  *See Bailey v. Fed. Bureau of Prisons*, Civ. A. No. 24-1219 (PLF), 2024 WL 3219207, at *10 (D.D.C. June 28, 2024).  For example, "[i]t does not suffice for the plaintiff to show that she was harmed by government action taken in response to a third party's speech," *id.*, but this is exactly what this provision of the Protective Order encompasses.

The Protective Order also violates PLRA's requirement to give "substantial weight" to "adverse impacts on public safety and operation of the criminal justice system."  18 U.S.C. § 3626(a).  Despite the Cout's adoption of Plaintiffs' proposed boilerplate language concerning this PLRA requirement—stating that the Court "has considered any adverse impact on public safety and on the operation of the criminal justice system caused by the order and has given substantial weight to such impacts," Prot. Ord. (ECF No. 124) at 3—there was no presentation, let alone any analysis, of any such evidence.  In fact, the Protective Order jeopardizes the safety

and security of a very dangerous and delicate carceral environment, given that the threat of contempt in the broad and unspecific injunction could chill legitimate discipline, and deter other appropriate treatment, of inmates.  For instance, BOP could face the prospect of contempt hearings for issuing incident reports for suspected disciplinary violations, conducting searches of class members' persons or cells, changing inmate housing assignments (even in response to known security risks), denying requested medical interventions that are not clinically indicated, or ensuring that class members adhere to institutional scheduling and assigned activities.  Ex. 5 (Norris Decl.)  Staff may hesitate to enforce rules against protected inmates due to the leverage the order provides over them. Such hesitation in a volatile prison environment could diminish staff's ability to maintain or restore order.  This concern is not theoretical.  On February 6, 2026, Pinson tried to avoid a citation for being insolent to a staff member by threatening to contact class counsel "so he can subpoena your ass to court [and] disrupt your life."  Ex. 1 (Garland Decl.) ¶ 61. In sum, any institutional actions that are viewed as adverse to class members or to any unknown inmates who might "in the future provide the Court information" could be litigated as violative of the Protective Order.

As discussed above, Plaintiffs' swift emergency motion for an order to show cause following the Court's entry of the Protective Order illustrates the burden on, and interference with, BOP's administration of prisons that the Protective Order might impose.  After giving Defendants less than a day's notice upon providing an adequate description of Pinson's new allegations of retaliation, Plaintiffs filed an emergency motion.  ECF No. 127.  In response, the Court held a hearing the next day and faulted government counsel for failing to personally investigate Pinson's allegations of officer misconduct, which would have contravened BOP protocol and interfered with OIA's investigatory function.  Hearing Tr. (Feb. 26, 2026) at 8-13; Ex. 4 (Vonville Decl.)

20

¶¶ 4, 6 (listing five open OIA investigations and one that has been closed already because Pinson's charges "were not sustained"); BOP Program Statement 1210.25, Office of Internal Affairs.  More importantly, in response to the Court's order to show cause, ECF No. 128, BOP has had to expedite its investigation of those allegations and have the Warden prepare a declaration to account for the accused officers' actions without the benefit of the OIA's investigation.  (Again, OIA is the office charged with investigating officer misconduct and has the requisite expertise to conduct such investigations in a fair and thorough manner.)  This process not only interfered with the Warden's ability to run the prison, but it also provides inmates with a powerful tool to improperly punish BOP officials for imposing discipline on the inmates, when BOP's Administrative Remedy Program already provides inmates an avenue to seek formal review of issues relating to their confinement, including retaliation and harassment, Program Statement 1330.18, Administrative Remedy Program, *see* https://www.bop.gov/inmates/custody_and_care/sexual_abuse_prevention. jsp.

Perhaps anticipating these objections, Plaintiffs' proposed order, adopted by the Court verbatim as the Protective Order, provides that the PLRA "does not apply to protective orders issued by the Court under the All Writs Act or its inherent Article III power."  ECF No. 124 at 3. But as discussed above, simply calling the injunction a "protective order" does not change the fact that the order provides "prospective relief . . . with respect to prison conditions," 18 U.S.C. § 3626(a), which is clearly governed by the PLRA.  This is likely why the Protective Order itself proceeds to say that PLRA's requirements—that the prospective relief is narrowly drawn, extends no further than necessary, and is the least intrusive means to correct the harm—are purportedly satisfied, as is the requirement that the Court give substantial weight to the potential burden on prison administration.  ECF No. 124 at 3.  In any event, the Court may not circumvent the statutory

requirement imposed by Congress in the PLRA when the terms of the Court's Order clearly fall within the PLRA.  As the Supreme Court instructed, the PLRA must not be interpreted in a way that would make the scheme "toothless" or "wholly ineffective."  *Woodford v. Ngo*, 548 U.S. 81, 95 (2006).  "Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to."  *Ross v. Blake*, 578 U.S. 632, 639 (2016).  Here, Congress has established "mandatory" requirements in the PLRA, "foreclosing judicial discretion" that the Court improperly seeks to exert here under the All Writs Act and Article III.  *Id.*

In sum, the Protective Order extends beyond the legal contours of retaliation, proscribes BOP action taken for disciplinary reasons and not unlawful retaliatory reasons, lacks the specificity required for BOP to comply, and ignores the impacts on prison safety and administration.  For these reasons, the Protective Order should be vacated.

## CONCLUSION

Because the Protective Order is premised on unsubstantiated factual allegations and otherwise violates requirements of Rule 65(d) and the PLRA, Defendants respectfully request that the Court grant this motion and vacate the Protective Order.


Dated: March 3, 2026                       Respectfully submitted,

                                           BRETT A. SHUMATE
                                           Assistant Attorney General

                                           JEAN LIN
                                           Special Litigation Counsel

                                           /s/ *M. Jared Littman*
                                           M. JARED LITTMAN
                                           ALEXANDER J. YUN
                                           ELIZABETH B. LAYENDECKER
                                           Trial Attorneys
                                           U.S. Department of Justice
                                           Civil Division, Federal Programs Branch

1100 L. Street, NW
Washington D.C. 20005
(202) 451-7478
Jared.Littman2@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALISHEA KINGDOM, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | Civ. A. No. 25-691 (RCL) |

**[PROPOSED] ORDER**

Upon consideration of Defendants' Motion for Reconsideration of the Protective Order, and any response thereto, it is hereby **ORDERED** that Defendants' motion is **GRANTED**.

It is further **ORDERED** that the Order at ECF No. 124 is **VACATED**.


DATED:                          _____

Royce C. Lamberth
United States District Judge