# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ALISHEA KINGDOM, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:25-cv-00691-RCL |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF SCOTT GARLAND

I, Scott Garland, do hereby declare as follows:

1.      I am employed by the Federal Bureau of Prisons ("BOP") as the Warden at the Federal Correctional Institution in Butner, North Carolina ("FCI Butner I" or "FCI Butner") and Acting Complex Warden of the Federal Correctional Complex in Butner, North Carolina ("FCC Butner").  I have been employed with the BOP since September 13, 2009.  I was selected to serve as Warden at FCI Butner I on October 29, 2025, and I began serving in that capacity on January 26, 2026.

2.      As Warden, I serve as the chief executive officer of the institution, and I am generally responsible for the administration and oversight of all institutional operations.  This includes broad authority over institutional programming, personnel management, financial management, the care, custody, and control of the inmate population, responses to institutional emergencies, and oversight of Federal Prison Industries.  While ultimately responsible for institutional operations, I routinely rely on subordinate leaders and subject-matter experts, such as Associate Wardens, department heads, and technical specialists to manage day-to-day operations, provide expert guidance, and inform me of significant developments, risks, and compliance issues.  This ensures operational decisions are made by individuals with direct technical expertise, permitting me to maintain strategic oversight, overall institutional direction, and compliance with federal law, regulations, and BOP policy.

3.      During my career with the BOP, I have worked at every security level institution, with the exception of the Administrative Maximum security institution ("ADX").  I have worked at both male and female institutions, and I have served in numerous positions of increasing responsibility, including Correctional Officer, Case Manager, Case Management Coordinator, the National Victim Witness Coordinator in the BOP's Correctional Programs Division in the Central Office, and Associate Warden ("AW").

4.      Pursuant to my official duties and in my current position, I have access to inmates' records, including, but not limited to: Judgment and Commitment Orders ("J&C"), Presentence Investigation Reports ("PSR"), sentence computation information, and electronic data maintained in the Bureau's SENTRY computer database, CICLOPS computer database, the electronic Inmate Central File ("eICF"), and the Discipline & Administration Reintegration Tracking System ("DARTS").  I also have access to and regularly utilize BOP Program Statements.

5.      This declaration is provided in response to this Court's Order dated February 26, 2026.  The below information has been made available to me in the course of my official capacity as the Warden and is based upon available official BOP records and information gathered by various BOP staff members including Lieutenant B. Teague, Lieutenant Cobb, Officer Terry, Officer Estrada, Officer Holloman, Case Manager Privette, and Officer Neal.  This declaration is intended to provide the required response for all the named BOP staff members in the February 26, 2026 court order.

**ALLEGATIONS CONTAINED WITHIN PLAINTIFFS' MOTION (ECF NO. 127)**

6.      On Wednesday, February 25, 2026, at 5:22 p.m., I was provided a copy of the Order Granting Plaintiffs' Motion for a Protective Order [ECF No. 124], as well as the allegations raised by Pinson in four declarations dated December 15, 2025, January 12, 2026, February 11, 2026, and February 24, 2026, respectively.

7.      I was subsequently also provided a copy of the declaration submitted by Elmer Moreno dated February 19, 2026.

8.      Until February 25, 2026, I was not previously aware that Pinson or Moreno had submitted declarations to this Court related to allegations of retaliation and misconduct by staff at FCI Butner I.  I was similarly not otherwise personally aware or informed that Pinson or Moreno submitted information to counsel or this Court before February 25, 2026.  In fact, I was not even assigned to FCI Butner I when Pinson submitted two of the four declarations.

9.      I categorically reject the proposition that the facilities under my supervision have or permit a policy of retaliation against inmates who complain about any noncompliance with any court order.  To the contrary, if I am made aware of any allegations of staff misconduct, to include noncompliance with a court order, I would refer those allegations to the Office of Internal Affairs, which investigates any allegations of officer misconduct pursuant to Program Statement 1210.25.

10.      Following receipt of the four declarations submitted by Pinson and one declaration submitted by Moreno, I reviewed the contents of each, and I am generally aware of the allegations contained therein.

11.      Jeremy Pinson, Register Number 16267-064, is a medium security ███████ ███████ inmate currently designated to FCI Butner I.  Pinson is in service of an aggregate 252-month sentence for threats against the President, false statements, threats to a juror, and mailing threatening communications.  Pinson is anticipated to release from service of this sentence

on January 15, 2027.  Pinson has been in BOP custody since July 2006, and while in service of this sentence, has received more than 110 incident reports over the course of the 19 years.

12.    Elmer Moreno, Register Number 93653-280, is medium security ███████ ██████ inmate currently designated to FCI Butner I.  Moreno is in service of an aggregate 210-month sentence for conspiracy to distribute and possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and 50 grams or more of methamphetamine, aiding and abetting in carjacking, and aiding and abetting in the use of a firearm during a crime of violence and drug trafficking crime.  Moreno is anticipated to release from his sentence on August 11, 2028.  Moreno has been in BOP custody since April 2013, and while in service of this sentence has received more than 55 incident reports over the course of the 13 years.

## RELEVANT BOP POLICIES

13.    The BOP Program Statements listed below contain federal regulations and BOP guidance that governs the conduct of BOP staff and inmates relevant to the incidents at issue in the Plaintiffs' motion.  This list is inclusive, but not exhaustive.

a) Program Statement 1120.18, <u>Delegating Authority in the Absence of the Chief Executive Officer</u> (Mar. 16, 1999) https://www.bop.gov/policy/progstat/1120_018.pdf

b) Program Statement 1210.25, <u>Internal Affairs, Office of</u> (Aug. 1, 2023) https://www.bop.gov/policy/progstat/1210.25.pdf

c) Program Statement 1315.07 CN-1, <u>Legal Activities, Inmate</u> (Aug. 1, 2023) https://www.bop.gov/policy/progstat/1315.07cn-1.pdf

d) Program Statement 1330.18, <u>Administrative Remedy Program</u> (Jan. 6, 2014) https://www.bop.gov/policy/progstat/1330_018.pdf

e) Program Statement 3420.12 CN-1, <u>Standards of Employee Conduct</u> (Feb. 18, 2025) https://www.bop.gov/policy/progstat/3420_012_cn-1.pdf

f) Program Statement 5100.08 CN-2, <u>Inmate Security Designation and Custody Classification</u> (Mar. 6, 2025) https://www.bop.gov/policy/progstat/5100_008_cn-2.pdf

g) Program Statement 5260.01, <u>Management of Inmates with Gender Dysphoria</u> (Feb. 19, 2026) https://www.bop.gov/policy/progstat/5260_001.pdf

h) Program Statement 5264.08, <u>Inmate Telephone Regulations</u> (Jan. 24, 2008) https://www.bop.gov/policy/progstat/5264_008.pdf

i)   Program   Statement   5265.14,   <u>Correspondence</u>   (Apr.   5,   2011) https://www.bop.gov/policy/progstat/5265_014.pdf

j)   Program   Statement   5267.09,   CN-1,   <u>Visiting   Regulations</u>   (Aug.   1,   2023) https://www.bop.gov/policy/progstat/5267.09cn-1.pdf

k)   Program   Statement   5270.09,   CN-1,   <u>Inmate Discipline Program</u>   (Nov. 18, 2020) https://www.bop.gov/policy/progstat/5270_009_cn_1.pdf

l)   Program   Statement   5270.12,   CN-1,   <u>Special   Housing   Units</u>   (Mar.   6,   2025) https://www.bop.gov/policy/progstat/5270_012_cn-1.pdf

m)   Program   Statement   5324.08,   <u>Suicide   Prevention   Program</u>   (Apr.   5,   2007) https://www.bop.gov/policy/progstat/5324_008.pdf

n)   Program   Statement   5324.12,   CN-1,   <u>Sexually Abusive Behavior Prevention and Intervention   Program</u>   (Feb.   18,   2025) https://www.bop.gov/policy/progstat/5324_012_cn-1.pdf

o)   Program   Statement   5335.01,   <u>Secure   Mental   Health   Units</u>   (Jan. 23,   2023) https://www.bop.gov/policy/progstat/5335.01.pdf

p)   Program   Statement   5511.17,   <u>Request   to   Staff,   Inmate</u>   (Aug.   14,   1998) https://www.bop.gov/policy/progstat/5511_007.pdf

q)   Program   Statement   5521.06,   CN-1,   <u>Searches   of   Housing   Units,   Inmates,   and Inmate   work   Areas</u>   (Mar.   6,   2025) https://www.bop.gov/policy/progstat/5521_006_cn-1.pdf

r)   Program Statement 5566.07, <u>Use of Force, Application of Restraints, and Firearms</u> (July 17, 2024) https://www.bop.gov/policy/progstat/5566.07.pdf

s)   Program   Statement   7310.04,   <u>Community Corrections Center (CCC)[1] Utilization and   Transfer   Procedure</u>   (Dec.   16,   1998) https://www.bop.gov/policy/progstat/7310_004.pdf

## <u>RESPONSE TO ALLEGATIONS</u>

14.    Based upon information gathered from interviews with staff, including the named BOP staff in the Court Order, available BOP records, including but not limited to the Bureau Electronic Medical Record ("BEMR"), Psychology Data System ("PDS"), DARTS, SENTRY, CICLOPS, and eICF, the following constitutes a detailed summary of events relevant to this Court's Order:

---

[1] CCCs are now more commonly referred to as Residential Reentry Centers ("RRCs") or halfway houses.

***Secure Mental Health Unit ("SMHU") Placement***

15.    As detailed in more detail below in paragraphs 19–55, Pinson was housed in the SMHU from October 9, 2025, through December 17, 2025

16.    From December 17, 2025, through January 20, 2026, Pinson was housed in general population.

17.    As detailed further below in paragraphs 57–59, Pinson was returned to the SMHU on January 20, 2026, and remains housed there as of the date of this filing.

***TRULINCS Access***

18.    A review of Pinson's TRULINCS account indicates that Pinson has had, and continues to have, regular access to the TRULINCS email system.  Pinson was sanctioned with the loss of email privileges for a 15-day period, as a result of a disciplinary sanction imposed following a finding of guilt for refusing a work or program assignment as charged in Incident Report Number 4209188.  *See* paragraph 24 below.

***October 9, 2025, SMHU Placement***

19.    On October 9, 2025, Pinson came to the Medication Assisted Treatment ("MAT") pill line inappropriately dressed and medical staff instructed Pinson to leave and return back in proper uniform.  Pinson became angry and stated "I can't stand that stupid bitch" to another inmate, referring to the medical staff.  When the medical staff confronted Pinson, Pinson stated "You heard me.  I leave in 84 days they can't do nothing to me."  Pinson then stated "you better watch your back in the parking lot."  Pinson stated, "I will have you arrested for assault."

20.    Pinson was directed to the Lieutenant's office based upon the interaction with a Health Services staff member.  Deputy Chief Psychologist ▮▮▮▮ spoke with Pinson outside of the Lieutenant's office.  Pinson expressed dissatisfaction with the medical staff member and indicated an intention to pursue legal action.  Due to the incident, SMHU placement was discussed, and Pinson denied having concerns regarding coping with SMHU placement.  Pinson was moved to the FCI Butner SMHU due to the incident in Health Services, pending an incident report and investigation.

21.    On October 30, 2025, Psychologist ▮▮▮▮ noted she had been notified that Pinson refused to accept two recommended cellmates in the SMHU.  Reportedly, Pinson requested to reside with a specific individual who was to be released from the SMHU that day.  Psychology continued to recommend an appropriate cellmate for Pinson.  The Deputy Chief Psychologist was informed of Pinson's refusal and current single cell status.

22.    On October 31, 2025, staff issued Pinson an incident report for refusing a work or program assignment.  According to the facts noted in Incident Report Number 4206483, Pinson was to be assigned a particular cellmate.  Pinson refused to accept a cellmate and threatened to sue

5

staff and have Psychology staff and the reporting officer fired. Pinson was found guilty by the Unit Discipline Committee ("UDC") and sanctioned with the loss of 15 days of commissary privileges.

23.    On November 4, 2025, Psychologist ███ noted she had been notified that Pinson refused to move into a new cell with a recommended cellmate in the SMHU. Psychology continued to recommend an appropriate cellmate for Pinson. The Deputy Chief Psychologist was informed of Pinson's refusal and current single cell status.

24.    On November 4, 2025, staff issued Pinson issued an incident report for refusing a work or program assignment. According to the facts noted in Incident Report Number 4209188, Officer ███ notified Pinson that Pinson was being moved to a different cell and was to be assigned a cellmate. Pinson refused to move to the new cell and stated "I'm tired of catering to these calls from psychology. You can move [inmate X] over here into this cell but I'm not moving to the short range." Pinson then refused to relocate to the new cell. Pinson was found guilty by the UDC and sanctioned with the loss of email privileges for 15 days.

***October 17, 2025, Incident and Medical Treatment***

25.    On October 17, 2025, at approximately 11:21 a.m., as seen on camera footage from Pinson's cell, Pinson was seen attempting to color on and block the camera in Pinson's cell. Pinson proceeded to use several markers or pens to color over the camera's lens and was seen punching the camera with a right closed fist at least three times. Pinson then covered the camera with what appeared to be black ink, almost fully blocking the camera's view. At approximately 11:34 a.m., Pinson is seen communicating with someone at the cell door, and then Pinson begins to submit to hand restraints. Pinson is then seen pulling away from the door with the left arm still in the food tray slot of the door. Pinson's body is completely turned away from the door and Pinson's right arm is visible on the camera without hand restraints. Pinson then submitted to hand restraints and was removed from the cell at 11:36 a.m.

26.    Psychologist ███ conducted a suicide risk assessment of Pinson, based upon reported statements made by Pinson when informed that Pinson would be changing cells and given a cellmate. Pinson did not cooperate or participate with the suicide risk assessment. At that time, Pinson was single celled due to there being no available cellmate in the SMHU. Upon the Lieutenant informing Pinson of the cell change, Pinson refused, became angry, and began covering the cell door window.

27.    Based upon Pinson's refusal to leave the cell and obstruction of the camera, an immediate use of force was implemented and the Operations Lieutenant removed Pinson from the cell and escorted Pinson to the holding cell, where Pinson continued to demonstrate disruptive behavior. Pinson was placed in hard ambulatory restraints due to the imminent threat of violence, continued disruptive behavior, and a history of defeating restraints. Pinson was also placed on suicide watch.

28.    ████████████████████████████



29.     During a scheduled restraint check at approximately 4:17 p.m. on that same day,

30.     On that same day, ████████████████████ was conducted by Psychologist ████ based upon Pinson's allegation of sexual misconduct by staff while being escorted to the holding cell in the SMHU and while being searched and changed into a suicide watch smock.

31.

32.

33.

34.

*Medical Treatment for Leg Injury*



*November 20, 2025, Search*

41.    There is no record of a digital search being requested or conducted on this date. However, cell shakedowns were conducted in the SMHU on November 20, 2025.  All inmates, including Pinson, were the subject of a visual search for contraband during the shakedowns.

42.    On November 21, 2025, ⬛⬛⬛⬛⬛⬛⬛⬛⬛ was conducted by Psychologist ⬛⬛⬛⬛ based upon a report contained in an outside third-party's email to the institution stating that Pinson was "forced to strip, endure a digital rectal cavity search, and to shower" while staff

leered at Pinson for approximately 10 minutes. ███████████████

### *RRC Placement*

43.     On April 8, 2025, Pinson's Unit Team submitted a request that Pinson be reviewed and placed in a Residential Reentry Center ("RRC" or halfway house) beginning on or about January 2, 2026. Pinson would be releasing to Midwest City, Oklahoma.

44.     The BOP's Dallas Residential Reentry Management Office, which serves the Oklahoma area, reviewed the placement referral, and determined that the RRC in Oklahoma City, Oklahoma, was the most appropriate facility for possible placement.

45.     On November 17, 2025, a BOP Community Treatment Coordinator contacted FCI Butner Psychologists ███ and ███, noting that Pinson had been identified as being considered for community placement. Specifically, the Community Treatment Coordinator requested a Multidisciplinary Community Care Coordination Meeting for ███████████ ███ inmate Pinson.

46.     Community Treatment Services ("CTS") is a part of BOP's Reentry Services Division and is responsible for the care and mental health treatment of inmates while in the community (RRC, home confinement, etc.) until their release.

47.     To determine Pinson's suitability for community placement, appropriate placement length, and continuity of care needs, CTS reached out to FCI Butner Psychologists for the purpose of coordinating a meeting among staff from the institution, Reentry Services, Health Services, and others deemed appropriate to make the determination.



52.     As a result of the committee's decision, Pinson's RRC placement was cancelled on or about December 17, 2025.

53.     On December 17, 2025, Psychologist ██████ and Case Manager Privette met with and notified Pinson that the halfway house date had been removed by Residential Reentry Management ("RRM") staff. Pinson appropriately expressed anger and frustration over the news and was provided with information regarding next steps, specifically reapplication for halfway house and behavioral expectations. Pinson expressed anger concerning the decision and stated that "someone was lying."

54.     Pinson's Unit Team is in the process of preparing a new referral for halfway house/RRC placement pursuant to the Second Chance Act. Following completion and submission, the RRM's office will review the recommendation and provide a new determination based on the information contained in the referral.

### Dormitory Housing

55.     Pinson was released from the SMHU on December 17, 2025, and returned to general population in the Wake Forest housing unit. Pinson was released from SMHU upon conclusion of the investigation into the October 9, 2025, incident involving Health Services staff.

56.     From December 17, 2025, through January 20, 2026, Pinson was housed in Wake Forest, a general population housing unit with dormitory style housing. All inmates in this style housing can change clothing in the restroom to ensure additional privacy.

### January 20, 2026, Incident Report and SMHU Placement

57.     On January 20, 2026, Pinson and Moreno were issued incident reports for engaging in sexual acts. According to the facts noted in Incident Report Number 4244397, at approximately 12:05 am, Officer Neal was conducting the official inmate count in the Wake Forest Housing unit and noticed that inmates Pinson and Moreno were not in their assigned cubicles. Officer Neal checked the bathroom and found Pinson and Moreno kissing. Officer Neal instructed them to stop and return to their assigned cubicles, and the inmates complied. Due to the seriousness of the offense, the UDC referred the incident report to the Discipline Hearing Officer ("DHO") for further processing.

58.     On January 20, 2026, Pinson and Moreno were returned to the SMHU pending disciplinary proceedings for engaging in sexual acts.

59.     The DHO ultimately dismissed the January 20, 2026, incident reports and expunged the incident from both inmates' disciplinary histories because the inmates were not properly identified in Section 11 of the Incident Report.

*February 2, 2026, Incident Report*

60.    On February 2, 2026, Lieutenant ███ provided Pinson with a copy of an incident report written by Officer ███ resulting from a verbal interaction between the Pinson and Officer ███. The incident report was resolved informally by Lieutenant ███ who advised if Pinson did not receive any further incident reports that week, then the incident report would be resolved with no disciplinary sanctions imposed. Informal resolution of incident reports is authorized by Program Statement 5270.09, CN-1, <u>Inmate Discipline Program</u> (Nov. 18, 2020) ("The incident report may be informally resolved at any stage of the disciplinary process, except for prohibited acts in the Greatest and High severity levels, or as otherwise required by law or these regulations. If the incident report is informally resolved, it will be removed from your records." 28 C.F.R. § 541.5(b)(3)).

*February 6, 2026, Incident Report*

61.    On February 6, 2026, staff issued Pinson an incident report for being insolent to a staff member. According to the facts noted in Incident Report Number 4252217, on February 4, 2026, Officer ███ was making rounds in the SMHU and was stopped by Pinson. Pinson asked "what is going on? Why haven't we been to the showers yet?" Officer ███ replied that she was the only one working at the time and was making rounds. Pinson asked "so what's going on? Why are you the only one on the range?" Officer ███ responded that everyone else was busy and asked if Pinson needed something. Pinson stated "we want to know when we are getting a shower. You can tell me why I haven't been pulled. Why you being so difficult when you could just tell me what's going on, I'm gonna find out anyway." Officer ███ responded stating that she had answered Pinson's question and was not going to provide specifics. Pinson began shouting "why the fuck not? You can make it so easy by just telling us what's going on. So, you want me to contact my lawyer so he can subpoena your ass to court, disrupt your life, and you'll still have to tell them." Officer ███ responded, "if that's the way you have to go about it, then feel free." Pinson shouted, "why, just why, why won't you tell me? I have the right to ask, and you have to tell me." Officer ███ stated, "you are there and I am here." Pinson began screaming and pointing at Officer ███ and stated "oh, so I'm an inmate and you are staff, that's what you're going with? Okay you fucking bitch! You're a dumb ass fucking bitch! Get the fuck away from my door!" Officer ███ stepped away from the cell door and into the officer's station to look at the cameras. Officer ███ noticed that the camera labeled 4-02 (for cell X04-002, Pinson's cell) was covered with something white which completely blocked the view into the cell. At that time, the Lieutenant went to the cell door to assess the situation. The officer's station door was open, and Officer ███ heard Pinson still screaming "you want an emergency, I'll show you an emergency. I'll show you a medical emergency!" and then Pinson banged on the door several times. Pinson also yelled "███, that stupid bitch disrespects me every single day. She is playing a dangerous game with her life, she will lose her life and I'm telling the truth!" Pinson was found guilty by the Discipline Hearing Officer of being insolent to a staff member and sanctioned with the loss of 14 days of Good Conduct Time and the loss of commissary privileges for 90 days.

*Medication*

62. ██████████████████████████████████████
████████████████████

63. ██████████████████████████████████████
██████

64. ██████████████████████████████████████
███████████████████████████████████

65. ██ ████████████████████████████████████

66. ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████

67. ██████████████████████████████████████
████████

68. ██████████████████████████████████████
████████████████████

*February 23, 2026, Incident Report*

69.    On February 23, 2026, staff issued Pinson an incident report for possessing drugs or alcohol and misusing authorized medication. According to the facts noted in Incident Report Number 4260389, on February 22, 2026, at approximately 6:44 a.m., Pinson received the prescribed dosage of ████████ at the cell door. On closed circuit video footage, Pinson was observed to remain at the cell door for several minutes and then was observed retrieving a white item resembling a paper medication dispensing spoon from the corner of the bed. Pinson was then observed to move to a position behind a towel hanging from the upper bunk obstructing the cameras and officer's view of Pinson's upper torso and head. Pinson was observed manipulating the spoon and Pinson's right index finger in a manner consistent with an attempt to remove or manipulate a substance. Pinson was observed holding out the index finger as if it was coated with a substance and then obtained a cup that appeared to contain water. Pinson then turned away from the camera and manipulated an item at face level before placing two small items on the desk. Staff continued to observe Pinson manipulating items and wiping something onto the desk and paper on

the desk. Staff directed Pinson and the cellmate to submit to hand restraints, at which time the cellmate handed a paper spoon to Pinson. Pinson then tore the tops off two paper spoons and handed the torn pieces back to the cellmate. The cellmate then dropped the items in the toilet. Following the inmates' removal from the cell, staff located the top portion of a ruled piece of paper containing an orange-colored spot on the upper right corner. The location where the paper was found was consistent with where Pinson had been observed to wipe a substance onto the desk or paper. Staff conducted a NIK field test on the substance, which resulted in a presumptively positive test for Buprenorphine. Due to the severity of the charges, the matter has been referred to the Discipline Hearing Officer for further processing. The matter is currently pending a hearing with the Discipline Hearing Officer.

70. A review of the camera footage following the removal of Pinson and the cellmate from their cell shows staff conducting a routine search of the property in the cell and carrying large stacks of paperwork out of the cell. A review of the camera footage following Pinson and the cellmate's placement in a new cell, shows large stacks of papers stacked neatly in the corner of the cell and on the bunk. Papers are not strewn around the cell, and no feces is visible on the floor or walls of the cell. Further review of camera footage from the new cell shows Pinson, at approximately 8:10 a.m. that same morning, sitting on the cell floor beside the stacks of papers, appearing to be sorting through and reading papers for approximately 20 minutes before leaving the cell with the papers left on the cell floor. Pinson returned to the cell approximately an hour and a half later and proceeded to gather the papers and resumed sitting on the floor sorting through papers for another 30 minutes or so. Pinson is seen walking in the cell without shoes on.

### *February 24, 2026 Incident Report*

71. On February 25, 2026, staff issued Pinson an incident report for lying or falsifying a statement and mail abuse, disrupt monitoring. According to the facts noted in Incident Report Number 4261157:

    a) On February 24, 2026, at approximately 6:30 a.m., Lieutenant Teague initiated a review of CCTV footage and Law Library computer activity after multiple inmate emails were received containing allegations claiming that an inmate housed in the SMHU had been harassed by a staff member. These emails originated from the TRULINCS system and were sent to outside contacts. The review was prompted by an incident that occurred on February 22, 2026, at approximately 7:05 a.m., when Pinson diverted medication during the MAT pill line. As a result of the diversion, Pinson received an incident report and was recommended for removal from the MAT program. Immediately following the incident, Pinson became verbally disruptive, yelling down the range, "Wait till my attorneys hear about this" indicating potential retaliatory intent toward staff.

    b) On February 23, 2026, a review of the Legal Law Library logbook confirmed that Pinson accessed the Law Library from 8:30 a.m. to 9:36 a.m. During this time frame, five emails were sent from the computer workstation that was in the exclusive use of Pinson. CCTV footage corroborated that no other inmates approached or used the workstation during this period. The emails were sent under the names of two different inmates, indicating deliberate impersonation. Two emails were sent under the name of Inmate Z, Register Number xxxxx-xxx. The

emails contained statements alleging possible staff misconduct against another SMHU inmate, including forcibly removing an inmate identified as "Grace" from the cell, stripping the inmate, threatening the inmate, reading the inmate's legal materials, and placing the inmate in an unsanitary cell. The emails claimed that staff threatened the inmate's safety and attempted to intimidate the inmate regarding communication with a federal judge.

c) Three additional emails were sent under the name of inmate Moreno. These emails repeated similar allegations of possible staff misconduct against another SMHU inmate, including claims that Lieutenant Teague, along with several officers, forcibly removed the inmate from the inmate cell, conducted a humiliating strip search, verbally abused the inmate, and threatened the inmate's life. The emails alleged that staff mishandled legal documents, placed the inmate in a cell contaminated with urine and feces, and made statements implying retaliation for communicating with a judge. One email requested that the information be forwarded to outside advocacy organizations. Another email referenced account access issues and attempted to create the appearance of legitimate communication from inmate Moreno, despite the fact that he was not present in the Law Library at the time the emails were sent.

d) All five emails originated from the workstation in the exclusive use of Pinson, and no evidence indicated that either inmate Z or inmate Moreno had access to the computer during the relevant time period. Based upon the CCTV review, Law Library records, TRULINCS activity logs, and the content of the emails, it was conclusively determined that Pinson authored and sent all five emails. Due to the severity of the charges, the matter has been referred to the Discipline Hearing Officer for further processing, and is pending a hearing.

*Additional Incident Reports[2]*

72. On October 18, 2025, staff issued Pinson an incident report for insolence towards a staff member. According to the facts noted in Incident Report Number 4199475, during an interaction with an FCI Butner Psychologist, Pinson became angry and hostile and began yelling and using profanity. Pinson was quoted as saying: "I'm so fucking angry with Psychology right now I would have nothing to say. But I'm gonna say this one time. I told [the Deputy Chief Psychologist] do not underestimate me. Watch me. Watch me." The Psychologist attempted to clarify the statements made, and Pinson proceeded to cover the cell door's window and yelled for the provider to "get the fuck away from my door." An attempt was made to instruct Pinson to remove the paper from the cell window, however, Pinson yelled again, "Get the fuck away from my door." During the investigation into the incident, Pinson stated that Pinson had apologized to the Psychologist and regretted the incident. Pinson was found guilty by the Unit Discipline Committee and sanctioned with the loss of 60 days of commissary privileges.

73. On January 1, 2026, staff issued Pinson an incident report for giving or accepting money without authorization. According to the facts noted in Incident Report Number 4235909, on January 1, 2026, a staff member was monitoring inmate recorded calls and noted that Pinson

---

[2] Pinson does not claim in any declaration that the following Incident Reports were issued for retaliatory purposes.

called phone number 405-xxx-xxxx on December 22, 2025, at 2:54 pm. Pinson told the caller to send "100" to inmate number xxxxx-xxx with the last name same as the capital of Virginia which is Richmond. The staff member looked up the inmate number it came back to inmate Y, Register Number xxxxx-xxx. Inmate Y received the money on December 22, 2025, at 5:02 pm. The phone number and name that sent the money is listed as Pinson's mother in official BOP records. Pinson was found guilty by the UDC and sanctioned with the loss of visiting privileges for 15 days.

74.    On January 1, 2026, staff issued Pinson an incident report for phone abuse. According to the facts noted in Incident Report Number 4235907, on January 1, 2026, a staff member was monitoring inmate recorded calls and noted that Pinson called phone number 405-xxx-xxxx on December 29, 2025, at 7:55 pm. During the call, Pinson told the caller to send "95" to inmate with the last name Richmond, you sent 100 to him a couple of days ago. The staff member looked up the phone number that Pinson called and learned that the phone number 405-xxx-xxxx sent $95 to inmate Y, Register Number xxxxx-xxx. The phone number and name that sent the money is listed as Pinson's mother in official BOP records. Pinson was found guilty by the UDC and sanctioned with the loss of visiting privileges for 15 days.

***Additional Medical/Mental Health Interventions [3]***

75.    On October 24, 2025, ▋▋▋▋▋▋▋▋▋ was conducted by Psychologist



76.    On November 5, 2025, Psychologist ▋▋▋ noted that two attempts had been made to contact the Durham Crisis Response Center ("DCRC") as a result of the ▋▋▋▋▋▋ ▋▋▋▋ on October 17, 2025. However, institution phone lines were down, and staff were unable to complete outside calls. Victim advocacy, as requested by Pinson, with DCRC would be rescheduled as soon as feasible.

77.    On November 26, 2025, Pinson spoke with the Durham Crisis Response Center victim advocate.

78.    On December 29, 2025, ▋▋▋▋▋▋▋▋ was conducted by Psychologist ▋▋▋ following receipt of an email to the Psychology Services email box from Pinson noting

---

[3] Pinson does not claim in any declaration that any of the following mental health contacts have been conducted in a retaliatory manner. However, for the fullness of the record, this information is included herein.



79.    On January 15, 2026, ████████████████ was conducted by Psychologist ████████ based upon Pinson's report of a PREA incident to her during their routine ████ contact.

80.    On January 24, 2026, a nurse noted that during the morning's Medication Assisted Treatment ("MAT") pill line, Pinson was observed moving away from the door window then immediately drank water. When asked why Pinson drank water before the nurse had an opportunity to check for the ████████████, Pinson replied "The strip tasty [sic] nasty." Pinson was counseled not to repeat the conduct as such action is considered a diversion of the medication.

81.    On that same day, the institution's Paramedic was watching the cell camera for cell X04-011 (Pinson's cell) for possible diversion of ████████ The Paramedic noted that when the inmates in that cell went to the cell door to receive their morning medication at approximately 7:10 a.m., Pinson received the morning medications and then the ████████████████ ████. Pinson can be seen putting the film into Pinson's mouth and then leaning away from the cell door window and can be seen sticking Pinson's finger in the mouth to pull something out of Pinson's mouth and sticking it to the cell door. Pinson then went back to the cell door window, reached over and grabbed a cup of water and drank it and then did the mouth check with the nurse. Pinson then walked away from cell door, sat in the cell bed and then walked back to cell door and can be seen peeling whatever came out of Pinson's mouth off the cell door and walking back over to the bunk. Pinson then can be seen on camera messing with what was taken off the cell door and placing it in an envelope. Pinson then "fished" (slid) the envelope to another cell. The inmate that received the envelope tested positive for Buprenorphine and Barbiturates on a urinalysis.

82.    On January 29, 2026, a sexual abuse intervention was conducted by Psychologist ████████ based upon Pinson's report of alleged misconduct by a staff member while at the outside hospital. Pinson reported to a nurse that around November 6 to 13, Officer ████████ "sexually

16

assaulted me in my hospital room. It was around midnight when she grabbed my genitalia with her right hand and tried to masturbate me. She also threatened to shoot me if I told anybody. She continues to harass me, today she told me that I'm not allowed to talk to other inmates because she is jealous." Immediate crisis intervention services were provided. Pinson expressed a desire to speak with the victim advocate at the Durham Crisis Response Center. ████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████

83.    On January 30, 2026, ████████████████ was conducted by Psychologist ████████ based upon Pinson's report that a staff member made sexually harassing remarks towards Pinson on the previous day. ████████████████████████████████████, and Pinson declined to speak with the victim advocate at the Durham Crisis Response Center.
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████

84.    On February 17, 2026, Pinson called a nurse over to the cell door and proceeded to make verbal threats of self-harm by painting the whole cell with blood if Pinson did not receive Pinson's Suboxone strip. The prescription was in the process of being refilled, and Pinson was educated on the process of medication renewal. Pinson verbalized understanding but still insisted on self-harm if Pinson did not get the Suboxone strip. Pinson denied being suicidal.

85.    On February 25, 2026, Pinson was seen by Psychologist ████████ for the routine ████████ contact. ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
As the session was wrapping up, the Deputy Chief Psychologist notified Psychologist ████████ that Pinson sent an email to the Psychology Services email box on February 24, 2026, at 1:49 p.m., stating, "This intentional infliction of emotional distress by the health services department is an extremely triggering event and my mind is in a very bad place because this asshole lieutenant charged me for something I didn't even do knowing that my cellmate claimed responsibility for his misconduct and yet medical is still trying to punish me. This is exactly why people start thinking in a depressed and often suicidal frame of mind because the people here don't even get all their facts before trying to hurt inmates."
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████

## STEPS TAKEN TO PROTECT INDIVIDUALS WHO HAVE COMPLAINED OF RETALIATION IN FCI BUTNER I

86.    From February 13, 2026, through February 22, 2026, I was on scheduled, pre-approved administrative leave and was not present at FCC Butner. I delegated my authority to an Associate Warden to act as Warden in my absence.

87.    When I returned to work on February 23, 2026, a staff member forwarded me copies of four emails sent on the BOP's TRULINCS inmate email system that the staff member had reviewed.  These emails contained the following statements:

- Grace Pinson "has been beaten to the point they look a little like the elephant man right now. eyes all swollen shut and bruised black like a raccoon. . . . knocked out two of her teeth and kept her 4 pointed for 2 days after beating her like that."

- "Theyre [sic] taking grace [sic] off her hormones. ██████████ threatened to beat her to death Sunday night, if she didnt [sic] give him her bras and panties.  She told him he's gonna have to take them to get them she will not surrender them."

- "They took [Pinson] off her meds.  Hormones.  New policy of some such.  Then Sunday they ran down on her cell at 6am, stripped her out, kept her naked in a shower for 30 minutes, searched everything in her cell too and went through all her legal papers reading them all.  Cursing her name.  Moved her to a disgusting new cell.  Told her to stop talking to the judge in DC or basically die."

- "They took Grace off her hormone meds on Friday. . . .  They came in Sunday with storm trooper and ran down on her cell.  Screamed obscenities at her I wont [sic] dignify.  Threaten to pepper spray her.  Took her out, stripped her in front of a bunch of men.  Left her naked for half an hour while they searched her cell and went through her legal papers reading them one by one.  Was real crazy.  Took her to a DISGUSTING new cell.  Told her she wasnt [sic] never gonna see home if she wasnt [sic] gonna stop telling on them to the judge in washington dc."

88.    I did not have the opportunity to read the email the staff member sent me upon receipt, but as soon as I opened the email, on the same day it was sent, I forwarded the email and all of its contents to the Special Investigative Agent ("SIA") assigned to FCC Butner and asked him to refer the matter within his chain of command with OIA.  I referred the allegations as required by Program Statement 1210.25, Internal Affairs, Office of, and Program Statement 3420.12, CN-1, Standards of Employee Conduct.  I also referred the allegations so that a proper investigation, factfinding, and determination could be made.

89.    On February 26, 2026, at 11:18 a.m., I was forwarded an email sent by inmate ██████████████████████████, to staff.  The email contained numerous allegations of staff misconduct.  Within approximately one hour, I forwarded the email to the SIA at the institution, and I asked for a fact-finding to be conducted. I was informed over the phone that pursuant to policy, OIA could not conduct a fact-finding outside the investigatory process, and I therefore asked that the matter be referred for investigation by OIA in accordance with policy.  *See* Program Statement 1210.25, Internal Affairs, Office of, and Program Statement 3420.12, CN-1, Standards of Employee Conduct.

90.    On February 27, 2026, I also forwarded another Referral of Incident to OIA regarding allegations made by inmate ████████████████████████. ████ reported that Lieutenant ██████ purportedly threatened to lock him up if he filed a Prison Rape Elimination Act ("PREA") complaint against inmates who had been watching ████ change in the housing unit.

91.    Following this Court's Order to Show Cause, I requested a preliminary fact-finding be conducted into the allegations made by Pinson and Moreno, to include a review of relevant documents and relevant camera footage, and interviews with the staff members identified in the declarations and this Court's Order. As result of the fact-finding, and in addition to the information contained above in paragraphs 15–90, I was provided the following information:

a)    On October 17, 2025, Lieutenant ███████ was attempting to place Pinson in hand restraints through the cell door's opening when Pinson pulled away from him. Lieutenant ███████ maintained control of Pinson's left wrist because there was a restraint on the left wrist and no restraint on the right wrist yet. Pinson continued pulling away from Lieutenant ███████ and the Lieutenant did not want to release the hand restraints because Pinson would then have a weapon in the cell if he did. The Lieutenant noted that he did not observe Pinson having any visible cuts or open skin at the time of the incident. Lieutenant ███████ reported that during this incident, Pinson made it known that Pinson wished to speak with the PREA Compliance Manager. The Lieutenant reports that he immediately called another lieutenant to relieve him so that he would not be involved in the incident any further due to a PREA allegation having been made.

b)    Official records do not indicate any digital search was performed on Pinson or Dye on November 20, 2025, by any staff member. Visual searches, on the other hand, were performed on both of these inmates, in addition to all inmates housed in the SMHU on that date.

c)    On January 20, 2026, Officer Neal issued an incident report to Pinson and Moreno (Pinson's former cellmate), following his direct personal observation of the inmates kissing in the bathroom area of the housing unit. On this same day, Case Manager Privett escorted Pinson and Moreno to the Lieutenant's office, based upon the reported incident in the bathroom. Both inmates were informed they would be moved to the SMHU for the incident. Pinson was not moved to the SMHU for an alleged refusal to sign any documentation or withdrawal of any statements.

* * *

d)    _Summary of Interview with Deputy Captain_ ███

When interviewed, Deputy Captain ███ stated that on or about October 17, 2025, he came into the cell to check on Pinson's hand. Captain ███ specifically denies telling Pinson, "Don't play the victim, I know what you've been writing to that judge in D.C. You did the crime and put yourself here. You know you were born with a penis and would be put in a male prison. The judge doesn't run this prison, I run this prison, and I'll do what I see fit."

19

Captain ███ stated that he never stood in a shower area while Pinson was being visually searched and stared at Pinson or anyone else.

Captain ███ stated he never called Pinson to the Lieutenant's Office for the purpose of signing any withdrawal form at any time. Captain ███ stated he never told Pinson that Pinson would be sent to the SMHU if Pinson did not sign the withdrawal form. Captain ███ stated Pinson was sent to SMHU that day not for refusing to sign a withdrawal form, but for receiving the incident report for engaging in sexual acts.

Captain ███ stated that no digital search was conducted at any time by any staff member as alleged in the declaration submitted.

Captain ███ stated he had never spoken to Officer ███ or directed her to do anything regarding Pinson.

Captain ███ stated he had never told Pinson the RRC transfer would be revoked if Pinson continued sharing information about the prison's noncompliance. He further stated that he had no involvement in the removal of Pinson's halfway house date.

Captain ███ stated he never threatened to beat Moreno half to death at any time. Captain ███ stated he did speak to Moreno about lying when asked if he broke two separate windows inside the secure institution, Moreno stated he did not break the windows, but both incidents were observed on camera.

e) *Summary of Interview with Officer Neal*

When interviewed, Correctional Officer Neal stated that he wrote Pinson and Moreno, respectively, a Code 205 (engaging in sexual acts) incident report on January 20, 2026, after observing both inmates kissing in the bathroom area of the Housing Unit. Officer Neal was unaware of Pinson ever filing any paperwork on him or anything of that nature. Officer Neal stated he has never been accused of retaliation by any inmate nor has he ever retaliated against any inmate at any time. Officer Neal stated he treats all inmates the same.

\* \* \*

f) At no time after September 2025 have inmates Pinson and Moreno been cellmates. While housed in the Wake Forest housing unit, specifically from December 18, 2025, through January 20, 2026, both inmates were housed in Wing 1, which is an open dorm (cubicle) style wing. Inmates Pinson and Moreno were assigned to different cubes in Wing 1. At no time relevant to the incidents referenced herein were Pinson and Moreno celled together in the SMHU.

g) While in the SMHU, inmate Moreno received an incident report on February 7, 2026, for destruction of property less than $100, after staff discovered his cell door's window cracked and Moreno admitted to staff that he had struck the cell door with his hand and the glass broke. As of February 23, 2026, inmate Moreno is being reviewed for a transfer due to the large number of incident reports he has incurred while at FCI Butner I. Since his arrival at FCI Butner I on April 29, 2025, inmate Moreno has received at least 14 incident reports, including multiple serious prohibited act codes—possession of drugs or alcohol, disruptive conduct (he was found to be high on an unknown substance), interfering with security devices, and destruction of property. Inmate Moreno received a second incident report for destruction of property less than $100 on February 24, 2026, after he was again directly observed by staff breaking the window of his cell door with his fist.

h) On February 2, 2026, Lieutenant ██████ provided Pinson with a copy of an incident report written by Officer ██████ resulting from a verbal interaction between the two. The incident report was resolved informally by Lieutenant ██████ stating that if Pinson did not receive any further incident reports that week, then the incident report would be resolved with no discipline sanctions imposed.

i) Reports indicate that on February 6, 2026, Pinson was involved in a verbal back and forth with Officer ██████ and Pinson threatened to cover the camera in the cell. Lieutenant ██████ reported to the SMHU and spoke with Pinson, who did not take any further action to cover the camera. At no time did Lieutenant ██████ or any other staff member inform Pinson of the functioning of the cell camera, as this would pose a security concern for all staff and for the inmate.

j) On February 22, 2026, Lieutenant Teague was informed by a nurse that Pinson was diverting prescribed ██████ Lieutenant Teague instructed staff to place hand restraints on Pinson and the cellmate while a camera review was conducted and the cell was searched. Pinson was viewed on camera diverting the prescribed ██████ At no time did any staff threaten to spray Pinson with pepper spray. Pinson and the cellmate willingly submitted to hand restraints and was removed from the cell. Pinson and the cellmate[4] were moved to the SMHU shower stall where a visual search of Pinson was conducted by Officer Holloman (a female staff member). Pinson was placed in shower stall 3 and the cellmate was placed in shower stall 1, with an empty stall in between them for privacy purposes. Officer Terry (a male) conducted a visual search of the cellmate. Officer Estrada stood on the side of the shower so as to assist Officer Holloman and verbally guide her through the visual search process, as she is a newer officer. At no time did Officer Estrada view Pinson naked, and at no time did anyone order Pinson to lift Pinson's breast multiple times or spread Pinson's buttocks; these directions were given one time only in accordance with policy.

---

[4] For clarity, Pinson's cellmate on February 22, 2026, was not inmate Moreno.

*See* Program Statement 5521.06, CN-1, <u>Searches of Housing Units, Inmates, and Inmate Work Areas</u>, at p. 2–5; *see also* 28 C.F.R. § 552.11(c).

k)  *Summary of Interview with Lieutenant Teague*

When interviewed, Lieutenant Teague stated a nurse told him that Pinson was diverting Pinson's prescribed Suboxone, at which time Teague went and spoke to Pinson and informed Pinson they were aware of the incident.  Teague stated on February 22, 2026, he had the SMHU staff place hand restraints on Pinson and the cellmate due to a camera review showing Pinson diverting the prescribed medication.  Lieutenant Teague stated Officer Hollomon (a female officer) conducted the visual search with the help of Officer Estrada (who was standing in an area where he could not see Pinson naked).  Lieutenant Teague stated no one ever told Pinson to lift breasts or spread butt cheeks multiple times.  Lieutenant Teague stated a cell search was conducted following the visual search due to the diverted Suboxone and pieces of paper with orange-colored smears were found in Pinson's cell.  Lieutenant Teague stated the orange-colored smears were positively identified by medical staff as Suboxone as well as tested utilizing the Narcotics Identification Kit ("NIK") tests and tested positive for Suboxone.  Lieutenant Teague stated he did not place the hand restraints on Pinson that day, his staff did.

Lieutenant Teague stated he never told Pinson that he does not give a fuck what the judge says, or that he does what he wants.  Lieutenant Teague stated there was no urine and feces in the cell they moved Pinson into, and all of Pinson's property and legal papers were stacked neatly in the cell on the bunk and desk.  Lieutenant Teague stated he never told Pinson "I told you I would get you."  Lieutenant Teague issued an incident report to Pinson that day for diverting his medication after Lieutenant Teague viewed it on camera.

Lieutenant Teague stated inmate Moreno is a ▆▆▆▆▆▆ inmate and he cannot release ▆▆▆▆▆▆ inmates from the SMHU; only Psychology can.  Therefore, that is why Lieutenant Teague told Moreno he was not leaving the SMHU that day.  Lieutenant Teague stated he never asked Moreno if he was talking to Pinson's lawyers at any time and never threatened to write a false incident report for Moreno or Pinson.

Lieutenant Teague stated he was aware Pinson was filing on him for conducting pat searches on Pinson even though Pinson has a female only pat search exemption.

l)  *Summary of Interview with Lieutenant Cobb*

When interviewed, Lieutenant Cobb stated Pinson was observed on camera not taking the prescribed Suboxone; Pinson was diverting it and smearing the damp sublingual strip on a piece of paper for reuse at a later time.  Lieutenant Cobb

reported that he has not had any negative interactions with Pinson at any time. Pinson complained daily about being searched, as Pinson did not like being searched at any time and would argue with staff daily.

On February 22, 2026, male staff did not conduct the visual search on Pinson; the visual search was conducted by female Officer Hollomon. Lieutenant Cobb reported that Pinson was not told to lift breasts or spread butt cheeks wider multiple times, only once to conduct a proper visual search. Lieutenant Cobb stated that inmates talk to their attorneys every day and file on staff everyday as well, but staff do not treat them any differently than anyone else. Lieutenant Cobb stated that he has never retaliated against an inmate for any reason at any time.

m) *Summary of Interview with Senior Officer Specialist Terry*

When interviewed, Senior Officer Specialist ("SOS") Terry stated he was the SMHU officer and received a telephone call from Lieutenant Teague to go to Pinson's cell and place Pinson and the cellmate in hand restraints. SOS Terry stated Pinson was using the bathroom and needed to get dressed, so he gave Pinson time to get dressed. SOS Terry stated female Officer Hollomon conducted the visual search of Pinson in the shower area. SOS Terry stated it was a routine visual search, and at no time did anyone tell Pinson to lift breasts and spread butt cheeks multiple times. SOS Terry stated at no time during the visual search or afterward did Pinson cry. SOS Terry stated they then moved Pinson to a different cell at the direction of Lieutenant Teague. SOS Terry stated he had no knowledge of Pinson filing on him or any other staff member at any time. SOS Terry stated staff treat every inmate the same.

n) *Summary of Interview with SOS Estrada*

When interviewed, SOS Estrada reported that on Sunday February 22, 2026, Pinson was viewed on camera diverting the prescribed Suboxone and was then placed in hand restraints so staff could conduct a cell shakedown. SOS Estrada stated that at no time, did Lieutenant Teague or anyone else that was present threaten to spray Pinson with OC spray. Pinson willingly submitted to hand restraints immediately after getting dressed. No staff members present made any threats toward Pinson nor did they retaliate against Pinson for any reason. Pinson and the cellmate were removed from the cell and placed in the SMHU shower stall where a visual search was conducted by Officer Holloman (a female officer). Pinson was placed in shower stall 3 and the cellmate was placed in shower stall 1 there was an empty shower between them for privacy purposes. Officer Terry (a male officer) conducted the visual search on Pinson's cellmate. SOS Estrada stated he stood on the side of the shower to help Officer Hollomon and guide her through the search because she had not done a visual search before. SOS Estrada stated he could not see Pinson naked from where he was standing. At no time did anyone order Pinson to lift breasts multiple

23

times or spread butt cheeks multiple times; it was only said one time as required by policy. SOS Estrada stated he knows the risks of retaliation and would not retaliate against any inmate.

o) _Summary of Interview with SOS Holloman_

When interviewed, Senior Officer Specialist Hollomon stated that she conducted a visual search of Pinson on February 22, 2026, in the shower on the SMHU. Hollomon stated she was not involved in any of the cell search or cell rotation that day all she did was the visual search. Hollomon stated that Lieutenant Teague and Officer Estrada told her to come with them and they went to Pinson's cell. Hollomon stated she does not know if anything was done in retaliation for anything. When asked why Lieutenant Teague and Estrada came to her to go to Pinson's cell, Hollomon stated she is unsure.

* * *

p) Based upon the incident report issued on February 22, 2026, for possession of drugs or alcohol and misusing of authorized medication, Pinson was not going to release from the SMHU on February 23, 2026, as continued housing in SMHU was necessary due to the pending investigation and processing of the incident report. The subsequent incident report for mail abuse, disrupt monitoring, for the use of other inmates' TRULINCS accounts further warrants continued housing in the SMHU pending hearing by the Discipline Hearing Officer.

q) At no time did the institution's physician go to Pinson's cell and present Pinson with the new policy concerning gender dysphoria. The physician has never told Pinson that the ▮▮▮▮▮▮▮▮▮▮ would be terminated, nor has he ever told Pinson that the ▮▮▮▮▮▮▮ would be stopped. The physician did not tell Pinson that the Central Office instructed him to come to only Pinson's cell and terminate the hormone therapy and provide her with a copy of the new policy. To date, Pinson's ▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮ dosages have been provided as prescribed, to include the most recent estrogen injection on February 25, 2026, and the most recent dose of spironolactone on March 3, 2026.

92.    Based on the information provided to me, I have no reason to believe any actions taken by staff at FCI Butner I were undertaken with the intent to retaliate against Pinson for speaking with counsel or providing information to this Court.

93.    Nevertheless, in an abundance of caution, and based upon information provided to me, in addition to the steps outlined below, I have implemented the following procedures:

a) On March 2, 2026, I instructed the Captain to disseminate guidance regarding pat searches and visual searches. This guidance includes:

- Information from BOP Program Statement 5521.06, CN-1, <u>Searches of Housing Unites, Inmates, and Inmate Work Areas</u> (March 6, 2025), concerning when to conduct a visual search or a pat search; and
- Guidance regarding documentation of visual searches conducted and any contraband recovered.

b) On March 2, 2026, I instructed the Complex Trust Fund Supervisor to post Special Purchase Order ("SPO") lists on TRULINCS for inmates diagnosed with gender dysphoria, and received confirmation that these lists were posted.

c) On March 2, 2026, I ensured a new pat search exception card was delivered to Pinson, and that Pinson signed confirming receipt. This card has been placed on the door of Pinson's assigned cell.

d) On March 2, 2026, I instructed staff to place all inmates at FCI Butner I diagnosed with gender dysphoria on call out to ask whether the individuals have or wish to have a pat search exception, and those requests will be processed accordingly. This was completed on March 3, 2026.

94.    As indicated above in paragraphs 87–90, I referred numerous allegations of misconduct to OIA. When I receive the outcome of these investigations, I will review the determination made. If OIA finds that the claim is unsubstantiated, I will take no further action. To the extent OIA returns any cases with an adverse finding, I will pursue the procedures outlined in Program Statement 3420.12, CN-1, <u>Standards of Employee Conduct</u> (Feb. 18, 2025), to complete any disciplinary process.

## <u>ACTIONS STAFF WILL TAKE TO PROTECT THE SAFETY OF CLASS MEMBERS OR OTHER INDIVIDUALS WHO HAVE PROVIDED OR WILL PROVIDE INFORMATION TO PLAINTIFFS' COUNSEL OR THE COURT</u>

### <u>*Notice*</u>

95.    On March 1, 2026, all staff at FCI Butner I and the other institutions within FCC Butner were provided with guidance by e-mail reiterating that the BOP remains obligated to comply with the preliminary injunction issued in this case on June 3, 2025, which requires the BOP to provide hormones and social accommodations to inmates diagnosed with gender dysphoria under the policy that existed before Executive Order 14168, issued on January 20, 2025. Along with the email, staff were also provided the following documents:

- Guidance originally issued on June 10, 2026, regarding this Court's Preliminary Injunction and Class Certification;
- Guidance originally issued on July 16, 2025, regarding Treatment and Accommodations for Inmates Diagnosed with Gender Dysphoria;
- Guidance issued on February 19, 2026, regarding the New Policy on Management of Inmates with Gender Dysphoria and Ongoing Obligations under the Preliminary Injunction issued in this case; and
- A Copy of this Court's February 19, 2026 Order Granting Plaintiffs' Motion for a Protective Order (ECF No. 124).

FCC Butner Complex staff will also be reminded of this information during Annual Training, which is currently underway. Should staff have any questions regarding the information provided, they have been directed to contact the appropriate Consolidated Legal Center attorneys, the Regional Counsel's Office, or the Litigation Branch within the BOP Office of General Counsel.

96.    On March 1, 2026, all staff at FCI Butner I and the remaining institutions within FCC Butner received a reminder notification by email of guidance contained in BOP Program Statement 3420.12, CN-1, <u>Standards of Employee Conduct</u> (Feb 18, 2025). This notice contained the following information:
- A reminder to all employees that they must conduct themselves in a manner that fosters respect for the BOP, Department of Justice, and U.S. Government as a whole.
- A reminder that in their official capacity, employees must act professionally in all interactions and communications and may not use profane, obscene, or abusive language when communicating with inmates, fellow staff, or members of the public.
- A reminder that employees shall conduct themselves in a manner that will not be demeaning to inmates, fellow employees, or others.
- A reminder that **no** retaliation can be taken against employees or inmates who report violations of the Standards of Employee Conduct, and that violations of the Standards of Employee Conduct are subject to disciplinary action or other appropriate remedial measures.
- A reminder that **no** retaliation or adverse actions can be taken against inmates who report violations of the Standards of Employee Conduct, violations of any Court Order, or file other grievances—whether internal or with an external agency or the Judiciary.

97.    On March 1, 2026, all inmates at FCC Butner were provided a notice by TRULINCS bulletin detailing the myriad ways to report staff misconduct, including behavior perceived as retaliatory, or in violation of any court order, federal statute, federal regulation, or BOP policy. These avenues include:
- Speaking to staff at mainline;
- Submitting an administrative remedy in accordance with Program Statement 1330.18, <u>Administrative Remedy Program</u> (Jan. 6, 2014);
  - This includes submitting an administrative remedy directly to the BOP's Mid-Atlantic Regional Office through the sensitive submission procedures
- Writing directly to the Warden;
- Writing directly to the Regional Director;
- Writing directly to the Director;
- Writing to the Office of the Inspector General ("OIG");
- Sending an e-mail to OIG; and
- Third-party reporting through the BOP's public website via Report a Concern or Support Coordinator Program.

**<u>Legal Access</u>**

98.    Legal access for inmates, including communication with attorneys, will be provided in accordance with the institutional procedures established in the following policies:

a)  Program Statement 1315.07, CN-1, <u>Legal Activities, Inmate</u> (Aug. 1, 2023);

- The Warden shall allow an inmate to contact and retain attorneys. With the written consent of the inmate, staff may advise an attorney of the inmate's available funds. Staff may not interfere with selection and retention of attorneys if the inmate has attained majority and is mentally competent. If the inmate is a mental incompetent or a minor, the Warden shall refer to the inmate's guardian or to the appropriate court all matters concerning the retention and payment of attorneys.  28 C.F.R. § 543.12(a).

- The Warden shall, under the conditions of this section, permit visits by the retained, appointed, or prospective attorney of an inmate or by an attorney who wishes to interview an inmate as a witness.  28 C.F.R. § 543.13(a).

- The Warden generally may not limit the frequency of attorney visits since the number of visits necessary is dependent upon the nature and urgency of the legal problems involved. The Warden shall set the time and place for visits, which ordinarily take place during regular visiting hours. Attorney visits shall take place in a private conference room, if available, or in a regular visiting room in an area and at a time designed to allow a degree of privacy. The Warden may make exceptions according to local conditions or for an emergency situation demonstrated by the inmate or visiting attorney.  28 C.F.R. § 543.13(b).

- The attorney shall make an advance appointment for the visit through the Warden prior to each visit; however, the Warden shall make every effort to arrange for a visit when prior notification is not practical.  28 C.F.R. § 543.13(c).

- The Warden may require an attorney to indicate where he is licensed as an attorney and how that fact may be verified. Prior to each appointment or visit, the Warden shall require each attorney to identify himself and to confirm that he wishes to visit an inmate who has requested his visit or whom he represents or whom he wishes to interview as a witness. The Warden may not ask the attorney to state the subject matter of the lawsuit or interview. If there is any question about the identity of the visitor or his qualification as an attorney in good standing, the Warden shall refer the matter to the Regional Counsel.  28 C.F.R. § 543.13(d).

- Staff may not subject visits between an attorney and an inmate to auditory supervision. The Warden may permit tape recordings to be used by an attorney during the course of a visit only if the attorney states in writing in advance of the interview that the sole purpose of the recording is to facilitate the attorney-client or attorney-witness relationship.  28 C.F.R. § 543.13(e).

b)  Program Statement 5264.08, <u>Inmate Telephone Regulations</u> (Jan. 24, 2008);

- ▪ "The Warden may not apply frequency limitations on inmate telephone calls to attorneys when the inmate demonstrates that communication with attorneys by correspondence, visiting, or normal telephone use is not adequate." 28 C.F.R. § 540.103
- ▪ "The Bureau provides each inmate with several methods to maintain confidential contact with his or her attorney. For example:
- ▪ inmate-attorney correspondence is covered under the special mail provisions;
- ▪ private inmate-attorney visits are provided; and,
- ▪ the inmate is afforded the opportunity to place an occasional unmonitored call to his or her attorney.
- ▪ Based on these provisions, frequent confidential inmate-attorney calls should be allowed only when an inmate demonstrates that communication with his or her attorney by other means is not adequate. For example, when the inmate or the inmate's attorney can demonstrate an imminent court deadline (see the Program Statements Inmate Correspondence or Inmate Legal Activities).
- ▪ Staff are to make reasonable efforts to verify unmonitored calls placed on an inmate's behalf are to an attorney's office. Inmates are responsible for the expense of unmonitored attorney telephone calls. When possible, it is preferred that inmates place unmonitored legal calls collect. Third-party or three-way calls are not authorized." *See* pp. 11–12.

c) Program Statement 5265.14, <u>Correspondence</u> (Apr. 5, 2011); and

- ▪ "Special mail means correspondence sent to the following: President and Vice President of the United States, the U.S. Department of Justice (including the Bureau of Prisons), U.S. Attorneys Offices, Surgeon General, U.S. Public Health Service, Secretary of the Army, Navy, or Air Force, U.S. Courts (including U.S. Probation Officers), Members of the U.S. Congress, Embassies and Consulates, Governors, State Attorneys General, Prosecuting Attorneys, Directors of State Departments of Corrections, State Parole Commissioners, State Legislators, State Courts, State Probation Officers, other Federal and State law enforcement offices, attorneys, and representatives of the news media." 28 C.F.R. § 540.2(c).
- ▪ "Special mail also includes correspondence received from the following: President and Vice President of the United States, attorneys, Members of the U.S. Congress, Embassies and Consulates, the U.S. Department of Justice (excluding the Bureau of Prisons but including U.S. Attorneys), other Federal law enforcement officers, State Attorneys General, Prosecuting Attorneys, Governors, U.S. Courts (including U.S. Probation Officers), and State Courts. For incoming correspondence to be processed under the special mail procedures (see §§ 540.18--540.19), the sender must be adequately identified on the envelope, and the front of the envelope must be marked "Special Mail — Open only in the presence of the inmate." 28 C.F.R. § 540.2(c).
- ▪ "The Warden shall open incoming special mail only in the presence of the inmate for inspection for physical contraband and the qualification of any

28

enclosures as special mail. The correspondence may not be read or copied if the sender is adequately identified on the envelope, and the front of the envelope is marked "Special Mail — Open only in the presence of the inmate."  28 C.F.R. § 540.18(a).

- "In the absence of either adequate identification or the "special mail" marking indicated in paragraph (a) of this section appearing on the envelope, staff may treat the mail as general correspondence and may open, inspect, and read the mail."  28 C.F.R. § 540.18(b).

- "Staff shall mark each envelope of incoming legal mail (mail from courts or attorneys) to show the date and time of receipt, the date and time the letter is delivered to an inmate and opened in the inmate's presence, and the name of the staff member who delivered the letter. The inmate may be asked to sign as receiving the incoming legal mail. This paragraph applies only if the sender has marked the envelope as specified in § 540.18." 28 C.F.R. § 540.19(a).

- "The inmate is responsible for advising any attorney that correspondence will be handled as special mail only if the envelope is marked with the attorney's name and an indication that the person is an attorney, and the front of the envelope is marked "Special Mail — Open only in the presence of the inmate."  Legal mail shall be opened in accordance with special mail procedures (see § 540.18)."  28 C.F.R. § 540.19(b).

d) Program Statement 5267.09 CN-1, <u>Visiting Regulations</u> (Aug. 1, 2023).

- "Requirements for attorney visits are governed by the provisions on inmate legal activities (see §543.12 through 543.16 of this chapter). Provisions pertinent to attorney visits for pretrial inmates are contained in §551.117 of this chapter."  28 C.F.R. § 540.46.

### *Administrative Remedy Program Access*

99.    Inmates will have access to the BOP's Administrative Remedy Program in accordance with Program Statement 1330.18, <u>Administrative Remedy Program</u> (Jan. 6, 2014).  To the extent a request for administrative remedy is determined to be of an emergency nature which threatens the inmate's immediate health or welfare, the inmate will be provided an institutional response within three calendar days after filing, in accordance with 28 C.F.R. § 542.18.  In addition, if an inmate reasonably believes the issue he or she intends to raise in an administrative remedy is sensitive and the inmate's safety or well-being would be placed in danger if the request became known at the institution, the inmate may submit a request directly to the Regional Director of the Mid-Atlantic Region in accordance with 28 C.F.R. § 542.14(d)(1).

### *Prison Rape Elimination Act ("PREA") Protocols*

100.    The institution will respond to any allegations of sexually abusive behavior or sexual harassment in accordance with Program Statement 5324.12, CN-1, <u>Sexually Abusive Behavior Prevention and Intervention Program</u> (Feb. 18, 2025), and the relevant federal regulations contained therein.  This includes monitoring the conduct and treatment of inmates who

report sexual abuse to see if there are changes that may suggest possible retaliation by other inmates or staff members.

## DETAILED PLAN OF STEPS FCI BUTNER I STAFF WILL TAKE TO PROTECT PINSON AND MORENO FROM FUTURE RETALIATION

101.    In addition to the steps identified above in paragraphs 95–100 for all inmates, the following additional steps will be implemented with respect to Pinson and Moreno:

### *Supervisory Review*

102.    Ordinarily, within 24 hours of any of the following, the Warden, the Warden at a different facility within FCC Butner, or his designee that has not been personally involved in the action, shall review and make a determination as the appropriateness of action and/or appropriate response:

- Receipt of Incident Report;
- Placement in Special Housing Unit ("SHU");
- Placement in a Secure Mental Health Unit ("SMHU");
- Written Report of Staff Misconduct forwarded to the Warden;
- Submission of Administrative Remedy ("BP-9") at the institutional level;
- Housing Assignment Changes;
- Program changes; and
- Redesignation to another facility.

The reviewing supervisor will determine if any of the above actions involve potential acts of retaliation by employees. If necessary, the supervisor shall contact the appropriate staff from the Office of General Counsel while conducting this review. The reviewing supervisor will take any appropriate action after review.

### *Temporary Reassignment*

103.    

104.    To the extent Pinson or Moreno report new allegations of employee misconduct or retaliation that are provided to me, a Referral of Incident will be completed and submitted to OIA within 24 hours of receipt, barring any institutional emergencies.

105.    After the referral has been made, I, or any other supervisory official I designate that has not been personally involved in the purported act of retaliation, will review the alleged incident and determine whether any additional steps need to be taken to safeguard Pinson or Moreno. This

may include reassignment of staff to minimize contact with Pinson or Moreno, if warranted by the allegations.



### *Video Recording and Review*

108.    To the extent feasible and practical, if Pinson or Moreno are involved in a Use of Force, or other disruptive conduct, staff will begin recording the incident as soon as possible via handheld video and audio recording devices.  This video will be reviewed at the conclusion of the incident to determine whether staff acted in accordance with BOP policy.



\* \* \*

112.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 3rd day of March 2026.

Scott Garland
Warden
Federal Correctional Institution
Butner, North Carolina