## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ALISHEA KINGDOM, et al.,

                 Plaintiffs,

      v.

DONALD J. TRUMP, et al.,

   Defendants.

Case No. 1:25-cv-00691-RCL

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION OF THE PROTECTIVE ORDER OF FEBRUARY 19, 2026 (DOC. 130)**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

    A.    The Evidence of Retaliation Upon Which the Court Based the
          Nonretaliation Order ....................................................................... 3

    B.    Defendants' Retaliation Persists After the Nonretaliation Order Issues............... 6

    C.    Procedural History of Defendants' Motion for Reconsideration.......................... 9

LEGAL STANDARD...................................................................................................... 9

ARGUMENT ................................................................................................................ 10

I.  Defendants Fail to Identify Newly Discovered Evidence Justifying
    Reconsideration................................................................................................... 10

    A.    Defendants Have Not Refuted Plaintiffs' Evidence of Retaliation. ................... 11

    B.    Defendants' Declarations Corroborate Much of the Retaliation ....................... 19

II.  The Court Did Not Make Clear Legal Error in Entering the Nonretaliation Order........ 22

    A.    The Court Did Not Make Clear Legal Error in Holding that It Has the
          Authority to Issue the Nonretaliation Order Under the All Writs Act................ 22

    B.    The Court Did Not Make Clear Legal Error in Holding that It Has
          Authority to Issue the Nonretaliation Order Under Its Article III Power ........... 25

    C.    The Nonretaliation Order is Clear, Specific, and Facially Plain and Does
          More Than Simply Order Defendants to "Follow the Law"............................... 27

III. The Court Did Not Make Clear Legal Error in Holding the PLRA Does Not
    Prevent Entry of the Nonretaliation Order........................................................... 29

    A.    The Administrative Exhaustion Requirement Only Applies to an "Action"
          and Not to Motions in an Existing Case. ......................................................... 29

    B.    The Nonretaliation Order Meets the PLRA Requirements for Prospective
          Relief................................................................................................ 33

CONCLUSION............................................................................................................. 37

# TABLE OF AUTHORITIES

## Cases

*Ala. Power Co. v. Fed. Power Comm'n*,
  511 F.2d 383 (D.C. Cir. 1974) ............................................................ 13

*Aref v. Holder*,
  774 F.Supp.2d 147 (D.D.C. 2011) ................................................... 35, 36

*Armstrong v. Newsom*,
  58 F.4th 1283 (9th Cir. 2023) ...................................................... 26, 29

*Ayyad v. Gonzales*,
  Civ. Act. Nos. 05-cv-02342-WYD-MJW, 05-cv-02653, 2008 WL 2955964
  (D. Colo. July 31, 2008) ..................................................................... 32

*Bailey v. Fed. Bureau of Prisons*,
  Civ. A. No. 24-1219 (PLF), 2024 WL 3219207 (D.D.C. June 28, 2024) ................. 33

*Baxley v. Jividen*,
  No. 3:18-1526, 2020 WL 1802935 (S.D. W.Va. April 8, 2020) ......................... 32

*Ben David v. Travisono*,
  495 F.2d 562 (1st Cir. 1974) ........................................................ 24, 25

*Brown v. Plata*,
  563 U.S. 493 (2011) ........................................................................ 33

*CFTC v. Trade Exch. Network Ltd.*,
  117 F.Supp.3d 22 (D.D.C. 2015) ............................................................ 28

*Cobell v. Babbitt*,
  37 F.Supp.2d 6 (D.D.C. 1999) .............................................................. 28

*Cobell v. Norton*,
  355 F.Supp.2d 531 (D.D.C. 2005) .......................................................... 10

*Common Cause v. Nuclear Regulatory Comm'n*,
  674 F.2d 921 (D.C. Circ. 1982) ........................................................... 28

*Duran v. Grisham*,
  853 Fed. App'x. 252 (10th Cir. 2021) ..................................................... 32

*Duvall v. Hogan*,
  Civ. Act. No. ELH-94-2541, 2020 WL 3402301 (D. Md. June 19, 2020) ................. 32

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ................................................................................................... 24

*Frew ex rel. Frew v. Hawkins*,
   540 U.S. 431 (2004) ................................................................................................... 25

*Gleklen v. Democratic Cong. Campaign Comm., Inc.*,
   199 F.3d 1365 (D.C. Cir. 2000) ................................................................................ 14

*Hadix v. Caruso*,
   465 F.Supp.2d 776 (W.D. Mich. 2006) .................................................................... 32

*Harvard v. Inch*,
   Case No. 4:19-cv-00212 (N.D. Fla. Jan. 28, 2020) .................................................. 26

*Heredia Mons v. Wolf*,
   No. CV 19-1593 (JEB), 2020 WL 4201596 (D.D.C. July 22, 2020) ........................ 11

*Hoskins v. Dilday*,
   No. 16-CR-334-MJR-SCW, 2017 WL 951410 (S.D. Ill. Mar. 10, 2017) ......... 19, 27

*I.N.S. v. Phinpathya*,
   464 U.S. 183 (1984) ................................................................................................... 12

*IIT Cmty. Dev. Corp. v. Barton*,
   569 F.2d 1351 (5th Cir. 1978) ................................................................................... 23

*Int'l Prod. Corp. v. Koons*,
   325 F.2d 403 (2d Cir. 1963) ...................................................................................... 25

*J.G.G. v. Trump*,
   No. CV 25-766 (JEB), --- F.Supp.3d ----, 2025 WL 3706685 (D.D.C. Dec. 22, 2025) ........... 23

*Kemp v. Peterson*,
   940 F.2d 110 (4th Cir. 1991) ..................................................................................... 23

*Klay v. United Healthgroup, Inc.*,
   376 F.3d 1092 (11th Cir. 2004) ........................................................................... 23, 29

*M.G. through Garcia v. Armijo*,
   117 F.4th 1230 (10th Cir. 2024) ................................................................................ 28

*Media Matters for Am. v. Paxton*,
   138 F.4th 563 (D.C. Cir. 2025) ................................................................................. 37

*Meritor Sav. Bank, FSB v. Vinson*,
   477 U.S. 57 (1986) .................................................................................................. 36

*Montgomery v. IRS*,
   356 F.Supp.3d 74 (D.D.C. 2019) ............................................................................. 10

*Nat'l Org. for the Reform of Marijuana Laws v. Mullen*,
   828 F.2d 536 (9th Cir. 1987) .................................................................................... 23

*Jones v. Bock*,
   549 U.S. 199 (2007) .................................................................................................. 30

*Parsons v. Ryan*,
   912 F.3d 486 (9th Cir. 2018), *cert. denied sub nom. Ryan v. Jensen*, 589 U.S. 926 (2019) .... 35

*Parsons v. Ryan*,
   No. CV-12-00601-PHX-DKD, 2017 WL 3575711 (D. Ariz. July 25, 2017) ......................... 27

*Penn. Bureau of Corr. v. U.S. Marshals Serv.*,
   474 U.S. 34 (1985) .................................................................................................... 25

*R.I. State Council of Churches v. Rollins*,
   158 F.4th 304 (1st Cir. 2025) ................................................................................... 26

*Ranke v. County of Saginaw*,
   No. 11-15712, 2013 WL 3944472 (E.D. Mich. July 31, 2013) ................................. 32

*Reid v. Buttigieg*,
   Civ. No. 20-1262 (TJK), 2023 WL 2184549 (D.D.C. Feb. 23, 2023) ........................ 29

*Roadway Exp., Inc. v. Piper*,
   447 U.S. 752 (1980) .................................................................................................. 25

*Ross v. Blake*,
   578 U.S. 632 (2016) ............................................................................................ 32, 33

*Seattle Times Co. v. Rhinehart*,
   467 U.S. 20 (1984) .......................................................................................... 25, 35, 36

*Tendler v. Jaffe*,
   203 F.2d 14 (D.C. Cir.1953) ................................................................................... 13

*Thorogood v. Sears, Roebuck & Co.*,
   678 F.3d 546 (7th Cir. 2012) ................................................................................... 23

*Tincher v. Noem*,
　　164 F.4th 1097 (8th Cir. 2026) ............................................................ 28

*Toolasprashad v. Bureau of Prisons*,
　　286 F.3d 576 (D.C. Cir. 2002) ............................................................ 36

*Turner v. Sacramento Cnty. Sheriff*,
　　No. 2:09-cv-0117 WBS KJN P., 2010 WL 4237023 (E.D. Cal. Oct. 21, 2010),
　　*report and recommendation adopted*, 2010 WL 5317331 (E.D. Cal. Dec. 20, 2010) .............. 23

*Twelve John Does v. Dist. of Columbia*,
　　117 F.3d 571 (D.C. Cir. 1997) ............................................................ 26, 34

*United States v. All Assets Held at Bank Julius, Baer & Co., Ltd.*,
　　315 F.Supp.3d 90 (D.D.C. 2018) ............................................................ 10, 17

*United States v. Ayala Lopez*,
　　327 F.Supp.2d 138 (D.P.R. 2004) ............................................................ 31

*United States v. Hashmi*,
　　621 F.Supp.2d 76 (S.D.N.Y. 2008) ............................................................ 31, 32

*United States v. Hudson*,
　　7 Cranch 32 (1812) ............................................................ 25

*United States v. New York Tel. Co.*,
　　434 U.S. 159 (1977) ............................................................ 22, 23, 24

*United States v. Philip Morris USA, Inc.*,
　　566 F.3d 1095 (D.C. Cir. 2009) ............................................................ 28

*United States v. Young*,
　　463 F.2d 934 (D.C. Cir. 1972) ............................................................ 13

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
　　570 U.S. 338 (2013) ............................................................ 35

*Women Prisoners of the Dist. of Columba Dep't of Corrs. v. Dist. of Columbia*,
　　93 F.3d 910 (D.C. Cir. 1996) ............................................................ 26, 34, 35

*Woodford v. Ngo*,
　　548 U.S. 81 (2006) ............................................................ 30, 32

**Statutes**

18 U.S.C. § 3626(a) ............................................................ 33

18 U.S.C. § 3626(a)(1)(A) ................................................................................ 33

28 U.S.C. § 1651 ................................................................................... 22, 24

42 U.S.C. § 1997e(a) .............................................................................. 30, 32

42 U.S.C. § 2000e-3(a) ................................................................................ 35

**Other Authorities**

Black's Law Dict. 28 (7th ed. 1999) ............................................................... 31

Cambridge Dictionary Online,
    *available at*: https://dictionary.cambridge.org/us/dictionary/english/retaliate ........................ 36

Felix Frankfurter,
    *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527 (1947)..................... 30

**Rules**

Federal Rule of Civil Procedure 54 (b)........................................................... 9, 10

Federal Rule of Civil Procedure Rule 65(d) ...................................................... 27, 28

**INTRODUCTION**

Incarcerated people have a constitutional right to challenge the conditions of confinement through legal actions, and prison officials may not retaliate against them for exercising their right to do so. Class Representatives and the Plaintiff class (collectively, "Plaintiffs") are exercising that basic right in this lawsuit, seeking permanent injunctive relief to permit them access to medically necessary health care and accommodations to address their diagnosed gender dysphoria. In response to Plaintiffs' exercise of their constitutional rights, the evidence shows that they are experiencing threats of, and acts of, retaliation — simply for providing information to Plaintiffs' counsel or to this Court related to Defendants' noncompliance with the Court's Preliminary Injunction, Doc. 67, renewed at Docs. 79, 96, and 114.

This Court has a duty and the authority to prevent parties or their agents from interfering with the judicial process through acts that would chill a reasonable person from exercising their constitutional rights of access to the courts and free speech. When prison staff take adverse actions against incarcerated people after they file cases, testify or provide information to a court, the judiciary's ability to adjudicate cases and administer justice suffers. Such actions by Defendants and/or their employees, regardless of any claims of intent, compromise Plaintiffs' counsel's ability to discharge their ethical obligation to zealously advocate for their clients, frustrate the Court's interest in obtaining an unimpeded flow of information about compliance with the Preliminary Injunction and provision of constitutionally adequate medical care, and undermine the litigation process and the administration of justice.

The Court's February 19, 2026 nonretaliation protective order (hereinafter "Nonretaliation Order") is well-grounded by the evidence and in the law. Accordingly, Defendants' Motion for Reconsideration, Doc. 130, should be denied.

## BACKGROUND

On February 19, 2026, this Court issued the Nonretaliation Order under its inherent power under Article III and the All Writs Act, Doc. 124 at 2-3.[1] The Court ordered that Defendants and their agents or employees shall take no "actions that harass, intimidate, or otherwise retaliate against witnesses who have provided or will in the future provide the Court information, either via oral testimony or written statements" or any "actions that harass, intimidate, or otherwise retaliate against people incarcerated in BOP custody who have filed or will file grievances alleging noncompliance with this Court's Preliminary Injunction, or who have contacted or will contact Plaintiffs' counsel or this Court alleging noncompliance with the Preliminary Injunction." *Id*. at 3.

The Nonretaliation Order directed that "within 14 days of this order, Defendants shall provide written notice to wardens at all BOP facilities at which a class member is incarcerated, describing this order and attaching it. Within 14 days of this order, Defendants shall also provide written notification and a copy of this order to all class members via individual delivery, posted notifications, or the tablet system." *Id*. at 4. On March 5, 2026, the Court denied Defendants' Emergency Motion (Doc. 134) to extend the 14-day deadline (of that same day) to provide class members and wardens notice of the nonretaliation order. *See* Doc. 139.[2]

Prior to issuing the Nonretaliation Order, the Court received extensive evidence in the record of retaliation against people, based on their participation in this matter, detailed in Part A below. Part B describes the events that occurred after the Court received that evidence and issued the Nonretaliation Order, further demonstrating the need for the Nonretaliation Order.

---

[1] All citations to docket page numbers are to those assigned by the Court's electronic case filing system.
[2] The Nonretaliation Order also directs that within 30 days of the order, "counsel for Defendants shall file a written declaration detailing how this order was conveyed to staff and incarcerated people at all BOP facilities at which class members are incarcerated." Doc. 124 at 4.

**A. The Evidence of Retaliation Upon Which the Court Based the Nonretaliation Order**

The Court issued the Nonretaliation Order after it held a status hearing on February 19, 2026. The status hearing was held as a result of the Court's November 2025 order that Plaintiffs file a status report "contemplating whether Defendants are complying with the preliminary injunction and what action, if any, the Court should take in response to the movants and letter writers" to the Court, who reported noncompliance and acts of retaliation for requesting medical treatment and other accommodations in accord with the Court's Preliminary Injunction. Doc. 101 at 2. On December 22, 2025, Plaintiffs filed a status report, detailing how counsel had been attempting to schedule confidential legal calls with each of the dozens of class members who had filed motions or notices of noncompliance with the court, or who had contacted counsel's hotline. Doc. 107 at 2. Plaintiffs reported that as of December 22, Counsel had investigated and confirmed reports of noncompliance or harassment of class members at 19 different BOP facilities. *Id.* On February 13, 2026, Plaintiffs provided additional information and new evidence of noncompliance with the Preliminary Injunction and of retaliation against class members Doc. 116-1.

The evidence submitted by class members and Plaintiffs' counsel showed as follows:

1.     **Valerie Simpkins' October 20, 2025 Motion to Intervene, Doc. 92**. Class member Ms. Simpkins filed a Motion to Intervene, detailing that she had been denied social accommodations and hormone injections at FCC Butner, *id.* ¶¶ 3, 6, and that her requests for legal calls with Plaintiffs counsel had been rejected. *Id.* ¶ 4. She also reported that "I have been witness to horrific physical and sexual abuse of transgender activist Jeremy 'Grace' Pinson #16267-064 after she sent a letter-motion to Judge Lamberth and I fear that I too will be thrown in SHU, beaten, restrained and abused like her for this letter if I am not protected by the Court[.]" *Id.* ¶ 5.

3

2.    **Mya Dye's October 23, 2025 Motion to Intervene, Doc. 95.** Class member Ms. Dye filed a Motion to Intervene, reporting noncompliance with the Preliminary Injunction at both FCI Petersburg and FCI Butner, including a denial of hormone treatment and social accommodations. *Id*. ¶¶ 1-2. Ms. Dye also reported that on October 17, 2025, she was present as Butner staff "broke bones" in the hand of class member Grace Pinson, "and cut her clothes off in full view of 20 cisgender male staff." *Id*. ¶ 4. Ms. Dye reported that she "personally heard and will testify to under oath" that during that assault, staff yelled at Ms. Pinson, "[t]ell Judge Lamberth this you fucking rat bitch, tell him this you fucking faggot." *Id*. ¶ 4

3.    **Rebecca-James Meskill's October 31, 2025 Declaration, Doc. 107-11**: Class member Ms. Meskill provided testimony that, after she submitted a declaration in this case, (Doc. 59-1), she was told by staff at FCI Talladega that she was being taken off her hormone therapy because of statements she had made. *Id*. ¶¶ 2, 4. The only other person at the Talladega prison of whom Ms. Meskill was aware who had been on hormone therapy was put back on hormone therapy after the entry of the preliminary injunction. *Id*. ¶ 3. Ms. Meskill repeatedly asked to be put back on hormone therapy, but that did not occur until after Plaintiffs' counsel advocated on her behalf. *Id*. ¶¶ 4, 6, 9; Doc. 107-1 ¶ 21.

4.    **Mya Dye's December 15, 2025 Declaration, Doc. 107-3**: Class member Ms. Dye provided testimony that after she filed grievances about non-compliance with the preliminary injunction in this case, and tried to contact the attorneys in this case, she was repeatedly told things like: "You need to stop filing, don't you want to go home?", which she understood to be a threat to interfere with her release from prison. *Id*. ¶ 13. She also testified to the treatment of Ms. Pinson by officers that appeared to her to be retaliatory. *Id*. ¶¶ 11-12.

5.      **Grace Pinson's December 15, 2025 Declaration, Doc. 107-2**: Class member Ms. Pinson provided testimony that following her involvement in this case, she was assaulted by Lt. Quinones and Capt. Hock on October 17, 2025 (*id*. ¶¶ 12-13), walked down a hallway naked in a male prison (*id*. ¶ 12), held naked in four-point restraints for 10 hours (*id*.), told that these incidents were occurring because she had written to the court and was transgender (*id*. ¶ 13), suffered from a delay in medical care following the staff assault (*id*. ¶ 14), was strip-searched and subjected to a digital rectal cavity search by a male officer, after having been told she was a "man in a man's prison" (*id*. ¶¶ 16-17), had her emails placed on an investigative hold, preventing her from contacting her attorneys (*id*. ¶ 19), and spent most of the time since October 9, 2025, in solitary confinement (*id*. ¶¶ 11, 18). She reported that after her hand was slammed into a cell door by Lt. Quinones, breaking bones, that Captain Hock came to her cell and stated, "Don't play the victim. I know what you've been writing to that judge in D.C. You did the crime and put yourself here. You know you were born with a penis and would be put in a male prison. The judge doesn't run this prison, I run this prison, and I'll do what I see fit." *Id*. ¶ 13.

6.      **Grace Pinson's January 12, 2026 Declaration, Doc. 121-6**: Ms. Pinson provided testimony that she had been scheduled to be transferred to a halfway house on January 2, 2026. *Id*. ¶ 1. She testified that she was told on December 18, 2025, that her transfer had been revoked. *Id*. ¶ 2. She had previously been told by Captain Hock that her transfer would be revoked if she continued sharing information in this case. *Id*. ¶ 4.

7.      **Grace Pinson's February 11, 2026 Declaration, Doc. 121-5:** Ms. Pinson provided testimony that on January 20, 2026, she was called to the Lieutenants' office and Lt. Quinn and Captain Hock asked her to sign a document withdrawing her previous declarations, and told her that she would be moved to the Special Housing Unit ("SHU"), a solitary confinement

unit, at a different facility if she did not withdraw the declarations. *Id.* ¶¶ 2-3. She testified that later that day, she was placed into the Secure Mental Health Unit ("SMHU"), a solitary confinement unit for people with serious mental illness, at the facility where she was located. *Id.* ¶ 4. She testified that on February 2 and 6, 2026, she was given write-ups for other incidents that she testified did not happen. *Id.* ¶¶ 6-7. She testified that her pat search exception card – which provides that pat searches of her are to be done by female staff – was taken away when she was moved to the SMHU, and that she had been strip searched by male staff many times since being moved into the SMHU. *Id.* ¶ 8.

## B. Defendants' Retaliation Persists After the Nonretaliation Order Issues

All told, Plaintiffs submitted 20 declarations in conjunction with the two Status Reports that the Court ordered. *See* Docs. 107, 121, and exhibits. In Defendants' Status Report, filed on January 12, 2026, three weeks after Plaintiffs' initial Status Report, Defendants filed no declarations. *See* Doc. 108. At the February 19, 2026, hearing, the Court accorded Defendants an opportunity to answer Plaintiffs' evidence of retaliation, but Counsel for Defendants had not even investigated it. 2/19/26 Tran. at 35:20-37:2. Faced with this record of uncontroverted evidence of retaliation, the Court entered the Nonretaliation Order on February 19, 2026.

Despite the Order, the retaliation continued. Days after the February 19, 2026, hearing, Grace Pinson (who, as noted, submitted four prior declarations in this matter, as well as a motion to intervene) informed Class Counsel that BOP staff were still retaliating against her. Doc. 127-1 ¶¶ 1-6. Although not relevant to Defendants' Motion for Reconsideration of the Nonretaliation Order, the evidence gathered and filed by Plaintiffs' counsel further demonstrates the need for the Nonretaliation Order and prompted the Court's issuance of the OSC:

8.     **Grace Pinson's February 24, 2026 Declaration, Doc. 127-1**: Ms. Pinson provided testimony that on February 20, 2026, Dr. Lawrence Sichel told her that she would not receive her next injection of estrogen or her twice-daily spironolactone, and that he had been "directed by Central Office to …terminate [her] hormone therapy immediately." *Id*. ¶ 4. She further testified that Lt. Teague, Lt. Cobb and Officers Terry, Estrada, and Holloman took her and her cellmate from their cell on Sunday, February 22, 2026, at about 6:30 a.m. to the shower cells and conducted invasive and humiliating strip searches on them, then left Ms. Pinson in the shower cell for about half an hour. *Id*. ¶ 5. Ms. Pinson testified that she was taken to a different cell, that her papers were strewn about in the cell, and that the cell had feces and urine in it. *Id*. ¶¶ 6-7.[3] She also testified that Lt. Teague said to her: "I've told you before, and I'll tell you again, I don't give a fuck what that judge says, I do what I want… You only have a little bit of time left in here. If you want to make it home alive, you need to stop sending stuff to that fucking judge, or you're not going to make it." *Id*. ¶ 6. She testified that she was served with a new incident report on February 23, 2026, the day she was supposed to be released from the SMHU. *Id*. ¶ 8. She further testified that she

---

[3] In declarations submitted with this brief, Plaintiffs provide further evidence of the state of the cell into which Ms. Pinson was moved. Ms. Pinson states that the new cell, Cell X04-001, "had a sewage leak sometime before I was moved there. It smelled horrible. There was a metal panel that had been removed from the wall of SMHU showers, and an officer told me that it was because there had been a leak in the shared wall between that shower and Cell 1. No one had been housed in Cell 1 for at least three weeks. When I got into the cell after being strip searched, there was a large puddle of what looked like brown water that had a strong sewage odor to the left of the table in the cell." March 4, 2026, Pinson Decl. ¶ 9 (Exhibit 1). In a declaration submitted with this brief, Mr. Moreno states that cell X04-001 "had human waste in it. Everyone who was housed in the SMHU at that time knew it was dirty with feces and urine and hadn't been occupied for awhile, at least longer than a week." March 4, 2026 Moreno Decl. ¶ 19 (attached herein as Exhibit 2).

heard Lt. Teague tell Elmer Moreno that the reason he was still in the SMHU was that he had spoken with Ms. Pinson's lawyers. *Id*. ¶ 9.[4]

9.    **Elmer Moreno's February 19, 2025 Declaration, Doc. 127-2**: Mr. Moreno testified that on January 20, 2026, he and Ms. Pinson were given a disciplinary charge for kissing the night before, a charge that was false. *Id*. ¶ 6. Mr. Moreno testified that he was taken to the SMHU upon receipt of the disciplinary charge. *Id*. ¶ 9. Mr. Moreno corroborated in his testimony much of what Ms. Pinson testified to in her February 11, 2026 declaration. *Id*. ¶¶ 5, 6, 10, 11. At the time of his declaration, about a month had passed since he was falsely charged and had been in solitary confinement the whole time. *Id*. ¶¶ 6, 17.[5]

After Plaintiffs filed an Emergency Motion for an Order to Show Cause ("OSC") in light of Ms. Pinson's evidence, the Court held a brief status conference the next day, February 26. Defense Counsel, once again, had not investigated the events discussed in Ms. Pinson's sworn statement; indeed, he had not even contacted the warden of the prison where the events occurred. 2/26/26 Tran. at 8:7-13:15. The Court issued an OSC on February 26, 2026, stating that "FCI-Butner Warden Scott Garland, Lieutenant B. Teague, Lieutenant Cobb, Officer Terry, Officer Estrada, Officer Holloman, Unit Manager Privette, and Officer Neil shall submit a response explaining why they should not be held in civil contempt." Doc. 128 at 1. Warden Garland was the only one of these officials to submit a response. Doc. 129-1. He was not present for any of the

---

[4] Mr. Moreno's March 4, 2026 declaration corroborates much of Ms. Pinson's description of the events of February 22, 2026. *See* Moreno Decl. ¶¶ 3-21 (Exhibit 2).

[5] In his March 4, 2026 declaration, Mr. Moreno provides testimony that he still had not been moved as of March 4, despite the January 20 disciplinary charges having been dismissed on February 20, 2026. Moreno Decl. ¶¶ 22-23 (Exhibit 2). He states that he was told he was being put in for a transfer to a USP – a higher security prison – and that Lt. Teague said to him words to the effect of, "since you want to help Pinson and talk to the lawyers we're going to transfer you back to USP so they can kill you." *Id*. ¶¶ 24, 27.

events discussed in Ms. Pinson's declaration, *see id.* ¶ 86, and his statement relied largely on information he "was provided" by unidentified sources, *see, e.g., id.* ¶ 90—in other words, hearsay within hearsay.

### C. Procedural History of Defendants' Motion for Reconsideration

Defendants filed their Motion for Reconsideration of the Nonretaliation Order the evening of March 3, 2026. Doc. 130. At the March 4, 2026, hearing on the OSC the next morning, the Court directed Plaintiffs to file their opposition to the Motion for Reconsideration within 14 days, to give the parties time to meet and confer about possible revisions to the Nonretaliation Order that Defendants would agree to. *See* 3/4/26 Tran. at 32:4-13. On March 5, the parties jointly stipulated to shorten the time for Plaintiffs' response to be due on or before March 11, based on Defendants' representations that if Plaintiffs agreed to a shorter time frame, then Defendants would not seek a stay of the Nonretaliation Order pending resolution of the Motion for Reconsideration, and their representation to Plaintiffs and the Court that Defendants would engage in good-faith negotiations with Plaintiffs to stipulate to an agreed-upon protective order. Doc. 135 at 1; Doc. 140.

Plaintiffs provided a proposed revised order to Defendants on March 9, 2026, pursuant to the Court's direction at the March 4 hearing, to try address Defendants' stated concern that the current Nonretaliation Order was too broad or vague, and to settle upon an agreed-upon revised order. The undersigned counsel avows that counsel for the parties met and conferred productively on March 10, 2026, have plans to exchange additional proposed language later this week, and are scheduled to meet and confer again on Monday, March 16, 2026.

## LEGAL STANDARD

Courts in this District disfavor reconsideration because of the court's interest in finality, and analyze such requests under Federal Rule of Civil Procedure 54. *See, e.g., Cobell v. Norton,*

355 F.Supp.2d 531, 539 (D.D.C. 2005) ("Rule 54(b) governs reconsideration of orders that do not constitute final judgments in a case.") (citations omitted). Rule 54(b) allows district courts to revise any such order "at any time before the entry of a judgment." Such motions should only be granted "as justice requires," *Montgomery v. IRS*, 356 F.Supp.3d 74, 79 (D.D.C. 2019), in three situations "(1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the [court's previous] order." *United States v. All Assets Held at Bank Julius, Baer & Co., Ltd.*, 315 F.Supp.3d 90, 96 (D.D.C. 2018) (cleaned up). While a court may use its discretion to reconsider orders for reasons other than those three listed above, there must be "good reason" to do so. *Cobell*, 355 F.Supp.2d at 540. The moving party has the burden to show "that reconsideration is appropriate and that harm or injustice would result if reconsideration were denied." *Bank Julius*, 315 F.Supp.3d at 96.

## ARGUMENT

Defendants offer no basis for the Court to reconsider the Nonretaliation Order. They identify no intervening change in the law, apparently resting their argument instead on the "discovery of new evidence not previously available" and a "clear error in" the Court's previous order. *Bank Julius*, 315 F.Supp.3d at 96. Both arguments fail. Defendants do not provide any newly discovered evidence, and the Court did not err.

### I.    Defendants Fail to Identify Newly Discovered Evidence Justifying Reconsideration.

Defendants cite several declarations in their Motion to Reconsider; however, they make no effort to explain why they could not have provided that evidence sooner. They do not explain, for instance, why they could not submit these declarations as part of their status report on January 12, 2026, in response to the extensive evidence of retaliation Plaintiffs filed with their December 22, 2025, Status Report. Nor do Defendants explain why, when Plaintiffs orally moved for the

Nonretaliation Order at the February 19, 2026, hearing, Counsel for Defendants failed to ask the Court for an opportunity to submit evidence before the Court ruled on the motion.

Even if Defendants had made this showing, the materials it submitted after the Court issued its Nonretaliation Order fall far short of justifying reconsideration. Indeed, even if the government submitted these materials *before* the Court issued the Nonretaliation Order, the information would still not suffice. The reason is straightforward: Most of what Defendants submitted is not evidence at all: the declaration on which they principally rely rests almost entirely on hearsay, and in many cases hearsay within hearsay. [6]

Before and after the entry of the Nonretaliation Order, Plaintiffs submitted substantial and significant evidence of retaliation by Defendants. *See* Background, *supra*. Although they had numerous opportunities to refute it, Defendants have completely failed to do so and, indeed, have corroborated some of it. Defendants' assertion that Plaintiffs' evidence is "unsubstantiated" is incorrect, and contrary to their contention, the Nonretaliation Order should not be vacated.

### A. Defendants Have Not Refuted Plaintiffs' Evidence of Retaliation.

Since Plaintiffs began submitting sworn evidence of retaliation, Defendants have had multiple opportunities to provide evidence refuting the Plaintiffs' evidence. But they have not done so. Instead, they have submitted second- or third-hand accounts of the incidents, and records that do not actually relate to the retaliatory actions taken.

---

[6] Defendants repeatedly minimize Plaintiffs' evidence by calling the sworn statements in the class members' declarations "allegations." *See* Docs. 108 at 3-7, 130 at 5-10 and 13-18. Unlike the declarations submitted by Defendants that are replete with hearsay upon hearsay, the class members' declarations and declarations of other incarcerated people are sworn testimony provided by people who relate incidents of which they have first-hand knowledge. *Compare* Docs. 107-2 – 107-14, 121-1, 121-3 – 121-6 *with* Docs. 129-2 – 129-4, 130, 131-1, 131-2, 131-5. The sworn declarations providing first-hand information are evidence, not mere "allegations." *See, e.g., Heredia Mons v. Wolf*, No. CV 19-1593 (JEB), 2020 WL 4201596, at *3 (D.D.C. July 22, 2020) (describing declarations by putative class members as a "trove of evidence").

Among the stated reasons for the Court's November 2025 order directing the parties to file status reports was that the Court had received reports of retaliation. *See* Doc. 101 at 2 and docket filings cited therein. On December 22, 2025, Plaintiffs submitted the status report with declarations describing retaliatory actions. Docs. 107, 107-2, 107-3, 107-11. When Defendants responded three weeks later, they did not in any way address Ms. Meskill's or Ms. Dye's evidence of retaliation summarized above at page 4. *See* Doc. 108. As to Ms. Pinson's evidence, they confirmed that much of what she had said had indeed occurred, but said that it was not done with a retaliatory intent. Doc. 108 at 6-7. They submitted no evidence about the incidents Ms. Pinson had discussed in her declaration, relying solely on the arguments of counsel. *Id*.[7]

During the status conference on February 19, 2026, Defendants again provided no evidence that refuted the declarations submitted by Plaintiffs. They simply asserted repeatedly that there was "no evidence" of retaliation, despite the submission of multiple sworn declarations. *See* 2/19/26 Tran. at 34:11-37:15. Counsel for Defendants admitted that he had come to court without having investigated the incidents sworn to by the class members. *Id*. at 35:20-37:2.

At the end of the Status Conference, the Court entered the Nonretaliation Order. Just three days later, Defendants retaliated against Ms. Pinson again in an egregious manner. Doc. 127-1 at ¶¶ 5-10. Plaintiffs moved for an emergency order to show cause, and submitted evidence to the Court of the violations. Docs. 127, 127-1, 127-2. The Court issued the OSC, directing eight (8) of the people involved in the retaliation to inform the Court of why they should not be held in contempt, including specifically addressing the retaliatory incidents discussed in the motion. Doc.

---

[7] "Counsel's unsupported assertions" in a brief "do not establish" a factual basis for legal arguments. *I.N.S. v. Phinpathya*, 464 U.S. 183, 188 n.6 (1984).

128. The Court's OSC was narrowly tailored – focused on violations of the Nonretaliation Order and events that occurred soon thereafter at FCI-Butner. *Id.*

Despite the Court's OSC giving Defendants five days to provide a response on these narrow issues, they chose not to provide any sworn statement of any person who had first-hand knowledge of the actions discussed in Plaintiffs' motion and Ms. Pinson's declaration. All of these people are employed by BOP and could, presumably, have given declarations of their own – but they did not. The failure of Defendants to provide evidence that is "peculiarly within [their] control[] raises the presumption that the evidence would be unfavorable to [their] cause." *Tendler v. Jaffe*, 203 F.2d 14, 19 (D.C. Cir.1953); *see also United States v. Young*, 463 F.2d 934, 939 (D.C. Cir. 1972) (same); *Ala. Power Co. v. Fed. Power Comm'n*, 511 F.2d 383, 391 n.14 (D.C. Cir. 1974) ("It is a familiar rule of evidence that a party having control of information bearing upon a disputed issue may be given the burden of bringing it forward and suffering an adverse inference from failure to do so.").

Rather than providing sworn statements of employees who Ms. Pinson testified directly engaged in retaliatory actions against her – seven of the eight people the Court named and ordered to provide a response in the OSC – Defendants instead chose to provide declarations only from:

1.    Warden Scott Garland, who was not in the facility on the days that most of the retaliatory actions were taken, was not personally involved in any of the retaliatory actions, does not appear to have been personally involved in the investigation of the retaliation, and does not appear to have reviewed medical records. Doc. 131-1 ¶¶ 86, 91.

2.    John Vonville, who works in the Office of Internal Affairs, who had no involvement with the retaliatory actions, and gave only the status of certain claims of misconduct made by Ms. Pinson and Mr. Moreno, without identifying the subject of any of the claims. Doc. 129-2.

13

3.      Nicholas Bell, a unit manager who was not involved in any of the retaliatory actions, and provided only information about housing locations of Ms. Dye and Ms. Pinson, information about a complaint by Ms. Dye about a sexual assault, information about disciplinary charges against Ms. Pinson although not about the outcome of any of the charges other than the dismissal of the disciplinary charge made on January 20, 2026, that resulted in her placement into the SMHU. Doc. 129-3.

4.      Khristy Robinson, an Assistant Health Services Administrator who was not involved in any of the retaliatory actions and who does not provide medications to Ms. Pinson or otherwise treat her. Doc. 129-4.

None of these declarations comes close to refuting Ms. Pinson's and Mr. Moreno's testimony. Docs. 127-1, 127-2. The declaration of Warden Garland is particularly problematic as he purports to provide information about incidents about which he has no actual knowledge and could not testify to. To the extent Warden Garland's declaration discusses the retaliatory actions, it is entirely second- or third-hand hearsay accounts: an unnamed investigator told him what someone else said, or what someone saw in a videotape and wrote in an Incident Report. *See, e.g.*, Doc. 131-1 ¶¶ 14-71.d, 91-91.q. Warden Garland's declaration includes conclusory assertions about relevant events that have no source. *Id.* ¶¶ 91.f-j, p-q. He may have reviewed incident reports written by some other person, but even that is not clear in his declaration. His statements about the retaliation are "sheer hearsay" about which he "would not be permitted to testify … at trial." *Gleklen v. Democratic Cong. Campaign Comm., Inc*., 199 F.3d 1365, 1369 (D.C. Cir. 2000). "It therefore counts for nothing." *Id*.

Ms. Pinson testified that "Dr. Lawrence Sichel, the Medical Director at FCI Butner," told her that her hormone therapy would be terminated by the direction of the "Central Office."

Doc. 127-1 ¶ 4. Defendants conspicuously chose not to provide a sworn declaration from Dr. Sichel, the medical provider. Warden Garland stated that he "requested a preliminary fact-finding be conducted" and that he "was provided" with information that the "the institution's physician" did not make these statements. Doc. 131-1 ¶¶ 91, 91.q. Warden Garland's statement is third-hand, and not even clear whether the person who was asked is Dr. Sichel, and it appears that Warden Garland's statement is based upon what an officer or investigator told him. Doc. 131-1 ¶ 91. Ms. Robinson's declaration attaches medication administration records purporting to show that the hormone therapy was not cut off. Doc. 129-4. But that misconstrues Ms. Pinson's testimony; she did not state that the hormone therapy was already cut off; but rather that she was told that it would be cut off in the future, and that this directive came from the Central Office. Doc. 127-1 ¶ 4.

Ms. Pinson testified about a degrading strip search on February 22, 2026, threats, and a move to a cell that had urine and feces in it. Doc. 127-1 ¶¶ 5-7. Warden Garland stated that he was not in the facility that day. Doc. 131-1 ¶ 86. His declaration contains triple hearsay, as he again reports on the information he "was provided" from the "preliminary fact-finding" that he had someone else do, stating that the people Ms. Pinson identified in participating in this degrading search told the unnamed investigator that they did nothing wrong. Doc. 131-1 ¶¶ 91, 91.k.-91.o. These self-serving third-hand reports do nothing to refute Ms. Pinson's testimony.

Warden Garland also made statements about the contents of video footage from the morning of February 22, 2026. Doc. 131-1 ¶¶ 69-70. But Warden Garland does not state that he reviewed the video footage himself, or identify who may have watched the videos. *Id*. To the contrary, he states that he is providing information "[a]ccording to the facts in Incident Report Number 4260389." *Id*. ¶ 69. This incident report was filled out by one of the people Ms. Pinson identified as engaging in the retaliatory conduct, Lt. Teague. Doc. 130-3 at 23.

And Lt. Teague was one of the eight people specifically named in the Court's OSC, Doc. 128 at 1, yet Defendants chose to not include a first-hand declaration sworn under penalty of perjury from him, nor Lieutenant Cobb, Officer Terry, Officer Estrada, Officer Holloman, Unit Manager Privette, or Officer Neil.

Ms. Pinson and Mr. Moreno testified that they were retaliated against by being placed into the SMHU on January 20, 2026, having been given a disciplinary for the false allegation of kissing. Docs. 121-5 ¶¶ 4-5; 127-2 ¶¶ 5-6, 9. They testified that they were kept in the SMHU pending a hearing which finally took place 30 days later, on February 20, 2026. Docs. 127-1 ¶ 3; 127-2 ¶ 17. The charges were dismissed on February 20, 2026, after they had both spent a month in solitary confinement, and Warden Garland confirms the dismissal. *See* Docs. 127-1 ¶ 3; 131-1 ¶ 59.[8] The only information about the "preliminary fact-finding" into this incident is that Warden Garland reports that the unnamed investigator reports that Officer Neal, the officer who wrote up the incident report, said he wrote up the report, and denied ever retaliating against any incarcerated person at any time. Doc. 131-1 ¶ 91.e. Again, this self-serving, third-hand claim that Officer Neal did nothing wrong does not refute the first-hand sworn testimony of Ms. Pinson and Mr. Moreno.

Defendants' Motion for Reconsideration, and the declarations filed in support of it, do not fill the void. Most of these declarations are duplicates of the ones filed in response to the OSC. *See* Doc. 130-1 (identical version of the Garland Decl.), 130-3 (identical version of the Bell Decl., submitted with two new attachments); Doc. 130-4 (identical version of the Vonville Decl.). Only

---

[8] Warden Garland does not state whether he reviewed the incident report, but states that, "[a]ccording to the facts noted in the incident report… Officer Neal … found Pinson and Moreno kissing." Doc. 131-1 ¶ 57. He then asserts that the charges were dismissed because the incident report did not identify the individuals involved. *Id.* ¶ 59. These two assertions are directly contradictory. Further, although Defendants submitted other incident reports (*see* Docs. 129-3 at 47, 130-3 at 9-25), they did not submit this one, making it impossible to see if they were in fact identified.

two are new. One says nothing about the retaliatory conduct discussed above and serves only to speculate on ways the Court's order could chill BOP action. *See* Doc. 130-5. The other, Doc. 130-2, comes from Dr. Kori Petty, a BOP medical provider, and purports to address Ms. Meskill's declaration concerning her inability to access hormones from June 3 through at least October 31 (the date of her declaration), Doc. 107-11 ¶¶ 3, 14. Dr. Petty implies that the delay arose because she had to determine if Ms. Meskill experienced gender dysphoria, Doc. 130-2 ¶ 9; however, Dr. Petty offers no reason why such an assessment was needed, given that BOP already recognized Ms. Meskill's gender dysphoria and had been providing her hormones for 18 months until shutting them off in response to the President's Executive Order. Doc. 59-1 ¶ 1. In any case, the government offers no explanation why Dr. Petty's declaration was "not previously available," *Bank Julius*, 315 F.Supp.3d at 96, such that Defendants had cause to wait two months after its status report and weeks after the Court's Nonretaliation Order to file it.

As to Defendants' Motion to Reconsider itself, the attacks it levels on Plaintiffs' evidence are baseless. Defendants characterize the discussion of retaliation in Ms. Meskill's declaration as unsubstantiated, Doc. 130 at 14-15; however, Ms. Meskill described her experiences under oath and, as noted previously, Defendants offered no evidence to refute it beyond the declaration of Dr. Petty, a declaration that could have been filed prior to the entry of the Nonretaliation Order and that leaves unanswered a question critical to the retaliation issue.

Defendants' similar assertions about Ms. Pinson's testimony fare no better. Doc. 130 at 15-18. Nearly all of Defendants' attacks on Ms. Pinson's sworn statements are supported only by the third-hand statements found in the Garland Declaration. *Id*. The declaration from Warden Garland has the same deficiencies with regard to the retaliatory actions discussed in Plaintiffs' status report as it does with regard to the retaliatory actions discussed in the Motion for an Order to Show Cause:

Warden Garland is merely telling the Court what an unnamed investigator relayed to him of the statements from the Butner staff who denied doing anything wrong.

Defendants provide one piece of evidence purporting to refute Ms. Pinson's testimony. On December 15, 2025, Ms. Pinson stated in a sworn statement that on October 10, 2025, her email had been frozen and that, as of the date of her declaration, she was unable to send emails or contact her attorneys. Doc. 107-2 ¶ 19. Defendants have submitted documentation of a disciplinary infraction that resulted in Ms. Pinson's loss of email privileges for 15 days, starting on November 4, 2025. Doc. 130-3 at 13-15. This does not explain why her email account was frozen from October 10 through at least December 15, 2025.

Defendants also argue that Ms. Pinson was placed in the SMHU because of disciplinary reports that were issued on February 4 and February 23, 2026. Docs. 130 at 16, 130-3 at 17-25. But Defendants acknowledge that Ms. Pinson was *already in the SMHU*, as of January 20, 2026, on a disciplinary charge that was eventually dismissed. Doc. 131-1 ¶¶ 58-59. And the February 23, 2026 disciplinary charge is the result of the incident on February 22, that Ms. Pinson testified was a retaliatory action, and Defendants have failed to refute.

Finally, Defendants assert that Ms. Dye's testimony that she was told repeatedly to stop filing grievances and trying to contact her attorneys if she wanted to go home is unsubstantiated, because it lacks detail and because she was in fact released. Doc. 130 at 14. Not so. Ms. Dye's testimony on the subject is consistent with the other evidence of retaliation, and thus corroborates and strengthens the testimony of Ms. Meskill and Ms. Pinson. And the fact that she has now been released does not in any way refute her statement that she was threatened that she wouldn't be.

Defendants also submitted information relating to incidents that no one asserted were retaliatory. *See, e.g.*, Docs. 131-1 at ¶¶ 72-85, 130-3 at ¶¶ 12, 15-16. This information appears to be submitted only for the purpose of portraying Ms. Pinson in a negative light. [9]

Defendants submitted a great deal of third-hand accounts, many of which are irrelevant to the testimony about retaliatory actions. Even if this evidence was previously unavailable (which it was not), it would still not aid Defendants, as it fails to refute the evidence underlying the Nonretaliation Order.

**B. Defendants' Declarations Corroborate Much of the Retaliation**

Not only do Defendants' declarations fail to refute the evidence submitted by Plaintiffs, in numerous instances, they actually corroborate the evidence of retaliation.

For example, Mr. Moreno testified that he and Ms. Pinson were placed in the SMHU on January 20, 2026, for allegedly kissing, which both separately claim they did not do. Docs. 127-2 ¶¶ 5-6, 9; 121-5 ¶ 4. In his February 19, 2026 declaration, Mr. Moreno stated that they still had not had their disciplinary hearings and remained in the SMHU. Doc. 127-2 ¶¶ 17-18. Ms. Pinson's February 24, 2026 declaration states that the disciplinary charges were dismissed on February 20, 2026, thirty-one days after their placement in the SMHU. Doc. 127-1 ¶ 3.

Warden Garland admits that the disciplinary charge was dismissed. Doc. 131-1 ¶ 59. Unit Manager Bell admits that the disciplinary charge was expunged by the hearing officer on February 20, 2026. Doc. 130-3 ¶ 17. Mr. Bell also attaches four other incident reports for Ms. Pinson. *Id*. at

---

[9] In *Hoskins v. Dilday*, No. 16-CR-334-MJR-SCW, 2017 WL 951410 (S.D. Ill. Mar. 10, 2017), an incarcerated person sought protection from retaliation by prison officials as a result of his litigation. The court noted that defendants submitted records showing that he had "had disciplinary issues in three different correctional institutions." *Id*. at *5. The court explained that "[n]one of the provided records negate the heart of Plaintiff's claims that he is being harmed physically and is facing ongoing threats of harm." *Id*. The same is true here.

9-25. The incident reports corroborate Mr. Moreno's testimony that the hearing process, during which he and Ms. Pinson were kept in solitary confinement, took an unusually long time. Three of these four incident reports show that the disciplinary hearing processes were completed between five and eight days after the incident leading to the disciplinary charge. *Id*. at 9-20.

The fourth is the incident report Defendants issued after the retaliatory strip search on February 22, 2026, about which Ms. Pinson testified. *Id*. at 21-25. It shows that the "investigation" was completed the next day on February 23, 2026, and specifically states that delivery of the incident report, on the day after the purported incident, was "delayed due to extenxive [sic] investigation." *Id*. at 25. The date of the Bell declaration to which this incident report is attached, and thus presumably the date the incident report was printed, is February 24, 2026, before Plaintiffs filed their motion for an order to show cause, and a week before Defendants submitted the declaration. Doc. 130-3 at 3. The incident report had apparently not yet come to a hearing. *Id*. at 21-25.

> However, Ms. Pinson states in her declaration filed with this brief, under oath, that:
>
> On or around the morning of February 24, 2026, Lieutenant Teague informed me that, because my cellmate in the SMHU had confessed to diverting his medications, the Disciplinary Hearing Officer had told him that he either had to dismiss the February 22, 2026 incident report accusing me of diverting medication, or rewrite it with accusations that could be substantiated by evidence. Lieutenant Teague told me that he did not plan to either rewrite or expunge the incident report. This would keep the incident report on "rewrite status," prolonging my time in the SMHU, indefinitely.

March 4, 2026 Pinson Decl. ¶ 6 (attached herein as Exhibit 1).

Also, Ms. Pinson previously testified that her pat search exemption card was taken away when she was sent to the SMHU. Doc. 121-5 ¶ 8. She testified that following her placement in the SMHU she was searched "at least two dozen times by male officers." *Id*. Warden Garland's declaration states that an investigator told him that Lt. Teague said to the investigator that "he was

aware Pinson was filing on him for conducting pat searches on Pinson even though Pinson has a female only pat search exemption." Doc. 131-1 at ¶ 91.k. The investigator did not indicate that Lt. Teague denied that there had been multiple searches by male officers. *Id.*

Further, Ms. Pinson testified that she was in the SMHU from October 9, 2025, through December 18, 2025. Docs. 107-2 ¶ 11, 121-6 at ¶ 6. Warden Garland admits that he was told she was placed in the SMHU on October 9, 2025 "pending an incident report and investigation" after Ms. Pinson verbally expressed her anger about and to a member of the medical staff. Doc 131-1 ¶¶ 19-20. Unit Manager Bell admits that there was no incident report relating to Ms. Pinson's placement into the SMHU on October 9, 2025. Doc. 130-3 ¶¶ 15-16.[10] Warden Garland admits he was told that Ms. Pinson was released from the SMHU on December 17, 2025 "upon the conclusion of the investigation into the October 9, 2025, incident." Doc. 131-1 ¶ 55. Thus, Defendants admit that Ms. Pinson was held in the SMHU for over two months for an incident that did not warrant any disciplinary charge whatsoever.[11]

Finally, Ms. Pinson stated in her December 15, 2025 declaration that her hand was broken by Lt. Quinones during a use of force when he was handcuffing her on October 17, 2025, and she did not receive a hand X-ray until October 23. Doc. 107-2 ¶¶ 12-15.[12] Defendants admit that Lt. Quinones used force on her on October 17 while handcuffing her, that her finger was fractured,

---

[10] Mr. Bell states that Ms. Pinson received eight incident reports since October 1, 2025. Doc. 130-3 ¶ 15. He then lists them and asserts that they are attached to his declaration. *Id*. ¶ 16. Most are not attached to the declaration, but the list. *See id*. There is no incident report listed for October 9, 2025. *Id*. at ¶ 16.

[11] The Garland Declaration also describes the decision to revoke Ms. Pinson's halfway house transfer in a manner similar to Ms. Pinson's description. *Compare* Doc. 121-6 ¶¶ 2, 4; *with* Doc. 131-1 ¶¶ 43-54. Ms. Pinson raised concerns about the foundations for that decision and Warden Garland's conclusory discussion of the revocation does not refute them.

[12] As detailed above on page 4, Ms. Dye separately wrote the Court on October 23, reporting witnessing the incident. Doc. 95 at ¶ 4.

but they quibble over the amount of the delay in getting Ms. Pinson's hand x-rayed, stating that they delayed it only by three days, not six. Doc. 130 at 17, citing Doc. 130-1 ¶¶ 32, 91(a).

As detailed above, Plaintiffs have submitted significant evidence of serious retaliation against class members and non-class member witnesses. Despite multiple opportunities to present evidence to refute Plaintiffs' evidence, and a specific OSC naming eight employees who were directed to provide a response, Defendants failed to do so, choosing instead to provide second- and third-hand hearsay accounts, and irrelevant and prejudicial allegations. Moreover, even in their protestations that they do not retaliate, they admit and corroborate the evidence submitted by Plaintiffs. Thus, even if the Court treated the evidence submitted by Defendants after its Nonretaliation Order as if it were "not previously available," that evidence in many ways supports the Nonretaliation Order and, in any event, does not justify reconsidering the order.

## II.     The Court Did Not Make Clear Legal Error in Entering the Nonretaliation Order.

Defendants' argument on the law fares no better than their argument on the facts. They assert that the Court made four legal errors in issuing the Nonretaliation Order, but the Court was not mistaken in any of the ways Defendants contend, let alone clearly so.

### A. The Court Did Not Make Clear Legal Error in Holding that It Has the Authority to Issue the Nonretaliation Order Under the All Writs Act.

The All Writs Act empowers courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. The Supreme Court "has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. New York Tel. Co.,* 434 U.S. 159, 172 (1977). "[U]nless appropriately confined by Congress, a federal court may avail itself of all auxiliary writs as aids in the performance of its

duties, when the use of such historic aids is calculated in its sound judgment to achieve the ends

of justice entrusted to it." *Id.* at 172–73 (citation omitted). The Act is applied "flexibly." *id.* at 173,

and "a codification of the federal courts' traditional, inherent power to protect the jurisdiction they

already have," so they may safeguard ongoing proceedings. *Klay v. United Healthgroup, Inc.*, 376

F.3d 1092, 1099 (11th Cir. 2004); *see also J.G.G. v. Trump*, No. CV 25-766 (JEB), --- F.Supp.3d

----, 2025 WL 3706685, at *13 (D.D.C. Dec. 22, 2025) (stating that the All Writs Act permits

courts to issue orders in aid of the court's jurisdiction) (cleaned up).

Orders must be directed at conduct "which, left unchecked, would have . . . the practical

effect of diminishing the court's power to bring the litigation to a natural conclusion." *Klay*, 376

F.3d at 1102 (quoting *IIT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978)); *Kemp*

*v. Peterson*, 940 F.2d 110, 113 (4th Cir. 1991) (finding no abuse of discretion for district court to

invoke the All Writs Act to issue a further order against defendants and third parties because it

"bears a direct relationship to the district court's purpose of monitoring compliance with the [past]

order."); *Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 544 (9th Cir. 1987)

(affirming district court's appointment under the All Writs Act of a special master to ensure

compliance with past court orders and to ensure non-retaliation against litigants on the basis that

"[o]ne of the recognized applications of the All Writs Act is the issuance of orders necessary to

ensure the integrity of orders previously issued."). [13]

---

[13] This power is not limited to the named parties before the Court in the underlying
litigation. Instead, it extends to all persons who "though not parties to the original action . . . are
in a position to frustrate . . . the proper administration of justice." *N.Y. Tel. Co.*, 434 U.S. at 174;
*Thorogood v. Sears, Roebuck & Co.*, 678 F.3d 546, 548 (7th Cir. 2012) (same); *see also Turner v.
Sacramento Cnty. Sheriff*, No. 2:09-cv-0117 WBS KJN P., 2010 WL 4237023, at *1 (E.D. Cal.
Oct. 21, 2010), *report and recommendation adopted*, 2010 WL 5317331 (E.D. Cal. Dec. 20, 2010)
(stating in a case involving an incarcerated plaintiff that while a plaintiff cannot normally "seek
injunctive relief in a case against parties who are not named as defendants[,]" that under 28 U.S.C.

The retaliatory actions detailed above, taken against class members who have signed declarations, filed grievances, or notified counsel of noncompliance with the preliminary injunction, are the clearest example one could imagine of "frustrat[ing] . . . the proper administration of justice" in a case before a federal court. *N.Y. Tel. Co.*, 434 U.S. at 174. And incarcerated people—more than any other class of litigant—are particularly vulnerable to these types of abuse as they rely on prison staff for every need: food, clothing, shelter, medical care, and even personal safety. *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("[H]aving stripped them of virtually every means of self-protection and foreclosed their access to outside aid," prison officials must meet incarcerated persons' basic human needs and "are not free to let the state of nature take its course.").

For example, in *Ben David v. Travisono*, incarcerated people brought a class action challenging their conditions of confinement. 495 F.2d 562, 563 (1st Cir. 1974). At the plaintiffs' request and following a hearing, the district court noted that they had testified to "beatings, gassing and 'strip' lockups, and that they feared further harassment and beatings." *Id*. The court relied upon its All Writs jurisdiction for an order enjoining prison officials, state police, and their agents from taking any retaliatory action against plaintiffs or class members and from depriving them of "any and all rights and privileges on account of plaintiffs and members of their class participating, assisting, or volunteering any facts or circumstances in the furtherance of this lawsuit." *Id*. The First Circuit upheld this order and acknowledged the uniqueness of the prison environment when assessing the reasonableness of plaintiffs' fears of retaliation: "rumor, suspicion, and the

---

§ 1651, "a federal court does have the power to issue orders in aid of its own jurisdiction . . . and to prevent threatened injury that would impair the court's ability to grant effective relief in a pending action").

dependency of the inmate might parlay even a low objective probability of misconduct into a substantial subjective fear." *Id.* at 564.

Certainly, the All Writs Act is not deployed lightly. *See Penn. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985) (holding that the All Writs Act does not authorize use of "ad hoc writs" whenever convenient, but it "empowers federal courts to fashion extraordinary remedies when the need arises"). But the Court's intervention here was necessary to prevent direct retaliation against Plaintiffs for invoking the Court's jurisdiction. Otherwise, BOP staff will be left with no deterrent to thwarting class members from reporting noncompliance with court orders, or from pursuing litigation critical of the Executive Order. This is precisely the type of exceptional circumstance for which the All Writs Act was designed. *See Travisono*, 495 F.2d at 563.

## B. The Court Did Not Make Clear Legal Error in Holding that It Has Authority to Issue the Nonretaliation Order Under Its Article III Power

Aside from the All Writs Act, this Court also has inherent authority to enter orders that prevent improper interference with ongoing cases on its docket. This Court retains all powers inherent in an Article III court, and those authorized by case law, statute, and the Federal Rules. *See Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980) (holding that "[t]he inherent powers of federal courts are those which 'are necessary to the exercise of all others.'") (quoting *United States v. Hudson*, 7 Cranch 32, 34 (1812)).

Courts may enter protective orders by exercising the "equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustices." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 (1984) (quoting *Int'l Prod. Corp. v. Koons*, 325 F.2d 403, 408 (2d Cir. 1963)). And it is beyond dispute that a court has the power to issue further enforcement orders to effectuate the purpose of an injunction or other past orders. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004) ("Federal courts are not reduced to approving consent decrees and hoping

for compliance. Once entered, a consent decree may be enforced.") (citation omitted); *R.I. State Council of Churches v. Rollins*, 158 F.4th 304, 314 (1st Cir. 2025) (holding that in issuing further orders, a court has "great discretion when deciding how to enforce violations of its own orders" and in fashioning the remedy) (cleaned up).

Indeed, the D.C. Circuit upheld a nonretaliation provision in an order issued by the district court in a case related to the sexual abuse of women incarcerated in three District of Columbia jail and prison facilities. *Women Prisoners of the Dist. of Columba Dep't of Corrs. v. Dist. of Columbia*, 93 F.3d 910, 913, 931 (D.C. Cir. 1996) (holding that an order prohibiting retaliation for protected activity relating to sexual harassment claims was not overbroad and would not, contrary to the defendants' arguments, "deprive[] them of taking any remedial action in response to fabricated claims of sexual misconduct").[14] Similarly, the Ninth Circuit recently held that a district court overseeing an injunctive case against the California prison system about disability accommodations had the authority to issue an order forbidding defendants and prison staff from taking retaliatory actions against class members who asked for disability accommodations as authorized under controlling law and past court orders. *Armstrong v. Newsom*, 58 F.4th 1283, 1290-93, 1301 (9th Cir. 2023).

Courts have found "it necessary to invoke [their] inherent power" in ongoing litigation related to prison conditions to "issue protective orders to limit any retaliation that would preclude [the] Court from fairly adjudicating a case." *Harvard v. Inch*, Case No. 4:19-cv-00212, Doc. 96 at 2-3 (N.D. Fla. Jan. 28, 2020) (exercising its inherent authority to issue a nonretaliation order

---

[14] *Twelve John Does v. Dist. of Columbia*, 117 F.3d 571 (D.C. Cir. 1997), cited several times by Defendants, does not displace the holding of *Women Prisoners* that the district court had the authority to issue a nonretaliation order. Doc. 130 at 6, 18, 21. In *Twelve John Does*, the D.C. Circuit held that there was no evidence in the district court record to support the issuance of a nonretaliation order, not that the district court was powerless to issue such an order. *Id.* at 578-79.

against the Florida Department of Corrections in a putative class action about solitary confinement conditions), *available at* https://www.courtlistener.com/docket/15763248/96/harvard-v-dixon/. For example, in *Parsons v. Ryan*, No. CV-12-00601-PHX-DKD, 2017 WL 3575711, *2 (D. Ariz. July 25, 2017), the court relied upon its inherent Article III power to issue a nonretaliation order against the Arizona Department of Corrections after class members who testified in court hearings about their lack of access to health care experienced adverse actions in the days after their testimony:

> [T]hese developments strongly suggest retaliatory action after the affected inmates provided testimony or written statements at the July 14 Hearing. Cell transfers, loss of property, and spreading potentially damaging information to other inmates are all adverse actions. Moreover, the testifying inmates plainly engaged in protected conduct by either testifying or submitting written statements to the Court. … [T]he temporal proximity between their protected conduct and the adverse actions are too close in time to reasonably viewed as anything other than retaliatory.

2017 WL 3575711, at *2 (citations omitted); *see also Hoskins*, 2017 WL 951410, at *7 (issuing an order requiring defendants to transfer an incarcerated person due to "ongoing threats" from staff due to his litigation).

### C. The Nonretaliation Order is Clear, Specific, and Facially Plain and Does More Than Simply Order Defendants to "Follow the Law"

Defendants contend that the Nonretaliation Order does not comply with Rule 65(d) of the Federal Rules of Civil Procedure because it does not "describe in reasonable detail … the act or acts restrained or required." Doc. 130 at 19. Not so. The Nonretaliation Order is clear and unambiguous. It is written in simple, direct, facially plain, and declarative sentences, and provides no language authorizing anything less than full compliance. *See* Doc. 124 at 3-4. "A clear and unambiguous order does not leave any reasonable doubt as to what behavior was expected and who was expected to behave in the indicated fashion." *CFTC v. Trade Exch. Network Ltd*., 117

F.Supp.3d 22, 26 (D.D.C. 2015) (cleaned up); *Cobell v. Babbitt*, 37 F.Supp.2d 6, 16 (D.D.C. 1999) (a court order was clear and reasonably specific because its language was "facially plain").

It is the rule in this Circuit that "[e]ven if it tracks statutory language, a general injunction is not too vague if it relates the enjoined violations to the context of the case." *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009). The D.C. Circuit's analysis of whether a district court's order meets the requirements of Rule 65(d) should be viewed "in the light of the circumstances surrounding (the injunction's) entry: the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent." *Id.* (quoting *Common Cause v. Nuclear Regulatory Comm'n*, 674 F.2d 921, 927 (D.C. Circ. 1982)).

Indeed, Defendants' argument that the Noncompliance Order simply directs them to "follow the law," Doc. 130 at 19-20, contradicts their argument elsewhere that the Noncompliance Order is too broad or vague, and interferes with their ability to run prisons. Defendants cannot reasonably argue that their ability to run prisons hinges on ***not*** following the law. The Tenth Circuit decision that Defendants cite, *M.G. through Garcia v. Armijo*, rejected the state agency defendants' argument that the challenged injunction was too vague or that it simply told them to obey the law, noting that the vagueness analysis takes into "consider[ation] all the facts and surrounding circumstances." 117 F.4th 1230, 1249-250 (10th Cir. 2024); *see id.* at 1236 n.6 (order). Defendants also rely on the Eight Circuit's recent decision in *Tincher v. Noem*, 164 F.4th 1097 (8th Cir. 2026), related to federal law enforcement and immigration officials' abuse of peaceful protesters in Minneapolis. Doc. 130 at 20. This case is likewise distinguishable and not controlling in this Circuit. Significantly, *Tincher* involved an emergency motion to the circuit court for a stay pending appeal of a preliminary injunction to benefit a putative class, 164 F.4th at 1099;

here, this Court has already certified a class, issued (and renewed) preliminary injunctive relief, and noticed and sought briefing on the allegations of noncompliance and retaliation it was receiving.[15]

Plaintiffs did not seek the Nonretaliation Order as a preliminary injunction on a stand-alone First Amendment retaliation claim, and the Court issued the nonretaliation order in ongoing litigation under its All Writs or Article III power. *See supra* Subparts (A), (B); *Klay*, 376 F.3d at 1101 ("The requirements for a traditional injunction do not apply to injunctions under the All Writs Act because a court's traditional power to protect its jurisdiction, codified by the Act, is grounded in entirely separate concerns."); *see also Armstrong*, 58 F.4th at 1293 n.8 (rejecting defendants' argument that plaintiffs had to show "changed conditions" to obtain a non-retaliation order).

### III. The Court Did Not Make Clear Legal Error in Holding the PLRA Does Not Prevent Entry of the Nonretaliation Order.

#### A. The Administrative Exhaustion Requirement Only Applies to an "Action" and Not to Motions in an Existing Case.

Defendants assert that the Court's issuance of the Nonretaliation Order is contrary to the Prison Litigation Reform Act's requirements of the "screening mechanisms" of administrative exhaustion and the three-strikes rule. Doc. 130 at 6. This flies in the face of the plain language of the administrative exhaustion provision of the PLRA, which states that a plaintiff must exhaust

---

[15] The procedural posture of *Reid v. Buttigieg*, Civ. No. 20-1262 (TJK), 2023 WL 2184549 (D.D.C. Feb. 23, 2023), an employment discrimination case cited by Defendants, Doc. 130 at 20, is also quite different from the situation at hand here. In *Reid*, Judge Kelly was reviewing the government defendants' motion to dismiss (or in the alternative, grant summary judgment for defendants) the Plaintiff's second amended complaint, which only included a claim her supervisors retaliated against her, and in addition to monetary relief, sought an injunctive order against "future retaliation and discrimination." 2023 WL 2184549 at *5-*6. Judge Kelly concluded that the plaintiff's request that the court "enjoin[] Defendant from taking illegal actions," *id.* at *9 (quoting plaintiffs' brief), was too vague and did not describe "an imminent retaliatory act with particular form" granted summary judgment to defendant in part and dismissed the complaint in remaining part with prejudice. *Id.* at *9, *13 (citation omitted).

administrative remedies prior to bringing an *action*—not prior to seeking a further order in an existing action. The statute provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). *See Woodford v. Ngo*, 548 U.S. 81, 88 (2006) (holding administrative exhaustion under § 1997e(a) is "a precondition to bringing suit in federal court."). In this case, Plaintiffs' causes of action relate to the deprivation of their right to constitutionally adequate medical care under the Eighth Amendment, violations of their equal protection rights under the Fifth Amendment, and violations of the Administrative Procedures Act ("APA"). *See generally* ECF 4-1, Corrected Complaint.

The Supreme Court has made it clear that in interpreting the PLRA's exhaustion provision, a federal court must follow the language of Section 1997e(a), and not add additional exhaustion requirements. Thus, in *Jones v. Bock,* the Court held that an incarcerated person need not plead exhaustion of administrative remedies in a complaint because the exhaustion statute does not explicitly state that exhaustion is a pleading requirement, and it is instead an affirmative defense:

> We understand the reasons behind the decisions of some lower courts to impose a pleading requirement on plaintiffs in this context, but that effort cannot fairly be viewed as an interpretation of the PLRA. "Whatever temptations the statesmanship of policy-making might wisely suggest," the judge's job is to construe the statute—not to make it better.

*Jones v. Bock*, 549 U.S. 199, 216 (2007) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 533 (1947)).

Just as 42 U.S.C. § 1997e(a) does not state that exhaustion is a pleading requirement, neither does it state that the exhaustion provision applies to enforcement motions or other various orders entered during the course of litigation. On the contrary, the statute specifically says that

exhaustion is a requirement for filing an "action," and here, Plaintiffs did not file an "action" related to retaliation, but rather made an oral application at the February 19, 2026, hearing for a Nonretaliation Order. For example, the Southern District of New York, quoting from *Black's Law Dictionary*, stated that "[i]n light of the purposes of the PLRA, an 'action' is best understood as 'a civil or criminal judicial proceeding.'" *United States v. Hashmi*, 621 F.Supp.2d 76, 84-85 (S.D.N.Y. 2008) (quoting Black's Law Dict. 28 (7th ed. 1999); *accord United States v. Ayala Lopez*, 327 F.Supp.2d 138, 141 n.1 (D.P.R. 2004)). The court contrasted the definition of "action" with that of "motion," i.e., "a written or oral application requesting a court to make a specified ruling or order," *id.* at n.7, and found that "this definition [of 'action'] constitutes the plain meaning of the statutory language, a meaning that should be given effect unless it would create an absurd result." *Hashmi*, 621 F.Supp.2d at 85 (citation omitted); *see Ayala Lopez*, 327 F.Supp.2d at 141 n.1 (noting same distinction between "action" and "motion"); *see also id.* at 142 ("We will not ratchet out the PLRA and read the word 'motion' into the Act in order for it to be applicable to [the] motion.").

Indeed, in *Hashmi*, the court explicitly rejected the same argument Defendants make here that the Nonretaliation Order somehow gives class members an end-run around the exhaustion requirement, or that it will result in a "deluge of frivolous prisoner claims" that would make BOP deviate from their usual investigative process. Doc. 130 at 6-7; *see also id.* at 22 (asserting that the Nonretaliation Order is a "blank check to defy BOP regulations"). In *Hashmi*, the court observed:

> Congress' clear purpose in enacting the PLRA, as the Supreme Court has recognized, was to reduce the quantity of lawsuits related to prison conditions. The initiation of a new lawsuit is certainly a more costly process than an application for a specific ruling or order brought to a court in the context of an already-pending action. A new lawsuit requires, *inter alia,* the assignment of a Judge; the effectuation of service on the Government; a formal answer from the Defendant; the briefing of a motion to dismiss or for summary judgment, etc. This is a costly process. A motion by a pretrial detainee, on the other hand, is relatively

> inexpensive. Thus it would certainly not be absurd for Congress to have intended that a motion be treated differently from the initiation of an "action."

621 F.Supp.2d at 85.

Multiple other courts have similarly held that motions in already filed civil cases are not considered separate or new "actions" requiring exhaustion under 42 U.S.C. § 1997e(a). *See, e.g.*, *Duran v. Grisham*, 853 Fed. App'x. 252, 255 (10th Cir. 2021) (unpublished) (rejecting argument that class member seeking to enforce a consent decree was required to exhaust before so filing); *Duvall v. Hogan*, Civ. Act. No. ELH-94-2541, 2020 WL 3402301, *8 (D. Md. June 19, 2020) (holding that a motion to enforce settlement agreement does not require exhaustion); *Baxley v. Jividen*, No. 3:18-1526, 2020 WL 1802935, at *3 (S.D. W.Va. April 8, 2020) (PLRA exhaustion inapplicable to claims challenging prison's response to COVID-19 asserted in a lawsuit that was properly exhausted and initiated prior to the pandemic); *Ranke v. County of Saginaw*, No. 11-15712, 2013 WL 3944472, *3 (E.D. Mich. July 31, 2013) (holding that motion for order to show cause for civil contempt, based on violation of earlier judgment, need not be exhausted); *Ayyad v. Gonzales*, Civ. Act. Nos. 05-cv-02342-WYD-MJW, 05-cv-02653, 2008 WL 2955964, *2 (D. Colo. July 31, 2008) (denying federal defendants' motion for reconsideration of order finding that the plaintiff did not have to exhaust again when seeking an order related to access to counsel during ongoing lawsuit against the BOP and DOJ); *Hadix v. Caruso*, 465 F.Supp.2d 776, 797 (W.D. Mich. 2006) (holding "the PLRA on its face and in its meaning does not apply to contempt requests.") (citations omitted).[16]

---

[16] Defendants' citations to *Woodford*, 548 U.S. at 95 and *Ross v. Blake*, 578 U.S. 632, 639 (2016), Doc. 130 at 26, do not disturb this body of law holding that the exhaustion requirement applies only to the commencement of an action versus subsequent motion practice in ongoing litigation. In *Woodford*, the Supreme Court reaffirmed that administrative exhaustion is "a precondition to bringing suit in federal court." 548 U.S. at 88. In *Ross*, the Court "underscore[d]

**B. The Nonretaliation Order Meets the PLRA Requirements for Prospective Relief.**

Even if the PLRA did apply to this Order, the Court did not make clear legal error in holding that its findings satisfied the demands of that statute. Section 3626(a)(1)(A) of the PLRA ensures that court-ordered relief "extend[s] no further than necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). The Nonretaliation Order complies with that mandate. Defendants contend that Nonretaliation Order is overly broad, Doc. 130 at 21-23, but under § 3626(a), injunctive orders are not limited to the bare minimum that the Constitution would require of its own force.

One of Defendants' arguments is foreclosed by U.S. Supreme Court precedent. In *Brown v. Plata*, 563 U.S. 493 (2011), the Supreme Court affirmed a prison population limit ordered by a three-judge court, after the panel found that prison overcrowding was so extreme that, without a population cap, the provision of medical and mental health care in California could never reach constitutional standards as required in two separate ongoing class action cases. The state challenged the order under § 3626(a) on the basis that it benefited incarcerated people who were not members of the class, same as Defendants argue here. Doc. 130 at 23. The Court rejected this argument, holding that an order "does not fail narrow tailoring simply because it will have positive effects beyond the plaintiff class." 563 U.S. at 531; *see also id.* at 532 (declining to limit releases of prisoners to class members); *id.* at 532-33 (order was not overbroad merely because it operated systemwide rather than separately assessing the need for relief at each prison).[17]

---

that statute's built-in exception to the exhaustion requirement: A prisoner need not exhaust remedies if they are not 'available.'" 578 U.S. at 635-36.

[17] *Bailey v. Fed. Bureau of Prisons*, Civ. A. No. 24-1219 (PLF), 2024 WL 3319207, *10 (D.D.C. June 28, 2024), cited by Defendants, Doc. 130 at 23, relates to the standards for obtaining a preliminary injunction on a claim for retaliation, not to the requirements of a protective order in ongoing litigation.

Defendants' reliance on *Twelve John Does*, 117 F.3d at 578-79, to support their Section 3626(a) argument is incorrect and unavailing. Doc. 130 at 21. There, the circuit court vacated and remanded the district court's nonretaliation order against the D.C. Jail not on the basis of the PLRA's requirements, but rather because the plaintiffs had not provided any supporting evidence of retaliation. 117 F.3d at 578. As detailed above, the evidence here is more than sufficient to obtain a nonretaliation order.

Defendants' argument that the Nonretaliation Order is overly broad and will interfere with their ability to operate prisons and will result in a deluge of false allegations is likewise not well taken. Doc. 130 at 6-7, 20-21; *see also id.* at 23-25 (asserting that the Noncompliance Order will have an "adverse impact on public safety" that would "chill legitimate discipline"). Defendants ignore that the D.C. Circuit addressed this very same argument in upholding a nonretaliation provision within a much broader remedial injunctive order issued by the district court in a case related to the conditions of confinement and sexual abuse of women incarcerated in three District of Columbia jail and prison facilities. *Women Prisoners*, 93 F.3d at 913, 931. In that case, D.C. jail officials argued in that case that the nonretaliation provision "sweeps far too broadly" and would, for example, deprive correctional officials of being able to take remedial action in response to fabricated claims of sexual misconduct. *Id.* at 931. The D.C. Circuit noted with approval that the district court, in a supplemental order, had "addressed this specific concern" and had held that the nonretaliation provision "does not prevent the Defendants from legitimately taking punitive action . . . . It simply prevents them from using disciplinary measures to cover up sexual harassment." *Id.* (cleaned up). The D.C. Circuit held that "the Department is free to discipline, without fear of being held in contempt of court, an inmate who has fabricated a charge of sexual

harassment or otherwise acted in bad faith in connection with such a charge. Accordingly, we reject appellees' challenge…." *Id.*[18]

Defendants argue that the Nonretaliation Order violates the PLRA because in their view it is overly broad as they contend it does not require a causal nexus between the protected activity and an adverse action taken by Defendants. Defendants cite *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013), and *Aref v. Holder*, 774 F.Supp.2d 147 (D.D.C. 2011),[19] to support their argument that there must be a requirement for a causal connection, and that there is not one here. Doc. 130 at 21-22. The cases do not support Defendants' argument.

As an initial matter, the cases Defendants cite relate to the standards for bringing a claim for retaliation, not to the requirements of a protective order. *See Univ. of Texas Sw. Med. Ctr.*, 570 U.S. 338; *Aref*, 774 F.Supp.2d 147. Trial courts have "broad discretion … to decide when a protective order is appropriate and what degree of protection is required." *Seattle Times Co.*, 467 U.S. at 36. Yet Defendants make no argument nor cite any case for the proposition that a court's protective order must meet the same pleading standards as a plaintiff bringing a retaliation claim. Also*, Univ. of Texas Sw. Med. Ctr.* was decided based on "[t]he text, structure, and history of Title VII." 570 U.S. at 362. The text at issue in Title VII prohibits discrimination "because [the employee] has" engaged in activities protected by the statute at issue. *Id*.; 42 U.S.C. § 2000e-3(a). Thus, the Court's opinion was based on the causal connection having been written into the specific statute, not on some generalized legal standard for retaliation.

---

[18] *See also Parsons v. Ryan*, 912 F.3d 486, 501 (9th Cir. 2018), *cert. denied sub nom. Ryan v. Jensen*, 589 U.S. 926 (2019) (noting that "[a] demonstration that an order [issued to vindicate the federal rights of prisoners] is burdensome does nothing to prove that it was overly intrusive") (cleaned up).

[19] Defendants erroneously cite this as an opinion from the U.S. Court of Appeals for the District of Columbia Circuit. Doc. 130 at 21.

Nonetheless, as noted in *Aref*, for an action to constitute retaliation, there must be a causal connection between the protected activity and the action taken against the person who engaged in the protected activity. *Aref*, 774 F.Supp.2d at 169. But the Nonretaliation Order here ***does*** require a causal connection. The definition of retaliation is: "to hurt someone or do something harmful to someone ***because they have done or said something harmful to you***." Cambridge Dictionary Online, *available at*: https://dictionary.cambridge.org/us/dictionary/english/retaliate (emphasis added). Thus, the prohibition on retaliation, by definition, requires a causal connection between the protected activity and the adverse action. Further, the structure of the prohibition indicates it only prohibits actions if they are retaliatory. The Nonretaliation Order prohibits Defendants from taking "actions that harass, intimidate or otherwise retaliate…" Doc. 124 at 3. The natural reading of this phrase is that it prohibits any form of retaliation, specifically including harassment and intimidation, but not limiting the possible forms of retaliation to those types of actions. The causal connection between protected activity and adverse actions taken in retaliation is clear.

Defendants also complain that the Nonretaliation Order does not define what would qualify as "impermissible harassment and intimidation." Doc. 130 at 22-23. Notably, this appears to be suggesting that BOP permits some level of harassment and intimidation. Regardless, Defendants rely on two cases for the proposition that harassment and intimidation must be of some stated level of severity. *Id.* (citing *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576 (D.C. Cir. 2002) and *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986)). As with their argument about requiring a causal connection or protecting non-class member witnesses, Defendants again cite cases that opine on pleading standards, not on the requirements for the entry of a protective order. *See Seattle Times Co.*, 467 U.S. at 36.

36

Additionally, as discussed above, the Nonretaliation Order prohibits retaliation, including harassment and intimidation as retaliation. Even if the pleading standards for a retaliation claim could be applied to the entry of a protective order, the issue is resolved by caselaw establishing what constitutes retaliation. In this Circuit, a retaliation claim requires that the retaliatory action be "sufficient to deter a person of ordinary firmness in [their] position" from engaging in the protected activity. *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025). Because, as written, the Nonretaliation Order includes harassment and intimidation as subsets of retaliation, the actions that are prohibited by the order are harassment, intimidation, and other actions that would deter an incarcerated person of ordinary firmness from providing information to the Court or grieving Defendants' noncompliance with the preliminary injunction. *See* Doc. 124 at 3.

## CONCLUSION

The Court depends upon Executive Branch Defendants—the President, Attorney General, government and Federal Bureau of Prison officials, and their staff—to respect the Court's authority and to comply with court orders. And when they and their agents do not do so, and take retaliatory actions against class members for participating in this litigation, the Court has ample power under both the All Writs Act and its inherent Article III authority to enter protective orders against retaliation that threatens to frustrate the fair, proper, and orderly progression of a case before it.

Threatening a litigant for speaking with their attorneys, or for providing sworn declarations to the Court, are paradigmatic examples of interference with this Court's docket and the administration of justice. Without judicial intervention in appropriate cases, prison staff will be left with every incentive to thwart litigation critical of the Bureau of Prisons, the President, the Attorney General, or themselves and their colleagues.

For the reasons set forth above and in the record, Plaintiffs respectfully request that the Court deny Defendants' Motion for Reconsideration.

Dated: March 11, 2026

Li Nowlin-Sohl (*pro hac vice*)
Leslie Cooper (*pro hac vice*)
Shana Knizhnik, DDC Bar ID 120840
James D. Esseks (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: 212-549-2500
lnowlin-sohl@aclu.org
lcooper@aclu.org
sknizhnik@aclu.org
jesseks@aclu.org

Michael Perloff, D.C. Bar No. 1601047
Aditi Shah, D.C. Bar No. 90033136
ACLU FOUNDATION OF THE DISTRICT
OF COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
Tel: 202-457-0800
mperloff@acludc.org
ashah@acludc.org
Shawn Thomas Meerkamper (*pro hac vice*)
Megan Z. F. Noor (*pro hac vice*)
Dale Melchert (*pro hac vice motion pending*)
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Tel: 510-587-9696
shawn@transgenderlawcenter.org
megan@transgenderlawcenter.org
dale@transgenderlawcenter.org

Respectfully submitted,

*/s/ Corene T. Kendrick*
Corene T. Kendrick (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California St., Ste. 700
San Francisco, CA 94104
Tel: 202-393-4930
ckendrick@aclu.org

David C. Fathi (*pro hac vice*) *
Maria V. Morris, D.C. Bar. No. 1697904
Elisa C. Epstein (*pro hac vice*) *
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, N.W.
Washington, D.C. 20005
Tel: 202-393-4930
dfathi@aclu.org
mmorris@aclu.org
eepstein@aclu.org
*Not admitted in D.C.; practice limited to federal courts.*

Lynly S. Egyes (*pro hac vice*)
TRANSGENDER LAW CENTER
594 Dean Street, Suite 11
Brooklyn, NY 11238
Tel: 510-587-9696
lynly@transgenderlawcenter.org

*Counsel for Plaintiff Class*