**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ALISHEA KINGDOM, *et al.*,

Plaintiffs,

v.                                                    Civ. A. No. 25-691 (RCL)

DONALD J. TRUMP, *et al.*,

Defendants.

## DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 2

I.      The Executive Order and BOP's Implementation. .................................................. 2

II.     Plaintiffs' Complaint Alleges that BOP's Implementing Memoranda Are
        Unlawful. ................................................................................................... 3

III.    The Court Preliminarily Enjoined the Implementing Memoranda. ........................ 4

IV.     BOP Issued a New, Superseding Policy. .................................................................. 5

LEGAL STANDARD ............................................................................................ 6

ARGUMENT ......................................................................................................... 7

CONCLUSION ...................................................................................................... 13

## TABLE OF AUTHORITIES

**Cases**

*Bell v. Wolfish*,
    441 U.S. 520 (1979) ................................................................................................ 13

*Doe 2 v. Shanahan*,
    755 F. App'x 19 (D.C. Cir. 2019) ................................................................... *passim*

*Hatim v. Obama*,
    760 F.3d 54 (D.C. Cir. 2014) ................................................................................ 13

*Horne v. Flores*,
    557 U.S. 433 (2009) ............................................................................................ 6, 7

*Kingdom v. Trump,*
    Civ. A. No. 25-691 (RCL), 2025 WL 1568238 (D.D.C. June 3, 2025) ........................ *passim*

*Nat'l Health Agencies' Comm. for Combined Fed. Campaign v. Devine*,
    564 F. Supp. 904 (D.D.C. 1983) ............................................................................. 8

*Neguse v. U.S. Immigration & Customs Enforcement,*
    Civ. A. No. 25-2463 (JMC), 2026 WL 137017 (D.D.C. Jan. 19, 2026) ................................. 8

*Petties v. Dist. of Columbia*,
    662 F.3d 564 (D.C. Cir. 2011) ............................................................................... 6

*Preiser v. Rodriguez*,
    411 U.S. 475 (1973) ............................................................................................ 13

*S.E.C. v. Vision Commun., Inc.,*
    Civ. A. No. 94-0615 (CRR), 1995 WL 109037 (D.D.C. Mar. 6, 1995) ............................ 7, 10

*Samma v. Dep't of Def.*,
    136 F.4th 1108 (D.C. Cir. 2025) ............................................................................. 7

*Talbott v. United States*,
    No. 25-5087, 2025 WL 3533344 (D.C. Cir. Dec. 9, 2025) ................................................. 12

*Washington State Grange v. Washington State Repub. Party*,
    552 U.S. 442 (2008) ............................................................................................ 12

**Other**

18 U.S.C. § 3626 ................................................................................................. 5, 13

Executive Order 1416890, Fed. Reg. 8615 (Jan. 30, 2025) ................................................. *passim*

Defendants respectfully move to dissolve the Court's preliminary injunction issued on June 3, 2025 (ECF Nos. 67, 68), which was renewed on August 20, 2025 (ECF No. 79), November 17, 2025 (ECF No. 96), and February 12, 2026 (ECF No. 114) ("Preliminary Injunction"), and in support thereof state the following.

## INTRODUCTION

This Court previously issued the Preliminary Injunction on the basis that the Federal Bureau of Prisons' ("BOP") February 21 and 28, 2025 memoranda implementing Executive Order 14168 ("EO 14168")—which generally provides that federal funds shall not be spent on any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex, EO 14168, § 4(c)—likely violated the Administrative Procedure Act's prohibition of arbitrary and capricious agency action.  Specifically, the Court found that the memoranda failed to provide a reasoned explanation as required by the APA because the "*only* explanation" provided was compliance with EO 14168. *Kingdom v. Trump*, Civ. A. No. 25-691 (RCL), 2025 WL 1568238, at *10 (D.D.C. June 3, 2025).  To address the harm from that procedural defect, the Court issued a preliminary injunction prohibiting Defendants from "enforcing [EO] 14168 as applied to medical hormone therapy and social accommodations for people in the custody of the BOP" and "from enforcing the BOP's memoranda implementing [EO] 14168."  ECF No. 68, at 2. The Court also ordered Defendants to "provide and continue providing Plaintiffs and members of the class gender-affirming hormone therapy and social accommodations in accordance with BOP policy and practice in effect immediately prior to . . . issuance of [EO] 14168." *Id.*

On February 13, 2026, BOP issued a new policy on medical care for inmates with gender dysphoria ("2026 Policy" or "Policy").  ECF No. 125.  The 2026 Policy supersedes the 2025 implementing memoranda.  Unlike the enjoined memoranda, BOP provided reasoned explanations

for the 2026 Policy. After extensive reviews of, among other things, relevant medical studies, medical expert opinions, state correctional policies, pertinent case law, and relevant prison administration and safety concerns, BOP produced approximately 47 pages of explanation for the 2026 Policy along with over 3,000 pages of documents in an Administrative Record. *See* AR Index (ECF No. 151). But BOP cannot implement the 2026 Policy—even though the procedural defect the Court identified and solely relied on is not present—because the Preliminary Injunction bars implementation of EO 14168 and requires Defendants to maintain pre-EO 14168 policy.

The Court should dissolve the Preliminary Injunction because the issuance of the new Policy, including BOP's reasoned explanation for the Policy, constitutes changed circumstances eviscerating the basis for the Preliminary Injunction. *See Doe 2 v. Shanahan*, 755 F. App'x 19, 22 (D.C. Cir. 2019) (holding that district court abused its discretion in denying government's motion to dissolve the preliminary injunction after the government issued a new policy); *see also, e.g.*, PI Renewal Order (ECF No. 114), at 2 (noting need to reassess preliminary injunction if "newly discovered factual circumstances" arise). The public interest favors allowing prison administrators to implement policies that are the product of reasoned decision-making and that protect the inmates, prison personnel, and public safety.

## BACKGROUND

### I.    The Executive Order and BOP's Implementation

On January 20, 2025, the President issued EO 14168 titled, "*Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*." 90 Fed. Reg. 8615 (Jan. 30, 2025). The Executive Order provides in relevant part that "[i]t is the policy of the United States to recognize two sexes, male and female," EO 14168, § 2, and that "'sex' shall refer to an individual's immutable biological classification as either male or female," *id.* § 2(a).

2

The Executive Order further requires all federal agencies to enforce laws in a manner that "protect men and women as biologically distinct sexes." *Id.* § 3(b). And, among other things, section 4(c) of the Executive Order provides, "The Attorney General shall ensure that [BOP] revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." *Id.* § 4(c). The Executive Order also requires that it "be implemented consistent with applicable law[.]" *Id.* § 8(b).

On February 21, 2025, BOP issued a memorandum implementing EO 14168. *See* ECF No. 1-1 (Memorandum: *Compliance with Executive Order "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"*). The memorandum provides in relevant part that BOP will not provide social accommodations for trans-identifying inmates (*e.g.*, binders, hair removal devices, and undergarments). *Id.* at 1–2. On February 28, 2025, BOP issued a second memorandum regarding compliance with EO 14168. *See* ECF No. 1-2 (Memorandum: *Executive Order 14168 Compliance*). The memorandum provides that, consistent with EO 14168, "no Bureau of Prisons funds are to be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmates' appearance to that of the opposite sex." *Id.* It further provides that "[t]his policy is to be implemented in a manner consistent with applicable law[,] including the Eighth Amendment." *Id.*

## II. Plaintiffs' Complaint Alleges that BOP's Implementing Memoranda Are Unlawful

On March 7, 2025, Plaintiffs—trans-identifying inmates receiving certain interventions and social accommodations to address gender dysphoria—filed this action on behalf of themselves and a putative class of similarly situated inmates, contending that the two implementing memoranda violate (i) the Eighth Amendment, (ii) the Fifth Amendment's Equal Protection

3

Clause, (iii) the Rehabilitation Act, and (iv) the Administrative Procedures Act ("APA").  Compl. (ECF No. 1).  Specifically, Plaintiffs challenge as unlawful BOP's purported "blanket ban on gender-affirming health care," namely cross-sex hormones, social accommodations, and sex trait modification surgery, implemented pursuant to EO 14168.  *Id.* ¶¶ 10, 18.

### III.    The Court Preliminarily Enjoined the Implementing Memoranda

On March 17, 2025, Plaintiffs moved for a preliminary injunction and to stay BOP's implementing memoranda as to cross-sex hormones and social accommodations, relying on their Eighth Amendment and APA claims.  ECF No. 7.  Plaintiffs also moved for class certification. ECF No. 8.

On June 3, 2025, the Court granted Plaintiffs' motions.  ECF No. 68.  The Court ruled solely based on Plaintiffs' APA arbitrary and capricious claim and did not address any other claim. Specifically, the Court found that Plaintiffs were likely to succeed on their APA claim because BOP's "*only* explanation for its new policies"—*i.e.*, "that the Executive Order required the adoption of those policies"—"falls short."  *Kingdom*, 2025 WL 1568238, at *10.  The Court made clear that "[t]o conclude that the defendants have failed to meet the procedural strictures of the APA is not to take any position on the underlying merits of the BOP's substantive policy decisions or the goals motivating the Executive Order."  *Id.* at *12.  The Court stayed BOP's implementing memoranda and enjoined BOP from enforcing EO 14168 and the implementing memoranda as to hormones and social accommodations.  ECF No. 68, at 2.  The Court further ordered BOP to provide hormones and social accommodations in accordance with pre-EO 14168 policy.  *Id.* Finally, the Court certified the case "as a class action on behalf of all persons who are or will be incarcerated in the custody of BOP facilities, with a current medical diagnosis of gender dysphoria or who receive such a diagnosis in the future."  *Id.* at 1.  Because the Prisoner Litigation Reform

4

Act ("PLRA") limits the injunction to 90 days, 18 U.S.C. § 3626(a)(2), the Court has since granted Plaintiffs' motions to renew the preliminary injunction because there had been no changed circumstances. ECF Nos. 79, 96, 114. The Preliminary Injunction is set to expire on May 31, 2026. ECF No. 114.

## IV.    BOP Issued a New, Superseding Policy

On February 13, 2026, BOP issued a new policy on treatment of inmates with gender dysphoria, *Management of Inmates with Gender Dysphoria*. 2026 Policy (ECF No. 125). The Policy specifies that each inmate's medical care will be provided pursuant to an "individualized" plan "tailored to the specific clinical needs of the inmate." *Id.* at 5. Medical and psychiatric comorbidities will generally be addressed before gender dysphoria treatment proceeds so as to rule them out "as the potential cause of [gender dysphoria]." *Id.* Gender dysphoria treatment will consist of psychotherapy, which will be prioritized, and psychoeducational group interventions, trauma treatment, and psychotropic medication, among other treatments. *Id.* at 5–6. Not available to address gender dysphoria, however, are sex trait modification surgeries and social accommodations. *Id.* at 6, 7–8.

As to cross-sex hormones, BOP will not provide cross-sex hormones to inmates not currently receiving them, and inmates who are currently receiving them generally will be tapered off of them pursuant to an individualized tapering plan, which will consider factors such as the duration the inmate has been receiving hormones. *Id.* at 6–7. "For inmates who (1) are post sex trait modification surgery, or (2) have been receiving hormones to address [gender dysphoria] for an extended period and develop severe physiological and psychological withdrawal effects from tapering, it may not be appropriate in all cases for the initial tapering plan to include cessation of hormones," but such tapering plans "should be reevaluated regularly[.]" *Id.* at 7. Moreover, "[a]ll

5

inmates who are tapering and were receiving mental health treatment before tapering shall continue to receive counseling and pharmacological treatment as appropriate as part of the inmate's individualized treatment plan." *Id.* Patients may also "submit a request for additional medical or mental health care evaluation if they have acute concerns during the tapering process." *Id.* "All requests shall be considered in a reasonable amount of time in accordance with standard procedure, and decisions concerning such requests shall be based on all relevant factors, including security and prison-administration concerns." *Id.* Separately, BOP has instructed its Chief Executive Officers, including Wardens, that BOP remains obligated to comply with the Court's Preliminary Injunction despite the issuance of the new Policy until they receive further direction.

On March 6, 2026, BOP filed a certified index of the 2026 Policy's administrative record, ECF No. 151, and produced the administrative record to Plaintiffs, which is over 3000 pages. In that record, BOP provided extensive discussion—indeed, approximately 47 pages of analysis—of the issues it considered, the evidence it reviewed, and its justification for the 2026 Policy.

Defendants now move to dissolve the Preliminary Injunction enjoining the 2025 implementing memoranda and the implementation of EO 14168 and requiring Defendants to adhere to pre-EO 14168 policy.

## LEGAL STANDARD

"A party seeking to dissolve an injunction has the burden of showing a significant change either in factual conditions or in law such that continued enforcement of the injunction would be detrimental to the public interest." *Doe 2*, 755 F. App'x at 22 (cleaned up); *see also Horne v. Flores*, 557 U.S. 433, 447 (2009); *Petties v. Dist. of Columbia*, 662 F.3d 564, 574 (D.C. Cir. 2011). "An injunction may be dissolved where, for instance, changed circumstances eviscerate the justification therefor, or where failure to dissolve the injunction would occasion severe hardship

upon the parties[.]" *S.E.C. v. Vision Commun., Inc.*, Civ. A. No. 94-0615 (CRR), 1995 WL 109037, at *2 (D.D.C. Mar. 6, 1995) (cleaned up). In asking the Court to dissolve a preliminary injunction, the focus is on whether there are changed circumstances that warrant dissolution, not the merits of the underlying order. *Doe 2*, 755 F. App'x at 22–23.

## ARGUMENT

The Court should dissolve the Preliminary Injunction because of the "significant change" in circumstances, namely, BOP's issuance of a new policy (with the requisite reasoned explanation for the policy) that undermines the justification for the Injunction. *See id.*; *Vision Commun., Inc.*, 1995 WL 109037, at *2.

In issuing the Preliminary Injunction, the Court found a likelihood of success on the merits of Plaintiffs' APA claim that the 2025 implementing memoranda were arbitrary and capricious for failing to provide sufficient explanation. That APA claim specifically targeted "BOP's [2025] implementing memoranda." *Kingdom*, 2025 WL 1568238, at *10; *see* Compl. (ECF No. 1) at 26–29 (Count 5: "Challenge to the Implementing Memoranda"). Those memoranda, which reflected BOP's 2025 policy, have now been superseded by a new agency action: the 2026 Policy, as reflected in Program Statement 5260.01. ECF No. 125. Because "no decision by this court would do anything to affect the [2025] Policy or the plaintiff class members' rights relative to it" given its recission, *Samma v. Dep't of Def.*, 136 F.4th 1108, 1114 (D.C. Cir. 2025), Plaintiffs' APA arbitrary and capricious claim challenging the memoranda that reflected BOP's 2025 policy has become moot. "[O]ngoing enforcement of the original [Preliminary Injunction] order" is thus no

longer "supported by an ongoing violation of federal law (here, the [APA])." *Horne*, 557 U.S. at 454. That changed circumstance alone warrants vacatur of the Preliminary Injunction.[1]

Moreover, the Court issued the Preliminary Injunction on the sole basis that BOP "failed to meet the procedural strictures of the APA" by citing EO 1418 as the "*only* explanation" for the challenged memoranda. *Kingdom*, 2025 WL 1568238, at *12. That procedural concern, however, is not present with respect to the issuance of the 2026 Policy. The Administrative Record produced by BOP reflects BOP's reasoned decision-making in formulating the 2026 Policy. *See, e.g.*, AR Index (ECF No. 151); Ex. 1 (AR1–4, Admin. Rec.); Ex. 2 (AR5–47, Memo. on Program Statement 5260.01); Ex. 3 (AR2599–2673, Decl. of Kristopher E. Kaliebe, M.D.).[2]

BOP conducted extensive reviews of, among other things, relevant medical studies, medical expert opinions, state correctional policies, pertinent case law, and prison administration and security concerns. Ex. 1 (AR1–4, Admin. Rec.); Ex. 2 (AR5–47, Memo.). Based on this review, BOP determined that the "newer, more rapidly evolving clinical landscape" hampered the identification of a universal standard of care. Ex. 1, at AR3; *see also* Ex. 2, at AR5–8. BOP also thoroughly researched the origin of the gender-affirming-care model advocated by the World Professional Association for Transgender Health ("WPATH"), which had been the standard of

---

[1]    To the extent Plaintiffs desire to bring new APA claims against the 2026 Policy, they must amend their complaint to do so. *See Neguse v. U.S. Immigration & Customs Enforcement*, Civ. A. No. 25-2463 (JMC), 2026 WL 137017, at *2 (D.D.C. Jan. 19, 2026) ("If Plaintiffs wish to challenge the legality of a new agency action, Plaintiffs may seek leave to amend their complaint or file a supplemental pleading, *see* Fed. R. Civ. P. 15[.]"); *see also Nat'l Health Agencies' Comm. for Combined Fed. Campaign v. Devine*, 564 F. Supp. 904, 906 (D.D.C. 1983) (dismissing case as moot where plaintiff declined to amend complaint to challenge superseding policy).

[2]    Defendants are submitting these documents from the Administrative Record to show that the procedural defect that the Court identified is not present in the 2026 Policy, not for the purposes of assessing the merits of Plaintiffs' APA and constitutional challenges should Plaintiffs decide to challenge the 2026 Policy.

care BOP previously followed.  Ex. 1, at AR3–4; Ex. 2, at AR5–8.  BOP's research determined, however, that there are grave "concerns about the body of research and potential research bias" underlying the WPATH model.  Ex. 1, at AR4; *see also* Ex. 2, at AR5–8.  BOP further found that many European countries "have distanced themselves from the stance" of WPATH, and that leading organizations in the United States are reevaluating their clinical guidance.  Ex. 1, at AR4; *see also* Ex. 2, at AR5–8.  BOP considered systematic reviews of available studies that found insufficient and low strength of evidence as to the safety and efficacy of sex trait modification interventions, including cross-sex hormones.  Ex. 1, at AR4; Ex. 2, at AR24–27.  BOP considered the many significant risks of cross-sex hormones, from breast cancer to cardiovascular complications.  Ex. 1, at AR4; Ex. 2, at AR24–27; Ex. 3, at AR2631–36.  In addition to considering the declarations of Plaintiffs' expert already submitted in this case, BOP considered the declaration of Dr. Kaliebe, an expert in psychiatry who has extensively studied treatment for gender dysphoria including in the carceral setting.  Ex. 3 (AR2599–2673).

Lastly, in addition to the medical evidence, BOP considered the safety, security, and prison-administration concerns for both the inmates receiving care to address gender dysphoria and for correctional staff.  Ex. 1, at AR2–3; Ex. 2, at AR10–13, 18–20, 28–30.  BOP reviewed at least five different state correctional policies (Florida, California, Kentucky, Oklahoma, and Minnesota) to understand how those states address gender dysphoria in the correctional context.  Ex. 1, at AR3.  BOP also reasonably considered costs, reliance interests, and alternatives.  Ex. 2, at AR13–16, 21–23, 30–33.  And BOP explained that "[a]fter considering the relevant issues and factors and weighing the relevant considerations," BOP determined that the 2026 Policy is reasonable and in the best interest of BOP, its officials, and those in its custody.  *E.g.*, Ex. 2, at AR7.

Thus, to the extent that the Court concluded that BOP's failure to meet the APA's "procedural strictures" justified the Preliminary Injunction, *Kingdom*, 2025 WL 1568238, at *12, because BOP's "*only* explanation" for the challenged memoranda "falls short," *id.* at *10, the issuance of the 2026 Policy "eviscerate[s] the justification therefor." *See Vision Commun., Inc.*, 1995 WL 109037, at *2. The "significant change" in circumstance demands that the Preliminary Injunction be dissolved. *Doe 2*, 755 F. App'x at 22–23.

The D.C. Circuit's decision in *Doe 2* is on all fours. There, the district court preliminarily enjoined a 2017 Presidential Memorandum that the court characterized as a "blanket ban on transgender service" in the military. *Doe 2*, 755 F. App'x at 24. Subsequently, the Department of Defense ("DoD") created a panel of experts to study the issue of military service by individuals with gender dysphoria and then adopted a policy based on that extensive review and study. *Id.* at 23. The government moved to dissolve the preliminary injunction in light of the policy adopted by DoD, but the district court denied the motion because, in its view, the DoD policy was not a "significant change" from the Presidential Memorandum but rather, an "implementation of the policy directives [previously] enjoined" by the Court. *Id.*

The D.C. Circuit reversed and vacated the preliminary injunction, finding that "[i]t was clear error to say there was no significant change." *Id.* at 22. The D.C. Circuit explained, among other things, that in issuing the policy, DoD "took substantial steps to cure the procedural deficiencies the court identified in the enjoined 2017 Presidential Memorandum," including by consulting with military and medical experts and considering other relevant evidence. *Id.* Dissolution was also in the public interest because, among other things, the DoD policy "accommodates at least some of Plaintiffs' interests." *Id.* at 25. Specifically, the DoD policy "contains a reliance exemption that [would] allow at least some transgender service members to

10

continue to serve." *Id.* at 24.  Moreover, the court emphasized that "while the executive and legislative branches remain subject to the limitations of the Constitution," courts "must be particularly careful not to substitute [their] judgment of what is desirable for that of the executive and legislative branches, or [their] own evaluation of evidence for their reasonable evaluation" because "[i]t is difficult to conceive of an area of governmental activity in which the courts have less competence." *Id.* (citation omitted) (original brackets omitted).

Here, like *Doe 2*, BOP "took substantial steps to cure the procedural deficiencies the court identified in the enjoined [memoranda]." *Doe 2*, 755 F. App'x at 22.  While the Court previously found that the challenged memoranda did not reflect reasoned decision-making and the "*only* explanation" was "that the Executive Order required the adoption of those policies," *Kingdom*, 2025 WL 1568238, at *10, in issuing the 2026 Policy, BOP conducted extensive reviews of relevant information, considered the relevant issues, and reasonably explained its decision. Ex. 1 (Admin. Rec.); Ex. 2 (Memo.).  For example, based on these extensive reviews, BOP determined that it is not possible to draw evidence-based conclusions about long-term outcomes of cross-sex hormones due to the limited reliable evidence base; well-documented side-effects of cross-sex hormones; lack of medical necessity of social accommodations, sex trait modification surgery, and cross-sex hormones, particularly in the correctional setting; and significant security and safety risks inherent in providing certain gender-dysphoria care in a carceral setting.  Ex. 1; Ex. 2.  Any failure perceived by the Court "to meet the procedural strictures of the APA" with respect to the challenged memoranda is not present in the superseding 2026 Policy.  *See Kingdom*, 2025 WL 1568238, at *12.

Lastly, like *Doe 2*, dissolution is in the public interest.  First, in providing safe and proven methods of gender dysphoria treatment and requiring individualized tapering plans (including

11

plans where it might not be appropriate to cease hormones in certain circumstances), the 2026 Policy "accommodates at least some of Plaintiffs' interests." *See Doe 2*, 755 F. App'x at 25.

Second, the President, as the head of the Executive Branch with ultimate responsibility for the operation of its prisons, has determined that federal funds should not be used to conform an inmate's appearance to that of the opposite sex. EO 14168, § 4(c).[3] There is a strong public interest in allowing the Executive Branch to implement administration policies. *See, e.g., Talbott v. United States*, No. 25-5087, 2025 WL 3533344, at *11 (D.C. Cir. Dec. 9, 2025) ("Injunctions that 'improperly intrude' on the Executive Branch often inflict irreparable injury." (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 859 (2025))). Similarly, there is also a strong public interest in deferring to the democratic process and allowing "laws embodying the will of the people" to be implemented "in a manner consistent with the Constitution." *Washington State Grange v. Washington State Repub. Party*, 552 U.S. 442, 451 (2008). This Court has "readily endorse[d] this principle, and agree[d] that it weighs in the defendants' favor," but found only "modestly" so at the time of the preliminary injunction because, "[j]ust as the Executive Order was issued by a democratically elected President with a platform to implement, so too is the [APA] the output of democratic processes, namely the constitutional schema of bicameralism and presentment." *Kingdom*, 2025 WL 1568238, at *12. Because the Court's APA procedural concern was premised on implementing memoranda that have been superseded by a new agency action—and that same procedural concern is not present with respect to the issuance of the 2026 Policy—the public interest in deferring to the democratic process now tilts heavily in the government's favor.

---

[3]   As BOP explained, though EO 14168 "supports" the new Policy, BOP "also adopt[ed] this policy independently of" EO 14168. 2026 Policy (ECF No. 125) at 6; *see also* Ex. 2, at AR5, 15, 19, 29.

Third, the PLRA shows that the public interest favors dissolving the Preliminary Injunction. The PLRA requires courts to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system" by prospective relief. 18 U.S.C. § 3626(a)(2). Preventing BOP from implementing the 2026 Policy harms the public interest because it endangers prison administration and security, which supports dissolution of the Preliminary Injunction. *See* Ex. 1, at AR2–3; Ex. 2, at AR10–13, 18–20, 28–30; *cf., e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."). In fact, as the Supreme Court has recognized, "[i]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973); *see also Hatim v. Obama*, 760 F.3d 54, 59 (D.C. Cir. 2014).

## CONCLUSION

For these reasons, the Court should grant Defendants' motion and dissolve the preliminary injunction. Defendants have conferred with Plaintiffs' counsel about this motion, pursuant to Local Rule 7(m). Counsel stated that Plaintiffs oppose.

Dated: April 1, 2026                    Respectfully submitted,

                                        BRETT A. SHUMATE
                                        Assistant Attorney General

                                        JEAN LIN
                                        Special Litigation Counsel

                                        /s/ *M. Jared Littman*
                                        M. JARED LITTMAN
                                        ELIZABETH B. LAYENDECKER
                                        Trial Attorneys

13

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
Jared.littman2@usdoj.gov

14