**ADMINISTRATIVE RECORD**

The goal of the Bureau of Prisons (BOP) is to deliver medically necessary health care to inmates effectively in accordance with proven standards of care without compromising public safety concerns inherent to BOP's overall mission. *See* Program Statement 6010.05.

BOP's clinical guidance is aimed to reflect the evolving nature of treatment, based on what is considered the "community standard," while translating it to a carceral environment. No single source is used in writing clinical guidance. Robust clinical guidance is ideally built on high-quality research, such as randomized controlled trials, systematic reviews, and well-designed observational studies. But not every diagnostic tool, condition, or treatment plan is well understood. Medical providers are therefore reliant on expert opinions, peer reviewed sources, and medical societies or organizations. As this administrative record will show, treatment of gender dysphoria is an evolving science; involves a field of medicine that is continuously shaped by advances in psychology, ethics, and public health; and implicates sensitive safety, security, and prison-administration concerns.

BOP is tasked with providing essential medical, dental, and mental health (psychiatric) services in a manner consistent with accepted community standards that are supported by reliable evidence for a correctional environment. Providing medically necessary care, which is informed by the community standard of care as translated into the carceral setting, is an important tenet of correctional health care and must be viewed in light of the correctional environment's unique safety, security, and administration concerns. But within this context, challenges exist in defining appropriate clinical guidance for patients who are diagnosed with gender dysphoria in a carceral setting.

On January 20, 2025, President Trump issued Executive Order 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8, 615 (Jan. 30, 2025). Section 4(c) of the Executive Order provided, "The Attorney General shall ensure that the Bureau of Prisons (BOP) revises its policies concerning medical care to be consistent with this order and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." "This Order shall be implemented consistent with applicable law[.]" *Id.* § 8(b).

In evaluating its medical policies, BOP considered the relevant issues, factors, information, and sources, including conducting extensive reviews of existing research, medical expert opinions, medical journals, national media reports, recent medical studies, state correctional policies, BOP's prior policies, and pertinent case law.

As a result of this research and as further explained in the accompanying memorandum to the Administrative Record, BOP has revised its policy to reflect treatment for gender dysphoria that is more aligned with the latest scientific information and consistent with BOP's longstanding policy of providing medical care that is tailored to the unique needs of the inmate. *See* Program Statement 5260.01, *Management of Inmates with Gender Dysphoria*, Federal Bureau of Prisons (Feb. 19, 2026). For example, BOP's reviews found, based on the best reliance evidence, that

providing hormones to inmates diagnosed with gender dysphoria is generally not medically necessary to address gender dysphoria. The reliable evidence base for the care of gender dysphoria with hormone interventions is limited. Existing studies are small in sample size, short in duration, observational rather than randomized, and focused on narrowly defined populations. For all these reasons, it is not possible to draw evidence-based conclusions about long-term outcomes of hormone use in persons diagnosed with gender dysphoria while there is well documented side effects and downsides flowing from hormone use. Providing hormone interventions in a carceral setting is further complicated because of heightened security risks and other prison-administration concerns. It is therefore appropriate to focus treatment for gender dysphoria in a carceral setting on non-hormone modalities that generally are available to those in the custody of the BOP, such as psychotherapy. Further, the tapering of hormones for inmates currently receiving hormone therapy is feasible if performed through the appropriate process and closely monitored by health and mental health providers, as required by Program Statement 5260.01.

Providing inmates with hormones to address gender dysphoria creates safety, security, and prison-administration concerns for both the inmate receiving hormones and for correctional staff. For example, the physical changes that may occur as a result of cross-sex hormones, such as the growth of breasts and the feminization of their faces and voices, increases the risk of victimization by other inmates. BOP incarcerates sexual predators and other violent individuals who have a tendency to prey upon inmates who appear feminine, including due to hormones or social accommodations, requiring BOP staff to devote more attention and time to keeping these inmates safe. For instance, BOP staff spend a significant amount of time ensuring these inmates have appropriate cellmates and often use additional resources managing these inmates in protective custody. Staff members' personal safety is also at an increased risk when they must intervene to stop fights between inmates or predatory behavior.

Similarly, providing or allowing access to social accommodations to some inmates and not to others causes animosity between inmates, which creates additional safety, security, and prison-administration concerns. Inmates who do not receive social accommodations may feel resentful for not being able to receive additional items from the commissary. Historically, providing certain items to one group of inmates and not another creates conflict within BOP facilities. Further, allowing inmates to use social accommodations, such as wearing makeup and feminine undergarments, increases the risk that those inmates will be targeted. Allowing inmates to have these social accommodations also requires BOP staff to spend more time and resources ensuring the safety of these inmates. Finally, providing social accommodations increases the risk of inmates concealing contraband and escaping from facilities and can hinder investigation of intra-prison incidents.

Finally, inmates have also threatened self-harm and suicide to obtain sex trait modification interventions, such as hormones and social accommodations. The availability of cross-sex hormones and social accommodations can create improper incentives for inmates to harm themselves.

Providing sex trait modification surgeries also jeopardizes the safety, security, and administration of BOP facilities because inmates receiving these surgeries are at higher risk of harassment due to their appearance. This increased risk results in BOP expending additional time and resources to

2

ensure the protection of these inmates. Transferring such inmates to opposite-sex facilities is not an acceptable way to mitigate these safety, security, and prison-administration concerns as it would then create security, safety, and privacy issues for the inmates of the opposite sex. For example, the presence of a male in close quarters with female inmates may harm the emotional and physical well-being of some female inmates, particularly those who have suffered from sexual abuse.

Based on a review of the practice of housing males in female facilities, BOP has decided to discontinue this practice. The previous practice potentially increases the risk of violence and sexual assault for women housed in the female facilities. Housing female inmates with men also compromises the female inmates' privacy. This is especially true when women are forced to sleep and shower in spaces with men.

**Research of State Policies**

Florida
Florida Department of Corrections Office of Health Services, Bulletin No. 15.05.23 titled Mental Health Treatment of Inmates with Gender Dysphoria.

California
- California Correctional Health Care Services, Care Guide on Gender Dysphoria. (2015)
- California Correctional Health Care Services Referral for Consideration of Gender Affirming Surgery. (2023)
- California Correctional Health Care Services, Care Guide on Transgender (2025)

Kentucky
Kentucky Corrections Policies and Procedures on Lesbian, Gay, Bisexual, Transgender and Intersex Offenders.

Oklahoma
Oklahoma Department of Corrections Policies on Determination and Management of Inmates with Gender Dysphoria.

Minnesota
Department of Corrections Management and Placement of Incarcerated People Who are Transgender, Gender Diverse, Intersex, or Nonbinary

**Review of Case Studies**

As further explained in the accompanying memorandum to the Administrative Record, the study of gender dysphoria in the carceral community is relatively new, which hampers the ability to reference a community standard of care. Compared with other illnesses or conditions, Gender dysphoria has had a newer, more rapidly evolving clinical landscape (Fraser, L., 2015). A recent and swift evolution of community clinical guidance makes it more difficult to determine where the standard of care currently lies. For example, the World Professional Association for Transgender Health's (WPATH) initial guidance recommended as recently as 1990 a treatment model for gender dysphoria with strict eligibility requirements for diagnosis, evaluations from separate mental

AR-000003

health providers, and required psychotherapy. This stands in contrast with later versions of the WPATH guidance, which reduced or eliminated these requirements (Fraser, L., 2015 & Coleman, E., et al., 2022).

Moreover, recent investigations have called into question WPATH's current recommendations, making determining the community standard even more challenging (Block, J., 2024). Other nations such as Sweden, Denmark, France, and the United Kingdom have distanced themselves from the stance of U.S. organizations such as WPATH, particularly related to care of minors and young adults, due to concerns about the body of research and potential research bias, among other things (Galvin, G., 2024). The recent divergence in global recommendations on proper care for this population leads to challenges in determining a set community standard, especially in the carceral setting. Other leading community organizations are similarly reevaluating their clinical guidance for patients diagnosed with gender dysphoria, in light of recent information. For example, the University of California at San Francisco, long known for its clinical guidance in this area, is currently undergoing a revision of its recommendations for this population (UCSF, n.d.).

A 2020 systematic review of available studies "found insufficient evidence to determine the efficacy or safety of hormonal treatment approaches for transgender women in transition"—it concluded that "[t]he evidence is very incomplete, demonstrating a gap between current clinical practice and clinical research." Haupt et al., *Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women*, 11 Cochrane Database of Systematic Reviews, Art. No. CD013138, at 2, 11 (2020). Another systematic review of studies concluded that it was "impossible to draw conclusions about the effects of hormone therapy on death by suicide" because of the "low" "strength of evidence." Kellan E. Baker, et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, 5 J. Endocrine Soc. 1, 12-13 (2021).

BOP reviewed recent studies that indicated that there are significant risks accompanying hormone interventions used to address gender dysphoria. For example, evidence showed that males who are treated with estrogen have twenty-two times the likelihood to develop breast cancer. *See* Rakesh R. Gurrala et al., *The Impact of Exogenous Testosterone on Breast Cancer Risk in Transmasculine Individuals*, 90(1) Annals of Plastic Surgery 96 (2023).

BOP also concluded that hormone-based interventions for gender dysphoria are fraught with serious risks. There are non-surgical, non-hormone related interventions that have been shown to address gender dysphoria effectively—specifically, "[s]ocial support and psychotherapy are widely recognized approaches." *K.C. v. Individual Members of the Med. Licensing Bd. of Ind.*, 121 F.4th 604, 610-11 (7th Cir. 2024) (citing Danyon Anderson et al., *Gender Dysphoria and Its Non-Surgical and Surgical Treatments*, 10 Health Psych. Rsch., 4 (2022)).

For additional details and cites, please see attached memorandum.

AR-000004