# Memorandum on Program Statement 5260.01, Management of Inmates with Gender Dysphoria (Feb. 19, 2026)

## I.        Introduction

On January 20, 2025, the President issued Executive Order 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615 (Jan. 30, 2025), which prohibited the Bureau of Prisons (BOP) from expending federal funds for "any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex" "to the extent consistent with applicable law." *Id.* at 8,617-18. In light of Executive Order 14,168 and BOP's own independent judgment, BOP has reevaluated its policies regarding inmates and gender dysphoria.

BOP's general policy is to "deliver medically necessary health care to inmates effectively in accordance with proven standards of care without compromising public safety concerns inherent to the Bureau's overall mission." BOP Program Statement (PS) 6010.05 §1, Health Services Administration. Though BOP considers community standards of care, BOP must consider such standards in light of the unique nature of the carceral environment. In evaluating its policies on gender dysphoria, BOP considered the relevant issues, factors, information, and sources, including conducting extensive reviews of existing research, medical expert opinions, medical journals, national media reports, recent medical studies, state correctional policies, BOP's prior policies, and pertinent case law.

For example, BOP has considered the standards of care issued by the World Professional Association for Transgender Health (WPATH) and other organizations, such as the Endocrine Society. BOP has determined that WPATH's standards of care and other guidelines issued by similar organizations are not reliable or at a minimum, show that medical interventions to address gender dysphoria are highly controversial, medically disputed, and insufficiently proven by appropriate evidence. In addition, the recent debate regarding WPATH's standards and other organizations' guidelines support reevaluation of policies regarding gender dysphoria, particularly in the correctional context.

WPATH has recently been characterized as not "political neutral," *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019), and as an "advocacy organization," whose "lodestar is ideology, not science," *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1261 (11th Cir. 2024) (Lagoa, J., concurring); *see, e.g.*, *United States v. Skrmetti*, 605 U.S. 495, 543 (2025) (Thomas, J., concurring) ("Recent revelations suggest that WPATH, long considered a standard bearer in treating pediatric gender dysphoria, bases its guidance on insufficient evidence and allows politics to influence its medical conclusions." (citation omitted)); *Edmo v. Corizon, Inc.*, 949 F.3d 489, 497 (9th Cir. 2020) (O'Scannlain, J., opinion respecting the denial of reh'g en banc) ("The WPATH Standards are merely criteria promulgated by a controversial private organization with a declared point of view."); Expert Report of Kristopher E. Kaliebe, M.D., ¶63 (Sept. 19, 2025) (hereinafter "Kaliebe Decl.") ("WPATH's internal documents clearly show that WPATH is an advocacy organization and not a scientific one."); *Nondiscrimination in Health & Health Education Programs or Activities*, 85 Fed. Reg. 37,160, 37,186-98 (June 19, 2020) (calling WPATH "an advocacy group" and explaining that the U.S. Department of Health and Human

AR-000005

Services did not consider WPATH's guidelines to be based on "independent scientific fact-finding"); *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, U.S. Dep't Health and Human Services, 170 (Nov. 19, 2025) ("This combination of poorly managed COIs [conflicts of interests] and restrictive membership practices significantly undermines the credibility and scientific integrity of SOC-8 as a clinical practice guideline. The GDG's [guideline development group's] handling of … evidence WPATH commissioned for development of SOC-8 further highlights the serious threat to clinical integrity that plagued the guideline development process."); Executive Order 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8,771, 8,771 (Feb. 3, 2025) (finding that WPATH "lacks scientific integrity"). And WPATH's standards have been described as being based on "self-referencing consensus rather than evidence-based research" and "built … on concededly weak evidence." *See, e.g.*, *Skrmetti*, 605 U.S. at 544 (Thomas, J., concurring) ("WPATH appears to rest [its conclusions] on self-referencing consensus rather than evidence-based research."); *id.* at 547 (WPATH and other "prominent medical professionals … have built their medical determinations on concededly weak evidence" and "have surreptitiously compromised their medical recommendations to achieve political ends."); *K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, 121 F.4th 604, 611 (7th Cir. 2024) ("Some have expressed doubt about whether WPATH's guidelines actually reflect medical consensus as to treatments for gender dysphoria."); Kaliebe Decl. ¶¶60-82.

An expert has persuasively opined that "WPATH has violated many principles underpinning medical ethics and research and contributed to widespread publication bias in gender medicine," Kaliebe Decl. ¶63, and that "WPATH openly engages in ideologically-based political advocacy, systematically misrepresents evidence, and often bases its recommendations, no matter how impactful for the patient, on low-quality supporting evidence," Kaliebe Decl. ¶60. Countries that once looked to WPATH and other organizations in the United States have begun to backtrack and distance themselves from WPATH and these other organizations. *See, e.g.*, Gabriela Galvin, *The UK is the latest country to ban puberty blockers for trans kids. Why is Europe restricting them?*, Euro News (Dec. 13, 2024); *Skrmetti*, 605 U.S. at 537-38 (Thomas, J., concurring). Other organizations are similarly reevaluating their clinical guidance for patients suffering from gender dysphoria, in light of recent debate. For example, the University of California at San Francisco, known for its clinical guidance in this area, is currently undergoing a revision of its recommendations for this population. *See Gender Affirming Health Program*, University of California San Francisco, https://transcare.ucsf.edu/guidelines.

WPATH's standards are particularly unreliable when it comes to prisoners. *See, e.g.*, Kaliebe Decl. ¶60. WPATH recommended that sex-trait-modification interventions, including surgery, hormones, and social accommodations, should be provided to inmates in correctional facilities before a meaningful number of inmates had such interventions. *See, e.g.*, *Edmo*, 949 F.3d at 497-98 (O'Scannlain, J., opinion respecting the denial of reh'g en banc). In fact, when WPATH published the current version of the standards, a small number of inmates in the United States had ever received sex-trait-modification interventions, there were no reliable studies on such interventions in the correctional context, and WPATH failed to adequately consider or address the

AR-000006

special challenges of the inmate population. *See, e.g.*, *id.* (O'Scannlain, J., opinion respecting the denial of reh'g en banc); Kaliebe Decl. ¶79.

Guidelines from other organizations are similarly unpersuasive as WPATH's. The Endocrine Society, for example, has received similar criticism to WPATH. *See, e.g.*, *K.C.*, 121 F.4th at 611 ("But the most influential voices in this group have been two professional organizations—the Endocrine Society and the World Professional Association for Transgender Health…. But these organizations have not evaded criticism."); *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, U.S. Dep't Health and Human Services, 14 (Nov. 19, 2025). This is unsurprising given that WPATH and the Endocrine Society collaborated on their guidelines. *See* Kaliebe Decl. ¶74 ("the WPATH and Endocrine Society collaborated, meaning a very small, interconnected group of WPATH members led to the creation of multiple guidelines among multiple medical organizations"). And WPATH's guidelines have also influenced other organization guidelines, making those guidelines similarly unpersuasive. *See* Kaliebe Decl. ¶75 ("WPATH's unreliable and low-quality recommendations have infected other guidelines, causing a systematic distortion of clinical guidance.").

In sum, BOP does not find WPATH's or other organizations' similar standards or guidelines persuasive. *See* Kaliebe Decl. ¶60 ("WPATH and other affirmative guidelines regarding the care of people with Gender Dysphoria should neither be treated as authoritative nor be used to determine care for Gender Dysphoria."). If anything, recent discussions show that the appropriateness of sex-trait-modification interventions to address gender dysphoria is subject to "fierce scientific and policy debates about the[ir] safety, efficacy, and propriety," and filled with "sincere concerns" with "profound" implications, *Skrmetti*, 605 U.S. at 525; *see, e.g.*, *Gibson*, 920 F.3d at 221 ("the WPATH Standards of Care [and the guidelines of other organizations] reflect not consensus, but merely one side in a sharply contested medical debate"); *Haverkamp v. Linthicum*, 152 F.4th 618, 625 n.7 (5th Cir. 2025) (same); *Clark v. Valletta*, 157 F.4th 201, 206 (2d Cir. 2025) ("how to treat that disorder [*i.e.*, gender dysphoria] is not settled in the scientific and medical community"); *id.* at 216 ("as the record reflects, medical experts disagree about how to treat gender dysphoria").

For at least these reasons and the others discussed in this memorandum, it was prudent for BOP to reevaluate its policies regarding gender dysphoria, as those policies unreasonably relied on these organizations, these organizations' guidelines, and other biased sources regarding interventions to address gender dysphoria. After considering the relevant issues and factors and weighing the relevant considerations, BOP has revised its policy to reflect treatment for gender dysphoria that is more aligned with the latest scientific information, that is consistent with BOP's longstanding policy of providing medical care that is tailored to the unique needs of the inmate, and that accounts for the complex security and administration concerns in the correctional environment. *See* Program Statement 5260.01, *Management of Inmates with Gender Dysphoria*, Federal Bureau of Prisons (Feb. 19, 2026).

As further explained below, BOP has adopted Program Statement 5260.01. That policy requires an individualized treatment plan for each inmate that is diagnosed with gender dysphoria.

AR-000007

The individualized treatment plan may include psychotherapy, group counseling, psychiatric services, and psychotropic medications.

BOP will not provide sex trait modification surgeries to address gender dysphoria, but BOP will provide care necessary to address any complications or resulting conditions from such surgeries, such as urethral stricture and pelvic infections.

BOP will not provide social accommodations to address gender dysphoria and when practicable, will remove or confiscate social accommodations.

If an inmate is diagnosed with gender dysphoria but is not currently receiving hormones to address gender dysphoria, BOP will not provide hormones to address the inmate's gender dysphoria. If an inmate is previously and currently diagnosed with gender dysphoria and is currently receiving hormones to address gender dysphoria, BOP will develop a tapering plan for each inmate after consideration of appropriate factors. For inmates that have recently begun receiving hormones to address gender dysphoria, the tapering plan will include a rapid discontinuation of the hormone intervention. For inmates that have been receiving hormones to address gender dysphoria for an extended period of time, the tapering plan will generally include an appropriately paced discontinuation of the hormone intervention. For inmates who (1) are post sex trait modification surgery or (2) have been receiving hormones to address gender dysphoria for an extended period of time and develop severe physiological and psychological withdrawal effects from tapering, it may not be appropriate in all cases for the initial tapering plan to include cessation of hormones.

Nothing in Program Statement 5260.01 prevents a prison official from providing care required by federal law, including the Eighth Amendment to the U.S. Constitution. And under Program Statement 5260.01 and other BOP policies, BOP will ensure that all inmates diagnosed with gender dysphoria receive care in accordance with federal law, including the Eighth Amendment to the U.S. Constitution.

## II.   Program Statement 5260.01, Management of Inmates with Gender Dysphoria (Feb. 19, 2026)

### A.   Sex Trait Modification Surgeries

After considering the relevant issues and factors and weighing the relevant considerations, BOP adopts a policy prohibiting sex trait modification surgeries to address gender dysphoria, but for inmates who have had sex trait modification surgery, medical care will be provided as necessary to address any complications or resulting conditions, such as urethral stricture and pelvic infections. Sex trait modification surgeries are not medically necessary to address gender dysphoria. Sex trait modification surgeries are highly controversial, medically disputed, and unproven by appropriate evidence; or at the very least, there is reasonable debate about the efficacy of sex trait modification surgeries to address gender dysphoria. To the extent there is uncertainty about the efficacy of sex trait modification surgeries to address gender dysphoria, that uncertainty counsels against providing such controversial interventions when there are other more established treatments, such as psychotherapy, available. Even assuming sex trait modification surgeries are

4

medically necessary or appropriate to address gender dysphoria, BOP concludes that sex trait modification surgeries in the secure prison environment raise numerous security and prison-administration concerns, and each concern, whether considered separately, cumulatively, or in any combination, outweighs any costs from Program Statement 5260.01, any reliance interests, and any benefits from providing sex trait modification surgeries. In BOP's judgment, and after considering the relevant issues and factors and weighing the relevant considerations, prohibiting sex trait modification surgeries is reasonable and appropriate to provide adequate care to inmates diagnosed with gender dysphoria; is reasonable and appropriate to maintain internal order, discipline, and institutional security of the correctional environment; and outweighs any asserted benefit, costs, or interests from allowing sex trait modification surgeries.

      **1.**      **Sex trait modification surgeries are not medically necessary to address gender dysphoria.**

BOP's general policy is to "deliver medically necessary health care to inmates effectively in accordance with proven standards of care without compromising public safety concerns inherent to the Bureau's overall mission." PS 6010.05 §1, Health Services Administration. BOP also provides inmates with gender dysphoria care to address the condition, including individualized treatment plans that may include psychotherapy, group counseling, psychiatric services, and psychotropic medications.

After considering the relevant issues and factors and weighing the relevant considerations, BOP concludes that sex trait modification surgeries are not medically necessary to address gender dysphoria, especially in the correctional context. Sex trait modification surgeries are highly controversial, medically disputed, and unproven by appropriate evidence. Medical professionals, at the very least, reasonably disagree on the efficacy of sex trait modification surgeries to address gender dysphoria, particularly in the correctional context. Sex trait modification surgeries are not "medically necessary" or "in accordance with proven standards of care." PS 6010.05 §1, Health Services Administration. It is reasonable for BOP to not provide medically disputed or insufficiently proven interventions to inmates, especially when those interventions may result in irreversible effects or harms.

Medical professionals have persuasively explained that sex trait modification surgeries are not medically necessary. *See, e.g.*, Kaliebe Decl. ¶21 ("Cross-sex surgeries are not medically necessary and should not be made available in correctional environments."); *id.* ¶155 (same); *id.* ¶118 ("Cross-sex surgeries have not been shown to be medically necessary."). At the very least, sex trait modification surgeries are highly controversial and subject to reasonable medical disagreement. *See, e.g.*, *Gibson*, 920 F.3d at 216 ("For it is indisputable that the necessity and efficacy of sex reassignment surgery is a matter of significant disagreement within the medical community."); *id.* at 221 ("sex reassignment surgery is medically controversial"); *id.* at 226 ("sex reassignment surgery remains an issue of deep division among medical experts"); *id.* ("the undisputed medical controversy over sex reassignment surgery"); *Haverkamp*, 152 F.4th at 625 ("there remains 'significant disagreement within the medical community' about whether sex-reassignment surgery is an 'effective treatment for gender dysphoria'"); *Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014) (en banc). There is little (if any) reliable evidence showing that sex trait

5

modification surgeries treat gender dysphoria. *See, e.g.*, Kaliebe Decl. ¶¶118-30. In any event, there is no reliable evidence showing that sex trait modification surgeries treat gender dysphoria in the correctional environment. *See, e.g.*, Kaliebe Decl. ¶118 ("These surgeries have substantial risks, and there is little, if any, reliable data supporting that such surgeries cause meaningful long-term benefits in improving mental health or reducing suicide risks. This is particularly true in prison settings. Indeed, there are no controlled studies, high-quality evidence, or reliable evidence on sex-trait modification, such as through cross-sex surgery, of inmates with Gender Dysphoria in the carceral setting."). Sex trait modification surgery can prolong symptoms of gender dysphoria, undermine other treatments to address gender dysphoria, worsen symptoms of gender dysphoria, and cause other physical and psychological harms. *See, e.g.*, Kaliebe Decl. ¶¶118-30; *id.* ¶129 ("Cross-sex surgeries can have serious complications, some of which are lifelong…."); *id.* ¶130 ("As such, with the known harms to healthy tissue, potential increased risk of psychiatric decompensation, technical issues such as wound care, potential surgical complications, potential life-long health complications, and unclear mental health benefits, cross-sex surgeries within the correctional environment are not medical necessary."). To the extent that sex trait modification surgeries might have short-term benefits to addressing gender dysphoria in the correctional context, they are outweighed by the potential long-term harm. *See, e.g.*, Kaliebe Decl. ¶¶118-30. In any event, BOP determines that it is reasonable to not provide sex trait modification surgeries given the uncertainty in long-term benefit and its potential irreversibility.

Even if there is some reliable evidence that sex trait modification surgeries address gender dysphoria when the individual is in society at large, the evidence does not sufficiently support that sex trait modification surgeries address gender dysphoria in the correctional environment. What a person may want or need to address gender dysphoria outside prison says little (if anything) about what that person should have access to in a secure prison environment. *See, e.g.*, Kaliebe Decl. ¶142 ("The concept of social transitioning through social accommodations, hormones, or surgery is out of place in the correctional context because an inmate does not live in society at large but a secure prison environment."); *id.* ¶118. That is especially true given that inmates often present unique backgrounds not readily present in individuals in society at large. *See, e.g.*, Kaliebe Decl. ¶¶127, 141-43.

Again, BOP provides inmates with gender dysphoria with individualized treatment plans with well-established treatment methods for gender dysphoria, such as psychotherapy, group counseling, psychiatric services, and psychotropic medications. Sex trait modification surgeries are not medically necessary or at a minimum, there is reasonable disagreement as to their efficacy, such that it is reasonable for BOP to not provide the intervention. In BOP's judgment, it is reasonable and appropriate to provide these individual treatment plans without the prospect of providing or allowing access to sex trait modification surgeries to address gender dysphoria.

> **2.    Security and prison-administration concerns support Program Statement 5260.01's prohibition on sex trait modification surgeries.**

BOP's general policy is to "deliver medically necessary health care to inmates effectively in accordance with proven standards of care *without compromising public safety concerns inherent to the Bureau's overall mission*." PS 6010.05 §1, Health Services Administration (emphasis

AR-000010

added). BOP is responsible for "the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. §4042(a). Providing sex trait modification surgeries to inmates, including to address gender dysphoria, raises serious security and prison-administration concerns. These security and prison-administration concerns independently support BOP's adoption of a prohibition on providing inmates sex trait modification surgeries to address gender dysphoria. The security and prison-administration concerns, when considered separately, cumulatively, or in any combination, outweigh the benefits (medical or otherwise) from providing sex trait modification surgeries. Thus, even if sex trait modification surgeries address gender dysphoria, BOP, after considering the relevant issues and factors and weighing the relevant considerations, determines that it is reasonable and appropriate to not provide or allow access to sex trait modification surgeries to address gender dysphoria.

Sex trait modification surgeries jeopardize the security, safety, and prison administration of correctional facilities in at least three ways. First, the inmate receiving sex trait modification surgery will experience increased risk of the inmate becoming a target for attacks, which increases harm to the targeted inmate and the prison officials tasked with protecting the inmate. Second, special treatments, such as providing or allowing access to sex trait modification surgeries to address gender dysphoria, raise fairness concerns and can breed resentment among other inmates, which can lead to violence. Third, granting sex trait modification surgeries conflicts with a reasonable practice of refusing to reward threats of self-harm and may even increase self-harm. Each of BOP's security and prison-administration concerns, whether considered cumulatively, separately, or in any combination, outweighs any asserted benefits from providing or allowing access to sex trait modification surgeries to address gender dysphoria.

First, prohibiting sex trait modification surgeries reduces the chance of an inmate being targeted by other inmates. "Recognizing that reasonable concerns would arise regarding a post-operative, male-to-female transsexual being housed with male prisoners takes no great stretch of the imagination." *Kosilek*, 774 F.3d at 93. The inmate would inevitably become a target for abuse in the male facility. *Cf., e.g.*, *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1275 (11th Cir. 2020) (noting the "obvious[]" consequence of permitting a male inmate to dress and be groomed as a female "would inevitably become a target for abuse in an all-male prison"). And based on BOP's experience and expertise, these same concerns also apply to women's correctional facilities, which also experience meaningful amounts of harassment and violence. *See, e.g.*, Emily Buehler, *Substantiated Incidents of Sexual Victimization Reported by Adult Correctional Authorities*, 2016-2018, U.S. Dep't of Justice, 18 (2023) (noting that 31% of the recorded incidents of inmate-on-inmate sexual harassment occurred in female correctional facilities).

Sex trait modification surgeries not only put the inmate at additional risk of assault or harassment but also endanger "the prison employees who would have to step in to protect" the inmate and will require expending already limited resources to address these risks. *Keohane*, 952 F.3d at 1263. Preventing such attacks would require prison officials to be more vigilant in protecting the inmates from assault or harassment, despite BOP's limited resources.

It is insufficient to point to transfer to mitigate these security and prison-administration complications from sex trait modification surgeries. For example, a transfer of a post-operative

7

male to a female facility will increase the risk of harm of female inmates. *See* Kaliebe Decl. ¶139 ("[H]ighly relevant is the fact that the presence of a biological male in close quarters in a female prison could significantly harm the emotional and physical well-being of certain female prisoners, such as female victims of sexual abuse. This concern is particularly acute since female prisoners suffer from extremely high rates of sexual trauma. Placing these vulnerable female inmates with biological males could have meaningful negative effects on female inmates."); *see also, e.g.*, *Cruel and Unusual Punishment: Stopping the Dangerous Policies Putting Men in Women's Prisons*, Independent Women's Forum (Dec. 20, 2024). And based on BOP's experience and expertise, similar concerns exist for transfer of a female inmate to a male facility, as the female inmate would be a target by other male prisoners and implicate the privacy interests of male inmates.

Second, based on BOP's experience and expertise, fairness concerns counsel against providing or allowing access to sex trait modification surgeries. When inmates receive special treatment within a correctional environment, other inmates may begin to resent those receiving special treatment, which can increase the risk of retaliation against the inmate receiving special treatment and cause ripple effects throughout the correctional institution and disrupting the delicate prison environment. Fairness concerns are particularly present if such special treatment is provided to one type of facilities (*e.g.*, female facilities) and not another (*e.g.*, male facilities).

Finally, BOP has considered the issue of self-harm and has determined that a policy prohibiting sex trait modification surgeries avoids rewarding threats of self-harm and may reduce overall self-harm. Inmates frequently use threats of self-harm and suicide to try to obtain concessions from prison officials. *See, e.g.*, Kaliebe Decl. ¶148 ("In my experience working in correctional facilities and treating adult and juvenile inmates, including those diagnosed with Gender Dysphoria, inmates frequently use threats of self-harm and suicide to try to obtain concessions from prison officials."); *Kosilek*, 774 F.3d at 94 ("Such threats are not uncommon in prison settings …."). But providing sex trait modification surgeries, especially in response to threats of self-harm or suicide, could increase self-harm. *See, e.g.*, Kaliebe Decl. ¶149 ("In corrections, rewarding self-injury or threats of self-injury tends to increase overall self-harm, both for the individual patient and also within the system."). Granting such requests may establish an "unacceptable precedent," forcing "prison authorities to comply with the prisoners' particular demands." *Kosilek*, 774 F.3d at 94. Consequently, it is reasonable for prison administrators to have rules against providing inmates benefits in response to self-harm or suicide to discourage threats. *See* Kaliebe Decl. ¶150 ("Simple and clear institutional policies, such as no social transitions or no initiation of new hormone treatments, are likely to lead to the lowest level of self-harm and the least overall harm to inmates because when prisoners know the interventions they desire are not available, they are less likely to self-harm to obtain them. In other words, it is reasonable for prison administrators to have outright prohibitions of providing inmates benefits, such as unproven surgeries, special-order items, and housing placements, in response to self-harm or suicide threats to discourage false threats."); *Kosilek*, 774 F.3d at 94 (noting that such threats must be "firm[ly] reject[ed] by the authorities, who must be given ample discretion in the dealing with such situations"). BOP determines that a clear rule against sex trait modification surgeries is the most reasonable way to handle this complex issue. BOP takes threats of self-harm seriously and has protocols in place to handle these complex situations.

8

AR-000012

After considering the relevant issues and factors and weighing the relevant considerations, BOP determines that each of its security and prison-administration concerns, whether considered separately, cumulatively, or in any combination, outweighs any asserted benefits of providing sex trait modification surgeries. In addition, after considering the relevant issues and factors and weighing the relevant considerations, BOP determines that the medical concerns discussed above when considered with any of its security or prison-administration concerns—separately, cumulatively, or in any combination—outweighs any asserted benefits of providing sex trait modification surgeries.

### 3.    Other considerations do not outweigh the benefits from Program Statement 5260.01.

#### a.    *Reliance Interests and Costs*

BOP has also considered potential reliance interests, but the potential reliance interests are either illegitimate or outweighed by the benefits of Program Statement 5260.01. Indeed, after considering the relevant issues and factors and weighing the relevant considerations, BOP determines that each of its medical, security, and prison-administration concerns, whether considered separately, cumulatively, or in any combination, outweighs the asserted benefits, interests, or costs of providing or allowing access to sex trait modification surgeries.

As an initial matter, the policy prohibits future sex trait modification surgeries, and an inmate has no reasonable reliance interest in the future possibility of obtaining such surgeries. That is all the more true if sex trait modification surgeries are not medically necessary or in accordance with proven standards of care.

Even if an inmate has a currently scheduled sex trait modification surgery, the inmate still does not have legitimate reliance interests. Sex trait modification surgeries are not medically necessary or in accordance with proven standards of care. An inmate has no legitimate reliance interest in an unproven surgical intervention. Nor does an inmate have a legitimate reliance interest in a surgical intervention that is, at a minimum, subject to reasonable debate in the medical community.

In any event, even if the prospect of sex trait modification surgeries created legitimate reliance interests, the interests are not weighty. Providing sex trait modification surgeries has not been a longstanding, formal policy of BOP, and access to medical interventions has always been subject to security concerns. *See, e.g.*, PS 6010.05 §1, Health Services Administration; PS 5538.08, Escorted Trips. Further, the policy has always been subject to change, including based on security and prison-administration concerns. And the reliance interests are even smaller given, again, that sex trait modification surgeries are not medically necessary, unproven, or medically disputed.

Moreover, implementing Program Statement 5260.01 will incur, at most, *de minimis* costs and will likely lead to savings. Program Statement 5260.01 will mitigate security and prison-administration concerns, which will reduce costs. Program Statement 5260.01 will also reduce expenditures on medical interventions that are not medically necessary or are medically disputed and on medical procedures to address potential complications from sex trait modification surgeries.

AR-000013

Expenditures on care for inmates diagnosed with gender dysphoria are unlikely to meaningfully increase. In general, BOP officials would monitor an inmate diagnosed with gender dysphoria and provide the patient with an individualized treatment plan, which would generally have care in addition to the provision of surgery. To the extent that Program Statement 5260.01 would result in increased costs, it is outweighed by other considerations or the savings from the unavailability of sex trait modification surgeries.

In sum, after considering the relevant issues and factors and weighing the relevant considerations, BOP determines that each of its medical, security, and prison-administration concerns, whether considered separately, cumulatively, or in any combination, significantly outweigh any costs, any reliance interests created by a former policy of providing or allowing access to sex trait modification surgeries, and any benefits from providing or allowing access to sex trait modification surgeries. In BOP's judgment and after considering the relevant issues and factors and weighing the relevant considerations, BOP determines that prohibiting sex trait modification surgeries is reasonable and in the best interest of the agency, its officials, and those in its custody.

### b.    *Alternatives*

BOP has considered alternatives and has determined that Program Statement 5260.01 is more reasonable than and preferable to potential alternatives.

For example, BOP has considered the option of allowing sex trait modification surgeries only for inmates that have already undergone a different sex trait modification surgery. Although Program Statement 5260.01 permits procedures to address complications with past sex trait modification surgeries, BOP does not think it is prudent to allow further surgeries that do not address complications of past surgeries. Sex trait modification surgeries are not medically necessary, are unproven, or are medically controversial; can harm the inmate; and can have long-term irreversible effects. BOP does not find it prudent to provide additional potentially harmful interventions because the inmate has already had an intervention. Even if sex trait modification surgeries are medically beneficial to address gender dysphoria, further surgeries still raise the above security and prison-administration concerns, and each of these concerns outweighs the benefits of providing or allowing access to sex trait modification surgeries in this context. In BOP's judgment, Program Statement 5260.01's handling of sex trait modification surgeries is more reasonable than and preferable to this alternative approach.

BOP has considered the option of allowing sex trait modification surgeries only for inmates that have undergone hormones to address gender dysphoria. But sex trait modification surgeries are not medically necessary, are unproven, or are medically controversial; can harm the inmate; and can have long-term irreversible effects. BOP does not find it prudent to provide this medically disputed and potentially harmful intervention because the inmate is undergoing hormones, even if the inmate has received hormones for an extended period of time. Even if sex trait modification surgeries are medically beneficial to address gender dysphoria, such surgeries still raise the above security and prison-administration concerns, including those in addition to the security and prison-administration concerns that hormones may raise. The security and prison-administration concerns outweigh the benefits of providing sex trait modification surgeries in this circumstance. In BOP's

10

AR-000014

judgment, Program Statement 5260.01's handling of sex trait modification surgeries is more reasonable than and preferable to this alternative approach.

BOP has considered a policy that would allow sex trait modification surgeries based on an inmate's individual security profile. But the inmate's security profile does not change that sex trait modification surgeries are not medically necessary, unproven, or medically controversial; can harm the inmate; and can have long-term irreversible effects. BOP does not find it prudent to provide this medically disputed and potentially harmful intervention when the inmate's security profile may be low risk. Even if sex trait modification surgeries are medically beneficial to address gender dysphoria, surgeries still raise security and prison-administration concerns: An inmate with a low-risk security profile does not sufficiently mitigate that sex trait modification surgeries increase the risk that the inmate will become a target from attacks, which increases the risk of harm to the targeted inmate and prison officials tasked with protecting the inmate. Nor does it mitigate the fairness or self-harm concerns. In BOP's judgment, Program Statement 5260.01's handling of sex trait modification surgeries is more reasonable than and preferable to this alternative approach.

BOP has considered allowing sex trait modification surgeries based on the type of custody the inmate is in. But this alternative does not change that sex trait modification surgeries are not medically necessary or at the very least, controversial and disputed. Even if sex trait modification surgeries are medically beneficial to address gender dysphoria, the above prison-administration and safety concerns persist regardless of the type of custody the inmate is in. For example, providing sex trait modification surgeries to inmates in administrative segregations or protective custody does not negate all the above security and prison-administration concerns. And even if the inmate is in more limited custody now, such as administrative segregation, the inmate likely will not always be in such custody. In BOP's judgment, Program Statement 5260.01's handling of sex trait modification surgeries is more reasonable than and preferable this alternative approach.

BOP has also considered and rejected an alternative that allows inmates to pay for sex trait modification surgeries. Such an alternative does not sufficiently mitigate the medical, security, or prison-administration concerns of allowing sex trait modification surgeries. In BOP's judgment, Program Statement 5260.01's handling of sex trait modification surgeries is more reasonable than and preferable to this alternative approach.

Finally, BOP has considered other alternatives, including a combination of the above alternatives, but BOP has determined that Program Statement 5260.01's handling of sex trait modification surgeries is better than alternative approaches and is the most reasonable approach for addressing this issue.

*     *     *

In sum, BOP issues Program Statement 5260.01 independent of Executive Order 14,168 and after considering the relevant issues and factors and weighing the relevant considerations. Program Statement 5260.01's handling of sex trait modification surgeries is justified by the medical concerns of the intervention alone. Security and prison-administration concerns bolster that determination. Further, even assuming there are medical benefits to inmates from sex trait modification surgery, Program Statement 5260.01's handling of sex trait modification surgeries is justified by security and prison-administration concerns, as each of those concerns, whether

11

AR-000015

considered separately, cumulatively, or in any combination, outweigh any costs of Program Statement 5260.01, any reliance interests, and any benefits sex trait modification surgeries provide. BOP also concludes that Program Statement 5260.01's handling of sex trait modification surgeries is more reasonable than and preferable to potential alternatives. After considering the relevant issues and factors and weighing the relevant considerations, BOP determines that Program Statement 5260.01's handling of sex trait modification surgeries is reasonable and appropriate.

## B.    Social Accommodations

After considering the relevant issues and factors and weighing the relevant considerations, BOP adopts a policy prohibiting social accommodations, including to address gender dysphoria. Social accommodations are not medically necessary to address gender dysphoria. Social accommodations are highly controversial, medically disputed, and unproven by appropriate evidence; or at the very least, there is reasonable debate about the efficacy of social accommodations to address gender dysphoria. Even assuming social accommodations are medically necessary or beneficial to treat gender dysphoria, BOP concludes that social accommodations in the secure prison environment raise numerous security and prison-administration concerns that separately, cumulatively, or in a combination outweigh any medical benefits to an inmate. In BOP's judgment, and after considering the relevant issues and factors and weighing the relevant considerations, prohibiting access to social accommodations is reasonable and appropriate to provide adequate care to inmates diagnosed with gender dysphoria; to maintain internal order, discipline, and institutional security of the correctional environment; and outweighs any asserted benefit from allowing social accommodations.

### 1.    Social accommodations are not medically necessary to address gender dysphoria.

BOP's general policy is to "deliver medically necessary health care to inmates effectively in accordance with proven standards of care without compromising public safety concerns inherent to the Bureau's overall mission." PS 6010.05 §1, Health Services Administration. BOP also provides inmates with gender dysphoria care to address the condition, including individualized treatment plans that may include psychotherapy, group counseling, psychiatric services, and psychotropic medications.

Based on BOP's review of the record and after considering the relevant issues and factors and weighing the relevant considerations, BOP concludes that social accommodations are not medically necessary to address gender dysphoria, especially in the correctional context. Social accommodations are highly controversial, medically disputed, and unproven by appropriate evidence. Medical professionals, at the very least, reasonably disagree on the efficacy of social accommodations to address gender dysphoria, particularly in the correctional context. Social accommodations are not "medically necessary" or "in accordance with proven standards of care." PS 6010.05 §1, Health Services Administration. It is reasonable for BOP to not provide medically disputed or insufficiently proven accommodations to inmates.

Medical professionals have persuasively explained that social accommodations are at most psychologically pleasing, not medically necessary. *See, e.g.*, Kaliebe Decl. ¶22 ("'Social

12

AR-000016

accommodation' is not medically necessary in the correctional setting."); *id.* ¶156 (same); *id.* ¶136 ("The fact that some social-transitioning items are psychologically pleasing to inmates with Gender Dysphoria does not mean that such interventions are medically necessary."); *Keohane*, 952 F.3d at 1274; *Bayse v. Ward*, 147 F.4th 1304, 1313 (11th Cir. 2025); *cf., e.g.*, *Fisher v. Fed. Bureau of Prisons*, 484 F. Supp. 3d 521, 534 (N.D. Ohio 2020) ("cosmetic products are not among the minimal civilized measures of life's necessities" (brackets omitted)). There is limited to no reliable evidence showing that access to social accommodations treats gender dysphoria. *See, e.g.*, Kaliebe Decl. ¶136 ("There is limited evidence suggesting that allowing cosmetic and clothing items, such binders, undergarments, makeup, wigs, and other accessories and items stereotypically associated with the opposite sex, would improve or resolve symptoms associated with Gender Dysphoria. And there is no evidence-based study or reliable evidence showing that access to such items improves or resolves symptoms in inmates with Gender Dysphoria, regardless of whether the inmate is in a facility that aligns with the inmate's biological sex or gender identity."). Social accommodations "can prolong the symptoms [of gender dysphoria] and undermine psychotherapy, and there is no clear evidence of medical benefit." Kaliebe Decl. ¶136. To the extent that social accommodations might have short-term benefits to addressing gender dysphoria in the correctional context, they are outweighed by the potential long-term harm. *See, e.g.*, Kaliebe Decl. ¶140 ("[W]hile social transition might decrease inmate-patients' discomfort in the short term, it ultimately may cause long-term harm, such as continuation of Gender Dysphoria."). In any event, BOP determines that it is reasonable to no longer provide access to social accommodations given the uncertainty in long-term benefit.

Even if there is some reliable evidence that social accommodations address gender dysphoria when the individual is in society at large, the evidence does not support that social accommodations address gender dysphoria in the correctional environment. The concept of access to social accommodations is out of place in the correctional context because an inmate does not live in society at large but rather a secure prison environment. What a person may want or need to socially transition outside prison says little (if anything) about what that person should have access to in a secure prison environment. *See, e.g.*, Kaliebe Decl. ¶142 ("The concept of social transitioning through social accommodations, hormones, or surgery is out of place in the correctional context because an inmate does not live in society at large but a secure prison environment.").

Again, BOP provides inmates with gender dysphoria with individualized treatment plans with well-established treatment methods for gender dysphoria, such as psychotherapy, group counseling, psychiatric services, and psychotropic medications. Social accommodations are not medically necessary or at a minimum, there is reasonable disagreement as to their efficacy, such that it is reasonable for BOP to not provide social accommodations. In BOP's judgment, it is reasonable and appropriate to provide these individual treatment plans without the prospect of providing or allowing access to social accommodations to address gender dysphoria.

AR-000017

**2.   Security and prison-administration concerns support Program Statement 5260.01's prohibition on social accommodations.**

BOP's general policy is to "deliver medically necessary health care to inmates effectively in accordance with proven standards of care *without compromising public safety concerns inherent to the Bureau's overall mission*." PS 6010.05 §1, Health Services Administration (emphasis added). BOP is responsible for "the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. §4042(a). Providing social accommodations to inmates, including to address gender dysphoria, raises serious security and prison-administration concerns. These security and prison-administration concerns not only support the medical concerns for BOP's adoption of a prohibition on providing inmates social accommodations but also independently support BOP's adoption of such a prohibition. At a minimum, the security and prison-administration concerns, when considered separately or cumulatively or in any combination, outweigh the benefits (medical or otherwise) from providing social accommodations. Thus, even if social accommodations address gender dysphoria, BOP, after considering the relevant issues and factors and weighing the relevant considerations, determines that it is reasonable and appropriate to not provide or allow access to social accommodations, including to address gender dysphoria.

Social accommodations jeopardize the security, safety, and prison administration of correctional facilities in at least four ways. First, providing social accommodations heightens the risk of inmates concealing dangerous contraband or escaping and may hinder the prison's ability to investigate intra-prison crimes. Second, providing social accommodations disrupts the uniform appearance among inmates, increasing the risk the accommodated inmate becomes a target for attacks, which increases the risk of harm to the targeted inmate and prison officials tasked with protecting the inmate. Third, special accommodations designed to change an inmate's outward appearance raise fairness concerns and can breed resentment among other inmates, which can lead to violence. Fourth, granting social accommodations conflicts with a reasonable practice of refusing to reward threats of self-harm and may even increase self-harm.

First, certain social accommodations, such as wigs, breast pads, buttock pads, and chest binders, can enable an inmate to hide contraband or other items without easy detection. *See, e.g.*, *Keohane*, 952 F.3d at 1263 ("the [Florida Department of Corrections] FDC concluded that there are clear advantages to maintaining uniformity in a prison setting, including the ability to more readily detect contraband"); *Keohane v. Fla. Dep't of Corr. Sec'y*, 981 F.3d 994, 998 (11th Cir. 2020) (Newsom, J., concurring in denial of reh'g en banc); *cf. Green v. Polunsky*, 229 F.3d 486, 490 (5th Cir. 2000) ("contraband such as drugs and weapons can be hidden in long hair"). A uniform dress code enables prison officials to more readily detect contraband. *See Keohane*, 952 F.3d at 1263. In addition to the harm from contraband going undetected, BOP would have to expend additional time and expense to administer the facility and ensure its security and safety.

Providing access to certain social accommodations also increases risk of escape by the inmate and may hinder the prison's ability to investigate intra-prison crimes because these items can be used to obfuscate or conceal an inmate's identity. Inmates would be able to change their appearances with ease by removing their social accommodations, such as wigs, chest binders, or

14

breast padding. *See, e.g.*, *Green*, 229 F.3d at 490. By prohibiting these items, Program Statement 5260.01 decreases the risk of fleeing inmates from avoiding detection or delaying detection and helps ensure the prison can adequately investigate intra-prison crimes.

Second, prohibiting social accommodations reduces the chance of an inmate being targeted by other inmates. For example, allowing a male inmate to obtain items designed to make him appear more feminine may entice other male inmates to disturb the orderly operation of the facility and can lead to increased incidents of assault or harassment on the accommodated inmate. Indeed, an inmate dressed or groomed as a female, such as via social accommodations, would increase the risk of the inmate becoming a target for abuse in a male prison. *See, e.g.*, *Keohane*, 952 F.3d at 1275 (noting the "obvious[]" consequence of permitting a male inmate to dress and be groomed as a female "would inevitably become a target for abuse in an all-male prison"); *Keohane*, 981 F.3d at 997-98 (Newsom, J., concurring in denial of reh'g en banc). And based on BOP's experience and expertise, these same concerns apply to both male and female correctional facilities, as female facilities also experience meaningful amounts of harassment and violence. *See, e.g.*, Emily Buehler, *Substantiated Incidents of Sexual Victimization Reported by Adult Correctional Authorities*, 2016-2018, U.S. Dep't of Justice, 18 (2023) (noting that 31% of the recorded incidents of inmate-on-inmate sexual harassment occurred in female correctional facilities).

Social accommodations not only put the inmate at additional risk of assault or harassment but also endanger "the prison employees who would have to step in to protect" the inmate and will require expending already limited resources to address these risks. *Keohane*, 952 F.3d at 1263. Preventing such attacks would require prison officials to be more vigilant in protecting the accommodated inmates from assault or harassment, despite BOP's limited resources.

And obviously, transfer to an opposite-sex facility is not an appropriate recourse in an attempt to mitigate these security and prison-administration complications from social-accommodations. Transfer would not sufficiently mitigate all the security and prison-administration concerns from providing social accommodations; in fact, transfer would create new grave security and prison-administration concerns. *See, e.g.*, Kaliebe Decl. ¶139 ("[H]ighly relevant is the fact that the presence of a biological male in close quarters in a female prison could significantly harm the emotional and physical well-being of certain female prisoners, such as female victims of sexual abuse. This concern is particularly acute since female prisoners suffer from extremely high rates of sexual trauma. Placing these vulnerable female inmates with biological males could have meaningful negative effects on female inmates."); *Cruel and Unusual Punishment: Stopping the Dangerous Policies Putting Men in Women's Prisons*, Independent Women's Forum (Dec. 20, 2024). And transfer is not medically necessary or appropriate to address gender dysphoria. *See, e.g.*, Kaliebe Decl. ¶¶23, 157. Transfer to address gender dysphoria is unproven, medically disputed, and controversial. *See* Kaliebe Decl. ¶139 ("There is no reliable study or high-quality evidence suggesting that an inmate being housed in a facility in line with the inmate's gender identity rather than the inmate's biological sex has any meaningful benefits (let alone long-term benefits) to the inmate's Gender Dysphoria symptoms."). It is reasonable for BOP to not provide a transfer to an inmate diagnosed with gender dysphoria, given the security, prison-administration, and medical issues.

AR-000019

Third, based on BOP's experience and expertise, fairness concerns counsel against providing access to social accommodations. When inmates receive special treatment within a correctional environment, other inmates may begin to resent those receiving special treatment, which can increase the risk of retaliation against the inmate receiving special treatment and cause ripple effects throughout the correctional institution and disrupting the delicate prison environment. Moreover, in general, correctional environments aim to be uniform in their approach to access to items because once a facility grants access to one thing for an inmate, it often makes it difficult to refuse granting special items to everyone else. Fairness concerns are particularly present if such special treatment is provided to one type of facilities (*e.g.*, female facilities) and not another (*e.g.*, male facilities).

Finally, BOP has considered the issue of self-harm and has determined that a policy prohibiting social accommodations avoids rewarding threats of self-harm and may reduce overall self-harm. Inmates frequently use threats of self-harm and suicide to try to obtain concessions from prison officials. *See, e.g.*, Kaliebe Decl. ¶148 ("In my experience working in correctional facilities and treating adult and juvenile inmates, including those diagnosed with Gender Dysphoria, inmates frequently use threats of self-harm and suicide to try to obtain concessions from prison officials."); *Kosilek*, 774 F.3d at 94 ("Such threats are not uncommon in prison settings …."). But providing access to social accommodations, especially in response to threats of self-harm or suicide, could increase self-harm. *See, e.g.*, Kaliebe Decl. ¶149 ("In corrections, rewarding self-injury or threats of self-injury tends to increase overall self-harm, both for the individual patient and also within the system."). Granting such requests may establish an "unacceptable precedent," forcing "prison authorities to comply with the prisoners' particular demands." *Kosilek*, 774 F.3d at 94. Consequently, it is reasonable for prison administrators to have rules against providing inmates benefits in response to self-harm or suicide to discourage threats. *See* Kaliebe Decl. ¶150 ("Simple and clear institutional policies, such as no social transitions or no initiation of new hormone treatments, are likely to lead to the lowest level of self-harm and the least overall harm to inmates because when prisoners know the interventions they desire are not available, they are less likely to self-harm to obtain them. In other words, it is reasonable for prison administrators to have outright prohibitions of providing inmates benefits, such as unproven surgeries, special-order items, and housing placements, in response to self-harm or suicide threats to discourage false threats."); *Kosilek*, 774 F.3d at 94 (noting that such threats must be "firm[ly] reject[ed] by the authorities, who must be given ample discretion in the dealing with such situations"). BOP determines that a clear rule against social accommodations is the most reasonable way to handle this complex issue. BOP takes threats of self-harm seriously and has protocols in place to handle these complex situations.

After considering the relevant issues and factors and weighing the relevant considerations, BOP determines that each of its security and prison-administration concerns, whether considered separately, cumulatively, or in any combination, outweighs any asserted benefits of providing social accommodations. In addition, after considering the relevant issues and factors and weighing the relevant considerations, BOP determines that the medical concerns discussed above when considered with any of its security and prison-administration concerns—separately, cumulatively, or in any combination—outweighs any asserted benefits of providing social accommodations.

16

AR-000020

3.    **Other considerations do not outweigh the benefits from Program Statement 5260.01.**

a.    *Reliance Interests and Costs*

BOP has also considered potential reliance interests, but the potential reliance interests are either illegitimate or outweighed by the benefits of the policy. Indeed, after considering the relevant issues and factors and weighing the relevant considerations, BOP determines that each of its medical, security, and prison-administration concerns, whether considered separately, cumulatively, or in any combination, outweighs the asserted benefits, interests, or costs of providing or allowing access to social accommodations.

As an initial matter, an inmate that currently does not have social accommodations has no legitimate reliance interest in the future possibility of obtaining access to social accommodations. That is especially true because social accommodations are not medically necessary or in accordance with proven standards of care.

Inmates currently in possession of social accommodations do not have legitimate reliance interests either. Social accommodations are not medically necessary or in accordance with proven standards of care. A policy that produces, at most, psychologically pleasing effects does not create legitimate reliance interests. That is all the more true given that social accommodations can prolong symptoms of gender dysphoria, may lead to long-term harm, and can undermine psychotherapy.

In any event, even if social accommodations create legitimate reliance interests, the interests are not weighty. Providing social accommodations has not been a longstanding, formal policy of BOP, and access to social accommodations has always been subject to security concerns. *See, e.g.*, PS 6010.05 §1, Health Services Administration; PS 5521.06, Housing Units, Inmates, and Inmate Work Areas; PS 5580.08, Inmate Personal Property ("Staff may not allow an inmate to accumulate materials to the point where the materials become a fire, sanitation, security, or housekeeping hazard."). Moreover, BOP policy has always been subject to change, including based on security and prison-administration concerns. Further, inmates that have had social accommodations for a short period of time have limited reliance interests. And the weight of this reliance varies among inmates due to, in part, the length of their prison sentence, among other things. Inmates that are in possession of social accommodations with little time left have a smaller interest than those with a longer remaining prison sentence.

Moreover, implementing Program Statement 5260.01 will incur, at most, *de minimis* costs and will likely lead to savings. Program Statement 5260.01 will mitigate security and prison-administration concerns, which will reduce costs. Program Statement 5260.01 will also reduce expenditures on interventions that are not medically necessary or medically disputed. Expenditures on care for inmates diagnosed with gender dysphoria are unlikely to meaningfully increase. In general, BOP officials would monitor an inmate diagnosed with gender dysphoria and provide the inmate with an individualized treatment plan, which would generally have care in addition to the provision of social accommodations. To the extent that Program Statement 5260.01 would result

17

in increased costs, it is outweighed by other considerations or the savings from reduced availability of social accommodations.

In sum, after considering the relevant issues and factors and weighing the relevant considerations, BOP determines that each of its medical, security, and prison-administration concerns, whether considered separately, cumulatively, or in any combination, significantly outweigh any costs of Program Statement 5260.01, any reliance interests created by a former policy of providing access to social accommodations, and any benefits from providing social accommodations. In BOP's judgment, prohibiting social accommodations is reasonable, appropriate, and in the best interest of the agency, its officials, and those in its custody.

### b.    *Alternatives*

BOP has considered alternatives and has determined that Program Statement 5260.01 is more reasonable than and preferable to potential alternatives.

For example, BOP has considered the option of denying future requests for social accommodations but allowing inmates who were previously given social accommodations to maintain access to social accommodations. Such an approach is not warranted because of BOP's medical concerns. Even if there are benefits to the more limited course as to social accommodations, BOP has determined that such a limitation would not adequately minimize the above security and prison-administration concerns to justify the alternative. In BOP's judgment, Program Statement 5260.01's handling of social accommodations is more reasonable than and preferable to this alternative approach.

BOP has considered a policy that would allow social accommodations based on an inmate's individual security profile. Such an approach is not warranted because of BOP's medical concerns. Even if there are benefits to this alternative approach to social accommodations, case-by-case determinations would not sufficiently mitigate the increased security and prison-administration concerns from social accommodations. For example, it would not sufficiently minimize the risks associated with the inmate becoming a target by other inmates, the risk to prison officials to deal with the increased risk of the inmate becoming a target, the risk from non-uniformity in the prison environment, or the risks related to threats of self-harm. Moreover, BOP's security profile is predictive, so the risk associated with contraband, escape, and intra-prison crime is still increased. In BOP's judgment, Program Statement 5260.01's handling of social accommodations is more reasonable than and preferable to this alternative approach.

BOP has considered allowing social accommodations based on the type of custody the inmate is in. Such an approach is not warranted because of BOP's medical concerns. Even if there are benefits to this alternative approach to social accommodations, the above prison-administration and safety concerns persist regardless of the type of custody the inmate is in, such as administrative segregations or general population. For example, providing social accommodations to inmates in administrative segregation still raises contraband-detection concerns, increases the risk of the inmate being targeted by other inmates, and raises the risk related to threats of self-harm. In any event, even if the inmate is in more limited custody now, such as administrative segregation, the inmate likely will not always be in such custody. Providing access to the items to inmates in such

18

custody to only take it away when the inmate leaves that custody is not prudent and risks further disruptions in the prison environment and potentially further self-harm threats by the inmate. In BOP's judgment, Program Statement 5260.01's handling of social accommodations is more reasonable than and preferable to this alternative approach.

BOP has considered and rejected a policy that removes all gendered clothing and hygiene products individually marketed to a particular sex. Though this option would foster uniformity for inmate dresswear, it also has significant drawbacks that render it a less desirable policy than the one selected. Implementing such a policy would be significantly costly and disruptive as it would require BOP to redesign its longstanding dress-code policy. This alternative policy would also entail the prison staff to remove newly classified contraband from all inmates, requiring BOP to expend even more resources than the selected policy as the latter involves removing contraband from a small percentage of the prison population. Moreover, this option would not be considered satisfactory by those who seek social accommodations to address gender dysphoria. In short, this alternative's defects significantly outweigh any purported advantages; in BOP's judgment, Program Statement 5260.01's handling of social accommodations is more reasonable than and preferable to this alternative approach.

BOP has also considered and rejected an alternative that allows inmates to pay for social accommodations to address gender dysphoria. Such an alternative does not sufficiently mitigate the medical, security, or prison-administration concerns of allowing social accommodations. In BOP's judgment, Program Statement 5260.01's approach to social accommodations is more reasonable than and preferable to this alternative approach.

Finally, BOP has considered other alternatives, including a combination of the above alternatives, but BOP has determined that Program Statement 5260.01's handling of social accommodations is better than and preferable to alternative approaches and is the most reasonable approach for addressing this issue.

*       *       *

In sum, BOP issues Program Statement 5260.01 independent of Executive Order 14,168 and after considering the relevant issues and factors and weighing the relevant considerations. Program Statement 5260.01's handling of social accommodations is justified by the medical concerns of the intervention. Security and prison-administration concerns bolster that determination. Further, even assuming there are medical benefits to inmates from providing social accommodations, Program Statement 5260.01's handling of social accommodations is justified by security and prison-administration concerns, as each of those interests, whether considered separately, cumulatively, or in any combination, outweighs any costs of Program Statement 5260.01, any reliance interests, and any benefits with respect to social accommodations. BOP also concludes that Program Statement 5260.01's handling of social accommodations is more reasonable than and preferable to potential alternatives. After considering the relevant issues and factors and weighing the relevant considerations, BOP determines that Program Statement 5260.01's handling of social accommodations is reasonable.

19

## C.    Hormones

After considering the relevant issues and factors and weighing the relevant considerations, BOP adopts Program Statement 5260.01's approach regarding hormones to address gender dysphoria. Under Program Statement 5260.01, if an inmate is diagnosed with gender dysphoria but is not currently receiving hormones to address gender dysphoria, BOP will not provide hormones to address the inmate's gender dysphoria. Hormonal interventions for inmates who are not currently receiving hormones to address gender dysphoria are not medically necessary or at a minimum, are highly controversial, medically disputed, and unproven by appropriate evidence. To the extent there is uncertainty about the efficacy of hormones to address gender dysphoria, that uncertainty counsels against providing such controversial interventions to inmates who are not currently receiving hormones when there are other more established treatments, such as psychotherapy, available. Even assuming hormones are beneficial to address gender dysphoria, BOP concludes that hormones in the secure prison environment raise numerous security and prison-administration concerns, and each concern, whether considered separately, cumulatively, or in any combination, outweigh any costs from Program Statement 5260.01, any reliance interests, and any benefits from providing hormones to inmates diagnosed with gender dysphoria who are not currently receiving hormones.

Under Program Statement 5260.01, if an inmate is previously and currently diagnosed with gender dysphoria and is currently receiving hormones to address gender dysphoria, BOP will develop a tapering plan for each inmate after consideration of appropriate factors. For inmates that have recently begun receiving hormones to address gender dysphoria, the tapering plan will include a rapid discontinuation of the hormone intervention. For inmates that have been receiving hormones to address gender dysphoria for an extended period of time, the tapering plan will generally include an appropriately paced discontinuation of the hormone intervention. For inmates who (1) are post sex trait modification surgery or (2) have been receiving hormones to address gender dysphoria for an extended period of time and develop severe physiological and psychological withdrawal effects from tapering, it may not be appropriate in all cases for the initial tapering plan to include cessation of hormones.

Even for inmates currently receiving hormones to address gender dysphoria, such hormonal interventions are medically controversial and disputed. There are little (if any) reliable evidence on the benefits of hormonal interventions to address gender dysphoria, especially in the correctional environment. There are also indications that hormonal interventions can prolong symptoms of gender dysphoria, undermine other treatments to address gender dysphoria, worsen symptoms of gender dysphoria, and cause physical and psychological harm. But given that inmates currently receiving hormones involve a more complex case in light of the reality that removing medical interventions can cause stress or other side effects, BOP determines that it is reasonable to take the above approach with respect to inmates who are currently receiving hormones to address gender dysphoria, which balances the medical, security, and prison-administration concerns to deal with this more complex situation.

In BOP's judgment, and after considering the relevant issues and factors and weighing the relevant considerations, Program Statement 5260.01's approach as to hormones is reasonable, and

AR-000024

appropriate to provide adequate care to inmates diagnosed with gender dysphoria; is reasonable and appropriate to maintain internal order, discipline, and institutional security of the correctional environment; and outweighs any asserted benefit from alternative policies regarding hormones to address gender dysphoria.

### 1. In general, hormones are not medically necessary to address gender dysphoria.

#### a. *Inmates Not Currently Receiving Hormones to Address Gender Dysphoria*

After considering the relevant issues and factors and weighing the relevant considerations, BOP concludes that hormones are not medically necessary to address gender dysphoria for individuals not currently receiving hormones to address gender dysphoria, especially in the correctional context. Hormonal interventions to address gender dysphoria are highly controversial, medically disputed, and unproven by appropriate evidence. Medical professionals, at the very least, reasonably disagree on the efficacy of hormones to address gender dysphoria for individuals not currently receiving hormones to address gender dysphoria, particularly in the correctional context. Hormones are not "medically necessary" or "in accordance with proven standards of care" for inmates not currently receiving hormones to address gender dysphoria. PS 6010.05 §1, Health Services Administration. It is reasonable for BOP to not provide medically disputed or insufficiently proven interventions to inmates who are not currently receiving the intervention.

An expert has persuasively explained that hormones are not medically necessary to address gender dysphoria when that inmate is not currently receiving hormones to address gender dysphoria. *See, e.g.*, Kaliebe Decl. ¶20 ("it is not medically necessary to provide hormone therapy to inmates who are diagnosed with Gender Dysphoria but not currently receiving hormone therapy"); *id.* ¶154 (same); *id.* ¶112 ("it is appropriate to not initiate hormone therapy on inmates who are not currently subject to hormonal therapy"). At the very least, providing hormones to address gender dysphoria is highly controversial, insufficiently proven, or subject to reasonable medical disagreement. Indeed, hormones to address gender dysphoria "is unproven" and "experimental." *See, e.g.*, Kaliebe Decl. ¶20 ("Hormone therapy is unproven and experimental treatment for Gender Dysphoria that generally should not be available to those in the custody of the Federal Bureau of Prisons."); *id.* ¶154 (same). Providing hormonal interventions to address gender dysphoria "is not based on guidelines using best practice or systematic reviews of evidence." Kaliebe Decl. ¶83. There is little (if any) reliable evidence showing that hormones address gender dysphoria. *See, e.g.*, Kaliebe Decl. ¶83; Haupt et al., *Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women*, 11 Cochrane Database of Systematic Reviews, Art. No. CD013138, at 2, 11 (2020); Kellan E. Baker, et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, 5 J. Endocrine Soc. 1, 12-13 (2021); *Marcum v. Crews*, No. 5:25-CV-00238-GFVT, 2025 WL 2630922, at *7 (E.D. Ky. Sept. 12, 2025) ("The problem in making this analogy is that the Plaintiff is assuming that HRT is a well-settled area of medicine. When, in fact, the record indicates that there remains significant disagreement about whether the side effects and the negative consequences of HRT outweigh the positive benefits. And, further, there is medical evidence

21

AR-000025

suggesting that even if HRT is not provided, there are other ways to care for an individual diagnosed with Gender Dysphoria, absent using HRT."); *Marcum v. Crews*, No. 25-5840, Dkt. 26 at 6 (6th Cir. Oct. 23, 2025) ("The existing record thus suggests that the medical community has not reached a consensus on the role hormone therapy should play in treating gender dysphoria."). In any event, there is no reliable evidence showing that hormones address gender dysphoria in the correctional environment. To the contrary, recent research has raised significant concerns on the safety, efficacy, and prudence of hormonal interventions to address gender dysphoria. *See, e.g.*, Kaliebe Decl. ¶86 ("Recent large reviews and research into harms from hormone treatment for Gender Dysphoria raise increased concerns regarding the safety, efficacy, and prudence of this practice.").

There are also indications that hormonal interventions can prolong symptoms of gender dysphoria, undermine other treatments to address gender dysphoria, worsen symptoms of gender dysphoria, and cause "[s]ubstantial [h]ealth risks" and "[m]edical harms." *See, e.g.*, Kaliebe Decl. ¶¶96-111; Rakesh R. Gurrala et al., *The Impact of Exogenous Testosterone on Breast Cancer Risk in Transmasculine Individuals*, 90(1) Annals of Plastic Surgery 96 (2023) (explaining that evidence showed that males who are treated with estrogen have twenty-two times the likelihood to develop breast cancer). Some of the effects of hormonal interventions also might not be reversible. *See, e.g.*, Kaliebe Decl. ¶109. To the extent that hormonal interventions might have short-term benefits to addressing gender dysphoria in the correctional context, they may be placebo effects, *see, e.g.*, Kaliebe Decl. ¶¶90-91, or in any event, outweighed by the potential long-term risks or harms. At any rate, BOP determines that it is reasonable to not provide hormones to inmates not currently receiving hormones given the uncertainty in benefits, the potential harms, and the potential irreversibility of some effects of the intervention.

Again, BOP provides inmates with gender dysphoria with individualized treatment plans with well-established treatment methods for gender dysphoria, such as psychotherapy, group counseling, psychiatric services, and psychotropic medications. Hormonal interventions for inmates not currently receiving the intervention to address gender dysphoria are not medically necessary or at a minimum, there is reasonable disagreement as to their efficacy, such that it is reasonable for BOP to not provide the intervention. In BOP's judgment, it is reasonable and necessary and appropriate to provide these individual treatment plans to inmates who are not currently hormones without the prospect of receiving hormones to address gender dysphoria.

### b.    *Inmates Currently Receiving Hormones to Address Gender Dysphoria*

Though the medical concerns explained above are still present for inmates currently receiving hormones, BOP has determined that a different approach is warranted as to inmates that are already receiving hormones to address gender dysphoria. These inmates involve a more complex situation, reflecting the reality that removing medical interventions can cause stress or other side effects. *See* Kaliebe Decl. ¶114.

Under Program Statement 5260.01, inmates who are previously and currently diagnosed with gender dysphoria and are currently receiving hormones to address gender dysphoria will receive tapering plans based on the appropriate factors, such as the duration the inmate has been

AR-000026

receiving hormones to address gender dysphoria, the initial rationale for receiving the hormone intervention, the response by the inmate to the intervention, and whether the inmate has undergone sex trait modification surgery. But BOP determines that it is appropriate to generally divide these inmates based on the length of time the inmate has received hormones to address gender dysphoria. *See* Kaliebe Decl. ¶114 ("it is reasonable for dysphoric patients to be divided into different patient populations with different clinical approaches").

For inmates that recently started receiving hormones to address gender dysphoria, BOP determines that such inmates will receive a tapering plan that includes a rapid discontinuation of hormones. *See* Kaliebe Decl. ¶114 ("A rapid discontinuation is appropriate for those who recently started treatment."). Given the medical concerns with respect to hormones, the short-term side-effects to discontinuing hormones when hormones have only been recently provided to the inmate, and the other measures BOP has in place to monitor and receive requests from inmate patients, among other relevant considerations, BOP determines that a tapering plan that includes a rapid discontinuation of hormones is reasonable for inmates who have only recently begun receiving hormones to address gender dysphoria.

For inmates that have been receiving hormones to address gender dysphoria for an extended period of time, the inmates will receive a tapering plan based on the appropriate factors. In general, the tapering plan will include an appropriately paced discontinuation of the hormone intervention. *See* Kaliebe Decl. ¶114 ("A rapid discontinuation is appropriate for those who recently started treatment, but a slow withdrawal could be appropriate for others …."). For inmates who (1) are post sex trait modification surgery or (2) have been receiving hormones to address gender dysphoria for an extended period of time and develop severe physiological and psychological withdrawal effects from tapering, it may not be appropriate in all cases for the initial tapering plan to include cessation of hormones. But given "the unproven medical benefits of continued hormone[s]," "the potential negative effects of hormone[s]," and that "it is likely rare that an inmate should continue hormone therapy indefinitely," Kaliebe Decl. ¶116, tapering plans should be reevaluated regularly with respect to cessation of hormones, including during the inmate's chronic care clinic appointments.

All inmates who are tapering and were receiving mental health treatment before tapering will continue to receive counseling and pharmacological treatment as appropriate as part of the inmate's individualized treatment plan. Tapering plans may be adjusted as necessary based on monitoring and follow-up evaluations, but the adjusted tapering plans must still be consistent with the purpose of Program Statement 5260.01 and based on all relevant factors, including security and prison-administration concerns. And inmate patients may submit a request for additional medical or mental health care or evaluation if they have acute concerns during the tapering process.

In BOP's judgment, the above approach reasonably balances the medical concerns presented by hormones for inmates that are currently receiving hormones to address gender dysphoria.

23

### 2. Security and prison-administration concerns support Program Statement 5260.01's approach to hormones to address gender dysphoria.

BOP's general policy is to "deliver medically necessary health care to inmates effectively in accordance with proven standards of care *without compromising public safety concerns inherent to the Bureau's overall mission*." PS 6010.05 §1, Health Services Administration (emphasis added). BOP is responsible for "the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. §4042(a). Providing hormonal interventions to inmates to address gender dysphoria raises serious security and prison-administration concerns. These security and prison-administration concerns independently support Program Statement 5260.01's handling of hormones. At a minimum, the security and prison-administration concerns, when considered separately, cumulatively, or in any combination, outweigh the benefits from a policy handling hormones differently, such as allowing more access to hormones to address gender dysphoria. Thus, after considering the relevant issues and factors and weighing the relevant considerations, BOP determines that it is reasonable and appropriate to adopt Program Statement 5260.01's approach to hormonal interventions to address gender dysphoria.

Using hormonal interventions to address gender dysphoria jeopardizes the security, safety, and prison administration of correctional facilities in at least three ways. First, the inmate receiving hormones will have increased risk of the inmate becoming a target for attacks, which increases harm to the targeted inmate and prison officials tasked with protecting the inmate. Second, special treatments raise fairness concerns and can breed resentment among other inmates, which can lead to violence. Third, granting hormones conflicts with a reasonable practice of refusing to reward threats of self-harm and may even increase self-harm. Each of BOP's security and prison-administration concerns, whether considered cumulatively, separately, or in any combination, outweighs any asserted benefits from a different approach to hormones than the one adopted in Program Statement 5260.01.

First, limiting the availability of hormonal interventions to address gender dysphoria reduces the chance of an inmate being targeted by other inmates. The inmate would inevitably become a target for abuse in the male facility. *Cf., e.g.*, *Keohane*, 952 F.3d at 1275 (noting the "obvious[]" consequence of permitting an inmate to dress and be groomed as a female "would inevitably become a target for abuse in an all-male prison"); *Kosilek*, 774 F.3d at 93 ("Recognizing that reasonable concerns would arise regarding a post-operative, male-to-female transsexual being housed with male prisoners takes no great stretch of the imagination."). And based on BOP's experience and expertise, these same concerns also apply to women's correctional facilities, which also experience meaningful amounts of harassment and violence. *See, e.g.*, Emily Buehler, *Substantiated Incidents of Sexual Victimization Reported by Adult Correctional Authorities*, 2016-2018, U.S. Dep't of Justice, 18 (2023) (noting that 31% of the recorded incidents of inmate-on-inmate sexual harassment occurred in female correctional facilities).

Hormonal interventions not only put the inmate at additional risk of assault or harassment but also endanger "the prison employees who would have to step in to protect" the inmate and will require expending already limited resources to address these risks. *Keohane*, 952 F.3d at 1263.

24

AR-000028

Preventing such attacks would require prison officials to be more vigilant in protecting the inmates from assault or harassment, despite BOP's limited resources.

It is insufficient to point to transfer to mitigate these security and prison-administration complications from providing hormones to address gender dysphoria. For example, a transfer of a male (who is receiving hormones to address gender dysphoria) to a female facility will increase the risk of harm of female inmates. *See* Kaliebe Decl. ¶139 ("[H]ighly relevant is the fact that the presence of a biological male in close quarters in a female prison could significantly harm the emotional and physical well-being of certain female prisoners, such as female victims of sexual abuse. This concern is particularly acute since female prisoners suffer from extremely high rates of sexual trauma. Placing these vulnerable female inmates with biological males could have meaningful negative effects on female inmates."); *see also, e.g.*, *Cruel and Unusual Punishment: Stopping the Dangerous Policies Putting Men in Women's Prisons*, Independent Women's Forum (Dec. 20, 2024). And based on BOP's experience and expertise, similar concerns exist for transfer of a female inmate to a male facility, as the female inmate would be a target by other male prisoners. Moreover, transfer is not medically necessary to address gender dysphoria. *See, e.g.*, Kaliebe Decl. ¶¶23, 157. Transfer to address gender dysphoria is unproven, medically disputed, and controversial. *See* Kaliebe Decl. ¶139 ("There is no reliable study or high-quality evidence suggesting that an inmate being housed in a facility in line with the inmate's gender identity rather than the inmate's biological sex has any meaningful benefits (let alone long-term benefits) to the inmate's Gender Dysphoria symptoms."). It is reasonable for BOP to not provide a transfer to an inmate diagnosed with gender dysphoria (including those receiving hormones), given the security, prison-administration, and medical concerns.

Second, based on BOP's experience and expertise, fairness concerns counsel against broader availability of hormones to address gender dysphoria. When inmates receive special treatment within a correctional environment, other inmates may begin to resent those receiving special treatment, which can increase the risk of retaliation against the inmate receiving special treatment and cause ripple effects throughout the correctional institution and disrupting the delicate prison environment. Fairness concerns are particularly present if such special treatment is provided to one type of facilities (*e.g.*, female facilities) and not another (*e.g.*, male facilities).

Finally, BOP has considered the issue of self-harm and has determined that Program Statement 5260.01's handling of hormones to address gender dysphoria reduces rewarding threats of self-harm and may reduce overall self-harm. Inmates frequently use threats of self-harm and suicide to try to obtain concessions from prison officials. *See, e.g.*, Kaliebe Decl. ¶148 ("In my experience working in correctional facilities and treating adult and juvenile inmates, including those diagnosed with Gender Dysphoria, inmates frequently use threats of self-harm and suicide to try to obtain concessions from prison officials."); *Kosilek*, 774 F.3d at 94 ("Such threats are not uncommon in prison settings …."). But providing more access to hormones, especially in response to threats of self-harm or suicide, could increase self-harm. *See, e.g.*, Kaliebe Decl. ¶149 ("In corrections, rewarding self-injury or threats of self-injury tends to increase overall self-harm, both for the individual patient and also within the system."). Granting such requests may establish an "unacceptable precedent," forcing "prison authorities to comply with the prisoners' particular demands." *Kosilek*, 774 F.3d at 94. Consequently, it is reasonable for prison administrators to have

AR-000029

rules against providing inmates benefits in response to self-harm or suicide to discourage threats. *See* Kaliebe Decl. ¶150 ("Simple and clear institutional policies, such as no social transitions or no initiation of new hormone treatments, are likely to lead to the lowest level of self-harm and the least overall harm to inmates because when prisoners know the interventions they desire are not available, they are less likely to self-harm to obtain them. In other words, it is reasonable for prison administrators to have outright prohibitions of providing inmates benefits, such as unproven surgeries, special-order items, and housing placements, in response to self-harm or suicide threats to discourage false threats."); *Kosilek*, 774 F.3d at 94 (noting that such threats must be "firm[ly] reject[ed] by the authorities, who must be given ample discretion in the dealing with such situations"). BOP determines that Program Statement 5260.01's approach as to hormones is the most reasonable way to handle this complex issue. BOP takes threats of self-harm seriously and has protocols in place to handle these complex situations.

After considering the relevant issues and factors and weighing the relevant considerations, BOP determines that each of its security and prison-administration concerns, whether considered separately, cumulatively, or in any combination, outweighs any asserted benefits of providing hormones in a broader way that differs from the approach adopted by Program Statement 5260.01. Specifically, each of the above security and prison-administration concerns, whether considered separately, cumulatively, or in any combination, support not providing hormones to address gender dysphoria to an inmate who is not currently receiving hormones. Each of the above security and prison-administration concerns, whether considered separately, cumulatively, or in any combination, also support providing tapering plans that include a rapid discontinuation of hormones for inmates who recently begun receiving hormones to address gender dysphoria. These concerns further support providing tapering plans that include an appropriately paced discontinuation of hormones for inmates who have been receiving hormones to address gender dysphoria for an extended period of time. And these concerns support the approach with respect to inmates who are post sex trait modification surgery or have been receiving hormones to address gender dysphoria for an extended period of time and develop severe physiological and psychological withdrawal effects from tapering. BOP has determined that it is reasonable to tolerate some of these security and prison-administration concerns for inmates that present the complex situation described above in the way that Program Statement 5260.01 handles hormones for these inmates. In addition, after considering the relevant issues and factors and weighing the relevant considerations, BOP determines that the medical concerns discussed above when considered with any of its security and prison-administration concerns—separately, cumulatively, or in any combination—outweighs any asserted benefits of providing hormones in a way that differs from the approach adopted by Program Statement 5260.01.

### 3. Other considerations do not outweigh the benefits from Program Statement 5260.01.

#### a. *Reliance Interests and Costs*

BOP has also considered potential reliance interests, but the potential reliance interests are either illegitimate or outweighed by the benefits of Program Statement 5260.01. Indeed, after considering the relevant issues and factors and weighing the relevant considerations, BOP

AR-000030

determines that each of its medical, security, and prison-administration concerns, whether considered separately, cumulatively, or in any combination, outweighs the asserted benefits, interests, or costs of providing hormones to address gender dysphoria in a way that differs from the approach adopted in Program Statement 5260.01.

As an initial matter, Program Statement 5260.01 prohibits providing hormones to inmates who are not currently receiving hormones to address gender dysphoria, and an inmate has no reasonable reliance interest in the future possibility of obtaining hormones. That is especially true because hormones are not medically necessary or at a minimum, controversial or medically disputed. It is reasonable for BOP to not provide medically disputed or insufficiently proven interventions to inmates who are not currently receiving the medically disputed intervention.

As for inmates currently receiving hormones to address gender dysphoria, these inmates' reliance interests are at best in the provision of "medically necessary health care to inmates effectively in accordance with proven standards of care without compromising public safety concerns inherent to the Bureau's overall mission." PS 6010.05 §1, Health Services Administration. In BOP's judgment, Program Statement 5260.01 is designed to provide such care.

In any event, even if the availability of hormones to address gender dysphoria create legitimate reliance interests, the interests are not sufficiently weighty to outweigh the benefits of Program Statement 5260.01. Access to hormones has always been subject to security concerns. *See, e.g.*, PS 6010.05 § 1, Health Services Administration. Moreover, BOP policies have always been subject to change, including based on new medical studies, security concerns, and prison-administration concerns.

Moreover, implementing Program Statement 5260.01 will incur, at most, *de minimis* costs and will likely lead to savings. Program Statement 5260.01 will mitigate security and prison-administration concerns, which will reduce costs. Program Statement 5260.01 will also reduce expenditures on medical interventions that are not medically necessary or medically disputed. Expenditures on care for inmates diagnosed with gender dysphoria are unlikely to meaningfully increase. In general, even if an inmate is receiving hormones, BOP officials would monitor the inmate patient and provide the inmate patient with an individualized treatment plan, which would generally have care in addition to the provision of hormones. To the extent that Program Statement 5260.01 would result in increased costs, it is outweighed by other considerations or the savings from reduced availability of hormones.

In sum, after considering the relevant issues and factors and weighing the relevant considerations, each of BOP's medical, security, and prison-administration concerns, whether considered separately, cumulatively, or in any combination, significantly outweigh any reliance interests created by a former policy that provided more access to hormones than the approach adopted in Program Statement 5260.01. In BOP's judgment, Program Statement 5260.01's handling of hormones to address gender dysphoria is reasonable and in the best interest of the agency, its officials, and those in its custody.

27

AR-000031

### b.    *Alternatives*

BOP has considered alternatives and has determined that Program Statement 5260.01 is more reasonable than and preferable to potential alternatives.

For example, BOP has considered a policy allowing hormones to inmates diagnosed with gender dysphoria but are not currently receiving hormones to address gender dysphoria, such as on a case-by-case basis. Such an approach is not warranted because of BOP's medical concerns. Even if there are benefits to the alternative approach as to hormones for inmates currently not receiving hormones, BOP has determined that the alternative approach would not adequately minimize the above security and prison-administration concerns to justify the alternative. In BOP's judgment, Program Statement 5260.01's approach to hormones for inmates not currently receiving hormones is preferable to this alternative approach.

BOP has considered a policy allowing case-by-case determinations on whether to adopt tapering plans for inmates who have recently begun receiving hormones. Such an approach is not warranted because of BOP's medical concerns. In BOP's judgment, any effects from tapering, including a rapid discontinuation of hormones, for inmates who recently began receiving hormones are outweighed by the benefits of not providing a medically disputed medical intervention that can prolong symptoms of gender dysphoria, undermine other treatments to address gender dysphoria, worsen symptoms of gender dysphoria, and cause physical and psychological harm, including harm that is potentially irreversible. Even if there are benefits to the alternative approach as to hormones for inmates who recently began receiving hormones, BOP has determined that the alternative approach would not adequately minimize the above security and prison-administration concerns to justify the alternative. In BOP's judgment, Program Statement 5260.01's approach to hormones for inmates who recently begun receiving hormones is preferable to this alternative approach.

BOP has considered an alternative that allows case-by-case determinations on whether to adopt tapering plans for inmates who have been receiving hormones for an extended period of time. Such an approach is not warranted because of BOP's medical concerns. In BOP's judgment, any effects from tapering for inmates have been receiving hormones for an extended period of time are outweighed by the benefits of not continuing to provide a medically disputed medical intervention that can prolong symptoms of gender dysphoria, undermine other treatments to address gender dysphoria, worsen symptoms of gender dysphoria, and cause physical and psychological harm, including harm that is potentially irreversible. The potential harm is further minimized by Program Statement 5260.01's approach to cessation of hormones for inmates who (1) are post sex trait modification surgery or (2) have been receiving hormones to address gender dysphoria for an extended period of time and develop severe physiological and psychological withdrawal effects from tapering. And the potential harm is even further minimized by the ability of inmate patients under Program Statement 5260.01 to request additional medical or mental health care or evaluation if they have acute concerns during the tapering process. Moreover, even if there are benefits to the alternative approach as to hormones for inmates who have been receiving hormones for an extended period of time, BOP has determined that this alternative approach would not adequately minimize the above concerns to justify the alternative. In BOP's judgment, Program

28

AR-000032

Statement 5260.01's approach to hormones for inmates who have been receiving hormones more an extended period of time is preferable to this alternative approach.

BOP has also considered and rejected an alternative that allows inmates to pay for hormones to address gender dysphoria when BOP would not provide such hormones. Such an alternative does not sufficiently mitigate the medical, security, or prison-administration concerns of allowing hormones when BOP would not provide such hormones. In BOP's judgment, Program Statement 5260.01's approach to hormones is preferable to this alternative approach.

Finally, BOP has considered other alternatives, including a combination of the above alternatives, but BOP has determined that Program Statement 5260.01's approach to hormones is preferable to alternative approaches and is the most reasonable approach for addressing this issue.

*    *    *

In sum, BOP issues Program Statement 5260.01 independent of Executive Order 14,168 and after considering the relevant issues and factors and weighing the relevant considerations. Program Statement 5260.01's approach to hormones is justified by the medical concerns of the intervention. Security and prison-administration concerns bolster that determination. Further, even assuming there are medical benefits to inmates from hormones, Program Statement 5260.01's handling of hormones is justified by security and prison-administration concerns, as each of those interests, whether considered separately, cumulatively, or in any combination, outweigh any costs of Program Statement 5260.01, any reliance interests, and any benefits from broader availability of hormones. BOP also concludes that Program Statement 5260.01's handling of hormones is preferable to and more reasonable than potential alternatives. After considering the relevant issues and factors and weighing the relevant considerations, BOP determines that Program Statement 5260.01's approach to hormones is reasonable.

### D.    Other Aspects of Program Statement 5260.01

After considering the relevant issues and factors and weighing the relevant considerations, including reliance interests, costs, and potential alternatives, BOP adopts the other aspects of Program Statement 5260.01.

For example, under Program Statement 5260.01, identified medical and psychiatric comorbidities, which can complicate treatment for gender dysphoria, should generally be addressed before treatment for gender dysphoria proceeds. *See, e.g.*, Kaliebe Decl. ¶¶55-57; Florida Dep't of Corrections, Policy 15.05.23, 3-4 (Sept. 30, 2024) ("All medical and psychiatric comorbidities must be identified as these comorbidities can complicate the treatment of Gender Dysphoria."). As appropriate, medical and psychiatric comorbidities should be addressed through psychotherapy, psychotropic medication, or other appropriate medically accepted interventions. *See, e.g.*, Kaliebe Decl. ¶¶55-59. When comorbidities are addressed before gender dysphoria, further treatment for gender dysphoria may be necessary and may proceed once these medical and psychiatric comorbidities are resolved or ruled out as the potential cause of gender dysphoria.

Moreover, psychotherapy should be prioritized. Psychotherapy is a well-known and well-established treatment for gender dysphoria and helps patients while avoiding the use of potentially

29

AR-000033

irreversible medical interventions. *See, e.g.*, Kaliebe Decl. at page 14 ("Psychotherapy is the preferred treatment approach for Gender Dysphoria, particularly within correctional environments."); *see also, e.g.*, Kaliebe Decl. ¶¶43-59; *K.C.*, 121 F.4th at 610-11 ("Social support and psychotherapy are widely recognized approaches" to treating gender dysphoria. (citing Danyon Anderson et al., *Gender Dysphoria and Its Non-Surgical and Surgical Treatments*, 10 Health Psych. Rsch., at 4 (2022))).

Again, BOP provides individualized treatment plans to address gender dysphoria, which may include psychotherapy, group counseling, psychiatric services, and psychotropic medications. Nothing in Program Statement 5260.01 prevents a prison official from providing care required by federal law, including the Eighth Amendment to the U.S. Constitution. And Program Statement 5260.01 requires BOP to ensure that all inmates diagnosed with gender dysphoria receive care in accordance with federal law, including the Eighth Amendment to the U.S. Constitution. In BOP's judgment, the other aspects of Program Statement 5260.01 are preferable to potential alternatives and reasonable in light of the relevant issues and factors. The costs for these other aspects of Program Statement 5260.01 are *de minimis* and outweighed by their benefits. Any reliance interests are outweighed by the benefits of these other aspects of Program Statement 5260.01 and Program Statement 5260.01 as a whole. After considering the relevant issues and factors and weighing the relevant considerations, BOP determines that the other aspects of Program Statement 5260.01 is reasonable.

## III.    Severability

Each of the provisions of Program Statement 5260.01 serve an important, related, but distinct purpose. BOP also confirms that each of the provisions in Program Statement 5260.01 is intended to operate independently of each other and that the potential invalidity of one provision should not affect the other provisions. Accordingly, if any provision of Program Statement 5260.01, or the application of any provision of Program Statement 5260.01 to any individual or circumstance, is held to be invalid, the remainder of Program Statement 5260.01 and the application of its provisions to any other individuals or circumstances shall not be affected.

For example, if a court concludes that the aspect or any aspect of Program Statement 5260.01 regarding hormones or social accommodations is unlawful, BOP would still prohibit sex trait modification surgeries. Program Statement 5260.01's prohibition on sex trait modification surgeries, even without the provisions on hormones or social accommodations, would still reasonably address the applicable medical, security, and prison-administration concerns; outweigh any costs, reliance interests, and countervailing benefits; and be more reasonable than and preferable to potential alternatives.

If a court concludes that the aspect of Program Statement 5260.01 regarding hormones or sex trait modification surgeries is unlawful, BOP would still prohibit social accommodations. Program Statement 5260.01's prohibition on social accommodations, even without the provisions on hormones or sex trait modification surgeries, would still reasonably address the applicable medical, security, and prison-administration concerns; outweigh any costs, reliance interests, and countervailing benefits; and be more reasonable than and preferable to potential alternatives.

AR-000034

If a court concludes that the aspect of Program Statement 5260.01 regarding hormones is unlawful, BOP would still prohibit sex trait modification surgeries and social accommodations. Program Statement 5260.01's prohibition on sex trait modification surgeries and social accommodations, even without the provisions on hormones, would still reasonably address the applicable medical, security, and prison-administration concerns; outweigh any costs, reliance interests, and countervailing benefits; and be more reasonable than and preferable to potential alternatives.

If a court concludes that any part of Program Statement 5260.01 regarding hormones is unlawful, BOP would still adopt the other aspects of Program Statement 5260.01 with respect to hormones. For instance, Program Statement 5260.01's prohibition on hormones for inmates with gender dysphoria who are not current receiving hormones, even without the other provisions on hormones, would still reasonably address the applicable medical, security, and prison-administration concerns; outweigh any costs, reliance interests, and countervailing benefits; and be more reasonable than and preferable to potential alternatives. Program Statement 5260.01's provision on hormones for inmates with gender dysphoria who recently begun receiving hormones, even without the provisions on hormones for inmates who have been receiving hormones for an extended period of time, would still reasonably address the applicable medical, security, and prison-administration concerns; outweigh any costs, reliance interests, and countervailing benefits; and be more reasonable than and preferable to potential alternatives.

To give another example, if a court concludes that Program Statement 5260.01 cannot be retroactive to remove already issued social accommodations, then BOP would apply that aspect of Program Statement 5260.01 prospectively, such that no social accommodations will be provided in the future. Although continuing to allow accommodations already granted may lead to medical, security, and prison-administration harms that Program Statement 5260.01 seeks to avoid, the benefits from a prohibition on future social accommodations would still outweigh any costs, reliance interests, and countervailing benefits and be preferable to a policy allowing more access to social accommodations.

To be sure, BOP has determined that every provision of Program Statement 5260.01 is legally supportable, individually and in the aggregate, but include this discussion to remove any doubt that it would have adopted the remaining provisions of Program Statement 5260.01 without any of the other provisions, should any of them or any application of them be deemed unlawful by a court. The intent of Program Statement 5260.01 is for federal funds to not be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex to the maximum extent permitted by law, including the Eighth Amendment to the U.S. Constitution. Nothing in Program Statement 5260.01 shall prevent a prison official from providing care required by federal law, including the Eighth Amendment to the U.S. Constitution. BOP shall ensure that all inmates diagnosed with gender dysphoria receive care in accordance with federal law, including the Eighth Amendment to the U.S. Constitution. And nothing in Program Statement 5260.01 is intended, nor shall it be construed, to create a private cause of action.

31

AR-000035

## IV.    Non-Exhaustive List of References

### A.    Case Law

- *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695 (D.C. Cir. 2007)

- *Bayse v. Ward*, 147 F.4th 1304 (11th Cir. 2025)

- *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002)

- *Boe v. Marshall*, No. 2:22-cv-00184 (M.D. Ala. 2023)

- *Booth v. Churner*, 532 U.S. 731 (2001)

- *Borum v. Brentwood Vill., LLC*, 324 F.R.D. 1 (D.D.C. 2018)

- *Bucklew v. Precythe*, 587 U.S. 119 (2019)

- *Califano v. Yamasaki*, 442 U.S. 682 (1979)

- *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106 (N.D. Cal. 2017)

- *Cayuga Nation v. Zinke*, 302 F. Supp. 3d 362 (D.D.C. 2018)

- *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)

- *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024)

- *Clark v. Valletta*, 157 F.4th 201 (2d Cir. 2025)

- *Columbia Gulf Transmission v. FERC*, 106 F.4th 1220 (D.C. Cir. 2024)

- *Common Cause v. Trump*, 506 F. Supp. 3d 39 (D.D.C. 2020)

- *ConverDyn v. Moniz*, 68 F. Supp. 3d 34 (D.D.C. 2014)

- *Damus v. Nielsen*, 313 F. Supp. 3d 317 (D.D.C. 2018)

- *Diamond v. Ward*, No. 20-cv-00453 (M.D. Ga. 2021)

- *Doe 2 v. Trump*, 319 F. Supp. 3d 539 (D.D.C. 2018)

- *Doe v. McKenry*, 763 F. Supp. 3d 81 (D.D.C. 2025)

- *Druley v. Patton*, 601 F. App'x 632 (10th Cir. 2015)

- *Edmo v. Corizon, Inc.*, 949 F.3d 489 (9th Cir. 2020)

- *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023)

- *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241 (11th Cir. 2024)

- *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016)

- *Estelle v. Gamble*, 429 U.S. 97 (1976)

- *Eubanks v. Billington*, 110 F.3d 87 (D.C. Cir. 1997)

32

- *Farmer v. Brennan*, 511 U.S. 825 (1994)

- *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)

- *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)

- *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542 (2025)

- *Fisher v. Fed. Bureau of Prisons*, 484 F. Supp. 3d 521 (N.D. Ohio 2020)

- *Franklin v. Massachusetts*, 505 U.S. 788 (1992)

- *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982)

- *Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019)

- *Green v. Polunsky*, 229 F.3d 486 (5th Cir. 2000)

- *Hanson v. District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024)

- *Haverkamp v. Linthicum*, 152 F.4th 618 (5th Cir. 2025)

- *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263 (11th Cir. 2020)

- *Husky Mktg. & Supply Co. v. FERC*, 105 F.4th 418 (D.C. Cir. 2024)

- *Hudson v. McMillian*, 503 U.S. 1 (1992)

- *In re Integra Realty Res., Inc.*, 354 F.3d 1246 (10th Cir. 2004)

- *Jones v. Bock*, 549 U.S. 199 (2007)

- *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024)

- *Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008)

- *K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, 121 F.4th 604 (7th Cir. 2024)

- *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257 (11th Cir. 2020)

- *Keohane v. Fla. Dep't of Corr. Sec'y*, 981 F.3d 994 (11th Cir. 2020)

- *Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2024) (en banc)

- *Kress v. CCA of Tennessee, LLC*, 694 F.3d 890 (7th Cir. 2012)

- *Lamb v. Norwood*, 899 F.3d 1159 (10th Cir. 2018)

- *Lange v. Houston Cnty.*, 152 F.4th 1245 (11th Cir. 2025) (en banc)

- *Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577 (7th Cir. 2000)

- *Lightfoot v. District of Columbia*, 273 F.R.D. 314 (D.D.C. 2011)

- *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023)

- *Marcum v. Crews*, No. 5:25-cv-00238, 2025 WL 2630922 (E.D. Ky. Sept. 12, 2025)

- *Marcum v. Crews*, No. 25-5840, Dkt. 26 (6th Cir. Oct. 23, 2025)

33

AR-000037

- *McCarthy v. Madigan*, 503 U.S. 140 (1992)

- *Mississippi v. Johnson*, 71 U.S. 475 (1866)

- *Money v. Pritzker*, 453 F. Supp. 3d 1103 (N.D. Ill. 2020)

- *NRDC v. DOE*, 362 F. Supp. 3d 126 (S.D.N.Y. 2019)

- *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032 (D.C. Cir. 2012)

- *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34 (D.D.C. 2011)

- *Newdow v. Roberts*, 603 F.3d 1002 (D.C. Cir. 2010)

- *Nez Perce Tribe v. Kempthorne*, No. 06-2239 (JR), 2008 WL 11408458 (D.D.C. Dec. 1, 2008)

- *Nken v. Holder*, 556 U.S. 418 (2009)

- *Ortiz v. Fireboard Corp.*, 527 U.S. 815 (1999)

- *Otto v. Boca Raton*, 981 F.3d 854 (11th Cir. 2020)

- *Ramirez v. U.S. Immigr. & Customs Enf't*, 338 F. Supp. 3d 1 (D.D.C. 2018)

- *Ross v. Blake*, 578 U.S. 632 (2016)

- *Rouse v. Plantier*,182 F.3d 192 (3d Cir. 1999)

- *Sabata v. Nebraska Dep't of Corr. Servs.*, 337 F.R.D. 215 (D. Neb. 2020)

- *Sampson v. Murray*, 415 U.S. 61 (1974)

- *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168 (2025)

- *Sherley v. Sebelius*, 689 F.3d 776 (D.C. Cir. 2012)

- *Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597 (10th Cir. 2008)

- *Sissel v. Wormuth*, 77 F.4th 941 (D.C. Cir. 2023)

- *Smith v. Hodge Unit Staff & Admin.*, No. 6:23CV268, 2024 WL 5346411 (E.D. Tex. Dec. 6, 2024)

- *Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024)

- *Sullivan v. Cnty. of Pierce*, 216 F.3d 1084 (9th Cir. 2000)

- *Torres v. Del Toro*, No. 1:21-cv-306-RCL, 2021 WL 4989451 (D.D.C. Oct. 7, 2021)

- *United States v. Salerno*, 481 U.S. 739 (1987)

- *United States v. Skrmetti*, 605 U.S. 495 (2025)

- *VanDerStok v. Garland*, 633 F. Supp. 3d 847 (N.D. Tex. 2022)

- *Wade v. McDade*, 106 F.4th 1251 (11th Cir. 2024) (en banc)

34

AR-000038

- *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008)

- *Winter v. NRDC*, 555 U.S. 7 (2008)

- *Wis. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)

- *Women Prisoners of D.C. Dep't of Corrections v. District of Columbia*, 93 F.3d 910 (D.C. Cir. 1996)

- *Woodford v. Ngo*, 548 U.S. 81 (2006)

## B.    Medical Expert Reports

- Expert Report of Kristopher E. Kaliebe, M.D., dated September 19, 2025

## C.    Journals, Media, and Reports

- Abbruzzese, E., Byrne, A., Curlin, F., Gorin, M., Kaliebe, K., Laidlaw, M. K., McDeavitt, K., Sapir, L., & Zhang, Y. (2025). Treatment for pediatric gender dysphoria: Review of evidence and best practices. U.S. Dep't of Health and Human Services. https://opa.hhs.gov/sites/default/files/2025-11/gender-dysphoria-report.pdf

- Adams, N., Hitomi, M., & Moody, C. (2017). Varied reports of adult transgender suicidality: Synthesizing and describing the peer-reviewed and gray literature. Transgender Health, 2(1), 60–75. https://doi.org/10.1089/trgh.2016.0036 (pmc.ncbi.nlm.nih.gov)

- Albar, Koziarz, McMahon, et al., Timing of testosterone discontinuation and assisted reproductive technology outcomes in transgender patients: a cohort study, Fertility & Sterility Report (2023).

- Aldrich, J., Kant, J., & Gramszlo, E. (June 2023). Gender-affirming care, incarceration, and the eight amendment. Health Law, 25 (6): E407-413. Doi: 10.1001/amajethics.2023.407.

- American Academy of Pediatrics. (2025). AAP speaks out against HHS report on gender dysphoria, medical organizations' statements (M. Del Monte, Interviewer) [News article]. AAP News. https://publications.aap.org/aapnews/news/32145/AAP-speaks-out-against-HHS-report-on-gender?autologincheck=redirected

- American Psychiatric Association (2022). Diagnostic and statistical manual of mental disorders (5-TR). American Psychiatric Association. (pages 511-520). *suicide risk page 518-519.

- American Psychological Association (2017). Ethical principles of psychologists and code of conduct (2002, amended effective June 1, 2010 and January 1, 2017). https://www.apa.org/ethics/code/.

- American Psychological Association. (Dec. 2015). Guidelines for psychological practice with transgender and gender nonconforming people. American Psychological Association, 70 (9), 832-864. http://dx.doi.org/10.1037/a0039906.

AR-000039

- American Psychological Association. (Feb. 2024). APA policy statement on affirming evidence-based inclusive care for transgender, gender-diverse, and nonbinary individuals, addressing misinformation, and the role of psychological practice and science. American Psychological Association.

- Amicus Brief of Idaho, Indiana, 23 other States, and the Arizona Legislature, in support of appellants, *Doe v. Bondi*, Nos. 25-5099, 25-5101, 25-5108 (D.C. Cir. filed May 16, 2025).

- Amicus Brief of Idaho, 19 other States, and the Arizona Legislature, in support of appellants, *Benjamin v. Oliver*, No. 25-14263 (11th Cir. filed Jan. 9, 2026).

- Anderson D, Wijetunge H, Moore P, Provenzano D, Li N, Hasoon J, Viswanath O, Kaye AD, Urits I. Gender dysphoria and its non-surgical and surgical treatments. Health Psychol Res. 2022 Sep 23;10(3):38358. doi: 10.52965/001c.38358. PMID: 36168640; PMCID: PMC9501960.

- Anne Lawrence, Patient-Reported Complications and Functional Outcomes of Male-to-Female Sex Reassignment Surgery, Archives of Sexual Behavior (2006).

- Baker KE, Wilson LM, Sharma R, Dukhanin V, McArthur K, Robinson KA, Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review, J Endocr Soc. 2021 Feb 2;5(4):bvab011. doi: 10.1210/jendso/bvab011. PMID: 33644622; PMCID: PMC7894249.

- Block, J., Dispute arises over World Professional Association for Transgender health's involvement in WHO's trans health guideline. BMJ Investigation, 387 (Oct. 30, 2024), doi:10/1136/bmj.q2227

- Buehler, Emily, Substantiated Incidents of Sexual Victimization Reported by Adult Correctional Authorities, 2016-2018, U.S. Dep't of Justice (2023)

- Carretta, R., McKee, S., Rhee, T. (2023). Gender differences in risks of suicide and suicidal behaviors in the USA: A Narrative Review. Current Psychiatry Reports, (25), 809-824.

- Coalition of Correctional Healthcare Authorities (CCHA), Correctional Health Policy Priorities (2025)

- Cohort profile: Study of Transition, Outcomes and Gender (STRONG) to assess health status of transgender people. Quinn VP, Nash R, Hunkeler E, et al. Cohort profile: Study of Transition, Outcomes and Gender (STRONG) to assess health status of transgender people. BMJ Open 2017;7:e018121.doi:10.1136/bmjopen-2017-018121

- Coleman, E., Radix, A. E., Bouman, W. P., Brown, G. R., De Vries, A. L. C., Deutsch, M. B., Ettner, R., Fraser, L., Goodman, M., Green, J., Hancock, A. B., Johnson, T. W., Karasic, D. H., Knudson, G., Leibowitz, S., Meyer-Bahlburg, H. F. L., Monstrey, S. J., Motmans, J., Nahata, L., Arcelus, J. (2022). Standards of care for the health of transgender and gender diverse people, version 8. International Journal of Transgender Health, 23(Suppl. 1), S1–S259. https://doi.org/10.1080/26895269.2022.2100644.

AR-000040

- Costa & Colizzi, The effect of cross-sex hormonal treatment on gender dysphoria individuals' mental health: a systematic review: Dove Press Journal, Neuropsychiatric Disease and Treatment (2016).

- Crosby, A. E., Ortega, L. A. G., & Melanson, C., Self-directed violence surveillance: Uniform definitions and recommended data elements, version 1.0, Centers for Disease Control and Prevention, National Center for Injury Prevention and Control (2011).

- Cruel and Unusual Punishment: Stopping the Dangerous Policies Putting Men in Women's Prisons, Independent Women's Forum (Dec. 20, 2024), https://www.independentwomen.com/cruel-and-unusual-punishment-report/.

- Defining a danger zone for iatrogenic long thoracic nerve injury in gender-affirming mastectomy, Journal of Plastic, Reconstructive & Aesthetic Surgery (Jan. 2025).

- Derek Bagley, Reducing Transgender Surgery Side Effects, Endocrine Society (2021).

- Drakeford, L., Correctional policy and attempted suicide among transgender individuals. Journal of Correctional Health Care, 24(2), 171-82 (2018), https://doi.org/10.1177/1078345818764110.

- Endocrine Society Clinical Practice Guideline: Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons (2017).

- Evans, D. (2002, Dec 20). Hierarchy of evidence: a framework for ranking evidence evaluating healthcare interventions. Journal of Clinical Nursing, 12(1): 77-84. Doi:10.1046/j.1365-2702.2003.00662.x.

- Examining gender-specific mental health risks after gender-affirming surgery: a national database study. Journal of Sexual Medicine, 2025, Vol. 00, Issue 00.

- Fenway Health Transgender Health Conference, Advancing Excellence in Transgender Health (2018).

- Fraser, L. (2015). Gender Dysphoria: Definition and Evolution Through the Years. In: Trombetta, C., Liguori, G., Bertolotto, M. (eds) Management of Gender Dysphoria. Springer, Milano. https://doi.org/10.1007/978-88-470-5696-1_3.

- Gaffney, T. (2023, Sept 15). Randomized controlled trials are the 'gold standard' of research—but a difficult fit for trans care. Statnews. Retrieved from The challenges of running trials on gender-affirming care.

- Galvin, G. (2024, Dec 13). Several countries have restricted the use of puberty blockers, citing insufficient evidence on their benefits for gender-questioning youth and potential long-term effects. Euronews. Retrieved from https://www.euronews.com/health/2024/12/13/the-uk-is-the-latest-country-to-ban-puberty-blockers-for-trans-kids-why-is-europe-restrict.

AR-000041

- García-Vega E, Camero A, Fernández M, Villaverde A. Suicidal ideation and suicide attempts in persons with gender dysphoria. Psicothema. 2018 Aug;30(3):283-288. doi: 10.7334/psicothema2017.438. PMID: 30009750.

- Gender-affirming treatment and mental health diagnoses in Danish transgender persons: a nationwide register-based cohort study. European Journal of Endocrinology, 2023, 189, 336-345, https://doi.org/10.1093/ejendo/lvad119.

- Gurrala, Rakesh R., et al., The Impact of Exogenous Testosterone on Breast Cancer Risk in Transmasculine Individuals, 90(1) Annals of Plastic Surgery 96 (2023).

- Haupt, et al., Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women, 11 Cochrane Database of Systematic Reviews, Art. No. CD013138, at 2, 11 (2020).

- Herman, J. and O'Neill, K. Fact Sheet: Suicide Risk and Prevention for Transgender People: Summary of Research Findings. UCLA School of Law Williams Institute (Sept. 2021).

- Hruz, P. W. (2020). Deficiencies in scientific evidence for medical management of gender dysphoria. The Linacre Quarterly, 87(1), 34–42. https://doi.org/10.1177/0024363919873762.

- Jackson D. Suicide-related outcomes following gender-affirming treatment: A review. Cureus. 2023 Mar 20;15(3):e36425. doi: 10.7759/cureus.36425. PMID: 36950718; PMCID: PMC10027312.

- Jacobs, P., Researchers slam HHS report on gender-affirming care for youth, Science (May 2, 2025), https://www.science.org/content/article/researchers-slam-hhs-report-gender-affirming-care-youth.

- Kaltiala, R., Helminen, M., Holttinen, T., & Tuisku, K. (2024). Discontinuing hormonal gender reassignment: A nationwide register study. BMC Psychiatry, 24, Article 566. https://doi.org/10.1186/s12888-024-06005-6 (bmcpsychiatry.biomedcentral.com).

- Klaver, M., Dekker, M.J.H.J., de Mutsert, R., Twisk, J.W.R, den Heijer, M. (2017, Jun). Cross-sex hormone therapy in transgender persons affects total body weight, body fat and lean body mass: a meta-analysis. Andrologia, 49(5). doi:10.1111/and.12660.

- Kohnepoushi, P., Nikouei, M., Cheraghi, M., Hasanabadi, P., Rahmani, H., Moradi, M., Moradi, G., Moradpour, F., & Moradi, Y. (2023). Prevalence of suicidal thoughts and attempts in the transgender population of the world: A systematic review and meta-analysis. Annals of General Psychiatry, 22(1), Article 28. https://doi.org/10.1186/s12991-023-00460-3.

- Krug, E. G., Dahlberg, L. L., Mercy, J. A., Zwi, A. B., & Lozano, R. (Eds.). (2002). World report on violence and health. World Health Organization. https://www.who.int/publications/i/item/9241545615.

AR-000042

- Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweeden. Dhejne C, Lichtenstein P, Boman M, Johansson ALV, Långström N, Landén M (2011) Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden. PLoS ONE 6(2): e16885. https://doi.org/10.1371/journal.pone.0016885.

- MacKinnon, K. R., Kia, H., Salway, T., Ashley, F., Lacombe-Duncan, A., Abramovich, A., Enxuga, G., & Ross, L. E. (2022). Health care experiences of patients discontinuing or reversing prior gender-affirming treatments. JAMA Network Open, 5(7), e2224717. https://doi.org/10.1001/jamanetworkopen.2022.24717 (jamanetwork.com).

- National LGBTQ+ Bar Association. (2022). Resource guide to improve safety in carceral housing for transgender people. https://lgbtqbar.org/programs/ti-project/.

- O. Moffit & J. C. Findley, A case report of first-onset psychosis in transgendered female, Gynecological Endocrinology (2016).

- Office of the Inspector General (OIG). (2020). OIG special report: The California Department of Corrections and Rehabilitation has taken thoughtful and important steps to address the difficult conditions of confinement for incarcerated transgender, nonbinary, and intersex individuals. California Office of the Inspector General. https://oig.ca.gov/reports.

- Philadelphia Trans-Health Conference (June 12-14, 2014).

- Restar, A. J., Layland, E. K., Davis, B., Thompson, H., & Streed, C. (2024). The public health crisis state of transgender health care and policy. American Journal of Public Health, 114(2), 161–163. https://doi.org/10.2105/AJPH.2023.307523.

- Risk of Suicide and Self-Harm Following Gender-Affirmation Surgery. Straub J J, Paul K K, Bothwell L G, et al. (April 02, 2024) Risk of Suicide and Self-Harm Following Gender-Affirmation Surgery. Cureus 16(4): e57472. DOI 10.7759/cureus.57472.

- Roberts, C. M., Klein, D. A., Adirim, T. A., Schvey, N. A., & Hisle-Gorman, E. (2022). Continuation of gender-affirming hormones among transgender adolescents and adults. The Journal of Clinical Endocrinology & Metabolism, 107(9), e3937–e3943. https://doi.org/10.1210/clinem/dgac251.

- Robinson, L., Dupre, J., Huselid, A., Burke, S. (May 2024). The present state of housing and treatment of transgender incarcerated persons. The Journal of the American Academy of Psychiatry and the Law, 52 (2). DOI: 10.29158/JAAPL.240020-24.

- Sinclair, J.C. (2003 Jun). Weighing risks and benefits in treating the individual patient. Clinics in Perinatology, 30(20). 251-268.

- Sinsky, C.A., Bavafa, H., Roberts, R.G., & Beasley, J.W. (2021, Mar-Apr). Standardization vs customization: finding the right balance. Annals of Family Medicine, 19(2), 171-177. Doi:10.1370.afm.2654.

AR-000043

- Spanos, C., Bretherton, I., Zajac, J.D., Cheung, A.S. (2020, Mar 15). Effects of gender-affirming hormone therapy on insulin resistance and body composition in transgender individuals: A systematic review. World Journal of Diabetes, 11(3):66-77.doi: 10.4239/wjd.v11.i3.66.

- Stuenkel, Davis, Gompel, et al, Treatment of Symptoms of the Menopause: An Endocrine Society Clinical Practice Guideline, The Journal of Clinical Endocrinology & Metabolism, Volume 100, Issue 11 (2015).

- Suffoletto & Hess, Tapering vs. Cold Turkey: Symptoms vs. Successful Discontinuation of Menopausal Hormone Therapy. National Institute of Health, NIH Public Access, (2010).

- The Cass Review, Independent Review of Gender Identity Services for Children and Young People: Final Report (April 2024), https://perma.cc/D728-LUM8.

- The Economist: Research into trans medicine has been manipulated. https://www.economist.com/united-states/2024/06/27/research-into-trans-medicine-has-been-manipulated.

- The Endocrine Society's Clinical Guidelines. Endocrine Treatment of Transsexual Persons (2009).

- The Moss Group, Inc. (2022). SB 132 the Transgender Respect, Agency, and Dignity Act implementation review report. The Moss Group, Inc.

- Thematic Analysis of Lived Experience in Patients With Adult Acquired Buried Penis. The Journal of Urology, Vol. 206, No. 3S, Supplement, Friday, September 10, 2021.

- transgender individuals: a systematic review. Transgender Health, 8(1):6-21. doi: 10.1089/trgh.2020.0094.

- U.S. Dep't of Health and Human Services, HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures, https://www.hhs.gov/press-room/hhs-releases-peer-reviewed-report-discrediting-pediatric-sex-rejecting-procedures.html.

- U.S. Dep't of Health and Human Services, The Perioperative Care of the Transgender Patient, Tollinche, Walters, Radix (2018).

- Uchimura, L.Y.T., Yonekura, T., Figueiró, M.F., Quintans, J.R., Freire, P., & Maia, F.H.A. (2025, Jan 10). Hormone therapy and cancer risks in transgender people: a systematic review. Epidemiologia e Servicios de Saude, 33(spe1):e2024319. doi: 10.1590/S2237-96222024v33e2024319.especial.en.

- University of California San Francisco. (n.d.) Gender affirming health program. Retrieved from https://transcare.ucsf.edu/guidelines.

- University of California, San Francisco Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People (2016).

AR-000044

- Van Leerdam, T.R., Zajac, J.D., Cheung, A.S., The Effect of Gender-Affirming Hormones on Gender Dysphoria, Quality of Life, and Psychological Functioning in Transgender Individuals: A Systematic Review (Feb. 8, 2023), doi: 10.1089/trgh.2020.0094.

- Van Zijverden, L.M., Wiepjes, C.M., van Diemen, J.J.K, Thijs, A., & den Heijer, M. (2024, Feb 1). Cardiovascular disease in transgender people: a systematic review and meta-analysis. European Journal of Endocrinology, 190(2), S13-S24. doi:10.1093/ejendo/lvad170.

- White Hughto, J.M., & Reisner, S.L. (2016, Jan 13). A systematic review of the effects of hormone therapy on psychological functioning and quality of life in transgender individuals. Transgender Health, 1(1):21-31. doi: 10.1089/trgh.2015.0008.

- Wiepjes, C. M., den Heijer, M., Bremmer, M. A., Nota, N. M., de Blok, C. J. M., Coumou, B. J. G., & Steensma, T. D. (2020). Trends in suicide death risk in transgender people: Results from the Amsterdam Cohort of Gender Dysphoria study (1972–2017). Acta Psychiatrica Scandinavica, 141(6), 486–491.

- World Professional Association for Transgender Health Standard of Care 8: Standards of Care for the Health of Transgender and Gender Diverse People, Version 8.

- World Professional Association for Transgender Health, WPATH and USPATH Comment on the Cass Review (2024).

- World Professional Association for Transgender Health: Certified Training Course on Transgender Health: Best Practices in Medical and Mental Health Care (2016).

- World Professional Association for Transgender Health: Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People (2012).

- https://www.independentwomen.com/wpcontent/uploads/2025/01/CUP_Report_FINAL.pdf

- https://www.nbcnews.com/nbc-out/out-news/nj-trans-prisoner-impregnated-2-inmates-transferred-mens-facility-rcna38947

- https://nypost.com/2023/09/06/new-jersey-prisoner-claims-she-was-sexually-assaulted-by-trans-prisoner-lawsuit/

- https://www.nationalreview.com/news/hundreds-of-transgender-california-inmates-request-transfers-to-womens-prisons/

- https://freebeacon.com/california/californias-female-prisoners-feel-threatened-by-transgender-inmates-the-state-doesnt-care/

AR-000045

### D.    Bureau of Prisons and Department of Justice Correspondence

- BOP Memorandum: Transgender Clinical Care Consultant Team (2014)

- BOP Transgender Resource Guide (2014)

- BOP Medical Management of Transgender Inmates (2016)

- BOP (n.d.) Custody & Care. Medical care. Retrieved from https://www.bop.gov/inmates/custody_and_care/medical_care.jsp

- BOP Program Statement 5521.06, Housing Units, Inmates, and Inmate Work Areas

- BOP Program Statement 5538.08, Escorted Trips

- BOP Program Statement 5580.08, Inmate Personal Property

- BOP Program Statement 6010.05, Health Services Administration

- BOP Program Statement 5324.12, CN-1 Sexually Abusive Behavior Prevention and Intervention Program, Reentry Services Division, Psychology Services Branch (Feb. 18, 2025).

- BOP Transgender resource guide: An aid for people in the custody of the Federal Bureau of Prisons. Reentry Services Division, Women and Special Populations Branch (Aug. 2024).

- BOP Program Statement 5200.08 Transgender Offender Manual, Reentry Services Division, Women and Special Populations Branch (Jan. 13, 2022).

### E.    Executive Orders

- Executive Order 14,168 of January 20, 2025, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615 (Jan. 30, 2025)

- Executive Order 14,187 of January 28, 2025, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8,771 (Feb. 3, 2025)

### F.    State Laws and Policies

- Florida

  - Florida Department of Corrections, Office of Health Services, Bulletin No. 15.05.23 titled Mental Health Treatment of Inmates with Gender Dysphoria.

  - Fla. Stat. Ann. §286.311, *et seq.*

- California

  - California Correctional Health Care Services, Care Guide on Gender Dysphoria. (2015)

42

AR-000046

- - California Correctional Health Care Services Referral for Consideration of Gender Affirming Surgery. (2023)
  - California Correctional Health Care Services, Care Guide on Transgender (2025)
- Georgia
  - Ga. Code Ann. §42-5-2, *et seq.*
- Idaho
  - Idaho Code §18-8901, *et seq.*
- Indiana
  - Ind. Code Ann. §11-10-3-3.5, *et seq.*
- Kentucky
  - Kentucky Corrections Policies and Procedures on Lesbian, Gay, Bisexual, Transgender and Intersex Offenders.
  - Ky. Rev. Stat. Ann. §197.280, *et seq.*
- Oklahoma
  - Oklahoma Department of Corrections Policies on Determination and Management of Inmates with Gender Dysphoria.
- Minnesota
  - Department of Corrections Management and Placement of Incarcerated People Who are Transgender, Gender Diverse, Intersex, or Nonbinary

AR-000047