**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALISHEA KINGDOM, et al., | Case No. 1:25-cv-00691-RCL |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

## MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR AN UPDATED PRELIMINARY INJUNCTION AND TO STAY AGENCY ACTION

# Table of Contents

**Page**

I.  INTRODUCTION ...................................................................................................1

II.  STATEMENT OF FACTS ....................................................................................3

    A.  Background on Gender Dysphoria.....................................................................3

    B.  The Program Statement, Consistent with EO 14168 and BOP's Prior Implementing Memoranda, Would Strip Plaintiffs and Class Members of Medically Necessary Health Care for Gender Dysphoria, Placing Them at Substantial Risk of Serious Harm. ......................................................................6

        1.  BOP's Treatment of Individuals with Gender Dysphoria Prior to the Executive Order ......................................................................6

        2.  EO 14168, BOP's Implementing Memoranda, and This Court's Preliminary Injunction ...........................................................8

        3.  BOP Issues Program Statement 5260.01, "Management of Inmates with Gender Dysphoria" ....................................................10

        4.  Impacts on Plaintiffs and Class Members...............................18

            a.  Alishea Sophia Kingdom ..............................................19

            b.  Solo Nichols...................................................................19

            c.  Jas Kapule ......................................................................20

            d.  Harms to the Class .........................................................21

III.  ARGUMENT........................................................................................................22

    A.  Plaintiffs Are Entitled to Preliminary Injunctive Relief and a Stay Under the APA...........................................................................................................24

        1.  Plaintiffs Are Likely to Succeed on the Merits........................24

            a.  Plaintiffs are Likely to Succeed on Their Eighth Amendment Claim........................................................24

            b.  Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims. ...................................................33

        2.  Plaintiffs Will Be Irreparably Harmed Absent an Injunction and/or Stay. ................................................................................42

        3.  The Balance of Hardships and Public Interest Favor Granting an Injunction. ...........................................................................43

    B.  No Bond Should Be Required.........................................................................44

IV.  CONCLUSION....................................................................................................44

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Affinity Healthcare Servs., Inc. v. Sebelius*,
720 F. Supp. 2d 12 (D.D.C. 2010) .......................................................................................23

*Afr. Communities Together v. Noem*,
2026 WL 395732 (D. Mass. Feb. 12, 2026) ........................................................................36

*Allen v. Sakai*,
48 F.3d 1082 (9th Cir. 1995) ...............................................................................................27

*Ancata v. Prison Health Servs.*,
769 F.2d 700 (11th Cir. 1985) .............................................................................................29

*Bedford Cnty. Mem'l Hosp. v. Health & Hum. Servs.*,
769 F.2d 1017 (4th Cir. 1985) .............................................................................................42

*Bennett v. Spear*,
520 U.S. 154 (1997).............................................................................................................33

*Bernier v. Allen*,
38 F.4th 1145 (D.C. Cir. 2022).............................................................................................26

*Board v. Farnham*,
394 F.3d 469 (7th Cir. 2005) ...............................................................................................30

*Brawner v. Scott Cty., Tenn.*,
14 F.4th 585 (6th Cir. 2021) ................................................................................................29

*Brock v. Wright*,
315 F.3d 158 (2d Cir. 2003).................................................................................................29

*Brown v. Plata*,
563 U.S. 493 (2011).......................................................................................................24, 26

*Butte Cnty., Cal. v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010).................................................................................34, 37, 38

*Colwell v. Bannister*,
763 F.3d 1060 (9th Cir. 2014) .......................................................................................28, 29

*Comcast Corp. v. FCC*,
579 F.3d 1 (D.C. Cir. 2009)..................................................................................................34

*Counsel of Parent Att'ys & Advocs., inc. v. DeVos*,
365 F. Supp. 3d 28 (D.D.C. 2019)..................................................................................34, 42

ii

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Cowpasture River Pres. Ass'n v. Forest Serv.*,
911 F.3d 150 (4th Cir. 2018) ...................................................................................35

*CSL Plasma Inc. v. United States Customs & Border Prot.*,
628 F. Supp. 3d 243 (D.D.C. 2022)....................................................................38, 39

*Cuoco v. Moritsugu,*
222 F.3d 99 (2d Cir. 2000)......................................................................................27

*Cuomo v. U.S. Nuclear Regulatory Comm'n*,
772 F.2d 972 (D.C. Cir. 1985)................................................................................23

*De'Lonta v. Angelone,*
330 F.3d 630 (4th Cir. 2013) .............................................................................27, 30

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)...........................................................................................34, 35

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020)....................................................................................................39

*Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*,
412 F.2d 165 (D.C. Cir. 1969)................................................................................22

*Edmo v. Corizon, Inc.*,
935 F.3d 757 (9th Cir. 2019) .............................................................................27, 43

*Estelle v. Gamble,*
429 U.S. 97 (1976)........................................................................................24, 26, 29

*Evergreen Shipping Agency (Am.) Corp. v. Fed. Mar. Comm'n*,
106 F.4th 1113 (D.C. Cir. 2024)....................................................................34, 41, 42

*Farmer v. Brennan,*
511 U.S. 825 (1994).............................................................................................25, 26

*Farmer v. Hawk,*
991 F.Supp. 19 (D.D.C. 1998), *rev'd in part on other grounds sub nom. Farmer v. Moritsugu*, 163 F.3d 610 (D.C. Cir. 1998) ...............................................................26

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)......................................................................................34, 38, 39, 41

*Fields v. Smith,*
653 F.3d 550 (7th Cir. 2011) .........................................................................27, 29, 32

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Getty v. Fed. Savs. & Loan Ins. Corp.*,
  805 F.2d 1050 (D.C. Cir. 1986) ...................................................................................40

*Gordon v. Schilling*,
  937 F.3d 348 (4th Cir. 2019) .......................................................................................29

*Graham v. Florida*,
  560 U.S. 48 (2010) .......................................................................................................28

*Greason v. Kemp*,
  891 F.2d 829 (11th Cir. 1990) .....................................................................................30

*Greeno v. Daley*,
  414 F.3d 645 (7th Cir. 2005) .......................................................................................31

*Hadix v. Johnson*,
  367 F.3d 513 (6th Cir. 2004) .......................................................................................26

*Hall v. Florida*,
  572 U.S. 701 (2014) .....................................................................................................28

*Helling v. McKinney*,
  509 U.S. 25 (1993) ..................................................................................................25, 26

*Hicklin v. Precynthe*,
  No. 16-CV-01357, 2018 WL 806764 (E.D. Mo. Feb. 9, 2018) ...................................31

*Howell v. Evans*,
  922 F.2d 712 (11th Cir. 1991), *vacated pursuant to settlement*,
  931 F.3d 711 (11th Cir. 1991)
  ......................................................................................................................................27

*In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*,
  2026 WL 710202 (D.D.C. Mar. 13, 2026) ...................................................................35

*Johnson v. California*,
  543 U.S. 499 (2005) .....................................................................................................32

*Johnson v. Wright*,
  412 F.3d 398 (2d Cir. 2005) ........................................................................................29

*Keohane v. Fla. Dep't of Corr. Sec'y*,
  952 F.3d 1257 (11th Cir. 2020) ..............................................................................27, 29

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Kosilek v. Spencer*,
774 F.3d 63 (1st Cir. 2014)................................................................................31

*Leach v. Shelby Cnty. Sheriff*,
891 F.2d 1241 (5th Cir. 1989) ...........................................................................30

*Manufacturers Ry. Co. v. Surface Transp. Bd.*,
676 F.3d 1094 (D.C. Cir. 2012)....................................................................34, 41

*Markel v. Del Toro*,
2025 WL 304875 (D.D.C. Jan. 27, 2025).........................................................42

*McKenna v. Wright*,
386 F.3d 432 (2d Cir. 2004)..............................................................................29

*Meriwether v. Faulkner*,
821 F.2d 408 (7th Cir. 1987) ............................................................................27

*Miller v. King*,
384 F.3d 1248 (11th Cir. 2004), *vacated and superseded on other grounds*,
449 F.3d 1149 (11th Cir. 2006) ........................................................................30

*\*Miot v. Trump*,
2026 WL 266413, at \*29 (D.D.C. Feb. 2, 2026), *cert. granted before judgment*,
2026 WL 731087 (U.S. Mar. 16, 2026)........................................................35, 36

*Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*,
834 F.2d 326 (3d Cir. 1987)..............................................................................29

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..............................................................................34, 41, 42

*Nat'l TPS All. V. Noem*,
2025 WO 4058572 (N.D. Cal. Dec. 31, 2025) .............................................11, 36

*National Senior Citizens Law Center, Inc. v. Legal Services Corp.*
581 F. Supp. 1362 (D.D.C. 1984)......................................................................43

*New York Cross Harbor Railroad v. Surface Transp. Bd.*,
374 F.3d 1177 (D.C. Cir. 2004)........................................................................41

*Nken v. Holder*,
556 U.S. 418 (2009)......................................................................................23, 43

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*NLRB v. Lily Transp. Corp.*,
  853 F.3d 31 (1st Cir. 2017) ..................................................................................................38

*P.J.E.S. v. Wolf*,
  502 F. Supp. 3d 492 (D.D.C. 2020) ......................................................................................44

*Petties v. Carter*,
  836 F.3d 722 (7th Cir. 2016) (en banc) ................................................................................31

*Phillips v. Mich. Dep't of Corrs.*,
  731 F. Supp. 792 (W.D. Mich. 1990), *aff'd*, 932 F.2d 969 (6th Cir. 1991)..........................27

*Planned Parenthood of Greater New York v. U.S. Dep't of Health & Hum. Servs.*,
  2025 WL 2840318 (D.D.C. Oct. 7, 2025) .......................................................................39, 41

*Pursuing America's Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016)..........................................................................................43, 44

*Roe v. Elyea*,
  631 F.3d 843 (7th Cir. 2011) ................................................................................................29

*Saget v. Trump*,
  375 F. Supp. 3d 280 (E.D.N.Y. 2019) ..............................................................................35, 36

*Smith v. Jenkins*,
  919 F.2d 90 (8th Cir. 1990) ..................................................................................................28

*Soneeya v. Spencer*,
  851 F. Supp. 2d 228 (D. Mass. 2012) ...................................................................................31

*Sorenson Commc'ns Inc. v. FCC*,
  755 F.3d 702 (D.C. Cir. 2014)...............................................................................................42

*\*Spain v. Procunier*,
  600 F.2d 189 (9th Cir. 1979) ...................................................................................24, 28, 32

*Steele v. Shah*,
  87 F.3d 1266 (11th Cir. 1996) ..............................................................................................30

*Sullivan v. Cnty. of Pierce*,
  No. 98-35399, 2000 WL 432368 (9th Cir. Apr. 21, 2000)....................................................30

*TikTok Inc. v. Trump*,
  490 F. Supp. 3d 73 (D.D.C. 2020).........................................................................................44

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United States v. Stanchich*,
550 F.2d 1294 (2d Cir. 1977) (Friendly, J.).............................................................35

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019).......................................................................38, 39

*White v. Farrier*,
849 F.2d 322 (8th Cir. 1988) ...............................................................................27

*White v. Napoleon*,
897 F.2d 103 (3d Cir. 1990)..................................................................................31

*Whitley v. Albers*,
475 U.S. 312 (1986)..............................................................................................32

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
485 F. Supp. 3d 1 (D.D.C. 2020) .....................................................................39, 40

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008)..............................................................................................23, 42

**STATUTES**

PS 6010.05 §1 .......................................................................................................39

5 U.S.C. § 705...................................................................................................22, 23

5 U.S.C. § 706.........................................................................................................33

Administrative Protection Act ("APA") ...................................................................2, 9

Prison Litigation Reform Act § 3626(a)(2) ..............................................................10

**RULES**

Fed. R. Civ. P. 65.............................................................................................22, 23

Fed. R. Civ. P. 65(c) ..............................................................................................44

**OTHER AUTHORITIES**

U.S. CONST. amend. I...............................................................................................32

U.S. CONST. amend. VIII ................................................................................... passim

U.S. CONST. amend XIV ..........................................................................................29

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*.......3

FED. BUREAU OF PRISONS, TRANSGENDER OFFENDER MANUAL (2022) ................................ passim

Exec. Order No. 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) .......... passim

FED. BUREAU OF PRISONS, *Medical Care*, https://www.bop.gov/inmates/custody_and_care/medical_care.jsp .........................................6

FED. BUREAU OF PRISONS, MEDICAL MANAGEMENT OF TRANSGENDER INMATES (Dec. 2016), https://perma.cc/K7RQ-8NTU ....................................................................................................6

## I.    **INTRODUCTION**

This Motion seeks to prevent irreparable injury Plaintiffs and Class Members face as a result of Executive Order 14168 ("EO 14168," the "Executive Order," or the "EO")[1] and the Federal Bureau of Prisons' ("BOP") February 19, 2026 Program Statement 5260.01, entitled "Management of Inmates with Gender Dysphoria" (the "Program Statement"). ECF 125. The stated intent of the Program Statement is to do exactly what EO 14168 mandates: "for federal funds to not be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex . . . ." ECF 125 § 8, at 9. Like EO 14168 and BOP's previous memoranda implementing it ("Implementing Memoranda"), ECF 1-1; ECF 1-2, the Program Statement bans gender-affirming medications and social accommodations to address gender dysphoria, regardless of individual medical needs. It therefore is just as unconstitutional and unlawful as EO 14168 and the Implementing Memoranda, and this Court should issue an updated preliminary injunction to enjoin BOP from enforcing its Program Statement to avoid irreparable harm to Plaintiffs and Class Members.

Plaintiffs and approximately one thousand Class Members are in BOP custody and have been diagnosed with gender dysphoria, a serious medical condition characterized by clinically significant distress resulting from the incongruence between a person's gender identity and the sex they were designated at birth. Untreated gender dysphoria can cause depression, anxiety, post-traumatic stress disorder, self-harm, and suicidality. Well-accepted evidence-based protocols for the treatment of gender dysphoria are gender-affirming care, which includes supporting social transition—whereby an individual dresses and otherwise lives consistently with their gender identity—and hormone therapy to bring one's physical features into alignment with their gender

---

[1] Exec. Order No. 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).

1

identity. Social transition and hormone therapy have been shown to greatly alleviate the distress of gender dysphoria and improve mental health.

Plaintiffs and the Class Members have been receiving treatment for their gender dysphoria in accordance with BOP's internal health care policies, which provides for hormone therapy when deemed medically necessary and accommodations such as clothing and other items that enabled them to socially transition ("social accommodations"). Plaintiffs and Class Members have received this care for years and have depended on it for their health.

EO 14168 declares that "[f]ederal funds shall not be used to promote gender ideology," which it defines as "the false claim that males can identify as and thus become women and vice versa," and directs the Attorney General to "ensure that the Bureau of Prisons revises its policies concerning medical care" so that "no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." EO 14168 § 2(f), 3(g), 4(e). Initially, BOP implemented EO 14168 through the Implementing Memoranda issued in February 2025. ECF 1-1; ECF 1-2.

Plaintiffs filed a complaint challenging EO 14168 and motions for preliminary injunction and class certification, and on June 3, 2025, this Court issued an order certifying the class and enjoining Defendants "from enforcing Executive Order 14168 as applied to medical hormone therapy and social accommodations for people in the custody of the BOP and from enforcing the BOP's memoranda implementing Executive Order 14168." ECF 68 at 1–2. Although Plaintiffs had moved based on their Eighth Amendment and Administrative Procedure Act (APA) claims, the Court's opinion was based only on the APA claim, with the Court concluding that Plaintiffs were likely to succeed on the merits of their APA claim that the Implementing Memoranda were arbitrary and capricious based, in part, on the lack of a reasoned explanation for the policy; the Court did not reach Plaintiffs' Eighth Amendment claim. *See generally* ECF 67.

In September 2025, Defendants informed Plaintiffs' counsel that BOP would soon be issuing a new policy. *See* ECF 87-2 ¶¶ 10-11. On February 19, 2026, BOP issued the Program Statement, which, like the Implementing Memoranda and EO 14168, bans gender-affirming care.

To continue to preserve the status quo as it existed before the Executive Order, and to prevent the unlawful infliction of irreparable harm, Plaintiffs seek an updated preliminary injunction that encompasses the Program Statement to preserve Plaintiffs' and Class Members' access to gender-affirming medications and social accommodations while the case is being litigated.

## II.    STATEMENT OF FACTS

### A.  Background on Gender Dysphoria

Gender dysphoria is a serious medical condition characterized by incongruence between one's gender identity and attributes related to one's sex assigned at birth, and clinically significant distress and/or impairment in social, occupational, or other important areas of functioning. ECF 7-2, Declaration of Dr. Dan H. Karasic in Support of Plaintiffs' Motion for a Preliminary Injunction ¶¶ 47-49 ("First Karasic Decl.").[2]

Without treatment, gender dysphoria can cause depression, anxiety, self-harm, and suicidality, and can impair a person's ability to function in all aspects of life, including in school, work, and family and other personal relationships. However, gender dysphoria is amenable to treatment, and the prevailing treatment for it—gender-affirming care, including hormone therapy and social transition—is highly effective. *Id.* ¶¶ 50-52, 64, 66.

Gender-affirming care is widely accepted in the medical community as effective treatment for gender dysphoria. Declaration of Dr. Dan Karasic in Support of Plaintiffs' Motion for an

---

[2] The diagnosis of Gender Dysphoria is described in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM). *Id.* ¶ 48.

Updated Preliminary Injunction ("Third Karasic Decl.") ¶ 33; ECF 7-2, First Karasic Decl. ¶¶ 27, 86. Such treatment can eliminate the distress of gender dysphoria by helping the patient live consistently with their gender identity by aligning their presentation and body with their gender identity. ECF 7-2, First Karasic Decl. ¶ 63. These treatments are supported by all the major American medical and mental health professional organizations and reflected in the clinical practice guidelines for the treatment of gender dysphoria that are relied on by healthcare providers, including those issued by the World Professional Association for Transgender Health (WPATH) and the Endocrine Society. *Id.* ¶¶ 53-62.

Social transition is an important part of care and for some people, can adequately address their gender dysphoria. *Id.* ¶¶ 64, 66. Many individuals with gender dysphoria cannot obtain relief without also receiving medical interventions such as hormone therapy to align the body with their gender identity. *Id.* ¶¶ 66, 68. Gender-affirming medical care may include a number of medications, such as testosterone or estrogen and testosterone suppressants. *Id.* ¶ 68; Third Karasic Decl. ¶ 23 n.1.

Decades of scientific research and clinical experience have demonstrated that social transition and hormone therapy are effective in treating gender dysphoria. ECF 7-2, First Karasic Decl. ¶¶ 28, 72, 73; Third Karasic Decl. ¶ 24. Medical treatment for gender dysphoria has been studied for over half a century, and there is substantial evidence that it improves patient mental health and functioning. Third Karasic Decl. ¶ 24. This evidence is the type and quality of evidence that supports many other widely accepted medical treatments. *Id.* ¶ 25; ECF 7-2, First Karasic Decl. ¶ 74.

There is also substantial evidence that hormone therapy for the treatment of gender dysphoria is safe and its risks are comparable to the risks of other well-accepted medical treatments, including the same medications when they are used to treat other conditions in

cisgender people. Declaration of Dr. Ole-Petter Hamnvik ("Hamnvik Decl.") ¶¶ 34-36, 38-39, 51-54, 63, 65.

For patients for whom gender-affirming medical care is indicated, no alternative treatments have been demonstrated to be effective. ECF 7-2, First Karasic Decl. ¶ 81. There is no evidence that psychotherapy or psychotropic medications can alleviate the distress of gender dysphoria. Third Karasic Decl. ¶¶ 41-45. And, as documented by leading medical authorities, efforts to try to change a person's gender identity are not only ineffective, but can cause harm and are considered unethical. ECF 7-2, First Karasic Decl. ¶ 39.

Gender-affirming care, including social transition and hormone therapy, is therefore medically necessary for many patients with gender dysphoria. *Id.* ¶ 28. Denying patients with gender dysphoria the ability to socially transition or obtain hormone therapy where indicated predictably will lead to significant deterioration in mental health. *Id.* ¶¶ 80, 82. It will not only prolong their gender dysphoria, but also cause additional distress and pose other significant health risks, such as depression, anxiety, suicidal ideation, self-harm, and increased substance use. *Id.* ¶ 80. Some individuals resort to self-treatment by attempting to self-castrate or remove breasts. ECF 7-2, First Karasic Decl. ¶¶ 83-84.

Research and clinical experience specifically show the harms to incarcerated individuals with gender dysphoria who have not been able to receive necessary treatment, including attempts at self-castration and suicidality. *Id.* ¶¶ 84-85.

For individuals with gender dysphoria who have socially and medically transitioned, forcing them to detransition by withdrawing hormone therapy and the ability to socially transition would be expected to cause severe mental health decompensation. *Id*. ¶¶ 72, 85. The Program Statement's provision for tapering of hormone therapy (as opposed to withdrawal cold turkey) does not prevent the predictable serious harms of denying hormone therapy to those who have a medical

5

need for it. Third Karasic Decl. ¶ 19. Clinical experience with patients with gender dysphoria who have had to temporarily pause hormone therapy due to loss of insurance, medical issues, or other reasons shows that the resulting development of sex characteristics that are misaligned with the patient's gender identity causes great distress and mental health decompensation. *Id.* ¶ 22; Hamnvik Decl. ¶ 28.

**B. The Program Statement, Consistent with EO 14168 and BOP's Prior Implementing Memoranda, Would Strip Plaintiffs and Class Members of Medically Necessary Health Care for Gender Dysphoria, Placing Them at Substantial Risk of Serious Harm.**

**1. BOP's Treatment of Individuals with Gender Dysphoria Prior to the Executive Order**

It is BOP policy to provide "essential medical, dental, and mental health (psychiatric) services in a manner consistent with accepted community standards for a correctional environment."[3] Prior to the issuance of EO 14168, under BOP's formal internal health care policies, people incarcerated in BOP facilities who were diagnosed with gender dysphoria received hormone therapy and social accommodations to enable social transition based on individualized patient need in accordance with well-accepted medical protocols, including the WPATH guidelines. ECF 7-3, Declaration of Dr. Cathy Thompson ("First Thompson Decl."), ¶ 33, Ex. B thereto (2022 Transgender Offender Manual), and Ex. C thereto (2023 Clinical Guidelines). In accordance with these BOP clinical guidance policies concerning the care of individuals with gender dysphoria, which were first promulgated in 2016[4] and periodically updated, BOP provided incarcerated people diagnosed with gender dysphoria with gender-affirming care when clinically indicated for them. *Id.* ¶¶ 33, 38; *id.*, Ex. C thereto at 4 ("Gender-affirming health care involves supporting individuals through social, psychological, behavioral, or medical (including hormonal

---

[3] *See* FED. BUREAU OF PRISONS, *Medical Care*, https://www.bop.gov/inmates/custody_and_care/medical_care.jsp.
[4] *See* FED. BUREAU OF PRISONS, MEDICAL MANAGEMENT OF TRANSGENDER INMATES (Dec. 2016), https://perma.cc/K7RQ-8NTU.

treatment or surgery) treatments—to support and affirm an individual's experienced gender identity.").[5] The most recent update to the policies aimed to more "closely align with community standards," *id.*, Ex. C thereto at i, and notes that "[p]roper medical practice necessitates that all cases are evaluated on an individual basis and that treatment decisions are patient-specific." *Id.*, Ex. C thereto at title page.

BOP's "Transgender Offender Manual," initially issued in 2017 and updated in March 2018 and January 2022, likewise provided for individualized assessment for hormone therapy and other treatment in accordance with BOP clinical guidance policies and also set forth the clothing and commissary policies applicable to incarcerated transgender people, as well as additional non-health care policies and practices in place related to the supervision of transgender incarcerated people. *Id.* ¶¶ 28, 32-33, 38 and Ex. B thereto.[6]

To implement these policies, BOP had a Transgender Clinical Care Team comprised of physicians, pharmacists, and social workers. *Id.* ¶ 33, Ex. C thereto at 1. It also had a Transgender Executive Council, which was the "decisionmaking body on all issues affecting the transgender population." *Id.* ¶ 31, Ex. B thereto at 4. Membership on this body included both senior correctional leaders from the BOP's Women and Special Populations Branch as well as the senior psychologist, psychiatrist, security expert, and medical administrator in the agency. *Id.* ¶ 31.

These policies have been effective in treating individuals with gender dysphoria and good for institutional security. Dr. Cathy Thompson saw this firsthand in her more than 20 years as a psychologist with BOP prior to retiring in 2023. *Id.* ¶¶ 1, 38. Dr. Thompson developed programs and policies specific to the safety and treatment of individuals in BOP custody, including BOP's

---

[5] The most recent BOP clinical guidance policy was issued in 2023. Shortly after EO 14168, the 2023 policy was removed from the BOP website; however, it is archived on a perma-CC website at https://perma.cc/U5UT-S9PN. *Id.* ¶ 33. ECF 7-3, First Thompson Decl. 8 33.
[6] Shortly after the issuance of EO 14168, the Transgender Offender Manual was removed from the BOP website; however, the 2022 version is archived on a perma-CC website at https://perma.cc/4BP6-YWRP. *Id.* ¶ 28 n.14.

policies for managing transgender inmates. *Id.* ¶ 1. Dr. Thompson also frequently served as the Acting Psychology Services Branch Administrator of the BOP and in that role served on the Transgender Executive Council. Expert Declaration of Dr. Cathy Thompson in Support of Plaintiffs' Motion for an Updated Preliminary Injunction ("Second Thompson Decl.") ¶ 10. She saw and reviewed the medical files of many patients who received gender-affirming care, *id.* ¶ 11 and had this to say:

> These interventions were effective at treating gender dysphoria in our patient population. Many patients experienced relief of their gender dysphoria and improvement in mental health and functioning including a reduction in symptoms of depression and anxiety, a reduction in self-harm, and greater engagement in programs like education and reentry preparation.

*Id.* ¶ 11; *see also* ECF 7-3, First Thompson Decl. ¶ 38.

Dr. Thompson noted that before BOP implemented these policies, "transgender individuals in BOP custody were more likely to require services to manage mental health crises than incarcerated individuals who are not transgender. In cases of severe gender dysphoria, risks included attempts at self-surgery and suicide." ECF 7-3, First Thompson Decl. at ¶ 27. These all create safety concerns "not only for people who are transgender, but for everyone who works or is incarcerated in the entire system." *Id.* at ¶ 44. Thus, Dr. Thompson concluded:

> BOP's . . . approach of providing gender affirming health care when indicated, as well as accommodations that support social transition under the [Transgender Offender Manual], was effective in maintaining transgender individuals' health and promoting institutional safety. Providing this care improves the agency goals of security and rehabilitation. Prohibiting such care undermines these goals.

*Id*. ¶ 45.

### 2. EO 14168, BOP's Implementing Memoranda, and This Court's Preliminary Injunction

On January 20, 2025, President Trump issued EO 14168, entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." The

Executive Order is aimed at what it calls "gender ideology," which it defines as "the false claim that males can identify as and thus become women and vice versa." EO 14168 § 2(f). It mandates that "[f]ederal funds shall not be used to promote gender ideology." *Id.* § 3(g); *see also* § 3(e) (directing all agencies to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology," and to "cease issuing such statements, policies, regulations, forms, communications or other messages."). Most relevant here, § 4(c) of the Executive Order directs the Attorney General to "ensure that the Bureau of Prisons revises its policies concerning medical care" so that "no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex."

In February 2025, BOP issued two brief memoranda implementing EO 14168's provisions precluding gender-affirming care for individuals in BOP custody (the "Implementing Memoranda"). ECF 1-1, 1-2.

On March 7, 2025, Plaintiffs filed this class action lawsuit challenging EO 14168 and the Implementing Memoranda. ECF-1. They moved for a preliminary injunction and to stay agency action based on their Eighth Amendment and Administrative Procedure Act ("APA") claims and class certification. ECF-7. Plaintiffs sought to enjoin Defendants from enforcing EO 14168 and the Implementing Memoranda, and to require Defendants to continue providing Plaintiffs and Class Members gender-affirming hormone therapy and social accommodations in accordance with BOP policy and practice in effect immediately prior to President Trump's issuance of EO 14168.

On June 3, 2025, this Court granted Plaintiffs' motion for a preliminary injunction after concluding that Plaintiffs were likely to succeed on the merits of their APA claim that the policy was arbitrary and capricious based, in part, on the lack of a reasoned explanation for the policy (the Court did not reach Plaintiffs' Eighth Amendment claim); that Plaintiffs would be irreparably

harmed absent an injunction; and that the balance of equities and public interested favored granting the injunction. ECF 67, 68. The Court enjoined Defendants "from enforcing Executive Order 14168 as applied to medical hormone therapy and social accommodations for people in the custody of the BOP and from enforcing BOP's memoranda implementing Executive Order 14168." ECF 68 at 2.[7] The Court also certified a class consisting of "all persons who are or will be incarcerated in the custody of BOP facilities, with a current medical diagnosis of gender dysphoria or who receive such a diagnosis in the future." *Id.* at 1.

### 3. BOP Issues Program Statement 5260.01, "Management of Inmates with Gender Dysphoria"

In early September 2025, three months after the preliminary injunction, Defendants informed Plaintiffs' counsel that BOP would soon be issuing a new policy. *See* ECF 87-2 ¶¶ 10-11. On February 19, 2026, BOP issued Program Statement 5260.01, entitled "Management of Inmates with Gender Dysphoria." ECF 125. Like the Implementing Memoranda and EO 14168, the Program Statement is a ban on gender-affirming care.

The Program Statement's objective is to provide *only* "mental health services" for gender dysphoria. *Id*. § 1.a, at 1. The Program Statement makes clear that its "intent . . . is for federal funds to not be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex . . . ." *Id.* § 8, at 9. The "Treatment" section of the Program Statement opens by stating that EO 14168 prohibits BOP "from expending federal funds for 'any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex,'" and that BOP will comply with EO 14168. *Id*. § 5, at 5-6. The "Treatment" section provides for mental health care as the only treatment for gender dysphoria. *Id*. § 5(a), at 6. It explicitly prohibits gender-affirming surgery (*id*. § 5(b), at 7),

---

[7] This Court has since granted each of Plaintiffs' motions to renew the preliminary injunction, necessitated by the automatic expiration of preliminary relief every 90 days under § 3626(a)(2) of the Prison Litigation Reform Act. The current 90-day period ends May 31, 2026. ECF 114.

hormone therapy (*id.* § 5(c), at 7-8); and social accommodations (*id.* § 5(d), at 8).

With respect to hormone therapy, the Program Statement mandates that for those not already receiving such treatment, the initiation of hormone therapy as a treatment for gender dysphoria is categorically prohibited. *Id.* § 5(c)(i), at 7. For those currently receiving hormone therapy, they are required to be tapered off, with the aim of "discontinuation of the hormone intervention" for all people in BOP custody receiving such treatment for gender dysphoria. *Id.* § 5(c)(ii), at 7-8. The Program Statement provides for individualized tapering plans for withdrawal from hormone therapy, but it does not permit an individualized determination of whether hormone therapy is medically necessary to treat a person's gender dysphoria—in other words, whether the person should be tapered off hormone therapy at all. *Id.* For individuals who recently began receiving hormones, their tapering plan will involve "a rapid discontinuation of hormones." *Id.* § 5(c)(ii), at 8. For those who have been receiving hormone therapy "for an extended period of time," their tapering plan will include "appropriately paced discontinuation of the hormone intervention." *Id.*

The Program Statement states that for individuals "who (1) are post sex trait modification surgery[8] or (2) have been receiving hormones to address [gender dysphoria] for an extended period of time and develop severe physiological and psychological withdrawal effects from tapering, it may not be appropriate in all cases for the *initial* tapering plan to include cessation of hormones," but in such cases, the Program Statement requires the patient's "tapering plan[]" to be "reevaluated regularly with respect to cessation of hormones." *Id.* (emphasis added). While the withdrawal process may take some time for some subset of patients under the policy, it contemplates *all*

---

[8] This presumably refers to people who have had surgeries that result in them no longer endogenously producing sex hormones. The absence of sex hormones—called hypogonadism—puts individuals at risk of rapid loss of bone strength, causing osteoporosis, which creates a high risk of fractures, and hot flashes and night sweats. Hamnvik Decl. ¶ 72. Thus, denying hormone therapy to someone who also does not produce sex hormones presents additional unique harms.

11

patients being withdrawn from this treatment. Of note, the second category of this provision requires someone to first suffer severe physiological *and* psychological effects of withdrawal for BOP to temporarily pause the cessation of their hormones—they must be put through this suffering, and it is not sufficient for them to suffer only severe physiological effects or severe psychological effects.

Though the Program Statement asserts that it was adopted "independently of Executive Oder 14,168," it also states that "the Bureau will comply with [the] Executive Order unless compliance with the Executive Order is prohibited by a court injunction or court order." *Id.* § 5, at 6. It also says "[t]he intent of [the Program Statement] is for federal funds to not be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex to the maximum extent permitted by law, including the Eighth Amendment to the U.S. Constitution"—mirroring the language of the EO. *Id.* § 8, at 9.

In March, 2026, Defendants produced an administrative record for the Program Statement ("AR"). ECF 160 at 6. Included in the AR is a 43-page memorandum explaining the purported reasons for the policy (of which 12 pages are references), ECF 160-2 ("Policy Memo"), and a 4-page Administrative Record memo, ECF 160-1 ("AR Memo").

To justify the ban on gender-affirming care, the Policy Memo relies primarily on a declaration from Dr. Kristopher Kaliebe, who was retained by Defendants to provide a declaration for purposes of this litigation. ECF 160-3, Declaration of Dr. Kristopher Kaliebe ¶ 1 ("Kaliebe Decl."). *See generally* ECF 160-2, Policy Memo (citing Dr. Kaliebe's declaration over 60 times). Dr. Kaliebe is a psychiatrist who has very little experience treating patients with gender dysphoria.[9] His understanding of gender dysphoria in adults as a temporary condition that will

---

[9] When deposed in another case on December 15, 2025, he testified that of the roughly 20,000 patients he has seen in his career, only about 30 had gender dysphoria and most of those—all but 6 to 8 of them—were pediatric patients. And his experience with this handful of patients was

likely resolve absent gender-affirming care is at odds with how the condition is understood in the field of psychiatry. ECF 160-3, Kaliebe Decl. ¶¶ 31, 38; Third Karasic Decl. ¶51. It is well accepted in the medical field that if gender dysphoria persists into adolescence and adulthood, it is highly unlikely to cease. Third Karasic Decl. ¶ 52. And his views on the treatment of gender dysphoria are at odds with all major medical organizations in the U.S. *Id.* ¶ 33.

The Policy Memo cites a number of post-hoc rationales for the policy that was mandated by the EO. But aside from the fact that these rationales were created to support a predetermined policy, they fail to justify categorically prohibiting gender-affirming care for individuals with gender dysphoria.

### *Assertion that this care is controversial and unproven*

BOP's claim that gender-affirming care for adults is highly controversial and "unproven" is baseless. Third Karasic Decl. ¶¶ 24-35; ECF 7-2, First Karasic Decl. ¶¶ 72-78. While there is some debate in public discourse about appropriate treatment for gender dysphoria in minors, there is no controversy or debate about hormone therapy and social transition for adults. Third Karasic Decl. ¶ 34. These treatments are well supported by research and decades of clinical experience and widely accepted in the medical field. *Id.* ¶¶ 24-33; ECF 7-2, First Karasic Decl. ¶ 73. BOP asserts that this evidence is not reliable, relying heavily on Dr. Kaliebe's declaration, ECF 160-2, Policy Memo at 21, which says the evidence is not reliable because it is not 'high quality evidence." ECF 160-3, Kaliebe Decl. ¶¶ 83, 83. But that is a term of art generally referring to studies that offer less certainty or confidence than randomized controlled trials, e.g cross sectional and longitudinal cohort studies; it does not mean "poor quality" and these methods are not considered "unreliable."

---

extremely limited, many consisting of one-time evaluations. *See* Declaration of Leslie Cooper and Ex. A thereto (excerpts of deposition of Dr. Kristopher Kaliebe in *Keohane v. Dixon*, at 15:14-16:10, 20:9-21:10, 24:11-25:21, 26:16-20, 27:6-12, 28:3-22, 32:4-18, 35:22-36:6, 38:3-40:1, 41:7-14, 48:1-21, 53:1-9 ("Kaliebe Tr."). His publications on this topic at that time were, with the exception of one article on pediatric treatment, letters to the editor of journals and other opinion pieces. *Id.* at 72:10-73:4, 74:8-19.

Third Karasic Decl. ¶¶ 25, 26; *see also* ECF 160-3, Kaliebe Decl. ¶¶ 29-30 (agreeing that "low quality' and "high quality" refer to the level of confidence). And much of medicine relies on "low quality" evidence, because it provides important information and randomized controlled trials are often not feasible or ethical. Third Karasic Decl. ¶ 25 (citing study finding that under 6% of all medical interventions were supported by "high quality" evidence and the majority were supported by "low" or "very low" quality evidence). And as explained by Dr. Karasic, studies that Dr. Kaliebe claims show that hormone therapy is ineffective in fact show no such thing. Third Karasic Decl. ¶¶ 28, 29.

The Policy Memo devotes several pages to making claims about the integrity of WPATH and all the major medical organizations that support gender-affirming care. Even if this characterization of the leading medical organizations had any basis in reality, it would not change the fact that decades of research and clinical experience demonstrate the effectiveness of these treatments, and that there are no other evidence-based treatments for gender dysphoria. Third Karasic Decl. ¶¶ 60, 65. But as Dr. Karasic explained, that narrative of WPATH disregarding science and patient health in favor of ideology, and infecting all the other medical groups, has no basis in fact. *Id*. ¶¶ 61-64, ECF 7-2, First Karasic Decl. ¶¶ 53-62.

> *Assertion that this care is not effective in prisons*

There is also no basis for the assertion that even if gender-affirming care is effective in the community, it is not effective in the carceral setting. BOP offers no support for this assertion, and Dr. Karasic explained that there is no basis to speculate that these treatments that have been proven to be effective for gender dysphoria would be ineffective if the patient is incarcerated. Third Karasic Decl. ¶¶ 37-40. Moreover, Dr. Thompson's declaration provides testimony that this treatment has, in fact, been effective for individuals in BOP custody. Second Thompson Decl. ¶ 11; s*ee also* Third Karasic Decl. ¶ 39 (discussing his experience with incarcerated patients who

14

benefited from gender-affirming care).

*Assertions regarding the risks of treatment*

BOP also points to health risks associated with hormone therapy, ECF 160-2, Policy Memo at 22, but risk is part of most medical treatment and the risks of hormone therapy for gender dysphoria are comparable to the risks of many other treatments, including these same hormonal treatments when used to treat cisgender people for other conditions. Hamnvik Decl. ¶¶ 24-27, 34, 37-39, 51-52, 63, 65. The more serious risks identified by Dr. Kaliebe are very low and often consistent with the risk profiles of cisgender people: transgender men receiving testosterone therapy may see increases in some risks and decreases in others as their risk profile aligns more closely with cisgender men, and transgender women receiving estrogen therapy may see increases in some risks and decreases in others as their risk profile aligns more closely with cisgender women. *Id.* ¶ 65.

*Assertion that psychotherapy is a well-established treatment for gender dysphoria*

The Policy Memo, relying on Dr. Kaliebe, asserts that psychotherapy is a "well-established" treatment for gender dysphoria. ECF 160-2, Policy Memo at 22. It offers no evidence to support that because there is none. While psychotherapy can be helpful to patients with gender dysphoria to address comorbidities and provide support, there is no evidence that psychotherapy can alleviate gender dysphoria and there are no psychotherapeutic protocols for the treatment of this condition. Third Karasic Decl. ¶¶ 42-45. Indeed, although Dr. Kaliebe's declaration asserts that "psychotherapy is the preferred treatment for gender dysphoria," in December he admitted in a deposition that there is no evidence showing that psychotherapy is an effective treatment for gender dysphoria. *See* Declaration of Leslie Cooper and Ex. A thereto (excerpts of deposition of Dr. Kristopher Kaliebe in *Keohane v. Dixon*) ("Kaliebe Tr.") at 144:9-145:4, 309:17-22.

*Assertion that gender-affirming care prolongs gender dysphoria and undermines psychotherapy*

15

The Policy Memo also asserts—again, relying solely on Dr. Kaliebe's declaration—that providing gender-affirming care can prolong gender dysphoria and undermine other treatments. ECF 160-2, Policy Memo at 22, 28. Dr. Kaliebe asserts that it may deter patients from participating in psychotherapy. ECF 160-3, Kaliebe Decl. ¶ 135. But he provides no evidence supporting such a claim, and at his December deposition, admitted there is none. Kaliebe Tr. at 133:4-11, 136:20-137:4; *see also* Third Karasic Decl. ¶¶ 51-53.

*Assertion of security concerns*

Finally, the Policy Memo asserts that providing gender-affirming care may present security issues. It says this care could make patients targets for victimization; that it will raise "fairness concerns" leading to resentment and violence; that social accommodations could facilitate concealing contraband and hiding one's identity; and that making this care available would reward threats of, and could increase, self-harm. ECF 160-2, Policy Memo at 14-16, 24-26. While security concerns can affect *how* medically necessary care is provided to incarcerated people, Dr. Thompson states that in her more than 20 years at BOP, it was not the policy of BOP to deny medically necessary care even when care raised legitimate security concerns, e.g. methadone treatment and canes and crutches that could be used as weapons. Second Thompson Decl. ¶¶ 14-15. Rather, she said, procedures were put in place to ensure that treatment was provided without compromising security. *Id.*

Moreover, Dr. Thompson was not aware of any such security issues arising related to gender-affirming care. *Id.* ¶ 12. Had that been a problem, she would have been informed; having served as BOP's Acting Psychology Services Branch Administrator, her responsibilities included collaborating with the Correctional Services Administrator to address concerns arising at the intersection of institutional security and mental health treatment. *Id.*.

Dr. Thompson's declarations also explained that it is not gender-affirming care that

16

compromises security, but, rather, withholding this care from those who need it, causing them mental health distress, that can create safety issues for other people in custody and staff. Second Thompson Decl. ¶ 13; ECF 7-3, First Thompson Decl. ¶ 38.

Additionally, Dr. Thompson's declaration explained that search protocols and other security measures guard against concealing contraband and hiding one's identity. Second Thompson Decl. ¶¶ 25, 27.

As for the claim that making gender-affirming treatment available will cause people to engage in self-harm to access care, as Drs. Karasic and Thompson explained, this is illogical—it is when care is not available despite an individual's medical need for it that there is a risk they will resort to self-harm. Third Karasic Decl. ¶ 49; Second Thompson Decl. ¶ 29. Similarly, the concern that providing medically necessary cross-sex hormones and social accommodations to individuals with gender dysphoria raises "fairness" and special treatment concerns that could "disrupt[] the delicate prison environment," ECF 160-2, Policy Memo at 16, 25, is nonsensical. Such a "special treatment" argument could be made for all sorts of accommodations BOP provides for medical or religious reasons. *See*, *e.g.*, Second Thompson Decl. ¶ 23 (many accommodations are provided for medical or religious reasons, such as special diets, a low bunk, or alternate work assignments, and are not denied for "fairness" concerns).

*     *     *

In addition to BOP's failure to support the ban on gender-affirming care with the evidence it offered, strikingly, BOP failed to consider or acknowledge its years of experience providing gender-affirming care—including social accommodations and hormone therapy—to patients with gender dysphoria. The Policy Memo, the AR Memo, and the Program Statement itself contain no discussion of it whatsoever. BOP did not examine the wealth of evidence in its possession of how its patients have fared receiving gender-affirming care, nor did it consult with its healthcare

17

providers who have been providing this care. For many years (until it was disbanded as a result of the EO), BOP had a Transgender Executive Council ("TEC"), which was BOP's "official decisionmaking body on all issues affecting the transgender population." ECF 7-3, First Thompson Decl., Ex. B thereto (2022 Transgender Offender Manual) at 4. The TEC met at least monthly to "offer advice and guidance on unique measures related to treatment and management needs of transgender inmates and/or inmates with [gender dysphoria]." *Id*. There is no mention in the Policy Memo or AR that anyone from the TEC was consulted or that any records from the TEC were considered in the development of the Program Statement.

BOP studiously avoided considering its own prior experience. As Dr. Thompson noted in her declaration, had BOP done so, it would have repudiated its proffered rationales for the policy. In her years of experience at BOP, having seen or reviewed medical files of many patients who had received such treatment, she saw that this care helped alleviate patients' gender dysphoria and improve their mental health and functioning. Second Thompson Decl. ¶ 11. And not only was there an absence of security problems of the type speculated in the Policy Memo, but providing the care improved prison security by reducing mental health distress. ECF 7-3, First Thompson Decl. ¶¶ 44-45; Second Thompson Decl. ¶¶ 12, 13.

### 4. Impacts on Plaintiffs and Class Members

Plaintiffs incorporate by reference the experiences of Plaintiffs as described in ECF 7-1 and the Plaintiffs declarations. ECF 7-4, 47-1 (Kingdom declarations); 7-5, 47-2 (Nichols declarations); 7-6, 47-3 (Kapule declarations). Plaintiffs Alishea Kingdom, Solo Nichols, and Jas Kapule all have been diagnosed with gender dysphoria, and have been receiving hormone therapy and social accommodations from BOP for years. The following supplements the impacts on Plaintiffs and Class Members since Plaintiffs' initial motion for a preliminary injunction.

      a.      <u>Alishea Sophia Kingdom</u>

As Ms. Kingdom explained to the court in March 2025, in January 2025, BOP stopped providing her hormone therapy and removed social accommodations as a result of EO 14168. ECF 7-4 ¶¶ 12-13. The hormone therapy was restored in March 2025, shortly after the present case was filed. ECF 47-1 ¶¶ 1-4. The social accommodations were also subsequently restored. Declaration of Alishea Kingdom ("Third Kingdom Decl.") ¶ 3. Losing her hormone therapy caused Ms. Kingdom severe and irreparable harm. In the several weeks after being denied hormone therapy due to EO 14168 and BOP's change in policy, Ms. Kingdom experienced anxiety, panic attacks, insomnia, mood swings, and thoughts of self-harm and suicide as her body reacted to the change in hormone levels and her gender dysphoria worsened. ECF 7-4 ¶¶ 21-22. Her "need to restart [her] medical care was all-consuming." Third Kingdom Decl. ¶ 6.

From her experience having her hormone therapy cut off, Ms. Kingdom knows that EO 14168 and the Program Statement, if implemented, would again cause her severe harm. Although she is currently optimistic about her re-entry and focused on moving forward after her incarceration, she knows that having her hormone therapy discontinued would put her back in "survival mode," the way she felt when it was cut off in early 2025. *Id.* ¶¶ 4-7. Having her hormone therapy and social accommodations enable her to "focus on [her] future." *Id*. ¶¶ 4, 8. Likewise, having access to social accommodations, particularly bras, allows her to feel safer in a men's prison. *Id*. ¶ 8. If she were denied access to accommodation items, her constant focus would be on how she could alleviate her gender dysphoria, rather than on her future and preparing for re-entry. *Id*.

      b.      <u>Solo Nichols</u>

From mid-November 2025 until mid-February 2026, Mr. Nichols did not receive his testosterone therapy. Delcaration of Solo Nichols ("Third Nichols Decl.") ¶ 3. During that time,

he experienced extreme hot flashes, rapid mood swings, loss of sleep, and irritability. *Id*. Between this experience and his experience in February 2025 when BOP started tapering down his hormone dosage after the EO was issued, ECF 7-5 ¶¶ 13-14, Mr. Nichols knows that being subjected to BOP's hormone therapy ban would make him dread waking up every day. Third Nichols Decl. ¶ 4.

He also knows personally that psychotherapy and psychotropic medications cannot alleviate his gender dysphoria, having been through seven years of psychotherapy and thirteen different psychotropic medications. *Id*. ¶ 5. He explains:

> Having tried so many different mental health treatments, I know unequivocally that testosterone is what works for me. Testosterone has fixed what so many other medications failed to. That's because I am a man who has gender dysphoria. Testosterone is the treatment I need.

*Id*.

Mr. Nichols also fears being subjected to BOP's ban on social accommodations. He describes the thought of being forced to wear bras or panties as "incredibly degrading,", and as making him feel "deeply uncomfortable, like [he] can't breathe," and "inadequate and embarrassed." ECF 56-1 ¶ 6. He fears that being subjected to such treatment would cause him to feel suicidal. Third Nichols Decl. ¶ 6.

### c.     Jas Kapule

Like Mr. Nichols, Mr. Kapule also recently experienced the harms that BOP's ban on gender-affirming care would impose.  In late 2025, BOP medical staff reduced Mr. Kapule's testosterone dose without his knowledge or participation in the decision; he was told that it was because his bloodwork showed his testosterone levels were too high but was not given further information when he asked. Declaration of Jas Kapule ("Third Kapule Decl.")  ¶¶ 2, 5. Before he was even aware that his dose had been reduced, Mr. Kapule began noticing increased anger, impatience, and worsened depression and anxiety. *Id*. ¶ 3. He began experiencing severe uterine

20

cramps as well. *Id*. A few months later, Mr. Kapule was devastated when his menstrual period returned for the first time in two years, an experience he described as "humiliat[ing] and emasculat[ing]." *Id*. ¶ 6. The effects of the lowered dose were so unbearable that Mr. Kapule withdrew from supportive relationships with his friends and loved ones, who told him that they could see that he was suffering immensely. *Id*. ¶¶ 8, 10. Mr. Kapule's medical provider observed the physical and emotional distress that the lowered testosterone dose caused him, and eventually resumed a higher dose. *Id*. ¶ 7. Increasing Mr. Kapule's dose did not instantly remedy the harm that he experienced, though. As his testosterone levels readjust, Mr. Kapule continues to feel the lingering effects of the months he received a lowered dose, such as emotional instability and his continued menstruation, which is a significant trigger of gender dysphoria for him. *Id*. ¶¶ 6, 8.

Mr. Kapule fears that if the Program Statement and EO 14168 are implemented, he will be forced through this same process once more. He fears the return of his menstrual period, and the emotional instability that a lowered dose brought him. *Id*. ¶ 9. Mr. Kapule "would feel hopeless," and "would worry about [his] ability to maintain [his] sobriety if [he] were under constant threat" of his hormone therapy being terminated, not to mention if it were actually terminated. *Id*. ¶ 10.

d.        Harms to the Class

There is ample evidence in the record about the critical benefits of hormone therapy and social accommodations in treating the gender dysphoria of Class Members, and the severe harms that have resulted when Defendants have withheld this care. In addition to the evidence regarding the Plaintiffs, the record provides multiple examples of how hormone therapy has improved Class Members' mental health[10] as well as physical health.[11] Conversely, the record contains numerous examples of the significant harm that results from denying, or even threatening to deny, hormone

---

[10] *See* ECF 7-4 ¶¶ 21-22, 7-5 ¶¶ 8, 16, 18, 7-6 ¶¶ 6,13.
[11] *See* ECF 107-11 ¶¶ 12-13.

therapy for gender dysphoria, including exacerbating Class Members' gender dysphoria [12] and otherwise worsening their mental health, [13] including causing them thoughts of self-harm, [14] self-surgery, [15] and suicidal ideation. [16]

Likewise, the record is rife with examples how social accommodations relieve Class Members' symptoms of gender dysphoria and improve mental health, [17] and the profound harms of losing the same. These harms include exacerbating their gender dysphoria, [18] worsened mental health [19] including suicidal ideation, [20] and the dignitary harms of being denied medically indicated accommodations. [21]

In addition to the evidence from Plaintiffs and Class Members, as discussed above, Dr. Karasic and Dr. Thompson established the importance of hormone therapy and social accommodations to individuals with gender dysphoria, including those in BOP custody, and the anticipated harms to their health and well-being should this care be withdrawn. *See supra* Parts II.A. II.B.1.

### III.    ARGUMENT

Fed. R. Civ. P. 65 authorizes courts to issue a preliminary injunction to preserve the status quo pending resolution of the underlying litigation. Fed. R. Civ. P. 65; *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969). Similarly, the APA authorizes courts to "postpone the effective date of an agency action or to

---

[12] *See* ECF 7-4 ¶¶ 21-22, 107-11 ¶¶ 12-13.
[13] *See* ECF 7-4 ¶¶ 21-22, 107-11 ¶¶ 12-13.
[14] *See* ECF 7-4 ¶¶ 21-22.
[15] *See* ECF 7-4 ¶¶ 21-22.
[16] *See* ECF 7-4 ¶¶ 21-22.
[17] *See* ECF 7-6 ¶ 7, 56-1 ¶ 6.
[18] *See* ECF 56-1 ¶ 6, 107-2 ¶ 20, 107-6 ¶ 11, 107-8 ¶ 13, 107-9 ¶ 15, 107-12 ¶ 16.
[19] *See* ECF 56-1 ¶ 6, 107-2 ¶ 20, 107-4 ¶ 13, 107-6 ¶ 11, 107-9 ¶ 15, 107-12 ¶ 16, 107-13 ¶ 9, 121-4 ¶ 7.
[20] *See* ECF 121-4 ¶ 7.
[21] *See* ECF 56-1 ¶ 6, 107-2 ¶ 20, 107-4 ¶ 13, 107-5 ¶ 13, 107-6 ¶ 11, 107-8 ¶ 13, 107-12 ¶ 16, 107-13 ¶ 9.

preserve status or rights pending conclusion" of APA proceedings, "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. "Motions to stay agency action pursuant to these provisions are reviewed under the same standards used to evaluate requests for interim injunctive relief." *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010) (citing *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)). To obtain a preliminary injunction, plaintiffs must establish that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The balance of equities and public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

This Court, in addressing Plaintiffs' prior motion for a preliminary injunction challenging the EO and the Implementing Memoranda, found that Plaintiffs had established all these factors and granted preliminary injunctive relief under Fed. R. Civ. P. 65 and a stay of enforcement of the Implementing Memoranda under 5 U.S.C. § 705. See ECF 67. Plaintiffs file this motion for an updated preliminary injunction and stay to ask the Court to extend relief to enjoin enforcement of and stay the Program Statement. As discussed below, Plaintiffs are likely to succeed on the merits of their claims. And this Court has already found that BOP's prior policy banning hormone therapy and social accommodations was likely to result in Plaintiffs and Class Members suffering irreparable harm, and that the balance of the equities and the public interest also weighed in Plaintiffs' favor. Those circumstances have not changed. Having established all four of the preliminary injunction factors, Plaintiffs are entitled to expanded preliminary injunctive relief and a stay of the Program Statement.

23

**A. Plaintiffs Are Entitled to Preliminary Injunctive Relief and a Stay Under the APA.**

    **1. Plaintiffs Are Likely to Succeed on the Merits.**

        a.        Plaintiffs are Likely to Succeed on Their Eighth Amendment Claim.

"Underlying the eighth amendment is a fundamental premise that prisoners are not to be treated as less than human beings." *Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir. 1979) (Kennedy, J.). Thirty years later, the Supreme Court reaffirmed this principle:

> As a consequence of their actions, prisoners may be deprived of rights that are fundamental to liberty. Yet the law and the Constitution demand recognition of certain other rights. Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.

*Brown v. Plata*, 563 U.S. 493, 510 (2011) (citations and internal quotation omitted). The Eighth Amendment's prohibition on cruel and unusual punishments extends to the failure to provide minimally adequate health care to incarcerated people. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976); *see also Brown,* 563 U.S. at 510-11 ("Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society").

Defendants violate Plaintiffs' Eighth Amendment rights by imposing a blanket ban on hormone therapy and social accommodations, without regard to an individual's need for such care. The Executive Order and the Program Statement place Plaintiffs and Class Members at substantial risk of serious harm from the withdrawal of medically necessary care, and Defendants are deliberately indifferent to that risk of harm. Accordingly, Plaintiffs are likely to succeed on the merits of this claim.

24

       i.       *Incarcerated People Challenging Conditions of Confinement Under the Eighth Amendment Must Show a Substantial Risk of Serious Harm to Which Government Officials are Deliberately Indifferent.*

When challenging conditions of confinement under the Eighth Amendment, incarcerated people must satisfy a two-part test. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The first part, the objective prong requires showing that a person "is incarcerated under conditions posing a substantial risk of serious harm." *Id*. The second requirement, the subjective prong requires showing a government official "ha[s] a sufficiently culpable state of mind . . . of deliberate indifference to inmate health or safety." *Id*. (cleaned up).

Under the objective prong, incarcerated people must provide evidence of harms that deprive them of the "minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. These necessities include "food, clothing, shelter, medical care and reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 32 (1993).

Under the subjective prong of *Farmer*, deliberate indifference "l[ies] somewhere between the poles of negligence . . . and purpose or knowledge . . . " *Farmer*, 511 U.S. at 836. Put another way, "acting or failing to act with deliberate indifference to a substantial risk of serious harm to a perisoner is the equivalent of recklessly disregarding that risk" *Id*. Though "Eighth Amendment liability requires consciousness of a risk," *id.* at 840, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official failed to act despite his knowledge of a substantial risk of serious harm," *id.* at 842, and "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that it was obvious." *Id*.

In an injunctive relief case, such as this one, prison officials' knowledge of the risk is not at issue, as the litigation itself puts them on notice. *See Farmer,* 511 U.S. at 846 n.9 ("If ... the

25

evidence before a district court establishes that an inmate faces an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness"); *Hadix v. Johnson*, 367 F.3d 513, 526 (6th Cir. 2004) ("If [prison] conditions are found to be objectively unconstitutional, then that finding would also satisfy the subjective prong because the same information that would lead to the court's conclusion was available to the prison officials"). Thus, Defendants here cannot disclaim knowledge of the well-established risks posed by the blanket denial of gender-affirming care.

Finally, "[t]hat the Eighth Amendment protects against future harm to inmates is not a novel proposition." *Helling*, 509 U.S. at 33. In an injunctive relief case, plaintiffs need not show actual physical harm; rather, the Constitution is violated by an unreasonable *risk* of harm. *Id*. at 33 (holding it "would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them"); *see also Brown*, 563 U.S. at 531-32 ("Even prisoners with no present physical or mental illness may become afflicted, and all prisoners [] are at risk so long as the State continues to provide inadequate care").

        ii.     *The BOP's Blanket Ban on Hormone Therapy and Social Accommodations Constitutes Deliberate Indifference to Plaintiffs' Serious Health Needs and Places Them at Substantial Risk of Serious Harm.*

Under the *Farmer* and *Estelle* analysis, the objective prong of the Eighth Amendment analysis is met when an incarcerated person shows that they have "a known, serious medical condition." *Bernier v. Allen*, 38 F.4th 1145, 1151 (D.C. Cir. 2022). The subjective component requires that government officials had "knowledge of the serious medical need and recklessly disregarded the excessive risk to inmate health or safety from that risk." *Id.* (cleaned up).

Plaintiffs meet the objective component. This Court and many others have recognized gender dysphoria as a serious medical condition. *See, e.g., Farmer v. Hawk*, 991 F.Supp. 19, 25

26

(D.D.C. 1998) (collecting cases), *rev'd in part on other grounds sub nom. Farmer v. Moritsugu*, 163 F.3d 610 (D.C. Cir. 1998); *see also Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019); *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2013); *Fields v. Smith*, 653 F.3d 550, 555 (7th Cir. 2011); *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000); *White v. Farrier*, 849 F.2d 322, 325 (8th Cir. 1988); *Meriwether v. Faulkner*, 821 F.2d 408, 411-13 (7th Cir. 1987); *Phillips v. Mich. Dep't of Corrs.*, 731 F. Supp. 792, 800 (W.D. Mich. 1990), *aff'd*, 932 F.2d 969 (6th Cir. 1991). It is undisputed that Plaintiffs and Class Members are wholly dependent upon Defendants for the provision of their health care.

The subjective prong of the Eighth Amendment test is also met. Defendants plainly know the medical necessity of gender-affirming care for Plaintiffs and other Class Members : BOP doctors prescribed it to them, after deeming them to have a clinical need for it. ECF 7-3, First Thompson Decl. ¶ 33 (citing 2023 Clinical Guidelines); *see also Allen v. Sakai*, 48 F.3d 1082, 1088 (9th Cir. 1995) (prison officials' acknowledged goal of providing five hours a week of exercise was evidence that they knew the risks of depriving prisoners of exercise).

BOP now asserts—incorrectly—that hormone therapy and social accommodations are never medically necessary treatments for gender dysphoria, relying largely on the declaration of one psychiatrist they retained for this litigation who has minimal experience treating gender dysphoria. *See supra* p. 12 n. 9. But as discussed above, these treatments are well supported by decades of research and clinical experience; they carry risks comparable to the risks of many other widely used medical treatments; and there is no evidence-based alternative to gender-affirming care. *See supra* Part II.A. Thus, gender-affirming care, including social transition and hormone therapy, is widely accepted treatment for gender dysphoria in the medical field. *See id.*; *Edmo*, 935 F.3d at 786 ("[a]ccepted standards of care and practice within the medical community are highly

27

relevant in determining what care is medically acceptable and unacceptable."); *Howell v. Evans*, 922 F.2d 712, 719 (11th Cir. 1991) ("[T]he contemporary standards and opinions of the medical profession also are highly relevant in determining what constitutes deliberate indifference to medical care."), *vacated pursuant to settlement*, 931 F.3d 711 (11th Cir. 1991); *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) (holding that the incarcerated plaintiff could "prove his case by establishing that [his] course of treatment, or lack thereof, so deviated from professional standards that it amounted to deliberate indifference").[22]

Moreover, while BOP made the suspicious decision not to consider its own prior experience providing gender-affirming care when considering a policy that would ban that care, Dr. Thompson's declaration explains that if it had, that experience would have refuted BOP's assertions, as gender-affirming care was effective in alleviating gender dysphoria and improving mental health in BOP's patient population. *See supra* Part II.B.1.

Even if Defendants were somehow not aware of the serious risk to Plaintiffs and other Class Members of withdrawing hormone therapy and social accommodations, the Courts of Appeals have consistently held that across-the-board policies denying or severely limiting entire categories of health care to incarcerated people without regard to patients' individual medical needs constitute deliberate indifference. An illustrative example outside the realm of transgender health care is *Colwell v. Bannister*, 763 F.3d 1060 (9th Cir. 2014). There, the plaintiff challenged the Nevada Department of Corrections' "one good eye" policy that denied any surgical treatment for prisoners with cataracts or other vision impairments, so long as the patient had at least one

---

[22] In assessing whether a risk of harm violates "contemporary standards of decency," courts rely on federal and state practices, as well as scientific studies. *See Hall v. Florida*, 572 U.S. 701, 709-10 (2014) (holding that it was "proper to consider the psychiatric and professional studies" to resolve an Eighth Amendment claim); *Graham v. Florida*, 560 U.S. 48, 62 (2010) (looking to federal and state practices to resolve Eighth Amendment claim); *Spain*, 600 F.2d at 200 ("[W]hen confronting the question whether penal confinement in all its dimensions is consistent with the constitutional rule, the court's judgment must be informed by current and enlightened scientific opinion as to the conditions necessary to insure good physical and mental health for prisoners.").

"good eye" with correctible vision. The Ninth Circuit held that it was undisputed that the incarcerated patient was denied treatment "solely because of an administrative policy, even in the face of medical recommendations to the contrary. . . . This is the very definition of deliberate indifference." *Id.* at 1068; *see also Brawner v. Scott Cty., Tenn.*, 14 F.4th 585, 599-600 (6th Cir. 2021) (jail's blanket policy banning prescription of any controlled substances, including suboxone for opioid use disorder) (applying Fourteenth Amendment deliberate indifference test); *Gordon v. Schilling*, 937 F.3d 348 (4th Cir. 2019) (categorical policy banning Hepatitis C treatment based on release date); *Roe v. Elyea*, 631 F.3d 843, 860 (7th Cir. 2011) (same); *McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004) (same); *Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003) (policy forbidding treatment of keloid scars for purposes of alleviating chronic pain); *see also Johnson v. Wright*, 412 F.3d 398, 406 (2d Cir. 2005) (ban on Hepatitis C treatment for anyone with a recent history of substance use); *Ancata v. Prison Health Servs.*, 769 F.2d 700, 704-05 (11th Cir. 1985) (policy of refusing to provide specialty consultations without a court order); *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 349 (3d Cir. 1987) (holding that "the categorical denial of elective, nontherapeutic abortions constitutes deliberate indifference to serious medical needs under both prongs of *Estelle*.").

Courts have recognized that this principle applies no less in cases involving gender-affirming care, where numerous courts have held that blanket bans violate the Eighth Amendment. The Eleventh Circuit held in the context of blanket bans on gender-affirming care that "responding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate is the very definition of 'deliberate indifference.'" *Keohane*, 952 F.3d at 1266-67. Similarly, in *Fields*, 653 F.3d at 559, the Seventh Circuit held that a state law that barred hormone therapy and sex reassignment surgery as possible treatments for incarcerated people with gender dysphoria facially violated the Eighth

29

Amendment. And in *De'Lonta*, 330 F.3d at 634-35, the Fourth Circuit held that an incarcerated person with gender dysphoria stated a claim for deliberate indifference where the prison system withheld hormone therapy under a blanket policy prohibiting such treatment.

Another cornerstone of minimally adequate prison health care is that incarcerated people receive necessary and appropriate medications, and courts repeatedly have held that prison systems' failure to provide needed medication constitutes deliberate indifference to serious health care needs. *See, e.g.*, *Board v. Farnham*, 394 F.3d 469, 484-85 (7th Cir. 2005) (asthma inhaler); *Sullivan v. Cnty. of Pierce*, No. 98-35399, 2000 WL 432368, at *1-2 (9th Cir. Apr. 21, 2000) (unpublished) (reversing and remanding for reconsideration of deliberate indifference where a jail detainee did not receive his HIV medication for at least two days); *Steele v. Shah*, 87 F.3d 1266, 1269-70 (11th Cir. 1996) (holding that deliberate indifference may be based on abrupt and unsupported discontinuation of medications). EO 14168 and the Program Statement categorically prohibit people from receiving medications for gender dysphoria even where they are medically necessary.

Similarly, under the Eighth Amendment, prison officials must provide incarcerated people the medical devices, supplies, assistive devices, and accommodations needed for their medical condition.[23] *See Miller v. King*, 384 F.3d 1248, 1261-62 (11th Cir. 2004) (finding denial of leg braces, orthopedic shoes, and urinary catheters), *vacated and superseded on other grounds*, 449 F.3d 1149 (11th Cir. 2006); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1243-44 (5th Cir. 1989) (upholding a liability finding for violation of the Eighth Amendment for denial of catheter supplies,

---

[23] There is no basis for Dr. Kaliebe's suggestion that social accommodations are not medically necessary because they involve things such as clothing and grooming, which he says are not "related to healing medical illness or disease." ECF 160-3, Kaliebe Decl. ¶¶ 131, 132. To the extent he is suggesting that treatment or accommodations for mental health conditions are not medically necessary, medically necessary care for purposes of the Eighth Amendment includes care for mental health conditions. *See, e.g.*, *Greason v. Kemp*, 891 F.2d 829, 834 (11th Cir. 1990). And many medically necessary interventions involve everyday items and activities, such as special shoes for people with orthopedic issues  or juice for diabetics. Third Karasic Decl. ¶ 36

30

a hospital mattress, and medical supplies to an incontinent man with paraplegia). And courts have recognized that social accommodations can be medically necessary for individuals with gender dysphoria. *See Hicklin v. Precynthe*, No. 16-CV-01357, 2018 WL 806764, at *13 (E.D. Mo. Feb. 9, 2018) (granting preliminary injunction for "gender-affirming canteen items"); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 248-50 (D. Mass. 2012) (undergarments and canteen items can be medically necessary to address gender dysphoria); *see also Kosilek v. Spencer*, 774 F.3d 63, 69-70, 90 (1st Cir. 2014) (noting that the "treatment" plaintiff was receiving to address gender dysphoria included "[being] provided female, gender-appropriate clothing and personal effects"). The Program Statement categorically bans accommodations that enable people to socially transition, an important aspect of care for gender dysphoria. ECF 125 § 5(d), at 8; ECF 7-2, First Karasic Decl. ¶¶ 63-64, 72.

The fact that the Program Statement offers psychotherapy as purported treatment for gender dysphoria does not insulate it from constitutional challenge. Claims that prison officials are insisting on providing only ineffective care for an objectively serious medical condition can amount to deliberate indifference. *Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005) ("a prisoner is not required to show that he was literally ignored") (cleaned up); *White v. Napoleon*, 897 F.2d 103, 109-11 (3d Cir. 1990) (holding allegation that a prison doctor provided treatment that he knew was ineffective stated an Eighth Amendment claim); *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc) (finding that choosing "easier and less efficacious treatment without exercising professional judgment" may not meet the Eighth Amendment's requirements). And as discussed above, psychotherapy is not a "less-efficacious" treatment; it is not even a treatment for gender dysphoria. *See supra* Parts II.A, II.B.3 at p. 15.

Finally, Defendants cannot defeat Plaintiffs' Eighth Amendment claims with talismanic invocations of security and prison-administration concerns. Defendants assert a range of such

speculative concerns, ECF 160-2, Policy Memo at 14-16, 24-26, but never say that any of these security and related prison-administration concerns were in fact an issue in their many years of providing gender-affirming care to people with gender dysphoria.  Their failure to point to actual security problems raises the inference that security was not actually compromised by the provision of this care. And in fact, Dr. Thompson was not aware of any security issues arising from gender-affirming care during her long tenure at BOP, Second Thompson Decl ¶ 12, and explains that gender-affirming care *improved* prison security by reducing mental health distress. *Id*. ¶  13. Defendants have failed to provide any evidence that security issues justify a categorical ban on gender-affirming care. *See Fields*, 653 F.3d at 558 ("The district court did not abuse its discretion in concluding that defendants' evidence failed to establish any security benefits associated with a ban on hormone therapy"); *Whitley v. Albers,* 475 U.S. 312, 320 (1986) (recognizing that "the State's responsibility to attend to the medical needs of prisoners" does not typically require consideration of "competing institutional concerns for the safety of prison staff or other inmates").

The deference due to prison officials and their policies in First Amendment and other contexts does not apply here, because "the integrity of the criminal justice system depends on full compliance with the Eighth Amendment." *Johnson v. California*, 543 U.S. 499, 511 (2005), *citing Spain,* 600 F.2d at 193-194 ("Mechanical deference to the findings of … prison officials in the context of the eighth amendment would reduce that provision to a nullity in precisely the context where it is most necessary.").

In any event, as Dr. Thompson stated in her declaration, in her more than two decades with BOP until her retirement a few years ago, it was not the policy or practice of BOP to deny medically necessary care based on security concerns, and when particular medically necessary care such as methadone or canes and crutches may have posed security issues, BOP put into place procedures to ensure treatment was provided without compromising safety. Second Thompson

32

Decl. ¶¶ 14-15.  That BOP does not categorically prohibit other medical care that may pose security concerns further undermines this asserted rationale for banning gender-affirming care.

Plaintiffs have therefore shown that they are likely to succeed on the merits of their Eighth Amendment claim.

b.      Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims.

Plaintiffs are likely to succeed on the merits of their APA claims challenging the Program Statement, which must be set aside as an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706.

As a threshold matter, the Program Statement constitutes final agency action, reviewable under the APA. The Program Statement "mark[s] the 'consummation' of the agency's decisionmaking process" and is "one by which 'rights or obligations have been determined, or from which legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997)) (cleaned up). The only reason the Program Statement has not yet been implemented is this Court's existing Preliminary Injunction, which BOP acknowledges it is "obligated to comply with . . . despite the issuance of the new Policy," ECF 160 at 9, and which BOP now seeks to dissolve in order to "allow[] the Executive Branch to implement administration policies." *Id.* at 15. As a result, even though the specific application of the Program Statement to individual Class Members' care has not yet occurred, "BOP's *decisionmaking process* undergirding the future" of that care has, ECF 67 at 19 (emphasis in original), and the Program Statement can be challenged as final agency action under the APA.

The Program Statement violates the APA on multiple independent grounds. First, the APA requires courts to set aside unconstitutional agency action, and here, the Program Statement violates the Eighth Amendment for the reasons discussed above. *See supra* Part III.A.1.a.

33

The Program Statement should also be set aside because it is arbitrary and capricious based on its lack of "reasoned decisionmaking," *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019), which requires that "an agency's exercise of its statutory authority be reasonable and reasonably explained," *Manufacturers Ry. Co. v. Surface Transp. Bd.*, 676 F.3d 1094, 1096 (D.C. Cir. 2012). First, the Program Statement "rest[s] on a pretextual basis," *Dep't of Com.*, 588 U.S. at 780; namely, it was preordained and reverse engineered in response to this litigation to continue the implementation of EO 14168's unlawful directives. Second, the Program Statement must be set aside because BOP did not properly consider its own experience under its prior policy of providing hormone therapy and social accommodations to those who need it, thereby "refus[ing] to consider evidence bearing on the issue before it." *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Comcast Corp. v. FCC,* 579 F.3d 1, 8 (D.C. Cir. 2009)). Third, BOP did not provide a sufficiently "detailed justification" to explain the complete reversal from its preexisting policy of providing gender-affirming care to patients when indicated for them. *Counsel of Parent Att'ys & Advocs., inc. v. DeVos*, 365 F. Supp. 3d 28, 51 (D.D.C. 2019) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). Fourth, the Program Statement must be set aside as objectively unreasonable, because it "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," and the explanation BOP provides for it "runs counter to the evidence before the agency." *Evergreen Shipping Agency (Am.) Corp. v. Fed. Mar. Comm'n*, 106 F.4th 1113, 1117 (D.C. Cir. 2024) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

    i.  *The Program Statement was Preordained and its Reasoning is Pretextual.*

The Program Statement violates the APA because it is pretextual, preordained, and reverse engineered in response to this litigation to be able to implement EO 14168's unlawful directives. The Program Statement acknowledges that EO 14168 "prohibits the Bureau from expending

federal funds for 'any medical procedure, treatment or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." ECF 125 § 5, at 5-6. Indeed, the policy states that its "intent . . . is for federal funds to not be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex to the maximum extent permitted by law." *Id.* § 8, at 9. It also states that "[t]he Bureau will comply with this Executive Order unless compliance with the Executive Order is prohibited by a court injunction or court order." *Id.* § 5, at 6. Despite these admissions, BOP thereafter claims that "[t]hough Executive Order 14168 supports this policy, the Bureau also adopts this policy independently of Executive Order 14168." *Id.*

But this Court is "not required to exhibit a naiveté from which ordinary citizens are free." *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 2026 WL 710202, at *9 (D.D.C. Mar. 13, 2026) (quoting *Dep't of Com.,* 588 U.S. at 785, in turn quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)). When the record reveals that an agency "preordained the decision," *Miot v. Trump*, 2026 WL 266413, at *29 (D.D.C. Feb. 2, 2026), *cert. granted before judgment*, 2026 WL 731087 (U.S. Mar. 16, 2026) and the agency merely "reverse engineered" a policy to justify the same outcome—thereby engaging in a "pretextual" action, *Saget v. Trump*, 375 F. Supp. 3d 280, 361 (E.D.N.Y. 2019) (quoting *Cowpasture River Pres. Ass'n v. Forest Serv.*, 911 F.3d 150, 179 (4th Cir. 2018)), that is itself a violation of the APA. *See also Dep't of Com.*, 588 U.S. at 780-85.

That is exactly the case here, where, following President Trump's Executive Order, BOP "follow[ed] the President's direction to terminate" gender-affirming care for individuals in BOP custody "before conducting any analysis." *Miot*, 2026 WL 266413, at *29. Subsequently, when enjoined from effectuating its Implementing Memoranda due to the lack of even perfunctory reasoning, BOP developed a repackaged policy with the same origin (the Executive Order) and the

35

same effect (a ban on gender-affirming care). The suggestion that BOP happened to independently reach the same result as the one required by the EO is preposterous.

BOP's actions described below in subsections ii. and iii. provide further evidence of pretext. In attempting to reverse engineer a rationalization to support the same predetermined policy choice, BOP "cherry-picked" materials to try to support its decision, *Afr. Communities Together v. Noem*, 2026 WL 395732, at *10 (D. Mass. Feb. 12, 2026), made "gross generalizations without any supporting data," *Miot*, 2026 WL 266413, at *29, and "ignore[ed] key aspects of the analysis," *Id.* The Program Statement was not "based on an objective review" of the evidence regarding medically necessary care for individuals with gender dysphoria in BOP custody, *Nat'l TPS All. V. Noem*, 2025 WO 4058572, at *24 (N.D. Cal. Dec. 31, 2025)—indeed, they didn't even consider their years of experience providing this care; rather, BOP merely "reverse engineered" a policy and supporting explanation "to achieve a desired political outcome," *Saget*, 375 F. Supp. 3d at 347. Because BOP's Program Statement is "a preordained outcome justified by pretextual reasons," *Miot*, 2026 WL 266413, at *34, this Court should set aside the policy as arbitrary and capricious.

      ii.     *BOP Ignored Relevant Evidence Regarding Its Longstanding Preexisting Policy.*

In asserting as justification for the Program Statement that hormone therapy and social accommodations are "unproven" treatments and "not medically necessary to address gender dysphoria, especially in the correctional context," ECF 160-2,  Policy Memo at 12, 21, and that these treatments pose "serious security and prison-administration concerns," *Id.* at 14, 24, BOP claims to have done a thorough review of relevant evidence, including "BOP's prior policies." ECF 160-1, AR Memo at 1. But it failed to consider critical, particularly relevant evidence: its own experience providing gender-affirming care to individuals with gender dysphoria for many years under its prior policy. BOP has evidence regarding its prior policy's empirical efficacy and

operation in its possession, which it naturally would have considered in evaluating a change in policy if its goal was actually to evaluate what policy would be most appropriate. It is striking that no such evidence is included in the AR or BOP's explanation for the Program Statement—which it surely would have included if it supported the Program Statement, raising a fair inference that the evidence "contradict[s] its position." *Butte Cnty.*, 613 F.3d at 192-95 (finding that "refus[al] to evaluate" historical information which "called into the doubt the judgment of the" agency because the relevant official "had already decided the issues" was "totally irrational" and thus arbitrary and capricious under the APA). By ignoring that evidence in promulgating its policy implementing EO 14168, BOP violates the APA. *Id.*

Despite providing hormone therapy and social accommodations to individuals in its custody for years, BOP provided zero evidence from BOP's medical and mental health professionals responsible for the care of patients with gender dysphoria to support its conclusions. BOP provided zero evidence from the Transgender Executive Council or its former members, which, until it was disbanded by EO 14168, met monthly to address "all issues affecting the transgender population." ECF 7-3, First Thompson Decl., Ex. B thereto (2022 Transgender Offender Manual) at 4. Defendants offer no evidence that the treatments were ineffective or harmful for their patients. Nor did they offer evidence that providing this care led to security problems for BOP facilities. If such evidence existed, they would have certainly provided it.

This APA claim does not require the Court to make factual findings about the impact of BOP's provision of gender-affirming care on patient health and security—a finding that BOP ignored relevant evidence is itself sufficient. But the declarations of Dr. Thompson indicate that such evidence would refute the stated rationales for the policy. As discussed above, during her years at BOP she observed that gender-affirming care alleviated gender dysphoria and improved the mental health of many incarcerated patients, and that the provision of such care did not create

security issues; to the contrary, it improved security by reducing mental health crises. *See supra* Parts II.B.1, II.B.3 at pp. 17-18.

BOP completely ignored the evidence in the agency's possession regarding its former policy's operation. This "refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of [the APA]." *Butte Cnty.*, 613 F.3d at 194.

      *iii.*     *BOP's Explanation for the Policy Does Not Sufficiently Justify Its About-Face.*

BOP's explanation for its change in policy also fails to provide the "more detailed justification" that is required when, as here, the "new policy rests upon factual findings that contradict those which underlay its prior policy," *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1284 (D.C. Cir. 2019) (quoting *Fox*, 556 U.S. at 515), and where "its prior policy has engendered serious reliance interests," *CSL Plasma Inc. v. United States Customs & Border Prot.*, 628 F. Supp. 3d 243, 259 (D.D.C. 2022) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)); *see also NLRB v. Lily Transp. Corp.*, 853 F.3d 31, 36 (1st Cir. 2017) (Souter, J.) ("[A]n about-face . . . requires . . . reasoned explanation for the change of direction."). Even when there are no serious reliance interests at stake, "an agency changing position must 'display awareness that it *is* changing position.'" *CSL Plasma Inc.*, 628 F. Supp. 3d at 259 (quoting *Fox*, 556 U.S. at 515). "When serious reliance interests are at play, the agency must 'determine whether they were significant, and weigh any such interests against competing policy concerns.'" *Id.* (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020)). In so doing, the agency must provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Planned Parenthood of Greater New York v. U.S. Dep't of Health & Hum. Servs.*, 2025 WL 2840318, at *28 (D.D.C. Oct. 7, 2025) (quoting *Fox*, 556 U.S. at 516).

38

Although the Policy Memo lists BOP's prior policy documents as "references," ECF 160-2, Policy Memo at 42, and several older versions are included in the AR,[24] *see* ECF 151 at 4-5, BOP provides no actual acknowledgement—in the Program Statement, the Policy Memo, or the AR Memo—of its preexisting policies under which hormone therapy and social accommodations were provided as clinically indicated for years. This failure to even "display awareness that it *is* changing position," let alone provide a "reasoned explanation . . . for disregarding [these] facts and circumstances," is itself fatal. *Fox*, 556 U.S. at 515 (2009); *see also United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1284 (D.C. Cir. 2019) (holding that a change in policy was arbitrary and capricious where the agency "gave no explanation" for shifting its position on a factual issue that underlay the prior policy).

BOP pays lip service to the reliance interests of Class Members. BOP provides a rote, conclusory statement about its consideration of reliance interests, stating that "inmates' reliance interests are at best in the provision of 'medically necessary health care to inmates effectively in accordance with proven standards of care without compromising public safety concerns inherent to the Bureau's overall mission,'" ECF 160-2, Policy Memo at 27 (quoting PS 6010.05 §1, Health Services Administration), and that any "legitimate reliance interests . . . are not sufficiently weighty to outweigh the benefits of Program Statement 5260.01." *Id*. But merely "stating that a factor was considered is not a substitute for considering it." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 43 (D.D.C. 2020) (quoting *Getty v. Fed. Savs. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986)) (internal alterations omitted). "The agency must instead provide more than 'conclusory statements' to prove that it considered the relevant priorities." *Id.* (quoting *Getty*, 805 F.2d at 1057) (internal alterations omitted).

---

[24] Notably missing from the AR, however, are both the 2023 Clinical Guidance and 2022 Transgender Offender Manual. See ECF 151 at 2-9.

BOP says nothing about the actual experience of patients to support its conclusory assertion that their reliance interests are outweighed.  BOP has not even considered how the treatment it intends to withdraw from these patients—treatment for which those patients' BOP healthcare providers determined they had a clinical need—is affecting those patients.  BOP does not claim that the care it has been providing has been ineffective or resulted in security problems. The sworn evidence from Dr. Thompson shows that the opposite was true. ECF 7-2, First Thompson Decl. at ¶ 38, 45; Second Thompson Decl. ¶¶ 11-13.[25] Disregarding the actual experience of patients currently receiving the prohibited care is a complete failure to consider reliance interests.

Plaintiffs' reliance interests are gravely serious given the medical issues at stake. *See supra* Parts II.A, II.B.4. Indeed, BOP contemplates that some patients will experience "severe physiological and psychological withdrawal effects" from the withdrawal of hormone therapy. ECF 125 § 5(c)(ii), at 8. The preexisting policies established bodies within BOP, including the Transgender Executive Council (TEC) and Transgender Clinical Care Team (TCCT), consisting of BOP officials and medical providers dedicated to the needs of this population. *See* ECF 7-1 at 10. Plaintiffs and other Class Members in BOP custody prior to January 20, 2025 relied on these bodies and the professionals within them to administer necessary medical care, which Defendants fail to acknowledge, even cursorily.

By not acknowledging, let alone properly considering or explaining, its own experience providing this care for years, including how it impacted patient health, BOP has failed to provide a "reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy," and has thereby acted arbitrarily and capriciously under the APA. *Planned Parenthood*, 2025 WL 2840318, at *28 (quoting *Fox*, 556 U.S. at 516). This "revers[al]

---

[25] Dr. Thompson further stated that BOP's policy has never been to deny medically necessary care due to security issues, contrary to BOP's asserted justifications for the Program Statement. Second Thompson Decl. ¶¶ 14-15. This raises an additional inference that the security justification is wholly pretextual.

[of] its position in the face of a precedent it has not persuasively distinguished" is itself sufficient grounds for this Court to set aside Program Statement 5260.01 under the APA. *Manufacturers Ry. Co. v. Surface Transp. Bd.*, 676 F.3d 1094, 1096 (D.C. Cir. 2012) (quoting *New York Cross Harbor Railroad v. Surface Transp. Bd.,* 374 F.3d 1177, 1181 (D.C. Cir. 2004)).

      iv.    *BOP's Explanation for its Policy is Irrational and Runs Counter to the Evidence Before the Agency.*

Finally, the Program Statement is arbitrary and capricious because it reaches a conclusion "so implausible that it could not be ascribed to a difference in view or the product of agency expertise," as evidenced by its explanation, which "runs counter to the evidence before the agency." *Evergreen Shipping Agency*, 106 F.4th at 1117 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

In addition to the points discussed above, the Program Statement is irrational for the following additional reasons. It is irrational for BOP to rely largely on the declaration of Dr. Kaliebe to support its policy. Dr. Kaliebe was retained specifically for this litigation and has very limited experience with gender dysphoria. *See supra* p. 12. And, as discussed above, Dr. Kaliebe's opinions, upon which BOP's reasoning relies, are not a product of reasonable disagreement, but rather run counter to the prevailing protocols for the treatment of gender dysphoria recognized by every major medical association in the country, which are supported by decades of scientific research and clinical experience, including BOP's own experience providing such care. *See supra* Parts II.A; II.B.3 at pp. 17-18. And BOP's policy substitutes this effective care with treatments that Dr. Kaliebe himself has recognized are not evidence based. See *supra* II.B.3 at p. 15; *see also supra* II.A at pp. 4-5. The evidence also establishes that a policy requiring the denial of such care when it is deemed necessary would lead to deterioration in the mental health of patients with gender dysphoria and would increase rates of depression, anxiety, and self-harm—including self-castration, and suicidality. *See supra* Part II.A; *infra* Part III.A.2. And as Dr. Karasic and Dr.

41

Thompson explain, the conclusion that a ban on necessary care would *decrease* self-harm is completely illogical. *See supra* Part II.B.3 at pp. 16-17. Such "judgments must be based on logic and evidence, not sheer speculation." *Council of Parent Att'ys*, 365 F. Supp. 3d at 51 (quoting *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014)) (cleaned up).

Banning care that all major medical organizations agree can be medically necessary for people with gender dysphoria and without any evidence-based alternative to treat an objectively serious medical condition is "contrary to the evidence and an implausible strategy" to treat individuals with gender dysphoria. *Bedford Cnty. Mem'l Hosp. v. Health & Hum. Servs.*, 769 F.2d 1017, 1022 (4th Cir. 1985). Such a strategy is the result of BOP's preordained decision to ban gender-affirming care in compliance with EO 14168 and unsupported by BOP's own experiences providing this care. It therefore cannot "be ascribed to a difference in view or the product of agency expertise." *Evergreen Shipping Agency*, 106 F.4th at 1117 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). "Such illogical decisions are not rationally connected to the facts and are thus arbitrary and capricious." *Markel v. Del Toro*, 2025 WL 304875, at *6 (D.D.C. Jan. 27, 2025). As a result, the policy must be set aside under the APA.

### 2. Plaintiffs Will Be Irreparably Harmed Absent an Injunction and/or Stay.

To obtain a preliminary injunction, Plaintiffs must demonstrate that irreparable injury "is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (cleaned up). Irreparable injury results where damages cannot adequately compensate for the loss if the injunction is denied. *National Senior Citizens Law Center, Inc. v. Legal Services Corp.* 581 F. Supp. 1362, 1372 (D.D.C. 1984) (injunction appropriate where money damages could not adequately compensate for plaintiff's injuries).

This Court has already found that this standard is met here, and Defendants' repackaging of their ban on gender-affirming care in the Program Statement does not change that. Plaintiffs

have already had their medically necessary gender-affirming hormone therapy temporarily discontinued or tapered by BOP within the last year, and suffered immensely during those lapses in care. Denying Plaintiffs and Class Members gender-affirming hormone therapy and accommodations will imminently cause irreparable injuries, including the exacerbation of their gender dysphoria and increased risk of depression, anxiety, self-harm (including attempts to self-castrate), and suicidality. ECF 7-2, First Karasic Decl. ¶¶ 72, 83-86, ECF 7-4, Kingdom Decl. ¶¶ 21-22 (experiencing symptoms including anxiety, panic attacks, and thoughts of self-harm and suicide when hormone therapy has been withdrawn).[26] *See also Edmo,* 935 F.3d at 797-98 ("severe, ongoing psychological distress" and a "high risk of self-castration and suicide" constitute irreparable harm).

### 3. The Balance of Hardships and Public Interest Favor Granting an Injunction.

The last two factors—balance of hardships and the public interest—also favor granting an injunction. In their balance of hardships analysis, courts must consider the hardships to Plaintiffs if their request for an injunction is denied, as well as the hardships to defendants if the injunction is granted. *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Where, as here, "the Government is the opposing party," the last two factors "merge," *Nken,* 556 U.S. at 435, for "the government's interest is the public interest," *Pursuing America's Greatness*, 831 F.3d at 511 (cleaned up). In assessing these factors, courts also consider "the impacts of the injunction on nonparties." *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 84 (D.D.C. 2020).

This Court has already found that these factors supported a preliminary injunction against implementing EO 14168, and nothing about the Program Statement changes that calculus or

---

[26] The harms associated with withholding medically necessary care to treat gender dysphoria are extensively detailed in Dr. Karasic's declaration. *See generally* Third Karasic Decl. Plaintiffs' personal experiences of these harms are detailed in their respective declarations. *See supra* Part II.B.a-c. Likewise, there is ample evidence of the harms to Class Members provided in declarations in the record. *See supra* Part II.B.4.d.

conclusion. ECF 67 at 25-27 (finding the final two prongs of the preliminary injunction analysis here "the most easily resolved" and resolving them in Plaintiffs' favor); *id*. at 26 (noting that it was "hard to cognize of *any* public interest in the immediate cessation of [the *McHenry* plaintiffs'] hormone therapy," and finding that "the equities tilt even more strongly in the plaintiffs' favor" in the case at hand).

## B.  No Bond Should Be Required.

Fed. R. Civ. P. 65(c) vests the district court with broad discretion to determine the appropriate amount of an injunction bond, including no bond at all. *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020). Here, because Plaintiffs seek an injunction of unconstitutional conduct by a government entity, and because there is no risk of monetary harm to Defendants if they are eventually found to be wrongfully enjoined, the FRCP 65(c) bond is neither appropriate nor necessary in this case and should be waived.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for an Updated Preliminary Injunction and to Stay Agency Action.

A proposed order is attached.

Dated: April 29, 2026

*/s/ Shana Knizhnik*

Li Nowlin-Sohl (*pro hac vice*)
Leslie Cooper (*pro hac vice*)
Shana Knizhnik, D.D.C. Bar No. 120840
James D. Esseks (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: 212-549-2500
lnowlin-sohl@aclu.org
lcooper@aclu.org
sknizhnik@aclu.org
jesseks@aclu.org

David C. Fathi (*pro hac vice*) *
Maria V. Morris, D.C. Bar. No. 1697904
Elisa C. Epstein (*pro hac vice*) *
American Civil Liberties Union Foundation
915 15th Street, N.W.
Washington, D.C. 20005
Tel: 202-393-4930
dfathi@aclu.org
mmorris@aclu.org
eepstein@aclu.org

Corene T. Kendrick (*pro hac vice*)
American Civil Liberties Union Foundation
425 California St., Ste. 700
San Francisco, CA 94104
Tel: 202-393-4930
ckendrick@aclu.org

Respectfully Submitted,

Michael Perloff, D.C. Bar No. 1601047
Aditi Shah, D.C. Bar No. 90033136
ACLU Foundation of the District of Columbia
529 14th Street NW, Suite 722
Washington, D.C. 20045
Tel: 202-457-0800
mperloff@acludc.org
ashah@acludc.org

Shawn Thomas Meerkamper (*pro hac vice*)
Megan Z. F. Noor (*pro hac vice*)
Dale Melchert (*pro hac vice)*
Transgender Law Center
P.O. Box 70976
Oakland, CA 94612
Tel: 510-587-9696
shawn@transgenderlawcenter.org
megan@transgenderlawcenter.org
dale@transgenderlawcenter.org

Lynly S. Egyes (*pro hac vice*)
Transgender Law Center
594 Dean Street, Suite 11
Brooklyn, NY 11238
Tel: 510-587-9696
lynly@transgenderlawcenter.org

*Counsel for Plaintiff Class*

**Not admitted in D.C.; practice limited to
federal courts.*

45