**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ALISHEA KINGDOM, et al.,

          Plaintiff,

    v.

DONALD J. TRUMP, et al.,

          Defendants.

Case No. 1:25-cv-00691

---

**EXPERT DECLARATION OF DR. DAN KARASIC IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR AN UPDATED PRELIMINARY INJUNCTION**

I, Dan H. Karasic, M.D., hereby declare and state as follows:

1. I am over the age of 18, of sound mind, and in all respects competent to testify.

2. I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

3. I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

4. I submitted an expert declaration in this case on March 14, 2024 (my "Initial Declaration") and a second declaration on April 4, 2025 (my "Second Declaration"). I incorporate both declarations by reference.

5. My background and qualifications are discussed in my Initial Declaration, which also includes my CV.

6. Since my Initial Declaration, I have given expert testimony by deposition or trial in the following cases: Hein v. UNMC Physicians et al; Keohane v Dixon; *Bella Boe et al. v.*

1

*Children's Hospital Colorado* (2026CV30232).

7.    Since my prior two declarations in this case, I have reviewed the following documents related to this case:  the Bureau of Prison's ("BOP") Program Statement 5260.01, Management of Inmates with Gender Dysphoria (the "Program Statement"); the Memorandum on Program Statement 5260.01, Management of Inmates with Gender Dysphoria (Feb. 19, 2026) (the "Memorandum"); and the Declaration of Dr. Kristopher Kaliebe dated September 19, 2025 ("Kaliebe Declaration" or "Kaliebe Dec.").

8.    I submit this declaration in support of Plaintiffs' Motion for an Updated Preliminary Injunction to address the Program Statement and respond to erroneous statements about gender dysphoria and its treatment contained in the Memorandum and the Kaliebe Declaration, upon which the Memorandum significantly relies.

## II.    SUMMARY OF EXPERT OPINIONS

9.    The Program Statement—by prohibiting and withdrawing hormone therapy and social accommodations from individuals with gender dysphoria—puts these individuals at risk of significant harm to their health and well-being just as the Implementing Memoranda did.  The provision for a tapering process for withdrawing hormone therapy does not prevent the predictable serious harms of denying this treatment to those who have a medical need for it.

10.    The assertion in the Memorandum and Kaliebe Declaration that social transition and hormone therapy are "unproven" treatments for gender dysphoria is baseless.  These interventions are supported by the same type of research that is routinely relied on in medicine, as well as decades of clinical experience.

11.    Contrary to assertions made in the Memorandum and Kaliebe Declaration, social transition and hormone therapy for the treatment of adults with gender dysphoria are not the

2

subject of controversy or debate within the medical and mental health fields. They are widely accepted treatments. To the extent there is any controversy about these treatments in public discourse, it is limited to the context of pediatric patients with gender dysphoria.

12. Dr. Kaliebe's assertion that social transition for individuals with gender dysphoria falls outside of the concept of medically necessary care because it involves things like clothing and grooming has no basis in medicine; all sorts of medically necessary interventions can involve everyday items and activities as opposed to prescriptions or other therapies.

13. The fact that an individual with gender dysphoria is incarcerated does not erase their medical need to socially transition or be treated with hormone therapy and does not make these interventions ineffective.

14. The Program Statement prohibits well-established treatments for gender dysphoria and, instead, provides for psychotherapy and psychotropic medications despite the absence of any evidence that these interventions are effective treatments for this condition. There is no basis for Dr. Kaliebe's assertion that "psychotherapy is the preferred treatment for gender dysphoria" (Kaliebe Dec. p. 14), or the Memorandum's assertion that the Program Statement "is more aligned with the latest scientific information." (Memorandum at 3)

15. There is no basis for the assertion in the Memorandum and Kaliebe Declaration that making gender-affirming care available to those who need it would reward threats of self-harm and that prohibiting such care may reduce self-harm. To the contrary, prohibiting this care regardless of medical need would increase the risk of self-harm.

16. Dr. Kaliebe's report rests on a fundamental lack of understanding of gender dysphoria and its treatment under the prevailing protocols. He has a personal idiosyncratic view of gender dysphoria that is at odds with how this condition is understood within the field of

3

psychiatry. And his description of what he calls the "affirming model" of care bears no resemblance to the widely accepted protocols for treatment.

17. The Memorandum and Kaliebe Declaration's claims about the lack of integrity of WPATH and all of the major medical and mental health professional organizations that support gender-affirming care for gender dysphoria are baseless.

## III.    EXPERT OPINIONS

**A.    The Program Statement—by prohibiting and withdrawing hormone therapy and social accommodations from individuals with gender dysphoria—puts these individuals at the same risk of significant harm to their health and well-being as the Implementing Memoranda did.**

18. The Program Statement, like the Implementing Memoranda, prohibits social accommodations and hormone therapy for individuals with gender dysphoria. The Program Statement provides that for those currently receiving hormone therapy to treat gender dysphoria, they should be withdrawn from such care pursuant to a "tapering plan" for each patient. Program Statement at 8. It recognizes that individuals who have been receiving hormones to address gender dysphoria for an extended period of time may "develop severe physiological and psychological withdrawal effects from tapering" and, thus, "it may not be appropriate in all cases for the initial tapering plan to include cessation of hormones," but such plans "should be reevaluated regularly with respect to cessation of hormones." Program Statement at 8.

19. By prohibiting and withdrawing social accommodations and hormone therapy from individuals with gender dysphoria, the Program Statement puts them at the same risk of significant harm to their health and well-being as the Implementing Memoranda did. The fact that hormone therapy is withdrawn through a tapering process rather than cold turkey does not prevent the predictable serious harms of denying hormone therapy to those who have a medical

4

need for it.  All of the anticipated harms to patients I identified in my Initial Declaration, thus, apply equally to the Program Statement.  As I explained in my Initial Declaration, gender dysphoria is a serious condition which, if untreated, can cause serious distress and result in depression, anxiety, self-harm and suicidality.  Patients who are stripped of this medically necessary care would be expected to see a resumption of the distress and other symptoms they experienced from gender dysphoria prior to treatment.

20.    It is disturbing to read the Program Statement, which appears to recognize that some people will be deliberately put through a process that BOP anticipates could cause a "severe physiological and psychological" impact.  Dr. Kaliebe suggests that the only harm from discontinuing hormone therapy for individuals with gender dysphoria is the withdrawal effect, which he compares to the impact of withdrawing standard psychiatric medications.  Kaliebe Dec. par. 115.  Focusing solely on withdrawal effects disregards the harm from losing medical care the patients need.  The more apt comparison would be the long-term harm experienced by patients on standard psychiatric medications who are withdrawn from those medications even though they still have a medical need for them.

21.    Moreover, there is no evidence that withdrawing people from hormone therapy they have been receiving to treat gender dysphoria (with or without a tapering process) can be done safely without causing significant mental health distress. And there is no evidence that provision of psychotherapy would make this safe

22.    In my clinical experience, patients who have needed to discontinue hormone therapy temporarily due to medical issues experienced great distress due to the development of secondary sex characteristics that did not accord with their gender identity and their mental health decompensated.  Subjecting this group of individuals to the withdrawal of hormone

5

therapy in the absence of a medical need to do so and against their will constitutes medical experimentation without consent.

23.    In sum, the Program Statement, just like the Implementing Memorandum, imposes a draconian denial of medically-necessary hormone therapy[1] and social transition accommodations and if implemented, BOP should anticipate a mental health crisis for many inmates with gender dysphoria.

**B.    Contrary to the Memorandum and Kaliebe Declaration's assertion that social transition and hormone therapy are "unproven" treatments for gender dysphoria, substantial evidence of the type routinely relied on in the medical field shows the efficacy of these treatments.**

24.    The assertion made in the Memorandum and Kaliebe Declaration that social transition and hormone therapy are "unproven" treatments for gender dysphoria is baseless.  As discussed in my Initial Declaration, research and decades of clinical experience demonstrate that social transition and hormone therapy can effectively alleviate gender dysphoria and improve patient mental health and functioning.  Hormone therapy has been researched and recognized as an effective treatment since the 1950's.  (Pfafflin and Junge, 1998)

Hormone therpy

25.    The Memorandum asserts that "there is little (if any) reliable evidence showing that hormones address gender dysphoria." Memorandum at 21.  It relies on Dr. Kaliebe and various review articles noting that the evidence supporting this care is "low quality".  Kaliebe Dec. pars. 83-84.  The term "low quality" evidence in scientific research is a term of art that

---

[1] There are other medications apart estrogen and testosterone, that can be part of hormonal treatment for gender dysphoria. They include testosterone blockers such as spironolactone and finasteride (the latter of which is sometimes used to treat male pattern hair loss).  Such medications are part of treatment to help align the patient's body and appearance with their gender identity and, thus, can also be medically necessary.

generally refers to research that uses methods other than randomized controlled trials, which are generally considered "high quality" and provide the strongest evidence, though even many randomized controlled trials do not provide "high quality" evidence. "Low quality" evidence does not have the colloquial meaning of "poor quality" and these methods are not considered "unreliable" as the Memorandum asserts. To the contrary, the research methods used in this body of research—largely cross-sectional and longitudinal observational studies—are widely relied on in the field of medicine. Many widely recommended medical treatments are supported by these kinds of studies rather than by randomized controlled clinical trials, which are not always feasible or ethical. In one large study of systematic reviews, only 5.6% of all medical interventions, and 0% of all endocrine interventions, had a high GRADE score—a scoring system used to rate the quality of scientific research; most had low or very low GRADE scores. (Howick, et al 2022). But banning all endocrine care has not been suggested.

26.     The authors of the North American systematic reviews of research on gender affirming medical care for minors that discussed the low quality (also called "low certainty") evidence in this area—Guyatt et al—put out a statement expressing their concern about that being inappropriately used as a basis to ban care, stating:

> It is profoundly misguided to cast health care based on low-certainty evidence as bad care or as care driven by ideology, and low-certainty evidence as bad science. Many of the interventions we offer are based on low certainty evidence, and enlightened individuals often legitimately and wisely choose such interventions. Thus, forbidding delivery of gender-affirming care and limiting medical management options on the basis of low certainty evidence is a clear violation of the principles of evidence-based shared decision-making and is unconscionable.

https://hei.healthsci.mcmaster.ca/systematic-reviews-related-to-gender-affirming-care/.

27.     The Memorandum's reliance on two systematic reviews—Haupt et al, "Antiandrogen or estradiol treatment or both during hormone therapy in transitioning

transgender women," 11 Cochrane Database of Systematic Reviews, Art. No. CD013138, (2020), and Baker, et al, "Hormone Therapy, Mental Health, and Quality of Life Among Transgender People:  A Systematic Review, 5 J. Endocrine Soc. 1 (2021)—is misplaced.  These reviews merely note that the research on the treatment of gender dysphoria is the type of "low quality" research discussed above that is not as strong as randomized controlled trials.  They do not suggest in any way that the research is unreliable.  The Baker review concluded that "gender-affirming hormone therapy is likely associated with improvements in [quality of life], depression and anxiety."  Baker 2021 at 13.  The Haupt review, which was a review of studies comparing the safety and efficacy of two different approaches to hormone therapy for transgender women, limited inclusion criteria to controlled studies and found a lack of such studies.  The authors said they plan to "include non-controlled cohort studies in the next iteration of this review, as our review has shown that such studies provide the highest quality evidence currently available in this field."  Haupt 2020 at 2.[2]

28.     Dr. Kaliebe's claim that a study by Dhejne had "unfavorable" findings about the efficacy of hormone therapy for the treatment of gender dysphoria (Kaliebe Dec. par. 92) is baseless.  Dhejne's study found 10 suicides by transgender people in Sweden from 1973-2003, compared to 5 in its general population matched controls, but no statistically significant difference in suicidality in those who transitioned in the second 15 years of the 30-year period.

---

[2] Dr. Kaliebe misleadingly cites Miroshneychenko 2025, saying "[t]he best available evidence reporting on the effects of GAHT [cross sex hormones] in individuals with [Gender Dysphoria] ranged from moderate to high certainty for cardiovascular events and low to very low certainty for the outcomes of [Gender Dysphoria], global function, depression, sexual dysfunction, BMD [bone mineral density] and death by suicide." (Kaliebe Dec. par 88).  The studies referenced by Miroshneychenko found that the risk of cardiovascular events was exceedingly low (.04%) and that various mental health measures improved with treatment.  The certainty of findings regarding the low-risk of cardiovascular events was greater than the certainty of the findings regarding the mental health benefits of treatment given the quality of the evidence.

The paper did not compare transgender people who received gender-affirming medical treatment to those who had not, only recording higher suicidality compared to the general population, especially for those transitioning in the 1970's and 1980's.  Therefore, no conclusions can be drawn from the study about the efficacy of hormone therapy for the treatment of gender dysphoria.  Indeed, the lead author has stated that the study has been misused to justify blocking the provision of gender affirming care as the study was not designed to evaluate the efficacy of such care., that gender affirming care is beneficial to mental health, and that elevated suicidality in transgender people in Sweden likely is a reflection of societal discrimination.[3]

29.    Dr. Kaliebe's suggestion that hormone therapy could actually worsen mental health, citing a study by Glintborg, is baseless.  (Kaliebe Dec. par. 86.)  Glintborg showed nothing of the kind.  The study explains that because a psychological assessment was required to initiate hormone treatment among the subjects of the study, the engagement with mental health professionals resulted in greater mental health diagnoses and treatment of transgender people recorded in this Danish registry study.  (Glintborg 2023) It did not suggest that hormone therapy worsens mental health.

30.    Dr. Kaliebe speculates that the benefits of hormone therapy found in the research could be the result of a placebo effect.  (Kaliebe Dec. par. 90) He offers no basis for making such an assumption that this accounts for all or most of the benefits of treatment found in the research;

---

[3] *See*
https://www.reddit.com/r/science/comments/6q3e8v/science_ama_series_im_cecilia_dhejne_a_fellow_of/; https://www.transadvocate.com/fact-check-study-shows-transition-makes-trans-people-suicidal_n_15483.htm
Dr. Kaliebe also cites a comment by Anckarsater and Gillberg to support his assertion that the data on the effectiveness of medical transition is unfavorable. (Kaliebe Dec. par. 92)  It does not.  It was a letter to the editor critiquing the methodology of a study on gender-affirming surgery.

nor does he explain why the findings of an entire body of research should be discounted based on this hypothesis (and if so, why all research on mental health treatments shouldn't be disregarded on this basis).

Social transition

31.     As for the Memorandum and Kaliebe Declaration's assertion that social transition is an "unproven" treatment for gender dysphoria, as discussed in my Initial Declaration, research shows that social transition positively affects the mental health of individuals with gender dysphoria.  *See also* James, et al 2024 (finding that transgender adults who reported social transition more often reported they were "very to pretty happy" (71% vs. 52%), "thriving" (36% vs. 18%), and satisfied with their lives (43% vs. 24%) compared to those who have not socially transitioned).  As discussed above, the lack of "high quality" evidence supporting this intervention is not unusual for widely-used treatments.  Additionally, decades of clinical experience show the benefits of social transition in alleviating the distress of gender dysphoria.

**C.     In the medical and mental health fields, social transition and hormone therapy are not controversial or disputed treatments for gender dysphoria in adults.**

32.     Contrary to assertions made in the Memorandum, social transition and hormone therapy for the treatment of adults with gender dysphoria are not "controversial" or "medically disputed".

33.     Gender-affirming care—including social transition and hormone therapy—is widely accepted in the medical community as effective treatment for gender dysphoria. This is recognized by every major medical and mental health professional organization in the United States including the American Medical Association, the American Psychological Association, the American Psychiatric Association, and the Endocrine Society.

34.     While gender-affirming care for minors has been debated in public discourse, that is not the case regarding such care for adults.  And there is no debate or controversy within the medical and mental health fields about the necessity and efficacy of social transition and hormone therapy for the treatment of adults with gender dysphoria.  As I have explained, decades of research and clinical experience have shown the benefits of gender-affirming care—including social transition and hormone therapy—to individuals with gender dysphoria and there are no other treatments that have been shown to be effective.

35.     The Memorandum asserts that other countries and organizations are "reevaluating their clinical guidance for patients suffering from gender dysphoria, in light of recent debate." (Memorandum at 2).  While government entities in some countries have urged caution in providing gender-affirming care for *minors* with gender dysphoria, none of those countries have moved away from gender-affirming care for adults.  The Memorandum suggests, without basis that UCSF's announcement of a forthcoming revision of their guidelines means they are shifting away from gender affirming care.  The UCSF guidelines, which I helped develop, are over 10 years old and it is the norm to periodically update clinical practice guidelines as the field accumulates more knowledge, as was done with the Endocrine Society Guideline and the WPATH SOC.  A revision does not indicate a retreat from recommended best practices.  I am not aware of any clinical practice guidelines for gender dysphoria that are shifting away from or questioning the effectiveness of hormone therapy for adults with gender dysphoria.

**D.     The fact that social transition involves everyday items like clothing does not mean it is not medically necessary.**

36.     Dr. Kaliebe claims that social transition is not medically necessary because, he says, "as can be seen from the list of activities related to social transition [--such as altering

appearance and expression and changing one's name and pronouns]—none are related to healing medical illness or disease." (Kaliebe Dec. pars. 131, 132) He seems to be suggesting that when treatment is for a mental health condition, it can never be medically necessary. But there are medically necessary interventions for many mental health conditions. And medically necessary interventions—whether for physiological or mental health conditions—can include not only medications but also other interventions such as prosthetic devices, particular clothing, and behavioral interventions. For example, people with orthopedic issues may have a medical need to wear certain types of shoes even though a doctor's prescription isn't needed to purchase these items. Diabetics have a medical need to eat sugar when their blood glucose is low even though they don't need a doctor's prescription to get juice or candy. And medically necessary treatment for eating disorders may include lifestyle/behavioral interventions focused on changing how one eats. The fact that there is no medication prescription does not make an intervention any less medically necessary.

E.    **The fact that an individual with gender dysphoria is incarcerated does not remove their medical need to socially transition or be treated with hormone therapy and does not make such care ineffective.**

37.    The Memorandum and Kaliebe Declaration say there is a lack of evidence that social transition or hormone therapy are effective at treating gender dysphoria if the patient is incarcerated. The Memorandum states that "[e]ven if there is some reliable evidence that social accommodations address gender dysphoria when the individual is in society at large," that does not apply to the correctional environment. Memorandum at 13. Dr. Kaliebe asserts that there is a lack of studies in the carceral setting that would support hormone therapy for inmates with gender dysphoria. (Kaliebe Dec. par. 83). But there is no basis for the speculation that treatments that have been shown to be effective treatments for gender dysphoria would be

ineffective if the patient is incarcerated.  Gender dysphoria is an internal sense of incongruity between assigned gender and experienced gender and the distress that comes from that.  The prison environment does not change it.[4]

38.    Dr. Kaliebe points to incarcerated people having "histories, characteristics, and vulnerabilities that differ substantially from community-dwelling people with Gender Dysphoria" (Kaliebe Dec. par. 141) and he says that the concept of socially transitioning through accommodations, hormones or surgery is "out of place in the correctional context because an inmate does not live in society at large but a security prison environment."  (Kaliebe Dec. par. 142)  But none of this explains why this treatment should be presumed to be ineffective for patients in prison.  Nothing in Dr. Kaliebe's Declaration offers a medically-based explanation for denying this care to individuals because they are incarcerated.

39.    My own experience with patients who are incarcerated is at odds with Dr. Kaliebe's speculation that gender-affirming care is not effective in the prison context.  As a consultant for the California Department of Corrections and Rehabilitation, the California Department of State Hospitals (forensic psychiatric hospitals), and the Alameda County jails, I reviewed the medical files of many patients with gender dysphoria, most of whom were receiving hormone therapy and social transition accommodations.  And as an expert witness in a cases in Colorado and Washington, I evaluated eight incarcerated people with gender dysphoria who were receiving those interventions.  For these patients, as with people with gender dysphoria in the community, these treatments helped alleviate gender dysphoria and improve mental health.

---

[4] It is worth noting that it can be difficult to do studies in prison because of the ethical issues in obtaining consent in that context in which they may not have the free will to refuse consent without consequences.  (Knight  2012)  And there is no need to wait for studies on incarcerated people before a medical treatment is used in prisons.

40.     While the Memorandum and Dr. Kaliebe assert that gender-affirming care for gender dysphoria is inappropriate in the prison environment, the National Commission on Correctional Health Care—the organization that develops nationally-recognized standards for health services in jails and prisons—supports hormone therapy and social transition accommodations for incarcerated people with gender dysphoria.  *See* Position Statement: Transgender and Gender Diverse Health Care in Correctional Settings, National Commission on Correctional Health Care, available at https://www.ncchc.org/wp-content/uploads/Transgender-and-Gender-Diverse-Health-Care-in-Correctional-Settings-2020.pdf.

**F.      There is no evidence that psychotherapy or psychotropic medications are effective treatments for gender dysphoria.**

41.     The Program Statement prohibits well-established treatments for gender dysphoria and, instead, provides for psychotherapy and psychotropic medications despite the absence of any evidence that these interventions are effective treatments for gender dysphoria.

42.     The Memorandum asserts that "[p]sychotherapy is a well-known and well-established treatment for gender dysphoria," Memorandum at 29, referencing Dr. Kaliebe's Declaration.  But neither the Memorandum nor the Kaliebe Declaration provide any studies finding that psychotherapy effectively treats gender dysphoria as a substitute for medical intervention.  That is because there are none.

43.     For decades, psychotherapy was attempted to try to alleviate gender dysphoria without success.  (Brown, 1960)  No studies have shown it to be effective.  Dopp, et al. 2024 found that psychotherapy aimed at trying to resolve gender incongruence was not effective and

associated only with harm.[5]

44.     There are no established psychotherapeutic protocols for the treatment of gender dysphoria.

45.     In my experience with patients in the years before medical transition was widely available, many patients with gender dysphoria underwent psychotherapy for years and did not experience relief until they were able to medically transition.

46.     This is not to say that psychotherapy can't be helpful in other ways for individuals with gender dysphoria.  It can be important to address comorbidities, to help the patient come to understand their gender identity, and to provide support.  But it cannot alleviate distress due to gender incongruence.

47.     To the extent the goal of psychotherapy is to encourage identification with a person's assigned sex at birth, the American Psychological Association has stated that such efforts are not effective and instead do harm.  (APA, 2021).

48.     Given that the Program Statement prohibits the evidence-based treatments that exist for gender dysphoria and replaces them with treatments for which there is no evidence of efficacy, there is no basis for Dr. Kaliebe's assertion that "psychotherapy is the preferred treatment for gender dysphoria," (Kaliebe Dec. p. 14), or the claim in the Memorandum that the Program Statement "is more aligned with the latest scientific information."  (Memorandum at 3)[6]

---

[5] For this reason, Dr. Kaliebe's speculation that the benefits seen in those being treated with hormone therapy could be due to psychosocial support patients may receive while being provided treatment (Kaliebe Dec. par. 91) is without basis.  *See also* Kaltiala 2020 (patients who had already been receiving mental health care treatment prior to hormone therapy for suicidality, depression, and anxiety saw significant improvement in those symptoms after being treated with hormone therapy).

[6] Dr. Kaliebe also asserts without any basis that social transition "may undermine an individual's desire to participate in psychotherapy," which he says can provide relief of gender-related distress.  (Kaliebe Dec. par 135)  As I discussed, no psychotherapy protocol resolves gender

**G.      There is no basis for the assertion in the Memorandum and Kaliebe Declaration that making gender-affirming care available to those who need it would reward threats of self-harm and that prohibiting such care may reduce self-harm.**

49.      The Memorandum, relying on Dr. Kaliebe's Declaration, says that one of the reasons for prohibiting gender affirming care is that it "avoids rewarding threats of self-harm and may reduce overall self-harm." (Memorandum at 16; Kaliebe Dec. pars 148-50).  This is one of the most bizarre justifications I've seen for denying care. Self-harm is one of the manifestations of the distress of gender dysphoria among some people who are unable to access treatment, including in prisons.  Long-term incarceration with limited access to gender affirming care has been associated with a much elevated risk of suicide attempts.  (Drakeford 2018)  This is consistent with my clinical experience.  One of my patients who was being held in a state psychiatric hospital after being convicted of a crime experienced such distress from the denial of gender-affirming care that he attempted to cut off his breasts.  But there is no logical basis to conclude that if treatment *is available* to those who need it, people will engage in self-harm to access care.  If care is being provided based on assessment of the patient's condition and need for treatment, there should be no reason patients would resort to self-harm as a plea for care.  The notion that withholding care could reduce self-harm is, thus, nonsensical.  Research and clinical experience make clear that the opposite is true.

---

dysphoria, but therapy can be important for comorbidities.  It is illogical to speculate that people who would otherwise seek psychotherapy to treat depression, anxiety or other comorbidities would not do so if permitted to socially transition.  And this speculation is at odds with my experience as many of my patients are socially transitioned and also participating in psychotherapy.

16

**H.      Dr. Kaliebe's declaration demonstrates a lack of understanding of gender dysphoria and its treatment.**

50.      The Memorandum relies heavily on the Kaliebe Declaration to support its asserted justifications for the policy.  But Dr. Kaliebe's declaration reflects a significant lack of understanding of gender dysphoria and its treatment.

51.      First, Dr. Kaliebe's declaration reflects a personal idiosyncratic view of gender dysphoria that is at odds with how this condition is understood within the field of psychiatry.  He claims that gender dysphoria is a "temporary" disorder that is not likely to be long-lasting if a patient is not provided gender affirming care (Kaliebe Dec. par. 38), which he claims can prolong gender dysphoria (Kaliebe Dec. par. 133).  There is no basis for these assertions.

52.      Dr. Kaliebe does not provide any support for his claim that "most" cases of gender dysphoria are not long-lasting and there is none, particularly with respect to adults.  Some who oppose gender-affirming care for minors have argued that research shows that gender dysphoria in children tends to resolve on its own as they grow up.  That is a misreading of that research, which does not actually look at children diagnosed with gender dysphoria, but rather, whether gender non-conforming children grow up to be transgender.  But even if one accepted that reading, it has no bearing on adults.  Dr. Kaliebe cites no evidence that gender incongruence in adults is likely to resolve on its own, and there is no such evidence.  To the contrary, it is widely recognized that when gender incongruence persists past childhood and into adolescence and adulthood, it is highly unlikely to desist.  (Zucker et al. 2010; van der Loos, et al 2022).  Withholding gender-affirming care as Dr. Kaliebe suggests does not make gender incongruence go away.  It only increases suffering by denying treatment that is known to alleviate the distress of gender dysphoria.

53.      Dr. Kaliebe's claim that gender affirming care can prolong gender dysphoria in

17

adults is similarly based on a misreading of inapplicable research on children.  He points to research he claims shows that "social transition appears to prolong transgender identification and continue Gender Dysphoria."  (Kaliebe Dec. par. 133-134).  The studies he cites found that most youth who socially transitioned continued to identify as transgender at follow up.  But they did not demonstrate that social transition causes continued transgender identification.  One of those studies, Steensma 2013, found that subjects with the most severe gender dysphoria were the ones who socially transitioned and also the ones who were more likely to continue to identify as transgender.  In any case, however one interprets this research on children, as noted, gender incongruence in adults is highly unlikely to desist.  Thus, withholding gender-affirming care will not promote a cisgender identification; it will cause unnecessary suffering.

54.     Further reflecting what appears to be a lack of experience with gender dysphoria, Dr. Kaliebe speculates that because psychotherapy can be effective for body dysmorphic disorder and eating disorders, it could be effective for gender dysphoria.  But as discussed, psychotherapy to resolve gender dysphoria was tried for decades and not found to be effective.  Kaliebe's assertion that psychotherapy is helpful for other disorders does not change the fact that psychotherapy is ineffective in resolving gender dysphoria.

55.     In addition to his lack of understanding of gender dysphoria, Dr. Kaliebe appears to have a profound misunderstanding of gender-affirming care as he offers a description of such care that bears no resemblance to the widely accepted protocols for treatment.  He refers to the "affirmation model" of care, implying that what he describes is an accepted mode of treatment, but the model he describes is not what is recommended by the WPATH SOC 8 or the Endocrine Society Guideline or any other well-accepted guideline for treatment of gender dysphoria.

56.     First, Dr. Kaliebe says the so-called "affirmation model" of care "promotes

affirmation of the transgender identity immediately and decisively." (Kaliebe Dec. par. 35)

Neither WPATH nor the Endocrine Society suggest such treatment. As WPATH has explained: "Treatment is available to assist people with such distress to explore their gender identity and find a gender role that is comfortable for them . . . . Treatment is individualized: What helps one person alleviate gender dysphoria might be very different from what helps another person. This process may or may not involve a change in gender expression or body modifications." (Coleman, et al., 2012) Psychotherapy, therefore, should be respectful of the patient and allow them the space to explore or express their gender identity, without preconceptions imposed by the therapist: "[Mental health providers] working with transgender people should use active listening as a method to encourage exploration in individuals who are uncertain about their gender identity. Rather than impose their own narratives or preconceptions, MHPs should assist their clients in determining their own path." (Coleman, et al., 2022 p.S171) Contrary to Dr. Kaliebe's assertion, "questions about the patients' self-identification" are not "viewed as hostile and potentially harmful to the patient" (Kaliebe Dec. par. 37), if these questions are part of a respectful process of helping the patient explore their gender, as opposed to an effort by a therapist to suppress the patient's gender expression or to attempt to change their identity.

57.     Next, contrary to what Dr. Kaliebe suggests, the prevailing treatment protocols do not ignore comorbidities or shun psychotherapy. (Kaliebe Dec. pars. 32-35) Addressing comorbidities is part of care. Psychotherapy is important to address comorbidities as well as to help patients better understand their gender identity. WPATH SOC 8 states that the health professional should be licensed and trained in identifying gender dysphoria as well as co-existing mental health and psychosocial concerns. (Coleman et al., 2022, at S32) As a psychiatrist working with transgender patients with co-occurring mental illness, treating co-morbidities in

transgender people has been my life's work.

58.    Finally, the prevailing treatment protocols do not "minimize discussion of" potential risks.  (Kaliebe Dec. par. 37).  Hormone therapy is not provided without patients first being informed of the potential risks as part of the informed consent process and treating doctors will not offer such treatment unless they have concluded after weighing the risks and benefits of care that treatment is appropriate.

59.    In sum, Dr. Kaliebe creates a straw man by providing a false description of care under the prevailing protocols and then attacks it.  He either misunderstands the prevailing protocols or assumes, without basis, that clinicians providing care to patients with gender dysphoria disregard them.

I.    **The Memorandum and Kaliebe Declaration's attempt to attack the professional medical organizations' support for gender-affirming care is unsupported.**

60.    The Memorandum and Kaliebe Declaration attempt to cast doubt on the integrity of the major American medical organizations, all of which support gender-affirming care for the treatment of gender dysphoria. They do this this by making a range of allegations about WPATH and the SOC 8 and arguing that all of the other major medical groups' positions are tainted by WPATH.  Even if there were such a conspiracy encompassing all of the major medical organizations in the country, that would not change the fact that decades of research and clinical experience demonstrate the effectiveness of gender-affirming care at alleviating gender dysphoria, and the absence of any other evidence-based treatments.  But there is no basis for these allegations and I will address some of the key problems with these claims.

61.    The Memorandum, relying largely on Dr. Kaliebe's Declaration, asserts that WPATH makes treatment recommendations based on ideology rather than science, suppresses

evidence, and used inappropriate methodology used in developing SOC 8. As I discussed in my Initial Declaration, WPATH's SOC 8 was developed by experts in the field using a well-accepted rigorous process. Kaliebe falsely states that WPATH Standards of Care 8 did not follow the Institute of Medicine's recommendations. They did, as I discussed in my initial declaration.

62. Dr. Kaliebe attempts to discredit the WPATH SOC by discussing cherry-picked excerpts of a document production from WPATH in the case *Boe v. Marshall* (M.D. Ala.) to make assertions about WPATH and its process for developing SOC 8. (Kaliebe Dec. pars. 62, 63) Dr. Kaliebe had access to the documents in the case, most of which remain under seal, because he served as an expert witness in the case. I also served as an expert witness in the case and had access to the same document production. His reliance on select out-of-context excerpts from a production containing thousands of pages of documents does not permit the conclusions that he draws. Nor do his conclusions gain validity by the fact that some opinion writers who have long opposed gender-affirming care and a non-scientific magazine (without an identified author) offered similar commentary about the WPATH document production. (Kaliebe Dec. par. 62)

63. Dr. Kaliebe also relies on a publication called "The WPATH Files," which similarly tries to cobble together a disparaging narrative of WPATH based on excerpts of communications among WPATH members on a clinical care message board. As I discussed in my Second Declaration, this misleading presentation was created by a journalist and activist opposed to gender-affirming medical care and published on an advocacy organization's website.

64. Dr. Kaliebe suggests that the involvement of members of other professional medical groups in the development of the WPATH SOC is a flaw that makes the other

21

professional groups' guidelines tainted by WPATH's SOC.  (Kaliebe Dec. par. 74) This reflects a misunderstanding of WPATH as a multidisciplinary organization.  WPATH enlists experts from the relevant fields, including endocrinology and psychology, to develop its clinical guidelines for patients with gender dysphoria.  Contrary to Dr. Kaliebe's implication, WPATH is not dictating guidelines for other professional groups to follow; rather, WPATH's guidelines are developed based on the expertise of members of those fields.  WPATH exists to coordinate educational and scientific sessions as well as to periodically release practice guidelines. WPATH's SOC is a reflection of the expertise and experience clinicians and academics who practice and study transgender health care around the world. It is therefore unsurprising that those groups' guidelines would agree with WPATH's recommendations.

65.     The provision of gender-affirming care for adults around the world is not based solely on WPATH's guidelines; it has been practiced globally for decades, even preceding the first WPATH Standards of Care in 1979. This care has been provided and considered beneficial for over 70 years, and fabricated controversies about WPATH does not change this fact.

66.     The Memorandum's reliance on the United States Department of Health and Human Services report "Treatment for Pediatric Gender Dysphoria:  Review of Evidence and Best Practices," Nov. 19, 2025, to support its attack on the scientific integrity of WPATH and all of the major medical groups that support gender-affirming should not be given any credence. This publication was mandated by President Trump's Executive Order 14187, "Protecting Children from Chemical and Surgical Mutilation" ("EO 14187").  EO 14187 refers to gender-affirming medical care as "dangerous" treatment that is "maiming" and "mutilat[ing]" children, and directs HHS to take action to "end the chemical and surgical mutilation of children."  In this same EO, the President directed HHS to "publish a review of the existing literature and best

22

practices for promoting the health of children who assert gender dysphoria . . . ."  That the report comes out against gender-affirming medical care for minors is, thus, hardly surprising. Moreover, the authors selected by HHS had publicly been on record opposing such care or transgender rights more generally.  And most do not have experience treating transgender people because they are not licensed clinicians.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 27th day of April, 2025

Dan H. Karasic

23

Bibliography

American Psychological Association (2021). APA Resolution on Gender Identity Change Efforts, https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf.

Baker, K, et al (2021). Hormone therapy, mental health, and quality of life among transgender people: A systematic review. *Journal of the Endocrine Society*, 5(4), 1-16.

Brown, D., Psychosexual Disturbances: Transvestism and Sex-Role. Source: Marriage and Family Living, Vol. 22, No. 3 (Aug., 1960), pp. 218-227. Published by: National Council on Family Relations. Stable URL: http://www.jstor.org/stable/347641.

Coleman, E., et al (2022). Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. *International journal of transgender health*, 23(Suppl 1), S1–S259.

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L., Långström, N., & Landén, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. *PloS one*, 6(2), e16885.

Dopp, Alex R., et al (2024). Interventions for Gender Dysphoria and Related Health Problems in Transgender and Gender-Expansive Youth: A Systematic Review of Benefits and Risks to Inform Practice, Policy, and Research. Santa Monica, CA: RAND Corporation. https://www.rand.org/pubs/research_reports/RRA3223-1.html.

Drakeford L. (2018). Correctional Policy and Attempted Suicide Among Transgender Individuals. *J Correct Health Care*. 2018 Apr;24(2):171-182.

Glintborg, D., et al. (2023). Gender-affirming treatment and mental health diagnoses in Danish transgender persons: a nationwide register-based cohort study. *European Journal of Endocrinology*, 189(3), 336-345.

Howick J, et al (2022). Most healthcare interventions tested in Cochrane Reviews are not effective according to high quality evidence: a systematic review and meta-analysis. *J Clin Epidemiol*. 2022 Aug;148:160-169.

Haupt et al, "Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women," 11 Cochrane Database of Systematic Reviews, Art. No. CD013138 (2020).

James, S.E., Herman, J.L., Durso, L.E., & Heng-Lehtinen, R. (2024). Early Insights: A Report of the 2022 U.S. Transgender Survey. National Center for Transgender Equality, Washington, DC.

Kaltiala, R, et al. (2020). Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. *Nordic Journal of Psychiatry*, 74, 213–219.

Knight K, Flynn PM. Clinical trials involving prisoners: a bioethical perspective. *Clin Investig*.

(Lond). 2012;2(12):1147-1149.

Miroshnychenko, A., et al. (2025). Gender affirming hormone therapy for individuals with gender dysphoria aged < 26: a systematic review and meta-analysis. *Archives of Disease in Childhood*, 110(6), 437-445.

National Commission on Correctional Health Care, Position Statement: Transgender and Gender Diverse Health Care in Correctional Settings, available at https://www.ncchc.org/wp-content/uploads/Transgender-and-Gender-Diverse-Health-Care-in-Correctional-Settings-2020.pdf.

Pfafflin, F., & Junge, A. (1998). Sex reassignment: Thirty years of international follow-up studies after sex reassignment surgery, a comprehensive review, 1961-1991. (Jacobson & Meir, trans.).

Steensma, T., et al. (2013). Factors Associated With Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study, *Journal of the American Academy of Child & Adolescent Psychiatry*, Volume 52, Issue 6, 2013, Pages 582-59.

United States Department of Health and Human Services report "Treatment for Pediatric Gender Dysphoria:  Review of Evidence and Best Practices," Nov. 19, 2025.

van der Loos, M. A. T. C., et al. (2022). Continuation of gender-affirming hormones in transgender people starting puberty suppression in adolescence: a cohort study in the Netherlands. *The Lancet. Child & adolescent health*, 6(12), 869–875.

Zucker, K., et al (2010) Puberty-Blocking Hormonal Therapy for Adolescents with Gender Identity Disorder: A Descriptive Clinical Study, *Journal of Gay & Lesbian Mental Health*, 15:1, 58-82.