**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALISHEA KINGDOM, et al., | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00691 |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

**EXPERT DECLARATION OF DR. CATHY THOMPSON IN SUPPORT OF
PLAINTIFFS' MOTION FOR AN UPDATED PRELIMINARY INJUNCTION**

I, Cathy Thompson, hereby declare and state as follows:

1. I am over the age of 18, of sound mind, and in all respects competent to testify.

2. I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

3. I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

4. I submitted an expert declaration in this case on March 14, 2024 (my "Initial Declaration"). I incorporate that declaration by reference.

5. My background and qualifications are discussed in my Initial Declaration.

6. In the last four years I have not given expert testimony by deposition or trial any cases.

7. Since my Initial Declaration, I have reviewed the following documents related to this case: the Bureau of Prisons' ("BOP") Program Statement 5260.01, Management of Inmates with Gender Dysphoria (the "Program Statement"); the Memorandum on Program Statement

1

5260.01, Management of Inmates with Gender Dysphoria (Feb. 19, 2026) (the "Memorandum").

8.    I submit this declaration in support of Plaintiffs' Motion for an Updated Preliminary Injunction.

## EXPERT OPINIONS

### A.  BOP's experience providing hormone therapy and social transition accommodations is at odds with the stated rationales for the Program Statement.

9.    I have reviewed the Memorandum on Program Statement 5260.01, which prohibits gender affirming care, including hormone therapy (precluding the initiation of treatment and providing for the withdrawal of those currently receiving such treatment), and accommodations for social transition.  The Memorandum asserts that there is a lack of evidence that hormone therapy and social transition help alleviate gender dysphoria, especially in prisons, and that providing these interventions can present security and prison-administration concerns.  I was struck by the absence of any discussion of BOP's years of experience providing this care to individuals with gender dysphoria.  If it had been included, it would have refuted their asserted rationales for the policy.

10.    I was a psychologist at BOP for more than two decades until I left in September 2023.  Starting in 2017, I was the Chief of Drug Treatment Programs for BOP.  As a section chief, I frequently served as Acting Psychology Services Branch Administrator.  In that role, I served as the senior agency psychologist on the Transgender Executive Council, which was BOP's "official decision-making body on all issues affecting the transgender population." (Transgender Offender Manual, Exh. B to my initial declaration, at 4).  I also had regular interaction with the Transgender Executive Council in my role as the Chief of Drug Treatment Programs when there were drug treatment planning issues for transgender patients.

2

11.     During my time at BOP, particularly since 2017, when BOP issued a national policy providing for gender-affirming care for individuals with gender dysphoria, including hormone therapy and accommodations for social transition, I have seen or reviewed the medical files of many patients who have received such treatment.  These interventions were effective at treating gender dysphoria in our patient population.  Many patients experienced relief of their gender dysphoria and improvement in mental health and functioning including a reduction in symptoms of depression and anxiety, a reduction in self-harm, and greater engagement in programs like education and reentry preparation.

12.     During my years at BOP when hormone therapy and social transition accommodations were available to individuals with gender dysphoria, I did not hear of it creating any security or prison-administration problems, including the security issues referenced in the Memorandum.  I did not hear of any incidents of social transition accommodations facilitating escape.  I did not hear that these accommodations created an issue regarding the concealment of contraband.  I did not hear that other inmates threatened or became violent with these individuals due to resentment of their access to social transition accommodations.  Nor did I hear that victimization of transgender people increased as a result of hormone therapy and accommodations for social transition being provided.  As the Acting Psychology Services Branch Administrator, I would have expected to be informed if any mental health treatments we provided were creating security concerns.  The Psychology Services Branch is responsible for oversight and consultation to the field regarding mental health care for individuals in BOP custody, and such issues would fall within that scope.  Additionally, the Psychology Services Branch Administrator is responsible for collaborating with the Correctional Services Administrator to address concerns arising at the intersection of institutional security and mental

3

health treatment.

13.     Rather than creating security or administrative challenges, providing this care improved institutional safety.  As I discussed in my prior declaration, these interventions reduced psychological distress and helped prevent mental health crises, including aggression, self-castration attempts, and suicide.  This, in turn, enhanced safety for the individuals receiving care, as well as for staff and others in custody.  It also benefitted prison administration, as I was aware of fewer acute mental health crises and suicide watches, which require clinical and correctional management.

**B. During my long career at BOP, medically necessary care was not denied to patients based on security concerns.**

14.     The Memorandum says that even if the prohibited treatments are medically necessary to address gender dysphoria, gender-affirming care should not be made available because providing it in the prison environment raises security and prison administration concerns.  As I discussed above, I was not aware of any such issues arising during the years that BOP provided hormone therapy and social transition accommodations to individuals with gender dysphoria.  But if such issues were to arise, in my more than two decades at BOP, it was not the policy of BOP to deny medically necessary care due to security concerns and I am not aware of any case in which medically necessary treatment was denied on that basis.  Rather, BOP would put in place procedures to ensure that treatment was provided without compromising safety.

15.     For example, medications such as Suboxone and methadone are routinely provided to patients to treat opioid use disorder.  While the potential for diversion of these medications presents a legitimate security concern, and patients prescribed them may be at risk of being targeted by other individuals, these concerns did not result in the denial of medically

4

necessary treatment. Instead, the BOP has developed and implemented protocols to administer these medications in a controlled manner, reducing the risk of diversion and enhancing patient safety. Similarly, medically necessary assistive devices such as canes and crutches are provided to individuals with mobility impairments, notwithstanding the potential for misuse as weapons or for concealing contraband. The security risks (e.g., escape, staff assault) associated with transporting incarcerated individuals to outside medical facilities are well-known; however, patients requiring emergency or inpatient care are not denied treatment. Rather, the BOP employs established safeguards, including the use of restraints and armed escorts, to mitigate these risks while ensuring access to necessary care.

C. **Additional responses to the specific security concerns cited in the Memorandum**

16. In addition to the facts that, during my time at BOP (until 2023), i) the potential security risks of gender affirming care cited in the Memorandum were not an issue, and ii) security concerns were never deemed a basis to deny medically-necessary care, I have some additional reactions to the specific security issues mentioned in the Memorandum.

*The claim that gender-affirming care will make patients targets for violence*

17. The Memorandum asserts that providing hormone therapy or accommodations for social transition will make individuals a target for attacks and increase the risk of harm to prison officials tasked with protecting them. I have several reactions to this based on my experience at BOP.

18. First, transgender people are vulnerable to being targeted whether or not they are receiving gender-affirming care. Earlier in my career at BOP before such care was consistently available, transgender people were considered a vulnerable population at risk of being targeted. I am aware of transgender people in BOP custody being subjected to assault whether or not they

5

were receiving hormone therapy or social transition accommodations.

19.     In my experience, providing gender-affirming care did not exacerbate the targeting of transgender individuals; if anything it made them less vulnerable by improving their mental health.  People with gender dysphoria experience profound distress when assigned social roles that are inconsistent with their gender identity.  The feelings of anxiety and depression associated with gender dysphoria can impair social functioning in ways that are likely to increase their chances of being targeted.  For example, people experiencing these conditions may have difficulty accurately interpreting social cues, may withdraw or self-isolate, and may exhibit irritability or heightened reactivity, increasing the likelihood of interpersonal conflict. As mental health improves, individuals are better able to engage in healthy, prosocial interactions; interpret social dynamics more accurately; and regulate their emotions and behavior.  These factors contribute to greater personal safety.

20.     Second, if medically necessary care makes someone vulnerable to being targeted by others in custody, BOP protects them; it doesn't deny medically necessary care.  As noted above, medications such as Suboxone and methadone are routinely provided to patients to treat opioid use disorder.  Patients prescribed them may be at risk of being targeted by other individuals; however, these concerns did not result in the denial of medically necessary treatment.  Instead, the BOP has established procedures to protect individuals who are at risk for coercion, threats, and violence from others, including changing housing assignments, placing someone into protective custody, and transferring them to another facility.  Nor is the burden or cost of protecting people a reason BOP would deny medically necessary care.

21.     There are many reasons people in prison may be targeted by others and at greater risk of violence, including their sexual orientation, cognitive limitations, being physically

6

weaker, or having a serious mental illness. People may also be targeted because they have access to certain areas of the institution like kitchen workers, who can be targeted to obtain contraband. When there are concerns about individual safety, BOP takes steps to protect them, whether placing them in protective custody, changing their housing assignment, or transferring them to another facility.

### The claim that social transition accommodations raise fairness concerns

22.     The Memorandum states that providing social transition accommodations that allow people to change their appearance "raises fairness concerns and can breed resentment among other inmates, which can lead to violence." Memorandum at 14.

23.     The idea that cisgender men in prison would resent that they aren't getting bras or women's grooming items is hard to take seriously. But even if others were envious of these items, all sorts of accommodations are provided to people in custody for medical or religious reasons that give them access to something others don't have. For example, BOP would provide lower bunk passes for those with physical limitations. It would provide special shoes to people who have orthopedic conditions. Special diets would be provided for medical or religious reasons. It would provide educational accommodations to people with diagnosed learning disabilities. And in some cases, work assignments would be changed as a religious accommodation. Concern about resentment and resulting violence was never a basis to deny these accommodations that were medically necessary or provided for religious reasons.

### The claim that social transition accommodations create the risk of concealing contraband or escaping and hindering investigation of in-prison crimes

24.     The Memorandum asserts that a reason for prohibiting accommodations for social transition is that "providing accommodations heightens the risk of inmates concealing dangerous

7

contraband or escaping and may hinder the prison's ability to investigate intra-prison crimes."
Memorandum at 14.

25.    People in BOP custody hide contraband in all sorts of places, including socks, shoes, bags, underwear, and in their hair.  BOP has established procedures for thorough pat searches of individuals to include all areas of clothing that might conceal contraband,  in addition to an individual's hair and personal property.  Nothing about social transition accommodations would create a special risk of concealment of contraband, including binders.  Other similar garments such as back support braces and belts are permitted when medically necessary and officers are able to search them.

26.    The asserted concern about concealment of contraband has no conceivable connection to many of the social transition accommodations that are available, e.g. hygiene items and makeup.

27.    Suggesting that access to social transition accommodations would enable someone to change their appearance enough to conceal their identity and possible escape from secure custody or avoid being investigated for intra-prison crimes is based on extreme speculation rather than any documented instance of this happening in federal custody,  and does not explain why all accommodations are removed, including undergarments and hygiene products.  BOP has established procedures to minimize risks of escape by incarcerated individuals who alter their appearance, including procedures for staff to be identified by presenting photo ID anytime they exit the institution, and staff escorts for all visitors.

*The claim that providing gender-affirming care conflicts with the practice of refusing to reward threats of self-harm and may even increase self-harm*

28.    The Memorandum states that providing gender-affirming care "conflicts with reasonable practice of refusing to reward threats of self-harm and may even increase self harm."

8

Memorandum at 14.

29. This makes no sense at all. When people are feeling hopeless and desperate in prison, threatening self-harm does sometimes happen. The suggestion that *permitting* gender-affirming care for patients who have a need for it would incentivize self-harm to get access to such treatment is illogical. If the treatment is available, there would be no reason to take such drastic measures to get care.

30. To the contrary, having a policy that *prohibits* gender-affirming care regardless of medical need would create that sense of hopelessness and desperation among people with gender dysphoria that could prompt self-harm. Before BOP consistently provided gender-affirming care to people with gender dysphoria, I was aware of some people who attempted self-castration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 28 day of April, 2025

Cathy L. Thompson, Ph.D.

9