**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ALISHEA KINGDOM, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | Civ. A. No. 25-691 (RCL) |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF
LAW IN SUPPORT THEREOF AND COMBINED OPPOSITION TO PLAINTIFFS'
UPDATED PRELIMINARY INJUNCTION AND TO STAY AGENCY ACTION**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................................1

BACKGROUND ...................................................................................................................................4

I.    BOP's Provision of Medical Care to Inmates in Its Custody .......................................4

II.   The Executive Order and BOP's 2025 Implementing Memoranda .............................4

III.  Plaintiffs' Challenge to EO 14,168 and BOP's 2025 Implementing Memoranda ......5

IV.   The Court Preliminarily Enjoined the Implementing Memoranda .............................5

V.    BOP Issued a New, Superseding Policy in 2026 ...........................................................6

VI.   The Administrative Record ..............................................................................................7

VII.  Discovery, Supplementation of the Complaint, and Motion for an Updated
      Preliminary Injunction .....................................................................................................9

LEGAL STANDARDS .........................................................................................................................9

ARGUMENT ......................................................................................................................................10

I.    The Court Lacks Jurisdiction Over Plaintiffs' Claims Challenging the 2025
      Memoranda and EO 14,168 ..........................................................................................11

      A.    Plaintiffs Lack Standing to Challenge EO 14,168 and the Implementing
            Memoranda .........................................................................................................11

      B.    The Court Lacks Jurisdiction to Enjoin EO 14,168 ......................................13

      C.    Plaintiffs' Challenge to the Superseded Memoranda Is Moot. .....................14

II.   The 2026 Policy Complies with the Eighth Amendment .............................................14

      A.    Medical Concerns and Necessity .....................................................................19

            1.    *Sex Trait Modification Surgery* .............................................................19

            2.    *Social Accommodations* ........................................................................21

            3.    *Cross-Sex Hormones* ............................................................................22

      B.    Safety, Security, and Prison Administration Concerns ...................................24

      C.    Plaintiffs' Eighth Amendment Arguments Are Unpersuasive .......................26

III.    The 2026 Policy Complies with the APA ..................................................................................28

    A.    BOP Did Not Act Arbitrarily or Capriciously under the APA ....................................28

    B.    Plaintiffs' APA Arguments Are Unpersuasive ................................................................30

IV.    The 2026 Policy Complies with Equal Protection ........................................................34

V.    Plaintiffs' Rehabilitation Act Claim Fails ........................................................................37

    A.    Plaintiffs Lack a Private Right of Action under the Rehabilitation Act. .......................37

    B.    Plaintiffs' Rehabilitation Act Claim Fails on the Merits..................................................39

VI.    Plaintiffs Have Not Demonstrated Irreparable Harm.................................................41

VII.    The Balance of Equities and Public Interest Favor Defendants.................................44

CONCLUSION....................................................................................................................................45

# TABLE OF AUTHORITIES

**CASES**

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000) ....................................................................................................43

*Alaska v. Dep't of Agric.*,
17 F.4th 1224 (D.C. Cir. 2021) ..............................................................................................14

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ................................................................................................................37

*Anderson v. Crouch*,
169 F.4th 474 (4th Cir. 2026).......................................................................................... 35, 37

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................................................9

*Baloch v. Kempthorne*,
550 F.3d 1191 (D.C. Cir. 2008) ..............................................................................................40

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
462 U.S. 87 (1983) ..................................................................................................................28

*Barr v. Pearson*,
909 F.3d 919 (8th Cir. 2018)...................................................................................15, 21, 26

*Bayse v. Ward*,
147 F.4th 1304 (11th Cir. 2025) ............................................................................................21

*Baz v. Dep't of Homeland Sec.*,
No. 18-cv-1013 (CJN), 2019 WL 5102827 (D.D.C. Oct. 11, 2019) ....................................13

*Bell v. Wolfish*,
441 U.S. 520 (1979) ...................................................................................................... 3, 28, 32

*Bernier v. Allen*,
38 F.4th 1145 (D.C. Cir. 2022)......................................................................................... 2, 15

*Bldg & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) .................................................................................................12

*Butte County v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010) ....................................................................................... 31, 32

*Campbell v. Kallas*,
936 F.3d 536 (7th Cir. 2019)..................................................................................................21

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ...............................................................................................41

*City of Cleburne v. Cleburne Living Ctr., Inc.*,
473 U.S. 432 (1985) ................................................................................................................36

*Clark v. Skinner*,
937 F.2d 123 (4th Cir. 1991) ..................................................................................................38

*Clark v. Valletta*,
157 F.4th 201 (2d Cir. 2025) ............................................................................... 15, 18, 20, 27

*Cousins v. Sec'y of the U.S. Dep't of Transp.*,
880 F.2d 603 (1st Cir. 1989) ..................................................................................................38

*Crete Carrier Corp. v. E.P.A.*,
363 F.3d 490 (D.C. Cir. 2004) ...............................................................................................12

*Davis v. FEC*,
554 U.S. 724 (2008) ................................................................................................................11

*De'Lonta v. Angelone*,
330 F.3d 630 (4th Cir. 2003) ..................................................................................................26

*Delta Const. Co. v. E.P.A.*,
783 F.3d 1291 (D.C. Cir. 2015) .............................................................................................13

*DiFraia v. Ransom*,
171 F.4th 622 (3d Cir. 2026) .................................................................................................15

*Doe v. Blanche*,
172 F.4th 901 (D.C. Cir. 2026) ...................................................................................15, 42, 44

*Doe v. Spahn*,
No. 23-cv-02859 (CJN), 2025 WL 1305360 (D.D.C. May 6, 2025) .....................................38

*Doe 2 v. Shanahan*,
755 F. App'x 19 (D.C. Cir. 2019) ...........................................................................................35

*Doe 2 v. Trump*,
319 F. Supp. 3d 539 (D.D.C. 2018) ........................................................................................13

*Edmo v. Corizon, Inc.*,
949 F.3d 489 (9th Cir. 2019) ............................................................................................. 15,  17

*Eknes-Tucker v. Governor of Alabama*,
114 F.4th 1241 (11th Cir. 2024) .............................................................................................17

*Estelle v. Gamble,*
  429 U.S. 97 (1976) ................................................................................ 2, 14, 15, 20, 24

*Farmer v. Brennan,*
  511 U.S. 825 (1994) ...........................................................................................15

*F.C.C. v. Beach Commc'ns, Inc.,*
  508 U.S. 307 (1993) ..................................................................................... 36, 37

*F.C.C. v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ...........................................................................................33

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021) ..................................................................................... 28, 32

*Fields v. Smith,*
  653 F.3d 550 (7th Cir. 2011) ............................................................................26

*Flast v. Cohen,*
  392 U.S. 83 (1968) .............................................................................................14

*Forest Cnty. Potawatomi Cmty. v. United States,*
  330 F. Supp. 3d 269 (D.D.C. 2018) ................................................................10

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ................................................................................... 1, 2, 13

*Friends of Animals v. Bernhart,*
  961 F.3d 1197 (D.C. Cir. 2020) .......................................................................14

*G&E Real Est., Inc. v. Avison Young-Washington, D.C., LLC,*
  168 F. Supp. 3d 147 (D.D.C. 2016) .................................................................11

*Gibson v. Collier,*
  920 F.3d 212 (5th Cir. 2019) ............................................................ 17, 18, 19, 20

*Haitan Bridge All. v. Biden,*
  No. 1:21-cv-03317 (JMC), 2026 WL 627405 (D.D.C. Mar. 6, 2026).................13

*Haverkamp v. Linthicum,*
  152 F.4th 618 (5th Cir. 2025)............................................................................19

*Heller v. Doe ex rel. Doe,*
  509 U.S. 312 (1993) ...........................................................................................36

*Hoffer v. Fla. Dep't of Corr.,*
  973 F.3d 1263 (11th Cir. 2020)..........................................................................15

*J.L. v. Soc. Sec. Admin.*,
    971 F.2d 260 (9th Cir. 1992)................................................................................................39

*J.T. v. District of Columbia*,
    983 F.3d 516 (D.C. Cir. 2020) ...........................................................................................14

*Johnson v. Dominguez*,
    5 F.4th 818 (7th Cir. 2021)................................................................................................16

*K.C. v. Individual Members of the Med. Licensing Bd. of Ind.*,
    121 F.4th 604 (7th Cir. 2024), *rehearing and rehearing en banc denied by*,
    No. 23-2366, 2025 WL 848427 (7th Cir. Mar. 18, 2025)........................................16, 18, 33

*Kadel v. Folwell*,
    100 F.4th 122 (4th Cir. 2024), *vacated and remanded by*, 145 S. Ct. 2838 (2025)...................18

*Kapche v. Holder*,
    677 F.3d 454 (D.C. Cir. 2012) ...........................................................................................39

*Keohane v. Fla. Dep't of Corr. Sec'y*,
    952 F.3d 1257 (11th Cir. 2020).....................................................................................*passim*

*Kincaid v. Williams*,
    600 U.S. ---, 143 S. Ct. 2414 (2023) ...................................................................................40

*Kingdom v. Trump*,
    No. 1:25-cv-691 RCL, 2025 WL 1568238 (D.D.C. June 3, 2025) ..............................5, 30, 44

*Kosilek v. Spencer*,
    774 F.3d 63 (1st Cir. 2014).........................................................................................*passim*

*Lane v. Pena*,
    518 U.S. 187 (1996)..........................................................................................................39

*League of Women Voters of the U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)................................................................................................10

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020)..........................................................................................................31

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..........................................................................................................11

*Lyng v. Castillo*,
    477 U.S. 635 (1986)..........................................................................................................35

*Marcum v. Crews,*
   No. 5:25-cv-238-GFVT, 2025 WL 2630922 (D. Ky. Sept. 12, 2025),
   *aff'd,* No. 25-5840, Dkt. 26 (6th Cir. Oct. 23, 2025) ..................................................... 17, 22

*Mathis v. U.S. Parole Comm'n,*
   749 F. Supp. 3d 8 (D.D.C. 2024) ..................................................................................38

*Michael M. v. Superior Ct.,*
   450 U.S. 464 (1981) ......................................................................................................34

*Mississippi v. Johnson,*
   71 U.S. 475 (1867) .................................................................................................... 2, 13

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ............................................................................. 10,  28, 30, 31

*Moya v. U.S. Dep't of Homeland Sec.,*
   975 F.3d 120 (2d Cir. 2020) .........................................................................................38

*Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regul. Comm'n,*
   680 F.2d 810 (D.C. Cir. 1982) .....................................................................................14

*Newdow v. Roberts,*
   603 F.3d 1002 (D.C. Cir. 2010) ...................................................................................13

*Nguyen v. Immigr. Naturalization Serv.,*
   533 U.S. 53 (2001) .......................................................................................................34

*Nken v. Holder,*
   556 U.S. 418 (2009) .....................................................................................................10

*Oceana, Inc. v. Locke,*
   831 F. Supp. 2d 95 (D.D.C. 2011) ...............................................................................10

*Otto v. City of Boca Raton,*
   981 F.3d 854, 869 (11th Cir. 2020) ..............................................................................27

*Porfiri v. Eraso,*
   121 F. Supp. 3d 188 (D.D.C. 2015) ..............................................................................39

*Porretti v. Dzurenda,*
   11 F.4th 1037 (9th Cir. 2021)........................................................................................18

*Preiser v. Rodriguez,*
   411 U.S. 475 (1973)......................................................................................................45

*SAI v. Dep't of Homeland Sec.,*
   149 F. Supp. 3d 99 (D.D.C. 2015) ................................................................................38

*Samma v. Dep't of Def.*,
 136 F.4th 1108 (D.C. Cir. 2025)...................................................................................... 13, 14

*Spokeo, Inc. v. Robins*,
 578 U.S. 330 (2016) ...............................................................................................................11

*Swan v. Clinton*,
 100 F.3d 973 (D.C. Cir. 1996) ..............................................................................................13

*Talbott v. United States*,
 No. 25-5087, 2025 WL 3533344 (D.C. Cir. Dec. 9, 2025)............................................. 35, 44

*Texas v. E.P.A.*,
 726 F.3d 180 (D.C. Cir. 2013) ..............................................................................................12

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*,
 444 U.S. 11 (1979) .................................................................................................................38

*Trump v. Am. Fed'n Gov't Emps.*,
 606 U.S. ---, 145 S. Ct. 2635 (2025) .....................................................................................12

*Trump v. CASA, Inc.*,
 606 U.S. 831 (2025) ...............................................................................................................44

*\*United States v. Skrmetti*,
 605 U.S. 495 (2025) .........................................................................................................*passim*

*Wash. State Grange v. Wash. State Repub. Party*,
 552 U.S. 442 (2008)................................................................................................................44

*Whitley v. Albers*,
 475 U.S. 312 (1986)................................................................................................................25

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) .....................................................................................................10, 41, 43

*Wis. Cent. Ltd. v. United States*,
 585 U.S. 274 (2018)................................................................................................................40

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
 758 F.2d 669 (D.C. Cir. 1985) ......................................................................................... 41, 43

*Ziglar v. Abbasi*,
 582 U.S. 120 (2017)................................................................................................................37

**CONSTITUTION**
U.S. Const. art. III, § 2 ..........................................................................................................11

## STATUTES

5 U.S.C. § 706 .............................................................................................................................28

18 U.S.C. § 3626 ................................................................................................................... 6, 43, 44

29 U.S.C. § 705 ........................................................................................................................ 39, 40

29 U.S.C. § 791 ............................................................................................................................37

29 U.S.C. § 794 .................................................................................................................38, 39, 40

29 U.S.C. § 794a .................................................................................................................... 38, 39

42 U.S.C. § 12211 .........................................................................................................................39

## RULES

Fed. R. Civ. P. 56(a) ......................................................................................................................9

## EXECUTIVE ORDERS

E.O. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ................................................................*passim*

## OTHER AUTHORITIES

Am. Psychiatric Ass'n, *DSM* 44 (2d ed. 1968) ......................................................................40

Am. Psychiatric Ass'n, *DSM* 71 (3rd ed. rev. 1987) .............................................................40

Anderson et al., *Gender Dysphoria and Its Non-Surgical and Surgical Treatments,*
10 Health Psych. Rsch. (2022) ..............................................................................................16

Fed. Bureau of Prisons, https://www.bop.gov/about/facilities/.  ........................................4

Fed. Bureau of Prisons, https://www.bop.gov/locations/ ...................................................4

Fed. Bureau of Prisons, Program Statement 6010.05 (June 26, 2014), *Health Services Administration,*
https://www.bop.gov/policy/progstat/6010_005.pdf ............................................... 4, 8, 25

Haupt et al., *Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender
women,* 11 Cochrane Database of Systematic Reviews, Art. No. CD013138 (2020) .........................22

Kellan E. Baker, et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A
Systematic Review,* 5 J. Endocrine Soc. 1 (2021) ........................................................................22

Rakesh R. Gurrala et al., *The Impact of Exogenous Testosterone on Breast Cancer Risk in Transmasculine
Individuals,* 90(1) Annals of Plastic Surgery 96 (2023) .........................................................23

Withers et al., *Transgender medicalization and the attempt to evade psychological distress*,
　　65 J. of Analytical Psychology 865 (2020)..................................................................................16

Wright & Miller's Federal Practice & Procedure (4th ed. 2020) ................................................................9

**INTRODUCTION**

This class action, consisting of inmates in the custody of the Federal Bureau of Prisons ("BOP") who are or will be diagnosed with gender dysphoria, challenges BOP's purported "blanket ban on gender-affirming health care"—namely, cross-sex hormones, social accommodations, and sex trait modification surgery—as reflected in BOP's memoranda of February 21 and February 28, 2025 ("implementing memoranda" or "2025 memoranda").  Compl. at ¶¶ 10, 18 (ECF No. 1).  The 2025 memoranda implemented Executive Order (EO) No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ("*Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*"), which directed BOP to revise its medical care policies to ensure that no Federal funds are expended for the purpose of conforming an inmate's appearance to that of the opposite sex, to the extent consistent with law.  The 2025 memoranda, however, has since been superseded by BOP's new, February 19, 2026 policy ("2026 Policy" or "Policy").  ECF No. 125.  Due to this Court's preliminary injunction, BOP has stayed the 2026 Policy.  On April 29, 2026, Plaintiffs filed a supplemental complaint to also challenge the 2026 Policy.  Suppl. Compl. (ECF No. 182).  The complaint, as supplemented, raises claims under the Eighth Amendment, the equal protection component of the Due Process Clause of the Fifth Amendment, the Rehabilitation Act, and the Administrative Procedure Act ("APA").  *Id.*; Compl.

The Court should grant summary judgment in BOP's favor and deny Plaintiffs' latest motion for preliminary injunction.  As an initial matter, Plaintiffs' challenge to the 2025 memoranda is moot because those memoranda no longer have any operative effect.  Any alleged harm caused by the lack of cross-sex hormones, social accommodations, or sex trait modification surgery will flow from the 2026 Policy once it goes into effect, not the superseded 2025 memoranda.  Enjoining the 2025 memoranda thus will not redress any alleged harm.  The same is true for EO 14,168, which never had any independent operative effect; it is a directive to agencies to take action consistent with law, and only the resulting agency action has any actual impact.  Moreover, "'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties,'" and thus, cannot enjoin the EO that is allegedly harming Plaintiffs.  *Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (quoting

*Mississippi v. Johnson*, 71 U.S. 475, 501 (1867)).  "While injunctive relief against executive officials . . . is within the courts' power," *id.* at 802, that merely confirms that the Court has authority to enjoin BOP's implementation of the EO, but not the EO itself.  Plaintiffs' claims challenging the implementing memoranda and EO 14,168 accordingly fail as a matter of law, and no preliminary injunction is warranted based on those claims.

As for Plaintiffs' Eighth Amendment challenge to the 2026 Policy, the central question is whether BOP's decisions to no longer provide sex trait modification surgery or social accommodations and to significantly limit the provision of cross-sex hormones constitute "deliberate indifference to [class members'] serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  The answer is clearly no.  BOP adopted the 2026 policy after it extensively reviewed relevant medical studies, medical expert opinions, state correctional policies, pertinent case law, and prison administration and safety concerns.  It determined that except in very limited circumstances for cross-sex hormones where long-term tapering may be necessary, the provision of "gender affirming" care is not medically necessary, is fraught with serious risks, presents significant security and safety risks, and is uncertain to deliver any benefits.  In guarding against these downside risks, BOP determined that the better approach in the carceral setting is to principally rely on psychotherapy, psychoeducational group interventions, trauma treatment, and psychotropic medication, all of which have been proven to be safe and effective.  BOP thus clearly has not "recklessly disregarded" any "excessive risk to inmate health or safety from [a serious medical need]."  *Bernier v. Allen*, 38 F.4th 1145, 1151 (D.C. Cir. 2022) (citation omitted).

BOP made its determination against the backdrop of ongoing scientific and policy debates about safety, efficacy and propriety of what Plaintiffs characterize as "gender affirming" care and BOP's discovery, based on newly available information, that certain external guidelines upon which it previously relied could not withstand scientific scrutiny.  *Infra* at 7–8, 17, 18, 27, 28–29, 33–34.  Plaintiffs readily admit that the Eighth Amendment dispute in this case is a "difference in medical opinion," *see, e.g.*, Mem. P. & A. in Supp. of PI Mot. ("PI Mem.) at 3–6, 12–16, 27, 31 (ECF No. 179-1) (describing disputes of the parties' experts as to the efficacy and risks of certain gender dysphoria

treatments).  But it is well established that a "difference in medical opinion . . . fails to support a claim of cruel and unusual punishment."  *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020) (citation modified).  "[W]hen the medical community can't agree on the appropriate course of care," which is the case here, "there is simply no legal basis for concluding that the treatment provided is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."  *Id.* at 1275 (citation omitted).  This is especially true because the Court must also give "wide-ranging deference" to prison administrators' determinations about institutional safety and security.  *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).  BOP's 2026 Policy thus easily clears the demands imposed by the Eighth Amendment.

Plaintiffs' other claims fail too. Plaintiffs' APA arbitrary and capricious claim fails because BOP's new policy is reasonable, amply explained, and supported by a fulsome administrative record, including an expert report from Kristopher E. Kaliebe, M.D., an expert in psychiatry who has extensively studied the treatment for gender dysphoria, including in the carceral setting.  Ex. 1 (AR excerpts).  Plaintiffs' Equal Protection claim fails because the 2026 Policy "does not prohibit conduct for one sex that it permits for the other."  *United States v. Skrmetti*, 605 U.S. 495, 514–15 (2025).  Under the Policy, "*no* [inmate] may be administered . . . hormones [absent certain circumstances unrelated to an inmate's sex, or provided social accommodations or sex trait modification surgery] to treat gender dysphoria."  *Id.* at 515.  Finally, Plaintiffs' Rehabilitation Act claim is not viable because the Act does not create a private right of action in these circumstances, and in any event, the claim fails on the merits because the Act specifically carves out conditions like gender dysphoria from its protective scope.

Accordingly, the Court should grant Defendants' motion for summary judgment, enter judgment in Defendants' favor as to all claims, and deny Plaintiffs' preliminary injunction motion as moot.  For similar reasons and based on a balance of equities, a preliminary injunction is not warranted even if the Court were inclined to entertain the motion.

## BACKGROUND

### I.    BOP's Provision of Medical Care to Inmates in Its Custody

BOP operates over 120 prisons across the country, *see* https://www.bop.gov/locations/, and is responsible for the custody and care of over 150,000 federal inmates, *see* https://www.bop.gov/about/facilities/.    BOP's Health Services Division is responsible for "deliver[ing] medically necessary health care to inmates effectively[,] in accordance with proven standards of care[,] without compromising public safety concerns inherent in the Bureau's overall mission."  Program Statement 6010.05 (June 26, 2014), *Health Services Administration* § 1, available at https://www.bop.gov/policy/progstat/6010_005.pdf.  Providing medical care within a correctional environment "presents unique challenges not encountered by practitioners elsewhere."  *Id.* § 2.  To address such challenges, the Health Services Division follows certain "core principles," including that inmates are entitled to "medically necessary health care"; that the provision of health care must account for "correctional concerns and responsibilities inherent to [BOP's] overall mission[,]" *i.e.*, public safety; and that BOP will employ only evidence-based care, *i.e.*, "proven treatment strategies, generally supported by outcome data."  *Id.* § 2(b).  About 1,000 inmates have a diagnosis of gender dysphoria.  Bina Decl., ¶ 7 (ECF No. 36-1).

### II.    The Executive Order and BOP's 2025 Implementing Memoranda

On January 20, 2025, the President issued EO 14,168.  The EO provides in relevant part that "[i]t is the policy of the United States to recognize two sexes, male and female," EO 14,168, § 2, and that "'sex' shall refer to an individual's immutable biological classification as either male or female," *id.* § 2(a).  And, as relevant, section 4(c) of the EO provides: "The Attorney General shall ensure that [BOP] revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex."  Finally, the EO requires that it "be implemented consistent with applicable law."  *Id.* § 8(b).

On February 21, 2025, BOP issued a memorandum implementing EO 14,168.  *See* ECF No. 1-1 (Memorandum: *Compliance with Executive Order "Defending Women from Gender Ideology Extremism and*

*Restoring Biological Truth to the Federal Government"*).  The memorandum provides in relevant part that BOP will not provide social accommodations for trans-identifying inmates (*e.g.*, binders, hair removal devices, and undergarments).  *Id.* at 1–2.  On February 28, 2025, BOP issued a second memorandum regarding compliance with EO 14,168.  *See* ECF No. 1-2 (Memorandum: *Executive Order 14168 Compliance*).  The memorandum provides that "no Bureau of Prisons funds are to be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex."  *Id.*  It further provides that "[t]his policy is to be implemented in a manner consistent with applicable law[,] including the Eighth Amendment."  *Id.*

## III.    Plaintiffs' Challenge to EO 14,168 and BOP's 2025 Implementing Memoranda

On March 7, 2025, Plaintiffs—trans-identifying inmates receiving certain interventions and social accommodations to address gender dysphoria—filed this action on behalf of themselves and a putative class of similarly situated inmates to challenge EO 14,168 and the two implementing memoranda, which they characterize as imposing a "blanket ban on gender-affirming health care."  Compl. ¶¶ 10, 18.  Plaintiffs seek to set aside EO 14,168 and the implementing memoranda.  *Id.* at 29–30.

## IV.    The Court Preliminarily Enjoined the Implementing Memoranda

On March 17, 2025, Plaintiffs moved for a preliminary injunction and to stay the 2025 memoranda as to cross-sex hormones and social accommodations, relying on their Eighth Amendment and APA claims.  ECF No. 7.  Plaintiffs also moved for class certification.  ECF No. 8.

On June 3, 2025, the Court granted Plaintiffs' motions.  ECF No. 68.  The Court ruled solely on Plaintiffs' APA arbitrary and capricious claim, finding that Plaintiffs were likely to succeed on that claim because BOP's "*only* explanation for its new policies"—*i.e.*, "that the Executive Order required the adoption of those policies"—"fall[s] short."  *Kingdom v. Trump*, No. 1:25-cv-691 RCL, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025).  The Court made clear that "[t]o conclude that the defendants have failed to meet the procedural strictures of the APA is not to take any position on the underlying merits of the BOP's substantive policy decisions or the goals motivating the Executive Order."  *Id.* at *12.  The Court stayed BOP's implementing memoranda and enjoined BOP from enforcing

5

EO 14,168 and the implementing memoranda as to hormones and social accommodations. ECF No. 68, at 2. The Court further ordered BOP to provide hormones and social accommodations in accordance with pre-EO 14,168 policy. *Id.* Finally, the Court certified the case "as a class action on behalf of all persons who are or will be incarcerated in the custody of BOP facilities, with a current medical diagnosis of gender dysphoria or who receive such a diagnosis in the future." *Id.* at 1. Because the Prisoner Litigation Reform Act ("PLRA") limits the injunction to 90 days, 18 U.S.C. § 3626(a)(2), the Court has since renewed the preliminary injunction several times because there had been no changed circumstances. ECF Nos. 79, 96, 114. The current Preliminary Injunction is set to expire on May 31, 2026. ECF No. 114.

## V.    BOP Issued a New, Superseding Policy in 2026

On February 19, 2026, BOP issued a new policy on treatment of inmates with gender dysphoria, Program Statement 5260.01, *Management of Inmates with Gender Dysphoria*. 2026 Policy (ECF No. 125). Under the Policy, BOP will provide medical care to each inmate pursuant to an "individualized" plan "tailored to the specific clinical needs of the inmate." *Id.* at 6. Medical and psychiatric comorbidities will generally be addressed before gender dysphoria treatment proceeds so as to rule them out "as the potential cause of [gender dysphoria]." *Id.* Gender dysphoria treatment will consist of psychotherapy and psychoeducational group interventions, trauma treatment, and psychotropic medication, among other treatments. *Id.* at 6–7. Not available to address gender dysphoria, however, are sex trait modification surgeries and social accommodations. *Id.* at 7, 8.

Under the Policy, BOP will not provide cross-sex hormones to inmates not currently receiving them, and inmates who are currently receiving them generally will be tapered off based on individual factors such as the duration the inmate has been receiving hormones. *Id.* at 7–8. "For inmates who (1) are post sex trait modification surgery[,] or (2) have been receiving hormones to address [gender dysphoria] for an extended period of time and develop severe physiological and psychological withdrawal effects from tapering, it may not be appropriate in all cases for the initial tapering plan to include cessation of hormones[,]" but such tapering plans "should be reevaluated regularly[.]" *Id.* at 8. Moreover, inmates may "submit a request for additional medical or mental health care or evaluation

6

if they have acute concerns during the tapering process," and their requests will be evaluated "based on all relevant factors, including security and prison-administration concerns." *Id.*[1]

## VI.    The Administrative Record

On March 6, 2026, BOP filed a certified index of the 2026 Policy's administrative record, ECF No. 151, and produced the administrative record to Plaintiffs, which is over 3,000 pages. In that record, BOP provided extensive discussion—indeed, approximately 47 pages of analysis—of the issues it considered, the evidence it reviewed, and its justification for the 2026 Policy.

The administrative record shows that, in revising its policy for gender dysphoria treatment, BOP conducted extensive reviews of, among other things, relevant medical studies, state correctional policies, pertinent case law, prison administration and security concerns, and expert medical opinions, AR1–4; AR5–47. The expert medical opinions reviewed include the declarations of Plaintiffs' expert previously submitted in this case and the expert report of Dr. Kaliebe, a psychiatrist with over 25 years of experience who has extensively studied the relevant gender dysphoria literature and presented and published articles about gender dysphoria, AR2599–2673; *see infra* at 19–24, 29 (detailed discussion of Dr. Kaliebe's report). Based on this review, BOP determined that the "newer, more rapidly evolving clinical landscape" hampered the identification of a universal standard of care. AR3; *see also* AR5–8. BOP also thoroughly examined the "gender affirming care model" advocated by the World Professional Association for Transgender Health ("WPATH"), which had been the standard of care BOP previously followed. AR3–4; AR5–8. BOP determined that there are grave "concerns about the body of research and potential research bias" underlying the WPATH model. AR4; *see also* AR5–8. BOP further found that many European countries "have distanced themselves from the stance" of WPATH, and that leading organizations in the United States are reevaluating their clinical guidance. AR4; *see also* AR5–8. BOP considered systematic reviews of available studies that found insufficient and low strength of evidence as to the safety and efficacy of sex trait modification interventions,

---

[1]    "If any provision of [the 2026 Policy], or the application of any provision of [the] policy to any individual or circumstance, is held to be invalid, the remainder of [the] policy and the application of any provision to any other individuals or circumstances shall not be affected." 2026 Policy at 9.

including cross-sex hormones. AR4; AR24–27. BOP considered the many significant risks of cross-sex hormones, from breast cancer to cardiovascular complications. AR4; AR24–27; AR2631–36. Many of these concerns are echoed by BOP Medical Director Elizabete Stahl's declaration that responds to some of Plaintiffs' factual assertions and reflects BOP's decision-making process when formulating the 2026 Policy. Ex. 2 (Stahl Decl), ¶¶ 5–14.[2]

Other highlights of the Administrative Record include: a 2020 review concluding that individuals receiving cross-sex hormones are "at increased risk of adverse cardiovascular outcomes, including myocardial infarction and stroke," AR2859; a 2021 systematic review concluding that any association between cross-sex hormones and increased quality of life and decreased depression and anxiety was uncertain because of "high risk of bias in study designs, small sample sizes, and confounding with other interventions," AR1552; a 2020 overview explaining that the efficacy of gender affirming modalities are lacking "high-quality scientific data on the effects of this approach," including the lack of randomized prospective trial design, small sample size, recruitment bias, and short study duration, AR1906; and a 2023 narrative review explaining that studies of suicides following gender affirming care "suffers from a lack of methodological rigor" that increases the risk of error and does not control for "the presence of psychiatric comorbidity, substance use, and other suicide risk-enhancing factors," AR1915, 1927.

Lastly, BOP considered the safety, security, and prison administration concerns for the inmates receiving care to address gender dysphoria, other inmates, and for correctional staff. AR2–3; AR10–13, 18–20, 28–30. BOP reviewed five different state correctional policies (Florida, California, Kentucky, Oklahoma, and Minnesota) to understand how those states address gender dysphoria in the correctional context. AR3. BOP also reasonably considered costs, reliance interests, and alternatives. AR13–16, 21–23, 30–33. "After considering the relevant issues and factors and weighing the relevant considerations," BOP adopted the 2026 Policy, concluding based on its judgment and

---

[2]    Dr. Stahl, as BOP's Medical Director, possesses delegated authority for medical oversight and guidance for all clinical activities related to the physical and psychiatric care of inmates, and "is the final health care authority for all clinical issues." Program Statement 6010.05 § 2(a).

experience that it reasonable and in the best interest of those inmates with gender dysphoria, as well as other inmates and BOP personnel.  *E.g.*, AR7.

**VII.    Discovery, Supplementation of the Complaint, and Motion for an Updated Preliminary Injunction**

On April 3, 2026, the Court issued a scheduling order that allows discovery into EO 14,168 and the 2025 memoranda.  ECF No. 163.  Although that discovery remains ongoing, Defendants' summary judgment motion raises jurisdictional arguments with respect to both EO 14,168 and the 2025 memoranda.  Defendants accordingly are filing a separate motion to stay discovery until these jurisdictional arguments are resolved.

On April 29, 2026, Plaintiffs filed a supplemental complaint to challenge the 2026 Policy.  Suppl. Compl. (ECF No. 182), alleging the same causes of action as before.[3]  They simultaneously moved for an updated preliminary injunction, but only on their Eighth Amendment and APA claims.  Mem. at 24–42 (ECF No. 179-1).  As with the 2025 preliminary injunction, Plaintiffs seek to continue "gender affirming medications and social accommodations in accordance with BOP policy and practice in effect immediately prior to . . . issuance of [EO] 14168 on January 20, 2025."  PI Mot. at 1 (ECF No. 179).

**LEGAL STANDARDS**

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material fact" is one whose existence affects the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine factual dispute" exists when the non-movant produces sufficient evidence of a material fact so that a fact finder is required to resolve the parties' differing versions at trial.  *Id.*

---

[3]    If the claims raised in Plaintiffs' supplemental complaint are not dismissed pursuant to this summary judgment motion, then Defendants will answer the supplemental complaint within 14 days after the Court's decision.  10A Wright & Miller's Federal Practice & Procedure § 2718 (4th ed. 2020) ("a summary-judgment motion made prior to an answer should have the benefit of the Rule 12(a) language tolling the period of time in which an answer must be filed").

Further, in actions under the APA, summary judgment is the mechanism for "deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 106 (D.D.C. 2011).  In such cases, the standard set forth in Rule 56 "does not apply because of the limited role of a court in reviewing the administrative record." *Forest Cnty. Potawatomi Cmty. v. United States*, 330 F. Supp. 3d 269, 278 (D.D.C. 2018) (citation omitted).  Rather, so long as the agency "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action," the agency's action clears arbitrary and capricious review.  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Judgment in Defendants' favor on their summary judgment motion would moot Plaintiffs' motion for an updated preliminary injunction, but if the Court entertains the motion, the standard is demanding.  A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief" and is "never rewarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008).  A party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citation omitted).  Where, as here, the defendants are government entities or officials sued in their official capacities, the balance of equities and the public interest factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

The Court should grant summary judgment in Defendants' favor as to all claims, which would moot Plaintiffs' preliminary injunction motion.  First, the Court lacks jurisdiction to review Plaintiffs' challenges to EO 14,168 and the 2025 memoranda.  Second, Plaintiffs' Eighth Amendment, Equal Protection, Rehabilitation Act, and APA claims addressing the 2026 Policy fail on their merits.  If the Court entertains Plaintiffs' preliminary injunction motion, Plaintiffs are unlikely to succeed on the

10

merits of their claims for these same reasons.  And Plaintiffs have not established irreparable harm, and the balance of equities and public interest factor favors the government.

**I.      The Court Lacks Jurisdiction Over Plaintiffs' Claims Challenging the 2025 Memoranda and EO 14,168**

Plaintiffs lack standing to challenge EO 14,168 and the implementing memoranda, and even if they have standing, the Court lacks jurisdiction to enjoin EO 14,168 itself and Plaintiffs' challenge to the superseded implementing memoranda is moot.

**A.  Plaintiffs Lack Standing to Challenge EO 14,168 and the Implementing Memoranda.**

A federal court's jurisdiction is limited to "Cases" and "Controversies."  U.S. Const. art. III, § 2; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016).  A case or controversy exists only when a plaintiff can satisfy "the irreducible constitutional minimum of standing," which in turn "contains three elements": (1) "injury in fact," (2) "causal connection between the injury and conduct complained of," and (3) likelihood that the injury will be "redressed" by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  "The party invoking federal jurisdiction bears the burden of establishing these elements."  *Id.* at 561.  Plaintiffs "must demonstrate standing for each claim [it] seeks to press and for each form of relief that is sought," *Davis v. FEC*, 554 U.S. 724, 734 (2008) (citation modified), and "the Court must measure standing by the state of the world as of the date of the . . . operative complaint in an action," *G&E Real Est., Inc. v. Avison Young-Washington, D.C., LLC*, 168 F. Supp. 3d 147, 159–60 (D.D.C. 2016).  At the summary judgment stage, Plaintiffs must "'set forth' by affidavit or other evidence 'specific facts,' [Fed. R. Civ. P.] 56(e)," establishing standing, including showing a causal connection between their asserted injury, such that the injury is "fairly traceable to the challenged action"; and that it is "likely, as opposed to merely speculative that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 560–61 (citation modified).

Here, Plaintiffs cannot establish that EO 14,168 or the superseded implementing memoranda are causing them injury or that a favorable court decision will redress their asserted injury—namely the purportedly unlawful deprivation of "gender affirming" care.  The operative policy will be the

11

2026 Policy, which Plaintiffs now challenge in their supplemental complaint. ECF No. 182. The 2026 Policy exists independently of EO 14,168, AR5, 6, 15, 19, 29, will supersede the 2025 implementing memoranda, and will independently cause the asserted harm once it goes into effect. Therefore, Plaintiffs cannot establish causation as to EO 14,168 or the 2025 implementing memoranda. *See Texas v. E.P.A.*, 726 F.3d 180, 198 (D.C. Cir. 2013) (holding that plaintiffs had no standing when they challenged an agency rule instead of the self-executing statute that was causing the purported harm); *Crete Carrier Corp. v. E.P.A.*, 363 F.3d 490, 494 (D.C. Cir. 2004) (no standing where entry of relief plaintiffs sought would not affect alleged harm because consent decree caused same injury as challenged rule).

Moreover, EO 14,168 never caused Plaintiffs the asserted harm in the first place because it merely provided policy directives to BOP, and any alleged harm necessarily flows from BOP action. *See Trump v. Am. Fed'n Gov't Emps.*, 145 S. Ct. 2635, 2635 (2025) (finding that the government is likely to succeed on its argument that the challenged EO and Memorandum are lawful where both the EO and Memorandum directed agencies to plan reorganizations and reductions in force consistent with applicable law, and where the agency's reorganization plans were not before the Court for the Court to assess whether they can and will be carried out consistent with applicable law); *id.* at 2636 (Sotomayor, J., concurring). Section 4(c) of EO 14,168 directs the Attorney General to "ensure that [BOP] revises its policies concerning medical care to be consistent with this order," and "that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." EO 14,168 § 4(c). The EO also requires that it "be implemented consistent with applicable law." *Id.* § 8(b). Consequently, if BOP "may lawfully implement [section 4(c) of] the Executive Order, then it must do so; if [BOP] is prohibited, by statute or other law, from implementing [section 4(c) of] the Executive Order, then the Executive Order itself instructs [BOP] to follow the law." *See Bldg & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). The challenge thus properly should be directed at the agency action and not the EO itself because it is the agency action that would have harmed Plaintiffs.

12

The above discussion also makes clear that even if the Court were to set aside EO 14,168 and the implementing memoranda, that would not redress Plaintiffs' asserted harm. *See Delta Const. Co. v. E.P.A.*, 783 F.3d 1291, 1296–97 (D.C. Cir. 2015) (per curiam). This Court has no means of redressing any alleged deficiencies associated with memoranda that have been superseded, *i.e.*, "no decision by this [C]ourt would do anything to affect the [2025 memoranda] or the . . . class members' rights relative to it" given that they will be superseded as soon as the 2026 Policy goes into effect. *See Samma v. Dep't of Def.*, 136 F.4th 1108, 1114 (D.C. Cir. 2025). And the 2026 Policy would continue to exist even if EO 14,168 is enjoined. *See* AR5, 6, 15, 19, 29. For these reasons, Plaintiffs cannot show redressability to establish their standing to challenge either the 2025 memoranda or EO 14,168. *See Baz v. Dep't of Homeland Sec.*, No. 18-cv-1013 (CJN), 2019 WL 5102827, at *4 (D.D.C. Oct. 11, 2019) (dismissing complaint because regardless of whether plaintiff was appropriately placed on No-Fly List, he could not fly to the United States due to his visa revocation).

## B.  The Court Lacks Jurisdiction to Enjoin EO 14,168.

Even if Plaintiffs have standing, the Court lacks jurisdiction to enjoin EO 14,168. In *Franklin*, the Supreme Court explained that, pursuant to separation of powers principles, and absent exceptions inapplicable here, courts have "'no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" 505 U.S. at 802–03 (quoting *Mississippi*, 71 U.S. at 501). The Court therefore does not have jurisdiction to enjoin EO 14,168, nor does it have jurisdiction to issue a declaratory relief against the EO. *See Newdow v. Roberts*, 603 F.3d 1002, 1012–13 (D.C. Cir. 2010) ("court[s]—whether via injunctive or declaratory relief—do[] not sit in judgment of a President's executive decisions"); *Swan v. Clinton*, 100 F.3d 973, 976–77 n.1 (D.C. Cir. 1996) ("similar considerations regarding a court's power to issue relief against the President himself apply to [a] request for a declaratory judgment").

Relatedly, because the President is immune from injunctive and declaratory relief, the Court should dismiss him as a defendant. *See Haitan Bridge All. v. Biden*, No. 1:21-cv-03317 (JMC), 2026 WL 627405, at *13 (D.D.C. Mar. 6, 2026) (dismissing President from case seeking injunctive and declaratory relief because plaintiffs can seek "complete relief" without retaining the President as a defendant); *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018).

13

### C.  Plaintiffs' Challenge to the Superseded Memoranda Is Moot.

Even if Plaintiffs had standing to challenge the superseded memoranda, the challenge is moot. (The 2026 Policy is not yet in effect only because of the Court's preliminary injunction.)  Courts lack jurisdiction to adjudicate claims that have been "mooted by subsequent developments." *Flast v. Cohen,* 392 U.S. 83, 95 (1968).  For example, the promulgation of a new policy is among such subsequent developments that moot a challenge to the superseded policy.  *Friends of Animals v. Bernhart*, 961 F.3d 1197, 1203 (D.C. Cir. 2020) ("the government's abandonment of a challenged regulation is just the sort of development that can moot an issue"); *Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regul. Comm'n*, 680 F.2d 810, 814 (D.C. Cir. 1982) ("Corrective action by an agency is one type of subsequent development that can moot a previously justiciable issue.").

The mootness exceptions do not help Plaintiffs.  The voluntary cessation exception does not apply because it is "imposed only if there is some evidence that the party sought to manipulate the court's jurisdiction" and "avoid litigation."  *Samma*, 136 F.4th at 1113–14; *Alaska v. Dep't of Agric.*, 17 F.4th 1224, 1229 (D.C. Cir. 2021) ("The established law of this circuit is that the voluntary-cessation exception to mootness has no play when the agency did not act in order to avoid litigation." (citation omitted)).  There is no evidence of manipulation here, particularly given that mootness would not affect Plaintiffs' challenge to the 2026 Policy.  Likewise, the capable of repetition yet evading review exception does not apply because the BOP's policy on medical care for gender dysphoria will not evade judicial review; indeed, the Court will now review the 2026 Policy.  *See, e.g.*, *J.T. v. District of Columbia*, 983 F.3d 516, 523–24 (D.C. Cir. 2020).

In sum, because the Court lacks jurisdiction over Plaintiffs' challenge to EO 14,168 and the superseded implementing memoranda, Plaintiffs' challenge to them fails as a matter of law.

## II.    The 2026 Policy Complies with the Eighth Amendment

Plaintiffs' Eighth Amendment challenge fails as a matter of law, which also means that the claim cannot support a preliminary injunction.

Under Supreme Court precedent, the Eighth Amendment prohibits "unnecessary and wanton infliction of pain" that is "repugnant to the conscience of mankind." *Estelle*, 429 U.S. at 105–06; *see*

*also Kosilek v. Spencer*, 774 F.3d 63, 96 (1st Cir. 2014) (en banc) (Eighth Amendment "proscribes only medical care so unconscionable as to fall below society's minimum standards of decency"). In challenging a purported failure to provide constitutionally adequate medical care, a plaintiff must show "deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. "Deliberate indifference includes subjective and objective components; an official 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Bernier*, 38 F.4th at 1151 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *see also Doe v. Blanche*, 172 F.4th 901, 906 (D.C. Cir. 2026) (to show "deliberate indifference," a prisoner must establish that he faced "a substantial risk of serious harm" and that prison officials "kn[ew] of and disregard[ed] an excessive risk" to the prisoner's health or safety (quoting *Farmer*, 511 U.S. at 834, 837)).

A plaintiff cannot show deliberate indifference simply because a defendant provided "minimally adequate care." *Hoffer v. Fla. Dep't of Corr.*, 973 F.3d 1263, 1277 (11th Cir. 2020). Minimally adequate care is "quite minimal"; that is, the care need not be "perfect, the best obtainable, or even very good." *Id.* (citation omitted). A "difference in medical opinion . . . fails to support a claim of cruel and unusual punishment." *Keohane*, 952 F.3d at 1266 (citation modified). And "when the medical community can't agree on the appropriate course of care, there is simply no legal basis for concluding that the treatment provided is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id.* at 1275; *see also, e.g.*, *DiFraia v. Ransom*, 171 F.4th 622, 629 (3d Cir. 2026) ("[I]n the specific context of prison medical care, it is not enough that a prisoner or another doctor would prefer a different approach than the one corrections officials took. Mere disagreements over medical judgment do not state Eighth Amendment claims."); *Clark v. Valletta*, 157 F.4th 201, 213–14 (2d Cir. 2025) (collecting circuit court decisions that "have rejected deliberate-indifference claims for denial of specific gender-dysphoria treatments," siding with those cases, and rejecting "Ninth Circuit's stray decision" in *Edmo v. Corizon, Inc.*, 949 F.3d 489 (9th Cir. 2019)); *Barr v. Pearson*, 909 F.3d 919, 921–22 (8th Cir. 2018) (holding that a "difference of opinion over matters of expert medical judgment" simply "fails to rise to the level of a constitutional violation"

15

(citation modified)).  In other words, a constitutional violation exists "only if no minimally competent professional would have so responded under those circumstances." *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021) (citation omitted); *see also Kosilek*, 774 F.3d at 91–92 ("The choice of a medical option that, although disfavored by some in the field, is presented by competent professionals does not exhibit a level of inattention or callousness to a prisoner's needs rising to a constitutional violation.").  Moreover, "[a]s long as prison administrators make judgments balancing security and health concerns that are 'within the realm of reason and made in good faith,' their decisions do not amount to a violation of the Eighth Amendment." *Kosilek*, 774 F.3d at 92 (citation omitted); *see also Keohane*, 952 F.3d at 1275–78.

Plaintiffs cannot meet the demanding standard to prove an Eighth Amendment violation. Defendants will analyze in detail below each of the three categories of "gender affirming" care, but application of the core Eighth Amendment principle shows that there is no violation.  This is so because BOP provides far more than minimally adequate care to inmates with gender dysphoria.  As the administrative record compiled in this case demonstrates, BOP has assessed that it is better to treat gender dysphoria through individualized treatment plans with long-established, well-studied, and effective approaches of psychotherapy, psychoeducational group interventions, trauma treatment, and psychotropic medication.  *See, e.g.*, AR2613–18 (Dr. Kaliebe explaining that psychotherapy is a better treatment approach for gender dysphoria, particularly within correctional environments and relying on, *inter alia*, Withers et al., *Transgender medicalization and the attempt to evade psychological distress*, 65 J. of Analytical Psychology, 865 (2020)); Stahl Decl., ¶ 6; *see also K.C. v. Individual Members of the Med. Licensing Bd. of Ind.*, 121 F.4th 604, 610–11 (7th Cir. 2024) ("Social support and psychotherapy are widely recognized approaches" for gender dysphoria (citing Anderson et al., *Gender Dysphoria and Its Non-Surgical and Surgical Treatments*, 10 Health Psych. Rsch., at 4 (2022))), *rehearing and rehearing en banc denied by*, No. 23-2366, 2025 WL 848427 (7th Cir. Mar. 18, 2025).  In contrast, BOP has determined the "gender affirming" care advocated by Plaintiffs is fraught with serious risks and are uncertain to deliver any benefits, especially in the correctional context.  AR1–4; AR5-47; AR2607–45; *see also Marcum v. Crews*, No. 5:25-cv-238-GFVT, 2025 WL 2630922, at *7 (D. Ky. Sept. 12, 2025) (finding that Kentucky

16

statute that banned public funds from being used to pay for cross-sex hormones for inmates did not constitute deliberate indifference because "there remains significant disagreement about whether the side effects and the negative consequences of [cross-sex hormones] outweigh the positive benefits," particularly when "there are other ways to care for an individual diagnosed with Gender Dysphoria"), *aff'd*, No. 25-5840, Dkt. 26 at 6 (6th Cir. Oct. 23, 2025).

This is particularly the case after BOP determined that the WPATH guidelines, upon which BOP previously heavily relied in formulating its policy on "gender affirming" care, are flawed in numerous respects. *See* AR2618–27 (Dr. Kaliebe's discussion of WPATH); *see also Skrmetti*, 605 U.S. at 543 (Thomas, J., concurring) ("Recent revelations suggest that WPATH . . . bases its guidance on insufficient evidence and allows politics to influence its medical conclusions.") (citation omitted); *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1249 (11th Cir. 2024) (Lagoa, J., concurring in the denial of en banc) (noting that internal WPATH documents revealed that "WPATH officials are aware of the risks of cross-sex hormones and other procedures yet are mischaracterizing and ignoring information about those risks"); *id.* at 1261 ("[R]ecent revelations indicate that WPATH's lodestar is ideology, not science."); *Edmo*, 949 F.3d at 497 (O'Scannlain, J., dissenting) (describing the WPATH standards as "merely criteria promulgated by a controversial private organization with a declared point of view"); *Gibson v. Collier*, 920 F.3d 212, 222–23 (5th Cir. 2019) (WPATH standards are not "politically neutral" (quoting *Kosilek*, 774 F.3d at 78)). Significantly, BOP's Medical Director Dr. Stahl explained that she had "relied heavily" on WPATH's guidelines and "trusted that the guidance was based on the best evidence to date," Stahl Decl., ¶ 9, but that changed following the public disclosure of significant deficiencies in WPATH's recommendations, *id.* ¶¶ 9–11. That led BOP to examine the issue and to conclude that "due to the high variability in study design and outcomes reported, lack of long-term follow-up and small study size, the long-term effects of cross-sex surgery and hormones in incarcerated patients who are diagnosed with gender dysphoria cannot be determined and is insufficient to deem these treatment modalities as 'medically necessary.'" *Id.* ¶ 14.

Contrary to Plaintiffs' assertions, *see, e.g.*, PI Mem. at 13–15, BOP and Dr. Kaliebe's approach to treatment of gender dysphoria is consistent with that of many other medical experts and providers.

17

*Supra* at 16.  At most, there is a difference in medical opinion, but "[t]he law is clear that where two alternative courses of medical treatment exist, and both alleviate negative effects within the boundaries of modern medicine, it is not the place of our court to second guess medical judgments or to require that the [Department of Corrections] adopt the more compassionate of two adequate options." *Kosilek*, 774 F.3d at 90; *see also, e.g.*, *Porretti v. Dzurenda*, 11 F.4th 1037, 1048 (9th Cir. 2021) ("mere disagreement of medical opinion between experts does not demonstrate deliberate indifference as a matter of law"); *Gibson*, 920 F.3d at 220 ("There is no intentional or wanton deprivation of care if a genuine debate exists within the medical community about the necessity or efficacy of that care."). That is certainly the case here, as "there is an ongoing debate over" the necessity and efficacy of treatments for gender dysphoria.  *Kadel v. Folwell*, 100 F.4th 122, 176 (4th Cir. 2024) (Richardson, J., dissenting), *vacated and remanded*, 145 S. Ct. 2838 (2025); *see also id.* at 193 (Wilkinson, J., dissenting) ("gender affirming" treatments "are matters of significant scientific debate and uncertainty"); *Clark*, 157 F.4th at 216 (crediting expert who stated that "there is considerable growing disagreement within the medical and scientific communities on how to best treat people with gender dysphoria" and court concluding that "medical experts disagree about how to treat gender dysphoria").  And consistent with BOP Medical Director's finding, courts have also recognized that WPATH guidelines "reflect not consensus, but merely one side in a sharply contested medical debate."  *Gibson*, 920 F.3d at 221; *see also K.C.*, 121 F.4th at 611 ("Some have expressed doubt about whether WPATH's guidelines actually reflect medical consensus as to treatments for gender dysphoria.").

The same is true for Plaintiffs' attempt to isolate this "controversy or debate" to gender dysphoria treatment for juveniles.  PI Mem. at 13.  Just as the WPATH guidelines have been contested in the context of juvenile treatment, their validity has likewise been questioned in the context of treatment for adults, especially in the correctional environment.  *Supra* at 17.  Moreover, Plaintiffs fail to acknowledge the unique considerations presented by treatment in a carceral setting, where prison administrators and prison medical providers are best positioned to weigh the safety and efficacy of different approaches.  Where reasonable minds can differ on the best approach to complex medical issues in the prison setting, nothing in the text, history or jurisprudence of the Eighth Amendment

18

requires prison decisionmakers to acquiesce to the demands of inmates on one side of the debate. *See* Amicus Br. at 9–10 (ECF No. 45). BOP's decision to choose one side of the "fierce scientific and policy debates" about gender dysphoria treatment, *Skrmetti*, 605 U.S. at 525, does not offend the Eighth Amendment just as surely as the Tennessee law banning certain types of treatment for gender dysphoria at issue in *Skrmetti* did not offend the Equal Protection Clause of the Fourteenth Amendment.

BOP is entitled to even more leeway when it takes into account security and prison administration concerns in addressing these complex medical issues. Here, in BOP's judgment, sex trait modification interventions endanger the inmate receiving the intervention, imperil the prison officials charged with protecting the inmate, and increase the risk of inmates concealing dangerous contraband, among other security and prison administration concerns. By limiting access to sex trait modification interventions, the 2026 Policy mitigates these concerns, while still allowing BOP to provide individualized care to address gender dysphoria. BOP's good-faith balancing of security and medical concerns does not violate the Eighth Amendment. At a minimum, that balancing, given the medical disagreement over sex trait modification interventions, confirms that the 2026 Policy does not violate the Eighth Amendment.

### A.    Medical Concerns and Necessity

#### 1.    *Sex Trait Modification Surgery*

BOP has determined, based on medical professional opinion and other evidence in the administrative record, that sex trait modification surgeries are not medically necessary. *See, e.g.*, AR2605, ¶ 21 ("Cross-sex surgeries are not medically necessary and should not be made available in correctional environments."); Stahl Decl., ¶ 6 ("After examining the issue, it is my opinion that the medical necessity and long-term benefit of cross-sex surgeries are currently in question."). "[I]t is indisputable that the necessity and efficacy of sex reassignment surgery is a matter of significant disagreement within the medical community." *Gibson*, 920 F.3d at 216; *see also Haverkamp v. Linthicum*, 152 F.4th 618, 625 (5th Cir. 2025) ("there remains 'significant disagreement within the medical community' about whether sex-reassignment surgery is an 'effective treatment for gender dysphoria'"

(quoting *Gibson*, 920 F.3d at 216)); *Clark*, 157 F.4th at 216; Stahl Decl., ¶¶ 6–7, 12.  Indeed, "[t]hese surgeries have substantial risks, and there is little, if any, reliable data supporting that such surgeries cause meaningful long-term benefits in improving mental health or reducing suicide risks.  This is particularly true in prison settings."  AR2637–38, ¶ 118; *see also* Stahl Decl., ¶ 12 ("Medical evidence demonstrating the long-term benefits of [cross-sex surgeries] is scant and even more so if the individual is in a prison setting and has a greater number of co-morbidities."); *id.* ¶ 14 ("I have concluded that due to the high variability in study design and outcomes reported, lack of long-term follow-up and small study size, the long-term effects of cross-sex surgery . . . in incarcerated patients who are diagnosed with gender dysphoria cannot be determined and is insufficient to deem [such surgeries] 'medically necessary.'").

BOP also reasonably credited medical expert opinion that sex trait modification surgery can prolong and worsen gender dysphoria symptoms, undermine other gender dysphoria treatments, and cause other physical and psychological harms, some of which are lifelong.  AR2637–41; *see* AR2640, ¶ 129.  For example, numerous studies showed that individuals who underwent sex trait modification surgery have a significantly higher risk for depression, anxiety, suicidal ideation, and substance abuse disorders. AR2638, ¶ 121; AR2639–40, ¶ 122–26; AR966–74; AR987–93.  Such surgeries can also have "serious complications, some of which are lifelong" and irreversible, including stenosis, nerve damage, chronic pain, and loss of sensation.  AR2640, ¶ 129; *see also* AR976–986; AR3032–39.  As Dr. Kaliebe explained, "with the known harms to healthy tissue, potential increased risk of psychiatric decompensation, technical issues such as wound care, potential surgical complications, potential life-long health complications, and unclear mental health benefits, cross-sex surgeries within the correctional environment are not medical necessary."  AR2641, ¶ 130.

BOP's decision not to provide sex trait modification surgery, where there is reasonable disagreement as to its efficacy and safety, and instead to prioritize other, widely accepted forms of treatment (psychotherapy, group counseling, psychiatric services, and psychotropic medications), AR2613–18, is nothing like the sort of action that violates the Eighth Amendment, by causing "unnecessary and wanton infliction of pain" that is "repugnant to the conscience of mankind." *Estelle*,

429 U.S. at 105–06. A "difference of opinion over matters of expert medical judgment" simply "fails to rise to the level of a constitutional violation." *Barr*, 909 F.3d at 921–22 (citation modified).

### 2. *Social Accommodations*

BOP's decision not to provide social accommodations likewise does not offend the Eighth Amendment. BOP concluded that social accommodations are not medically necessary to address gender dysphoria. AR16–17. Medical professionals have persuasively explained that social accommodations are not medically necessary. *See, e.g.*, AR2605, ¶¶ 22, 136; *Bayse v. Ward*, 147 F.4th 1304, 1313 (11th Cir. 2025) (holding that growing long hair and wearing makeup, earrings, and nail polish, while perhaps "psychologically pleasing" to trans-identifying prisoner, are not medically necessary per prisoner's psychological treatment team); *Keohane*, 952 F.3d at 1274–75 (inmate's treatment team, Florida Department of Corrections' chief clinical officer, and retained expert opining that social accommodations of wearing long hair, makeup, and female undergarments are not medically necessary for the inmate plaintiff). "There is limited evidence suggesting that allowing cosmetic and clothing items, such [as] binders, undergarments, makeup, wigs, and other accessories and items stereotypically associated with the opposite sex, would improve or resolve symptoms associated with Gender Dysphoria." AR2643, ¶ 136. And there is no reliable evidence showing social accommodations address gender dysphoria in prison, given that social transition in the correctional environment is fundamentally different from such concepts outside the environment. AR2644, ¶ 139; AR2646, ¶¶ 141–43. At the same time, social accommodations "can prolong the symptoms [of gender dysphoria] and undermine psychotherapy." AR2643, ¶ 136. Social transition is also "related to future harms and risks due to increased likelihood of later sex-trait modification." AR2642, ¶ 133; *supra* at 19–20. Accordingly, two circuit courts that have considered whether social accommodations are medically necessary in the corrections environment have concluded that the specific accommodations requested were not medically necessary to treat the inmates' condition. *See Bayse*, 147 F.4th at 1313; *Keohane*, 952 F.3d at 1277; *see also Campbell v. Kallas*, 936 F.3d 536, 549 (7th Cir. 2019) (in qualified immunity case, no clearly established right for electrolysis or makeup).

21

### 3. *Cross-Sex Hormones*

The 2026 Policy provides that hormones should generally not be used to address gender dysphoria, subject to certain exceptions.  In reaching that decision, BOP considered, among other things, Dr. Kaliebe's opinion that hormonal interventions to address gender dysphoria are highly controversial, medically disputed, and unproven by appropriate evidence.  AR1–4; AR24–27; AR2605, ¶ 20; AR2650, ¶ 154; *see also* Stahl Decl., ¶¶ 6, 12–14, 16; *Marcum*, 2025 WL 2630922, at *7 ("[T]here remains significant disagreement about whether the side effects and the negative consequences of [cross-sex hormones] outweigh the positive benefits.").  As Dr. Kaliebe opined based on his review of relevant literature, providing hormonal interventions to address gender dysphoria "is not based on guidelines using best practice or systematic reviews of evidence[,]" and there is little (if any) reliable evidence showing that hormones address gender dysphoria.  AR2627, ¶ 83.  For example, "[a] 2020 systematic review of available studies 'found insufficient evidence to determine the efficacy or safety of hormonal treatment approaches for transgender women in transition'—it concluded that '[t]he evidence is very incomplete, demonstrating a gap between current clinical practice and clinical research.'"  AR4 (quoting Haupt et al., *Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women*, 11 Cochrane Database of Systematic Reviews, Art. No. CD013138, at 2, 11 (2020)); AR25.  "Another systematic review of studies concluded that it was 'impossible to draw conclusions about the effects of hormone therapy on death by suicide' because of the 'low' 'strength of evidence.'"  AR4 (quoting Kellan E. Baker, et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, 5 J. Endocrine Soc. 1, 12-13 (2021)); AR25.

Not only is the efficacy of cross-sex hormones to treat gender dysphoria disputed, but there are also indications that hormonal interventions can prolong and worsen symptoms of gender dysphoria, undermine other gender dysphoria treatments, and cause substantial health risks and medical harms.  *See* AR26; AR2631–36, ¶¶ 96–111.  For example, evidence shows that males who are treated with estrogen have twenty-two times the likelihood to develop breast cancer than other males.  AR4 (citing Rakesh R. Gurrala et al., *The Impact of Exogenous Testosterone on Breast Cancer Risk in Transmasculine Individuals*, 90(1) Annals of Plastic Surgery 96 (2023)); AR26.  Cross-sex hormones have

22

also been associated with "a range of cardiovascular complications," including a 1.5 to 2-fold increase in strokes and a 2- to 5-fold increased risk of pulmonary embolisms and deep vein thrombosis. AR2632, ¶ 98; AR2633, ¶¶ 101, 102. Additionally, cross-sex hormones affect cholesterol, which can lead to coronary artery disease and atherosclerosis (plaque buildup on artery walls). AR2633, ¶ 101; AR2634, ¶ 104. Other substantial risks include Pelvic Floor Dysfunction (94.1% in a cross-section study showed at least one symptom); urinary issues, including urinary incontinence, frequent urination, and bed-wetting (86.7% of participants had an issue); bowel-related issues, including constipation anorectal symptoms, and flatal incontinence (74%); and sexual dysfunction (52.9%). AR2634–35, ¶¶ 105, 106. Cross-sex hormones are also linked to cognitive issues, including memory loss, early-onset cognitive impairment, and loss of processing speed. AR2636, ¶ 110. Some of the effects of hormonal interventions, such as infertility and low sperm production, might be irreversible. AR26; AR2635–36, ¶ 109. BOP thus reasonably determined not to provide hormones to inmates not currently receiving them given the uncertainty in benefits, the potential harms, and the potential irreversibility of some negative effects of that intervention. AR1–2; AR25.

Though the medical concerns explained above are still present for inmates currently receiving hormones, BOP determined that a more nuanced approach is warranted for inmates who are already receiving hormones to address gender dysphoria because removing the hormones can cause stress or other side effects. AR26–27; AR2636–37, ¶ 114. Under the 2026 Policy, inmates who are currently receiving hormones to address gender dysphoria will receive tapering plans based on factors such as the duration the inmate has been receiving hormones to address gender dysphoria, the initial reason for receiving the hormone intervention, the response by the inmate to the intervention, and whether the inmate has undergone sex trait modification surgery. 2026 Policy at 7–8; *see also* AR27; AR2636–37, ¶ 114. For inmates who recently started receiving hormones, BOP determined that such inmates will receive a tapering plan that includes "a rapid discontinuation" of hormones because the medical concerns are minimal and the side effects, if any, are short-term. 2026 Policy at 8; *see* AR27; AR2636–37, ¶ 114. In contrast, for inmates who have been receiving hormones to address gender dysphoria for an extended period, their tapering plan will include "an appropriately paced discontinuation of

23

hormone intervention" based on the above factors. 2026 Policy at 7–8; *see* AR27; AR2636–37, ¶ 114. For inmates who (1) are post sex trait modification surgery or (2) develop severe physiological and psychological withdrawal effects from tapering, it may not be appropriate to include cessation of hormones in the initial tapering plan. 2026 Policy at 8. "But given 'the unproven medical benefits of continued hormone[s],' 'the potential negative effects of hormone[s],' and that 'it is likely rare that an inmate should continue hormone therapy indefinitely,'" AR27 (quoting AR2637, ¶ 116), tapering plans will be reevaluated regularly with respect to cessation of hormones, 2026 Policy at 8; AR27. In BOP's judgment, the above approach reasonably balances the medical concerns presented by hormones for inmates who are currently receiving them.

In sum, the 2026 Policy's approach to cross-sex hormones does not offend the Eighth Amendment because there is no "unnecessary and wanton infliction of pain" that is "repugnant to the conscience of mankind." *Estelle*, 429 U.S. at 105–06. BOP reasonably determined that hormonal interventions for inmates are not medically necessary or, at a minimum, are medically disputed and unproven by appropriate evidence. To the extent that there is uncertainty about the efficacy of hormones to address gender dysphoria, that uncertainty counsels against providing such controversial interventions when effective treatments, such as psychotherapy, are available.

## B.    Safety, Security, and Prison Administration Concerns

BOP also considered safety, security, and prison administration concerns in developing the 2026 Policy. AR2–3; AR10–13, 18–20, 28–30. BOP's balance of those concerns along with medical considerations further dooms Plaintiffs' Eighth Amendment claim. For example, BOP considered the fact that providing sex trait modification surgeries jeopardizes the safety, security, and administration of BOP facilities because "inmates receiving these surgeries are at higher risk of harassment due to their appearance." AR2; *see also* AR11–12; *Keohane*, 952 F.3d at 1263 (holding that sex trait modification interventions endanger "the prison employees who would have to step in to protect" the inmate and will require expending already limited resources to address these risks); *Kosilek*, 774 F.3d at 93 ("Recognizing that reasonable concerns would arise regarding a postoperative, male-to-female transsexual being housed with male prisoners takes no great stretch of the imagination.").

24

The same is true with hormone interventions and social accommodations.  *See* AR2, 19, 28–29; *Keohane*, 952 F.3d at 1275 (noting the "obvious[]" consequence of permitting a male inmate to dress and be groomed as a female "would inevitably become a target for abuse in an all-male prison").

BOP is committed to keeping all inmates in its custody safe, including those with gender dysphoria.  And for the inmates in its custody who have undergone surgery or have been on hormones for a substantial amount of time, BOP believes that it can adequately address the safety and security risks that they will pose.  But in light of the added burden from mitigating potential risks to such inmates, BOP reasonably concluded that it should not increase the number of individuals subject to these risks.

Special treatments associated with sex trait modification interventions also raise fairness concerns and can breed resentment among other inmates, which in turn "can increase the risk of retaliation against the inmate receiving special treatment and cause ripple effects throughout the correctional institution[,] disrupting the delicate prison environment."  AR12, 20, 29.  Moreover, providing "gender affirming" care conflicts with a reasonable prison safety practice of refusing to reward threats of self-harm and may even increase self-harm.  AR12, 20, 29–30; *see also* AR2648, ¶ 148; AR2649, ¶ 149.

These considerations are reasonable and entitled to significant deference.  *See Kosilek*, 774 F.3d at 83 ("When evaluating medical care and deliberate indifference, security considerations inherent in the functioning of a penological institution must be given significant weight.");  *see also* Program Statement 6010.05, § 1 (purpose of Health Services Administration is "[t]o deliver medically necessary health care to inmates effectively in accordance with proven standards of care without compromising public safety concerns inherent to the Bureau's overall mission").  "'[W]ide-ranging deference' is accorded to prison administrators 'in the adoption and execution of policies and practices that in their judgement are needed to . . . maintain institutional security.'"  *Kosilek*, 774 F.3d at 83 (quoting *Whitley v. Albers*, 475 U.S. 312, 321–22 (1986)).  "In consequence, even a denial of care may not amount to an Eighth Amendment violation if that decision is based in legitimate concerns regarding prisoner safety and institutional security."  *Id.*; *see also Keohane*, 952 F.3d at 1275–77.

In sum, the 2026 Policy does not offend the Eighth Amendment.  In adopting that policy, BOP chose a meaningful course of treatment to address gender dysphoria, was not deliberately indifferent to class members' medical needs, and reasonably considered safety, security, and prison administration concerns.

### C.    Plaintiffs' Eighth Amendment Arguments Are Unpersuasive.

Plaintiffs' counter arguments lack merit.  Plaintiffs argue that "across-the-board policies denying or severely limiting entire categories of health care to incarcerated people without regard to patients' individual medical needs constitute deliberate indifference."  PI Mem. at 28.  Even assuming this is an accurate statement of law, it is not an accurate characterization of BOP policy.  Unlike the examples that Plaintiffs provide (*e.g.*, the "one good eye" policy, banning Hepatitis treatment, and no treatment for keloid scars), *id.* at 28–29, here, BOP is not refusing to treat gender dysphoria altogether but is offering forms of treatment, albeit treatment that Plaintiffs believe is inadequate.  As explained above, however, a "difference of opinion over matters of expert medical judgment" simply "fails to rise to the level of a constitutional violation."  *Barr*, 909 F.3d at 921–22.  Moreover, unlike the "shoulder-shrugging refusal" in *Keohane*, 952 F.3d at 1266–67; *Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011), where "defendants did not produce any evidence that another treatment could be an adequate replacement"; or the complete lack of an alternative treatment in *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003), where the prison "terminated the hormone treatment" and "refused to provide any treatment to prevent [the inmate] from mutilating herself," BOP provided extensive evidence of a different, adequate treatment course with "individualized" plans that are "tailored to the specific clinical needs of the inmate." 2026 Policy at 6.

Plaintiffs also argue that BOP must know that sex trait modification interventions are medically necessary because BOP provided such care pursuant to prior (albeit soon to be rescinded) guidelines. PI Mem. at 27.  But Plaintiffs fail to appreciate that those guidelines under which BOP provided "gender affirming" care relied heavily on WPATH, Stahl Decl., ¶¶ 8, 9, and as Dr. Stahl explained, she later "became aware of information regarding WPATH studies and data that brings into question the validity of their recommendations," *id.* ¶ 10.  Dr. Stahl previously "firmly believed

26

WPATH's written guidance was reflective of all published evidence[,] [but she] no longer believe[s] that to be the case." *Id.* ¶ 9. After examining the issue further, Dr. Stahl concluded that BOP could no longer "trust the reliability of the WPATH guidance, when it has been so broadly questioned for lack of sound evidence and for being free from bias." *Id.* ¶ 11. Additionally, BOP must give extra caution to the medical care it provides because the population it treats has higher rates of certain chronic conditions (*e.g.*, hypertension, asthma, arthritis, tuberculosis), infectious diseases, and mental illness, compared to people living in the community, in addition to the safety and security concerns found in a carceral setting. *Id.* ¶ 7. BOP accordingly reassessed its approach to the treatment of gender dysphoria, including which treatment it previously deemed medically necessary. *Cf., e.g., Otto v. City of Boca Raton*, 981 F.3d 854, 869 (11th Cir. 2020) ("It is not uncommon for professional organizations to do an about-face in response to new evidence or new attitudes," which is why old "institutional positions cannot [permanently] define the boundaries of constitutional rights."). Thus, no negative inferences can be drawn from the fact that BOP previously followed WPATH guidelines because the information that was believed to be the "standard of care" that was propagated by WPATH "is under a cloud of doubt and uncertainty" following the exposure of WPATH's lack of scientific rigor and bias. Stahl Decl. ¶ 6; *see also supra* at 17.

At bottom, "there is considerable growing disagreement within the medical and scientific communities on how to best treat people with gender dysphoria," *Clark*, 157 F.4th at 216, and that includes criticisms of the WPATH's guidelines. BOP's decision to switch from one side of this ongoing debate to the other, based on a comprehensive re-assessment of how best to treat inmates' medical needs, does not amount to deliberate indifference. The Court accordingly should deny Plaintiffs' request for a preliminary injunction and grant summary judgment in favor of Defendants as to Plaintiffs' Eighth Amendment claim.

27

III.     **The 2026 Policy Complies with the APA**

Plaintiffs' arbitrary and capricious APA claim likewise fails as a matter of law and certainly cannot support a preliminary injunction.

### A. BOP Did Not Act Arbitrarily or Capriciously Under the APA.

The 2026 Policy is a product of reasoned decision-making. 5 U.S.C. § 706(2)(A). The arbitrary or capricious standard of review is "narrow." *State Farm*, 463 U.S. at 43. "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "[A] court is not to substitute its [own] judgment for that of the agency," and a "difference in view" does not violate the APA. *State Farm*, 463 U.S. at 43. The Court must be "most deferential" when reviewing scientific, medical, and other technical determinations, *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983), particularly here where the medical determinations are intertwined with prison administrators' safety and security determinations that are due "wide-ranging deference," *Bell*, 441 U.S. at 547.

BOP's 2026 Policy easily satisfies the narrow and highly deferential arbitrary and capricious standard. In the over 3,000-page administrative record, BOP provided extensive discussion—indeed, approximately 47 pages of analysis—of the issues it considered, the evidence it reviewed, and its justification for the 2026 Policy. *See* ECF No. 151; AR1–4; AR5–47. The administrative record shows that, in revising its medical policy for gender dysphoria treatment, BOP conducted extensive reviews of, among other things, relevant medical studies, medical expert opinions, state correctional policies, pertinent case law, and prison administration and security concerns. AR1–4; AR5–47. Based on this review, BOP determined that the "newer, more rapidly evolving clinical landscape" hampered the identification of a universal standard of care. AR3; *see also* AR5–8. BOP also thoroughly examined the "gender affirming care model" advocated by WPATH, which had been the standard of care BOP previously followed. AR3–4; AR5–8. BOP determined that there are grave "concerns about the body of research and potential research bias" underlying the WPATH model, AR4. *See also* AR5–8. BOP further found that many other countries "have distanced themselves from the stance" of WPATH,

28

and that leading organizations in the United States are reevaluating their clinical guidance.  AR4; *see also* AR5–8.  BOP considered available studies that found insufficient or low strength of evidence as to the safety and efficacy of sex trait modification interventions, including cross-sex hormones.  AR4; AR24–27.  BOP also considered the many significant risks of cross-sex hormones, from breast cancer to cardiovascular complications, AR4; AR24–27; AR2631–36, and the downside risks of cross-sex surgeries, AR9–10; AR2637–41.  In contrast, as the administrative record compiled in this case demonstrates, BOP assessed that it is better to treat gender dysphoria with long-established, well-studied, and effective approaches of psychotherapy, psychoeducational group interventions, trauma treatment, and psychotropic medication.  *See, e.g.*, AR2613–18.

In addition to considering the declarations of Plaintiffs' expert already submitted in this case, BOP considered the expert report of Dr. Kaliebe.  AR2599–2673.  Dr. Kaliebe discussed the hierarchies of evidence in medicine, the treatment approaches for gender dysphoria, the many weaknesses and risks of "gender affirming care model" advocated by WPATH, and why psychotherapy is the preferred treatment approach, particularly in correctional environments. AR2607–18.  Dr. Kaliebe also explained that WPATH's guidelines advocating affirmation of a patient's preferred gender should not be used to formulate treatment of gender dysphoria because "WPATH openly engages in ideologically-based political advocacy, systematically misrepresents evidence, and often bases its recommendations, no matter how impactful for the patient, on low-quality supporting evidence."  AR2618–27.  He also explained that other similar guidelines suffer from many of the same issues.  AR2624–25, ¶¶ 74, 75.  Dr. Kaliebe opined that, for the reasons discussed above, cross-sex hormones, social accommodations, and sex trait modification surgery are not medically necessary, particularly in the correctional setting.  *Supra* at 19–24.

In addition to the medical evidence, BOP reasonably considered the safety, security, and prison administration concerns for both the inmates receiving care to address gender dysphoria and for correctional staff.  AR2–3; AR10–13; AR18–20; AR28–30; *supra* at 24–26.  BOP reviewed at least five different state correctional policies to understand how those States address gender dysphoria in the correctional context.  AR3.

29

Lastly, BOP reasonably considered costs, reliance interests, and alternatives. AR13–16; AR21–23; AR30–33. As to reliance interests, contrary to Plaintiffs contention that BOP merely "pa[id] lip service" to their reliance interests, Mem. at 39–40, BOP directly addressed reliance interests over multiple pages and reasonably determined that inmates lack a valid reliance interest in receiving unproven treatments (or at a minimum treatment subject to reasonable debate in the medical community), particularly when the treatments have not been part of a longstanding, formal BOP policy. AR13–16; AR21–23; AR30–33. Moreover, under the 2026 Policy, inmates who are currently receiving hormones will receive individualized tapering plans that address reliance interests and lessen any potential harm. 2026 Policy at 7–8. BOP also reasonably determined that even if there were valid reliance interests, those interests were not sufficient to outweigh the benefits of the 2026 Policy. *See, e.g.*, AR21–22 (social accommodations); AR30–32 (hormones). And BOP also reasonably considered alternatives of providing these treatments in certain situations or to certain inmates, but in the end, found that it was not prudent to provide interventions that are unproven or are medically controversial; can harm the inmate; can have long-term irreversible effects; and can negatively affect security and prison administration. AR13–16; AR21–23; AR30–33.

In sum, the 2026 Policy is not arbitrary or capricious. BOP reasonably considered the relevant issues and factors, weighed the different considerations, and articulated "satisfactory explanation[s]" for the Policy. *State Farm*, 463 U.S. at 30. Unlike the 2025 implementing memoranda that the Court preliminarily enjoined because the "*only* explanation" was EO compliance, *Kingdom*, 2025 WL 1568238, at *10, the Court may not substitute its own judgment for the 2026 Policy in light of the fulsome record and extensive explanation supporting the Policy. *State Farm*, 463 U.S. at 43.

### B. Plaintiffs' APA Arguments Are Unpersuasive.

Plaintiffs' APA arguments lack merit.

First, contrary to Plaintiffs' argument, the 2026 Policy was not a "preordained" result, nor was it the result of any "reverse engineer[ing]." PI Mem. at 34–36. Plaintiffs are essentially arguing that BOP's mind was closed when issuing the 2026 Policy, but the Supreme Court has specifically refused to incorporate any "open-mindedness test" or any other "judge-made procedures" into the APA

30

because "the text of the APA provides the maximum procedural requirements that an agency must follow." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 685 (2020) (citation modified). The agency's only obligation is to "articulate a satisfactory explanation for [the] action including a rational connection between the facts found and the choice made," *id.* at 683 (quoting *State Farm*, 463 U.S. at 43), which BOP easily satisfies here.

Moreover, the factual premise of Plaintiffs' argument is wrong—the 2026 Policy is not a "repackaged" version of the 2025 implementing memoranda. For example, under the 2025 implementing memoranda, and even without the Court's preliminary injunction, BOP continued to provide cross-sex hormones to inmates (including Plaintiffs) to address gender dysphoria, Bina Decl. ¶¶ 14, 17, 20, 22 (ECF No. 36-1), while it studied the issue to determine whether and how to revise its medical care policy. But under the 2026 Policy, BOP will not provide cross-sex hormones to inmates not currently receiving them, and inmates who are currently receiving them generally will be tapered off based on individual factors such as the duration the inmate has been receiving hormones. 2026 Policy at 7–8. And just because the 2026 Policy is consistent with EO 14,168 does not mean that the Policy was "pre-ordained" or "reverse engineered." The EO requires BOP to revise its medical care policy only to the extent consistent with law. EO 14,168, § 8. The administrative record shows that the Policy was not "pre-ordained" or "reverse engineered" as BOP's study of the issues took about twelve months, over which time, it undertook extensive analysis, then issued a Policy that is "rational[ly] connect[ed]" to the facts found. *State Farm*, 463 U.S. at 43 (citation omitted). The 2026 Policy thus readily satisfies the APA.

Second, BOP did not ignore the inmates' treatment histories under the prior policy. As a result, *Butte County v. Hogen*, 613 F.3d 190 (D.C. Cir. 2010), cited by Plaintiffs, is inapposite. PI Mem. at 36–38. *Butte County* involved a dispute between the National Indian Gaming Commission and a county where an Indian tribe sought to conduct gaming operations. 613 F.3d at 192–93. The county submitted a consultant's report explaining that the tribe did not have a historic connection to the site and thus the land could not be "restored" to them. *Id.* at 193. The Commission refused to consider the issue, contending that the decision was already final. *Id.* at 193–94. The D.C. Circuit held that

31

this violated the APA because the issue "was still pending before the Secretary" and thus the agency's perfunctory response did not reflect "[r]easoned decisionmaking." *Id.* at 195.

Here, unlike *Butte County*, BOP reasonably considered its experience under the prior policy. *See Prometheus Radio Project*, 592 U.S. at 423. The APA does not require BOP to scrutinize any particular documents as Plaintiffs contend, PI Mem. at 37–38, especially here where many of the BOP senior officials who wrote, consulted and applied the previous BOP policy were also responsible for evaluating, implementing, and ultimately formulating the 2026 policy, Stahl Decl. ¶ 17. Those officials, including Dr. Stahl, used their "experience with the prior policy to help formulate the 2026 Policy." *Id.* Moreover, as Dr. Stahl explained, the treatment histories of the inmates would not be helpful because "there is not a vetted, or validated clinical instrument that measures the success or failure of gender dysphoria treatment," *id.* ¶ 16, and in her experience given her "reviews of published data, it has been challenging to link use of cross-sex hormone[s] to Gender Dysphoria symptom improvement," *id.* ¶ 13. Further, BOP's experience under the prior policy is only one piece of the puzzle. BOP was very concerned with the long-term, irreversible health risks of "gender affirming" interventions, including breast cancer, cardiovascular complications, cognitive issues, and coronary artery disease from hormones. *Supra* at 19–24; *see also* Stahl Decl. ¶ 12. Thus, unlike *Butte County*, BOP did not fail to consider "the relevant issues," *Prometheus Radio Project*, 592 U.S. at 423, but had a firm grasp on those issues based on the officials' first-hand experiences. It then reasonably determined that it was not prudent to provide unproven interventions that can have long-term negative and potentially irreversible effects. This Court according should defer to BOP's expert judgment and not substitute its own for that of BOP's expert judgment as pressed by Plaintiffs. *See Bell*, 441 U.S. at 547.

Third, contrary to Plaintiffs' argument, PI Mem. at 38–39. BOP did explain why it was revising its policy, *i.e.*, "to reflect treatment for gender dysphoria that is more aligned with the latest scientific information." AR1. As BOP explained, its previously "unreasonably relied on [WPATH and other similar organizations] and other biased sources regarding interventions to address gender dysphoria." AR7. But after it became clear that BOP could not reasonably rely on WPATH, "it was prudent for BOP to reevaluate its policies regarding gender dysphoria[.]" *Id.* Aligning treatment with the latest

32

scientific information and moving away from a policy that relied on discredited guidelines are "good reasons" to revisit a policy. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009) (holding that the agency must only offer "good reasons" for the new policy and "*believe[]*" that the new policy is better).

Fourth, BOP reasonably considered Dr. Kaliebe's report in formulating the 2026 Policy. PI Mem. at 41. Plaintiffs disagreed with the report because in their view it is inconsistent with what Plaintiffs call "the prevailing protocols," which are essentially the WPATH guidelines. *Id.* But many medical professionals, including Dr. Kaliebe, have recognized the shortcomings of the WPATH guidelines, rendering them an unreliable basis for guidance on treatment of gender dysphoria. *See, e.g.*, Stahl Decl., ¶ 11; AR1178 (Dep't of Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, at 157 (Nov. 19, 2025) (peer reviewed article discussing that WPATH guidelines are "rated among the lowest in quality and have not been recommended implementation by systematic reviews (SRs) of guidelines[,]" but "[d]espite their lack for trustworthiness, for more than a decade WPATH guidelines have served as the foundation of the healthcare infrastructure for gender dysphoric (GD) youth in the United States.")); *Skrmetti*, 605 U.S. at 543 (Thomas, J., concurring) ("Recent revelations suggest that WPATH . . . bases its guidance on insufficient evidence and allows politics to influence its medical conclusions." (citation omitted)); *K.C.*, 121 F.4th at 611 ("Some have expressed doubt about whether WPATH's guidelines actually reflect medical consensus as to treatments for gender dysphoria."). Likewise, medical professionals, including Dr. Kaliebe, have recognized that the psychotherapeutic model is a safe approach that can be used to effectively treat gender dysphoria. *Supra* at 16. In contrast, while Plaintiffs rely extensively on Dr. Thompson's declarations, she lacks credibility because she does not have the roles or experience that she claimed to have. Stahl Decl., ¶ 18 (discussing, for example, that Dr. Thompson served as Acting National Administrator for Psychology Services for only about seven months, not the five years she claimed, and never served as the senior agency psychologist on TEC).

For these reasons, the Court should grant judgment in Defendants' favor on the APA claim, and at a minimum, this clam cannot support a preliminary injunction.

33

**IV.    The 2026 Policy Complies with Equal Protection**

The Court should also grant summary judgment in Defendants' favor on Plaintiffs' Equal Protection claim. Equal protection generally demands only rational basis review, unless a policy discriminates against a suspect or quasi-suspect class (or burdens a fundamental right, which is not at issue here). *See Skrmetti*, 605 U.S. at 509. Because the 2026 Policy does not discriminate on any such basis, heightened scrutiny is unwarranted and the deferential rational basis standard applies. BOP's 2026 Policy easily satisfies rational basis review.

The 2026 Policy does not discriminate based on sex. The Supreme Court has long recognized that sex discrimination requires treating members of one sex differently from "similarly situated" members of the opposite sex. *Nguyen v. Immigr. Naturalization Serv.*, 533 U.S. 53, 63 (2001); *see Michael M. v. Superior Ct.*, 450 U.S. 464, 469 (1981) (plurality opinion). The Court reaffirmed that principle in *Skrmetti*, where the Court considered an equal protection challenge to a state law that restricted puberty blockers and sex hormones to treat gender dysphoria in minors. 605 U.S. at 506. The Court held that the law does not discriminate based on sex because it applies equally to both sexes; it "does not prohibit conduct for one sex that it permits for the other" and instead turns on "the underlying medical concern the treatment is intended to address"—namely, gender dysphoria—and applies regardless of a minor's sex. *Id.* at 514–15. That is equally true here.

The 2026 Policy's restriction on using hormones to address gender dysphoria, for example, applies evenhandedly across both sexes. Except as part of the tapering plans, *supra* at 6–7, no inmate may be administered hormones to address gender dysphoria. 2026 Policy at 7–8. The same is true with respect to sex trait modification surgery and social accommodations: BOP "will not" provide them to any inmate, regardless of sex. *Id.* at 6, 7. Therefore, the 2026 Policy does not, in the words of *Skrmetti*, "prohibit conduct for one sex that it permits for the other" but instead turns on "the underlying medical concern the treatment is intended to address," *i.e.*, gender dysphoria. *Skrmetti*, 605 U.S. at 514–15. Heightened scrutiny is thus not warranted.

The 2026 Policy also does not discriminate based on trans-identifying status. The 2026 Policy draws lines based on a medical condition (gender dysphoria)—not trans-identity. Like the Diagnostic

34

and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"), on which it is based, the 2026 Policy uses the term gender dysphoria to describe "a psychological disorder caused by clinically significant distress or impairment due to the perceived discrepancy between a person's expressed/experienced gender identity and his or her biological sex." 2026 Policy at 1. As the Supreme Court and D.C. Circuit have recognized, not all trans-identifying individuals have gender dysphoria. *Skrmetti*, 605 U.S. at 502; *Talbott v. United States*, No. 25-5087, 2025 WL 3533344, at *2 (D.C. Cir. Dec. 9, 2025); *Doe 2 v. Shanahan*, 755 F. App'x 19, 24 (D.C. Cir. 2019). The classification is thus not based on trans-identifying status. *See Skrmetti*, 605 U.S. at 514–15; *Anderson v. Crouch*, 169 F.4th 474, 486 (4th Cir. 2026) (citing *Skrmetti* and holding that a Medicaid plan that does not cover sex trait modification surgeries "classifies based on medical diagnosis" (not sex or trans-identifying status), "applies evenhandedly to everyone," and "using medical diagnosis as the distinguishing factor is not so irrational that we can presume the Exclusion discriminates by proxy"); *Talbott*, 2025 WL 3533344, at *5 ("doubt[ing]" that a policy that generally bars individual with gender dysphoria from serving in the military triggers heightened scrutiny because the policy classifies based on a medical condition).

Even if the challenged policy discriminated based on trans-identifying status, heightened scrutiny would still be inappropriate because trans-identifying people are not a suspect or quasi-suspect class. *See Skrmetti*, 605 U.S. at 550 (Barrett, J., concurring) (the Supreme Court has "never embraced" a new suspect or quasi-suspect class under the multi-factor test delineated in *Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (emphasis omitted)); *id.* at 573–76 (Alito, J., concurring in part and concurring in the judgment) (observing that the Court has previously declined to recognize the poor, the elderly, illegal aliens, close relatives, and people with disabilities as suspect or quasi-suspect classes). Trans-identifying people in any event do not satisfy the multi-factor test. *See Skrmetti*, 605 U.S. at 549–51, 554–56 (Barrett, J., concurring); *see id.* at 574–76 (Alito, J., concurring in part and concurring in the judgment); *Talbott*, 2025 WL 3533344, at *5 (*Skrmetti* "casts significant doubt on the proposition that a classification based on transgender status would trigger heightened scrutiny"). First, trans-identifying people are not marked by the "obvious, immutable, or distinguishing characteristics" of a

35

"discrete group." *Skrmetti*, 605 U.S. at 549-50 (Barrett, J., concurring) (citation omitted); *see id.* at 574–76 (Alito, J., concurring in part and concurring in the judgment). Second, trans-identifying people have not "suffered a history of *de jure* discrimination." *Id.* at 554 (Barrett, J., concurring); *see id.* at 574–76 (Alito, J., concurring in part and concurring in the judgment). Third, trans-identifying people are not politically powerless. *Id.* at 576 (Alito, J., concurring in part and concurring in the judgment); *see id.* at 555–56 (Barrett, J., concurring). And finally, treating trans-identifying people as a quasi-suspect class "would require courts to oversee all manner of policy choices normally committed to legislative discretion." *Id.* at 551 (Barrett, J., concurring); *see also City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 445 (1985) (holding that individuals with mental disabilities are not a quasi-suspect class because governments must have "flexibility and freedom from judicial oversight in shaping and limiting their remedial efforts"). Because the challenged policy does not classify based on sex or any other suspect or quasi-suspect characteristic, rational basis review applies.

The 2026 Policy easily satisfies rational basis review, which "is a paradigm of judicial restraint." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993). The court must "uphold a statutory classification so long as there is 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Skrmetti*, 605 U.S. at 522 (quoting *Beach Comm'ns, Inc.*, 508 U.S. at 313). Under that standard, the government "has no obligation to produce evidence to sustain the rationality of" the policy. *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 320 (1993). Instead, the policy "is presumed constitutional," and the burden is on the challengers "'to negative every conceivable basis which might support it,' whether or not the basis has a foundation in the record." *Id.* at 320–21 (citation omitted). "Where there exist 'plausible reasons' for the relevant government action, '[the Court's] inquiry is at an end.'" *Skrmetti*, 605 U.S. at 522 (quoting *Beach Comm'ns, Inc.*, 508 U.S. at 313–14).

Here, BOP set forth several legitimate reasons for the 2026 Policy, and each is sufficient to establish a rational basis. In BOP's judgment, the uncertainty about the efficacy and necessity of sex trait modification interventions to address gender dysphoria and the well-documented side effects of such treatment counsel against providing such interventions in favor of other more established, effective treatments, such as psychotherapy. AR1–4; AR5-8; AR2607–45. BOP's concerns provide a

36

rational basis for the 2026 Policy. *Anderson*, 169 F.4th at 491 (citing *Skrmetti*, 605 U.S. at 522–23, which states that Tennessee's finding that harmful effects associated with "gender affirming' treatment are not fully known provided a rational basis for the policy). "It is not irrational" for BOP to prohibit certain interventions that are "arguably ineffective and dangerous procedures and allocate its limited resources to [providing] other treatments" that it reasonably believes are more effective and less dangerous. *Id.* at 492. Indeed, "[t]he Supreme Court's decision in *Skrmetti* forecloses any argument to the contrary." *Id.*

Moreover, BOP's legitimate security and prison administration concerns about sex trait modification surgeries, cross-sex hormones, and social accommodations provide additional rational bases for the 2026 Policy. AR2–3; AR10–13, 18–20, 28–30. BOP explained why providing inmates with these sex trait interventions creates safety, security, and prison administration concerns for both the inmates and for correctional staff, including victimization and harassment and increase of self-harm. AR2–3; AR10–13, 18–20, 28–30.

Because BOP has provided "plausible reasons" that are rationally related to the 2026 Policy, the Court's "'inquiry is at an end.'" *Skrmetti*, 605 U.S. at 522 (quoting *Beach Comm'ns, Inc.*, 508 U.S. at 313–14). The 2026 Policy passes rational basis review and thus the Court should enter judgment in Defendants' favor on this claim.

## V.    Plaintiffs' Rehabilitation Act Claim Fails

### A.    Plaintiffs Lack a Private Right of Action under the Rehabilitation Act.

The Rehabilitation Act does not provide for a private right of action for Plaintiffs to sue BOP under the Act in these circumstances. "[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). It is well-established that if Congress intends to create a private right of action, it should expressly do so in the statute. *E.g.*, *Ziglar v. Abbasi*, 582 U.S. 120, 133 (2017); *Alexander*, 532 U.S. at 286–87. "If the statute does not itself so provide, a private cause of action will not be created through judicial mandate." *Ziglar*, 582 U.S. at 133.

The Rehabilitation Act prohibits discrimination (1) by federal agencies in their capacity as employers, 29 U.S.C. § 791 (§ 501 of the Rehabilitation Act); (2) by recipients of federal funds and

federal agencies in their capacity as funders, 29 U.S.C. § 794(a) (§ 504 of the Rehabilitation Act); and (3) by federal agencies in their capacity as the "conduct[ors]" of their own "program[s] or activit[ies]," *id.* Congress provided express remedies, including private rights of action, to enforce the first two prohibitions, but not the third. 29 U.S.C. § 794a (Remedies and attorney fees). Specifically, § 794a(a)(1) provides for a private right of action to disabled federal employees and applicants seeking federal employment who are aggrieved by an agency's affirmative action plan in violation of § 791. Likewise, § 794a(a)(2) provides for a private right of action "to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794." In contrast, § 794a does not provide a private right of action against federal agencies in their capacity as the operators of their own "program[s] or activit[ies]" under § 794. Congress knows how to create a private right of action, and the fact that it did not do so in the circumstances here forecloses Plaintiffs' claim. It is "an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19 (1979).

Although the D.C. Circuit has not directly addressed the question, the overwhelming weight of authority among the other circuits and this District supports Defendants' position that there is no private cause of action under § 504 for federal programs or activities. *See Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 128 (2d Cir. 2020); *Clark v. Skinner*, 937 F.2d 123, 126 (4th Cir. 1991); *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989) (en banc); *Doe v. Spahn*, No. 23-cv-02859 (CJN), 2025 WL 1305360, at *4 (D.D.C. May 6, 2025) ("the Rehabilitation Act does not create a private right of action" to challenge agencies "acting as conductors of federal programs"); *Mathis v. U.S. Parole Comm'n*, 749 F. Supp. 3d 8, 19 (D.D.C. 2024) ("Congress only created private rights of action for the first two categories, not the last."); *SAI v. Dep't of Homeland Sec.*, 149 F. Supp. 3d 99, 113 (D.D.C. 2015) (holding that the Rehabilitation Act provides no "cause of action for a substantive claim of disability discrimination in a federal program or activity").

When the Supreme Court was confronted with the Rehabilitation Act's statutory language in a related context of sovereign immunity for money damages, it found it "telling[]" that in amending

the Rehabilitation Act to cover federal programs and activities, Congress did not amend the § 794a remedies provision to include federal programs and activities. *Lane v. Pena*, 518 U.S. 187, 192–93 (1996) (holding that Congress did not intend to waive sovereign immunity for suits for money damages for Rehabilitation Act programs and activities claims); *id.* at 193 ("Congress did not intend to treat all § 504(a) defendants alike with regard to remedies."). The only Circuit to hold otherwise is the Ninth Circuit. *See J.L. v. Soc. Sec. Admin.*, 971 F.2d 260 (9th Cir. 1992). But the Ninth Circuit reached its holding based on the premise—later refuted by the Supreme Court in *Lane*—that a private right of action under Section 504 was needed to ensure that plaintiffs could secure "money damages," *id.* at 268, which are not at issue here.

Here, Plaintiffs, who are not federal employees or recipients of federal funds, are suing BOP under the Rehabilitation Act in BOP's capacity as the "conduct[or]" of its programs or activities. *See* 29 U.S.C. § 794(a); Compl. ¶¶ 118–123 (alleging Rehabilitation Act disability discrimination in the medical treatment and accommodations that BOP provides); Suppl. Compl. ¶¶ 188–194 (same). Given the express causes of action otherwise outlined in 29 U.S.C. § 794a, the Court should follow the weight of authority and related Supreme Court precedent by holding that Plaintiffs lack a private right of action to sue BOP under the Rehabilitation Act in these circumstances.

### B.    Plaintiffs' Rehabilitation Act Claim Fails on the Merits.

Even if a private right of action existed, Plaintiffs' Rehabilitation Act claim fails because gender dysphoria is not a protected disability. The Rehabilitation Act excludes from its definition of "individual with a disability" an individual with "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, *gender identity disorders* not resulting from physical impairments, or other sexual behavior disorders." 29 U.S.C. § 705(20)(F)(i) (emphasis added). The Americans with Disabilities Act ("ADA"), passed in 1990, contains the same exclusion. *See* 42 U.S.C. § 12211(b)(1). Because of the textual similarities between the Rehabilitation Act and the ADA, the same standards govern claims under both, *e.g.*, *Kapche v. Holder*, 677 F.3d 454, 460 (D.C. Cir. 2012), and courts rely on cases construing these provisions "interchangeabl[y]," *e.g.*, *Porfiri v. Eraso*, 121 F. Supp. 3d 188, 194 (D.D.C. 2015) (citation omitted).

39

When the Rehabilitation Act was passed in 1973 and when the ADA was passed in 1990, Congress's use of the term "gender identity disorders" would have been commonly understood to include gender dysphoria. Because neither the Rehabilitation Act nor the ADA define "gender identity disorders," the phrase must be given its ordinary public meaning at the time of the statute's enactment. *See Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 276–77 (2018). Plaintiffs rely on the DSM. *See* Compl. ¶ 36. But when the Rehabilitation Act was passed, the DSM edition then in use (DSM-II) did not define gender identity disorders. Am. Psychiatric Ass'n, *DSM* 44 (2d ed. 1968). When the ADA was passed, the DSM edition then in use (DSM-III-R) identified "the essential feature" of all gender identity disorders as "an incongruence between assigned sex (i.e., the sex that is recorded on the birth certificate) and gender identity." Am. Psychiatric Ass'n, *DSM* 71 (3rd ed. rev. 1987). The DSM-III-R also explained that while "some forms of gender identity disturbance are on a continuum," even "mild" cases involve feeling "discomfort and a sense of inappropriateness about the assigned sex." *Id.* Indeed, the DSM-III-R's first "diagnostic criteria" for gender identity disorder is "persistent or recurrent discomfort and a sense of inappropriateness about one's assigned sex." *Id.* at 77. What is now called "gender dysphoria," therefore, is simply a subset of gender identity disorders. In other words, gender dysphoria is a gender identity disorder with clinically significant distress or impairment—*i.e.*, a particularly intense form of a gender identity disorder. Gender dysphoria is thus subject to the statutory exclusion and is not a protected disability under the Rehabilitation Act.

If any doubt remains that gender dysphoria is excluded by the Rehabilitation Act, the catchall phase "other sexual behavior disorders" extinguishes it. 29 U.S.C. § 705. "This final catch-all category suggests that Congress sought to prohibit the [statute]'s application to conditions that are sufficiently similar to the more specific categories of conditions that precede." *Kincaid v. Williams*, 600 U.S. ---, 143 S. Ct. 2414, 2417 (2023) (Alito, J., dissenting from denial of certiorari).

In any event, BOP has not treated Plaintiffs differently from other inmates "because" they are disabled. *See, e.g.*, *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008); 29 U.S.C. § 794(a) ("solely by reason of her or his disability"). Rather, BOP will not be providing certain treatment to Plaintiffs because BOP has determined that those interventions are not medically necessary to address gender

40

dysphoria, in contrast to a vaginoplasty to treat a prolapsed or dropped bladder or hormones to treat an endocrinal condition. Thus, the determinative factor is medical necessity, not whether the inmate is disabled.[4]

## VI.    Plaintiffs Have Not Demonstrated Irreparable Harm

Because Plaintiffs' claims all fail on the merits, the Court should grant summary judgment in BOP's favor and need not consider Plaintiffs' motion for a preliminary injunction. If the Court considers that motion, it should find that Plaintiffs have failed to demonstrate a likelihood of success on their claims and need not address the equities. But if the Court reaches the equities, it should find that Plaintiffs have failed to make a clear irreparable harm showing, which is sufficient "grounds for refusing to issue a preliminary injunction, even if the other three factors . . . merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The Supreme Court's "frequently reiterated standard requires [movants] seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Plaintiffs must also demonstrate that they face an injury that is "both certain and great; it must be actual and not theoretical." *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

Here, Plaintiffs' harm is entirely speculative and is not "likely" to occur absent a preliminary injunction. Plaintiffs speculate that if BOP does not provide them with their preferred "gender affirming" care, then their gender dysphoria will worsen. But BOP determined—with the support of medical expert opinion—that such interventions are fraught with serious risks, are uncertain to deliver any benefits, and are inferior to a safer and more measured approach for addressing gender dysphoria. Plaintiffs thus cannot clearly show that irreparable harm is *likely* to occur.

As the D.C. Circuit recently explained in vacating this Court's preliminary injunction against BOP in similar circumstances, it is Plaintiffs' burden to show that each of their "distinct characteristics would subject them to irreparable harm[,]" and they may not do so on a "categorical" basis. *Doe*, 172 F.4th at 918. Kingdom tries to establish irreparable harm by stating that Kingdom's gender dysphoria

---

[4]    Plaintiffs separately bring their Eighth Amendment, Equal Protection, and Rehabilitation Act claims under the APA. Suppl. Compl. at 14–15. The Court should enter judgment in Defendants' favor on Count 5 for the reasons discussed above.

deteriorated after being "cut off" from hormones for a couple of months after issuance of the EO. Kingdom Decl. 3/4/25, ¶ 21 (ECF No. 7-4). Kingdom states that cross-sex hormones were immediately withheld, *i.e.*, Kingdom was "denied care." *Id.* ¶¶ 12, 16, 19. But under the 2026 Policy, Kingdom's hormones will not be immediately "cut off." Kingdom has been receiving hormone therapy for about a decade, *id.* ¶ 21, and under the Policy, Kingdom's hormones would be tapered pursuant to an individualized plan, which will consider the duration that Kingdom has received hormones, 2026 Policy at 7–8. Indeed, pursuant to the Policy, for inmates that have received "hormones to address [gender dysphoria] for an extended period of time and develop severe physiological and psychological withdrawal effects from tapering, it may not be appropriate in all cases for the initial tapering plan to include cessation of hormones." *Id.* at 8. Moreover, to the extent Kingdom states that the "distress of losing . . . care" has caused anxiety, panic attacks, mood swings, and sleeping difficulties, Kingdom Decl. 3/4/25, ¶ 21, the 2026 Policy states that "[a]ll inmates who are tapering and were receiving mental health treatment before tapering shall continue to receive counseling and pharmacological treatment as appropriate as part of the inmate's individualized treatment plan." 2026 Policy at 8. Thus, Kingdom has not clearly shown that the cessation of hormones pursuant to an individualized tapering plan under the Policy is likely to cause irreparable harm.

Likewise, Plaintiff Kapule has never been subject to a taper so Kapule has not made a clear irreparable harm showing either. Kapule has received cross-sex hormones since 2023, Kapule Decl. 4/3/25, ¶ 1 (ECF No. 47-3), and Kapule's hormones continued following the EO, Kapule Decl. 3/12/25, ¶ 9 (ECF No. 7-6); Kapule Decl. 4/3/25, ¶ 1. True, BOP medical providers lowered Kapule's dose in late 2025 because Kapule's testosterone levels were too high, Kapule Decl. 4/14/26, ¶¶ 2–4 (ECF No. 179-8), but this shows not that Kapule would likely suffer irreparable harm pursuant to an individualized tapering plan, but rather, that there are dangers and risks associated with cross-sex hormones.

Likewise with Nichols. Nichols has been on cross-sex hormones since 2021. Nichols Decl. 3/5/25 (ECF No. 7-5), ¶ 7. In early 2025, Nichols' hormones were reduced. *Id.* ¶¶ 13–15. Nichols

42

received no medical or mental health support during the dose reduction and experienced "fatigue and mood swings." *Id.*  ¶¶ 15–16.  In late 2025, Nichols was "cut off" from hormones and experienced hot flashes, sleep difficulties, and mood swings.  Nichols Decl. 4/16/26, ¶ 3 (ECF No. 179-7).  Based on these experiences, Nichols claims to "know how it would feel to be tapered off or removed from hormone therapy." *Id.* ¶ 4.  But under the 2026 Policy, Nichols' individualized tapering plan will occur at an appropriate pace, taking into account factors including how long Nichols has been receiving hormones and Nichols' response to hormones.  2026 Policy at 7–8.  Additionally, if Nichols experienced a bad reaction, the pace could be adjusted and even paused if appropriate. *Id.* at 8.  And unlike Nichols' previous experiences (according to Nichols' allegations), BOP medical and mental health professionals will monitor Nichols before, during, and after the tapering process. *Id.*

The removal of social accommodations is also unlikely to cause irreparable harm, *i.e.*, harm that is "certain" and "great." *Wis. Gas Co.*, 758 F.2d at 674.  Social accommodations are at most "psychologically pleasing," not medically necessary, and can even prolong gender dysphoria symptoms and undermine treatment. *Supra* at 21.  Thus, none of the three named Plaintiffs can establish a likelihood of irreparable harm under the 2026 Policy.  The "possibility of irreparable harm"—which is all that Plaintiffs have shown here— is not sufficient. *Winter*, 555 U.S. at 22.

Plaintiffs also fail to establish "a foundation from which one could infer that all (or virtually all) members of a group are irreparably harmed," and therefore, the Court cannot "enter a mass preliminary injunction." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000).  Indeed, Plaintiffs point to the declaration of only one additional class member, Meskill, but Meskill also was not subject to a tapering plan.  PI Mem. at 22; *see* Meskill Decl. (ECF No. 107-11).  Given the highly individualized nature of the harms that Plaintiffs are alleging and the fact that the harms cannot be judged categorically, Plaintiffs have not shown entitlement to class-wide relief. *See* 18 U.S.C. § 3626(a)(2) ("Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm.").

43

Dr. Karasic is also not helpful to Plaintiffs in terms of establishing irreparable harm because he incorrectly assumes that the class members' gender dysphoria will be left "untreated" during and after the tapering process, Karasic Decl. 4/27/25, ¶ 19 (ECF No. 179-2), which is contrary to the 2026 Policy. And in any event, this type of "categorical" irreparable harm argument is not adequate in this Circuit. *Doe*, 172 F.4th at 918.

## VII.    The Balance of Equities and Public Interest Favor Defendants.

The merged last two factors—balance of the equities and the public interest—favor Defendants too. The President, as the head of the Executive Branch with ultimate responsibility for the operation of its prisons, has determined that federal funds should not be used to conform an inmate's appearance to that of the opposite sex. EO 14168, § 4(c). There is a strong public interest in allowing the Executive Branch to implement administration policies. *See, e.g.*, *Talbott*, 2025 WL 3533344, at *11 ("Injunctions that 'improperly intrude' on the Executive Branch often inflict irreparable injury." (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 859 (2025))). Similarly, there is also a strong public interest in deferring to the democratic process and allowing "laws embodying the will of the people" to be implemented "in a manner consistent with the Constitution." *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 451 (2008). This Court has "readily endorse[d] this principle, and agree[d] that it weighs in the defendants' favor," but found only "modestly" so at the time of the initial preliminary injunction because, "[j]ust as the Executive Order was issued by a democratically elected President with a platform to implement, so too is the [APA] the output of democratic processes, namely the constitutional schema of bicameralism and presentment." *Kingdom*, 2025 WL 1568238, at *12. Because the Court's APA procedural concern was premised on the 2025 implementing memoranda that have been superseded by a new agency action—and that same procedural concern is not present with respect to the issuance of the 2026 Policy—the public interest in deferring to the democratic process now tilts heavily in the government's favor.

The PLRA shows that the public interest favors denying the updated preliminary injunction. The PLRA requires courts to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system" by prospective relief. 18 U.S.C. § 3626(a)(2). Preventing BOP

44

from implementing the 2026 Policy harms the public interest because it endangers prison administration and security, which counsel against a preliminary injunction. AR2–3, 10–13, 18–20, 28–30.  In fact, as the Supreme Court has recognized, "[i]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons."  *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973).

For these reasons, the public interest and balance of equities tilts heavily in Defendants' favor.

## CONCLUSION

The Court should grant Defendants' motion, enter judgment in Defendants' favor as to all claims, and deny Plaintiffs' preliminary injunction motion as moot.

Dated: May 13, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

JEAN LIN
Special Litigation Counsel

*/s/ M. Jared Littman*
M. JARED LITTMAN
ELIZABETH B. LAYENDECKER
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
Jared.littman2@usdoj.gov