**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ALISHEA KINGDOM, *et al.*,

Plaintiffs,

v.

DONALD J. TRUMP, *et al.*,

Defendants.

Civ. A. No. 25-691 (RCL)

**DECLARATION OF ELIZABETE M. STAHL**
**MEDICAL DIRECTOR OF THE FEDERAL BUREAU OF PRISONS**

I, Elizabete M. Stahl, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me during the course of my official duties, hereby declare as follows:

1.      I have served as the Medical Director for the Federal Bureau of Prisons (BOP) in the Health Services Division since February 28, 2021. Prior to serving as Medical Director, I served as the Clinical Director at the Federal Correctional Complex in Allenwood, Pennsylvania (FCI Allenwood), from August of 2009, until February of 2021.

2.      The Health Services Division is responsible for the medical, dental, and mental health (psychiatric) services provided to BOP inmates, including healthcare delivery, infectious disease management, and medical designations. Our mission is to deliver medically necessary health care to inmates effectively in accordance with proven standards of care without compromising safety and security concerns inherent to the Bureau's overall mission. The BOP Medical Director is responsible for updating the BOP clinical guidance and protocols based on guidelines from experts in the field. My duties and responsibilities include interpreting and issuing guidance on a multitude of diseases and medical conditions for implementation in our prison setting. I am responsible for ensuring that the BOP can provide care for any diagnosis, including gender dysphoria. Part of my duties include reviewing medical literature and information from medical organizations regarding developments

within the medical community. The BOP has a team of physicians, pharmacists, and mental health professionals who also review medical literature and advise me on how best to apply new diagnostic methodologies, treatment plans and procedures. In my role as Medical Director, I was actively involved in BOP's formulation of the 2026 Policy (Program Statement 5260.01, issued on February 19, 2026), and formulation of BOP's prior clinical guidance on medical care for inmates with gender dysphoria.

3.        BOP previously had a Transgender Clinical Care Team (TCCT), composed of psychiatrists, pharmacists, social workers, psychologists, and physicians. The team was established to provide consultation and training to BOP primary care providers who provide treatment to trans-identifying patients. I was the appointed Chair of TCCT beginning in 2014 and served in that collateral duty until my selection as the Medical Director in February of 2021.

4.        I submit this declaration to respond to certain factual assertions Plaintiffs made in their motion for updated preliminary injunction.

5.        First, Plaintiffs state on page 27 of their motion for updated preliminary injunction that "Defendants plainly know the medical necessity of gender-affirming care for Plaintiffs and other Class Members: BOP doctors prescribed it to them [under the old policy], after deeming them to have a clinical need for it."

6.        The above statement misleads the court into believing BOP providers no longer believe in the medical necessity of treating inmates with gender dysphoria. In fact, the new policy intensifies psychotherapy, and the utilization of psychotropic medications, which have been validated as appropriate treatment modalities for all the co-existing mental health problems accompanying gender dysphoria, e.g., anxiety, depression, bipolar, personality and posttraumatic stress disorders, etc. The "standard of care" for treating individuals with gender dysphoria and related disorders with cross-sex hormones and surgery is under a cloud of doubt and uncertainty, especially in carceral environments. After examining the issue, it is my opinion that the medical necessity and long-term benefit of cross-sex surgeries are currently in question and cross-sex hormones only appropriate in a very small subset number of incarcerated individuals with gender dysphoria until tapering can

2

appropriately be considered. The care that BOP previously provided therefore is not indicative of what is currently validated as medically necessary, but what had been propagated and accepted as validated scientific evidence by WPATH and like entities.

7.    All of BOP's clinical guidance, including guidance on treatment for gender dysphoria, has aimed to reflect the evolving nature of treatment, based on what is considered the "community standard," while translating it to a carceral environment.  Such translation is necessary because inmates have higher rates of certain chronic conditions and infectious diseases compared to people living in the community. They have higher rates of hypertension, asthma, arthritis, tuberculosis and others. They also suffer from higher rates of mental illness. These factors, coupled with the safety and security concerns found in a carceral setting, provide challenges to BOP medical providers that are not present to medical providers who provide treatment outside of a prison setting.

8.    In 2017, BOP issued the Transgender Offender Manual to provide guidance about transgender inmates. The last Transgender Care Clinical Guidance adopted by BOP was in June 2023. Several sources were utilized by BOP in writing the Transgender Care Clinical Guidance, including WPATH. The 2023 guidance noted that significant changes were made "to more closely align with community standards and the [WPATH] Standards of Care for the Health of Transgender and Gender Diverse People, Version 8 published in 2022," referred to as WPATH SOC 8.

9.    I, in my role as Medical Director, along with the medical community, and BOP colleagues relied heavily on WPATH SOC 8 and trusted that the guidance was based on the best evidence to date. I also firmly believed WPATH's written guidance was reflective of all published evidence. I no longer believe that to be the case.

10.    I became aware of information regarding WPATH studies and data that brings into question the validity of their recommendations. WPATH's leaders have admitted to "gaps" in evidence, and I have determined that WPATH has not been careful, conscientious, or rigorous in reporting systematic reviews of all available evidence when it comes to cross-sex surgeries. Also concerning is that WPATH has not been transparent; it failed to publish all relevant evidence or at the very least "caution" the target audience and well-intended providers about the gaps in knowledge

on potential long-term harms of "gender-affirming" care.

11.     The medical associations that have published medical guidelines for purposes of guiding providers, clinicians and patients, followed WPATH's written ideological guidance and effectively abandoned the rigorous scientific review steps required in all other areas of medicine. As primary care providers and consumers of such published guidelines, BOP providers cannot trust the reliability of the WPATH guidance, when it has been so broadly questioned for lack of sound evidence and for being free from bias.

12.     Medical evidence demonstrating the long-term benefits of cross-sex surgeries and hormones is scant and even more so if the individual is in a prison setting and has a greater number of co-morbidities. For example, as I explained in my attached declaration of August 19, 2025, that I submitted in the case of *JJS v. Plier* concerning cross-sex surgeries, in examining the available evidence regarding cross-sex surgeries, I found that published evidence surrounding the long-term effects of cross-sex surgeries is very limited, typically from observational studies with short-term follow-up and highly variable outcomes. The majority of the studies involve small groups comparing before and after cross-sex surgery reports of the impacts from the surgical outcome. And most studies of the long-term effects of cross-sex surgeries reveal a complex picture. Some studies focus on patient reports of satisfaction with the reassignment procedure, which generally is rated highly by the patient.  Some studies demonstrate improved quality of life and sexual satisfaction in the short term. Some studies, however, demonstrate worsened urinary tract functioning, and increased risk for cardiovascular disease, HIV, and hepatitis C among those who have undergone cross-sex surgery.  And, there are a number of studies that found poor mental health outcomes including worsening depression, anxiety, and increased suicidal ideation, making it impossible to determine the precise effects on mental health outcomes among these patients.

13.     While serving as a BOP primary care physician, before serving in my current role as Medical Director, I provided direct patient care to inmates with gender dysphoria and followed WAPTH's guidance in prescribing cross-sex hormones, even when I rarely saw any sustained mental health improvement in my patients. I trusted that even if the small number of patients I treated lacked

4

the benefits promoted by WPATH and other self-proclaimed experts, I was doing the right thing. However, in light of more recent thorough reviews of published data, it has been challenging to link the use of cross-sex hormones to improvements in gender dysphoria symptoms. To the extent possible, medical and mental health providers often rely on objective measures to follow disease progression or control. For example, when we treat hypertension, we rely on serial blood pressure measurements to adjust our treatment. Similarly, for depression, we rely on validated assessment tools that measure response to treatment and use it to increase or decrease antidepressants. For gender dysphoria, however, one of the many obstacles for medical providers is that there is no universally accepted, fully validated clinical instrument that can isolate and quantify the causal relationship between cross-sex hormone treatment and outcomes in people diagnosed with gender dysphoria receiving such treatment. Cross-sex hormone doses are adjusted based on patient preference and to avoid unsafe physiological hormone ranges, but historically speaking, providers do not have objective or standardized means to determine what is successful treatment for gender dysphoria.  In the last year, some attempts have been made to create tools to assess "gender preoccupation", or measure various aspects of gender dysphoria over time, but there is no evidence to show that these assessment tools can reliably assess the outcome with cross-sex hormone use. Many studies rely on self-reports and measure anxiety/depression, or satisfaction with treatment, none of which measure cross-sex hormone response in gender dysphoric patients. It is this lack of evidence that brings us to question the medical necessity of cross-sex hormones in individuals with gender dysphoria. On the other hand, the downside risks of cross-hormone use and its long-term effects are substantial, which contributes to BOP's decision to limit cross-sex hormone use and ensure medical providers meet their medical and ethical obligation to first do no harm.

14.    As the Medical Director, and after examining available evidence or lack thereof, and in consultation with others of the BOP clinical team, I have concluded that due to the high variability in study design and outcomes reported, lack of long-term follow-up and small study size, the long-term effects of cross-sex surgery and hormones in incarcerated patients who are diagnosed with gender dysphoria cannot be determined and is insufficient to deem these treatment modalities as "medically

necessary."

15.     Plaintiffs state on page 37 of their brief that BOP "failed to consider critical, particularly relevant evidence: its own  experience providing gender-affirming care to individuals with gender dysphoria for many years under its prior policy."  This is not accurate.

16.     As the Medical Director, I am not aware of any "critical, particularly relevant evidence" that would justify the prior policy. As already mentioned in this declaration, there is not a vetted, or validated clinical instrument that measures the success or failure of gender dysphoria treatment. The BOP has several quality metrics (National Performance Measures) broadly applied to different disease states e.g. Hypertension, DM, Cardiovascular Disease, Hepatitis C, HIV, etc.  Through validated clinical instruments, we can measure how our inmate population responds to different treatment modalities or guidance in the various disease states.  However, while we've been able to monitor the total number of inmates on cross-sex hormones throughout the BOP, neither the medical community, nor BOP has a standardized clinical assessment instrument available to measure gender dysphoria response to treatment. I am not aware of any evidence in our own experience of providing "gender-affirming" care that is considered critical in supporting its continued provision of such care.

17.     Many of the BOP senior officials who wrote, consulted and applied the previous BOP policy were also responsible for evaluating, implementing, and ultimately formulating the 2026 policy. In my previous roles as Clinical Director and Chair of the TCCT, I was directly involved in the application of the prior policy. Like other senior officials, I used my experience with the prior policy to help formulate the 2026 Policy.

18.     Third, Plaintiffs rely on the declarations of Cathy Thompson, a former BOP psychologist, to support their claim that cross-hormones for inmates with gender dysphoria is medically necessary.  According to BOP records, Dr. Thompson only served as the Acting National Administrator for Psychology Services for approximately seven months (not for five years as she represents in her resume, attached as exhibit A to her declaration). In that role, she would have been consulted about the results of Transgender Executive Committee (TEC) meetings and specific mental health challenges agency wide as issues arose. However, to my knowledge, Dr. Thompson never

6

served as the senior agency psychologist on the TEC as she claims in her resume and did not attend TEC meetings regularly. Most of her time spent in BOP leadership focused on substance use treatment programs as the National Chief of Drug Treatment Programs, not on issues related to the population of trans-identifying inmates. Furthermore, in her role as a psychologist, she would not be a reliable expert to opine on what medications are considered "medically necessary" for treatment of any mental health disorder because psychologists do not prescribe cross-sex hormones or any other medication; only physicians, advanced practice providers, and pharmacists have the educational background, and licensure for that clinical skill.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

ELIZABETE STAHL
Digitally signed by ELIZABETE STAHL
Date: 2026.05.13 07:31:44 -04'00'

Dated:  May 12, 2026

_____
ELIZABETE STAHL, D.O.

7

# ATTACHMENT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JJS, | |
| Petitioner, | 19 Civ. 02020 (VSB) (SDA) |
| v. | |
| WARDEN PLILER, | |
| Respondent. | |

**DECLARATION OF ELIZABETE M. STAHL**
**MEDICAL DIRECTOR OF THE FEDERAL BUREAU OF PRISONS**

I, Elizabete M. Stahl, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby declare as follows relating to the above-captioned matter:

1.      I have served as the Medical Director for the Federal Bureau of Prisons (BOP) in the Health Services Division, located in Central Office, Washington D.C., since February 28, 2021. The Health Services Division is responsible for the medical, dental, and mental health (psychiatric) services provided to BOP inmates, including healthcare delivery, infectious disease management, and medical designations.  Our mission is to deliver medically necessary health care to inmates effectively in accordance with proven standards of care without compromising safety and security concerns inherent to the Bureau's overall mission. The BOP Medical Director is responsible for updating the BOP clinical guidance and protocols based on guidelines from experts in the field.  My duties and responsibilities include interpreting and issuing guidance on a multitude of diseases and medical conditions for implementation in our prison setting. I am

responsible for ensuring that the BOP can provide care for any diagnosis, including gender dysphoria. Part of my duties include reviewing medical literature and information from medical organizations regarding developments within the medical community. The BOP has a team of physicians, pharmacists, and mental health professionals who also review medical literature and advise me on how best to apply new methods and procedures.

2.      I received my Doctor of Osteopathic Medicine (D.O.) degree from the University of New England in June of 2005. In 2009, I completed my combined four-year residency in Internal Medicine and Pediatrics at Geisinger Medical Center in Danville, Pennsylvania. I am board certified by the American Board of Internal Medicine and the National Board of Physicians and Surgeons.

3.      Prior to serving as Medical Director, I served as the Clinical Director at the Federal Correctional Complex in Allenwood, Pennsylvania (FCI Allenwood), from August of 2009, until February of 2021. As Clinical Director at FCI Allenwood, I provided direct patient care to incarcerated patients, which included providing hormones for patients diagnosed with gender dysphoria, transexualism, or gender incongruence, which are terms that can be used interchangeably.

4.      In November 2014, I was appointed as the Chair of BOP's Transgender Clinical Care Team (TCCT). This team was composed of psychiatrists, pharmacists, social workers, psychologists, and physicians. The team was established to provide consultation and training to BOP primary care providers who provide treatment to trans-identifying patients.

5.      In my role as the Chair of the TCCT, I presented several medical education trainings on transgender care, including for inmates with gender dysphoria at national in-person and virtual conferences within the BOP in 2015, 2016, 2017, and 2018. These trainings were

focused on instructing medical providers how to prescribe hormone treatment to trans-identifying individuals with gender dysphoria inside of our facilities.

6. Members of the TCCT participated in accredited Continuous Medical Education (CME) courses in Trans-Health on gender dysphoria to further the team's knowledge in hormone treatments for inmates with gender dysphoria, transsexualism, or gender incongruence. I, along with members of the TCCT attended courses in 2014 that were sponsored by the Mazzoni Center in Philadelphia, Pennsylvania. We attended courses in 2015 that were sponsored by the University of California, San Francisco School of Medicine in Oakland, California. We attended courses sponsored by the World Professional Association for Transgender Health (WPATH) in 2016 at Rush University Medical Center in Atlanta, Georgia. In 2018, we attended courses at the Harvard Medical School in Boston, Massachusetts.

7. Non-incarcerated individuals living in the community often receive treatment for their gender dysphoria at subspecialty clinics. The primary care providers at the Bureau safely provide this care within the confines of the prison setting. Most hormones prescribed in the BOP for patients diagnosed with gender dysphoria are provided by BOP primary care providers.

8. Many BOP prisons are located in rural locations without ready access to larger hospitals or subspecialty clinics. The BOP has succeeded at imbedding treatment of subspecialty medical conditions into our primary care model. This was possible through robust training programs, which targeted the education of primary care providers, preparing them to render subspecialty care inside our prisons. As relevant here, such training allows our providers to evaluate, examine, diagnose, and provide safe treatment to patients with gender dysphoria.

9. Providing medical care in a prison setting is challenging. BOP medical providers have to take several factors into consideration when providing a specific course of treatment that

providers outside of a prison setting do not. Prior to providing a specific medical treatment or procedure, BOP medical providers must assist in assessing the safety and security risks for the inmate, the rest of the inmate population, and the facility.

10.    All of BOP's clinical guidance, including guidance on treatment for gender dysphoria, has aimed to reflect the evolving nature of treatment, based on what is considered the "community standard," while translating it to a carceral environment. In 2017, BOP issued the Transgender Offender Manual to provide guidance about transgender inmates. The last Transgender Care Clinical Guidance adopted by BOP was in June 2023. Several sources were utilized by BOP in writing the Transgender Care Clinical Guidance, which included information from the Endocrine Society, the University of California San Franciso School of Medicine, the World Health Organization, and WPATH. The 2023 guidance noted that significant changes were made "to more closely align with community standards and the [WPATH] Standards of Care for the Health of Transgender and Gender Diverse People, Version 8 published in 2022." WPATH SOC 8.

11.    In 1930, pursuant to Pub. L. No. 71-218, 46 Stat. 325 (May 14, 1930), Congress established the BOP within the Department of Justice and charged the agency with the "management and regulation of all Federal penal and correctional institutions."  BOP did not have a policy regarding cross-sex surgery for individuals with gender dysphoria until the 2017 Transgender Offender Manual was issued.  BOP rescinded the Transgender Offender Manual in 2025.

12.    The Bureau first approved a cross-sex surgery in 2021, and although it has approved several cross-sex surgeries since, to date only one inmate was approved and provided with the surgery.  Another inmate received surgery while in a half-way house pursuant to litigation.

13. On January 20, 2025, President Trump issued Executive Order 14168, "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Section 4 (c) of the Executive Order provided, "The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex."

14. Following the Executive Order, BOP repealed the section of the Transgender Offender Manual that included the policy on providing surgical procedures. Prior to the Executive Order, the policy provided that inmates who met certain criteria established by the Transgender Executive Counsel (TEC) would be referred to the Health Services Division for an evaluation. The TEC monitored the inmate's progress and made sure that the inmate was compliant with their medication, lived at least one year within a facility consistent with the inmate's preferred gender, and did not receive certain disciplinary infractions.

15. The TEC would refer suitable inmates to the Transgender Utilization Advisory Group (TURAG) to review and interview prospective surgical patients for clinical readiness and to ascertain if there were any absolute contraindications to surgery. The group was composed of clinicians appointed by the Medical Director. The TURAG would review reports made by the inmate's primary care provider, psychologist, and social worker to determine whether the inmate met standard criteria to undergo the referral to the surgeon for the medical procedure. The TURAG would send their findings to the Medical Director for review and final disposition.

16. InterQual criteria was used to verify basic criteria for surgical consideration, which included the diagnosis of gender dysphoria. InterQual is a Clinical Decision Tool utilized by

Medicare and large insurance companies like United Health and Blue Cross Blue Shield to validate that certain clinical criteria are met prior to medical testing or surgery.

17. The BOP used InterQual, among other medical references, to standardize the utilization review process across its institutions. In addition to meeting InterQual criteria for a surgical referral, members of the TURAG took special care to review the patient's electronic health record to find out whether there were any contraindications to major surgery. Supportive evaluations and written clinical summaries from the inmate's assigned social worker, psychologist, and attending physician were also required prior to any surgical evaluation consideration.

18. Inmates have higher rates of certain chronic conditions and infectious diseases compared to people living within the community. They have higher rates of hypertension, asthma, arthritis, and tuberculosis. They also suffer from higher rates of mental illness. These factors coupled with the safety and security concerns found in a carceral setting, provide challenges to BOP medical providers that are not present to medical providers who provide treatment outside of a prison setting.

19. The inmate's compliance with the overall plan of care was also an important factor for consideration. Patients were interviewed and underwent a typical pre-operative work-up, and if no absolute contraindications were found, the patient was referred to the Medical Director for review and decision on whether the patient met standard criteria to undergo surgical evaluation.

20. As stated earlier, to date, only one inmate underwent cross-sex surgery, after approval by the Medical Director.  The procedure took place on January 5, 2023.  The decision to approve the referral for surgery was made in good faith, according to what BOP believed to be based on the consensus in the medical community. At the time, we believed that providing the cross-sex surgery was in the best interest of the patient.

21.     On March 22, 2024, while performing the duties of Medical Director, I approved a cross-sex surgery for Petitioner, a now 61-year-old inmate. This decision was based largely on WPATH's and other published written guidance. However, I no longer believe providing Petitioner or any other BOP inmate with cross-sex surgery is appropriate.

22.     After initially approving the surgery for Petitioner in March 2024, I have learned that there is an ongoing clinical uncertainty surrounding whether to provide individuals, including inmates, with cross-sex surgeries. Medical evidence demonstrating the long-term benefits of the procedures is scant and even more so if the individual is in a prison setting and has a greater number of co-morbidities. I, in my role as the Medical Director for the BOP, along with the medical community, relied heavily on WPATH SOC 8 and trusted that the guidance was based on the best evidence to date.

23.     More recently, I became aware of information regarding WPATH studies and data that brings into question the validity of their recommendations. WPATH's leaders have admitted to "gaps" in evidence, and I have determined that WPATH has not been careful, conscientious, or rigorous in reporting systematic reviews of all available evidence when it comes to cross-sex surgeries.

24.     Published evidence surrounding the long-term effects of cross-sex surgeries is very limited, typically from observational studies with short-term follow-up and highly variable outcomes. The majority of the studies involve small groups comparing before and after cross-sex surgery reports of the impacts from the surgical outcome.

25.     Most studies of the long-term effects of cross-sex surgeries reveal a complex picture. Some studies focus on patient reports of satisfaction with the reassignment procedure, which generally is rated highly. Some studies demonstrate improved quality of life and sexual

satisfaction in the short term. Some studies, however, demonstrate worsened urinary tract functioning, and increased risk for cardiovascular disease, HIV, and hepatitis C among those who have undergone cross-sex surgery. And, there are a number of studies that found poor mental health outcomes including worsening depression, anxiety, and increased suicidal ideation, making it impossible to determine the precise effects on mental health outcomes among these patients.

26. I have concluded that due to the high variability in study design and outcomes reported, lack of long-term follow-up and small study size, the long-term effects of cross-sex surgery in incarcerated patients who are diagnosed with gender dysphoria cannot be determined.

27. WPATH's SOC 8, Chapter 13, titled "Surgery and Post-operative care" does not discuss the evidence or lack thereof on the long-term outcomes of cross-sex surgery in patients diagnosed with gender dysphoria or its effects on mental health. In fact, the topic is largely avoided. The chapter's discussion surrounds surgical and sexual satisfaction outcomes, and rates of surgical complications and regret.

28. Until recently, I firmly believed WPATH's written guidance was reflective of all published evidence. I no longer believe that to be the case. WPATH was at the forefront, in establishing itself as the "standard" in treatment of patients with gender dysphoria. Over the years, all major medical societies generally have lined up behind WPATH, including the American Medical Association, American College of Physicians, major medical colleges and universities such as UCSF, CMS, the Endocrine Society, and BOP, even if for some, they did not fully adopt WPATH's recommendations, as is the case of BOP.

29. It wasn't until the Summer of 2024 that I learned of certain entities questioning the strength of evidence guiding the treatment of patients with gender dysphoria, including the

Cass Review published by the National Health Service (NHS) England. Shortly after, WPATH published a rejoinder report against the Cass Review.

30.    The media's attention to this topic, coupled with the departure of medical societies and associations from WPATH's guidance, and the Executive Order 14168, prompted BOP to question its previous position on this topic.

31.    As noted above, BOP has always used multiple sources in writing clinical guidance on different diagnoses, and this is also true for gender dysphoria. No single source was universally applied in writing the BOP gender dysphoria guidance. There were elements of WPATH's guidance that were never adopted by BOP. For example, BOP providers only provided treatment to patients with a validated medical/mental health diagnosis; this was in line with the Endocrine Society guidance, but not WPATH SOC 8, which did not require a medical diagnosis, and failed to consistently demonstrate and provide guidance on what constituted medical necessity. WPATH defines "medical necessity" as a term used by insurers or insurance companies. They further define it as health care services that a physician and/or health care professional, exercising prudent clinical judgement, would provide to a patient for the purpose of preventing, evaluating, diagnosing, or treating an illness, injury, disease, or its symptoms. While this definition is generally accepted as stated by the medical community, it is in conflict with how WPATH applies the definition of "medical necessity".  WPATH does not require a validated medical/mental health diagnosis in practice, which the medical community requires as a tenant of "medical necessity". Instead, according to section 13.6, of WPATH SOC 8, the guidance suggests that "health care professionals consider gender-affirming genital procedures in eligible transgender and gender diverse adults seeking these interventions when there is evidence the individual has been stable on their current treatment regime (which may include at least 6

months of hormone treatment or a longer period . . ."  Moreover, Statement 13.6 guides the reader to review "eligibility criteria" for surgery in Appendix D, which does not require a medical diagnosis, unless it's in situation where the diagnosis is necessary to access health care. In practice, this guidance does not require a medical diagnosis for a surgeon to perform the surgery.

32.    WPATH does not endorse or require that an individual be diagnosed with gender dysphoria, transsexualism, or gender incongruence before being approved for cross-sex surgery. WPATH does not see these conditions as being an illness, injury, or disease. This is problematic because WPATH insists that "gender-affirming" surgeries are "medically necessary." The medical community requires a medical diagnosis when submitting patients to undergo "medically necessary" care, as this is a very basic tenant of medicine. BOP did not adopt WPATH's approach in not requiring an inmate to first have a diagnosis before being approved for cross-sex surgery.

33.    In its definition, WPATH also refers to "medical necessity" as "the service provided by a physician and/or health care professional, exercising prudent clinical judgement." In my medical opinion, a prudent physician would not consider any treatment "medically necessary" unless there is an associated medical diagnosis and evidence to justify it, especially inside of a prison setting.

34.    When it comes to surgeries, WPATH lists facelifts, lipofilling, liposuction, hair line advancement, hair line transplants, body contouring, and other such procedures as "medically necessary," when these procedures are considered purely cosmetic in the rest of the medical community.

35.    I have seen firsthand the suffering and mental turmoil of patients with gender dysphoria and find it hard to accept that a uterine transplant and many of the other procedures recommended by WPATH SOC 8 might somehow "alleviate" and help a patient's symptoms, especially when the recommendations were made without robust evidence.

36.    A primary care physician's first and most important responsibility is to do no harm, and there is simply not enough evidence on the long-term effects of these procedures to deem them "medically necessary," or suitable treatment modality in the long-term, especially inside a prison setting.

37.    It is my opinion that the medical necessity and long-term benefit of cross-sex surgeries in the treatment of gender dysphoria is currently in question.  The entities who have published guidance on such care outside of WPATH have been quiet or are revisiting the evidence before publishing updated guidance.  The information that was believed to be the "standard of care" for treating individuals with gender dysphoria and related disorders is under a cloud of doubt and uncertainty.

38.    Also concerning is that WPATH has not been transparent; it failed to publish all relevant evidence or at the very least "caution" the target audience and well-intended providers about the gaps in knowledge on potential long-term harms of these procedures.

39.    In any other area of medicine, surgeries that are considered "medically necessary" are a last resort when other medical treatments have failed and are always associated with a medical diagnosis. WPATH asserts that a phalloplasty is as "medically necessary", as a uterine transplant, or chin reshaping, however many, if not all, of the aforementioned procedures  like facelifts, lipofilling, liposuction, hair line advancement, hair line transplants, body contouring, and other such procedures listed under the Gender-Affirming Surgical Procedures are considered

cosmetic and not covered by private health insurance in the community, because medical necessity has not been well established in medical literature, and long-term effects remain largely unknown.

40.     Patients entrusted to BOP receive effective medically necessary care. There currently is not any medical consensus for cross-sex surgeries that is trustworthy. The medical necessity of cross-sex surgery is in question, especially given the controversy surrounding its long-term effects on mental health. The medical associations that have published medical guidelines for purposes of guiding providers, clinicians and patients, followed WPATH's ideologies and effectively abandoned the rigorous scientific review steps required in all other areas of medicine. As the consumer of such published guidelines, BOP cannot trust the reliability of the guidance, when it has been so broadly questioned for lack of sound evidence and for being free from bias. Patient safety and well-being is paramount to BOP.

41.     Accordingly, based on recent studies or lack thereof, consultation with Department of Justice's psychiatric expert Dr. Kristopher E. Kaliebe, M.D., and closer scrutiny of WPATH's recommendations, BOP has stopped cross-sex surgical referrals, because to knowingly render high-cost, high-risk, irreversible surgeries not vetted by robust medical evidence would be irresponsible.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

ELIZABETE STAHL
Digitally signed by ELIZABETE STAHL
Date: 2025.08.19 14:25:04 -04'00'

Dated: August 19, 2025

_____
ELIZABETE STAHL,DO