**ADMINISTRATIVE RECORD**

The goal of the Bureau of Prisons (BOP) is to deliver medically necessary health care to inmates effectively in accordance with proven standards of care without compromising public safety concerns inherent to BOP's overall mission. *See* Program Statement 6010.05.

BOP's clinical guidance is aimed to reflect the evolving nature of treatment, based on what is considered the "community standard," while translating it to a carceral environment. No single source is used in writing clinical guidance. Robust clinical guidance is ideally built on high-quality research, such as randomized controlled trials, systematic reviews, and well-designed observational studies. But not every diagnostic tool, condition, or treatment plan is well understood. Medical providers are therefore reliant on expert opinions, peer reviewed sources, and medical societies or organizations. As this administrative record will show, treatment of gender dysphoria is an evolving science; involves a field of medicine that is continuously shaped by advances in psychology, ethics, and public health; and implicates sensitive safety, security, and prison-administration concerns.

BOP is tasked with providing essential medical, dental, and mental health (psychiatric) services in a manner consistent with accepted community standards that are supported by reliable evidence for a correctional environment. Providing medically necessary care, which is informed by the community standard of care as translated into the carceral setting, is an important tenet of correctional health care and must be viewed in light of the correctional environment's unique safety, security, and administration concerns. But within this context, challenges exist in defining appropriate clinical guidance for patients who are diagnosed with gender dysphoria in a carceral setting.

On January 20, 2025, President Trump issued Executive Order 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8, 615 (Jan. 30, 2025). Section 4(c) of the Executive Order provided, "The Attorney General shall ensure that the Bureau of Prisons (BOP) revises its policies concerning medical care to be consistent with this order and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." "This Order shall be implemented consistent with applicable law[.]" *Id.* § 8(b).

In evaluating its medical policies, BOP considered the relevant issues, factors, information, and sources, including conducting extensive reviews of existing research, medical expert opinions, medical journals, national media reports, recent medical studies, state correctional policies, BOP's prior policies, and pertinent case law.

As a result of this research and as further explained in the accompanying memorandum to the Administrative Record, BOP has revised its policy to reflect treatment for gender dysphoria that is more aligned with the latest scientific information and consistent with BOP's longstanding policy of providing medical care that is tailored to the unique needs of the inmate. *See* Program Statement 5260.01, *Management of Inmates with Gender Dysphoria*, Federal Bureau of Prisons (Feb. 19, 2026). For example, BOP's reviews found, based on the best reliance evidence, that

1

providing hormones to inmates diagnosed with gender dysphoria is generally not medically necessary to address gender dysphoria. The reliable evidence base for the care of gender dysphoria with hormone interventions is limited. Existing studies are small in sample size, short in duration, observational rather than randomized, and focused on narrowly defined populations. For all these reasons, it is not possible to draw evidence-based conclusions about long-term outcomes of hormone use in persons diagnosed with gender dysphoria while there is well documented side effects and downsides flowing from hormone use. Providing hormone interventions in a carceral setting is further complicated because of heightened security risks and other prison-administration concerns. It is therefore appropriate to focus treatment for gender dysphoria in a carceral setting on non-hormone modalities that generally are available to those in the custody of the BOP, such as psychotherapy. Further, the tapering of hormones for inmates currently receiving hormone therapy is feasible if performed through the appropriate process and closely monitored by health and mental health providers, as required by Program Statement 5260.01.

Providing inmates with hormones to address gender dysphoria creates safety, security, and prison-administration concerns for both the inmate receiving hormones and for correctional staff. For example, the physical changes that may occur as a result of cross-sex hormones, such as the growth of breasts and the feminization of their faces and voices, increases the risk of victimization by other inmates. BOP incarcerates sexual predators and other violent individuals who have a tendency to prey upon inmates who appear feminine, including due to hormones or social accommodations, requiring BOP staff to devote more attention and time to keeping these inmates safe. For instance, BOP staff spend a significant amount of time ensuring these inmates have appropriate cellmates and often use additional resources managing these inmates in protective custody. Staff members' personal safety is also at an increased risk when they must intervene to stop fights between inmates or predatory behavior.

Similarly, providing or allowing access to social accommodations to some inmates and not to others causes animosity between inmates, which creates additional safety, security, and prison-administration concerns. Inmates who do not receive social accommodations may feel resentful for not being able to receive additional items from the commissary. Historically, providing certain items to one group of inmates and not another creates conflict within BOP facilities. Further, allowing inmates to use social accommodations, such as wearing makeup and feminine undergarments, increases the risk that those inmates will be targeted. Allowing inmates to have these social accommodations also requires BOP staff to spend more time and resources ensuring the safety of these inmates. Finally, providing social accommodations increases the risk of inmates concealing contraband and escaping from facilities and can hinder investigation of intra-prison incidents.

Finally, inmates have also threatened self-harm and suicide to obtain sex trait modification interventions, such as hormones and social accommodations. The availability of cross-sex hormones and social accommodations can create improper incentives for inmates to harm themselves.

Providing sex trait modification surgeries also jeopardizes the safety, security, and administration of BOP facilities because inmates receiving these surgeries are at higher risk of harassment due to their appearance. This increased risk results in BOP expending additional time and resources to

AR-000002

ensure the protection of these inmates. Transferring such inmates to opposite-sex facilities is not an acceptable way to mitigate these safety, security, and prison-administration concerns as it would then create security, safety, and privacy issues for the inmates of the opposite sex. For example, the presence of a male in close quarters with female inmates may harm the emotional and physical well-being of some female inmates, particularly those who have suffered from sexual abuse.

Based on a review of the practice of housing males in female facilities, BOP has decided to discontinue this practice. The previous practice potentially increases the risk of violence and sexual assault for women housed in the female facilities. Housing female inmates with men also compromises the female inmates' privacy. This is especially true when women are forced to sleep and shower in spaces with men.

**Research of State Policies**

Florida
Florida Department of Corrections Office of Health Services, Bulletin No. 15.05.23 titled Mental Health Treatment of Inmates with Gender Dysphoria.

California
- California Correctional Health Care Services, Care Guide on Gender Dysphoria. (2015)
- California Correctional Health Care Services Referral for Consideration of Gender Affirming Surgery. (2023)
- California Correctional Health Care Services, Care Guide on Transgender (2025)

Kentucky
Kentucky Corrections Policies and Procedures on Lesbian, Gay, Bisexual, Transgender and Intersex Offenders.

Oklahoma
Oklahoma Department of Corrections Policies on Determination and Management of Inmates with Gender Dysphoria.

Minnesota
Department of Corrections Management and Placement of Incarcerated People Who are Transgender, Gender Diverse, Intersex, or Nonbinary

**Review of Case Studies**

As further explained in the accompanying memorandum to the Administrative Record, the study of gender dysphoria in the carceral community is relatively new, which hampers the ability to reference a community standard of care. Compared with other illnesses or conditions, Gender dysphoria has had a newer, more rapidly evolving clinical landscape (Fraser, L., 2015). A recent and swift evolution of community clinical guidance makes it more difficult to determine where the standard of care currently lies. For example, the World Professional Association for Transgender Health's (WPATH) initial guidance recommended as recently as 1990 a treatment model for gender dysphoria with strict eligibility requirements for diagnosis, evaluations from separate mental

AR-000003

health providers, and required psychotherapy. This stands in contrast with later versions of the WPATH guidance, which reduced or eliminated these requirements (Fraser, L., 2015 & Coleman, E., et al., 2022).

Moreover, recent investigations have called into question WPATH's current recommendations, making determining the community standard even more challenging (Block, J., 2024). Other nations such as Sweden, Denmark, France, and the United Kingdom have distanced themselves from the stance of U.S. organizations such as WPATH, particularly related to care of minors and young adults, due to concerns about the body of research and potential research bias, among other things (Galvin, G., 2024). The recent divergence in global recommendations on proper care for this population leads to challenges in determining a set community standard, especially in the carceral setting. Other leading community organizations are similarly reevaluating their clinical guidance for patients diagnosed with gender dysphoria, in light of recent information. For example, the University of California at San Francisco, long known for its clinical guidance in this area, is currently undergoing a revision of its recommendations for this population (UCSF, n.d.).

A 2020 systematic review of available studies "found insufficient evidence to determine the efficacy or safety of hormonal treatment approaches for transgender women in transition"—it concluded that "[t]he evidence is very incomplete, demonstrating a gap between current clinical practice and clinical research." Haupt et al., *Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women*, 11 Cochrane Database of Systematic Reviews, Art. No. CD013138, at 2, 11 (2020). Another systematic review of studies concluded that it was "impossible to draw conclusions about the effects of hormone therapy on death by suicide" because of the "low" "strength of evidence." Kellan E. Baker, et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, 5 J. Endocrine Soc. 1, 12-13 (2021).

BOP reviewed recent studies that indicated that there are significant risks accompanying hormone interventions used to address gender dysphoria. For example, evidence showed that males who are treated with estrogen have twenty-two times the likelihood to develop breast cancer. *See* Rakesh R. Gurrala et al., *The Impact of Exogenous Testosterone on Breast Cancer Risk in Transmasculine Individuals*, 90(1) Annals of Plastic Surgery 96 (2023).

BOP also concluded that hormone-based interventions for gender dysphoria are fraught with serious risks. There are non-surgical, non-hormone related interventions that have been shown to address gender dysphoria effectively—specifically, "[s]ocial support and psychotherapy are widely recognized approaches." *K.C. v. Individual Members of the Med. Licensing Bd. of Ind.*, 121 F.4th 604, 610-11 (7th Cir. 2024) (citing Danyon Anderson et al., *Gender Dysphoria and Its Non-Surgical and Surgical Treatments*, 10 Health Psych. Rsch., 4 (2022)).

For additional details and cites, please see attached memorandum.

AR-000004

# Memorandum on Program Statement 5260.01, Management of Inmates with Gender Dysphoria (Feb. 19, 2026)

## I.    Introduction

On January 20, 2025, the President issued Executive Order 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615 (Jan. 30, 2025), which prohibited the Bureau of Prisons (BOP) from expending federal funds for "any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex" "to the extent consistent with applicable law." *Id.* at 8,617-18. In light of Executive Order 14,168 and BOP's own independent judgment, BOP has reevaluated its policies regarding inmates and gender dysphoria.

BOP's general policy is to "deliver medically necessary health care to inmates effectively in accordance with proven standards of care without compromising public safety concerns inherent to the Bureau's overall mission." BOP Program Statement (PS) 6010.05 §1, Health Services Administration. Though BOP considers community standards of care, BOP must consider such standards in light of the unique nature of the carceral environment. In evaluating its policies on gender dysphoria, BOP considered the relevant issues, factors, information, and sources, including conducting extensive reviews of existing research, medical expert opinions, medical journals, national media reports, recent medical studies, state correctional policies, BOP's prior policies, and pertinent case law.

For example, BOP has considered the standards of care issued by the World Professional Association for Transgender Health (WPATH) and other organizations, such as the Endocrine Society. BOP has determined that WPATH's standards of care and other guidelines issued by similar organizations are not reliable or at a minimum, show that medical interventions to address gender dysphoria are highly controversial, medically disputed, and insufficiently proven by appropriate evidence. In addition, the recent debate regarding WPATH's standards and other organizations' guidelines support reevaluation of policies regarding gender dysphoria, particularly in the correctional context.

WPATH has recently been characterized as not "political neutral," *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019), and as an "advocacy organization," whose "lodestar is ideology, not science," *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1261 (11th Cir. 2024) (Lagoa, J., concurring); *see, e.g.*, *United States v. Skrmetti*, 605 U.S. 495, 543 (2025) (Thomas, J., concurring) ("Recent revelations suggest that WPATH, long considered a standard bearer in treating pediatric gender dysphoria, bases its guidance on insufficient evidence and allows politics to influence its medical conclusions." (citation omitted)); *Edmo v. Corizon, Inc.*, 949 F.3d 489, 497 (9th Cir. 2020) (O'Scannlain, J., opinion respecting the denial of reh'g en banc) ("The WPATH Standards are merely criteria promulgated by a controversial private organization with a declared point of view."); Expert Report of Kristopher E. Kaliebe, M.D., ¶63 (Sept. 19, 2025) (hereinafter "Kaliebe Decl.") ("WPATH's internal documents clearly show that WPATH is an advocacy organization and not a scientific one."); *Nondiscrimination in Health & Health Education Programs or Activities*, 85 Fed. Reg. 37,160, 37,186-98 (June 19, 2020) (calling WPATH "an advocacy group" and explaining that the U.S. Department of Health and Human

1

Services did not consider WPATH's guidelines to be based on "independent scientific fact-finding"); *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, U.S. Dep't Health and Human Services, 170 (Nov. 19, 2025) ("This combination of poorly managed COIs [conflicts of interests] and restrictive membership practices significantly undermines the credibility and scientific integrity of SOC-8 as a clinical practice guideline. The GDG's [guideline development group's] handling of … evidence WPATH commissioned for development of SOC-8 further highlights the serious threat to clinical integrity that plagued the guideline development process."); Executive Order 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8,771, 8,771 (Feb. 3, 2025) (finding that WPATH "lacks scientific integrity"). And WPATH's standards have been described as being based on "self-referencing consensus rather than evidence-based research" and "built … on concededly weak evidence." *See, e.g.*, *Skrmetti*, 605 U.S. at 544 (Thomas, J., concurring) ("WPATH appears to rest [its conclusions] on self-referencing consensus rather than evidence-based research."); *id.* at 547 (WPATH and other "prominent medical professionals … have built their medical determinations on concededly weak evidence" and "have surreptitiously compromised their medical recommendations to achieve political ends."); *K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, 121 F.4th 604, 611 (7th Cir. 2024) ("Some have expressed doubt about whether WPATH's guidelines actually reflect medical consensus as to treatments for gender dysphoria."); Kaliebe Decl. ¶¶60-82.

An expert has persuasively opined that "WPATH has violated many principles underpinning medical ethics and research and contributed to widespread publication bias in gender medicine," Kaliebe Decl. ¶63, and that "WPATH openly engages in ideologically-based political advocacy, systematically misrepresents evidence, and often bases its recommendations, no matter how impactful for the patient, on low-quality supporting evidence," Kaliebe Decl. ¶60. Countries that once looked to WPATH and other organizations in the United States have begun to backtrack and distance themselves from WPATH and these other organizations. *See, e.g.*, Gabriela Galvin, *The UK is the latest country to ban puberty blockers for trans kids. Why is Europe restricting them?*, Euro News (Dec. 13, 2024); *Skrmetti*, 605 U.S. at 537-38 (Thomas, J., concurring). Other organizations are similarly reevaluating their clinical guidance for patients suffering from gender dysphoria, in light of recent debate. For example, the University of California at San Francisco, known for its clinical guidance in this area, is currently undergoing a revision of its recommendations for this population. *See Gender Affirming Health Program*, University of California San Francisco, https://transcare.ucsf.edu/guidelines.

WPATH's standards are particularly unreliable when it comes to prisoners. *See, e.g.*, Kaliebe Decl. ¶60. WPATH recommended that sex-trait-modification interventions, including surgery, hormones, and social accommodations, should be provided to inmates in correctional facilities before a meaningful number of inmates had such interventions. *See, e.g.*, *Edmo*, 949 F.3d at 497-98 (O'Scannlain, J., opinion respecting the denial of reh'g en banc). In fact, when WPATH published the current version of the standards, a small number of inmates in the United States had ever received sex-trait-modification interventions, there were no reliable studies on such interventions in the correctional context, and WPATH failed to adequately consider or address the

2

AR-000006

special challenges of the inmate population. *See, e.g.*, *id.* (O'Scannlain, J., opinion respecting the denial of reh'g en banc); Kaliebe Decl. ¶79.

Guidelines from other organizations are similarly unpersuasive as WPATH's. The Endocrine Society, for example, has received similar criticism to WPATH. *See, e.g.*, *K.C.*, 121 F.4th at 611 ("But the most influential voices in this group have been two professional organizations—the Endocrine Society and the World Professional Association for Transgender Health…. But these organizations have not evaded criticism."); *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, U.S. Dep't Health and Human Services, 14 (Nov. 19, 2025). This is unsurprising given that WPATH and the Endocrine Society collaborated on their guidelines. *See* Kaliebe Decl. ¶74 ("the WPATH and Endocrine Society collaborated, meaning a very small, interconnected group of WPATH members led to the creation of multiple guidelines among multiple medical organizations"). And WPATH's guidelines have also influenced other organization guidelines, making those guidelines similarly unpersuasive. *See* Kaliebe Decl. ¶75 ("WPATH's unreliable and low-quality recommendations have infected other guidelines, causing a systematic distortion of clinical guidance.").

In sum, BOP does not find WPATH's or other organizations' similar standards or guidelines persuasive. *See* Kaliebe Decl. ¶60 ("WPATH and other affirmative guidelines regarding the care of people with Gender Dysphoria should neither be treated as authoritative nor be used to determine care for Gender Dysphoria."). If anything, recent discussions show that the appropriateness of sex-trait-modification interventions to address gender dysphoria is subject to "fierce scientific and policy debates about the[ir] safety, efficacy, and propriety," and filled with "sincere concerns" with "profound" implications, *Skrmetti*, 605 U.S. at 525; *see, e.g.*, *Gibson*, 920 F.3d at 221 ("the WPATH Standards of Care [and the guidelines of other organizations] reflect not consensus, but merely one side in a sharply contested medical debate"); *Haverkamp v. Linthicum*, 152 F.4th 618, 625 n.7 (5th Cir. 2025) (same); *Clark v. Valletta*, 157 F.4th 201, 206 (2d Cir. 2025) ("how to treat that disorder [*i.e.*, gender dysphoria] is not settled in the scientific and medical community"); *id.* at 216 ("as the record reflects, medical experts disagree about how to treat gender dysphoria").

For at least these reasons and the others discussed in this memorandum, it was prudent for BOP to reevaluate its policies regarding gender dysphoria, as those policies unreasonably relied on these organizations, these organizations' guidelines, and other biased sources regarding interventions to address gender dysphoria. After considering the relevant issues and factors and weighing the relevant considerations, BOP has revised its policy to reflect treatment for gender dysphoria that is more aligned with the latest scientific information, that is consistent with BOP's longstanding policy of providing medical care that is tailored to the unique needs of the inmate, and that accounts for the complex security and administration concerns in the correctional environment. *See* Program Statement 5260.01, *Management of Inmates with Gender Dysphoria*, Federal Bureau of Prisons (Feb. 19, 2026).

As further explained below, BOP has adopted Program Statement 5260.01. That policy requires an individualized treatment plan for each inmate that is diagnosed with gender dysphoria.

AR-000007

The individualized treatment plan may include psychotherapy, group counseling, psychiatric services, and psychotropic medications.

BOP will not provide sex trait modification surgeries to address gender dysphoria, but BOP will provide care necessary to address any complications or resulting conditions from such surgeries, such as urethral stricture and pelvic infections.

BOP will not provide social accommodations to address gender dysphoria and when practicable, will remove or confiscate social accommodations.

If an inmate is diagnosed with gender dysphoria but is not currently receiving hormones to address gender dysphoria, BOP will not provide hormones to address the inmate's gender dysphoria. If an inmate is previously and currently diagnosed with gender dysphoria and is currently receiving hormones to address gender dysphoria, BOP will develop a tapering plan for each inmate after consideration of appropriate factors. For inmates that have recently begun receiving hormones to address gender dysphoria, the tapering plan will include a rapid discontinuation of the hormone intervention. For inmates that have been receiving hormones to address gender dysphoria for an extended period of time, the tapering plan will generally include an appropriately paced discontinuation of the hormone intervention. For inmates who (1) are post sex trait modification surgery or (2) have been receiving hormones to address gender dysphoria for an extended period of time and develop severe physiological and psychological withdrawal effects from tapering, it may not be appropriate in all cases for the initial tapering plan to include cessation of hormones.

Nothing in Program Statement 5260.01 prevents a prison official from providing care required by federal law, including the Eighth Amendment to the U.S. Constitution. And under Program Statement 5260.01 and other BOP policies, BOP will ensure that all inmates diagnosed with gender dysphoria receive care in accordance with federal law, including the Eighth Amendment to the U.S. Constitution.

## II.      Program Statement 5260.01, Management of Inmates with Gender Dysphoria (Feb. 19, 2026)

### A.      Sex Trait Modification Surgeries

After considering the relevant issues and factors and weighing the relevant considerations, BOP adopts a policy prohibiting sex trait modification surgeries to address gender dysphoria, but for inmates who have had sex trait modification surgery, medical care will be provided as necessary to address any complications or resulting conditions, such as urethral stricture and pelvic infections. Sex trait modification surgeries are not medically necessary to address gender dysphoria. Sex trait modification surgeries are highly controversial, medically disputed, and unproven by appropriate evidence; or at the very least, there is reasonable debate about the efficacy of sex trait modification surgeries to address gender dysphoria. To the extent there is uncertainty about the efficacy of sex trait modification surgeries to address gender dysphoria, that uncertainty counsels against providing such controversial interventions when there are other more established treatments, such as psychotherapy, available. Even assuming sex trait modification surgeries are

4

AR-000008

medically necessary or appropriate to address gender dysphoria, BOP concludes that sex trait modification surgeries in the secure prison environment raise numerous security and prison-administration concerns, and each concern, whether considered separately, cumulatively, or in any combination, outweighs any costs from Program Statement 5260.01, any reliance interests, and any benefits from providing sex trait modification surgeries. In BOP's judgment, and after considering the relevant issues and factors and weighing the relevant considerations, prohibiting sex trait modification surgeries is reasonable and appropriate to provide adequate care to inmates diagnosed with gender dysphoria; is reasonable and appropriate to maintain internal order, discipline, and institutional security of the correctional environment; and outweighs any asserted benefit, costs, or interests from allowing sex trait modification surgeries.

### 1. Sex trait modification surgeries are not medically necessary to address gender dysphoria.

BOP's general policy is to "deliver medically necessary health care to inmates effectively in accordance with proven standards of care without compromising public safety concerns inherent to the Bureau's overall mission." PS 6010.05 §1, Health Services Administration. BOP also provides inmates with gender dysphoria care to address the condition, including individualized treatment plans that may include psychotherapy, group counseling, psychiatric services, and psychotropic medications.

After considering the relevant issues and factors and weighing the relevant considerations, BOP concludes that sex trait modification surgeries are not medically necessary to address gender dysphoria, especially in the correctional context. Sex trait modification surgeries are highly controversial, medically disputed, and unproven by appropriate evidence. Medical professionals, at the very least, reasonably disagree on the efficacy of sex trait modification surgeries to address gender dysphoria, particularly in the correctional context. Sex trait modification surgeries are not "medically necessary" or "in accordance with proven standards of care." PS 6010.05 §1, Health Services Administration. It is reasonable for BOP to not provide medically disputed or insufficiently proven interventions to inmates, especially when those interventions may result in irreversible effects or harms.

Medical professionals have persuasively explained that sex trait modification surgeries are not medically necessary. *See, e.g.*, Kaliebe Decl. ¶21 ("Cross-sex surgeries are not medically necessary and should not be made available in correctional environments."); *id.* ¶155 (same); *id.* ¶118 ("Cross-sex surgeries have not been shown to be medically necessary."). At the very least, sex trait modification surgeries are highly controversial and subject to reasonable medical disagreement. *See, e.g.*, *Gibson*, 920 F.3d at 216 ("For it is indisputable that the necessity and efficacy of sex reassignment surgery is a matter of significant disagreement within the medical community."); *id.* at 221 ("sex reassignment surgery is medically controversial"); *id.* at 226 ("sex reassignment surgery remains an issue of deep division among medical experts"); *id.* ("the undisputed medical controversy over sex reassignment surgery"); *Haverkamp*, 152 F.4th at 625 ("there remains 'significant disagreement within the medical community' about whether sex-reassignment surgery is an 'effective treatment for gender dysphoria'"); *Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014) (en banc). There is little (if any) reliable evidence showing that sex trait

5

modification surgeries treat gender dysphoria. *See, e.g.*, Kaliebe Decl. ¶¶118-30. In any event, there is no reliable evidence showing that sex trait modification surgeries treat gender dysphoria in the correctional environment. *See, e.g.*, Kaliebe Decl. ¶118 ("These surgeries have substantial risks, and there is little, if any, reliable data supporting that such surgeries cause meaningful long-term benefits in improving mental health or reducing suicide risks. This is particularly true in prison settings. Indeed, there are no controlled studies, high-quality evidence, or reliable evidence on sex-trait modification, such as through cross-sex surgery, of inmates with Gender Dysphoria in the carceral setting."). Sex trait modification surgery can prolong symptoms of gender dysphoria, undermine other treatments to address gender dysphoria, worsen symptoms of gender dysphoria, and cause other physical and psychological harms. *See, e.g.*, Kaliebe Decl. ¶¶118-30; *id.* ¶129 ("Cross-sex surgeries can have serious complications, some of which are lifelong…."); *id.* ¶130 ("As such, with the known harms to healthy tissue, potential increased risk of psychiatric decompensation, technical issues such as wound care, potential surgical complications, potential life-long health complications, and unclear mental health benefits, cross-sex surgeries within the correctional environment are not medical necessary."). To the extent that sex trait modification surgeries might have short-term benefits to addressing gender dysphoria in the correctional context, they are outweighed by the potential long-term harm. *See, e.g.*, Kaliebe Decl. ¶¶118-30. In any event, BOP determines that it is reasonable to not provide sex trait modification surgeries given the uncertainty in long-term benefit and its potential irreversibility.

Even if there is some reliable evidence that sex trait modification surgeries address gender dysphoria when the individual is in society at large, the evidence does not sufficiently support that sex trait modification surgeries address gender dysphoria in the correctional environment. What a person may want or need to address gender dysphoria outside prison says little (if anything) about what that person should have access to in a secure prison environment. *See, e.g.*, Kaliebe Decl. ¶142 ("The concept of social transitioning through social accommodations, hormones, or surgery is out of place in the correctional context because an inmate does not live in society at large but a secure prison environment."); *id.* ¶118. That is especially true given that inmates often present unique backgrounds not readily present in individuals in society at large. *See, e.g.*, Kaliebe Decl. ¶¶127, 141-43.

Again, BOP provides inmates with gender dysphoria with individualized treatment plans with well-established treatment methods for gender dysphoria, such as psychotherapy, group counseling, psychiatric services, and psychotropic medications. Sex trait modification surgeries are not medically necessary or at a minimum, there is reasonable disagreement as to their efficacy, such that it is reasonable for BOP to not provide the intervention. In BOP's judgment, it is reasonable and appropriate to provide these individual treatment plans without the prospect of providing or allowing access to sex trait modification surgeries to address gender dysphoria.

### 2. Security and prison-administration concerns support Program Statement 5260.01's prohibition on sex trait modification surgeries.

BOP's general policy is to "deliver medically necessary health care to inmates effectively in accordance with proven standards of care *without compromising public safety concerns inherent to the Bureau's overall mission*." PS 6010.05 §1, Health Services Administration (emphasis

AR-000010

added). BOP is responsible for "the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. §4042(a). Providing sex trait modification surgeries to inmates, including to address gender dysphoria, raises serious security and prison-administration concerns. These security and prison-administration concerns independently support BOP's adoption of a prohibition on providing inmates sex trait modification surgeries to address gender dysphoria. The security and prison-administration concerns, when considered separately, cumulatively, or in any combination, outweigh the benefits (medical or otherwise) from providing sex trait modification surgeries. Thus, even if sex trait modification surgeries address gender dysphoria, BOP, after considering the relevant issues and factors and weighing the relevant considerations, determines that it is reasonable and appropriate to not provide or allow access to sex trait modification surgeries to address gender dysphoria.

Sex trait modification surgeries jeopardize the security, safety, and prison administration of correctional facilities in at least three ways. First, the inmate receiving sex trait modification surgery will experience increased risk of the inmate becoming a target for attacks, which increases harm to the targeted inmate and the prison officials tasked with protecting the inmate. Second, special treatments, such as providing or allowing access to sex trait modification surgeries to address gender dysphoria, raise fairness concerns and can breed resentment among other inmates, which can lead to violence. Third, granting sex trait modification surgeries conflicts with a reasonable practice of refusing to reward threats of self-harm and may even increase self-harm. Each of BOP's security and prison-administration concerns, whether considered cumulatively, separately, or in any combination, outweighs any asserted benefits from providing or allowing access to sex trait modification surgeries to address gender dysphoria.

First, prohibiting sex trait modification surgeries reduces the chance of an inmate being targeted by other inmates. "Recognizing that reasonable concerns would arise regarding a post-operative, male-to-female transsexual being housed with male prisoners takes no great stretch of the imagination." *Kosilek*, 774 F.3d at 93. The inmate would inevitably become a target for abuse in the male facility. *Cf., e.g.*, *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1275 (11th Cir. 2020) (noting the "obvious[]" consequence of permitting a male inmate to dress and be groomed as a female "would inevitably become a target for abuse in an all-male prison"). And based on BOP's experience and expertise, these same concerns also apply to women's correctional facilities, which also experience meaningful amounts of harassment and violence. *See, e.g.*, Emily Buehler, *Substantiated Incidents of Sexual Victimization Reported by Adult Correctional Authorities*, 2016-2018, U.S. Dep't of Justice, 18 (2023) (noting that 31% of the recorded incidents of inmate-on-inmate sexual harassment occurred in female correctional facilities).

Sex trait modification surgeries not only put the inmate at additional risk of assault or harassment but also endanger "the prison employees who would have to step in to protect" the inmate and will require expending already limited resources to address these risks. *Keohane*, 952 F.3d at 1263. Preventing such attacks would require prison officials to be more vigilant in protecting the inmates from assault or harassment, despite BOP's limited resources.

It is insufficient to point to transfer to mitigate these security and prison-administration complications from sex trait modification surgeries. For example, a transfer of a post-operative

AR-000011

male to a female facility will increase the risk of harm of female inmates. *See* Kaliebe Decl. ¶139 ("[H]ighly relevant is the fact that the presence of a biological male in close quarters in a female prison could significantly harm the emotional and physical well-being of certain female prisoners, such as female victims of sexual abuse. This concern is particularly acute since female prisoners suffer from extremely high rates of sexual trauma. Placing these vulnerable female inmates with biological males could have meaningful negative effects on female inmates."); *see also, e.g.*, *Cruel and Unusual Punishment: Stopping the Dangerous Policies Putting Men in Women's Prisons*, Independent Women's Forum (Dec. 20, 2024). And based on BOP's experience and expertise, similar concerns exist for transfer of a female inmate to a male facility, as the female inmate would be a target by other male prisoners and implicate the privacy interests of male inmates.

Second, based on BOP's experience and expertise, fairness concerns counsel against providing or allowing access to sex trait modification surgeries. When inmates receive special treatment within a correctional environment, other inmates may begin to resent those receiving special treatment, which can increase the risk of retaliation against the inmate receiving special treatment and cause ripple effects throughout the correctional institution and disrupting the delicate prison environment. Fairness concerns are particularly present if such special treatment is provided to one type of facilities (*e.g.*, female facilities) and not another (*e.g.*, male facilities).

Finally, BOP has considered the issue of self-harm and has determined that a policy prohibiting sex trait modification surgeries avoids rewarding threats of self-harm and may reduce overall self-harm. Inmates frequently use threats of self-harm and suicide to try to obtain concessions from prison officials. *See, e.g.*, Kaliebe Decl. ¶148 ("In my experience working in correctional facilities and treating adult and juvenile inmates, including those diagnosed with Gender Dysphoria, inmates frequently use threats of self-harm and suicide to try to obtain concessions from prison officials."); *Kosilek*, 774 F.3d at 94 ("Such threats are not uncommon in prison settings …."). But providing sex trait modification surgeries, especially in response to threats of self-harm or suicide, could increase self-harm. *See, e.g.*, Kaliebe Decl. ¶149 ("In corrections, rewarding self-injury or threats of self-injury tends to increase overall self-harm, both for the individual patient and also within the system."). Granting such requests may establish an "unacceptable precedent," forcing "prison authorities to comply with the prisoners' particular demands." *Kosilek*, 774 F.3d at 94. Consequently, it is reasonable for prison administrators to have rules against providing inmates benefits in response to self-harm or suicide to discourage threats. *See* Kaliebe Decl. ¶150 ("Simple and clear institutional policies, such as no social transitions or no initiation of new hormone treatments, are likely to lead to the lowest level of self-harm and the least overall harm to inmates because when prisoners know the interventions they desire are not available, they are less likely to self-harm to obtain them. In other words, it is reasonable for prison administrators to have outright prohibitions of providing inmates benefits, such as unproven surgeries, special-order items, and housing placements, in response to self-harm or suicide threats to discourage false threats."); *Kosilek*, 774 F.3d at 94 (noting that such threats must be "firm[ly] reject[ed]" by the authorities, who must be given ample discretion in the dealing with such situations"). BOP determines that a clear rule against sex trait modification surgeries is the most reasonable way to handle this complex issue. BOP takes threats of self-harm seriously and has protocols in place to handle these complex situations.

8

After considering the relevant issues and factors and weighing the relevant considerations, BOP determines that each of its security and prison-administration concerns, whether considered separately, cumulatively, or in any combination, outweighs any asserted benefits of providing sex trait modification surgeries. In addition, after considering the relevant issues and factors and weighing the relevant considerations, BOP determines that the medical concerns discussed above when considered with any of its security or prison-administration concerns—separately, cumulatively, or in any combination—outweighs any asserted benefits of providing sex trait modification surgeries.

### 3. Other considerations do not outweigh the benefits from Program Statement 5260.01.

#### a. *Reliance Interests and Costs*

BOP has also considered potential reliance interests, but the potential reliance interests are either illegitimate or outweighed by the benefits of Program Statement 5260.01. Indeed, after considering the relevant issues and factors and weighing the relevant considerations, BOP determines that each of its medical, security, and prison-administration concerns, whether considered separately, cumulatively, or in any combination, outweighs the asserted benefits, interests, or costs of providing or allowing access to sex trait modification surgeries.

As an initial matter, the policy prohibits future sex trait modification surgeries, and an inmate has no reasonable reliance interest in the future possibility of obtaining such surgeries. That is all the more true if sex trait modification surgeries are not medically necessary or in accordance with proven standards of care.

Even if an inmate has a currently scheduled sex trait modification surgery, the inmate still does not have legitimate reliance interests. Sex trait modification surgeries are not medically necessary or in accordance with proven standards of care. An inmate has no legitimate reliance interest in an unproven surgical intervention. Nor does an inmate have a legitimate reliance interest in a surgical intervention that is, at a minimum, subject to reasonable debate in the medical community.

In any event, even if the prospect of sex trait modification surgeries created legitimate reliance interests, the interests are not weighty. Providing sex trait modification surgeries has not been a longstanding, formal policy of BOP, and access to medical interventions has always been subject to security concerns. *See, e.g.*, PS 6010.05 §1, Health Services Administration; PS 5538.08, Escorted Trips. Further, the policy has always been subject to change, including based on security and prison-administration concerns. And the reliance interests are even smaller given, again, that sex trait modification surgeries are not medically necessary, unproven, or medically disputed.

Moreover, implementing Program Statement 5260.01 will incur, at most, *de minimis* costs and will likely lead to savings. Program Statement 5260.01 will mitigate security and prison-administration concerns, which will reduce costs. Program Statement 5260.01 will also reduce expenditures on medical interventions that are not medically necessary or are medically disputed and on medical procedures to address potential complications from sex trait modification surgeries.

9

Expenditures on care for inmates diagnosed with gender dysphoria are unlikely to meaningfully increase. In general, BOP officials would monitor an inmate diagnosed with gender dysphoria and provide the patient with an individualized treatment plan, which would generally have care in addition to the provision of surgery. To the extent that Program Statement 5260.01 would result in increased costs, it is outweighed by other considerations or the savings from the unavailability of sex trait modification surgeries.

In sum, after considering the relevant issues and factors and weighing the relevant considerations, BOP determines that each of its medical, security, and prison-administration concerns, whether considered separately, cumulatively, or in any combination, significantly outweigh any costs, any reliance interests created by a former policy of providing or allowing access to sex trait modification surgeries, and any benefits from providing or allowing access to sex trait modification surgeries. In BOP's judgment and after considering the relevant issues and factors and weighing the relevant considerations, BOP determines that prohibiting sex trait modification surgeries is reasonable and in the best interest of the agency, its officials, and those in its custody.

### b.    *Alternatives*

BOP has considered alternatives and has determined that Program Statement 5260.01 is more reasonable than and preferable to potential alternatives.

For example, BOP has considered the option of allowing sex trait modification surgeries only for inmates that have already undergone a different sex trait modification surgery. Although Program Statement 5260.01 permits procedures to address complications with past sex trait modification surgeries, BOP does not think it is prudent to allow further surgeries that do not address complications of past surgeries. Sex trait modification surgeries are not medically necessary, are unproven, or are medically controversial; can harm the inmate; and can have long-term irreversible effects. BOP does not find it prudent to provide additional potentially harmful interventions because the inmate has already had an intervention. Even if sex trait modification surgeries are medically beneficial to address gender dysphoria, further surgeries still raise the above security and prison-administration concerns, and each of these concerns outweighs the benefits of providing or allowing access to sex trait modification surgeries in this context. In BOP's judgment, Program Statement 5260.01's handling of sex trait modification surgeries is more reasonable than and preferable to this alternative approach.

BOP has considered the option of allowing sex trait modification surgeries only for inmates that have undergone hormones to address gender dysphoria. But sex trait modification surgeries are not medically necessary, are unproven, or are medically controversial; can harm the inmate; and can have long-term irreversible effects. BOP does not find it prudent to provide this medically disputed and potentially harmful intervention because the inmate is undergoing hormones, even if the inmate has received hormones for an extended period of time. Even if sex trait modification surgeries are medically beneficial to address gender dysphoria, such surgeries still raise the above security and prison-administration concerns, including those in addition to the security and prison-administration concerns that hormones may raise. The security and prison-administration concerns outweigh the benefits of providing sex trait modification surgeries in this circumstance. In BOP's

10

AR-000014

judgment, Program Statement 5260.01's handling of sex trait modification surgeries is more reasonable than and preferable to this alternative approach.

BOP has considered a policy that would allow sex trait modification surgeries based on an inmate's individual security profile. But the inmate's security profile does not change that sex trait modification surgeries are not medically necessary, unproven, or medically controversial; can harm the inmate; and can have long-term irreversible effects. BOP does not find it prudent to provide this medically disputed and potentially harmful intervention when the inmate's security profile may be low risk. Even if sex trait modification surgeries are medically beneficial to address gender dysphoria, surgeries still raise security and prison-administration concerns: An inmate with a low-risk security profile does not sufficiently mitigate that sex trait modification surgeries increase the risk that the inmate will become a target from attacks, which increases the risk of harm to the targeted inmate and prison officials tasked with protecting the inmate. Nor does it mitigate the fairness or self-harm concerns. In BOP's judgment, Program Statement 5260.01's handling of sex trait modification surgeries is more reasonable than and preferable to this alternative approach.

BOP has considered allowing sex trait modification surgeries based on the type of custody the inmate is in. But this alternative does not change that sex trait modification surgeries are not medically necessary or at the very least, controversial and disputed. Even if sex trait modification surgeries are medically beneficial to address gender dysphoria, the above prison-administration and safety concerns persist regardless of the type of custody the inmate is in. For example, providing sex trait modification surgeries to inmates in administrative segregations or protective custody does not negate all the above security and prison-administration concerns. And even if the inmate is in more limited custody now, such as administrative segregation, the inmate likely will not always be in such custody. In BOP's judgment, Program Statement 5260.01's handling of sex trait modification surgeries is more reasonable than and preferable this alternative approach.

BOP has also considered and rejected an alternative that allows inmates to pay for sex trait modification surgeries. Such an alternative does not sufficiently mitigate the medical, security, or prison-administration concerns of allowing sex trait modification surgeries. In BOP's judgment, Program Statement 5260.01's handling of sex trait modification surgeries is more reasonable than and preferable to this alternative approach.

Finally, BOP has considered other alternatives, including a combination of the above alternatives, but BOP has determined that Program Statement 5260.01's handling of sex trait modification surgeries is better than alternative approaches and is the most reasonable approach for addressing this issue.

\*      \*      \*

In sum, BOP issues Program Statement 5260.01 independent of Executive Order 14,168 and after considering the relevant issues and factors and weighing the relevant considerations. Program Statement 5260.01's handling of sex trait modification surgeries is justified by the medical concerns of the intervention alone. Security and prison-administration concerns bolster that determination. Further, even assuming there are medical benefits to inmates from sex trait modification surgery, Program Statement 5260.01's handling of sex trait modification surgeries is justified by security and prison-administration concerns, as each of those concerns, whether

11

AR-000015

considered separately, cumulatively, or in any combination, outweigh any costs of Program Statement 5260.01, any reliance interests, and any benefits sex trait modification surgeries provide. BOP also concludes that Program Statement 5260.01's handling of sex trait modification surgeries is more reasonable than and preferable to potential alternatives. After considering the relevant issues and factors and weighing the relevant considerations, BOP determines that Program Statement 5260.01's handling of sex trait modification surgeries is reasonable and appropriate.

### B.    Social Accommodations

After considering the relevant issues and factors and weighing the relevant considerations, BOP adopts a policy prohibiting social accommodations, including to address gender dysphoria. Social accommodations are not medically necessary to address gender dysphoria. Social accommodations are highly controversial, medically disputed, and unproven by appropriate evidence; or at the very least, there is reasonable debate about the efficacy of social accommodations to address gender dysphoria. Even assuming social accommodations are medically necessary or beneficial to treat gender dysphoria, BOP concludes that social accommodations in the secure prison environment raise numerous security and prison-administration concerns that separately, cumulatively, or in a combination outweigh any medical benefits to an inmate. In BOP's judgment, and after considering the relevant issues and factors and weighing the relevant considerations, prohibiting access to social accommodations is reasonable and appropriate to provide adequate care to inmates diagnosed with gender dysphoria; to maintain internal order, discipline, and institutional security of the correctional environment; and outweighs any asserted benefit from allowing social accommodations.

### 1.    Social accommodations are not medically necessary to address gender dysphoria.

BOP's general policy is to "deliver medically necessary health care to inmates effectively in accordance with proven standards of care without compromising public safety concerns inherent to the Bureau's overall mission." PS 6010.05 §1, Health Services Administration. BOP also provides inmates with gender dysphoria care to address the condition, including individualized treatment plans that may include psychotherapy, group counseling, psychiatric services, and psychotropic medications.

Based on BOP's review of the record and after considering the relevant issues and factors and weighing the relevant considerations, BOP concludes that social accommodations are not medically necessary to address gender dysphoria, especially in the correctional context. Social accommodations are highly controversial, medically disputed, and unproven by appropriate evidence. Medical professionals, at the very least, reasonably disagree on the efficacy of social accommodations to address gender dysphoria, particularly in the correctional context. Social accommodations are not "medically necessary" or "in accordance with proven standards of care." PS 6010.05 §1, Health Services Administration. It is reasonable for BOP to not provide medically disputed or insufficiently proven accommodations to inmates.

Medical professionals have persuasively explained that social accommodations are at most psychologically pleasing, not medically necessary. *See, e.g.*, Kaliebe Decl. ¶22 ("'Social

AR-000016

accommodation' is not medically necessary in the correctional setting."); *id.* ¶156 (same); *id.* ¶136 ("The fact that some social-transitioning items are psychologically pleasing to inmates with Gender Dysphoria does not mean that such interventions are medically necessary."); *Keohane*, 952 F.3d at 1274; *Bayse v. Ward*, 147 F.4th 1304, 1313 (11th Cir. 2025); *cf., e.g.*, *Fisher v. Fed. Bureau of Prisons*, 484 F. Supp. 3d 521, 534 (N.D. Ohio 2020) ("cosmetic products are not among the minimal civilized measures of life's necessities" (brackets omitted)). There is limited to no reliable evidence showing that access to social accommodations treats gender dysphoria. *See, e.g.*, Kaliebe Decl. ¶136 ("There is limited evidence suggesting that allowing cosmetic and clothing items, such as binders, undergarments, makeup, wigs, and other accessories and items stereotypically associated with the opposite sex, would improve or resolve symptoms associated with Gender Dysphoria. And there is no evidence-based study or reliable evidence showing that access to such items improves or resolves symptoms in inmates with Gender Dysphoria, regardless of whether the inmate is in a facility that aligns with the inmate's biological sex or gender identity."). Social accommodations "can prolong the symptoms [of gender dysphoria] and undermine psychotherapy, and there is no clear evidence of medical benefit." Kaliebe Decl. ¶136. To the extent that social accommodations might have short-term benefits to addressing gender dysphoria in the correctional context, they are outweighed by the potential long-term harm. *See, e.g.*, Kaliebe Decl. ¶140 ("[W]hile social transition might decrease inmate-patients' discomfort in the short term, it ultimately may cause long-term harm, such as continuation of Gender Dysphoria."). In any event, BOP determines that it is reasonable to no longer provide access to social accommodations given the uncertainty in long-term benefit.

Even if there is some reliable evidence that social accommodations address gender dysphoria when the individual is in society at large, the evidence does not support that social accommodations address gender dysphoria in the correctional environment. The concept of access to social accommodations is out of place in the correctional context because an inmate does not live in society at large but rather a secure prison environment. What a person may want or need to socially transition outside prison says little (if anything) about what that person should have access to in a secure prison environment. *See, e.g.*, Kaliebe Decl. ¶142 ("The concept of social transitioning through social accommodations, hormones, or surgery is out of place in the correctional context because an inmate does not live in society at large but a secure prison environment.").

Again, BOP provides inmates with gender dysphoria with individualized treatment plans with well-established treatment methods for gender dysphoria, such as psychotherapy, group counseling, psychiatric services, and psychotropic medications. Social accommodations are not medically necessary or at a minimum, there is reasonable disagreement as to their efficacy, such that it is reasonable for BOP to not provide social accommodations. In BOP's judgment, it is reasonable and appropriate to provide these individual treatment plans without the prospect of providing or allowing access to social accommodations to address gender dysphoria.

AR-000017

### 2.    Security and prison-administration concerns support Program Statement 5260.01's prohibition on social accommodations.

BOP's general policy is to "deliver medically necessary health care to inmates effectively in accordance with proven standards of care *without compromising public safety concerns inherent to the Bureau's overall mission*." PS 6010.05 §1, Health Services Administration (emphasis added). BOP is responsible for "the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. §4042(a). Providing social accommodations to inmates, including to address gender dysphoria, raises serious security and prison-administration concerns. These security and prison-administration concerns not only support the medical concerns for BOP's adoption of a prohibition on providing inmates social accommodations but also independently support BOP's adoption of such a prohibition. At a minimum, the security and prison-administration concerns, when considered separately or cumulatively or in any combination, outweigh the benefits (medical or otherwise) from providing social accommodations. Thus, even if social accommodations address gender dysphoria, BOP, after considering the relevant issues and factors and weighing the relevant considerations, determines that it is reasonable and appropriate to not provide or allow access to social accommodations, including to address gender dysphoria.

Social accommodations jeopardize the security, safety, and prison administration of correctional facilities in at least four ways. First, providing social accommodations heightens the risk of inmates concealing dangerous contraband or escaping and may hinder the prison's ability to investigate intra-prison crimes. Second, providing social accommodations disrupts the uniform appearance among inmates, increasing the risk the accommodated inmate becomes a target for attacks, which increases the risk of harm to the targeted inmate and prison officials tasked with protecting the inmate. Third, special accommodations designed to change an inmate's outward appearance raise fairness concerns and can breed resentment among other inmates, which can lead to violence. Fourth, granting social accommodations conflicts with a reasonable practice of refusing to reward threats of self-harm and may even increase self-harm.

First, certain social accommodations, such as wigs, breast pads, buttock pads, and chest binders, can enable an inmate to hide contraband or other items without easy detection. *See, e.g.*, *Keohane*, 952 F.3d at 1263 ("the [Florida Department of Corrections] FDC concluded that there are clear advantages to maintaining uniformity in a prison setting, including the ability to more readily detect contraband"); *Keohane v. Fla. Dep't of Corr. Sec'y*, 981 F.3d 994, 998 (11th Cir. 2020) (Newsom, J., concurring in denial of reh'g en banc); *cf. Green v. Polunsky*, 229 F.3d 486, 490 (5th Cir. 2000) ("contraband such as drugs and weapons can be hidden in long hair"). A uniform dress code enables prison officials to more readily detect contraband. *See Keohane*, 952 F.3d at 1263. In addition to the harm from contraband going undetected, BOP would have to expend additional time and expense to administer the facility and ensure its security and safety.

Providing access to certain social accommodations also increases risk of escape by the inmate and may hinder the prison's ability to investigate intra-prison crimes because these items can be used to obfuscate or conceal an inmate's identity. Inmates would be able to change their appearances with ease by removing their social accommodations, such as wigs, chest binders, or

14

AR-000018

breast padding. *See, e.g.*, *Green*, 229 F.3d at 490. By prohibiting these items, Program Statement 5260.01 decreases the risk of fleeing inmates from avoiding detection or delaying detection and helps ensure the prison can adequately investigate intra-prison crimes.

Second, prohibiting social accommodations reduces the chance of an inmate being targeted by other inmates. For example, allowing a male inmate to obtain items designed to make him appear more feminine may entice other male inmates to disturb the orderly operation of the facility and can lead to increased incidents of assault or harassment on the accommodated inmate. Indeed, an inmate dressed or groomed as a female, such as via social accommodations, would increase the risk of the inmate becoming a target for abuse in a male prison. *See, e.g.*, *Keohane*, 952 F.3d at 1275 (noting the "obvious[]" consequence of permitting a male inmate to dress and be groomed as a female "would inevitably become a target for abuse in an all-male prison"); *Keohane*, 981 F.3d at 997-98 (Newsom, J., concurring in denial of reh'g en banc). And based on BOP's experience and expertise, these same concerns apply to both male and female correctional facilities, as female facilities also experience meaningful amounts of harassment and violence. *See, e.g.*, Emily Buehler, *Substantiated Incidents of Sexual Victimization Reported by Adult Correctional Authorities*, 2016-2018, U.S. Dep't of Justice, 18 (2023) (noting that 31% of the recorded incidents of inmate-on-inmate sexual harassment occurred in female correctional facilities).

Social accommodations not only put the inmate at additional risk of assault or harassment but also endanger "the prison employees who would have to step in to protect" the inmate and will require expending already limited resources to address these risks. *Keohane*, 952 F.3d at 1263. Preventing such attacks would require prison officials to be more vigilant in protecting the accommodated inmates from assault or harassment, despite BOP's limited resources.

And obviously, transfer to an opposite-sex facility is not an appropriate recourse in an attempt to mitigate these security and prison-administration complications from social-accommodations. Transfer would not sufficiently mitigate all the security and prison-administration concerns from providing social accommodations; in fact, transfer would create new grave security and prison-administration concerns. *See, e.g.*, Kaliebe Decl. ¶139 ("[H]ighly relevant is the fact that the presence of a biological male in close quarters in a female prison could significantly harm the emotional and physical well-being of certain female prisoners, such as female victims of sexual abuse. This concern is particularly acute since female prisoners suffer from extremely high rates of sexual trauma. Placing these vulnerable female inmates with biological males could have meaningful negative effects on female inmates."); *Cruel and Unusual Punishment: Stopping the Dangerous Policies Putting Men in Women's Prisons*, Independent Women's Forum (Dec. 20, 2024). And transfer is not medically necessary or appropriate to address gender dysphoria. *See, e.g.*, Kaliebe Decl. ¶¶23, 157. Transfer to address gender dysphoria is unproven, medically disputed, and controversial. *See* Kaliebe Decl. ¶139 ("There is no reliable study or high-quality evidence suggesting that an inmate being housed in a facility in line with the inmate's gender identity rather than the inmate's biological sex has any meaningful benefits (let alone long-term benefits) to the inmate's Gender Dysphoria symptoms."). It is reasonable for BOP to not provide a transfer to an inmate diagnosed with gender dysphoria, given the security, prison-administration, and medical issues.

15

AR-000019

Third, based on BOP's experience and expertise, fairness concerns counsel against providing access to social accommodations. When inmates receive special treatment within a correctional environment, other inmates may begin to resent those receiving special treatment, which can increase the risk of retaliation against the inmate receiving special treatment and cause ripple effects throughout the correctional institution and disrupting the delicate prison environment. Moreover, in general, correctional environments aim to be uniform in their approach to access to items because once a facility grants access to one thing for an inmate, it often makes it difficult to refuse granting special items to everyone else. Fairness concerns are particularly present if such special treatment is provided to one type of facilities (*e.g.*, female facilities) and not another (*e.g.*, male facilities).

Finally, BOP has considered the issue of self-harm and has determined that a policy prohibiting social accommodations avoids rewarding threats of self-harm and may reduce overall self-harm. Inmates frequently use threats of self-harm and suicide to try to obtain concessions from prison officials. *See, e.g.*, Kaliebe Decl. ¶148 ("In my experience working in correctional facilities and treating adult and juvenile inmates, including those diagnosed with Gender Dysphoria, inmates frequently use threats of self-harm and suicide to try to obtain concessions from prison officials."); *Kosilek*, 774 F.3d at 94 ("Such threats are not uncommon in prison settings ...."). But providing access to social accommodations, especially in response to threats of self-harm or suicide, could increase self-harm. *See, e.g.*, Kaliebe Decl. ¶149 ("In corrections, rewarding self-injury or threats of self-injury tends to increase overall self-harm, both for the individual patient and also within the system."). Granting such requests may establish an "unacceptable precedent," forcing "prison authorities to comply with the prisoners' particular demands." *Kosilek*, 774 F.3d at 94. Consequently, it is reasonable for prison administrators to have rules against providing inmates benefits in response to self-harm or suicide to discourage threats. *See* Kaliebe Decl. ¶150 ("Simple and clear institutional policies, such as no social transitions or no initiation of new hormone treatments, are likely to lead to the lowest level of self-harm and the least overall harm to inmates because when prisoners know the interventions they desire are not available, they are less likely to self-harm to obtain them. In other words, it is reasonable for prison administrators to have outright prohibitions of providing inmates benefits, such as unproven surgeries, special-order items, and housing placements, in response to self-harm or suicide threats to discourage false threats."); *Kosilek*, 774 F.3d at 94 (noting that such threats must be "firm[ly] reject[ed] by the authorities, who must be given ample discretion in the dealing with such situations"). BOP determines that a clear rule against social accommodations is the most reasonable way to handle this complex issue. BOP takes threats of self-harm seriously and has protocols in place to handle these complex situations.

After considering the relevant issues and factors and weighing the relevant considerations, BOP determines that each of its security and prison-administration concerns, whether considered separately, cumulatively, or in any combination, outweighs any asserted benefits of providing social accommodations. In addition, after considering the relevant issues and factors and weighing the relevant considerations, BOP determines that the medical concerns discussed above when considered with any of its security and prison-administration concerns—separately, cumulatively, or in any combination—outweighs any asserted benefits of providing social accommodations.

16

AR-000020

**3.    Other considerations do not outweigh the benefits from Program Statement 5260.01.**

*a.    Reliance Interests and Costs*

BOP has also considered potential reliance interests, but the potential reliance interests are either illegitimate or outweighed by the benefits of the policy. Indeed, after considering the relevant issues and factors and weighing the relevant considerations, BOP determines that each of its medical, security, and prison-administration concerns, whether considered separately, cumulatively, or in any combination, outweighs the asserted benefits, interests, or costs of providing or allowing access to social accommodations.

As an initial matter, an inmate that currently does not have social accommodations has no legitimate reliance interest in the future possibility of obtaining access to social accommodations. That is especially true because social accommodations are not medically necessary or in accordance with proven standards of care.

Inmates currently in possession of social accommodations do not have legitimate reliance interests either. Social accommodations are not medically necessary or in accordance with proven standards of care. A policy that produces, at most, psychologically pleasing effects does not create legitimate reliance interests. That is all the more true given that social accommodations can prolong symptoms of gender dysphoria, may lead to long-term harm, and can undermine psychotherapy.

In any event, even if social accommodations create legitimate reliance interests, the interests are not weighty. Providing social accommodations has not been a longstanding, formal policy of BOP, and access to social accommodations has always been subject to security concerns. *See, e.g.*, PS 6010.05 §1, Health Services Administration; PS 5521.06, Housing Units, Inmates, and Inmate Work Areas; PS 5580.08, Inmate Personal Property ("Staff may not allow an inmate to accumulate materials to the point where the materials become a fire, sanitation, security, or housekeeping hazard."). Moreover, BOP policy has always been subject to change, including based on security and prison-administration concerns. Further, inmates that have had social accommodations for a short period of time have limited reliance interests. And the weight of this reliance varies among inmates due to, in part, the length of their prison sentence, among other things. Inmates that are in possession of social accommodations with little time left have a smaller interest than those with a longer remaining prison sentence.

Moreover, implementing Program Statement 5260.01 will incur, at most, *de minimis* costs and will likely lead to savings. Program Statement 5260.01 will mitigate security and prison-administration concerns, which will reduce costs. Program Statement 5260.01 will also reduce expenditures on interventions that are not medically necessary or medically disputed. Expenditures on care for inmates diagnosed with gender dysphoria are unlikely to meaningfully increase. In general, BOP officials would monitor an inmate diagnosed with gender dysphoria and provide the inmate with an individualized treatment plan, which would generally have care in addition to the provision of social accommodations. To the extent that Program Statement 5260.01 would result

17

in increased costs, it is outweighed by other considerations or the savings from reduced availability of social accommodations.

In sum, after considering the relevant issues and factors and weighing the relevant considerations, BOP determines that each of its medical, security, and prison-administration concerns, whether considered separately, cumulatively, or in any combination, significantly outweigh any costs of Program Statement 5260.01, any reliance interests created by a former policy of providing access to social accommodations, and any benefits from providing social accommodations. In BOP's judgment, prohibiting social accommodations is reasonable, appropriate, and in the best interest of the agency, its officials, and those in its custody.

### b.    *Alternatives*

BOP has considered alternatives and has determined that Program Statement 5260.01 is more reasonable than and preferable to potential alternatives.

For example, BOP has considered the option of denying future requests for social accommodations but allowing inmates who were previously given social accommodations to maintain access to social accommodations. Such an approach is not warranted because of BOP's medical concerns. Even if there are benefits to the more limited course as to social accommodations, BOP has determined that such a limitation would not adequately minimize the above security and prison-administration concerns to justify the alternative. In BOP's judgment, Program Statement 5260.01's handling of social accommodations is more reasonable than and preferable to this alternative approach.

BOP has considered a policy that would allow social accommodations based on an inmate's individual security profile. Such an approach is not warranted because of BOP's medical concerns. Even if there are benefits to this alternative approach to social accommodations, case-by-case determinations would not sufficiently mitigate the increased security and prison-administration concerns from social accommodations. For example, it would not sufficiently minimize the risks associated with the inmate becoming a target by other inmates, the risk to prison officials to deal with the increased risk of the inmate becoming a target, the risk from non-uniformity in the prison environment, or the risks related to threats of self-harm. Moreover, BOP's security profile is predictive, so the risk associated with contraband, escape, and intra-prison crime is still increased. In BOP's judgment, Program Statement 5260.01's handling of social accommodations is more reasonable than and preferable to this alternative approach.

BOP has considered allowing social accommodations based on the type of custody the inmate is in. Such an approach is not warranted because of BOP's medical concerns. Even if there are benefits to this alternative approach to social accommodations, the above prison-administration and safety concerns persist regardless of the type of custody the inmate is in, such as administrative segregations or general population. For example, providing social accommodations to inmates in administrative segregation still raises contraband-detection concerns, increases the risk of the inmate being targeted by other inmates, and raises the risk related to threats of self-harm. In any event, even if the inmate is in more limited custody now, such as administrative segregation, the inmate likely will not always be in such custody. Providing access to the items to inmates in such

18

custody to only take it away when the inmate leaves that custody is not prudent and risks further disruptions in the prison environment and potentially further self-harm threats by the inmate. In BOP's judgment, Program Statement 5260.01's handling of social accommodations is more reasonable than and preferable to this alternative approach.

BOP has considered and rejected a policy that removes all gendered clothing and hygiene products individually marketed to a particular sex. Though this option would foster uniformity for inmate dresswear, it also has significant drawbacks that render it a less desirable policy than the one selected. Implementing such a policy would be significantly costly and disruptive as it would require BOP to redesign its longstanding dress-code policy. This alternative policy would also entail the prison staff to remove newly classified contraband from all inmates, requiring BOP to expend even more resources than the selected policy as the latter involves removing contraband from a small percentage of the prison population. Moreover, this option would not be considered satisfactory by those who seek social accommodations to address gender dysphoria. In short, this alternative's defects significantly outweigh any purported advantages; in BOP's judgment, Program Statement 5260.01's handling of social accommodations is more reasonable than and preferable to this alternative approach.

BOP has also considered and rejected an alternative that allows inmates to pay for social accommodations to address gender dysphoria. Such an alternative does not sufficiently mitigate the medical, security, or prison-administration concerns of allowing social accommodations. In BOP's judgment, Program Statement 5260.01's approach to social accommodations is more reasonable than and preferable to this alternative approach.

Finally, BOP has considered other alternatives, including a combination of the above alternatives, but BOP has determined that Program Statement 5260.01's handling of social accommodations is better than and preferable to alternative approaches and is the most reasonable approach for addressing this issue.

*    *    *

In sum, BOP issues Program Statement 5260.01 independent of Executive Order 14,168 and after considering the relevant issues and factors and weighing the relevant considerations. Program Statement 5260.01's handling of social accommodations is justified by the medical concerns of the intervention. Security and prison-administration concerns bolster that determination. Further, even assuming there are medical benefits to inmates from providing social accommodations, Program Statement 5260.01's handling of social accommodations is justified by security and prison-administration concerns, as each of those interests, whether considered separately, cumulatively, or in any combination, outweighs any costs of Program Statement 5260.01, any reliance interests, and any benefits with respect to social accommodations. BOP also concludes that Program Statement 5260.01's handling of social accommodations is more reasonable than and preferable to potential alternatives. After considering the relevant issues and factors and weighing the relevant considerations, BOP determines that Program Statement 5260.01's handling of social accommodations is reasonable.

19

AR-000023

## C.      Hormones

After considering the relevant issues and factors and weighing the relevant considerations, BOP adopts Program Statement 5260.01's approach regarding hormones to address gender dysphoria. Under Program Statement 5260.01, if an inmate is diagnosed with gender dysphoria but is not currently receiving hormones to address gender dysphoria, BOP will not provide hormones to address the inmate's gender dysphoria. Hormonal interventions for inmates who are not currently receiving hormones to address gender dysphoria are not medically necessary or at a minimum, are highly controversial, medically disputed, and unproven by appropriate evidence. To the extent there is uncertainty about the efficacy of hormones to address gender dysphoria, that uncertainty counsels against providing such controversial interventions to inmates who are not currently receiving hormones when there are other more established treatments, such as psychotherapy, available. Even assuming hormones are beneficial to address gender dysphoria, BOP concludes that hormones in the secure prison environment raise numerous security and prison-administration concerns, and each concern, whether considered separately, cumulatively, or in any combination, outweigh any costs from Program Statement 5260.01, any reliance interests, and any benefits from providing hormones to inmates diagnosed with gender dysphoria who are not currently receiving hormones.

Under Program Statement 5260.01, if an inmate is previously and currently diagnosed with gender dysphoria and is currently receiving hormones to address gender dysphoria, BOP will develop a tapering plan for each inmate after consideration of appropriate factors. For inmates that have recently begun receiving hormones to address gender dysphoria, the tapering plan will include a rapid discontinuation of the hormone intervention. For inmates that have been receiving hormones to address gender dysphoria for an extended period of time, the tapering plan will generally include an appropriately paced discontinuation of the hormone intervention. For inmates who (1) are post sex trait modification surgery or (2) have been receiving hormones to address gender dysphoria for an extended period of time and develop severe physiological and psychological withdrawal effects from tapering, it may not be appropriate in all cases for the initial tapering plan to include cessation of hormones.

Even for inmates currently receiving hormones to address gender dysphoria, such hormonal interventions are medically controversial and disputed. There are little (if any) reliable evidence on the benefits of hormonal interventions to address gender dysphoria, especially in the correctional environment. There are also indications that hormonal interventions can prolong symptoms of gender dysphoria, undermine other treatments to address gender dysphoria, worsen symptoms of gender dysphoria, and cause physical and psychological harm. But given that inmates currently receiving hormones involve a more complex case in light of the reality that removing medical interventions can cause stress or other side effects, BOP determines that it is reasonable to take the above approach with respect to inmates who are currently receiving hormones to address gender dysphoria, which balances the medical, security, and prison-administration concerns to deal with this more complex situation.

In BOP's judgment, and after considering the relevant issues and factors and weighing the relevant considerations, Program Statement 5260.01's approach as to hormones is reasonable, and

AR-000024

appropriate to provide adequate care to inmates diagnosed with gender dysphoria; is reasonable and appropriate to maintain internal order, discipline, and institutional security of the correctional environment; and outweighs any asserted benefit from alternative policies regarding hormones to address gender dysphoria.

### 1.    In general, hormones are not medically necessary to address gender dysphoria.

#### a.    *Inmates Not Currently Receiving Hormones to Address Gender Dysphoria*

After considering the relevant issues and factors and weighing the relevant considerations, BOP concludes that hormones are not medically necessary to address gender dysphoria for individuals not currently receiving hormones to address gender dysphoria, especially in the correctional context. Hormonal interventions to address gender dysphoria are highly controversial, medically disputed, and unproven by appropriate evidence. Medical professionals, at the very least, reasonably disagree on the efficacy of hormones to address gender dysphoria for individuals not currently receiving hormones to address gender dysphoria, particularly in the correctional context. Hormones are not "medically necessary" or "in accordance with proven standards of care" for inmates not currently receiving hormones to address gender dysphoria. PS 6010.05 §1, Health Services Administration. It is reasonable for BOP to not provide medically disputed or insufficiently proven interventions to inmates who are not currently receiving the intervention.

An expert has persuasively explained that hormones are not medically necessary to address gender dysphoria when that inmate is not currently receiving hormones to address gender dysphoria. *See, e.g.*, Kaliebe Decl. ¶20 ("it is not medically necessary to provide hormone therapy to inmates who are diagnosed with Gender Dysphoria but not currently receiving hormone therapy"); *id.* ¶154 (same); *id.* ¶112 ("it is appropriate to not initiate hormone therapy on inmates who are not currently subject to hormonal therapy"). At the very least, providing hormones to address gender dysphoria is highly controversial, insufficiently proven, or subject to reasonable medical disagreement. Indeed, hormones to address gender dysphoria "is unproven" and "experimental." *See, e.g.*, Kaliebe Decl. ¶20 ("Hormone therapy is unproven and experimental treatment for Gender Dysphoria that generally should not be available to those in the custody of the Federal Bureau of Prisons."); *id.* ¶154 (same). Providing hormonal interventions to address gender dysphoria "is not based on guidelines using best practice or systematic reviews of evidence." Kaliebe Decl. ¶83. There is little (if any) reliable evidence showing that hormones address gender dysphoria. *See, e.g.*, Kaliebe Decl. ¶83; Haupt et al., *Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women*, 11 Cochrane Database of Systematic Reviews, Art. No. CD013138, at 2, 11 (2020); Kellan E. Baker, et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, 5 J. Endocrine Soc. 1, 12-13 (2021); *Marcum v. Crews*, No. 5:25-CV-00238-GFVT, 2025 WL 2630922, at *7 (E.D. Ky. Sept. 12, 2025) ("The problem in making this analogy is that the Plaintiff is assuming that HRT is a well-settled area of medicine. When, in fact, the record indicates that there remains significant disagreement about whether the side effects and the negative consequences of HRT outweigh the positive benefits. And, further, there is medical evidence

AR-000025

suggesting that even if HRT is not provided, there are other ways to care for an individual diagnosed with Gender Dysphoria, absent using HRT."); *Marcum v. Crews*, No. 25-5840, Dkt. 26 at 6 (6th Cir. Oct. 23, 2025) ("The existing record thus suggests that the medical community has not reached a consensus on the role hormone therapy should play in treating gender dysphoria."). In any event, there is no reliable evidence showing that hormones address gender dysphoria in the correctional environment. To the contrary, recent research has raised significant concerns on the safety, efficacy, and prudence of hormonal interventions to address gender dysphoria. *See, e.g.*, Kaliebe Decl. ¶86 ("Recent large reviews and research into harms from hormone treatment for Gender Dysphoria raise increased concerns regarding the safety, efficacy, and prudence of this practice.").

There are also indications that hormonal interventions can prolong symptoms of gender dysphoria, undermine other treatments to address gender dysphoria, worsen symptoms of gender dysphoria, and cause "[s]ubstantial [h]ealth risks" and "[m]edical harms." *See, e.g.*, Kaliebe Decl. ¶¶96-111; Rakesh R. Gurrala et al., *The Impact of Exogenous Testosterone on Breast Cancer Risk in Transmasculine Individuals*, 90(1) Annals of Plastic Surgery 96 (2023) (explaining that evidence showed that males who are treated with estrogen have twenty-two times the likelihood to develop breast cancer). Some of the effects of hormonal interventions also might not be reversible. *See, e.g.*, Kaliebe Decl. ¶109. To the extent that hormonal interventions might have short-term benefits to addressing gender dysphoria in the correctional context, they may be placebo effects, *see, e.g.*, Kaliebe Decl. ¶¶90-91, or in any event, outweighed by the potential long-term risks or harms. At any rate, BOP determines that it is reasonable to not provide hormones to inmates not currently receiving hormones given the uncertainty in benefits, the potential harms, and the potential irreversibility of some effects of the intervention.

Again, BOP provides inmates with gender dysphoria with individualized treatment plans with well-established treatment methods for gender dysphoria, such as psychotherapy, group counseling, psychiatric services, and psychotropic medications. Hormonal interventions for inmates not currently receiving the intervention to address gender dysphoria are not medically necessary or at a minimum, there is reasonable disagreement as to their efficacy, such that it is reasonable for BOP to not provide the intervention. In BOP's judgment, it is reasonable and necessary and appropriate to provide these individual treatment plans to inmates who are not currently hormones without the prospect of receiving hormones to address gender dysphoria.

### b.    *Inmates Currently Receiving Hormones to Address Gender Dysphoria*

Though the medical concerns explained above are still present for inmates currently receiving hormones, BOP has determined that a different approach is warranted as to inmates that are already receiving hormones to address gender dysphoria. These inmates involve a more complex situation, reflecting the reality that removing medical interventions can cause stress or other side effects. *See* Kaliebe Decl. ¶114.

Under Program Statement 5260.01, inmates who are previously and currently diagnosed with gender dysphoria and are currently receiving hormones to address gender dysphoria will receive tapering plans based on the appropriate factors, such as the duration the inmate has been

22

receiving hormones to address gender dysphoria, the initial rationale for receiving the hormone intervention, the response by the inmate to the intervention, and whether the inmate has undergone sex trait modification surgery. But BOP determines that it is appropriate to generally divide these inmates based on the length of time the inmate has received hormones to address gender dysphoria. *See* Kaliebe Decl. ¶114 ("it is reasonable for dysphoric patients to be divided into different patient populations with different clinical approaches").

For inmates that recently started receiving hormones to address gender dysphoria, BOP determines that such inmates will receive a tapering plan that includes a rapid discontinuation of hormones. *See* Kaliebe Decl. ¶114 ("A rapid discontinuation is appropriate for those who recently started treatment."). Given the medical concerns with respect to hormones, the short-term side-effects to discontinuing hormones when hormones have only been recently provided to the inmate, and the other measures BOP has in place to monitor and receive requests from inmate patients, among other relevant considerations, BOP determines that a tapering plan that includes a rapid discontinuation of hormones is reasonable for inmates who have only recently begun receiving hormones to address gender dysphoria.

For inmates that have been receiving hormones to address gender dysphoria for an extended period of time, the inmates will receive a tapering plan based on the appropriate factors. In general, the tapering plan will include an appropriately paced discontinuation of the hormone intervention. *See* Kaliebe Decl. ¶114 ("A rapid discontinuation is appropriate for those who recently started treatment, but a slow withdrawal could be appropriate for others …."). For inmates who (1) are post sex trait modification surgery or (2) have been receiving hormones to address gender dysphoria for an extended period of time and develop severe physiological and psychological withdrawal effects from tapering, it may not be appropriate in all cases for the initial tapering plan to include cessation of hormones. But given "the unproven medical benefits of continued hormone[s]," "the potential negative effects of hormone[s]," and that "it is likely rare that an inmate should continue hormone therapy indefinitely," Kaliebe Decl. ¶116, tapering plans should be reevaluated regularly with respect to cessation of hormones, including during the inmate's chronic care clinic appointments.

All inmates who are tapering and were receiving mental health treatment before tapering will continue to receive counseling and pharmacological treatment as appropriate as part of the inmate's individualized treatment plan. Tapering plans may be adjusted as necessary based on monitoring and follow-up evaluations, but the adjusted tapering plans must still be consistent with the purpose of Program Statement 5260.01 and based on all relevant factors, including security and prison-administration concerns. And inmate patients may submit a request for additional medical or mental health care or evaluation if they have acute concerns during the tapering process.

In BOP's judgment, the above approach reasonably balances the medical concerns presented by hormones for inmates that are currently receiving hormones to address gender dysphoria.

AR-000027

## 2.    Security and prison-administration concerns support Program Statement 5260.01's approach to hormones to address gender dysphoria.

BOP's general policy is to "deliver medically necessary health care to inmates effectively in accordance with proven standards of care *without compromising public safety concerns inherent to the Bureau's overall mission*." PS 6010.05 §1, Health Services Administration (emphasis added). BOP is responsible for "the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. §4042(a). Providing hormonal interventions to inmates to address gender dysphoria raises serious security and prison-administration concerns. These security and prison-administration concerns independently support Program Statement 5260.01's handling of hormones. At a minimum, the security and prison-administration concerns, when considered separately, cumulatively, or in any combination, outweigh the benefits from a policy handling hormones differently, such as allowing more access to hormones to address gender dysphoria. Thus, after considering the relevant issues and factors and weighing the relevant considerations, BOP determines that it is reasonable and appropriate to adopt Program Statement 5260.01's approach to hormonal interventions to address gender dysphoria.

Using hormonal interventions to address gender dysphoria jeopardizes the security, safety, and prison administration of correctional facilities in at least three ways. First, the inmate receiving hormones will have increased risk of the inmate becoming a target for attacks, which increases harm to the targeted inmate and prison officials tasked with protecting the inmate. Second, special treatments raise fairness concerns and can breed resentment among other inmates, which can lead to violence. Third, granting hormones conflicts with a reasonable practice of refusing to reward threats of self-harm and may even increase self-harm. Each of BOP's security and prison-administration concerns, whether considered cumulatively, separately, or in any combination, outweighs any asserted benefits from a different approach to hormones than the one adopted in Program Statement 5260.01.

First, limiting the availability of hormonal interventions to address gender dysphoria reduces the chance of an inmate being targeted by other inmates. The inmate would inevitably become a target for abuse in the male facility. *Cf., e.g.*, *Keohane*, 952 F.3d at 1275 (noting the "obvious[]" consequence of permitting an inmate to dress and be groomed as a female "would inevitably become a target for abuse in an all-male prison"); *Kosilek*, 774 F.3d at 93 ("Recognizing that reasonable concerns would arise regarding a post-operative, male-to-female transsexual being housed with male prisoners takes no great stretch of the imagination."). And based on BOP's experience and expertise, these same concerns also apply to women's correctional facilities, which also experience meaningful amounts of harassment and violence. *See, e.g.*, Emily Buehler, *Substantiated Incidents of Sexual Victimization Reported by Adult Correctional Authorities*, 2016-2018, U.S. Dep't of Justice, 18 (2023) (noting that 31% of the recorded incidents of inmate-on-inmate sexual harassment occurred in female correctional facilities).

Hormonal interventions not only put the inmate at additional risk of assault or harassment but also endanger "the prison employees who would have to step in to protect" the inmate and will require expending already limited resources to address these risks. *Keohane*, 952 F.3d at 1263.

24

AR-000028

Preventing such attacks would require prison officials to be more vigilant in protecting the inmates from assault or harassment, despite BOP's limited resources.

It is insufficient to point to transfer to mitigate these security and prison-administration complications from providing hormones to address gender dysphoria. For example, a transfer of a male (who is receiving hormones to address gender dysphoria) to a female facility will increase the risk of harm of female inmates. *See* Kaliebe Decl. ¶139 ("[H]ighly relevant is the fact that the presence of a biological male in close quarters in a female prison could significantly harm the emotional and physical well-being of certain female prisoners, such as female victims of sexual abuse. This concern is particularly acute since female prisoners suffer from extremely high rates of sexual trauma. Placing these vulnerable female inmates with biological males could have meaningful negative effects on female inmates."); *see also, e.g.*, *Cruel and Unusual Punishment: Stopping the Dangerous Policies Putting Men in Women's Prisons*, Independent Women's Forum (Dec. 20, 2024). And based on BOP's experience and expertise, similar concerns exist for transfer of a female inmate to a male facility, as the female inmate would be a target by other male prisoners. Moreover, transfer is not medically necessary to address gender dysphoria. *See, e.g.*, Kaliebe Decl. ¶¶23, 157. Transfer to address gender dysphoria is unproven, medically disputed, and controversial. *See* Kaliebe Decl. ¶139 ("There is no reliable study or high-quality evidence suggesting that an inmate being housed in a facility in line with the inmate's gender identity rather than the inmate's biological sex has any meaningful benefits (let alone long-term benefits) to the inmate's Gender Dysphoria symptoms."). It is reasonable for BOP to not provide a transfer to an inmate diagnosed with gender dysphoria (including those receiving hormones), given the security, prison-administration, and medical concerns.

Second, based on BOP's experience and expertise, fairness concerns counsel against broader availability of hormones to address gender dysphoria. When inmates receive special treatment within a correctional environment, other inmates may begin to resent those receiving special treatment, which can increase the risk of retaliation against the inmate receiving special treatment and cause ripple effects throughout the correctional institution and disrupting the delicate prison environment. Fairness concerns are particularly present if such special treatment is provided to one type of facilities (*e.g.*, female facilities) and not another (*e.g.*, male facilities).

Finally, BOP has considered the issue of self-harm and has determined that Program Statement 5260.01's handling of hormones to address gender dysphoria reduces rewarding threats of self-harm and may reduce overall self-harm. Inmates frequently use threats of self-harm and suicide to try to obtain concessions from prison officials. *See, e.g.*, Kaliebe Decl. ¶148 ("In my experience working in correctional facilities and treating adult and juvenile inmates, including those diagnosed with Gender Dysphoria, inmates frequently use threats of self-harm and suicide to try to obtain concessions from prison officials."); *Kosilek*, 774 F.3d at 94 ("Such threats are not uncommon in prison settings ….."). But providing more access to hormones, especially in response to threats of self-harm or suicide, could increase self-harm. *See, e.g.*, Kaliebe Decl. ¶149 ("In corrections, rewarding self-injury or threats of self-injury tends to increase overall self-harm, both for the individual patient and also within the system."). Granting such requests may establish an "unacceptable precedent," forcing "prison authorities to comply with the prisoners' particular demands." *Kosilek*, 774 F.3d at 94. Consequently, it is reasonable for prison administrators to have

25

rules against providing inmates benefits in response to self-harm or suicide to discourage threats. *See* Kaliebe Decl. ¶150 ("Simple and clear institutional policies, such as no social transitions or no initiation of new hormone treatments, are likely to lead to the lowest level of self-harm and the least overall harm to inmates because when prisoners know the interventions they desire are not available, they are less likely to self-harm to obtain them. In other words, it is reasonable for prison administrators to have outright prohibitions of providing inmates benefits, such as unproven surgeries, special-order items, and housing placements, in response to self-harm or suicide threats to discourage false threats."); *Kosilek*, 774 F.3d at 94 (noting that such threats must be "firm[ly] reject[ed] by the authorities, who must be given ample discretion in the dealing with such situations"). BOP determines that Program Statement 5260.01's approach as to hormones is the most reasonable way to handle this complex issue. BOP takes threats of self-harm seriously and has protocols in place to handle these complex situations.

After considering the relevant issues and factors and weighing the relevant considerations, BOP determines that each of its security and prison-administration concerns, whether considered separately, cumulatively, or in any combination, outweighs any asserted benefits of providing hormones in a broader way that differs from the approach adopted by Program Statement 5260.01. Specifically, each of the above security and prison-administration concerns, whether considered separately, cumulatively, or in any combination, support not providing hormones to address gender dysphoria to an inmate who is not currently receiving hormones. Each of the above security and prison-administration concerns, whether considered separately, cumulatively, or in any combination, also support providing tapering plans that include a rapid discontinuation of hormones for inmates who recently begun receiving hormones to address gender dysphoria. These concerns further support providing tapering plans that include an appropriately paced discontinuation of hormones for inmates who have been receiving hormones to address gender dysphoria for an extended period of time. And these concerns support the approach with respect to inmates who are post sex trait modification surgery or have been receiving hormones to address gender dysphoria for an extended period of time and develop severe physiological and psychological withdrawal effects from tapering. BOP has determined that it is reasonable to tolerate some of these security and prison-administration concerns for inmates that present the complex situation described above in the way that Program Statement 5260.01 handles hormones for these inmates. In addition, after considering the relevant issues and factors and weighing the relevant considerations, BOP determines that the medical concerns discussed above when considered with any of its security and prison-administration concerns—separately, cumulatively, or in any combination—outweighs any asserted benefits of providing hormones in a way that differs from the approach adopted by Program Statement 5260.01.

### 3.   Other considerations do not outweigh the benefits from Program Statement 5260.01.

#### a.   *Reliance Interests and Costs*

BOP has also considered potential reliance interests, but the potential reliance interests are either illegitimate or outweighed by the benefits of Program Statement 5260.01. Indeed, after considering the relevant issues and factors and weighing the relevant considerations, BOP

AR-000030

determines that each of its medical, security, and prison-administration concerns, whether considered separately, cumulatively, or in any combination, outweighs the asserted benefits, interests, or costs of providing hormones to address gender dysphoria in a way that differs from the approach adopted in Program Statement 5260.01.

As an initial matter, Program Statement 5260.01 prohibits providing hormones to inmates who are not currently receiving hormones to address gender dysphoria, and an inmate has no reasonable reliance interest in the future possibility of obtaining hormones. That is especially true because hormones are not medically necessary or at a minimum, controversial or medically disputed. It is reasonable for BOP to not provide medically disputed or insufficiently proven interventions to inmates who are not currently receiving the medically disputed intervention.

As for inmates currently receiving hormones to address gender dysphoria, these inmates' reliance interests are at best in the provision of "medically necessary health care to inmates effectively in accordance with proven standards of care without compromising public safety concerns inherent to the Bureau's overall mission." PS 6010.05 §1, Health Services Administration. In BOP's judgment, Program Statement 5260.01 is designed to provide such care.

In any event, even if the availability of hormones to address gender dysphoria create legitimate reliance interests, the interests are not sufficiently weighty to outweigh the benefits of Program Statement 5260.01. Access to hormones has always been subject to security concerns. *See, e.g.*, PS 6010.05 § 1, Health Services Administration. Moreover, BOP policies have always been subject to change, including based on new medical studies, security concerns, and prison-administration concerns.

Moreover, implementing Program Statement 5260.01 will incur, at most, *de minimis* costs and will likely lead to savings. Program Statement 5260.01 will mitigate security and prison-administration concerns, which will reduce costs. Program Statement 5260.01 will also reduce expenditures on medical interventions that are not medically necessary or medically disputed. Expenditures on care for inmates diagnosed with gender dysphoria are unlikely to meaningfully increase. In general, even if an inmate is receiving hormones, BOP officials would monitor the inmate patient and provide the inmate patient with an individualized treatment plan, which would generally have care in addition to the provision of hormones. To the extent that Program Statement 5260.01 would result in increased costs, it is outweighed by other considerations or the savings from reduced availability of hormones.

In sum, after considering the relevant issues and factors and weighing the relevant considerations, each of BOP's medical, security, and prison-administration concerns, whether considered separately, cumulatively, or in any combination, significantly outweigh any reliance interests created by a former policy that provided more access to hormones than the approach adopted in Program Statement 5260.01. In BOP's judgment, Program Statement 5260.01's handling of hormones to address gender dysphoria is reasonable and in the best interest of the agency, its officials, and those in its custody.

27

### b.    Alternatives

BOP has considered alternatives and has determined that Program Statement 5260.01 is more reasonable than and preferable to potential alternatives.

For example, BOP has considered a policy allowing hormones to inmates diagnosed with gender dysphoria but are not currently receiving hormones to address gender dysphoria, such as on a case-by-case basis. Such an approach is not warranted because of BOP's medical concerns. Even if there are benefits to the alternative approach as to hormones for inmates currently not receiving hormones, BOP has determined that the alternative approach would not adequately minimize the above security and prison-administration concerns to justify the alternative. In BOP's judgment, Program Statement 5260.01's approach to hormones for inmates not currently receiving hormones is preferable to this alternative approach.

BOP has considered a policy allowing case-by-case determinations on whether to adopt tapering plans for inmates who have recently begun receiving hormones. Such an approach is not warranted because of BOP's medical concerns. In BOP's judgment, any effects from tapering, including a rapid discontinuation of hormones, for inmates who recently began receiving hormones are outweighed by the benefits of not providing a medically disputed medical intervention that can prolong symptoms of gender dysphoria, undermine other treatments to address gender dysphoria, worsen symptoms of gender dysphoria, and cause physical and psychological harm, including harm that is potentially irreversible. Even if there are benefits to the alternative approach as to hormones for inmates who recently began receiving hormones, BOP has determined that the alternative approach would not adequately minimize the above security and prison-administration concerns to justify the alternative. In BOP's judgment, Program Statement 5260.01's approach to hormones for inmates who recently begun receiving hormones is preferable to this alternative approach.

BOP has considered an alternative that allows case-by-case determinations on whether to adopt tapering plans for inmates who have been receiving hormones for an extended period of time. Such an approach is not warranted because of BOP's medical concerns. In BOP's judgment, any effects from tapering for inmates have been receiving hormones for an extended period of time are outweighed by the benefits of not continuing to provide a medically disputed medical intervention that can prolong symptoms of gender dysphoria, undermine other treatments to address gender dysphoria, worsen symptoms of gender dysphoria, and cause physical and psychological harm, including harm that is potentially irreversible. The potential harm is further minimized by Program Statement 5260.01's approach to cessation of hormones for inmates who (1) are post sex trait modification surgery or (2) have been receiving hormones to address gender dysphoria for an extended period of time and develop severe physiological and psychological withdrawal effects from tapering. And the potential harm is even further minimized by the ability of inmate patients under Program Statement 5260.01 to request additional medical or mental health care or evaluation if they have acute concerns during the tapering process. Moreover, even if there are benefits to the alternative approach as to hormones for inmates who have been receiving hormones for an extended period of time, BOP has determined that this alternative approach would not adequately minimize the above concerns to justify the alternative. In BOP's judgment, Program

28

AR-000032

Statement 5260.01's approach to hormones for inmates who have been receiving hormones more an extended period of time is preferable to this alternative approach.

BOP has also considered and rejected an alternative that allows inmates to pay for hormones to address gender dysphoria when BOP would not provide such hormones. Such an alternative does not sufficiently mitigate the medical, security, or prison-administration concerns of allowing hormones when BOP would not provide such hormones. In BOP's judgment, Program Statement 5260.01's approach to hormones is preferable to this alternative approach.

Finally, BOP has considered other alternatives, including a combination of the above alternatives, but BOP has determined that Program Statement 5260.01's approach to hormones is preferable to alternative approaches and is the most reasonable approach for addressing this issue.

*    *    *

In sum, BOP issues Program Statement 5260.01 independent of Executive Order 14,168 and after considering the relevant issues and factors and weighing the relevant considerations. Program Statement 5260.01's approach to hormones is justified by the medical concerns of the intervention. Security and prison-administration concerns bolster that determination. Further, even assuming there are medical benefits to inmates from hormones, Program Statement 5260.01's handling of hormones is justified by security and prison-administration concerns, as each of those interests, whether considered separately, cumulatively, or in any combination, outweigh any costs of Program Statement 5260.01, any reliance interests, and any benefits from broader availability of hormones. BOP also concludes that Program Statement 5260.01's handling of hormones is preferable to and more reasonable than potential alternatives. After considering the relevant issues and factors and weighing the relevant considerations, BOP determines that Program Statement 5260.01's approach to hormones is reasonable.

## D.    Other Aspects of Program Statement 5260.01

After considering the relevant issues and factors and weighing the relevant considerations, including reliance interests, costs, and potential alternatives, BOP adopts the other aspects of Program Statement 5260.01.

For example, under Program Statement 5260.01, identified medical and psychiatric comorbidities, which can complicate treatment for gender dysphoria, should generally be addressed before treatment for gender dysphoria proceeds. *See, e.g.*, Kaliebe Decl. ¶¶55-57; Florida Dep't of Corrections, Policy 15.05.23, 3-4 (Sept. 30, 2024) ("All medical and psychiatric comorbidities must be identified as these comorbidities can complicate the treatment of Gender Dysphoria."). As appropriate, medical and psychiatric comorbidities should be addressed through psychotherapy, psychotropic medication, or other appropriate medically accepted interventions. *See, e.g.*, Kaliebe Decl. ¶¶55-59. When comorbidities are addressed before gender dysphoria, further treatment for gender dysphoria may be necessary and may proceed once these medical and psychiatric comorbidities are resolved or ruled out as the potential cause of gender dysphoria.

Moreover, psychotherapy should be prioritized. Psychotherapy is a well-known and well-established treatment for gender dysphoria and helps patients while avoiding the use of potentially

29

AR-000033

irreversible medical interventions. *See, e.g.*, Kaliebe Decl. at page 14 ("Psychotherapy is the preferred treatment approach for Gender Dysphoria, particularly within correctional environments."); *see also, e.g.*, Kaliebe Decl. ¶¶43-59; *K.C.*, 121 F.4th at 610-11 ("Social support and psychotherapy are widely recognized approaches" to treating gender dysphoria. (citing Danyon Anderson et al., *Gender Dysphoria and Its Non-Surgical and Surgical Treatments*, 10 Health Psych. Rsch., at 4 (2022))).

Again, BOP provides individualized treatment plans to address gender dysphoria, which may include psychotherapy, group counseling, psychiatric services, and psychotropic medications. Nothing in Program Statement 5260.01 prevents a prison official from providing care required by federal law, including the Eighth Amendment to the U.S. Constitution. And Program Statement 5260.01 requires BOP to ensure that all inmates diagnosed with gender dysphoria receive care in accordance with federal law, including the Eighth Amendment to the U.S. Constitution. In BOP's judgment, the other aspects of Program Statement 5260.01 are preferable to potential alternatives and reasonable in light of the relevant issues and factors. The costs for these other aspects of Program Statement 5260.01 are *de minimis* and outweighed by their benefits. Any reliance interests are outweighed by the benefits of these other aspects of Program Statement 5260.01 and Program Statement 5260.01 as a whole. After considering the relevant issues and factors and weighing the relevant considerations, BOP determines that the other aspects of Program Statement 5260.01 is reasonable.

## III.    Severability

Each of the provisions of Program Statement 5260.01 serve an important, related, but distinct purpose. BOP also confirms that each of the provisions in Program Statement 5260.01 is intended to operate independently of each other and that the potential invalidity of one provision should not affect the other provisions. Accordingly, if any provision of Program Statement 5260.01, or the application of any provision of Program Statement 5260.01 to any individual or circumstance, is held to be invalid, the remainder of Program Statement 5260.01 and the application of its provisions to any other individuals or circumstances shall not be affected.

For example, if a court concludes that the aspect or any aspect of Program Statement 5260.01 regarding hormones or social accommodations is unlawful, BOP would still prohibit sex trait modification surgeries. Program Statement 5260.01's prohibition on sex trait modification surgeries, even without the provisions on hormones or social accommodations, would still reasonably address the applicable medical, security, and prison-administration concerns; outweigh any costs, reliance interests, and countervailing benefits; and be more reasonable than and preferable to potential alternatives.

If a court concludes that the aspect of Program Statement 5260.01 regarding hormones or sex trait modification surgeries is unlawful, BOP would still prohibit social accommodations. Program Statement 5260.01's prohibition on social accommodations, even without the provisions on hormones or sex trait modification surgeries, would still reasonably address the applicable medical, security, and prison-administration concerns; outweigh any costs, reliance interests, and countervailing benefits; and be more reasonable than and preferable to potential alternatives.

AR-000034

If a court concludes that the aspect of Program Statement 5260.01 regarding hormones is unlawful, BOP would still prohibit sex trait modification surgeries and social accommodations. Program Statement 5260.01's prohibition on sex trait modification surgeries and social accommodations, even without the provisions on hormones, would still reasonably address the applicable medical, security, and prison-administration concerns; outweigh any costs, reliance interests, and countervailing benefits; and be more reasonable than and preferable to potential alternatives.

If a court concludes that any part of Program Statement 5260.01 regarding hormones is unlawful, BOP would still adopt the other aspects of Program Statement 5260.01 with respect to hormones. For instance, Program Statement 5260.01's prohibition on hormones for inmates with gender dysphoria who are not current receiving hormones, even without the other provisions on hormones, would still reasonably address the applicable medical, security, and prison-administration concerns; outweigh any costs, reliance interests, and countervailing benefits; and be more reasonable than and preferable to potential alternatives. Program Statement 5260.01's provision on hormones for inmates with gender dysphoria who recently begun receiving hormones, even without the provisions on hormones for inmates who have been receiving hormones for an extended period of time, would still reasonably address the applicable medical, security, and prison-administration concerns; outweigh any costs, reliance interests, and countervailing benefits; and be more reasonable than and preferable to potential alternatives.

To give another example, if a court concludes that Program Statement 5260.01 cannot be retroactive to remove already issued social accommodations, then BOP would apply that aspect of Program Statement 5260.01 prospectively, such that no social accommodations will be provided in the future. Although continuing to allow accommodations already granted may lead to medical, security, and prison-administration harms that Program Statement 5260.01 seeks to avoid, the benefits from a prohibition on future social accommodations would still outweigh any costs, reliance interests, and countervailing benefits and be preferable to a policy allowing more access to social accommodations.

To be sure, BOP has determined that every provision of Program Statement 5260.01 is legally supportable, individually and in the aggregate, but include this discussion to remove any doubt that it would have adopted the remaining provisions of Program Statement 5260.01 without any of the other provisions, should any of them or any application of them be deemed unlawful by a court. The intent of Program Statement 5260.01 is for federal funds to not be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex to the maximum extent permitted by law, including the Eighth Amendment to the U.S. Constitution. Nothing in Program Statement 5260.01 shall prevent a prison official from providing care required by federal law, including the Eighth Amendment to the U.S. Constitution. BOP shall ensure that all inmates diagnosed with gender dysphoria receive care in accordance with federal law, including the Eighth Amendment to the U.S. Constitution. And nothing in Program Statement 5260.01 is intended, nor shall it be construed, to create a private cause of action.

AR-000035

## IV.       Non-Exhaustive List of References

### A.       Case Law

- *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695 (D.C. Cir. 2007)

- *Bayse v. Ward*, 147 F.4th 1304 (11th Cir. 2025)

- *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002)

- *Boe v. Marshall*, No. 2:22-cv-00184 (M.D. Ala. 2023)

- *Booth v. Churner*, 532 U.S. 731 (2001)

- *Borum v. Brentwood Vill., LLC*, 324 F.R.D. 1 (D.D.C. 2018)

- *Bucklew v. Precythe*, 587 U.S. 119 (2019)

- *Califano v. Yamasaki*, 442 U.S. 682 (1979)

- *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106 (N.D. Cal. 2017)

- *Cayuga Nation v. Zinke*, 302 F. Supp. 3d 362 (D.D.C. 2018)

- *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)

- *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024)

- *Clark v. Valletta*, 157 F.4th 201 (2d Cir. 2025)

- *Columbia Gulf Transmission v. FERC*, 106 F.4th 1220 (D.C. Cir. 2024)

- *Common Cause v. Trump*, 506 F. Supp. 3d 39 (D.D.C. 2020)

- *ConverDyn v. Moniz*, 68 F. Supp. 3d 34 (D.D.C. 2014)

- *Damus v. Nielsen*, 313 F. Supp. 3d 317 (D.D.C. 2018)

- *Diamond v. Ward*, No. 20-cv-00453 (M.D. Ga. 2021)

- *Doe 2 v. Trump*, 319 F. Supp. 3d 539 (D.D.C. 2018)

- *Doe v. McKenry*, 763 F. Supp. 3d 81 (D.D.C. 2025)

- *Druley v. Patton*, 601 F. App'x 632 (10th Cir. 2015)

- *Edmo v. Corizon, Inc.*, 949 F.3d 489 (9th Cir. 2020)

- *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023)

- *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241 (11th Cir. 2024)

- *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016)

- *Estelle v. Gamble*, 429 U.S. 97 (1976)

- *Eubanks v. Billington*, 110 F.3d 87 (D.C. Cir. 1997)

32

- *Farmer v. Brennan*, 511 U.S. 825 (1994)

- *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)

- *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)

- *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542 (2025)

- *Fisher v. Fed. Bureau of Prisons*, 484 F. Supp. 3d 521 (N.D. Ohio 2020)

- *Franklin v. Massachusetts*, 505 U.S. 788 (1992)

- *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982)

- *Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019)

- *Green v. Polunsky*, 229 F.3d 486 (5th Cir. 2000)

- *Hanson v. District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024)

- *Haverkamp v. Linthicum*, 152 F.4th 618 (5th Cir. 2025)

- *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263 (11th Cir. 2020)

- *Husky Mktg. & Supply Co. v. FERC*, 105 F.4th 418 (D.C. Cir. 2024)

- *Hudson v. McMillian*, 503 U.S. 1 (1992)

- *In re Integra Realty Res., Inc.*, 354 F.3d 1246 (10th Cir. 2004)

- *Jones v. Bock*, 549 U.S. 199 (2007)

- *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024)

- *Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008)

- *K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, 121 F.4th 604 (7th Cir. 2024)

- *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257 (11th Cir. 2020)

- *Keohane v. Fla. Dep't of Corr. Sec'y*, 981 F.3d 994 (11th Cir. 2020)

- *Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2024) (en banc)

- *Kress v. CCA of Tennessee, LLC*, 694 F.3d 890 (7th Cir. 2012)

- *Lamb v. Norwood*, 899 F.3d 1159 (10th Cir. 2018)

- *Lange v. Houston Cnty.*, 152 F.4th 1245 (11th Cir. 2025) (en banc)

- *Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577 (7th Cir. 2000)

- *Lightfoot v. District of Columbia*, 273 F.R.D. 314 (D.D.C. 2011)

- *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023)

- *Marcum v. Crews*, No. 5:25-cv-00238, 2025 WL 2630922 (E.D. Ky. Sept. 12, 2025)

- *Marcum v. Crews*, No. 25-5840, Dkt. 26 (6th Cir. Oct. 23, 2025)

33

- *McCarthy v. Madigan*, 503 U.S. 140 (1992)

- *Mississippi v. Johnson*, 71 U.S. 475 (1866)

- *Money v. Pritzker*, 453 F. Supp. 3d 1103 (N.D. Ill. 2020)

- *NRDC v. DOE*, 362 F. Supp. 3d 126 (S.D.N.Y. 2019)

- *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032 (D.C. Cir. 2012)

- *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34 (D.D.C. 2011)

- *Newdow v. Roberts*, 603 F.3d 1002 (D.C. Cir. 2010)

- *Nez Perce Tribe v. Kempthorne*, No. 06-2239 (JR), 2008 WL 11408458 (D.D.C. Dec. 1, 2008)

- *Nken v. Holder*, 556 U.S. 418 (2009)

- *Ortiz v. Fireboard Corp.*, 527 U.S. 815 (1999)

- *Otto v. Boca Raton*, 981 F.3d 854 (11th Cir. 2020)

- *Ramirez v. U.S. Immigr. & Customs Enf't*, 338 F. Supp. 3d 1 (D.D.C. 2018)

- *Ross v. Blake*, 578 U.S. 632 (2016)

- *Rouse v. Plantier*, 182 F.3d 192 (3d Cir. 1999)

- *Sabata v. Nebraska Dep't of Corr. Servs.*, 337 F.R.D. 215 (D. Neb. 2020)

- *Sampson v. Murray*, 415 U.S. 61 (1974)

- *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168 (2025)

- *Sherley v. Sebelius*, 689 F.3d 776 (D.C. Cir. 2012)

- *Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597 (10th Cir. 2008)

- *Sissel v. Wormuth*, 77 F.4th 941 (D.C. Cir. 2023)

- *Smith v. Hodge Unit Staff & Admin.*, No. 6:23CV268, 2024 WL 5346411 (E.D. Tex. Dec. 6, 2024)

- *Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024)

- *Sullivan v. Cnty. of Pierce*, 216 F.3d 1084 (9th Cir. 2000)

- *Torres v. Del Toro*, No. 1:21-cv-306-RCL, 2021 WL 4989451 (D.D.C. Oct. 7, 2021)

- *United States v. Salerno*, 481 U.S. 739 (1987)

- *United States v. Skrmetti*, 605 U.S. 495 (2025)

- *VanDerStok v. Garland*, 633 F. Supp. 3d 847 (N.D. Tex. 2022)

- *Wade v. McDade*, 106 F.4th 1251 (11th Cir. 2024) (en banc)

34

- *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008)

- *Winter v. NRDC*, 555 U.S. 7 (2008)

- *Wis. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)

- *Women Prisoners of D.C. Dep't of Corrections v. District of Columbia*, 93 F.3d 910 (D.C. Cir. 1996)

- *Woodford v. Ngo*, 548 U.S. 81 (2006)

## B.    Medical Expert Reports

- Expert Report of Kristopher E. Kaliebe, M.D., dated September 19, 2025

## C.    Journals, Media, and Reports

- Abbruzzese, E., Byrne, A., Curlin, F., Gorin, M., Kaliebe, K., Laidlaw, M. K., McDeavitt, K., Sapir, L., & Zhang, Y. (2025). Treatment for pediatric gender dysphoria: Review of evidence and best practices. U.S. Dep't of Health and Human Services. https://opa.hhs.gov/sites/default/files/2025-11/gender-dysphoria-report.pdf

- Adams, N., Hitomi, M., & Moody, C. (2017). Varied reports of adult transgender suicidality: Synthesizing and describing the peer-reviewed and gray literature. Transgender Health, 2(1), 60–75. https://doi.org/10.1089/trgh.2016.0036 (pmc.ncbi.nlm.nih.gov)

- Albar, Koziarz, McMahon, et al., Timing of testosterone discontinuation and assisted reproductive technology outcomes in transgender patients: a cohort study, Fertility & Sterility Report (2023).

- Aldrich, J., Kant, J., & Gramszlo, E. (June 2023). Gender-affirming care, incarceration, and the eight amendment. Health Law, 25 (6): E407-413. Doi: 10.1001/amajethics.2023.407.

- American Academy of Pediatrics. (2025). AAP speaks out against HHS report on gender dysphoria, medical organizations' statements (M. Del Monte, Interviewer) [News article]. AAP News. https://publications.aap.org/aapnews/news/32145/AAP-speaks-out-against-HHS-report-on-gender?autologincheck=redirected

- American Psychiatric Association (2022). Diagnostic and statistical manual of mental disorders (5-TR). American Psychiatric Association. (pages 511-520). *suicide risk page 518-519.

- American Psychological Association (2017). Ethical principles of psychologists and code of conduct (2002, amended effective June 1, 2010 and January 1, 2017). https://www.apa.org/ethics/code/.

- American Psychological Association. (Dec. 2015). Guidelines for psychological practice with transgender and gender nonconforming people. American Psychological Association, 70 (9), 832-864. http://dx.doi.org/10.1037/a0039906.

AR-000039

- American Psychological Association. (Feb. 2024). APA policy statement on affirming evidence-based inclusive care for transgender, gender-diverse, and nonbinary individuals, addressing misinformation, and the role of psychological practice and science. American Psychological Association.

- Amicus Brief of Idaho, Indiana, 23 other States, and the Arizona Legislature, in support of appellants, *Doe v. Bondi*, Nos. 25-5099, 25-5101, 25-5108 (D.C. Cir. filed May 16, 2025).

- Amicus Brief of Idaho, 19 other States, and the Arizona Legislature, in support of appellants, *Benjamin v. Oliver*, No. 25-14263 (11th Cir. filed Jan. 9, 2026).

- Anderson D, Wijetunge H, Moore P, Provenzano D, Li N, Hasoon J, Viswanath O, Kaye AD, Urits I. Gender dysphoria and its non-surgical and surgical treatments. Health Psychol Res. 2022 Sep 23;10(3):38358. doi: 10.52965/001c.38358. PMID: 36168640; PMCID: PMC9501960.

- Anne Lawrence, Patient-Reported Complications and Functional Outcomes of Male-to-Female Sex Reassignment Surgery, Archives of Sexual Behavior (2006).

- Baker KE, Wilson LM, Sharma R, Dukhanin V, McArthur K, Robinson KA, Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review, J Endocr Soc. 2021 Feb 2;5(4):bvab011. doi: 10.1210/jendso/bvab011. PMID: 33644622; PMCID: PMC7894249.

- Block, J., Dispute arises over World Professional Association for Transgender health's involvement in WHO's trans health guideline. BMJ Investigation, 387 (Oct. 30, 2024), doi:10/1136/bmj.q2227

- Buehler, Emily, Substantiated Incidents of Sexual Victimization Reported by Adult Correctional Authorities, 2016-2018, U.S. Dep't of Justice (2023)

- Carretta, R., McKee, S., Rhee, T. (2023). Gender differences in risks of suicide and suicidal behaviors in the USA: A Narrative Review. Current Psychiatry Reports, (25), 809-824.

- Coalition of Correctional Healthcare Authorities (CCHA), Correctional Health Policy Priorities (2025)

- Cohort profile: Study of Transition, Outcomes and Gender (STRONG) to assess health status of transgender people. Quinn VP, Nash R, Hunkeler E, et al. Cohort profile: Study of Transition, Outcomes and Gender (STRONG) to assess health status of transgender people. BMJ Open 2017;7:e018121.doi:10.1136/bmjopen-2017-018121

- Coleman, E., Radix, A. E., Bouman, W. P., Brown, G. R., De Vries, A. L. C., Deutsch, M. B., Ettner, R., Fraser, L., Goodman, M., Green, J., Hancock, A. B., Johnson, T. W., Karasic, D. H., Knudson, G., Leibowitz, S., Meyer-Bahlburg, H. F. L., Monstrey, S. J., Motmans, J., Nahata, L., Arcelus, J. (2022). Standards of care for the health of transgender and gender diverse people, version 8. International Journal of Transgender Health, 23(Suppl. 1), S1–S259. https://doi.org/10.1080/26895269.2022.2100644.

36

- Costa & Colizzi, The effect of cross-sex hormonal treatment on gender dysphoria individuals' mental health: a systematic review: Dove Press Journal, Neuropsychiatric Disease and Treatment (2016).

- Crosby, A. E., Ortega, L. A. G., & Melanson, C., Self-directed violence surveillance: Uniform definitions and recommended data elements, version 1.0, Centers for Disease Control and Prevention, National Center for Injury Prevention and Control (2011).

- Cruel and Unusual Punishment: Stopping the Dangerous Policies Putting Men in Women's Prisons, Independent Women's Forum (Dec. 20, 2024), https://www.independentwomen.com/cruel-and-unusual-punishment-report/.

- Defining a danger zone for iatrogenic long thoracic nerve injury in gender-affirming mastectomy, Journal of Plastic, Reconstructive & Aesthetic Surgery (Jan. 2025).

- Derek Bagley, Reducing Transgender Surgery Side Effects, Endocrine Society (2021).

- Drakeford, L., Correctional policy and attempted suicide among transgender individuals. Journal of Correctional Health Care, 24(2), 171-82 (2018), https://doi.org/10.1177/1078345818764110.

- Endocrine Society Clinical Practice Guideline: Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons (2017).

- Evans, D. (2002, Dec 20). Hierarchy of evidence: a framework for ranking evidence evaluating healthcare interventions. Journal of Clinical Nursing, 12(1): 77-84. Doi:10.1046/j.1365-2702.2003.00662.x.

- Examining gender-specific mental health risks after gender-affirming surgery: a national database study. Journal of Sexual Medicine, 2025, Vol. 00, Issue 00.

- Fenway Health Transgender Health Conference, Advancing Excellence in Transgender Health (2018).

- Fraser, L. (2015). Gender Dysphoria: Definition and Evolution Through the Years. In: Trombetta, C., Liguori, G., Bertolotto, M. (eds) Management of Gender Dysphoria. Springer, Milano. https://doi.org/10.1007/978-88-470-5696-1_3.

- Gaffney, T. (2023, Sept 15). Randomized controlled trials are the 'gold standard' of research—but a difficult fit for trans care. Statnews. Retrieved from The challenges of running trials on gender-affirming care.

- Galvin, G. (2024, Dec 13). Several countries have restricted the use of puberty blockers, citing insufficient evidence on their benefits for gender-questioning youth and potential long-term effects. Euronews. Retrieved from https://www.euronews.com/health/2024/12/13/the-uk-is-the-latest-country-to-ban-puberty-blockers-for-trans-kids-why-is-europe-restrict.

37

- García-Vega E, Camero A, Fernández M, Villaverde A. Suicidal ideation and suicide attempts in persons with gender dysphoria. Psicothema. 2018 Aug;30(3):283-288. doi: 10.7334/psicothema2017.438. PMID: 30009750.

- Gender-affirming treatment and mental health diagnoses in Danish transgender persons: a nationwide register-based cohort study. European Journal of Endocrinology, 2023, 189, 336-345, https://doi.org/10.1093/ejendo/lvad119.

- Gurrala, Rakesh R., et al., The Impact of Exogenous Testosterone on Breast Cancer Risk in Transmasculine Individuals, 90(1) Annals of Plastic Surgery 96 (2023).

- Haupt, et al., Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women, 11 Cochrane Database of Systematic Reviews, Art. No. CD013138, at 2, 11 (2020).

- Herman, J. and O'Neill, K. Fact Sheet: Suicide Risk and Prevention for Transgender People: Summary of Research Findings. UCLA School of Law Williams Institute (Sept. 2021).

- Hruz, P. W. (2020). Deficiencies in scientific evidence for medical management of gender dysphoria. The Linacre Quarterly, 87(1), 34–42. https://doi.org/10.1177/0024363919873762.

- Jackson D. Suicide-related outcomes following gender-affirming treatment: A review. Cureus. 2023 Mar 20;15(3):e36425. doi: 10.7759/cureus.36425. PMID: 36950718; PMCID: PMC10027312.

- Jacobs, P., Researchers slam HHS report on gender-affirming care for youth, Science (May 2, 2025), https://www.science.org/content/article/researchers-slam-hhs-report-gender-affirming-care-youth.

- Kaltiala, R., Helminen, M., Holttinen, T., & Tuisku, K. (2024). Discontinuing hormonal gender reassignment: A nationwide register study. BMC Psychiatry, 24, Article 566. https://doi.org/10.1186/s12888-024-06005-6 (bmcpsychiatry.biomedcentral.com).

- Klaver, M., Dekker, M.J.H.J., de Mutsert, R., Twisk, J.W.R, den Heijer, M. (2017, Jun). Cross-sex hormone therapy in transgender persons affects total body weight, body fat and lean body mass: a meta-analysis. Andrologia, 49(5). doi:10.1111/and.12660.

- Kohnepoushi, P., Nikouei, M., Cheraghi, M., Hasanabadi, P., Rahmani, H., Moradi, M., Moradi, G., Moradpour, F., & Moradi, Y. (2023). Prevalence of suicidal thoughts and attempts in the transgender population of the world: A systematic review and meta-analysis. Annals of General Psychiatry, 22(1), Article 28. https://doi.org/10.1186/s12991-023-00460-3.

- Krug, E. G., Dahlberg, L. L., Mercy, J. A., Zwi, A. B., & Lozano, R. (Eds.). (2002). World report on violence and health. World Health Organization. https://www.who.int/publications/i/item/9241545615.

AR-000042

- Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweeden. Dhejne C, Lichtenstein P, Boman M, Johansson ALV, Långström N, Landén M (2011) Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden. PLoS ONE 6(2): e16885. https://doi.org/10.1371/journal.pone.0016885.

- MacKinnon, K. R., Kia, H., Salway, T., Ashley, F., Lacombe-Duncan, A., Abramovich, A., Enxuga, G., & Ross, L. E. (2022). Health care experiences of patients discontinuing or reversing prior gender-affirming treatments. JAMA Network Open, 5(7), e2224717. https://doi.org/10.1001/jamanetworkopen.2022.24717 (jamanetwork.com).

- National LGBTQ+ Bar Association. (2022). Resource guide to improve safety in carceral housing for transgender people. https://lgbtqbar.org/programs/ti-project/.

- O. Moffit & J. C. Findley, A case report of first-onset psychosis in transgendered female, Gynecological Endocrinology (2016).

- Office of the Inspector General (OIG). (2020). OIG special report: The California Department of Corrections and Rehabilitation has taken thoughtful and important steps to address the difficult conditions of confinement for incarcerated transgender, nonbinary, and intersex individuals. California Office of the Inspector General. https://oig.ca.gov/reports.

- Philadelphia Trans-Health Conference (June 12-14, 2014).

- Restar, A. J., Layland, E. K., Davis, B., Thompson, H., & Streed, C. (2024). The public health crisis state of transgender health care and policy. American Journal of Public Health, 114(2), 161–163. https://doi.org/10.2105/AJPH.2023.307523.

- Risk of Suicide and Self-Harm Following Gender-Affirmation Surgery. Straub J J, Paul K K, Bothwell L G, et al. (April 02, 2024) Risk of Suicide and Self-Harm Following Gender-Affirmation Surgery. Cureus 16(4): e57472. DOI 10.7759/cureus.57472.

- Roberts, C. M., Klein, D. A., Adirim, T. A., Schvey, N. A., & Hisle-Gorman, E. (2022). Continuation of gender-affirming hormones among transgender adolescents and adults. The Journal of Clinical Endocrinology & Metabolism, 107(9), e3937–e3943. https://doi.org/10.1210/clinem/dgac251.

- Robinson, L., Dupre, J., Huselid, A., Burke, S. (May 2024). The present state of housing and treatment of transgender incarcerated persons. The Journal of the American Academy of Psychiatry and the Law, 52 (2). DOI: 10.29158/JAAPL.240020-24.

- Sinclair, J.C. (2003 Jun). Weighing risks and benefits in treating the individual patient. Clinics in Perinatology, 30(20). 251-268.

- Sinsky, C.A., Bavafa, H., Roberts, R.G., & Beasley, J.W. (2021, Mar-Apr). Standardization vs customization: finding the right balance. Annals of Family Medicine, 19(2), 171-177. Doi:10.1370.afm.2654.

39

- Spanos, C., Bretherton, I., Zajac, J.D., Cheung, A.S. (2020, Mar 15). Effects of gender-affirming hormone therapy on insulin resistance and body composition in transgender individuals: A systematic review. World Journal of Diabetes, 11(3):66-77.doi: 10.4239/wjd.v11.i3.66.

- Stuenkel, Davis, Gompel, et al, Treatment of Symptoms of the Menopause: An Endocrine Society Clinical Practice Guideline, The Journal of Clinical Endocrinology & Metabolism, Volume 100, Issue 11 (2015).

- Suffoletto & Hess, Tapering vs. Cold Turkey: Symptoms vs. Successful Discontinuation of Menopausal Hormone Therapy. National Institute of Health, NIH Public Access, (2010).

- The Cass Review, Independent Review of Gender Identity Services for Children and Young People: Final Report (April 2024), https://perma.cc/D728-LUM8.

- The Economist: Research into trans medicine has been manipulated. https://www.economist.com/united-states/2024/06/27/research-into-trans-medicine-has-been-manipulated.

- The Endocrine Society's Clinical Guidelines. Endocrine Treatment of Transsexual Persons (2009).

- The Moss Group, Inc. (2022). SB 132 the Transgender Respect, Agency, and Dignity Act implementation review report. The Moss Group, Inc.

- Thematic Analysis of Lived Experience in Patients With Adult Acquired Buried Penis. The Journal of Urology, Vol. 206, No. 3S, Supplement, Friday, September 10, 2021.

- transgender individuals: a systematic review. Transgender Health, 8(1):6-21. doi: 10.1089/trgh.2020.0094.

- U.S. Dep't of Health and Human Services, HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures, https://www.hhs.gov/press-room/hhs-releases-peer-reviewed-report-discrediting-pediatric-sex-rejecting-procedures.html.

- U.S. Dep't of Health and Human Services, The Perioperative Care of the Transgender Patient, Tollinche, Walters, Radix (2018).

- Uchimura, L.Y.T., Yonekura, T., Figueiró, M.F., Quintans, J.R., Freire, P., & Maia, F.H.A. (2025, Jan 10). Hormone therapy and cancer risks in transgender people: a systematic review. Epidemiologia e Servicios de Saude, 33(spe1):e2024319. doi: 10.1590/S2237-96222024v33e2024319.especial.en.

- University of California San Francisco. (n.d.) Gender affirming health program. Retrieved from https://transcare.ucsf.edu/guidelines.

- University of California, San Francisco Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People (2016).

AR-000044

- Van Leerdam, T.R., Zajac, J.D., Cheung, A.S., The Effect of Gender-Affirming Hormones on Gender Dysphoria, Quality of Life, and Psychological Functioning in Transgender Individuals: A Systematic Review (Feb. 8, 2023), doi: 10.1089/trgh.2020.0094.

- Van Zijverden, L.M., Wiepjes, C.M., van Diemen, J.J.K, Thijs, A., & den Heijer, M. (2024, Feb 1). Cardiovascular disease in transgender people: a systematic review and meta-analysis. European Journal of Endocrinology, 190(2), S13-S24. doi:10.1093/ejendo/lvad170.

- White Hughto, J.M., & Reisner, S.L. (2016, Jan 13). A systematic review of the effects of hormone therapy on psychological functioning and quality of life in transgender individuals. Transgender Health, 1(1):21-31. doi: 10.1089/trgh.2015.0008.

- Wiepjes, C. M., den Heijer, M., Bremmer, M. A., Nota, N. M., de Blok, C. J. M., Coumou, B. J. G., & Steensma, T. D. (2020). Trends in suicide death risk in transgender people: Results from the Amsterdam Cohort of Gender Dysphoria study (1972–2017). Acta Psychiatrica Scandinavica, 141(6), 486–491.

- World Professional Association for Transgender Health Standard of Care 8: Standards of Care for the Health of Transgender and Gender Diverse People, Version 8.

- World Professional Association for Transgender Health, WPATH and USPATH Comment on the Cass Review (2024).

- World Professional Association for Transgender Health: Certified Training Course on Transgender Health: Best Practices in Medical and Mental Health Care (2016).

- World Professional Association for Transgender Health: Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People (2012).

- https://www.independentwomen.com/wpcontent/uploads/2025/01/CUP_Report_FINAL.pdf

- https://www.nbcnews.com/nbc-out/out-news/nj-trans-prisoner-impregnated-2-inmates-transferred-mens-facility-rcna38947

- https://nypost.com/2023/09/06/new-jersey-prisoner-claims-she-was-sexually-assaulted-by-trans-prisoner-lawsuit/

- https://www.nationalreview.com/news/hundreds-of-transgender-california-inmates-request-transfers-to-womens-prisons/

- https://freebeacon.com/california/californias-female-prisoners-feel-threatened-by-transgender-inmates-the-state-doesnt-care/

41

**D.    Bureau of Prisons and Department of Justice Correspondence**

- BOP Memorandum: Transgender Clinical Care Consultant Team (2014)

- BOP Transgender Resource Guide (2014)

- BOP Medical Management of Transgender Inmates (2016)

- BOP (n.d.) Custody & Care. Medical care. Retrieved from https://www.bop.gov/inmates/custody_and_care/medical_care.jsp

- BOP Program Statement 5521.06, Housing Units, Inmates, and Inmate Work Areas

- BOP Program Statement 5538.08, Escorted Trips

- BOP Program Statement 5580.08, Inmate Personal Property

- BOP Program Statement 6010.05, Health Services Administration

- BOP Program Statement 5324.12, CN-1 Sexually Abusive Behavior Prevention and Intervention Program, Reentry Services Division, Psychology Services Branch (Feb. 18, 2025).

- BOP Transgender resource guide: An aid for people in the custody of the Federal Bureau of Prisons. Reentry Services Division, Women and Special Populations Branch (Aug. 2024).

- BOP Program Statement 5200.08 Transgender Offender Manual, Reentry Services Division, Women and Special Populations Branch (Jan. 13, 2022).

**E.    Executive Orders**

- Executive Order 14,168 of January 20, 2025, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615 (Jan. 30, 2025)

- Executive Order 14,187 of January 28, 2025, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8,771 (Feb. 3, 2025)

**F.    State Laws and Policies**

- Florida

  - Florida Department of Corrections, Office of Health Services, Bulletin No. 15.05.23 titled Mental Health Treatment of Inmates with Gender Dysphoria.

  - Fla. Stat. Ann. §286.311, *et seq.*

- California

  - California Correctional Health Care Services, Care Guide on Gender Dysphoria. (2015)

42

AR-000046

- o California Correctional Health Care Services Referral for Consideration of Gender Affirming Surgery. (2023)
- o California Correctional Health Care Services, Care Guide on Transgender (2025)

- Georgia
  - o Ga. Code Ann. §42-5-2, *et seq.*

- Idaho
  - o Idaho Code §18-8901, *et seq.*

- Indiana
  - o Ind. Code Ann. §11-10-3-3.5, *et seq.*

- Kentucky
  - o Kentucky Corrections Policies and Procedures on Lesbian, Gay, Bisexual, Transgender and Intersex Offenders.
  - o Ky. Rev. Stat. Ann. §197.280, *et seq.*

- Oklahoma
  - o Oklahoma Department of Corrections Policies on Determination and Management of Inmates with Gender Dysphoria.

- Minnesota
  - o Department of Corrections Management and Placement of Incarcerated People Who are Transgender, Gender Diverse, Intersex, or Nonbinary

43

AR-000047

**Cureus**
Part of SPRINGER NATURE

Open Access Original Article

**DOI:** 10.7759/cureus.57472

# Corrected: Risk of Suicide and Self-Harm Following Gender-Affirmation Surgery

Review began 11/14/2023
Review ended 03/21/2024
Published 04/02/2024
Corrected 06/11/2024

© Copyright 2024
Straub et al. This is an open access article distributed under the terms of the Creative Commons Attribution License CC-BY 4.0., which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited.

John J. Straub [1], Krishna K. Paul [1], Lauren G. Bothwell [1], Sterling J. Deshazo [1], Georgiy Golovko [2], Michael S. Miller [3], Dietrich V. Jehle [1]

1. Department of Emergency Medicine, University of Texas Medical Branch at Galveston, Galveston, USA  2. Department of Pharmacology, University of Texas Medical Branch at Galveston, Galveston, USA  3. Department of Psychiatry and Behavioral Services, University of Texas Medical Branch at Galveston, Galveston, USA

**Corresponding author:** Dietrich V. Jehle, dijehle@utmb.edu

## This article has been corrected.

Correction date: June 11, 2024. Cite this correction as Straub J J, Paul K K, Bothwell L G, et al. (June 11, 2024) Correction: Risk of Suicide and Self-Harm Following Gender-Affirmation Surgery. Cureus 16(6): c182. doi:10.7759/cureus.c182.

This article has been corrected by the Editors-in-Chief to clarify the conclusions of the study. Two sentences have been revised as detailed below. The authors agree with these corrections.

- Original abstract conclusions: "Gender-affirming surgery is significantly associated with elevated suicide attempt risks, underlining the necessity for comprehensive post-procedure psychiatric support."

  Corrected to: "Patients who have undergone gender-affirming surgery are associated with a significantly elevated risk of suicide, highlighting the necessity for comprehensive post-procedure psychiatric support."

- Original first sentence of the Conclusions section: "The results of this study show that gender-affirmation surgery is associated with a significantly higher risk of suicide, death, suicide/self-harm, and PTSD compared to control groups in this real-world database."

  Corrected to: "The results of this study indicate that patients who have undergone gender affirmation surgery are associated with significantly higher risks of suicide, self-harm, and PTSD compared to general population control groups in this real-world database."

---

## Abstract

### Introduction

With the growing acceptance of transgender individuals, the number of gender affirmation surgeries has increased. Transgender individuals face elevated depression rates, leading to an increase in suicide ideation and attempts. This study evaluates the risk of suicide or self-harm associated with gender affirmation procedures.

### Methods

This retrospective study utilized de-identified patient data from the TriNetX (TriNetX, LLC, Cambridge, MA) database, involving 56 United States healthcare organizations and over 90 million patients. The study involved four cohorts: cohort A, adults aged 18-60 who had gender-affirming surgery and an emergency visit (N = 1,501); cohort B, control group of adults with emergency visits but no gender-affirming surgery (N = 15,608,363); and cohort C, control group of adults with emergency visits, tubal ligation or vasectomy, but no gender-affirming surgery (N = 142,093). Propensity matching was applied to cohorts A and C. Data from February 4, 2003, to February 4, 2023, were analyzed to examine suicide attempts, death, self-harm, and post-traumatic stress disorder (PTSD) within five years of the index event. A secondary analysis involving a control group with pharyngitis, referred to as cohort D, was conducted to validate the results from cohort C.

### Results

AR-000966

Individuals who underwent gender-affirming surgery had a 12.12-fold higher suicide attempt risk than those who did not (3.47% vs. 0.29%, RR 95% CI 9.20-15.96, p < 0.0001). Compared to the tubal ligation/vasectomy controls, the risk was 5.03-fold higher before propensity matching and remained significant at 4.71-fold after matching (3.50% vs. 0.74%, RR 95% CI 2.46-9.024, p < 0.0001) for the gender affirmation patients with similar results with the pharyngitis controls.

## Conclusion

Patients who have undergone gender-affirming surgery are associated with a significantly elevated risk of suicide, highlighting the necessity for comprehensive post-procedure psychiatric support.

---

**Categories:** Psychiatry, Psychology, Public Health
**Keywords:** self-harm, post traumatic stress disorder (ptsd), suicide, transgender, gender affirmation

# Introduction

The prevalence of transgender individuals in the United States is approximately 0.3% to 0.6% of the adult population based on self-reporting studies [1]. Investigations that only include individuals with transgender diagnostic codes, hormone therapy, or gender-affirming surgery report a much lower rate of approximately 0.008% of the population [2]. People who identify as transgender are shown to have a higher risk of suicide in the United States and across many other countries [3-6].

In 2021, the Centers for Disease Control reported that 48,183 people died by suicide in the United States. Depression, substance abuse, other mental illness, legal/financial problems, harmful relationships, community risk factors, and easy access to lethal means are contributing factors to successful suicide. Transgender individuals have a higher prevalence of depression across several age groups, often due to life experiences that include discrimination, harassment, violence, misgendering, and enacted stigma that may generate poor mental health outcomes and harmful behaviors [4,7,8]. It is widely accepted that depression puts an individual at higher risk for suicidal ideation and suicide attempts [9]. Individuals at higher risk for suicide and post-traumatic stress disorder (PTSD) should have comprehensive psychiatric interventions and care throughout their lifetime. A better understanding of the relationship between suicide and gender affirmation remains particularly important.

There is ongoing controversy surrounding the benefits of gender-affirmation surgery on mental health [10-20]. This controversy reflects diverse perspectives within the medical and research communities, emphasizing the need for a more comprehensive understanding of the psychological outcomes of gender-affirming procedures. Despite the increasing acceptance of transgender individuals, questions persist about the psychological outcomes of gender-affirming procedures. Responses to the discussion surrounding the benefits of gender-affirmation surgery have been diverse, as evidenced by studies conducted by Branstrom and colleagues [11], Almazan et al. [13], and others [10,14-20].

The purpose of this study is to assess the risk of adverse outcomes, specifically suicide, death, self-harm, and PTSD in the five years following gender-affirmation surgery. Suicide risk over time among patients who received gender-affirmation surgery is compared to individuals in several control groups. The TriNetX (TriNetX, LLC, Cambridge, MA) database will be utilized to better understand the relationship between sex change and these outcomes.

This article was previously presented virtually as a meeting abstract at the 2023 Texas College of Emergency Physicians (TCEP) Research Forum on April 07, 2023.

# Materials And Methods

TriNetX is a global health research network providing access to de-identified retrospective electronic medical records. The database consists of over 90 million patients from 56 healthcare organizations (HCOs) within the United States. This study utilized TriNetX to identify patients who had a "personal history of sex reassignment" and evaluate their relative risk for suicide attempt, death, suicide/self-harm, and PTSD. The term "sex reassignment" was based on the International Classification of Diseases, 10th Revision (ICD-10) code in the database but will be referred to as the current term "gender-affirmation surgery" for the remaining article. All outcomes were evaluated during the five years after gender-affirmation surgery.

Patients who have undergone gender-affirmation surgery of all sexes, races, and ethnicities were identified by using the ICD-10 code, ICD10CM:Z87.890. Sex, race, and ethnicity were derived from the electronic medical record. Patients who have undergone gender-affirmation surgery are identified by their affirmed gender. A total of four cohorts were identified for this study. Cohort A consisted of patients ages 18 to 60 who had both gender-affirmation surgery and an emergency visit. Cohort B was the study control group that consisted of patients ages 18 to 60 who had no history of gender-affirmation surgery but had an emergency visit. In this database, propensity matching is not possible for very large cohorts, more than 8.3 million patients with 12 covariates.

AR-000967

Additional control groups were chosen to perform propensity matching, which controls for confounders. Cohort C was the study's second control group and consisted of adult patients (18-60 years) who had no history of gender-affirmation surgery, had an emergency visit, and had a tubal ligation or vasectomy. Patients who had undergone tubal ligation were identified through the ICD-10 code, ICD10CM:Z98.51, while the vasectomy procedure was identified by Current Procedural Terminology (CPT), CPT:55250. A secondary sub-group analysis, cohort D, was performed utilizing acute pharyngitis (ICD10CM:J02) as a control group for patients aged 18-60 that was run on June 2, 2023. This was performed to ensure that the vasectomy or bilateral tubal ligation (BTL) group acted as an appropriate control. The relative risk for suicide attempt, death, suicide/self-harm, and PTSD was evaluated during the five years following gender-affirmation surgery in comparison to those without gender-affirmation surgery with the diagnosis of pharyngitis. Cohort A was used again and compared with cohort D, which included patients presenting to the emergency room after diagnosis of acute pharyngitis.

The outcome analysis between the three cohorts was performed for four events: suicide attempt (ICD10CM:T14.91), death (vital status: deceased), suicide/self-harm (ICD10CM:T14.91 or ICD10CM:X71-X83), and PTSD (ICD10CM:F43.1). An analysis was performed utilizing the measures contained in the TriNetX platform, which compared the individual outcomes between cohorts A and B and also cohorts A and C within the designated time frame. Patients who had the outcome before the time window were excluded from the analysis. The final TriNetX data reported RR, 95% CI, ORs, and a risk comparison expressed as a p-value. To control potentially confounding risk factors for the measured outcomes, the propensity matching tool in TriNetX was utilized. Factors involved in the data propensity matching are based on age at index, race, ethnicity, and sex. Propensity matching was only performed between the comparison of cohorts A and C, but not cohort B, due to the large sample size limitation.

Propensity score matching (PSM) is often used in observational studies to reduce confounding biases. It has been investigated and well-documented regarding its properties for statistical inference. PSM is a quasi-experimental method in which the researcher uses statistical techniques to construct an artificial control group by matching the affected group with a non-affected group of similar characteristics. Using these matches, the researcher can estimate the difference between both groups without the confounding variables' influence [21]. To justify our use of propensity matching for age, race, sex, and ethnicity, we considered established risk factors for suicide such as older age, male gender identity, and racial or ethnic minority status [3,4].

The cohort was analyzed descriptively using univariate and bivariate frequencies with chi-square and t-testing to assess differences. All eligible persons in the cohort were analyzed using both binary event estimation with RRs, 95% CIs, and probability values. Using the TriNetX database, a 1:1 propensity match using linear and logistic regression for age, sex, race, and ethnicity was employed for maximum generalization of the United States population. Greedy nearest-neighbor matching was used with a tolerance of 0.1 and a difference between propensity scores less than or equal to 0.1. Comparisons were made between cohorts before and after propensity matching. Statistical significance was set at a two-sided alpha <0.05. TriNetX provides data that have been de-identified, and as a result, an Institutional Review Board (IRB) review is not required for this study [22]. Three comparison reports were generated on February 4, 2023. Data gathered from HCOs was from February 4, 2003, to February 4, 2023.

## Results

We identified 15,609,864 adult patients from TriNetX who were adults and had a visit to an emergency department within the United States Collaborative Network. Cohort A consisted of 1,501 adult patients who had a visit to the emergency department and a history of gender-affirmation surgery. Cohort B consisted of 15,608,363 patients who had an emergency visit but no history of gender-affirmation surgery. Cohort C consisted of 142,093 adult patients who had a visit to the emergency department and no history of gender-affirmation surgery but had a vasectomy or BTL.

Without propensity matching between cohorts A and B, patients with a history of gender-affirmation surgery exhibited a significantly higher risk for each possible outcome compared to patients without a history of gender-affirmation surgery (Table 1). Patients who had a history of gender-affirmation surgery had a 12.12 times greater risk of suicide attempts (3.47% vs. 0.29%, RR 95% CI 9.20-15.96, p < 0.0001) vs. patients who had no history of gender-affirmation surgery. In patients with a history of gender-affirmation surgery, there was a 3.35 times greater risk of being deceased (4.9% vs. 1.5%, RR 95% CI 2.673-4.194, p < 0.0001). Patients with a history of gender-affirmation surgery had a 9.88 times higher risk of self-harm or suicide (4.5% vs. 0.5%, RR 95% CI 7.746-12.603, p < 0.0001). Lastly, patients who had a history of gender-affirmation surgery had a 7.76 times higher risk of PTSD (9.2% vs. 1.2%, RR 95% CI 6.514-9.244, p < 0.0001).

AR-000968

| Outcomes | Cohort A | Cohort B | RR (95% CI) | p-value |
|---|---|---|---|---|
| Suicide attempts | 3.50% | 0.30% | 12.12 (9.202, 15.958) | <0.0001 |
| Deceased | 4.90% | 1.50% | 3.348 (2.673, 4.194) | <0.0001 |
| Suicide or self-harm | 4.50% | 0.50% | 9.880 (7.746, 12.603) | <0.0001 |
| PTSD | 9.20% | 1.20% | 7.760 (6.514, 9.244) | <0.0001 |

**TABLE 1: Outcomes following gender-affirmation surgery (cohort A) vs. no history of gender-affirmation surgery (cohort B)**

PTSD, post-traumatic stress disorder

Before the propensity matching of cohorts A and C, there was a significantly higher risk for each outcome when considering patients with a history of gender-affirmation surgery compared to those without a history of gender-affirmation surgery but with a prior vasectomy or BTL (Table 2). Patients with a history of gender-affirmation surgery had a 5.03 times higher risk of suicide attempts (3.5% vs. 0.7%, RR 95% CI 3.795-6.676, p < 0.0001), a 2.37 times higher risk of being deceased (4.9% vs. 2.1%, RR 95% CI 1.889-2.982, p < 0.0001), a 5.44 times higher risk of suicide or self-harm (4.5% vs. 0.8%, RR 95% CI 4.233-6.981, p < 0.0001), and a 3.74 times higher risk of PTSD (9.2% vs. 2.5%, RR 95% CI 3.125-4.463, p < 0.0001) compared to patients without a history of gender-affirmation surgery but with a prior vasectomy or BTL.

| Outcomes | Cohort A | Cohort C | RR (95% CI) | p-value |
|---|---|---|---|---|
| Suicide attempts | 3.50% | 0.70% | 5.03 (3.795, 6.676) | <0.0001 |
| Deceased | 4.90% | 2.10% | 2.37 (1.889, 2.982) | <0.0001 |
| Suicide or self-harm | 4.50% | 0.80% | 5.44 (4.233, 6.981) | <0.0001 |
| PTSD | 9.20% | 2.50% | 3.74 (3.125, 4.463) | <0.0001 |

**TABLE 2: Outcomes following gender-affirmation surgery (cohort A) vs. vasectomy/tubal ligation (cohort C) before propensity matching**

PTSD, post-traumatic stress disorder

After propensity matching of cohorts A and C, each cohort had 1,489 patients of similar age at index, race, and ethnicity (Tables 3-4). Patients who had a history of gender-affirmation surgery compared to patients without a gender-affirmation surgery history but had a vasectomy or BTL showed significantly higher risks for each outcome (Table 3). The adjusted suicide attempt risk for patients with gender-affirmation surgery compared to no history of gender-affirmation surgery but with a prior BTL or vasectomy was adjusted to a 4.71 times greater risk (3.50% vs. 0.74%, RR 95% CI 2.46-9.024, p < 0.0001). The risk of being deceased was 4.26 times greater in patients with a history of gender-affirmation surgery vs. patients with no history of gender-affirmation surgery but vasectomy or BTL (4.9% vs. 1.1%, RR 95% CI 2.520-7.191, p < 0.0001). Patients with a history of gender-affirmation surgery showed a 5.10 times higher risk of suicide or self-harm compared to patients with no history of gender-affirmation surgery but vasectomy or BTL (4.5% vs. 0.9%, RR 95% CI 2.816-9.227, p < 0.0001). Lastly, patients with a history of gender-affirmation surgery showed a 3.23 times higher risk for PTSD compared to patients with no history of gender-affirmation surgery but vasectomy or BTL (9.2% vs. 2.8%, RR 95% CI 2.278-4.580, p < 0.0001).

AR-000969

| Outcomes | Cohort A | Cohort C | RR (95% CI) | p-value |
|---|---|---|---|---|
| Suicide attempts | 3.50% | 0.74% | 4.71 (2.46, 9.024) | <0.0001 |
| Deceased | 4.90% | 1.10% | 4.26 (2.520, 7.191) | <0.0001 |
| Suicide or self-harm | 4.50% | 0.90% | 5.10 (2.816, 9.227) | <0.0001 |
| PTSD | 9.20% | 2.80% | 3.23 (2.278, 4.580) | <0.0001 |

**TABLE 3: Outcomes following gender-affirmation surgery (cohort A) vs. vasectomy/tubal ligation (cohort C) after propensity matching**

PTSD, post-traumatic stress disorder

| Demographics | Before propensity score matching | | After propensity score matching | |
|---|---|---|---|---|
| | Cohort A (%) | Cohort C (%) | Cohort A (%) | Cohort C (%) |
| Total patients | 1,501 | 142,093 | 1,489 | 1,489 |
| Age at index ± SD | 35.8 ± 11.6 | 41.1 ± 9.8 | 35.8 ± 11.6 | 36.3 ± 11.3 |
| Female | 760 (50.7%) | 104,631 (76.1%) | 760 (51.0%) | 752 (50.5%) |
| Male | 732 (48.8%) | 32,830 (23.9%) | 729 (49.0%) | 737 (49.5%) |
| White | 932 (62.1%) | 90,431 (65.8%) | 924 (62.1%) | 892 (59.9%) |
| American Indian or Alaska Native | 15 (1%) | 483 (0.4%) | 12 (0.8%) | 32 (2.1%) |
| Native Hawaiian or other Pacific Islander | 10 (0.7%) | 147 (0.1%) | 10 (0.7%) | 10 (0.7%) |
| Hispanic or Latino | 114 (7.6%) | 15,780 (11.5%) | 113 (7.6%) | 111 (7.5%) |
| Black or African American | 339 (22.6%) | 27,253 (19.8%) | 339 (22.8%) | 345 (23.3%) |
| Asian | 22 (1.5%) | 2,073 (1.5%) | 22 (1.5%) | 19 (1.3%) |
| Not Hispanic or Latino | 1,066 (71.1%) | 87,544 (63.7%) | 1,059 (71.1%) | 1,060 (71.2%) |
| Unknown race | 187 (12.5%) | 17, 081 (12.4%) | 187 (12.6%) | 195 (13.1%) |
| Unknown ethnicity | 320 (21.3%) | 34,144 (24.8%) | 317 (21.3%) | 318 (21.4%) |

**TABLE 4: Demographics before and after propensity score matching**

Cohort A: Adult patients who had a visit to the emergency department and a history of sexual reassignment.

Cohort C: Adult patients who had a visit to the emergency department and no history of sexual reassignment but had a vasectomy or bilateral tubal ligation.

The secondary sub-group analysis utilizing pharyngitis (N = 1,390,880) as a control revealed that patients presenting to the emergency department with a history of gender-affirmation surgery had a 7.95 times greater risk of suicide attempt than patients with pharyngitis (1.5% vs. 0.2%, RR CI 5.379-11.755, p < 0.0001), a 3.65 times greater risk of death (4.6% vs. 1.3%, RR CI 2.921-4.563, p < 0.0001), a 7.33 times greater risk of suicide or self-harm (2.7% vs. 0.4%, RR CI 5.448-9.850, p < 0.0001), and a 4.61 times greater risk of PTSD (9.2% vs. 2.0%, RR CI 3.901-5.438, p < 0.0001) compared to patients who were sent to the emergency department following acute pharyngitis. After propensity matching, mortality was 3.59 times greater in patients with a history of gender-affirmation surgery (4.6% vs. 1.3%, RR CI 2.224-5.806, p < 0.0001), and PTSD was 5.49 times greater (9.2% vs. 1.7%, RR CI 3.648-8.267, p < 0.0001) compared to patients with acute pharyngitis. There were too few suicides or self-harm outcomes to report results from the propensity-matched pharyngitis group. These results were similar to the results with cohort C.

## Discussion

AR-000970

The purpose of this study was to explore the relationship between gender-affirmation surgery and the risk of suicide outcomes compared to two control groups with data from 2003 to 2023. The significance of this investigation lies not only in its scale but also in its methodology, as it relies on real-world data rather than meta-analyses and self-reported surveys.

The first controlled group was a large number of patients who had emergency department visits but had not had gender-affirmation surgery. Propensity matching is not possible in the TriNetX database for large groups with millions of patients like the first control group. The second control group consisted of individuals who had not had gender-affirmation surgery but had either a vasectomy or BTL. This control group was selected to allow for propensity matching. Propensity matching was done for this comparison to control for the confounding influence of age, sex, and race/ethnicity. This is particularly important since the rate of successful suicide is much higher in men. At the start of this study, the hypothesis that was proposed predicted individuals who had undergone gender-affirmation surgery would have a greater risk of suicide, death, and self-harm compared to the two controls. This was confirmed by comparing the two control groups. In the second analysis, it was determined that patients who had undergone gender affirmation had a statistically significant increase in suicide attempts, death, self-harm, and PTSD after completion of gender affirmation in comparison with those who had undergone BTL or vasectomy and had not undergone gender-affirmation before propensity matching. After propensity matching our cohorts for age at index, race, and ethnicity, we also found a statistically significant increased risk of suicide attempts, death, self-harm/suicide, and PTSD. These outcomes confirmed the hypothesis. The secondary sub-group analysis utilizing pharyngitis as a control showed results that were comparable to the BTL/vasectomy control group, validating cohort C as an appropriate control group for propensity matching.

These data are supported by previous studies from multiple geographic regions of the globe, including Lebanon [3], Turkey [3], Pakistan [4], China [5], and Canada [6], as well as data from within the United States [3-4,6]. The large size of our study is an asset to our findings, which will help further our understanding of the relationship between sex change and suicide. To our knowledge, a study of this size has not been described in the literature. Using two control groups, a) those who had not experienced gender-affirmation surgery and had presented to the emergency department and b) a group that had not experienced gender-affirmation surgery, had visited the emergency department, and had a vasectomy or BTL, also helped effectively control for confounding variables utilizing propensity matching. Over the last 20 years, this study demonstrated a 12.12 times greater risk of suicide utilizing the first control group and a 4.71 to 5.03 times increased risk with the other control groups.

Transgender individuals, encompassing both those seeking gender-affirming surgery and those who have undergone it, demonstrate a significantly elevated risk of developing PTSD compared to the general population [10,23]. Among those who seek access to gender-affirming surgery, the commonality of discrimination, interpersonal assault, and a lack of social support have been identified as influential factors in the development of PTSD within this group [23]. Financial stress and insufficient insurance coverage prove to be significant obstacles for those trying to access gender-affirming surgery. Additionally, the limited availability of medical professionals with expertise in gender-affirming procedures, particularly in areas of lower socioeconomic status, further exacerbates the challenges faced by individuals seeking such care [10]. However, it is important to consider PTSD development in those who have undergone gender-affirming procedures. The emergence of PTSD following surgery often stems from the pre-operative challenges (such as harassment, limited social support, etc.) in conjunction with suboptimal surgical outcomes and insufficient psychiatric assistance.

This study has revealed a significantly elevated prevalence of PTSD in post-operative transgender individuals, with a 7.76-fold increase in comparison to cohort B and a 3.74-fold increased risk compared to cohort C after propensity matching. These findings were consistent with other studies investigated previously. A study conducted by Livingston et al. in 2022 used probabilistic and rule-based modeling on Veterans Health Administration (VHA) records from 1999 to 2021 to assess the differences in PTSD prevalence among 9,995 transgender and 29,985 cisgender veterans (1:3 ratio). They concluded that transgender veterans experienced PTSD at 1.5-1.8 times the rate of veterans identifying as cisgender, especially higher in recent users of VHA services [24]. There have proven to be many obstacles when comparing our findings to other studies assessing general population PTSD risk in those who have undergone gender-affirmation surgery. A 2018 systematic review conducted by Valentine et al. showed that many studies used assessment tools not particularly appropriate for evaluating mental health in transgender or gender non-conforming individuals [25]. The poor psychometric framework has led to many studies not acknowledging confounding and contextual variables, such as exposure to discrimination or minority identity when assessing PTSD in this demographic [10,25]. To avoid the repeated shortcomings of prior research, future studies should employ rigorous and reliable assessment tools such as cross-sectional studies or the collection of prospective data [25]. Improving transgender representation in emerging PTSD treatment trials is another step in improving the understanding and management of PTSD in transgender individuals [10].

In light of the examination of the relationship between gender-affirmation surgery and mental health outcomes discussed in this study, it is imperative to acknowledge the broader landscape of research on this topic. Our investigation contributes broad insight, examining real-world data over two decades and

AR-000971

encompassing a diverse cohort. However, to further expand upon the contextual significance, it is essential to compare findings from other studies that explore multifaceted aspects of mental health post-gender-affirmation surgery. A study published in the American Journal of Psychiatry by Branstrom et al. in October 2019 drew strong conclusions regarding the positive impact of gender-affirmation surgery on mental health [11]. However, the study faced criticism of its methodology, leading to a correction/retraction by the journal's editors that stated, "the results demonstrated no advantage of surgery about subsequent mood or anxiety disorder-related health care visits or prescriptions or hospitalizations following suicide attempts" [12]. In a subsequent study conducted in 2021, Almazan et al. compared the mental health outcomes of a group of patients who were not approved for gender-affirmation surgery with a group that had undergone the surgery [13].

Their findings suggested better mental health outcomes for those who underwent surgery, but notable limitations warrant careful interpretation. First, the study conducted a comparison between two groups: one that had not been approved for surgery, a process requiring two mental health screenings as per the World Professional Association for Transgender Health's standard of care recommendations, and another group that had already undergone surgery. Therefore, it is plausible that the surgery group could inherently have been healthier, irrespective of the surgery. Second, when the analysis was broadened to include lifetime outcomes, the positive association with the surgery became insignificant [14].

Although our study has revealed a statistically significant increase in suicide risk among those who have undergone gender-affirming surgery, it remains vital to recognize and support the positive impacts that these surgical interventions can have on the lives of transgender individuals. The results of a study by Park et al., published in October 2022 in the Annals of Plastic Surgery, provide a different perspective on the enduring effectiveness and consequences of gender-affirmation surgery [20]. While our research specifically examined the risk of suicide, death, self-harm, and PTSD in the five years following surgery, Park et al. surveyed the outcomes of 15 gender-affirming surgeries over a more extended period. Their results reveal an improvement in patient well-being, with high satisfaction levels, reduced dysphoria, and persistent mental health benefits even decades after surgery. Notably, the study highlights the durability of these positive outcomes and significantly reduced suicidal ideation following gender-affirmation surgery.

The number of non-gender-conforming individuals continues to increase globally. It is likely, therefore, that a growing number of medical professionals will care for an individual who has undergone gender-affirmation at some point in their career. Apart from additional assistance in surgical recovery, the most common aftercare needs for patients following gender-affirmation surgery is consultation with a mental health professional [26]. To properly address the mental health needs of transgender individuals, Lapinski et al. emphasize the significance of cultural competency, a patient-focused approach, and collaborative efforts involving psychiatric professionals [27-30]. Transgender individuals tend to see mental health care providers and face discrimination in clinical settings at a far higher rate than the cis-gendered population [27,28,30]. Competent medical care following gender-affirming surgery is vital in effectively managing PTSD and its respective mental health challenges for this population [27].

It is important to note that this study has several limitations. The retrospective cohort design can only demonstrate associations but not causality. However, the larger size of this study, in conjunction with propensity matching, gives this investigation a greater power to identify differences between groups. Additionally, with the extensive timeline of data collection, the findings are relevant and contemporary to modern situations. A limitation of the study design could include the fact that only adult data was analyzed, so the research cannot be generalized to those under the age of 18. The data were also only extracted from a population of residents from the United States. Patients who have undergone gender-affirmation surgery and our control groups may have refrained from disclosing their suicidal ideations or other psychiatric symptoms to their medical providers, potentially influenced by societal pressures or other factors such as perceived attitudes toward those with psychiatric complaints. It may be worth examining if groups considering gender-affirmation surgery who have not yet received the surgery share the same increased risk levels for suicidal actions and ideations. However, given the standard practice of undergoing psychiatric testing before being approved for gender-affirmation surgery, individuals contemplating the procedure may potentially pose a greater suicide risk compared to those who have been approved for surgery.

## Conclusions

The results of this study indicate that patients who have undergone gender affirmation surgery are associated with significantly higher risks of suicide, self-harm, and PTSD compared to general population control groups in this real-world database. With suicide being one of the most common causes of death for adolescent and middle-aged individuals, it is clear that we must work to prevent these unfortunate outcomes. This further reinforces the need for comprehensive psychiatric care in the years that follow gender-affirmation surgery.

## Appendices

### Greedy nearest-neighbor matching

AR-000972

The most common implementation of propensity matching is pair-matching, in which pairs of treated and control participants are formed. There are several common implementations of pair-matching. The most commonly used is greedy nearest-neighbor matching (NNM), which we used, in which a treated participant is selected at random and then matched to the control participant whose propensity score is closest to that of the treated participant. The process is described as greedy because, at each stage, the control is selected who is closest to the currently considered treated participant, even if that untreated participant would serve better as a control for a subsequently treated participant. This process is then repeated until a matched control participant has been selected for each treated participant. This process generally uses matching without replacement so that once a control participant is matched to a treated participant, that control participant is no longer available to match to a subsequently treated participant. A refinement to NNM is NNM with a caliper restriction. Using this approach, a control participant is an acceptable match for a treated participant only if the difference in their propensity scores is less than a maximum amount (the caliper width or distance). For technical reasons, one typically matches the logit of the propensity score and uses a caliper width that is defined as a proportion of the (0.1-0.2) SD of the logit of the propensity score. A crucial step in any study that uses PSM is to assess the degree to which matching the propensity score resulted in the formation of a matched sample in which the distribution of baseline characteristics is similar between treated and control participants. This assessment is critical as it allows both the researcher and readers to assess whether matching the estimated propensity score has removed systematic baseline differences between treatments. The use of the standardized difference, which is the difference in means in units of SD, is often used for assessing the similarity of matched treated and control participants. Some authors have suggested that a threshold of 0.10 (or 10%) be used to denote acceptable balance after matching. Once an acceptable balance has been achieved, analysts can unblind themselves to the outcome and compare outcomes between treated and control participants in the matched sample. The analyses conducted in the propensity score-matched sample can be similar to those that would be done in an RCT with a similar outcome.

## Additional Information

### Author Contributions

All authors have reviewed the final version to be published and agreed to be accountable for all aspects of the work.

**Acquisition, analysis, or interpretation of data:** Krishna K. Paul, John J. Straub, Lauren G. Bothwell, Sterling J. Deshazo, Georgiy Golovko, Michael S. Miller, Dietrich V. Jehle

**Drafting of the manuscript:** Krishna K. Paul, John J. Straub, Lauren G. Bothwell, Sterling J. Deshazo, Dietrich V. Jehle

**Critical review of the manuscript for important intellectual content:** Krishna K. Paul, John J. Straub, Lauren G. Bothwell, Sterling J. Deshazo, Georgiy Golovko, Michael S. Miller, Dietrich V. Jehle

**Supervision:** Krishna K. Paul, Dietrich V. Jehle

**Concept and design:** Georgiy Golovko, Dietrich V. Jehle

### Disclosures

**Human subjects:** Consent was obtained or waived by all participants in this study. **Animal subjects:** All authors have confirmed that this study did not involve animal subjects or tissue. **Conflicts of interest:** In compliance with the ICMJE uniform disclosure form, all authors declare the following: **Payment/services info:** This study was conducted with the support of the Institute for Translational Sciences at the University of Texas Medical Branch, supported in part by a Clinical and Translational Science Award (UL1 TR001439) from the National Center for Advancing Translational Sciences, National Institutes of Health. The content is solely the responsibility of the authors and does not necessarily represent the official views of the National Institutes of Health. **Financial relationships:** All authors have declared that they have no financial relationships at present or within the previous three years with any organizations that might have an interest in the submitted work. **Other relationships:** All authors have declared that there are no other relationships or activities that could appear to have influenced the submitted work.

## References

1.  How many adults and youth identify as transgender in the United States? . (2022). Accessed: November 07, 2023: https://williamsinstitute.law.ucla.edu/publications/trans-adults-united-states/.
2.  Collin L, Reisner SL, Tangpricha V, Goodman M: Prevalence of transgender depends on the "case" definition: a systematic review. J Sex Med. 2016, 13:613-26. 10.1016/j.jsxm.2016.02.001
3.  Narang P, Sarai SK, Aldrin S, Lippmann S: Suicide among transgender and gender-nonconforming people. Prim Care Companion CNS Disord. 2018, 20:3. 10.4088/PCC.18nr02273
4.  Azeem R, Zubair UB, Jalil A, Kamal A, Nizami A, Minhas F: Prevalence of suicide ideation and its relationship with depression among transgender population. J Coll Physicians Surg Pak. 2019, 29:349-52.

AR-000973

10.29271/jcpsp.2019.04.349

5. Chen R, Zhu X, Wright L, et al.: Suicidal ideation and attempted suicide amongst Chinese transgender persons: national population study. J Affect Disord. 2019, 245:1126-34. 10.1016/j.jad.2018.12.011

6. Austin A, Craig SL, D'Souza S, McInroy LB: Suicidality among transgender youth: elucidating the role of interpersonal risk factors. J Interpers Violence. 2022, 37:5-6. 10.1177/0886260520915554

7. Connolly MD, Zervos MJ, Barone CJ 2nd, Johnson CC, Joseph CL: The mental health of transgender youth: advances in understanding. J Adolesc Health. 2016, 59:489-95. 10.1016/j.jadohealth.2016.06.012

8. Study shows significant increase in transgender population among younger generations . (2022). Accessed: November 07, 2023: https://instituteofliving.org/health-wellness/news/newsroom-detail?articleId=42505&publicid=461.

9. Ribeiro JD, Huang X, Fox KR, Franklin JC: Depression and hopelessness as risk factors for suicide ideation, attempts and death: meta-analysis of longitudinal studies. Br J Psychiatry. 2018, 212:279-86. 10.1192/bjp.2018.27

10. Stauffer CS, Brown MR, Adams D, Cassity M, Sevelius J: MDMA-assisted psychotherapy; inclusion of transgender and gender diverse people in the frontiers of PTSD treatment trials. Front Psychiatry. 2022, 13:932605. 10.3389/fpsyt.2022.932605

11. Bränström R, Pachankis JE: Reduction in mental health treatment utilization among transgender individuals after gender-affirming surgeries: a total population study. Am J Psychiatry. 2020, 177:727-34. 10.1176/appi.ajp.2019.19010080

12. Kalin NH: Reassessing mental health treatment utilization reduction in transgender individuals after gender-affirming surgeries: a comment by the editor on the process. Am J Psychiatry. 2020, 177:764. 10.1176/appi.ajp.2020.20060803

13. Almazan AN, Keuroghlian AS: Association between gender-affirming surgeries and mental health outcomes. JAMA Surg. 2021, 156:611-8. 10.1001/jamasurg.2021.0952

14. Marano AA, Louis MR, Coon D: Gender-affirming surgeries and improved psychosocial health outcomes. JAMA Surg. 2021, 156:685-7. 10.1001/jamasurg.2021.0953

15. de Brouwer IJ, Elaut E, Becker-Hebly I, Heylens G, Nieder TO, van de Grift TC, Kreukels BP: Aftercare needs following gender-affirming surgeries: findings from the ENIGI Multicenter European follow-up study. J Sex Med. 2021, 18:1921-32. 10.1016/j.jsxm.2021.08.005

16. Becker-Hebly I, Fahrenkrug S, Campion F, Richter-Appelt H, Schulte-Markwort M, Barkmann C: Psychosocial health in adolescents and young adults with gender dysphoria before and after gender-affirming medical interventions: a descriptive study from the Hamburg Gender Identity Service. Eur Child Adolesc Psychiatry. 2021, 30:1755-67. 10.1007/s00787-020-01640-2

17. Glynn TR, Gamarel KE, Kahler CW, Iwamoto M, Operario D, Nemoto T: The role of gender affirmation in psychological well-being among transgender women. Psychol Sex Orientat Gend Divers. 2016, 3:336-44. 10.1037/sgd0000171

18. Davis SA, St. Amand C: Effects of testosterone treatment and chest reconstruction surgery on Mental Health and sexuality in female-to-male transgender people. Int J Sex Health. 2014, 26:113-28. 10.1080/19317611.2013.833152

19. Konrad M, Kostev K: Increased prevalence of depression, anxiety, and adjustment and somatoform disorders in transsexual individuals. J Affect Disord. 2020, 274:482-5. 10.1016/j.jad.2020.05.074

20. Park RH, Liu YT, Samuel A, et al.: Long-term outcomes after gender-affirming surgery: 40-year follow-up study. Ann Plast Surg. 2022, 89:431-6. 10.1097/SAP.0000000000003233

21. Mendez DR, Rumph G, Richardson J, Paul KK, Jehle D: Outcomes of croup in children: COVID-19 versus non-COVID-19 cases. J Am Coll Emerg Physicians Open. 2023, 4:e13053. 10.1002/emp2.13053

22. Murphy LR, Hill TP, Paul K, Talbott M, Golovko G, Shaltoni H, Jehle D: Tenecteplase versus alteplase for acute stroke: mortality and bleeding complications. Ann Emerg Med. 2023, 82:720-8. 10.1016/j.annemergmed.2023.03.022

23. Valentine SE, Smith AM, Miller K, Hadden L, Shipherd JC: Considerations and complexities of accurate PTSD assessment among transgender and gender diverse adults. Psychol Assess. 2023, 35:383-95. 10.1037/pas0001215

24. Livingston NA, Lynch KE, Hinds Z, Gatsby E, DuVall SL, Shipherd JC: Identifying posttraumatic stress disorder and disparity among transgender veterans using nationwide veterans health administration electronic health record data. LGBT Health. 2022, 9:94-102. 10.1089/lgbt.2021.0246

25. Valentine SE, Shipherd JC: A systematic review of social stress and mental health among transgender and gender non-conforming people in the United States. Clin Psychol Rev. 2018, 66:24-38. 10.1016/j.cpr.2018.03.003

26. Lapinski J, Covas T, Perkins JM, Russell K, Adkins D, Coffigny MC, Hull S: Best practices in transgender health: a clinician's guide. Prim Care. 2018, 45:687-703. 10.1016/j.pop.2018.07.007

27. Holt NR, Hope DA, Mocarski R, Meyer H, King R, Woodruff N: The provider perspective on behavioral health care for transgender and gender nonconforming individuals in the Central Great Plains: a qualitative study of approaches and needs. Am J Orthopsychiatry. 2020, 90:136-46. 10.1037/ort0000406

28. Copp HL: Adult transgender care: an interdisciplinary approach for training mental health professionals . Health Soc Work. 2018, 43:278-79. 10.1093/hsw/hly025

29. Powell HA, Cochran BN: Mental health providers' biases, knowledge, and treatment decision making with gender-minority clients. Psychol Sex Orientat Gend Divers. 2021, 8:451-57. 10.1037/sgd0000444

30. WISQARS Data Visualization . (2020). Accessed: November 07, 2023: https://wisqars.cdc.gov/data/lcd/home.

AR-000974

# Defining a danger zone for iatrogenic long thoracic nerve injury in gender-affirming mastectomy; (2025) 100 EJPRAS 362-367

January 2025

**Section:** Pgs. 362-367 Vol. 100 ISSN: 1748-6815

**Length:** 4677 words

**History:** Received: May 10, 2024; Accepted: November 7, 2024

**Author:**

Peter C. Ferrin [a]

Danielle Eble [b]

Ellie A. Moeller [c]

Kelsey Isbester [c]

Blair R. Peters [cd] petersbl@ohsu.edu

[a]Oregon Health and Science University, Department of Surgery, Portland, OR, USA

[b]University of Washington Medical Center, Division of Plastic and Reconstructive Surgery, Seattle, WA, USA

[c]Oregon Health and Science University, Division of Plastic and Reconstructive Surgery, Portland, OR, USA

[d]Oregon Health and Science University, Transgender Health Program, Portland, OR, USA

## Body

### ABSTRACT

The long thoracic nerve's (LTN) superficial location on the chest wall renders it vulnerable to iatrogenic injury. Plastic surgeons' gender-affirming mastectomy volumes are rapidly increasing. This operation involves lateral chest contouring placing the distal LTN at risk of injury along the chest wall. Although proximal LTN injury can cause debilitating shoulder dysfunction, more distal injury can cause chronic postoperative shoulder pain and dysfunction without frank scapular winging, making diagnosis and treatment difficult. Therefore, injury is best avoided. In this study, the course of the LTN relative to the lateral border of the pectoralis major muscle was mapped to delineate and define a danger zone for LTN injury in gender-affirming mastectomy. The course of the LTN along the lateral chest wall relative to the pectoralis major lateral border was prospectively mapped using intraoperative nerve stimulation. Twelve individuals were enrolled. The LTN was mapped bilaterally and was most reliably located directly lateral to the intersection of the 4th rib and the lateral border of the pectoralis major muscle. The LTN was found a median of 4.3cm (interquartile range [IQR] = 0.9cm) lateral to the pectoralis major at the 3rd rib level, 5.0cm (IQR = 0.5cm) lateral to the pectoralis border at the 4th rib level, and 7.0cm (IQR = 0.5cm) lateral to the pectoralis border at the 5th rib level. In conclusion, this study defines a danger zone for LTN injury in gender-affirming mastectomy. With recent increases in the number of plastic surgeons performing gender-affirming mastectomies, awareness of this LTN danger zone is important to avoid iatrogenic injuries.

Jenni Wallace

Defining a danger zone for iatrogenic long thoracic nerve injury in gender-affirming mastectomy

## FULL TEXT

The long thoracic nerve (LTN) is a motor nerve responsible for the innervation of the serratus anterior (SA) muscle which stabilizes the scapula against the chest wall during upper extremity motion. The proximal LTN originates from the roots of the fifth, sixth, and seventh cervical rami, traversing dorsal to the brachial plexus and axillary artery, passes adjacent to the clavicle at the level of the first rib, and distally lies along the chest wall between ribs 2 through 9 on the superficial surface of the SA, [1] where it is particularly susceptible to injury in surgery. [2] [3] The rate of *distal* LTN injury and the subsequent deficits are not well described in the literature because proximal innervation is maintained to the upper slips of the SA preventing clinically apparent scapular winging. However, injury of the distal portion of the LTN and subsequent denervation of the lower SA can result in persistent shoulder pain and less pronounced symptoms of instability with either subclinical, asymptomatic, or partial scapular winging. [4] [5] While it is difficult to diagnose distal LTN injury clinically and therefore difficult to quantify, it is the senior author's experience seeing referrals for chronic postoperative pain following gender-affirming mastectomy involving significant lateral chest wall contouring that this problem is more common than realized.

The proximal portion of the infraclavicular LTN from the 1st through 3rd ribs has a known risk of iatrogenic injury during procedures such as scalenectomy, surgery for thoracic outlet syndrome, first rib resection, and mastectomy with axillary dissection. The distal portion of the LTN from rib levels 4 to 9 is in the surgical field in many procedures of the chest, such as thoracotomy, [6] and several studies defined a danger zone for LTN injury in thoracic surgery. 2 [7] [8] LTN injury during oncologic mastectomy has also been well documented in the surgical oncology literature, [9] [10]

[1] R.S. Tubbs, E.G. Salter, J.W. Custis, J.C. Wellons, J.P. Blount, W.J. Oakes; Surgical anatomy of the cervical and infraclavicular parts of the long thoracic nerve; J Neurosurg; Vol. 104, 5; (May 2006), pp. 792-795.Tubbs R.S., Salter E.G., Custis J.W., Wellons J.C., Blount J.P., Oakes W.J. Surgical anatomy of the cervical and infraclavicular parts of the long thoracic nerve. J Neurosurg. May 2006;104(5):792-795. doi:10.3171/jns.2006.104.5.792

[2] O. Jehoon, H.J. Kwon, T.H. Cho, S.Y. Won, H.M. Yang; Analysis of the positional relationship of the long thoracic nerve considering clinical treatment; Clin Anat; Vol. 34, 4; (May 2021), pp. 617-623.Jehoon O., Kwon H.J., Cho T.H., Won S.Y., Yang H.M. Analysis of the positional relationship of the long thoracic nerve considering clinical treatment. Clin Anat. May 2021;34(4):617-623. doi:10.1002/ca.23647

[3] N.A. Ebraheim, J. Lu, B. Porshinsky, B.E. Heck, R.A. Yeasting; Vulnerability of long thoracic nerve: an anatomic study; J Shoulder Elbow Surg; Vol. 7, 5; (1998), pp. 458-461.Ebraheim N.A., Lu J., Porshinsky B., Heck B.E., Yeasting R.A. Vulnerability of long thoracic nerve: an anatomic study. J Shoulder Elbow Surg. 1998;7(5):458-461. doi:10.1016/s1058-2746(98)90194-x

[4] L.D. Derby, S.P. Bartlett, D.W. Low; Serratus anterior free-tissue transfer: harvest-related morbidity in 34 consecutive cases and a review of the literature; J Reconstr Microsurg; Vol. 13, 6; (Aug 1997), pp. 397-403.Derby L.D., Bartlett S.P., Low D.W. Serratus anterior free-tissue transfer: harvest-related morbidity in 34 consecutive cases and a review of the literature. J Reconstr Microsurg. Aug 1997;13(6):397-403. doi:10.1055/s-2007-1006419

[5] L.R. Le Nail, G. Bacle, E. Marteau, P. Corcia, L. Favard, J. Laulan; Isolated paralysis of the serratus anterior muscle: surgical release of the distal segment of the long thoracic nerve in 52 patients; Orthop Trauma Surg Res; Vol. 100, 4Suppl; (Jun 2014), pp. S243-S248.Le Nail L.R., Bacle G., Marteau E., Corcia P., Favard L., Laulan J. Isolated paralysis of the serratus anterior muscle: surgical release of the distal segment of the long thoracic nerve in 52 patients. Orthop Traumatol Surg Res. Jun 2014;100(4Suppl):S243-S248. doi:10.1016/j.otsr.2014.03.004

[6] A. Lagueny, G. Reboul, P. Kien, B. Duch; Myoclonus of the serratus anterior muscle after posterolateral thoracotomy; Clin Neurol Neurosurg; Vol. 122; (Jul 2014), pp. 1-3.Lagueny A., Reboul G., Kien P., Duch B. Myoclonus of the serratus anterior muscle after posterolateral thoracotomy. Clin Neurol Neurosurg. Jul 2014;122:1-3. doi:10.1016/j.clineuro.2014.03.016

[7] J.D. Salazar, J.R. Doty, E.E. Tseng; Relationship of the long thoracic nerve to the scapular tip: an aid to prevention of proximal nerve injury; J Thorac Cardiovasc Surg; Vol. 116, 6; (Dec 1998), pp. 960-964.Salazar J.D., Doty J.R., Tseng E.E., et al. Relationship of the long thoracic nerve to the scapular tip: an aid to prevention of proximal nerve injury. J Thorac Cardiovasc Surg. Dec 1998;116(6):960-964. doi:10.1016/S0022-5223(98)70047-9

[8] S. Erdogmus, F. Govsa; Distal variations of the neurovascular pedicle of the serratus anterior muscle as a flap; Surg Radiol Anat; Vol. 27, 2; (Apr 2005), pp. 100-107.Erdogmus S., Govsa F. Distal variations of the neurovascular pedicle of the serratus anterior muscle as a flap. Surg Radiol Anat. Apr 2005;27(2):100-107. doi:10.1007/s00276-004-0294-3

AR-000977

and landmarks to help identify and protect the LTN during oncologic surgery of the breast and axilla have been proposed. [11] While injuries to the LTN have been occasionally described in the plastic surgery literature, [12] [13] no studies to date discuss the anatomy of the LTN in the context of gender-affirming mastectomy.

Gender-affirming mastectomy is a surgical procedure that has seen large annual growth due to improvements in insurance coverage and accessibility of care for transgender patients. [14] This translates clinically to a significant increase in the number of mastectomy procedures being performed by plastic surgeons. Although many plastic surgeons are trained to perform breast reconstruction, oncologic mastectomy has typically been performed by general and oncologic breast surgeons. Mastectomy therefore represents a relatively recent addition to the breadth of practice for many plastic surgeons and the plastic surgery literature lacks any report of the anatomy of the LTN as it relates specifically to gender-affirming mastectomy procedures. In addition, gender-affirming mastectomy places the LTN at higher risk of injury than other breast procedures as it often requires significant lateral chest wall contouring to address the "bra roll" of the lateral chest which can be a significant source of dysphoria. Additionally, the incision itself is relatively superior in this operation with a lateral curve that extends even more superiorly to mirror the lateral border of the pectoralis major muscle bringing the operative field directly over the course of the LTN.

Given the increasing number of gender-affirming mastectomies performed each year and the anatomic factors predisposing the distal LTN to iatrogenic injury during this procedure specifically, there is a need to define a danger zone for iatrogenic LTN injury in gender-affirming mastectomy. The purpose of this study is to identify and define this danger zone using in situ nerve mapping in live patients positioned appropriately for this procedure and provide technical recommendations to decrease the risk of iatrogenic LTN injury in gender-affirming mastectomy procedures.

**Patients and methods**

**Patient population and data analysis**

After obtaining IRB approval (STUDY00026655), an observational cross-sectional study was performed involving 12 patients undergoing gender-affirming mastectomy by the senior author. All patients undergoing gender-affirming

[9] I. Feller, R.T. Woodburne; The long thoracic and thoracodorsal nerves in radical mastectomy; Surg Gynecol Obstet; Vol. 107, 6; (Dec 1958), pp. 789-791.Feller I., Woodburne R.T. The long thoracic and thoracodorsal nerves in radical mastectomy. Surg Gynecol Obstet. Dec 1958;107(6):789-791.

[10] R. Belmonte, S. Monleon, N. Bofill, M.L. Alvarado, J. Espadaler, I. Royo; Long thoracic nerve injury in breast cancer patients treated with axillary lymph node dissection; Support Care Cancer; Vol. 23, 1; (Jan 2015), pp. 169-175.Belmonte R., Monleon S., Bofill N., Alvarado M.L., Espadaler J., Royo I. Long thoracic nerve injury in breast cancer patients treated with axillary lymph node dissection. Support Care Cancer. Jan 2015;23(1):169-175. doi:10.1007/s00520-014-2338-5

[11] V.P. Khatri, M.H. Espinosa; Constant landmark for simplified identification of the long thoracic nerve during mastectomy; J Surg Oncol; Vol. 64, 1; (Jan 1997), pp. 82-83.Khatri V.P., Espinosa M.H. Constant landmark for simplified identification of the long thoracic nerve during mastectomy. J Surg Oncol. Jan 1997;64(1):82-83. doi:10.1002/(sici)1096-9098(199701)64:1<82::aid-jso16>3.0.co;2-y

[12] I. Ducic, H.M. Zakaria, J.M. Felder, S. Fantus; Nerve injuries in aesthetic breast surgery: systematic review and treatment options; Aesthet Surg J; Vol. 34, 6; (Aug 2014), pp. 841-856.Ducic I., Zakaria H.M., Felder J.M., Fantus S. Nerve injuries in aesthetic breast surgery: Systematic review and treatment options. Aesthet Surg J. Aug 2014;34(6):841-856. doi:10.1177/109082014536726

[13] E. Laban, M. Kon; Lesion of the long thoracic nerve during transaxillary breast augmentation: an unusual complication; Ann Plast Surg; Vol. 24, 5; (May 1990), pp. 445-446.Laban E., Kon M. Lesion of the long thoracic nerve during transaxillary breast augmentation: an unusual complication. Ann Plast Surg. May 1990;24(5):445-446. doi:10.1097/00000637-199005000-00008

[14] M. Lane, G.C. Ives, E.C. Sluiter; Trends in gender-affirming surgery in insured patients in the United States; Plast Reconstr Surg Glob Open; Vol. 6, 4; (Apr 2018).Lane M., Ives G.C., Sluiter E.C., et al. Trends in gender-affirming surgery in insured patients in the United States. Plast Reconstr Surg Glob Open. Apr 2018;6(4):e1738. doi:10.1097/GOX.0000000000001738

Defining a danger zone for iatrogenic long thoracic nerve injury in gender-affirming mastectomy

mastectomy during the study period (November 15, 2023 - February 15, 2024) with a BMI <35 were consecutively prospectively enrolled. Patients with a BMI >35 were excluded from the study due to the increased thickness of adipose tissue on the chest wall fascia in these cases making nerve stimulation unreliable. Methodology was conducted in accordance with the STROBE guidelines. Patient demographic data at the time of operation was documented and the location of the LTN was recorded relative to the lateral border of the pectoralis major muscle and the 3rd, 4th, and 5th rib levels bilaterally with intraoperative nerve stimulation as described below. Nerve stimulation was used to map the nerve rather than dissection of the nerve to avoid unnecessary risk of nerve injury associated with nerve dissection that is not clinically indicated. Data were analyzed using descriptive statistics. Shapiro-Wilk testing revealed the location of the nerve to be not normally distributed at rib level 4. The dataset was therefore treated as having a nonparametric distribution and the nerve location between the right and left sides was compared using Mann-Whitney U tests.

**Nerve stimulation technique**

Gender-affirming mastectomy was performed using a standard double incision technique. [15] At our institution, incision placement may vary slightly depending on patient preference but typically follows the inferior and lateral borders of the pectoralis major. Breast tissue is excised off of the pectoralis fascia and lateral to the pectoralis major muscle a thin layer of adipose tissue is left on top of the fascia of the SA and latissimus dorsi to minimize the risk of iatrogenic injury to the LTN. After the excision of the breast and lateral chest wall tissue, a Checkpoint Nerve Stimulator (Checkpoint Surgical, Independence, OH) was used at 0.5mA to aid in precise localization of the LTN along the fascia of the exposed anterior surface of the SA. This setting was selected as it allows for adequate nerve stimulation specifically and does not cause contraction from direct stimulation of muscle. If paralytic was used for anesthetic induction, it was reversed and robust muscle response was confirmed prior to intraoperative nerve mapping. The distance between the LTN and the lateral border of the pectoralis major was recorded at each rib level where the SA muscle was visible and the LTN was able to be identified and stimulated. The lateral border of the pectoralis major muscle was the chosen landmark because it is always identifiable in the surgical field and its location is easy to reliably locate (as opposed to the often described midaxillary line which has a more subjective location and is often difficult to identify in a draped field in an abducted arm position). This process was repeated bilaterally.

**Results**

In this study, 12 patients underwent gender-affirming mastectomy with bilateral intraoperative stimulation and mapping of the long thoracic nerve for a total of 24 mappings of the LTN danger zone. Table 1 displays the study cohort demographics. None of the included patients had undergone a previous chest operation prior to gender-affirming mastectomy.

**Table 1**

| 1077 | **22 (9.5)** |
|---|---|
| **Age[1077], y** | |
| BMI | 27.7 (4.7) |
| 188 | |
| Fisher grade[188] | |

[15] A.A. Salibian, E. Gonzalez, J.D. Frey, R. Bluebond-Langner; Tips and tricks in gender-affirming mastectomy; Plast Reconstr Surg; Vol. 147, 6; (Jun 01 2021), pp. 1288-1296.Salibian A.A., Gonzalez E., Frey J.D., Bluebond-Langner R. Tips and tricks in gender-affirming mastectomy. Plast Reconstr Surg. Jun 01 2021;147(6):1288-1296. doi:10.1097/PRS.0000000000007997

AR-000979

Defining a danger zone for iatrogenic long thoracic nerve injury in gender-affirming mastectomy

| | |
|---|---|
| [1077] | **22 (9.5)** |
| **Age[1077], y** | |
| 1 | 0 (0) |
| 2 | 1 (8) |
| 3 | 5 (42) |
| 4 | 6 (50) |

Table 1 - Patient Demographics.

[a]Displayed as median (IQR).

[b]Displayed as n(%).

Table 2 displays the location of the LTN in relation to the lateral border of the pectoralis major muscle. The location of the nerve was not significantly different between sides (3rd rib: p = 0.65; 4th rib: p = 0.72; 5th rib: p = 0.73) and therefore the location of the nerve was grouped between sides. The LTN was most consistently identified in the surgical field with intraoperative stimulation at the 4th rib level (100% of study participants), followed by the 3rd rib level (75% of participants), and finally the 5th rib level (40% of participants). The distances from the lateral pectoralis border were used to map the danger zone within which the LTN is most likely to be injured. See Video, Supplemental Digital Content 1. The LTN was found a median of 4.3cm lateral to the pectoralis border at the 3rd rib level (IQR = 0.9cm; range: 3 to 6cm), 5.0cm lateral to the pectoralis border at the 4th rib level (IQR = 0.5cm; range: 4.5 to 7cm), and 7.0cm lateral to the pectoralis border at the 5th rib level (IQR = 0.5cm; range 6 to 7.5cm). Figure 1 depicts the danger zone boundaries within the surgical field, with the LTN depicted traversing through the middle of

this zone along the lateral chest wall.

Figure 1 - Intraoperative photo demonstrating the anatomy of the long thoracic nerve as it courses through the danger zone between rib levels 3-5, with blue dots representing the measured points of each included patient in the study (A). Illustration of the nerve anatomy with measurements indicating the median distance the nerve was found lateral to the lateral border of the pectoralis major muscle (B).

## Table 2

| Rib Level | 3 | 4 | 5 |
|---|---|---|---|
| Distance from pectoralis border (cm)[5875] | 4.3 (0.9) | 5.0 (0.5) | 7.0 (0.5) |
| Range, cm | 3–6 | 4.7–7 | 6- 7.5 |
| Nerve identified at this level[1293] | 83 | 100 | 58 |

AR-000980

Defining a danger zone for iatrogenic long thoracic nerve injury in gender-affirming mastectomy

Table 2 - Location of the Long Thoracic Nerve in Relation to the Lateral Border of the Pectoralis Major Muscle.

[a]Presented as median (IQR).

[b]Presented as percentage of sides investigated.

Supplementary material related to this article can be found online at doi:10.1016/j.nanoen.2021.105929.

The following is the Supplementary material related to this article  Video S1.
Supplemental Digital Content 1: Intraoperative Stimulation of the Long Thoracic Nerve.

**Discussion**

While the anatomy of the LTN is familiar to many surgeons performing breast surgery, some plastic surgeons trained in the era of integrated residency programs but before widespread insurance coverage of gender-affirming mastectomy procedures, limiting their training exposure to mastectomy operations performed for either oncologic or gender-affirming indications. Therefore, they may have had less formal training in performing mastectomies and less experience with the anatomy and identification of the LTN in this setting. Gender-affirming mastectomy also poses a heightened risk of LTN injury compared to many other common breast surgery procedures due to the dysphoria caused by lateral chest wall fullness or "bra rolls" which necessitates more extensive lateral chest wall contouring. This chest contouring often involves direct excision of the lateral chest wall adipose excess down to the level of the fascia overlying the SA and latissimus dorsi to achieve a cosmetically acceptable result. This resection often leaves only a thin layer of fascia over the SA to protect the LTN. Inadvertent violation of this fascia can easily occur, particularly in patients with significant soft tissue laxity or slender patients with only a thin fascial layer over the SA. 10 In addition, the adipose tissue of the lateral chest is frequently fed by large perforating vessels from the lateral thoracic artery along the chest wall. Overly aggressive cauterization of these vessels represents another potential source of injury to the LTN. Furthermore, incision placement in gender-affirming mastectomy procedures frequently results in a surgical field that is superior to other breast procedures such as mastopexy and breast reduction. Additionally, it is common practice to curve the upper incision superolaterally toward the axilla so the final scar mirrors the lateral border of the pectoralis major. Defining an LTN danger zone may help raise awareness and minimize the risk of iatrogenic injury of the LTN during gender-affirming mastectomy procedures. In addition, while this study focuses on gender-affirming mastectomy for the aforementioned reasons, the findings reported here may additionally be applied more broadly to non-oncologic mastectomies performed for other indications such as gynecomastia or granulomatous mastitis, and given the ease and reliability of finding the proposed landmarks intraoperatively compared to previously proposed landmarks for LTN identification in oncologic mastectomies, they may also prove to be useful for oncologic breast and axillary surgery.

In this study, the LTN was identified and stimulated in the surgical field at the level of the 3rd through 5th ribs. A recent study defined the danger zone of the distal portion of the LTN during thoracotomy to lie between the 4th to 6th rib spaces within 3 cm anterior and 1 cm posterior to the midaxillary line. 2 That study also documented that 76% of LTN branches entered the SA within the 4th to 6th intercostal spaces. 2 The danger zone defined here has a significant overlap with this area described in the thoracic surgery literature, though is described and defined using anatomic landmarks familiar to plastic surgeons and relevant to gender-affirming mastectomy specifically. In this study, the location of the LTN was identified within the gender-affirming mastectomy field and in relation to the lateral border of the pectoralis major muscle, a reproducible landmark for this operation. In prior literature on the LTN, the midaxillary line is often used which is a more subjective landmark often less clearly defined in the gender-affirming mastectomy operative field. Other less practical landmarks have also been proposed such as the scapular tip or the sternum. 1  2  7 One additional advantage of this study design was that previous studies have used cadavers to map the course of the LTN, 1  2  7 wherein this study used intraoperative nerve stimulation to identify the LTN location in situ. This study provides a more relevant context for where the nerve may be encountered when taking into account patient positioning, arm abduction, and expected surgical field.

AR-000981

Defining a danger zone for iatrogenic long thoracic nerve injury in gender-affirming mastectomy

Iatrogenic injury to the distal LTN is one potential etiology for chronic pain following gender-affirming mastectomy that is often overlooked. Previous studies have documented distal LTN injury or entrapment as a cause of chronic shoulder pain which can be neuropathic in origin or mechanical due to SA dysfunction (leading to anterior shoulder rocking or compensatory muscle pain). [5] Prevention of LTN injury is important as treatment options are poor if spontaneous recovery does not occur, [10] and counseling regarding LTN injury should be included in all gender-affirming mastectomy surgical consents. If the LTN is injured proximally in the neck or the axilla, a nerve transfer can be performed from the thoracodorsal nerve with the possible addition of a pectoral fascicle of the middle trunk. [16] [17] [18] However, the location most at risk of injury in gender-affirming mastectomy procedures is along the chest wall between ribs 3 to 5 as demonstrated here. When this part of the nerve is injured, nerve transfer may not be viable as the distal LTN target is damaged and may not be available as a distal nerve transfer target. An additional challenge in treatment is a lack of recognition or significant delay in diagnosis. If innervation is maintained to the upper slips of the SA, as in the case of a distal LTN injury, this may not result in scapular winging which is the clinical sign most physicians are trained to look for if suspecting injury to the LTN. A lack of winging does not rule out injury to the distal portion of the LTN. Diagnosis should be considered based on symptoms of persistent low-grade pain and physical exam signs of instability and confirmed with electromyography testing the lower slips of the serratus for evidence of denervation. [10]

**Technical recommendations to reduce the risk of iatrogenic injury**

The anatomic danger zone defined in this study is most frequently encountered during the resection of the axillary tail of breast tissue or the frequently performed additional resection of adipose tissue on the lateral chest wall in gender-affirming mastectomy cases. Although addressing the lateral chest is important, it is critical to avoid over-resection of the adipose tissue/bra roll on the lateral chest wall, to leave the fascia of the SA completely intact and even to consider leaving a thin tissue layer superficial to the SA fascia to avoid injury to the LTN and its branches. Large perforating vessels are typically encountered originating from the lateral thoracic artery, and careful cauterization or clip application to these branches should be considered to avoid thermal injury to the nearby LTN. Finally, all efforts must be made to avoid entering the axilla during gender-affirming mastectomy procedures. Some patients, particularly those with a significantly elevated body mass index, may have ptotic axillary fat that enters the resection field. It is important to recognize the difference in the appearance of axillary fat and leave this in situ to minimize the risk of both inadvertent lymph node dissection and lymphedema as well as a more proximal iatrogenic injury to the LTN. While we do not recommend routine use of intraoperative nerve stimulation for nerve identification, it can be a helpful adjunct in cases that involve extensive chest wall contouring, or to rule out an LTN nerve injury if there is a significant violation of the SA fascia noted within the described danger zone.

**Limitations**

This study was limited to defining an anatomic danger zone and did not include prospective outcomes. Due to limitations with the intraoperative nerve stimulation technique, we were unable to perform LTN stimulation and mapping in patients with BMI >35. Therefore, the application of this LTN danger zone to this patient population should be used with caution. Furthermore, given the small sample size and nonparametric distribution of the nerve

---

[16] W.Z. Ray, M.A. Pet, M.C. Nicoson, A. Yee, L.C. Kahn, S.E. Mackinnon; Two-level motor nerve transfer for the treatment of long thoracic nerve palsy; J Neurosurg; Vol. 115, 4; (Oct 2011), pp. 858-864.Ray W.Z., Pet M.A., Nicoson M.C., Yee A., Kahn L.C., Mackinnon S.E. Two-level motor nerve transfer for the treatment of long thoracic nerve palsy. J Neurosurg. Oct 2011;115(4):858-864. doi:10.3171/2011.5.JNS101615

[17] S.S. Noland, E.M. Krauss, J.M. Felder, S.E. Mackinnon; Surgical and clinical decision making in isolated long thoracic nerve palsy; Hand (N Y); Vol. 13, 6; (Nov 2018), pp. 689-694.Noland S.S., Krauss E.M., Felder J.M., Mackinnon S.E. Surgical and clinical decision making in isolated long thoracic nerve palsy. Hand (N Y). Nov 2018;13(6):689-694. doi:10.1177/1558944717733306

[18] C.B. Novak, S.E. Mackinnon; Surgical treatment of a long thoracic nerve palsy; Ann Thorac Surg; Vol. 73, 5; (May 2002), pp. 1643-1645.Novak C.B., Mackinnon S.E. Surgical treatment of a long thoracic nerve palsy. Ann Thorac Surg. May 2002;73(5):1643-1645. doi:10.1016/s0003-4975(01)03372-0

AR-000982

Defining a danger zone for iatrogenic long thoracic nerve injury in gender-affirming mastectomy

locations at some rib levels, nonparametric statistical tests were utilized which may increase the likelihood of type I error being present in the results.

**Conclusion**

Gender-affirming mastectomy frequently involves significant lateral chest wall contouring. The superficial location of the LTN and its branches on the anterior surface of the SA muscle places the nerve at risk of iatrogenic injury. The danger zone for injury to the LTN in gender-affirming mastectomy traverses from the 3rd to 5th rib, and extends from 3 cm to 7.5 cm lateral to the lateral border of the pectoralis major muscle. Strategies to minimize the risk of iatrogenic injury to the LTN in gender-affirming mastectomy include avoiding over-resection of tissue of the lateral chest wall, not violating the fascia of the SA, and avoiding thermal injury from aggressive cauterization of lateral thoracic perforating vessels.

**Ethical approval statement**

All patients gave written and verbal consent to participate in this study. This study was approved by our institution's Institutional Review Board (STUDY00026655).

**Funding**

None.

**Conflict of interest statement**

PCF - none; DE - none; EAM - none; KI - none; BRP - none.

CONTACT: Correspondence to: Division of Plastic and Reconstructive Surgery, Transgender Health Program, Oregon Health & Science University, 3303 SW Bond Ave, Portland, OR, USA.

# References

1  R.S. Tubbs, E.G. Salter, J.W. Custis, J.C. Wellons, J.P. Blount, W.J. Oakes; Surgical anatomy of the cervical and infraclavicular parts of the long thoracic nerve; J Neurosurg; Vol. 104, 5; (May 2006), pp. 792-795.Tubbs R.S., Salter E.G., Custis J.W., Wellons J.C., Blount J.P., Oakes W.J. Surgical anatomy of the cervical and infraclavicular parts of the long thoracic nerve. J Neurosurg. May 2006;104(5):792-795. doi:10.3171/jns.2006.104.5.792

2  O. Jehoon, H.J. Kwon, T.H. Cho, S.Y. Won, H.M. Yang; Analysis of the positional relationship of the long thoracic nerve considering clinical treatment; Clin Anat; Vol. 34, 4; (May 2021), pp. 617-623.Jehoon O., Kwon H.J., Cho T.H., Won S.Y., Yang H.M. Analysis of the positional relationship of the long thoracic nerve considering clinical treatment. Clin Anat. May 2021;34(4):617-623. doi:10.1002/ca.23647

3  N.A. Ebraheim, J. Lu, B. Porshinsky, B.E. Heck, R.A. Yeasting; Vulnerability of long thoracic nerve: an anatomic study; J Shoulder Elbow Surg; Vol. 7, 5; (1998), pp. 458-461.Ebraheim N.A., Lu J., Porshinsky B., Heck B.E., Yeasting R.A. Vulnerability of long thoracic nerve: an anatomic study. J Shoulder Elbow Surg. 1998;7(5):458-461. doi:10.1016/s1058-2746(98)90194-x

4  L.D. Derby, S.P. Bartlett, D.W. Low; Serratus anterior free-tissue transfer: harvest-related morbidity in 34 consecutive cases and a review of the literature; J Reconstr Microsurg; Vol. 13, 6; (Aug 1997), pp. 397-403.Derby L.D., Bartlett S.P., Low D.W. Serratus anterior free-tissue transfer: harvest-related morbidity in 34 consecutive cases and a review of the literature. J Reconstr Microsurg. Aug 1997;13(6):397-403. doi:10.1055/s-2007-1006419

5  L.R. Le Nail, G. Bacle, E. Marteau, P. Corcia, L. Favard, J. Laulan; Isolated paralysis of the serratus anterior muscle: surgical release of the distal segment of the long thoracic nerve in 52 patients; Orthop Trauma Surg Res; Vol. 100, 4Suppl; (Jun 2014), pp. S243-S248.Le Nail L.R., Bacle G., Marteau E., Corcia P., Favard L., Laulan J.

AR-000983

Defining a danger zone for iatrogenic long thoracic nerve injury in gender-affirming mastectomy

Isolated paralysis of the serratus anterior muscle: surgical release of the distal segment of the long thoracic nerve in 52 patients. Orthop Traumatol Surg Res. Jun 2014;100(4Suppl):S243-S248. doi:10.1016/j.otsr.2014.03.004

6  A. Lagueny, G. Reboul, P. Kien, B. Duch; Myoclonus of the serratus anterior muscle after posterolateral thoracotomy; Clin Neurol Neurosurg; Vol. 122; (Jul 2014), pp. 1-3.Lagueny A., Reboul G., Kien P., Duch B. Myoclonus of the serratus anterior muscle after posterolateral thoracotomy. Clin Neurol Neurosurg. Jul 2014;122:1-3. doi:10.1016/j.clineuro.2014.03.016

7  J.D. Salazar, J.R. Doty, E.E. Tseng; Relationship of the long thoracic nerve to the scapular tip: an aid to prevention of proximal nerve injury; J Thorac Cardiovasc Surg; Vol. 116, 6; (Dec 1998), pp. 960-964.Salazar J.D., Doty J.R., Tseng E.E., et al. Relationship of the long thoracic nerve to the scapular tip: an aid to prevention of proximal nerve injury. J Thorac Cardiovasc Surg. Dec 1998;116(6):960-964. doi:10.1016/S0022-5223(98)70047-9

8  S. Erdogmus, F. Govsa; Distal variations of the neurovascular pedicle of the serratus anterior muscle as a flap; Surg Radiol Anat; Vol. 27, 2; (Apr 2005), pp. 100-107.Erdogmus S., Govsa F. Distal variations of the neurovascular pedicle of the serratus anterior muscle as a flap. Surg Radiol Anat. Apr 2005;27(2):100-107. doi:10.1007/s00276-004-0294-3

9  I. Feller, R.T. Woodburne; The long thoracic and thoracodorsal nerves in radical mastectomy; Surg Gynecol Obstet; Vol. 107, 6; (Dec 1958), pp. 789-791.Feller I., Woodburne R.T. The long thoracic and thoracodorsal nerves in radical mastectomy. Surg Gynecol Obstet. Dec 1958;107(6):789-791.

10  R. Belmonte, S. Monleon, N. Bofill, M.L. Alvarado, J. Espadaler, I. Royo; Long thoracic nerve injury in breast cancer patients treated with axillary lymph node dissection; Support Care Cancer; Vol. 23, 1; (Jan 2015), pp. 169-175.Belmonte R., Monleon S., Bofill N., Alvarado M.L., Espadaler J., Royo I. Long thoracic nerve injury in breast cancer patients treated with axillary lymph node dissection. Support Care Cancer. Jan 2015;23(1):169-175. doi:10.1007/s00520-014-2338-5

11  V.P. Khatri, M.H. Espinosa; Constant landmark for simplified identification of the long thoracic nerve during mastectomy; J Surg Oncol; Vol. 64, 1; (Jan 1997), pp. 82-83.Khatri V.P., Espinosa M.H. Constant landmark for simplified identification of the long thoracic nerve during mastectomy. J Surg Oncol. Jan 1997;64(1):82-83. doi:10.1002/(sici)1096-9098(199701)64:1<82::aid-jso16>3.0.co;2-y

12  I. Ducic, H.M. Zakaria, J.M. Felder, S. Fantus; Nerve injuries in aesthetic breast surgery: systematic review and treatment options; Aesthet Surg J; Vol. 34, 6; (Aug 2014), pp. 841-856.Ducic I., Zakaria H.M., Felder J.M., Fantus S. Nerve injuries in aesthetic breast surgery: Systematic review and treatment options. Aesthet Surg J. Aug 2014;34(6):841-856. doi:10.1177/1090820X14536726

13  E. Laban, M. Kon; Lesion of the long thoracic nerve during transaxillary breast augmentation: an unusual complication; Ann Plast Surg; Vol. 24, 5; (May 1990), pp. 445-446.Laban E., Kon M. Lesion of the long thoracic nerve during transaxillary breast augmentation: an unusual complication. Ann Plast Surg. May 1990;24(5):445-446. doi:10.1097/00000637-199005000-00008

14  M. Lane, G.C. Ives, E.C. Sluiter; Trends in gender-affirming surgery in insured patients in the United States; Plast Reconstr Surg Glob Open; Vol. 6, 4; (Apr 2018).Lane M., Ives G.C., Sluiter E.C., et al. Trends in gender-affirming surgery in insured patients in the United States. Plast Reconstr Surg Glob Open. Apr 2018;6(4):e1738. doi:10.1097/GOX.0000000000001738

15  A.A. Salibian, E. Gonzalez, J.D. Frey, R. Bluebond-Langner; Tips and tricks in gender-affirming mastectomy; Plast Reconstr Surg; Vol. 147, 6; (Jun 01 2021), pp. 1288-1296.Salibian A.A., Gonzalez E., Frey J.D., Bluebond-Langner R. Tips and tricks in gender-affirming mastectomy. Plast Reconstr Surg. Jun 01 2021;147(6):1288-1296. doi:10.1097/PRS.0000000000007997

AR-000984

Defining a danger zone for iatrogenic long thoracic nerve injury in gender-affirming mastectomy

16  W.Z. Ray, M.A. Pet, M.C. Nicoson, A. Yee, L.C. Kahn, S.E. Mackinnon; Two-level motor nerve transfer for the treatment of long thoracic nerve palsy; J Neurosurg; Vol. 115, 4; (Oct 2011), pp. 858-864.Ray W.Z., Pet M.A., Nicoson M.C., Yee A., Kahn L.C., Mackinnon S.E. Two-level motor nerve transfer for the treatment of long thoracic nerve palsy. J Neurosurg. Oct 2011;115(4):858-864. doi:10.3171/2011.5.JNS101615

17  S.S. Noland, E.M. Krauss, J.M. Felder, S.E. Mackinnon; Surgical and clinical decision making in isolated long thoracic nerve palsy; Hand (N Y); Vol. 13, 6; (Nov 2018), pp. 689-694.Noland S.S., Krauss E.M., Felder J.M., Mackinnon S.E. Surgical and clinical decision making in isolated long thoracic nerve palsy. Hand (N Y). Nov 2018;13(6):689-694. doi:10.1177/1558944717733306

18  C.B. Novak, S.E. Mackinnon; Surgical treatment of a long thoracic nerve palsy; Ann Thorac Surg; Vol. 73, 5; (May 2002), pp. 1643-1645.Novak C.B., Mackinnon S.E. Surgical treatment of a long thoracic nerve palsy. Ann Thorac Surg. May 2002;73(5):1643-1645. doi:10.1016/s0003-4975(01)03372-0

# Classification

**Language:** ENGLISH

**Document Type:** Full-length article

**Publication Type:** Journal

**Journal Code:** PRAS

**Subject:** ANATOMY & PHYSIOLOGY (90%); COSMETIC & RECONSTRUCTIVE SURGERY (90%); NEUROLOGICAL DISORDERS & INJURIES (90%); SURGERY & TRANSPLANTATION (90%); WOUNDS & INJURIES (89%); MORBIDITY RATES (78%); MUSCULOSKELETAL DISORDERS & INJURIES (78%); Long thoracic nerve; Gender-affirming mastectomy; Gender-affirming surgery; Nerve injury; Mastectomy; Shoulder pain

**Company:** ROOTS CORP (72%)

**Ticker:** ROOT (TSX) (72%)

**Industry:** NAICS721110 HOTELS (EXCEPT CASINO HOTELS) & MOTELS (72%); SIC7041 ORGANIZATION HOTELS & LODGING HOUSES, ON MEMBERSHIP BASIS (72%); SIC7011 HOTELS & MOTELS (72%)MORBIDITY RATES (78%)

**Load-Date:** January 23, 2025

Journal of Plastic, Reconstructive and Aesthetic Surgery
Copyright 2025 British Association of Plastic, Reconstructive and Aesthetic Surgeons All Rights Reserved

AR-000985

Defining a danger zone for iatrogenic long thoracic nerve injury in gender-affirming mastectomy

**End of Document**

*The Journal of Sexual Medicine*, 2025, 1–7
https://doi.org/10.1093/jsxmed/qdaf026
**Original Research**

Downloaded from https://academic.oup.com/jsm/advance-article/doi/10.1093/jsxmed/qdaf026/8042063 by NIH - Health Services Research Library user on 28 March 2025

# Examining gender-specific mental health risks after gender-affirming surgery: a national database study

Joshua E. Lewis, BS[1] (iD), Amani R. Patterson, MBS[2], Maame A. Effirim, BS[3], Manav M. Patel, BSA[2], Shawn E. Lim, BS[2], Victoria A. Cuello, BS[2], Marc H. Phan, BS[2], Wei-Chen Lee, PhD[4],*

[1]School of Medicine, Baylor College of Medicine, Houston, TX 77030, United States
[2]John Sealy School of Medicine, University of Texas Medical Branch, Galveston, TX 77555-1317, United States
[3]John P. and Kathrine G. McGovern Medical School, University of Texas Health Houston, Houston, TX 77030, United States
[4]Department of Family Medicine, University of Texas Medical Branch, Galveston, TX 77555-1123, United States

*Corresponding author: Department of Family Medicine, University of Texas Medical Branch, Galveston, TX 77555-1123, United States. Email: weilee@utmb.edu

## Abstract

**Background**: Transgender individuals face heightened psychological distress, including depression, anxiety, and suicidal ideation, partly due to stigma and lack of gender affirmation.
**Aim:** To evaluate mental health outcomes in transgender individuals with gender dysphoria who have undergone gender-affirming surgery, stratified by gender and time since surgery.
**Methods:** This retrospective study utilized the TriNetX database, analyzing U.S. patients aged $\geq 18$ with gender dysphoria (International Classification of Diseases, Tenth Revision [ICD-10] F64) between June 2014 and June 2024. Six cohorts were created based on gender and surgery status: Cohorts A-D included patients with or without surgery, and Cohorts E-F allowed for gender comparison among those with surgery. Propensity score matching controlled for age, race, and ethnicity. Mental health outcomes included depression, anxiety, suicidal ideation, substance use disorder, and body dysmorphic disorder, assessed over two years post-surgery using clinician-verified ICD-10 codes. Body dysmorphic disorder (BDD) was analyzed separately and not conflated with gender dysphoria cohorts to ensure the distinction between these conditions. Statistical analysis employed risk ratios, with $P < 0.05$ deemed significant.
**Outcomes:** Primary outcomes were differences in mental health disorders, specifically depression, anxiety, suicidal ideation, body-dysmorphic disorder, and substance use disorder, among transgender individuals' post-surgery.
**Results**: From 107 583 patients, matched cohorts demonstrated that those undergoing surgery were at significantly higher risk for depression, anxiety, suicidal ideation, and substance use disorders than those without surgery. Males with surgery showed a higher prevalence of depression (25.4% vs. 11.5%, RR 2.203, $P < 0.0001$) and anxiety (12.8% vs. 2.6%, RR 4.882, $P < 0.0001$). Females exhibited similar trends, with elevated depression (22.9% vs. 14.6%, RR 1.563, $P < 0.0001$) and anxiety (10.5% vs. 7.1%, RR 1.478, $P < 0.0001$). Feminizing individuals demonstrated particularly high risk for depression (RR 1.783, $P = 0.0298$) and substance use disorders (RR 1.284, $P < 0.0001$).
**Clinical implications:** Findings suggest the necessity for gender-sensitive mental health support following gender-affirming surgery to address post-surgical psychological risks.
**Strengths and Limitations:** By leveraging ICD-10 codes, we provide a more accurate representation of patient demographics and clinical outcomes, minimizing recall and reporting biases that often limit survey-based research. Limitations include the inability to account for unmeasured confounders such as social support.
**Conclusion:** Gender-affirming surgery, while beneficial in affirming gender identity, is associated with increased risk of mental health issues, underscoring the need for ongoing, gender-sensitive mental health support for transgender individuals' post-surgery.

**Keywords:** transgender; gender identity; gender dysphoria; gender-affirming surgery; mental health; TriNetX.

## Introduction

Transgender individuals—those who experience a mismatch between their gender identity and the sex assigned at birth—face a heightened risk of psychological distress and related challenges, including suicidal tendencies [1–4]. This increased risk is thought to arise partly from transgender individuals' heightened exposure to stigma-related stress, often referred to as minority stress [5, 6]. Additionally, it may be linked to the stress of not receiving gender affirmation, which involves the accurate acknowledgment and validation of their gender identity [3, 7]. For some transgender individuals, this distress reaches a clinical threshold known as gender dysphoria, defined as significant discomfort or distress stemming from an incongruence between one's experienced or expressed gender and their assigned sex at birth [8, 9]. To relieve the stress associated with the ongoing mismatch between one's gender identity and assigned sex, a growing number of transgender individuals pursue gender-affirming medical treatments, such as hormone therapy and gender-affirming surgeries.

Despite increasing support for gender-affirming medical interventions to alleviate distress in transgender individuals experiencing gender incongruence, the long-term mental health outcomes associated with these interventions remain largely unclear. Much of the available research is based on small sample sizes, cross-sectional designs, and self-reported data on treatment exposure and mental health outcomes,

Received: November 6, 2024. Revised: January 25, 2025. Accepted: February 4, 2025
© The Author(s) 2025. Published by Oxford University Press on behalf of The International Society for Sexual Medicine. All rights reserved. For permissions, please e-mail: journals.permissions@oup.com

**2**                                                                                          *The Journal of Sexual Medicine*, 2025, Vol 00, Issue 00

which can introduce biases and limit the reliability of findings [4, 10–13]. A meta-analysis of small-scale studies, primarily cross-sectional, suggested a positive association between self-reported hormone therapy and gender-affirming surgery with improved mental health outcomes [10]. However, these studies are often limited by short follow-up periods and lack of control for confounding variables, making it challenging to establish causative links over time.

Existing studies also fall short due to non-representative sampling and limited longitudinal data, leaving critical questions unanswered about the association between the duration since gender-affirming treatment and mental health outcomes among transgender individuals. Moreover, the absence of probability-based data on the prevalence of mood and anxiety disorders within this population, as compared to the general population, reflects a gap in understanding the true impact of these interventions [14].

Our study seeks to address these gaps by utilizing the TriNetX database and International Classification of Diseases, Tenth Revision (ICD-10) codes, which allow for a more comprehensive, clinician-verified assessment of gender dysphoria and related mental health outcomes across a large, nationally representative cohort. Unlike previous studies that rely on self-reported data and smaller, institution-based samples, our methodology leverages robust, real-world data to enable a more accurate and generalizable understanding of mental health outcomes following gender-affirming surgery. The objectives of this study are threefold: (1) to assess mental health outcomes in transgender individuals with gender dysphoria who have undergone gender-affirming surgery compared to those who have not, (2) to explore gender-specific mental health differences among those who have received gender-affirming surgery, and (3) to evaluate whether mental health outcomes vary based on the length of time since undergoing surgery. By addressing these objectives, this study aims to provide valuable insights into the mental health impacts of gender-affirming surgery, contributing to more informed and supportive care for transgender individuals.

## Methods
### Data source
This study utilized the TriNetX database, a global health research network managed by a private organization, providing access to de-identified patient data from over 64 U.S.-based healthcare organizations, including a mix of public and private institutions. The database encompasses data from more than 113.4 million patients, aggregated from electronic medical records (EMRs), claims, and other healthcare data sources, ensuring standardized and comprehensive documentation. Organizations contribute their data to support research initiatives, improve healthcare outcomes, and leverage analytics for quality improvement. This study was deemed exempt from Institutional Review Board (IRB) oversight as it exclusively involved de-identified patient data.

### Study design and population
The retrospective study selected patients from June 12, 2014, to June 12, 2024 of U.S. patients. To be included, all patients had to be 18 years or older with a diagnosis of gender dysphoria, as identified by the ICD-10 code F64. This criterion

was chosen based on literature highlighting elevated mental health concerns for transgender and nonbinary patients with gender dysphoria [15, 16]. Gender-affirming surgery cohorts consisted of patients with a documented diagnosis of gender dysphoria who had undergone specific gender-affirming surgical procedures. For transmen, this primarily included mastectomy (chest masculinization surgery, CPT codes 19 303 and 19 304), while for transwomen, this encompassed a range of feminizing procedures such as tracheal shave (CPT code 31899), breast augmentation (CPT code 19325), and vaginoplasty (CPT codes 57 335 and 55 970). These surgeries were identified using clinician-verified CPT codes within the TriNetX database, allowing for precise classification.

### Classification of cohorts
We classified patients using the gender documented in the EMRs within the TriNetX database, recognizing that this documentation may reflect either natal sex or gender identity, depending on how it was recorded. To minimize potential misclassification, we identified transgender individuals using the ICD-10 code F64 (gender dysphoria) and categorized them into six cohorts.

- **Cohort A**: Patients documented as male (which may indicate natal sex or affirmed gender identity), aged ≥18 years, with a prior diagnosis of gender dysphoria, who had undergone gender-affirming surgery.
- **Cohort B**: Male patients with the same diagnosis but without surgery.
- **Cohort C**: Patients documented as female, aged ≥18 years, with a prior diagnosis of gender dysphoria, who had undergone gender-affirming surgery.
- **Cohort D**: Female patients with the same diagnosis but without surgery.
- **Cohort E**: Transgender male patients who underwent masculinizing gender-affirming regardless of a previous documented diagnosis of gender dysphoria
- **Cohort F**: Transgender female patients who underwent feminizing gender-affirming surgery regardless of a previous documented diagnosis of gender dysphoria.

Cohorts E and F include transgender patients who underwent gender-affirming surgery but lacked a documented diagnosis of gender dysphoria, unlike Cohorts A and C, which specifically require this diagnosis for inclusion. This distinction allows for the evaluation of mental health outcomes in a broader transgender population, encompassing individuals who sought surgery without meeting the formal diagnostic criteria for gender dysphoria. By comparing these cohorts, the study provides unique insights into how mental health outcomes may differ based on diagnostic status. While longitudinal data at the individual level were unavailable, mental health outcomes were assessed in a cross-sectional manner using diagnoses recorded before and after surgery within the database. Risk for mental health outcomes was assessed for all cohorts over two years following surgery, based on findings from the 2015 US Transgender Survey that highlighted significant adverse mental health outcomes occurring within this timeframe [17]. Mental health outcomes were determined using validated tools administrated by the doctors and healthcare organizations, with the results recorded using corresponding ICD-10 codes.

Downloaded from https://academic.oup.com/jsm/advance-article/doi/10.1093/jsxmed/qdaf026/8042063 by NIH - Health Services Research Library user on 28 March 2025

AR-000988

*The Journal of Sexual Medicine*, 2025, Vol 00, Issue 00                                                                        3

## Mental health outcome assessment

Mental health outcomes in this study were assessed using clinician-verified International Classification of Diseases, Tenth Revision (ICD-10) diagnostic codes, as recorded in the EMRs within the TriNetX database. These diagnoses were established by healthcare professionals during clinical encounters and documented in the EMRs of participating healthcare organizations. This approach eliminates the reliance on self-report measures, ensuring that diagnoses such as depression, anxiety, suicidal ideation, substance use disorder, and body dysmorphic disorder are based on clinical evaluations rather than patient-reported symptoms or survey items. By utilizing ICD-10 codes, we sought to enhance the validity and reliability of the data, addressing the limitations of bias and subjectivity inherent in self-reported mental health measures.

## Study outcomes

The outcomes for our study were chosen based on studies that highlighted mental health outcomes that exist within the transgender patient population [18–20]. Patients included in the analysis had no documented mental health disorder diagnoses prior to the index date. The absence of longitudinal patient trajectories in the database limited within-patient tracking, and outcomes were evaluated cross-sectionally based on ICD-10 diagnoses documented at two time points: pre- and post-surgery. The database does not include explicit information on sex assigned at birth, relying instead on documented demographic data as "male" or "female."

## Propensity score matching

To control for potentially confounding factors, propensity score matching was utilized. In our study, we propensity matched for age, race, and ethnicity, criteria identified in the literature as risk factors for mental health in this population [21, 22].

## Statistical analysis

Data analysis was conducted using the TriNetX software platform, which facilitates statistical computations and cohort comparisons. Risk ratios (RRs) with 95% confidence intervals (CIs) were calculated to assess the relative risk of mental health outcomes between cohorts. Statistical significance was determined with a threshold of $P < 0.05$. Additional tables summarizing demographic and outcome data were generated using Microsoft Excel to provide a comprehensive overview of the results.

## Results

Our team identified 107 583 patients aged ≥18 with a previous diagnosis of gender dysphoria using the TriNetX Database United States Collaborative Network. Initially, Cohort A included 2774 male patients with gender dysphoria and gender-affirming surgery; Cohort B included 48 090 male patients with gender dysphoria but no gender-affirming surgery; Cohort C included 3358 female patients with gender dysphoria and gender-affirming surgery; Cohort D included 67 579 female patients with gender dysphoria but no gender-affirming surgery; Cohort E included 3790 transgender male patients who underwent gender-affirming surgery but did not have a documented diagnosis of gender dysphoria; Cohort F

included 4643 transgender female patients who underwent gender-affirming surgery but did not have a documented diagnosis of gender dysphoria. The demographics for each cohort before and after propensity score matching is attached to the supplementary tables.

After propensity score matching of cohorts A and B, each cohort had 2774 patients of similar race, ethnicity, and age at index (**Supplementary document:** Table S1). Compared to male patients with a diagnosis of gender dysphoria only, those with gender affirmation surgery were at significantly higher risk for depression, anxiety, suicidal ideation, and substance use disorders. However, neither cohort was at increased risk for body dysmorphic disorder (Table 1). Male patients with gender-affirming surgery had a 25.4% rate of depression, compared to 11.5% for those without surgery (RR 2.203, 95% CI 1.477-3.287, $P < 0.0001$). Male patients with surgery had 4.882 times the risk of anxiety (12.783% vs. 2.618%, RR 4.882, 95% CI 4.505-5.29, $P < 0.0001$) compared to those who did not receive surgery (12.783% vs. 2.618%, RR 4.882, 95% CI 4.505-5.29, $P < 0.0001$). Both groups had the same risk for body dysmorphic disorder (0.4% vs. 0.4%, RR 1.001, 95% CI 0.417-2.402, $P = 0.9974$).

After propensity score matching of Cohorts C and D, each cohort had 3358 female patients of similar age at index, race, and ethnicity (**Supplementary document:** Table S2). Female patients with gender dysphoria and a history of gender-affirming surgery had significantly higher risks for depression, anxiety, suicidal ideation, and substance use disorders compared to those with a diagnosis of gender dysphoria only. However, neither group was at an increased risk for body dysmorphic disorder (Table 2). Females with gender-affirming surgery had a 22.9% rate of depression, compared to 14.6% for those without surgery (RR 1.563, 95% CI 1.422-1.717, $P < 0.0001$). Compared to those without surgery, females who had undergone gender-affirming surgery had a 1.478 times higher risk of anxiety (10.496% vs. 7.098%, RR 1.478, 95% CI 1.214-1.797, $P < 0.0001$), a 2.357 times higher risk of suicidal ideation (19.811% vs. 8.402%, RR 2.357, 95% CI 1.579-3.515), and a 2.712 times higher risk of substance use disorder (19.322% vs. 7.123%, RR 2.712, 95% CI 1.439-3.217). Both groups had the same risk for body dysmorphic disorder (0.3%) (Table 2).

To assess gender disparities in mental health outcomes in transgender patients who underwent gender-affirming surgery but lacked a documented diagnosis of gender dysphoria, we compared Cohorts E and F. After propensity score matching, both cohorts included 3607 patients who were similar at index, in age, race, and ethnicity (**Supplementary document:** Table S3). Transgender men who had undergone gender-affirming surgery were at higher risk of most mental health issues compared to transgender women. Specifically, transgender men had a 1.58 times higher risk of anxiety (14.1% vs. 8. 9%, RR 1.580, 95% CI 0.845-2.134, $P = 0.0002$), a 1.186 times higher risk of suicidal ideation (5.5% vs. 4.6%, RR 1.186, 95% CI 0.97-1.449, $P = 0.0358$), and a 1.284 times higher risk of substance use disorder (14.4% vs. 11.2%, RR 1.284, 95% CI 1.137-1.45, $P < 0.0001$). Among the five outcomes, the relative risk was highest for depression among transgender men compared to transgender women (RR 1.783, 95% CI 1.327-2.389, $P = 0.0298$). Both cohorts were at the same risk for body dysmorphic disorder (Table 3).

Downloaded from https://academic.oup.com/jsm/advance-article/doi/10.1093/jsxmed/qdaf026/8042063 by NIH - Health Services Research Library user on 28 March 2025

AR-000989

4    The Journal of Sexual Medicine, 2025, Vol 00, Issue 00

**Table 1.** Outcomes for male patients with a previous diagnosis of gender dysphoria following gender-affirming surgery (cohort A) vs. male patients with gender dysphoria only (cohort B) after propensity score matching.

| Outcomes | Cohort A | Cohort B | RR (95% CI) | p-value |
|---|---|---|---|---|
| Depression | 25.4% | 11.5% | 2.203 (1.477, 3.287) | <0.0001 |
| Anxiety | 12.8% | 2.6% | 4.882 (4.505, 5.29) | <0.0001 |
| Suicidal ideation | 3.4% | 2.5% | 1.356 (0.984, 1.868) | 0.0002 |
| Substance use disorder | 19.0% | 8.2% | 2.299 (2.158, 2.45) | <0.0001 |
| Body dysmorphic disorder | 0.4% | 0.4% | 1.00 (0.417, 2.402) | 0.9974 |

RR: relative risk; CI: confidence interval.

**Table 2.** Female patient outcomes following gender-affirming surgery with a previous diagnosis of gender dysphoria (cohort C) vs. female patient outcomes with a previous diagnosis of gender dysphoria only (cohort D) after propensity score matching.

| Outcomes | Cohort C | Cohort D | RR (95% CI) | p-value |
|---|---|---|---|---|
| Depression | 22.9% | 14.6% | 1.563 (1.422, 1.717) | <0.0001 |
| Anxiety | 10.5% | 7.1% | 1.478 (1.214, 1.797) | <0.0001 |
| Suicidal ideation | 19.8% | 8.4% | 2.357 (1.579, 3.515) | 0.0401 |
| Substance use disorder | 19.3% | 7.1% | 2.712 (1.439, 3.217) | 0.0193 |
| Body dysmorphic disorder | 0.3% | 0.3% | 1.00 (0.416, 2.406) | 0.9995 |

RR: relative risk; CI: confidence interval.

**Table 3.** Outcomes of transgender males without documented gender dysphoria following gender-affirming surgery (cohort E) vs. transgender females without documented gender dysphoria following gender-affirming surgery (cohort F) after propensity score matching.

| Outcomes | Cohort E | Cohort F | RR (95% CI) | p-value |
|---|---|---|---|---|
| Depression | 44.2% | 24.7% | 1.789 (1.327, 2.389) | 0.0298 |
| Anxiety | 14.1% | 8.9% | 1.580 (0.845, 2.134) | 0.0002 |
| Suicidal ideation | 5.5% | 4.6% | 1.186 (0.97, 1.449) | 0.0358 |
| Substance use disorder | 14.4% | 11.2% | 1.284 (1.137, 1.45) | <0.0001 |
| Body dysmorphic disorder | 0.3% | 0.3% | 1.00 (0.416, 2.405) | 1.000 |

RR: relative risk; CI: confidence interval.

## Discussion

The findings of this study underscore a pressing need for enhanced mental health guidelines tailored to the needs of transgender individuals following gender-affirming surgery. Our analysis reveals a significantly elevated risk of mental health disorders—including depression, anxiety, suicidal ideation, and substance use disorder—post-surgery among individuals with a prior diagnosis of gender dysphoria. Importantly, however, our results indicate no increased risk of body dysmorphic disorder following surgery, suggesting that these individuals generally experience satisfaction with their body image and surgical outcomes. Notably, the heightened risk of mental health issues post-surgery was particularly pronounced among individuals undergoing feminizing transition compared to masculinizing transition, emphasizing the necessity for gender-sensitive approaches even after gender-affirming procedures.

By excluding patients with documented pre-existing mental health diagnoses, this study sought to ensure that identified mental health outcomes likely represented new or emergent conditions rather than pre-existing disorders. This methodological approach was critical to focusing on the relationship between gender-affirming surgery and mental health. However, we acknowledge that this approach, relying solely on ICD-10 codes, may not fully account for undiagnosed or subclinical conditions prior to surgery. These emergent mental health issues may result from a multifactorial interplay of social, psychological, and physiological factors, including social support systems, environmental stressors, hormonal changes, surgical outcomes, and the broader psychosocial adjustments involved in transitioning.

## Comparison with previous studies

When evaluating these findings within the context of previous research, it is crucial to recognize the limitations inherent in studies that rely primarily on survey data, such as those analyzed by Marano et al. and Almazan and Keuroghlian [13, 23]. These studies, using data from the U.S. Transgender Survey, underscore the psychosocial benefits of gender-affirming surgeries, including reductions in depression, anxiety, and suicidal ideation, while emphasizing the importance of aligning physical appearance with gender identity to improve mental health. However, survey-based studies are limited by self-reported data, which may introduce response bias and lack clinical validation, potentially limiting the generalizability of their findings [24]. Our study diverges by using a national database of de-identified clinical data, enabling a more comprehensive and representative examination of real-world mental health outcomes across diverse demographics. This approach allows us to capture more nuanced insights into mental health risks, particularly the heightened susceptibility to depression, anxiety, suicidal ideation, and substance use disorder in transwomen individuals' post-surgery. This divergence from survey-based findings highlights the need for gender-sensitive mental health strategies that extend beyond the surgical intervention itself.

## Implications for mental health care

Despite the observed increase in mental health issues, gender-affirming surgery remains essential in aligning transgender individuals' physical appearance with their gender identity, offering significant psychological benefits [8, 19]. Research,

Downloaded from https://academic.oup.com/jsm/advance-article/doi/10.1093/jsxmed/qdaf026/8042063 by NIH - Health Services Research Library user on 28 March 2025

AR-000990

*The Journal of Sexual Medicine*, 2025, Vol 00, Issue 00    **5**

such as that conducted by Park et al., has documented long-term satisfaction and mental health improvements in patients who have undergone gender-affirming surgeries over decades [25]. These enduring benefits underscore the necessity for mental health practitioners to recognize and address these specific challenges, ensuring that post-surgical mental health care is both accessible and gender-responsive.

It is also crucial to acknowledge that transgender individuals seek mental health support for a wide range of issues, not solely those related to gender identity. The lifelong impact of minority stress continues to affect transgender individuals' experiences of depression and anxiety even after transitioning [3, 26, 27]. Barriers to mental health care, including discrimination within healthcare settings, exacerbate these mental health challenges, fostering systemic distrust and reducing access to necessary services [28–30]. Our findings highlight that anxiety is particularly prevalent among transgender men post-surgery, while substance use disorder is more common among transgender women, reflecting gender-specific mental health risks. For transgender women, societal pressures to conform to traditional female roles and the pervasive devaluation of femininity may contribute to heightened stress, emotional distress, and, ultimately, increased reliance on substance use as a coping mechanism [31, 32]. Conversely, transgender men may encounter societal expectations to suppress emotions, aligning with traditional masculine norms, which can heighten anxiety as they navigate their new gender identity.

### Hierarchical criteria and mental health diagnoses

An important consideration in interpreting our findings is the hierarchical nature of psychiatric diagnoses, as specified in the DSM. This framework often precludes standalone diagnoses of anxiety or depression if these symptoms are deemed to be better explained by another superior diagnosis, such as gender dysphoria [33]. Consequently, symptoms of anxiety or depression that co-occur with gender dysphoria may be subsumed under the latter diagnosis, particularly in pre-surgical contexts. Following gender-affirming surgery, the alleviation of distress related to gender incongruence may enable the reclassification of these symptoms as independent diagnoses. This diagnostic shift could contribute to the observed increase in mental health diagnoses post-surgery, not as a reflection of adverse surgical outcomes but rather as a reconceptualization of symptoms within the care pathway. Including this perspective enhances our understanding of the study's findings and emphasizes the need for nuanced mental health assessments tailored to the unique trajectories of transgender individuals. Future research should explore how changes in diagnostic frameworks and psychiatric practices influence mental health outcomes in this population.

### Future directions

Further research should investigate the complex factors contributing to mental health disparities post-surgery, including social support, family acceptance, societal stigma, and pre-existing mental health conditions. Prospective, longitudinal studies are needed to track changes in mental health from pre-surgery through long-term follow-up, providing greater clarity on the causal impact of gender-affirming surgery. Additionally, examining how systemic factors, such as healthcare policy, insurance coverage, and provider training, influence access to care would offer critical insights into improving equity and effectiveness in mental health care for transgender individuals.

While the limitations of this study cannot be fully overcome with the current data available from the TriNetX database, it is important to carefully interpret the conclusions within the context of these constraints. The retrospective design and reliance on de-identified, aggregated data restrict our ability to establish causation or continuously follow individuals across healthcare systems. Furthermore, potential misclassification of mental health outcomes due to undocumented pre-existing conditions or incomplete follow-up outside the TriNetX network remains a limitation. Despite these challenges, our analytic design offers valuable insights into associations between gender-affirming surgery and mental health outcomes at a population level, leveraging clinician-verified ICD-10 codes to enhance diagnostic reliability compared to self-reported data. However, this approach cannot capture nuanced individual trajectories or address disparities in access to care that may influence the likelihood of receiving a diagnosis. Future research should employ longitudinal designs with continuous follow-up to better address these limitations, allowing for more robust evaluations of the relationship between gender-affirming care and mental health outcomes.

### Study limitations

While this study offers critical insights into the mental health challenges experienced by transgender individuals following gender-affirming surgery, several limitations must be acknowledged. The TriNetX database, comprising de-identified patient records, restricts patient-level linkage for multiple diagnoses or tracking individual health trajectories, which limits our ability to perform true longitudinal or within-person analyses. Instead, our analysis relied on cross-sectional comparisons of mental health outcomes before and after surgery. While TriNetX aggregates patient data from multiple healthcare organizations within its network, this does not extend to patients who leave the network entirely, potentially leading to incomplete follow-up data. Additionally, data stored in unstructured formats, such as clinical notes, are not included, which may contribute to selection bias. A significant limitation is the potential selection bias inherent in the study population. Individuals pursuing gender-affirming surgery may represent a subgroup experiencing higher levels of psychological distress compared to those who do not seek surgery. This increased baseline distress could inherently elevate the risk of adverse mental health outcomes, independent of the surgical intervention itself. Future research should consider methods to account for these pre-existing differences to better understand the true impact of surgery on mental health outcomes.

One significant limitation is the binary classification of gender within the TriNetX database, which only records patients as "male" or "female" in its demographic data. This excludes non-binary individuals and others who do not align with binary gender categories, limiting the inclusivity and representativeness of the study. Furthermore, the database does not include explicit information on sex assigned at birth, legal gender changes, or affirmed gender identities, which prevents more nuanced subgroup analyses. This limitation underscores the importance of developing future data systems that allow for broader gender identity categories to support more inclusive research.

While our use of clinician-verified ICD-10 codes ensures objective and standardized diagnoses, these codes are reliant

Downloaded from https://academic.oup.com/jsm/advance-article/doi/10.1093/jsxmed/qdaf026/8042063 by NIH - Health Services Research Library user on 28 March 2025

AR-000991

6                                                                    *The Journal of Sexual Medicine*, 2025, Vol 00, Issue 00

on the clinical expertise and practices of healthcare professionals, which may vary across organizations. This variability introduces potential inconsistencies in diagnosis accuracy. Moreover, differences in healthcare access likely influence the likelihood of receiving formal mental health diagnoses. Patients undergoing surgery often have greater access to healthcare services, including mental health care, compared to those who do not. This may lead to higher rates of mental health diagnoses in surgical cohorts, independent of actual differences in mental health status, introducing potential surveillance bias.

Another limitation is the potential misclassification of individuals in the "no-surgery" cohort. The TriNetX database captures surgical history only from participating organizations, which means that patients who underwent gender-affirming surgeries outside of these institutions may have been incorrectly categorized. This limitation may affect the accuracy of our comparisons between surgical and non-surgical cohorts. Future studies with access to centralized and comprehensive data sources are needed to improve the classification of surgical histories.

The criteria for identifying transgender individuals in this study were based on documented diagnoses of gender dysphoria (ICD-10 code F64). This approach excludes transgender or gender-diverse individuals who do not seek medical treatment for gender incongruence, limiting the generalizability of our findings. Additionally, the absence of a comparison group for individuals who sought but had not yet received gender-affirming treatments restricts the study's ability to assess the impact of treatment timing on mental health outcomes. Longitudinal studies that track outcomes before and after treatment are needed to address this gap.

Lastly, mental health treatment utilization serves as an imperfect proxy for mental health itself. Transgender individuals receiving treatment for gender dysphoria are frequently in healthcare settings, where they may encounter more mental health treatment opportunities, potentially skewing utilization rates. Finally, while our findings support the need for accessible gender-affirming treatments, the generalizability of these results may be further limited by systemic factors, including healthcare policies, insurance coverage, and regional differences in provider training. These barriers, which vary significantly across different healthcare systems, can affect transgender individuals' access to adequate mental health care and underscore the necessity for policies that ensure consistent, affirming care.

## Conclusion

Our study reveals that both male and female patients with gender dysphoria who undergo gender-affirming surgery are at significantly higher risk for adverse mental health outcomes, including depression, anxiety, suicidal ideation, and substance use disorder, compared to those who do not undergo gender-affirming surgery. This trend persists even after controlling for confounding factors through propensity score matching. Notably, transgender men showed a greater relative risk for these mental health issues compared to transgender women following gender-affirming surgery. Despite the benefits of surgery in alleviating gender dysphoria, our findings underscore the necessity for ongoing mental health support for transgender individuals during their post-surgery

trajectories. These results also highlight the critical need for gender-specific care tailored to the unique experiences of male and female populations, respectively, addressing both pre- and post-surgical mental health care to improve overall well-being and prevent any mental illness or diseases.

## Acknowledgements

The authors thank Norma A Pérez Raifaisen, MD, DrPH, CPC-ELI-MP, Director of the UTMB Center of Excellence for Professional Advancement and Re-search (COEPAR), for assistance with manuscript preparation.

## Author contributions

Joshua Lewis (Conceptualization [lead], Data curation [lead], Methodology [lead], Writing—original draft [equal], Writing—review & editing [equal]), Amani Patterson (Writing—original draft [equal], Writing—review & editing [equal]), Maame Effirim (Writing—original draft [equal], Writing—review & editing [equal]), Manav Patel (Writing—original draft [equal], Writing—review & editing [equal]), Shawn Lim (Writing—original draft [equal], Writing—review & editing [equal]), Victoria Cuello (Writing—original draft [equal], Writing—review & editing [equal]), Marc Phan (Writing—original draft [equal], Writing—review & editing [equal]), Wei-Chen Lee (Data curation [supporting], Methodology [lead], Supervision [lead], Writing—original draft [equal], Writing—review & editing [equal]).

## Supplementary material

Supplementary material is available at *The Journal of Sexual Medicine* online.

## Conflicts of interest

The authors that there are no conflicts of interest regarding the publication of this paper.

## Funding

This work was supported in part by the Department of Health and Human Services, Health Resources and Services Administration [grant number 1 D34HP49234-01-00].

## Ethical statement

The study was deemed IRB exempt from University of Texas Medical Branch Institutional Review Board.

## References

1. Kingsbury M, Hammond NG, Johnstone F, Colman I. Suicidality among sexual minority and transgender adolescents: a nationally representative population-based study of youth in Canada. *CMAJ Can Med Assoc J*. 2022;194(22):E767–E774. https://doi.org/10.1503/cmaj.212054
2. Kirakosian N, Stanton AM, McKetchnie SM, *et al*. Suicidal ideation disparities among transgender and gender diverse compared to cisgender community health patients. *J Gen Intern Med*. 2023;38(6):1357–1365. https://doi.org/10.1007/s11606-022-07996-2
3. Mezzalira S, Scandurra C, Mezza F, Miscioscia M, Innamorati M, Bochicchio V. Gender felt pressure, affective domains, and mental health outcomes among transgender and gender diverse (TGD)

Downloaded from https://academic.oup.com/jsm/advance-article/doi/10.1093/jsxmed/qdaf026/8042063 by NIH - Health Services Research Library user on 28 March 2025

AR-000992

*The Journal of Sexual Medicine*, 2025, Vol 00, Issue 00                                                                                          **7**

children and adolescents: a systematic review with developmental and clinical implications. *Int J Environ Res Public Health*. 2022;**20**(1):785. https://doi.org/10.3390/ijerph20010785

4. Tordoff DM, Wanta JW, Collin A, Stepney C, Inwards-Breland DJ, Ahrens K. Mental health outcomes in transgender and nonbinary youths receiving gender-affirming care. *JAMA Netw Open*. 2022;**5**(2):e220978. https://doi.org/10.1001/jamanetworkopen.2022.0978

5. Bockting WO, Miner MH, Swinburne Romine RE, Hamilton A, Coleman E. Stigma, mental health, and resilience in an online sample of the US transgender population. *Am J Public Health*. 2013;**103**(5):943–951. https://doi.org/10.2105/AJPH.2013.301241

6. Falck F, Bränström R. The significance of structural stigma towards transgender people in health care encounters across Europe: health care access, gender identity disclosure, and discrimination in health care as a function of national legislation and public attitudes. *BMC Public Health*. 2023;**23**(1):1031. https://doi.org/10.1186/s12889-023-15856-9

7. Sevelius JM. Gender affirmation: a framework for conceptualizing risk behavior among transgender women of color. *Sex Roles*. 2012;**68**(11-12):675–689. https://doi.org/10.1007/s11199-012-0216-5

8. Leerdam TR v, Zajac JD, Cheung AS. The effect of gender-affirming hormones on gender dysphoria, quality of life, and psychological functioning in transgender individuals: a systematic review. *Transgender Health*. 2023;**8**(1):6–21. https://doi.org/10.1089/trgh.2020.0094

9. Bizic MR, Jeftovic M, Pusica S, *et al*. Gender dysphoria: bioethical aspects of medical treatment. *Biomed Res Int*. 2018;**2018**:9652305–9652306. https://doi.org/10.1155/2018/9652305.

10. Murad MH, Elamin MB, Garcia MZ, *et al*. Hormonal therapy and sex reassignment: a systematic review and meta-analysis of quality of life and psychosocial outcomesDatabase Abstr. Rev. Eff. DARE Qual.-Assess. Rev. Internet, Centre for Reviews and Dissemination (UK). 2010;**72**(2):214–231.

11. White Hughto JM, Reisner SL. A systematic review of the effects of hormone therapy on psychological functioning and quality of life in transgender individuals. *Transgender Health*. 2016;**1**(1):21–31. https://doi.org/10.1089/trgh.2015.0008

12. Chou J, Kilmer LH, Campbell CA, DeGeorge BR, Stranix JY. Gender-affirming surgery improves mental health outcomes and decreases anti-depressant use in patients with gender dysphoria. *Plast Reconstr Surg Glob Open*. 2023;**11**(6S):1. https://doi.org/10.1097/01.GOX.0000944280.62632.8c

13. Almazan AN, Keuroghlian AS. Association between gender-affirming surgeries and mental health outcomes. *JAMA Surg*. 2021;**156**(7):611–618. https://doi.org/10.1001/jamasurg.2021.0952

14. Reisner SL, Poteat T, Keatley J, *et al*. Global Health burden and needs of transgender populations: a review. *Lancet Lond Engl*. 2016;**388**(10042):412–436. https://doi.org/10.1016/S0140-6736(16)00684-X

15. Santos T, Mahowald L, Gruberg S. Protecting and advancing health Care for Transgender Adult Communities. *Cent Am Prog*. 2021. https://www.americanprogress.org/article/protecting-advancing-health-care-transgender-adult-communities/ (accessed July 5, 2024).

16. Brown A, Horowitz JM, Parker K, Minkin R. *The Experiences, Challenges and Hopes of Transgender and Nonbinary U.S. Adults*. Pew Research Center: n.d. https://www.pewresearch.org/social-trends/2022/06/07/the-experiences-challenges-and-hopes-of-transgender-and-nonbinary-u-s-adults/ (accessed June 30, 2024).

17. USTS-Full-Report-Dec17.pdf n.d.

18. Anzani A, Decaro SP, Prunas A. Trans masculinity: comparing trans masculine individuals' and cisgender Men's conformity to hegemonic masculinity. *Sex Res Soc Policy*. 2023;**20**(2):539–547. https://doi.org/10.1007/s13178-021-00677-5

19. Bhatt N, Cannella J, Gentile JP. Gender-affirming Care for Transgender Patients. *Innov Clin Neurosci*. 2022;**19**(4-6):23–32.

20. Smith SG, Sinkford JC. Gender equality in the 21st century: overcoming barriers to women's leadership in global health. *J Dent Educ*. 2022;**86**(9):1144–1173. https://doi.org/10.1002/jdd.13059

21. Tebbe EA, Budge SL. Factors that drive mental health disparities and promote well-being in transgender and nonbinary people. *Nat Rev Psychol*. 2022;**1**(12):694–707. https://doi.org/10.1038/s44159-022-00109-0

22. Alegría M, NeMoyer A, Falgas I, Wang Y, Alvarez K. Social determinants of mental health: where we are and where we need to go. *Curr Psychiatry Rep*. 2018;**20**(11):95. https://doi.org/10.1007/s11920-018-0969-9

23. Marano AA, Louis MR, Coon D. Gender-affirming surgeries and improved psychosocial health outcomes. *JAMA Surg*. 2021;**156**(7):685–687. https://doi.org/10.1001/jamasurg.2021.0953

24. Althubaiti A. Information bias in health research: definition, pitfalls, and adjustment methods. *J Multidiscip Healthc*. 2016;**9**:211–217. https://doi.org/10.2147/JMDH.S104807.

25. Park RH, Liu Y-T, Samuel A, *et al*. Long-term outcomes after gender-affirming surgery: 40-year follow-up study. *Ann Plast Surg*. 2022;**89**(4):431–436. https://doi.org/10.1097/SAP.0000000000003233

26. Davies RD, Kessel B. Gender minority stress, depression, and anxiety in a transgender high school student. *Am J Psychiatry*. 2017;**174**(12):1151–1152. https://doi.org/10.1176/appi.ajp.2017.17040439

27. Puckett JA, Dyar C, Maroney MR, Mustanski B, Newcomb ME. Daily experiences of minority stress and mental health in transgender and gender diverse individuals. *J Psychopathol Clin Sci*. 2023;**132**(3):340–350. https://doi.org/10.1037/abn0000814

28. Warner DM, Mehta AH. Identifying and addressing barriers to transgender healthcare: where we are and what we need to do about it. *J Gen Intern Med*. 2021;**36**(11):3559–3561. https://doi.org/10.1007/s11606-021-07001-2

29. Johnson AH, Hill I, Beach-Ferrara J, Rogers BA, Bradford A. Common barriers to healthcare for transgender people in the U.S. Southeast *Int J Transgender Health*. 2019;**21**(1):70–78. https://doi.org/10.1080/15532739.2019.1700203

30. Safer JD, Coleman E, Feldman J, *et al*. Barriers to health Care for Transgender Individuals. *Curr Opin Endocrinol Diabetes Obes*. 2016;**23**(2):168–171. https://doi.org/10.1097/MED.0000000000000227

31. Wilson EC, Chen Y-H, Arayasirikul S, Raymond HF, McFarland W. The impact of discrimination on the mental health of trans*female youth and the protective effect of parental support. *AIDS Behav*. 2016;**20**(10):2203–2211. https://doi.org/10.1007/s10461-016-1409-7

32. White Hughto JM, Reisner SL, Pachankis JE. Transgender stigma and health: a critical review of stigma determinants, mechanisms, and interventions. *Soc Sci Med*. 2015;**147**(147):222–231. https://doi.org/10.1016/j.socscimed.2015.11.010

33. Resnick A. *An Expert-Backed Guide to Body Dysmorphia and Gender Dysphoria*. Verywell Mind. n.d. https://www.verywellmind.com/dysmorphia-vs-dysphoria-8646777 (accessed January 9, 2025).

Downloaded from https://academic.oup.com/jsm/advance-article/doi/10.1093/jsxmed/qdaf026/8042063 by NIH - Health Services Research Library user on 28 March 2025

© The Author(s) 2025. Published by Oxford University Press on behalf of The International Society for Sexual Medicine. All rights reserved. For permissions, please e-mail: journals.permissions@oup.com
*The Journal of Sexual Medicine*, 2025, 1–7
https://doi.org/10.1093/jsxmed/qdaf026
Original Research                                                                                   **AR-000993**

# TREATMENT FOR PEDIATRIC GENDER DYSPHORIA

## Review of Evidence and Best Practices



**Department of Health and Human Services**

November 19, 2025

AR-001020

# Chapter 10    WPATH's *Standards of Care* 8

As shown in Chapter 9, the guidelines issued by the World Professional Association for Transgender Health (WPATH) have been rated among the lowest in quality and have not been recommended for implementation by systematic reviews (SRs) of guidelines. Despite their lack of trustworthiness, for more than a decade WPATH guidelines have served as the foundation of the healthcare infrastructure for gender dysphoric (GD) youth in the United States. The WPATH *Standards of Care* guidelines are embedded in nearly all aspects of healthcare including clinical education, delivery of care, and reimbursement decisions by private and public insurers.

This chapter focuses on the current Version 8 of the WPATH *Standards of Care* guidelines (SOC-8),[1] published in 2022.[2] Section 10.1 describes WPATH's central role in shaping the treatment of youth with GD in U.S. healthcare settings. Section 10.2 provides a brief overview of the rationale for the development of SOC-8, highlighting how it differs significantly from earlier guideline versions with particular emphasis on the new Adolescent chapter. Section 10.3 examines the development process of SOC-8, considering both internal dynamics and external pressures, and analyzes its multipurpose role as a clinical guideline, a tool to secure insurance coverage, and a legal instrument aimed at promoting broad access to pediatric medical transition (PMT). Section 10.4 highlights one critical downstream consequence of the guideline's flawed development process: the elimination of all minimum age requirements for endocrine and surgical interventions (except phalloplasty) in minors. Section 10.5 discusses the implications of continued reliance on WPATH.

## 10.1    Influence of WPATH in the United States

There is no accredited subspecialty in "gender medicine" in the U.S. Instead, the practice of PMT typically involves a series of handoffs among different providers: a pediatrician or an adolescent medicine specialist[3] first assesses whether PMT may be

---

[1] Coleman et al. (2022).

[2] Portions of this evaluation necessarily rely on internal WPATH communications made publicly available through subpoena. See Boe v. Marshall, No. 2:22-cv-00184, (M.D. Ala.). Some material from Boe v. Marshall was previously released in Voe v. Mansfield, No. 1:23-Cv-00864: 100-1 (M.D.N.C.).

[3] American Board of Pediatrics (2024).

AR-001178

*Journal of the Endocrine Society*, 2021, Vol. 5, No. 4, 1–16
doi:10.1210/jendso/bvab011
Meta-Analysis



## Meta-Analysis

# Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review

**Kellan E. Baker,**[1,3] **Lisa M. Wilson,**[1,3] **Ritu Sharma,**[1,3] **Vadim Dukhanin,**[1,3] **Kristen McArthur,**[1,3] **and Karen A. Robinson**[2,3]

[1]Department of Health Policy and Management, Johns Hopkins Bloomberg School of Public Health, Baltimore, MD 21205, USA; [2]Department of Medicine, Johns Hopkins University School of Medicine, Baltimore, MD, USA; and [3]Johns Hopkins Evidence-Based Practice Center, 615 North Wolfe Street, Baltimore, MD 21205, USA

**ORCiD number:** 0000-0002-9716-7936 (K. E. Baker).

**Abbreviations:** BDI, Beck Depression Inventory; ENIGI, European Network for the Investigation of Gender Incongruence; GnRH, gonadotropin-releasing hormone; HADS, Hospital Anxiety and Depression Scale; QOL, quality of life; RCT, randomized controlled trial; SF-36, Short Form-36 Health Survey; WPATH, World Professional Association for Transgender Health.

Received: 5 October 2020; Editorial Decision: 25 January 2021; First Published Online: 2 February 2021; Corrected and Typeset: 19 February 2021.

## Abstract

We sought to systematically review the effect of gender-affirming hormone therapy on psychological outcomes among transgender people. We searched PubMed, Embase, and PsycINFO through June 10, 2020 for studies evaluating quality of life (QOL), depression, anxiety, and death by suicide in the context of gender-affirming hormone therapy among transgender people of any age. We excluded case studies and studies reporting on less than 3 months of follow-up. We included 20 studies reported in 22 publications. Fifteen were trials or prospective cohorts, one was a retrospective cohort, and 4 were cross-sectional. Seven assessed QOL, 12 assessed depression, 8 assessed anxiety, and 1 assessed death by suicide. Three studies included trans-feminine people only; 7 included trans-masculine people only, and 10 included both. Three studies focused on adolescents. Hormone therapy was associated with increased QOL, decreased depression, and decreased anxiety. Associations were similar across gender identity and age. Certainty in this conclusion is limited by high risk of bias in study designs, small sample sizes, and confounding with other interventions. We could not draw any conclusions about death by suicide. Future studies should investigate the psychological benefits of hormone therapy among larger and more diverse groups of transgender people using study designs that more effectively isolate the effects of hormone treatment.

**Key Words:** Transgender, hormone therapy, sex hormones, mental health, systematic review

ISSN 2472-1972

© The Author(s) 2021. Published by Oxford University Press on behalf of the Endocrine Society.
This is an Open Access article distributed under the terms of the Creative Commons Attribution-NonCommercial-NoDerivs licence (http://creativecommons.org/licenses/by-nc-nd/4.0/), which permits non-commercial reproduction and distribution of the work, in any medium, provided the original work is not altered or transformed in any way, and that the work is properly cited. For commercial re-use, please contact journals.permissions@oup.com

https://academic.oup.com/jes    AR-001552    1

Transgender people are those whose gender identity is different from the sex they were assigned at birth. Estimates of the size of the transgender population vary depending on how the data are collected [1]. In studies that rely on clinical records, estimates range between 1 and 30 people per 100 000 (0.001% to 0.03%) [2]. Studies that focus instead on self-report among nonclinical populations find estimates that range between 0.1% and 2% [2].

Many transgender people seek medical services to affirm their gender identity. According to the *Standards of Care for Transsexual, Transgender, and Gender Non-Conforming People* maintained by the World Professional Association for Transgender Health (WPATH), gender-affirming medical care is different for each individual and may include a variety of services and procedures, such as psychological support, hormone therapy, and surgeries [3]. Hormone therapy, which typically involves estrogens and anti-androgens for transgender women and other trans-feminine people and testosterone for transgender men and other trans-masculine people, is a common component of medical gender affirmation [4]. Because hormone treatment can have a powerful effect on physical appearance, it is often a priority for transgender people seeking medical gender affirmation [5]. Gender-affirming hormone therapy can be managed for most patients by primary care providers, as it typically involves long-term maintenance on doses similar to those used for cisgender patients with conditions such as hypogonadism [6, 7]. Some clinicians require a minimum period of psychological counseling before hormone therapy can be initiated, while others provide hormone therapy on the basis of informed consent [8].

The need for gender-affirming care is often characterized using psychiatric diagnoses such as gender dysphoria, which replaced gender identity disorder in the fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) [9]. The 11th International Classification of Diseases (ICD-11) replaces these terms with a diagnosis called gender incongruence (codes: HA60, HA61, HA6Z), which is located in a new chapter on sexual health. These changes clarify that the target of gender-affirming medical interventions is not the person's gender identity itself but rather the clinically significant distress that can accompany a misalignment between gender identity and sex assigned at birth [10]. Some countries have further underscored that transgender identity is not a pathology by recognizing gender affirmation as fundamental to the human right to self-definition and removing requirements that transgender people seeking gender-affirming medical care present with a diagnosis such as gender dysphoria [11].

Several previous reviews have indicated that gender-affirming hormone therapy is associated with psychological benefits that include reductions in depression and anxiety and improvements in quality of life (QOL) among transgender people [12-17]. Most of these reviews did not require a minimum duration of hormone therapy [14-17]. One review that did impose a minimum follow-up requirement is 10 years old [12]. The other that required a minimum of 3 months of therapy included only uncontrolled prospective cohorts, which resulted in a sample of only 3 studies [13]. A comprehensive review without a minimum follow-up period assessed gender-affirming hormone therapy and surgeries only in adolescents [17]. By requiring a minimum duration of hormone treatment but considering all ages and a variety of study designs, we sought to update and more completely summarize the growing evidence base regarding the relationship between gender-affirming hormone therapy and psychological outcomes in transgender people.

## Search Strategy and Selection Criteria

This review is one of a series of systematic reviews on gender-affirming care conducted for WPATH to inform the eighth revision of the *Standards of Care*. The protocol is registered on PROSPERO (CRD42018115379) [18], and we followed the Preferred Reporting Items for Systematic Reviews and Meta-Analyses (PRISMA) guidelines in reporting our findings [19].

We searched PubMed, Embase, and PyscINFO from inception to October 2018 and updated the search through June 10, 2020, for studies assessing QOL, depression, anxiety, and death by suicide among transgender participants of any age in the context of gender-affirming hormone therapy [20]. We also reviewed the reference lists of previous reviews and hand-searched the *International Journal of Transgenderism*. Using DistillerSR [21], 2 reviewers independently screened titles, abstracts, and full-text articles. Differences were resolved through consensus adjudication.

We included studies that evaluated the psychological effects of any testosterone, estrogen, or anti-androgen formulation used for gender affirmation. We also considered gonadotropin-releasing hormone (GnRH) analogues used as anti-androgens or for puberty delay. Study participants must have been on hormone therapy for at least 3 months in order to reflect a minimum time for expected onset of effects [3]. Health care provider supervision was not required. We excluded studies that did not state therapy type and duration, including the range for cross-sectional studies. We included studies regardless of language (the search terms were in English) and country of origin, and we accepted any study design except case reports.

We created standardized forms for data extraction using the Systematic Review Data Repository system. The data extracted included participant demographics; study design

AR-001553

*Journal of the Endocrine Society*, 2021, Vol. 5, No. 4                                                3

and methods; hormone therapy type, dose, and duration; potential confounders such as gender-affirming surgery status; outcome scales [20]; and psychological outcomes. From studies that used the Short Form-36 Health Survey (SF-36) to measure QOL, we extracted scores in all domains [22]. For studies that used measures with depression or anxiety subscales, we extracted only the subscale scores corresponding to the psychological outcomes of interest (eg, the depression subscale of the Minnesota Multiphasic Personality Inventory [MMPI]). We extracted comparisons with cisgender controls or general population norms only when longitudinal findings in a transgender population or comparisons with an untreated transgender control group were not reported. We used WebPlotDigitizer to extract data reported only in figures [23].

Two reviewers independently assessed risk of bias [20]. For randomized controlled trials (RCTs), we used the revised Cochrane tool [24]. For non-randomized studies, we used the Cochrane Risk of Bias Assessment Tool for Non-Randomized Studies of Interventions (ROBINS-I) [25]. One reviewer graded strength of evidence for each outcome using the Agency for Healthcare Research and Quality Methods Guide for Conducting Comparative Effectiveness Reviews [26]. We considered the directionality and magnitude of effects reported in cross-sectional studies as additional context for our evaluation of evidence from trials and prospective and retrospective cohorts. Each strength of evidence assessment was confirmed by a second reviewer.

WPATH provided the research question and reviewed the protocol, evidence tables, and report. WPATH had no role in study design, data collection, analysis, interpretation, or drafting. The corresponding author had full access to all the data and had final responsibility for the decision to submit for publication. The authors are responsible for all content, and statements in this report do not necessarily reflect the official views of or imply endorsement by WPATH.

## Results

We retrieved 1753 nonduplicate studies for the broader systematic review project of which this review was a part (Fig. 1). After screening and full-text review for the specific research question on the psychological effects of gender-affirming hormone therapy, 20 studies reported in 22 publications were included (Table 1): 1 RCT [27], 2 before-after trials [28, 29], 12 prospective cohorts reported in 13 publications [30-42], 1 retrospective cohort reported in 2 publications [43, 44], and 4 cross-sectional studies [45-48]. De Vries (2014) [35] reported on a subset of the participants in de Vries (2011) [34] who continued in care. We counted these publications as a single study but extracted and reported data separately because the characteristics of the

study's adolescent population changed substantially in the period between the 2 publications. Similarly, Asscheman (2011) [44] reported on an extension of Asscheman (1989) [43]; we counted these as a single study but extracted data separately. In Table 1 and in the subsequent tables for each outcome, studies are ordered first by study design (RCTs, before-after trials, prospective cohorts, retrospective cohorts, and cross-sectional studies); within these categories, studies are presented in the following order according to how the study results were reported: adult transgender women only, adult transgender men only, adult transgender women and transgender men together, and transgender adolescents (no study reported separate results by gender identity for transgender youth). Where multiple studies shared the same study design and population, they are additionally ordered chronologically.

The time frame covered in the included studies began in 1972 [43], but most studies dated from post-2000. Eight studies were conducted in Italy [27-29, 31, 32, 36, 39, 41]; 2 each in Belgium [37, 48], the Netherlands [34, 35, 43, 44], the United States [30, 47], and Spain [38, 45]; and 1 in the United Kingdom [33], Turkey [42], and France [46]. One study recruited participants from Switzerland and Germany [40]. One study was part of the European Network for the Investigation of Gender Incongruence (ENIGI), which is a research collaborative between clinics providing gender-affirming care to transgender people in Ghent (Belgium), Amsterdam (Netherlands), Oslo (Norway), and Hamburg (Germany). The ENIGI study included in this review drew participants only from the Ghent clinic [37].

The study sizes ranged from 20 to 1331, although most had fewer than 60 participants. Fourteen studies reported on testosterone formulations in adult transgender men [27, 29, 31-33, 36, 39-46, 48]. These formulations were typically injectable testosterone cypionate or enanthate, although some studies used long-acting injectable testosterone undecanoate or daily transdermal gels. Ten studies reported on estrogen formulations in adult transgender women, usually in conjunction with an anti-androgen such as cyproterone acetate or spironolactone [28, 31, 33, 36, 37, 39, 43-47]. Estrogen formulations included transdermal, oral, or injectable estradiol (commonly estradiol valerate) or conjugated estrogens. Three studies reported on the psychological effects of GnRH therapy for puberty delay among mixed-gender groups of transgender adolescents [30, 34, 35, 38]. No study reported on hormone therapy among nonbinary people.

All studies that reported information about recruitment drew their participants largely or exclusively from specialized clinics dedicated to providing gender-affirming care for transgender people. These clinics were typically part of larger systems such as university hospitals. Clinic-based

AR-001554



**Figure 1.** PRISMA flow diagram.

studies often applied strict eligibility criteria that included a period of psychiatric evaluation and a formal diagnosis of gender dysphoria before hormone therapy was initiated. Some studies also reported that psychological counseling was either available or required during the course of hormone therapy. In many cases, hormone therapy was considered a prerequisite for gender-affirming surgeries. The type and timing of gender-affirming surgeries and the proportion of participants for whom hormone therapy and surgeries were assessed simultaneously varied widely: some studies assessed only participants who had not had any type of gender-affirming surgery [27, 28, 30-32, 34, 36, 38-40, 42, 46, 47], while in others some or all participants

underwent gender-affirming surgeries during the study period [29, 33, 35, 43-45, 48].

## Quality of Life

Seven studies, including 1 RCT [27], 2 before-after trials [28, 29], 2 prospective cohorts [30, 39], and 2 cross-sectional studies [46, 48], assessed QOL (Table 2). An RCT found an improvement of approximately 5.5 points on a 10-point measure of life satisfaction across 3 groups of transgender men (n = 15 each) after 1 year of testosterone treatment ($P < 0.05$) [27]. A before-after trial similarly reported that life satisfaction scores almost

*Journal of the Endocrine Society*, 2021, Vol. 5, No. 4   **5**

**Table 1.** Studies Reporting Effects of Gender-Affirming Hormone Therapy on Psychological Outcomes Among Transgender People

| Author, year Location Study name | Study design | Start year | Transgender population | Overall N | Age in years | Baseline HT status | Outcomes | GAS status | Risk of bias |
|---|---|---|---|---|---|---|---|---|---|
| Pelusi, 2014 [27] Italy | Randomized controlled trial[a] | NR | Men | 45 | Mean: 29.5 | No previous HT | QOL | No GAS before or during study | High |
| Gava, 2016 [28] Italy | Before-after trial | NR | Women | 40 | Mean: 3.2 (range, 19–55) | No previous HT | QOL, Depression | No GAS before or during study | Low |
| Gava, 2018 [29] Italy | Before-after trial[a] | NR | Men | 50 | Mean: 30.1 (range, 21–42) | No previous HT | QOL | 72% (n = 36) had gonadectomy during study | Serious |
| Fuss, 2015 [37] Belgium ENIGI (NCT01072825) | Prospective cohort | 2010 | Women | 20 | Mean: 33.9 (range, 17–48) | No previous HT | Anxiety | NR | Serious |
| Costantino, 2013 [32] Italy | Prospective cohort | 2001 | Men | 50 | Mean: 29.8 | No previous HT | Depression | No GAS before or during study | Serious |
| Motta, 2018 [41] Italy | Prospective cohort | 2013 | Men | 52 | Mean: 28.3 | No previous HT | Anxiety | NR | Moderate |
| Turan, 2018 [42] Turkey | Prospective cohort[b] | NR | Men | 37 | Mean: 24.6 | No previous HT | Depression, Anxiety | No GAS before or during study | Moderate |
| Metzger, 2019 [40] Switzerland, Germany | Prospective cohort[b] | 2013 | Men | 23 | Mean: 27.2 (range, 18–51) | No previous HT | Depression | No GAS before or during study | Moderate |
| Colizzi, 2014 [31] Italy | Prospective cohort | 2008 | Women and men | 107 | Mean: 29.2 | No previous HT | Depression, Anxiety | No GAS before or during study | Low |
| Manieri, 2014 [39] Italy | Prospective cohort | NR | Women and men | 83 | Mean: 32.7 (women), 30.2 (men) | No previous HT | QOL | No GAS before or during study | Moderate |
| Fisher, 2016 [36] Italy | Prospective cohort | 2012 | Women and men | 54 | Mean: 32.5 (women), 26.3 (men) | No previous HT | Depression | No GAS before or during study | Low |
| Defreyne, 2018 [33] UK | Prospective cohort | 2012 | Women and men | 155 | Median: 27 (range, 18–52) | No previous HT | Depression, Anxiety | Some had GAS during study; % and type NR | Serious |
| Asscheman, 1989 [43] Netherlands | Retrospective cohort[b,d] | 1972 | Women and men | 425 | Median: 32 (women, range, 16–67); 25.4 (men, range, 16–54) | Previous HT for at least 6 months | Death by suicide | 78% (n = 235) of transgender women had GAS during study; data NR for transgender men | Serious |

AR-001556

**6** *Journal of the Endocrine Society*, 2021, Vol. 5, No. 4

**Table 1.** Continued

| Author, year Location Study name | Study design | Start year | Transgender population | Overall N | Age in years | Baseline HT status | Outcomes | GAS status | Risk of bias |
|---|---|---|---|---|---|---|---|---|---|
| Asscheman, 2011 [44] Netherlands | Retrospective cohort[b,d] | 1975 | Women and men | 1331 | Mean: 31.4 (women, range, 16–76); 26.1 (men, range, 16–57) | Previous HT for at least 1 year | Death by suicide | 87% (n = 834) of transgender women and 94% (n = 343) of transgender men had GAS during study | Serious |
| Leavitt, 1980 [47] US | Cross-sectional | 1976 | Women | 41 | Range, 18–35 | 54% (n = 22) on HT | Depression | No previous GAS | Serious |
| Wierckx, 2011 [48] Belgium | Cross-sectional[b] | 2009 | Men | 47 | Mean: 37 (range, 22–54) | 100% on HT | QOL | 100% had GAS, but not within previous year | Serious |
| Gómez-Gil, 2012 [45] Spain | Cross-sectional | NR | Women and men | 187 | Mean: 29.9 (range, 15–61) | 64% (n = 120) on HT | Depression, Anxiety | 42% (n = 79) of all participants and 64% (n = 77) of participants on HT had previous GAS | Serious |
| Gorin-Lazard, 2012 [46] France | Cross-sectional[b] | NR | Women and men | 61 | Mean: 34.7 | 72% (n = 44) on HT | QOL | No previous GAS | Serious |
| de Vries, 2011 [34] Netherlands | Prospective cohort | 2000 | Girls and boys | 70 | Mean: 14.8 (range, 11.3–18.6) | No previous HT | Depression, Anxiety | No GAS before or during study | Moderate |
| de Vries, 2014 [35] Netherlands | Prospective cohort[b,c] | 2000 | Girls and boys | 55 | Mean: 14.8 (range, 11.5–18.5) | No previous HT | Depression, Anxiety | 100% had GAS during study | Serious |
| Achille, 2020 [30] US | Prospective cohort | 2013 | Girls and boys | 50 | Mean: 16.2 | No previous HT | QOL, Depression | No GAS before or during study | Moderate |
| López de Lara, 2020 [38] Spain | Prospective cohort[b] | 2018 | Girls and boys | 23 | Mean: 16 (range, 14-18) | No previous HT | Depression, Anxiety | No GAS before or during study | Moderate |

Abbreviations: ENIGI, European Network for the Investigation of Gender Incongruence; GAS, gender-affirming surgery; HT, hormone therapy; NR, not reported; QOL, quality of life.

[a]25 participants were included in both Pelusi [27] and Gava (2018) [29]

[b]Included a cisgender control group or a comparison to general population norms

[c]All participants were also included in de Vries (2011) [34]

[d]An unknown number of participants were included in both Asscheman (1989) [43] and Asscheman (2011) [44]

AR-001557

*Journal of the Endocrine Society*, 2021, Vol. 5, No. 4    **7**

**Table 2.** Effects of Gender-Affirming Hormone Therapy on Quality of Life Among Transgender People

| Author, year Study design | Transgender population | Treatment / comparison (n) | QOL measures | Length of treatment | Findings |
|---|---|---|---|---|---|
| Pelusi, 2014 [27] RCT[a] | Men | Testoviron depot (15) vs testosterone gel (15) vs testosterone undecanoate (15) | VAS (general life satisfaction) | 54 weeks | Mean QOL scores increased from 2.8 to 8.5 ($P < 0.05$) in the testoviron depot arm, from 3.2 to 8.9 ($P < 0.05$) in the testosterone gel arm, and from 2.6 to 8.0 ($P < 0.05$) in the testosterone undecanoate arm.[d] There was no difference across arms. |
| Gava, 2016 [28] Before-after trial | Women | Cyproterone acetate + estradiol (20) vs leuprolide acetate + estradiol (20) | VAS (general life satisfaction) SF-36 | 12 months | Mean QOL scores did not change in either arm. No comparisons across arms were reported. |
| Gava, 2018 [29] Before-after trial[a] | Men | Testosterone undecanoate (25)[c] vs testosterone enanthate (25)[c] | VAS (general satisfaction) | 5 years | Mean QOL scores increased from 4.3 ± 3.1 to 8.1 ± 1.8 ($P < 0.001$) in the testosterone undecanoate arm and from 4.3 ± 3.8 to 8.3 ± 1.7 ($P < 0.001$) in the testosterone enanthate arm. No comparisons across arms were reported. |
| Manieri, 2014 [39] Prospective cohort | Women | HT (56) | WHOQOL | 12 months | Mean QOL scores increased from 62.5 to 72.2 ($P < 0.05$).[d] |
| Manieri, 2014 [39] Prospective cohort | Men | HT (27) | WHOQOL | 12 months | Mean QOL scores did not change. |
| Wierckx, 2011 [48] Cross-sectional[b] | Men | HT (47)[c] | SF-36 | At least 3 years | Mean QOL scores on the VT and MH subscales were lower for transgender men than cisgender men (VT subscale: 62.1 ± 20.7 vs 71.9 ± 18.3, $P = 0.002$; MH subscale: 72.6 ± 19.2 vs 79.3 ± 16.4, $P = 0.020$). There were no other differences between transgender men and either cisgender men or cisgender women. |
| Gorin-Lazard, 2012 [46] Cross-sectional[b] | Women and men | HT (44) vs no HT (17) | SF-36 | Median: 20 months (range, 12–42 months) | Mean QOL scores were generally higher in the group receiving HT vs the group not receiving HT (MCS: 51.0 ± 7.7 vs 39.8 ± 12.7, $P = 0.003$; MH subscale: 76.4 ± 14.1 vs 59.1 ± 19.6, $P = 0.004$; RE subscale: 88.6 ± 22.7 vs 54.9 ± 40.7, $P = 0.001$; SF subscale: 83.2 ± 23.3 vs 69.9 ± 24.2, $P = 0.026$). There were no differences in the other subscales. |
| Achille, 2020 [30] Prospective cohort | Girls and boys | GnRH treatment + HT (47) | Q-LES-Q-SF | 12 months | Mean QOL scores did not change. |

Abbreviations: GnRH, gonadotropin-releasing hormone; HT, hormone therapy; MCS, Mental Component Summary; MH, mental health; QOL, quality of life; RCT, randomized controlled trial; RE, role functioning/emotional; SF, social functioning; SF-36, Short Form-36 Health Survey; VAS, visual analog scale; VT, vitality; WHOQOL, World Health Organization Quality of Life measure.

[a]10 participants on testosterone enanthate and 15 participants on testosterone undecanoate were included in both Pelusi [27] and Gava (2018) [29]

[b]Included a cisgender control group or a comparison to general population norms

[c]Included participants who had undergone gender-affirming surgery/surgeries, or surgery status not reported

[d]No standard deviations reported

AR-001558

doubled among transgender men (n = 50) over 5 years [29]. A prospective study found a 16% improvement in QOL scores among transgender women (n = 56) after 1 year of treatment ($P < 0.05$) but no change among transgender men (n = 27) [39]. Another before-after trial reported no difference in SF-36 scores among 2 groups of transgender women (n = 20 each) after 1 year [28]. Among adolescents, a mixed-gender prospective cohort (n = 50) showed no difference in QOL scores after a year of endocrine interventions, which included combinations of GnRH analogues and estrogen or testosterone formulations [30]. No study found that hormone therapy decreased QOL scores. We conclude that hormone therapy may improve QOL among transgender people. The strength of evidence for this conclusion is low due to concerns about bias in study designs, imprecision in measurement because of small sample sizes, and confounding by factors such as gender-affirming surgery status.

## Depression

Twelve studies, including 1 before-after trial [28], 9 prospective cohorts [30-36, 38, 40, 42], and 2 cross-sectional studies [45, 47], assessed depression (Table 3). A prospective study found that the proportion of transgender men and transgender women (n = 107) showing symptoms of depression decreased from 42% to 22% over 12 months of treatment ($P < 0.001$) [31]. In 2 other prospective cohorts, Beck Depression Inventory (BDI-II) scores improved by more than half among both transgender men (n = 26) and transgender women (n = 28) after 24 months of therapy ($P < 0.001$) [36] and improved from 15.7 ± 12.3 to 8.1 ± 6.2 among transgender men (n = 23) after 6 months ($P < 0.001$) [40]. A fourth prospective study reported improvements of 1.05 points (95% CI: −1.87, −0.22) and 1.42 points (95% CI: −2.61, −0.24) on the 21-point Hospital Anxiety and Depression Scale (HADS) among 91 transgender women and 64 transgender men after 12 months ($P = 0.013$ and $P = 0.019$, respectively) [33]. A before-after trial, however, found no change in BDI-II scores among 2 groups of transgender women (n = 20 each) after 1 year [28]. Two prospective studies reported no difference among transgender men (n = 37) after 24 weeks [42] or among transgender men (n = 50) after 12 months [32], although in the latter study this outcome did not change from a baseline median of 0.0 ("not at all depressed") on an unvalidated 4-point scale. Among adolescents, 2 mixed-gender prospective cohorts (n = 50 and n = 23, respectively) showed improvements in depression scores after 1 year of treatment with GnRH analogues and estrogen or testosterone formulations (both $P < 0.001$) [30, 38]. Another prospective study reported that BDI scores improved

almost by half among adolescents (n = 41) after a mean of 1.88 years of treatment with GnRH analogues to delay puberty ($P = 0.004$) [34]. The overall improvement after several subsequent years of testosterone or estrogen therapy in this cohort (n = 32) was smaller, however, resulting in no significant change from baseline [35]. No study found that hormone therapy increased depression. We conclude that hormone therapy may decrease depression among transgender people. The strength of evidence for this conclusion is low due to concerns about study designs, small sample sizes, and confounding.

## Anxiety

Eight studies, including 7 prospective cohorts [31, 33-35, 37, 38, 41, 42] and 1 cross-sectional study [45], assessed anxiety (Table 4). One prospective study found that Symptom Checklist 90-Revised scores indicating a probable anxiety disorder among a mixed-gender group of adults (n = 107) improved from borderline to normal over 12 months ($P < 0.001$) [31]. Another prospective study, however, did not find a difference in HADS anxiety scores among either transgender men (n = 64) or transgender women (n = 91) after 1 year [33], and a third study reported no change in the number of transgender men (6/52, 12%) with a diagnosed anxiety disorder after 7 months [41]. Likewise, 2 other prospective studies found no difference in anxiety scores among transgender men (n = 37) after 24 weeks of treatment [42] or transgender women (n = 20) after 12 months [37], although this latter finding represented no change from a baseline median score of 0 (answering "no" to the question, "do you feel anxious?") on an unvalidated 3-point scale. Among adolescents, 1 prospective study saw mean anxiety scores in a mixed-gender group (n = 23) improve from 33.0 ± 7.2 to 18.5 ± 8.4 after 1 year ($P < 0.001$) [38], but another reported no changes in anxiety after approximately 2 years of puberty delay treatment with GnRH analogues and 4 years of hormone therapy (n = 32) [35]. No study found that hormone therapy increased anxiety. We conclude that hormone therapy may decrease anxiety among transgender people. The strength of evidence for this conclusion is low due to concerns about study designs, small sample sizes, and confounding.

## Death by Suicide

One retrospective study reported in 2 publications assessed death by suicide (Table 5) [43, 44]. The first publication reported that 3 transgender women in the Amsterdam gender dysphoria study cohort (n = 303) died by suicide between 1972 and 1986 [43]. The authors calculated the number of suicide deaths expected in an age-matched stratum of

**Table 3.** Effects of Gender-Affirming Hormone Therapy on Depression Among Transgender People

| Author, year Study design | Transgender population | Treatment / comparison (n) | Depression measures | Length of treatment | Findings |
|---|---|---|---|---|---|
| Gava, 2016 [28] Before-after trial | Women | Cyproterone acetate + estradiol (20) vs Leuprolide acetate + estradiol (20) | BDI-II | 12 months | Mean depression scores did not change in either arm. No comparisons across arms were reported. |
| Fisher, 2016 [37] Prospective cohort | Women | HT (28) | BDI-II | 24 months | Mean depression score decreased from 10.12 to 4.58 ($P < 0.001$).[d, e] |
| Defreyne, 2018 [33] Prospective cohort | Women | HT (91)[c] | HADS (depression subscale) | 1 year | Median depression score decreased by 1.05 (95% CI: −1.87, −0.22) on a 21-point scale ($P = 0.013$). |
| Costantino, 2013 [32] Prospective cohort | Men | HT (50) | Ad hoc questionnaire | 12 months | Depression score did not change from a median of 0.0 at baseline (IQR: 0.0, 1.0). |
| Fisher, 2016 [36] Prospective cohort | Men | HT (26) | BDI-II | 24 months | Mean depression score decreased from 9.31 to 4.25 ($P < 0.001$).[d, e] |
| Defreyne, 2018 [33] Prospective cohort | Men | HT (64)[c] | HADS (depression subscale) | 1 year | Median depression score decreased by 1.42 (95% CI: −2.61, −0.24) on a 21-point scale ($P = 0.019$). |
| Turan, 2018 [42] Prospective cohort[b] | Men | HT (37) | SCL-90-R (depression subscale) | 24 weeks | Mean depression score did not change. |
| Metzger, 2019 [40] Prospective cohort[b] | Men | HT (23) | BDI-II | 6 months | Mean depression score decreased from 15.7 ± 12.3 to 8.1 ± 6.2 ($P < 0.001$). |
| Colizzi, 2014 [31] Prospective cohort | Women and men | HT (107) | Zung SDS SCL-90-R (depression subscale) | 12 months | Mean Zung SDS score improved from 48.40 ± 10.5 to 39.98 ± 10.79 ($P < 0.001$), and the proportion with Zung SDS scores indicating mild, moderate, or severe depression (vs no depression) decreased from 42% to 22% ($\chi^2 = 19.05$, $P < 0.001$). Mean SCL-90-R score decreased from 0.83 ± 0.74 to 0.51 ± 0.49 ($P < 0.001$), which represents an improvement from possible borderline depression to no depression. |
| Leavitt, 1980 [47] Cross-sectional | Women | HT (22) vs No HT (19) | MMPI (depression subscale) | At least 12 months | Mean depression score was lower in the group receiving HT vs the group not receiving HT (53.1 ± 14.7 vs 65.7 ± 11.2, $P = 0.004$). |

AR-001560

**Table 3.** Continued

| Author, year Study design | Transgender population | Treatment / comparison (n) | Depression measures | Length of treatment | Findings |
|---|---|---|---|---|---|
| Gómez-Gil, 2012 [45] Cross-sectional | Women and men | HT (120)[c] vs No HT (67)[c] | HADS (depression subscale) | Mean: 11.0 years (women, range, 1–46 years); 4.7 years (men, range, 1–22 years) | Mean depression score was lower in the group receiving HT vs the group not receiving HT (3.3 ± 3.2 vs 5.2 ± 4.2, $P = 0.002$).[f] The proportion with scores indicating depression (vs no depression) was larger in the group not receiving HT (31% vs 8%, $\chi^2 = 16.46$, $P = 0.001$).[f] |
| de Vries, 2011 [34] Prospective cohort | Girls and boys | GnRH treatment (41) | BDI | 1.88 years | Mean depression score decreased from 8.31 ± 7.12 to 4.95 ± 6.72 ($P = 0.004$). |
| de Vries, 2014 [35] Prospective cohort[a,b] | Girls and boys | GnRH treatment + HT (32)[c] | BDI | 5.9 years | Mean depression score did not change. |
| Achille, 2020 [30] Prospective cohort | Girls and boys | GnRH treatment + HT (47) | CESD-R, PHQ-9 (modified for adolescents) | 12 months | Mean CESD-R score decreased from 21.4 to 13.9 ($P < 0.001$);[d] a score of <16 indicates no clinical depression. Mean PHQ-9 score decreased from 9.0 to 5.4 ($P < 0.001$).[d] |
| López de Lara, 2020 [38] Prospective cohort[b] | Girls and boys | GnRH treatment + HT (23) | BDI-II | 1 year | Mean depression score decreased from 19.3 ± 5.5 to 9.7 ± 3.9 ($P < 0.001$). |

Abbreviations: BDI/BDI-II, Beck Depression Inventory; GAS, gender-affirming surgery; GnRH, gonadotropin-releasing hormone; HADS, Hospital Anxiety and Depression Scale; HT, hormone therapy; IQR, interquartile range; MMPI, Minnesota Multiphasic Personality Inventory; NA, not applicable; SCL-90-R, Symptom Checklist 90-Revised; Zung SDS, Zung Self-Rating Depression Scale.

[a]All participants were also included in de Vries (2011) [34]
[b]Included a cisgender control group or a comparison to general population norms
[c]Included participants who had undergone gender-affirming surgery/surgeries, or surgery status not reported
[d]No standard deviations reported
[e]Adjusted for age, gender role, and surgery status
[f]Adjusted for age, gender, and education level

AR-001561

**Table 4.** Effects of Gender-Affirming Hormone Therapy on Anxiety Among Transgender People

| Author, year | Transgender population | Treatment / comparison (n) | Anxiety measures | Length of treatment | Findings |
|---|---|---|---|---|---|
| Fuss, 2015 [37] Prospective cohort | Women | HT (20)[c] | Ad hoc questionnaire | 12 months | Anxiety score did not change from a median of 0.0 at baseline. |
| Defreyne, 2018 [33] Prospective cohort | Women | HT (91)[c] | HADS (anxiety subscale) | 1 year | Median anxiety score did not change. |
| Defreyne, 2018 [33] Prospective cohort | Men | HT (64)[c] | HADS (anxiety subscale) | 1 year | Median anxiety score did not change. |
| Motta, 2018 [41] Prospective cohort | Men | HT (46)[c] | DSM | 7 months | Proportion diagnosed with an anxiety disorder (6/46, 12%) did not change. |
| Turan, 2018 [42] Prospective cohort[b] | Men | HT (37) | SCL-90-R (anxiety subscale) | 24 weeks | Mean anxiety score did not change. |
| Colizzi, 2014 [31] Prospective cohort | Women and men | HT (107) | SCL-90-R (anxiety subscale) Zung SAS | 12 months | Mean SCL-90-R score decreased from $1.05 \pm 0.95$ to $0.54 \pm 0.56$ ($P < 0.001$), which represents an improvement from borderline anxiety disorder to no anxiety disorder. Mean Zung SAS score improved from $44.91 \pm 9.59$ to $37.90 \pm 8.97$ ($P < 0.001$), and the proportion with Zung SAS scores indicating mild, moderate, or severe anxiety (vs no anxiety) decreased from 50% to 17% ($\chi^2 = 33.03$, $P < 0.001$). |
| Gómez-Gil, 2012 [45] Cross-sectional | Women and men | HT (120)[c] vs No HT (67)[c] | HADS (anxiety subscale) SADS | Mean: 11.0 years (women, range, 1-46 years); 4.7 years (men, range, 1-22 years) | Mean HADS and SADS scores were lower in the group receiving HT vs the group not receiving HT ($6.4 \pm 3.7$ vs $9.0 \pm 4.0$, $P = 0.001$; $8.5 \pm 7.8$ vs $11.0 \pm 7.3$, $P = 0.038$, respectively).[d] The proportion with scores indicating anxiety (vs no anxiety) was higher in the group not receiving HT ($\chi^2 = 14.46$, $P < 0.001$).[d] |
| de Vries, 2011 [34] Prospective cohort | Girls and boys | GnRH treatment (41) | STAI (trait subscale) | 1.88 years | Mean anxiety score did not change. |
| de Vries, 2014 [35] Prospective cohort[a,b] | Girls and boys | GnRH treatment + HT (32)[c] | STAI (trait subscale) | 5.9 years | Mean anxiety score did not change. |
| López de Lara, 2020 [38] Prospective cohort[b] | Girls and boys | GnRH treatment + HT (23) | STAI (trait subscale) | 1 year | Mean anxiety score decreased from $33.0 \pm 7.2$ to $18.5 \pm 8.4$ ($P < 0.001$). |

Abbreviations: BAI, Beck Anxiety Inventory; DSM, Diagnostic and Statistical Manual of Mental Disorders; GAS, gender-affirming surgery; GnRH, gonadotropin-releasing hormone; HADS, Hospital Anxiety and Depression Scale; HT, hormone therapy; IQR, interquartile range; SADS, Social Avoidance and Distress Scale; SCL-90-R, Symptom Checklist 90-Revised; STAI, State-Trait Anxiety Inventory; Zung SAS, Zung Self-Rating Anxiety Scale.

[a]All participants were also included in de Vries (2011) [34]

[b]Included a cisgender control group or a comparison to general population norms

[c]Included participants who have undergone gender-affirming surgery/surgeries, or surgery status not reported

[d]Adjusted for age, gender, and education level

the general male Dutch population over this period to be 0.208. No data were reported for transgender men (n = 122). An update to this study reported 17 deaths by suicide among transgender women (n = 966) and 1 among transgender men (n = 365) between 1975 and 2007 [44].

The age- and sex-stratified standardized mortality ratios were 5.70 (95% CI: 4.93, 6.54) and 2.22 (95% CI: 0.53, 6.18), respectively. The risk of bias for this study was serious due to the difficulty of identifying appropriate comparison groups and uncontrolled confounding by surgery

AR-001562

**Table 5.** Effects of Gender-Affirming Hormone Therapy on Death by Suicide Among Transgender People

| Author, year | Transgender population | Treatment / comparison (n) | Measures | Length of treatment | Findings |
|---|---|---|---|---|---|
| Asscheman, 1989 [43] Retrospective cohort[a,b] | Women | HT (303)[c] | Death by suicide (confirmed by autopsy report) | Median: 4.4 years (range, 6 months to 13 years) | 3 transgender women (1%) died by suicide between 1972 and 1986. The adjusted number of suicide deaths expected among the general Dutch male population was 0.208. |
| Asscheman, 2011 [44] Retrospective cohort[a,b] | Women | HT (966)[c] | Death by suicide (confirmed by medical report or physician information) | Median: 18.6 years (range, 0.7–44.5 years) | 17 transgender women (2%) died by suicide between 1975 and 2007. The age-stratified SMR compared to the general Dutch male population was 5.70 (95% CI: 4.93, 6.54). |
| Asscheman, 1989 [43] Retrospective cohort[a,b] | Men | HT (122)[c] | Death by suicide (confirmation procedure NR) | Median: 3.6 years (range, 6 months to 13 years) | No deaths by suicide among transgender men were reported during the study period. |
| Asscheman, 2011 [44] Retrospective cohort[a,b] | Men | HT (365)[c] | Death by suicide (confirmed by medical report or physician information) | Median: 18.4 years (range, 4.7–42.6 years) | 1 transgender man (0.3%) died by suicide between 1975 and 2007. The age-stratified SMR compared to the general Dutch female population was 2.22 (95% CI: 0.53, 6.18). |

Abbreviations: HT, hormone therapy; NR, not reported; SMR, standardized mortality ratio.

[a]An unknown number of participants were included in both Asscheman (1989) [43] and Asscheman (2011) [44]

[b]Included a cisgender control group or a comparison to general population norms

[c]Includes participants who had undergone gender-affirming surgery/surgeries, or surgery status not reported

status and socioeconomic variables such as unemployment. We cannot draw any conclusions on the basis of this single study about whether hormone therapy affects death by suicide among transgender people.

## Discussion

This systematic review of 20 studies found evidence that gender-affirming hormone therapy may be associated with improvements in QOL scores and decreases in depression and anxiety symptoms among transgender people. Associations were similar across gender identity and age. The strength of evidence for these conclusions is low due to methodological limitations (Table 6). It was impossible to draw conclusions about the effects of hormone therapy on death by suicide.

Uncontrolled confounding was a major limitation in this literature. Many studies simultaneously assessed different types of gender-affirming care and did not control for gender-affirming surgery status, making it difficult to isolate the effects of hormone therapy. Others failed to report complete information about surgery status. Additional factors that may influence both access to care and psychological outcomes, including extent of social or legal gender affirmation and exposure to determinants of health such as discrimination, were typically not considered. In addition, some evidence indicates that cyproterone acetate, a common anti-androgen assessed in many studies alongside estrogen therapy, may increase depression, which may be a source of confounding [49].

Another source of potential bias was recruitment of participants from specialized clinics that impose strict diagnostic criteria as a prerequisite for gender-affirming care. The dual role of clinicians and researchers as both gatekeepers and investigators may force transgender study participants to over- or understate aspects of their mental health in order to access gender-affirming care [8]. Similarly, transgender clinic patients may feel that they cannot opt out of research-related activities, which is a serious concern for the validity of psychological outcome measurements.

Clinic-based recruitment also overlooks transgender people who cannot access these clinics for financial or other reasons and misses those whose need for gender affirmation does not fit into current medical models. This is a particular concern for nonbinary and other gender-diverse people, for whom a model of gender affirmation as a linear transition from one binary gender to another is inaccurate [50].

Most studies used well-known scales for measuring psychological outcomes. None of these scales, however, have been specifically validated for use in transgender populations [51]. Furthermore, many scales are normed

*Journal of the Endocrine Society*, 2021, Vol. 5, No. 4  **13**

**Table 6.** Strength of Evidence of Studies that Evaluate the Psychological Effects of Hormone Therapy Among Transgender People

| Outcome | Number of studies (n) | Strength of evidence | Summary[a] |
|---|---|---|---|
| Quality of life | 1 randomized controlled trial [27] (45)[b] <br> 2 before-after trials [28, 29] (65)[b] <br> 2 prospective cohorts [30, 39] (133) <br> 2 cross-sectional studies [46, 48] (108) | Low[e] | Hormone therapy may improve quality of life among transgender people.[g] |
| Depression | 1 before-after trial [28] (40) <br> 9 prospective cohorts [30-36, 38, 40, 42] (569)[c] <br> 2 cross-sectional [45, 47] (228) | Low[e] | Hormone therapy may alleviate depression among transgender people.[g] |
| Anxiety | 7 prospective cohorts [31, 33-35, 37, 38, 41, 42] (464)[c] <br> 1 cross-sectional [45] (187) | Low[e] | Hormone therapy may alleviate anxiety among transgender people.[g] |
| Death by suicide | 1 retrospective cohort [43, 44] (1756)[d] | Insufficient[f] | There is insufficient evidence to draw a conclusion about the effect of hormone therapy on death by suicide among transgender people. |

[a]Due to similarity of findings, the summary is the same for transgender men and transgender women and for adolescents and adults

[b]25 participants are included in both Pelusi [27] and Gava (2018) [29] and are counted once

[c]All 55 participants in de Vries (2014) [35] were also included among the 70 participants in de Vries (2011) [34] and are counted once

[d]An unknown number of participants were included in both Asscheman (1989) [43] and Asscheman (2011), [44] so the unique sample size is smaller than indicated here

[e]Evidence downgraded due to study limitations, including uncontrolled confounding, and imprecision because of small sample sizes

[f]Evidence downgraded due to study limitations, including confounding and a lack of meaningful comparison groups, and imprecision in measurement of a rare event

[g]The body of cross-sectional evidence tended to align with the conclusion

separately for (presumed cisgender) men and women [52]. Inconsistency in identification of appropriate general population norms hinders comparisons between transgender and cisgender groups, which is a major related research question that requires further investigation.

Beyond methodological concerns in the studies we assessed, our review has other limitations. First, it is likely subject to publication bias, as we may have missed studies not published in the peer-reviewed literature. Second, a number of potentially relevant studies could not be included because the authors did not report on a minimum of 3 months of treatment or did not clearly state the type and/or duration of therapy, including the range for cross-sectional studies [53-65]. Finally, even where outcome measurements were similar across studies, heterogeneity in study designs, study populations, intervention characteristics, and reporting of results (ie, some studies reported results separately by gender identity, while others did not), prevented us from quantitatively pooling results.

More research is needed to further explore the relationship between gender-affirming hormone therapy and QOL, death by suicide, and other psychological outcomes, especially among adolescents. Future studies should investigate these outcomes in larger groups of diverse participants recruited outside clinical settings. Studies assessing the relationship between gender-affirming hormone therapy and mental health outcomes in transgender populations should be prospective or use strong quasi-experimental designs; consistently report type, dose, and duration of hormone therapy; adjust for possible confounding by gender-affirming surgery status; control for other variables that may independently influence psychological outcomes; and report results separately by gender identity. Despite the limitations of the available evidence, however, our review indicates that gender-affirming hormone therapy is likely associated with improvements in QOL, depression, and anxiety. No studies showed that hormone therapy harms mental health or quality of life among transgender people. These benefits make hormone therapy an essential component of care that promotes the health and well-being of transgender people.

## Acknowledgments

*Financial Support:* This review was partly funded by the World Professional Association for Transgender Health.

*Author Contributions:* R.S. developed and implemented the search strategy with input from K.B., L.W., and K.R. K.B., L.W., R.S., V.D., K.M., and K.R. screened and assessed studies, extracted data, and graded strength of evidence. K.B. wrote the report, which was reviewed by all co-authors.

AR-001564

## Additional Information

*Correspondence:* Kellan E. Baker, MPH, MA, Department of Health Policy and Management, Johns Hopkins Bloomberg School of Public Health, 624 North Broadway, Baltimore, MD 21205, USA. Email: kbaker39@jhu.edu.

*Disclosure Summary:* This review was partially funded by the World Professional Association for Transgender Health (WPATH). The authors of this manuscript are responsible for its content. Statements in the manuscript do not necessarily reflect the official views of or imply endorsement by WPATH.

*Data Availability:* Some or all data generated or analyzed during this study are included in this published article or in the data repository listed in the References.

## References

1. Collin L, Reisner SL, Tangpricha V, Goodman M. Prevalence of transgender depends on the "case" definition: a systematic review. *J Sex Med.* 2016;**13**(4):613-626.
2. Goodman M, Adams N, Corneil T, Kreukels B, Motmans J, Coleman E. Size and distribution of transgender and gender nonconforming populations: a narrative review. *Endocrinol Metab Clin North Am.* 2019;**48**(2):303-321.
3. Coleman E, Bockting W, Botzer M, et al. Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *Int J Transgenderism.* 2012;**13**(4):165-232.
4. Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: an Endocrine Society Clinical Practice Guideline. *J Clin Endocrinol Metab.* 2017;**102**(11):3869-3903.
5. James SE, Herman JL, Rankin S, Keisling M, Mottet L, Anafi M. *The Report of the 2015 U.S. Transgender Survey.* National Center for Transgender Equality; 2016.
6. Deutsch MB, ed. Guidelines for the primary and gender-affirming care of transgender and gender nonbinary people. 2016. Accessed December 19, 2020. https://transcare.ucsf.edu/guidelines
7. Wylie K, Knudson G, Khan SI, Bonierbale M, Watanyusakul S, Baral S. Serving transgender people: clinical care considerations and service delivery models in transgender health. *Lancet.* 2016;**388**(10042):401-411.
8. Schulz SL. The informed consent model of transgender care: an alternative to the diagnosis of gender dysphoria. *J Humanist Psychol.* 2018;**58**(1):72-92.
9. American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders.* 5th ed. American Psychiatric Association; 2013.
10. Robles R, Fresán A, Vega-Ramírez H, et al. Removing transgender identity from the classification of mental disorders: a Mexican field study for ICD-11. *Lancet Psychiatry.* 2016;**3**(9):850-859.
11. Arístegui I, Radusky PD, Zalazar V, Romero M, Schwartz J, Sued O. Impact of the Gender Identity Law in Argentinean transgender women. *Int J Transgenderism.* 2017;**18**(4):446-456.
12. Murad MH, Elamin MB, Garcia MZ, et al. Hormonal therapy and sex reassignment: a systematic review and meta-analysis of quality of life and psychosocial outcomes. *Clin Endocrinol (Oxf).* 2010;**72**(2):214-231.
13. White Hughto JM, Reisner SL. A systematic review of the effects of hormone therapy on psychological functioning and quality of life in transgender individuals. *Transgend Health.* 2016;**1**(1):21-31.
14. Costa R, Colizzi M. The effect of cross-sex hormonal treatment on gender dysphoria individuals' mental health: a systematic review. *Neuropsychiatr Dis Treat.* 2016;**12**:1953-1966.
15. Nobili A, Glazebrook C, Arcelus J. Quality of life of treatment-seeking transgender adults: a systematic review and meta-analysis. *Rev Endocr Metab Disord.* 2018;**19**(3):199-220.
16. Rowniak S, Bolt L, Sharifi C. Effect of cross-sex hormones on the quality of life, depression and anxiety of transgender individuals: a quantitative systematic review. *JBI Database System Rev Implement Rep.* 2019;**17**(9):1826-1854.
17. Mahfouda S, Moore JK, Siafarikas A, et al. Gender-affirming hormones and surgery in transgender children and adolescents. *Lancet Diabetes Endocrinol.* 2019;**7**(6):484-498.
18. Sharma R, Robinson K, Wilson L, Baker KE. Effects of hormone therapy in transgender people. Accessed December 19, 2020. https://www.crd.york.ac.uk/prospero/display_record.php?RecordID=115379
19. Moher D, Liberati A, Tetzlaff J, Altman DG; PRISMA Group. Preferred reporting items for systematic reviews and meta-analyses: the PRISMA statement. *BMJ.* 2009;**339**:b2535.
20. Baker KE, Wilson LM, Sharma R, Dukhanin V, McArthur K, Robinson KA. Data associated with the publication: Hormone therapy, mental health, and quality of life among transgender people: a systematic review. *Johns Hopkins Univ Data Arch.* **V1.** doi: 10.7281/T1/E70MXR.
21. *Evidence Partners.* DistillerSR [software]; 2020.
22. Ware JE Jr, Kosinski M, Bayliss MS, McHorney CA, Rogers WH, Raczek A. Comparison of methods for the scoring and statistical analysis of SF-36 health profile and summary measures: summary of results from the Medical Outcomes Study. *Med Care.* 1995;**33**(4 Suppl):AS264-AS279.
23. Rohatgi A. WebPlotDigitizer: an HTML5-based online tool for to extract numerical data from plot images. 2020. https://automeris.io/WebPlotDigitizer/index.html
24. Sterne JAC, Savović J, Page MJ, et al. RoB 2: a revised tool for assessing risk of bias in randomised trials. *BMJ.* 2019;**366**:l4898.
25. Sterne JA, Hernán MA, Reeves BC, et al. ROBINS-I: a tool for assessing risk of bias in non-randomised studies of interventions. *BMJ.* 2016;**355**:i4919.
26. Berkman ND, Lohr KN, Ansari MT, et al. Grading the strength of a body of evidence when assessing health care interventions: an EPC update. *J Clin Epidemiol.* 2015;**68**(11):1312-1324.
27. Pelusi C, Costantino A, Martelli V, et al. Effects of three different testosterone formulations in female-to-male transsexual persons. *J Sex Med.* 2014;**11**(12):3002-3011.
28. Gava G, Cerpolini S, Martelli V, Battista G, Seracchioli R, Meriggiola MC. Cyproterone acetate vs leuprolide acetate in combination with transdermal oestradiol in transwomen: a comparison of safety and effectiveness. *Clin Endocrinol (Oxf).* 2016;**85**(2):239-246.
29. Gava G, Mancini I, Cerpolini S, Baldassarre M, Seracchioli R, Meriggiola MC. Testosterone undecanoate and testosterone

AR-001565

enanthate injections are both effective and safe in transmen over 5 years of administration. *Clin Endocrinol (Oxf)*. 2018;**89**(6):878-886.

30. Achille C, Taggart T, Eaton NR, et al. Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: preliminary results. *Int J Pediatr Endocrinol*. 2020;**2020**:8.

31. Colizzi M, Costa R, Todarello O. Transsexual patients' psychiatric comorbidity and positive effect of cross-sex hormonal treatment on mental health: results from a longitudinal study. *Psychoneuroendocrinology*. 2014;**39**:65-73.

32. Costantino A, Cerpolini S, Alvisi S, Morselli PG, Venturoli S, Meriggiola MC. A prospective study on sexual function and mood in female-to-male transsexuals during testosterone administration and after sex reassignment surgery. *J Sex Marital Ther*. 2013;**39**(4):321-335.

33. Defreyne J, T'Sjoen G, Bouman WP, Brewin N, Arcelus J. Prospective evaluation of self-reported aggression in transgender persons. *J Sex Med*. 2018;**15**(5):768-776.

34. de Vries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT. Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study. *J Sex Med*. 2011;**8**(8):2276-2283.

35. de Vries AL, McGuire JK, Steensma TD, Wagenaar EC, Doreleijers TA, Cohen-Kettenis PT. Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics*. 2014;**134**(4):696-704.

36. Fisher AD, Castellini G, Ristori J, et al. Cross-sex hormone treatment and psychobiological changes in transsexual persons: two-year follow-up data. *J Clin Endocrinol Metab*. 2016;**101**(11):4260-4269.

37. Fuss J, Hellweg R, Van Caenegem E, et al. Cross-sex hormone treatment in male-to-female transsexual persons reduces serum brain-derived neurotrophic factor (BDNF). *Eur Neuropsychopharmacol*. 2015;**25**(1):95-99.

38. López de Lara D, Pérez Rodríguez O, Cuellar Flores I, et al. Evaluación psicosocial en adolescentes transgénero. *An Pediatría*. 2020;**93**(1):41-48.

39. Manieri C, Castellano E, Crespi C, et al. Medical treatment of subjects with gender identity disorder: the experience in an Italian Public Health Center. *Int J Transgenderism*. 2014;**15**(2):53-65.

40. Metzger NY, Boettger S. The effect of testosterone therapy on personality traits of trans men: a controlled prospective study in Germany and Switzerland. *Psychiatry Res*. 2019;**276**:31-38.

41. Motta G, Crespi C, Mineccia V, Brustio PR, Manieri C, Lanfranco F. Does testosterone treatment increase anger expression in a population of transgender men? *J Sex Med*. 2018;**15**(1):94-101.

42. Turan Ş, Aksoy Poyraz C, Usta Sağlam NG, et al. Alterations in body uneasiness, eating attitudes, and psychopathology before and after cross-sex hormonal treatment in patients with female-to-male gender dysphoria. *Arch Sex Behav*. 2018;**47**(8):2349-2361.

43. Asscheman H, Gooren LJ, Eklund PL. Mortality and morbidity in transsexual patients with cross-gender hormone treatment. *Metabolism*. 1989;**38**(9):869-873.

44. Asscheman H, Giltay EJ, Megens JA, de Ronde WP, van Trotsenburg MA, Gooren LJ. A long-term follow-up study of mortality in transsexuals receiving treatment with cross-sex hormones. *Eur J Endocrinol*. 2011;**164**(4):635-642.

45. Gómez-Gil E, Zubiaurre-Elorza L, Esteva I, et al. Hormone-treated transsexuals report less social distress, anxiety and depression. *Psychoneuroendocrinology*. 2012;**37**(5):662-670.

46. Gorin-Lazard A, Baumstarck K, Boyer L, et al. Is hormonal therapy associated with better quality of life in transsexuals? A cross-sectional study. *J Sex Med*. 2012;**9**(2):531-541.

47. Leavitt F, Berger JC, Hoeppner JA, Northrop G. Presurgical adjustment in male transsexuals with and without hormonal treatment. *J Nerv Ment Dis*. 1980;**168**(11):693-697.

48. Wierckx K, Van Caenegem E, Elaut E, et al. Quality of life and sexual health after sex reassignment surgery in transsexual men. *J Sex Med*. 2011;**8**(12):3379-3388.

49. Heinemann LA, Will-Shahab L, van Kesteren P, Gooren LJ; Collaborating Centers. Safety of cyproterone acetate: report of active surveillance. *Pharmacoepidemiol Drug Saf*. 1997;**6**(3):169-178.

50. Reisner SL, Hughto JMW. Comparing the health of non-binary and binary transgender adults in a statewide non-probability sample. *Plos One*. 2019;**14**(8):e0221583.

51. Thompson HM, Reisner SL, VanKim N, Raymond HF. Quality-of-life measurement: assessing the WHOQOL-BREF scale in a sample of high-HIV-risk transgender women in San Francisco, California. *Int J Transgend*. 2015;**16**(1):36-48.

52. Webb A, Heyne G, Holmes J, Peta J. Assessment norms for gender and implications for transgender, nonbinary populations. *Division 44 Newsletter*. 2016. Accessed June 9, 2020. https://www.apadivisions.org/division-44/publications/newsletters/division/2016/04/nonbinary-populations

53. Heylens G, Verroken C, De Cock S, T'Sjoen G, De Cuypere G. Effects of different steps in gender reassignment therapy on psychopathology: a prospective study of persons with a gender identity disorder. *J Sex Med*. 2014;**11**(1):119-126.

54. Gorin-Lazard A, Baumstarck K, Boyer L, et al. Hormonal therapy is associated with better self-esteem, mood, and quality of life in transsexuals. *J Nerv Ment Dis*. 2013;**201**(11):996-1000.

55. Gómez-Gil E, Vidal-Hagemeijer A, Salamero M. MMPI-2 characteristics of transsexuals requesting sex reassignment: comparison of patients in prehormonal and presurgical phases. *J Pers Assess*. 2008;**90**(4):368-374.

56. Oda H, Kinoshita T. Efficacy of hormonal and mental treatments with MMPI in FtM individuals: cross-sectional and longitudinal studies. *BMC Psychiatry*. 2017;**17**(1):256.

57. Elaut E, De Cuypere G, De Sutter P, et al. Hypoactive sexual desire in transsexual women: prevalence and association with testosterone levels. *Eur J Endocrinol*. 2008;**158**(3):393-399.

58. Warmuz-Stangierska I, Stangierski A, Ziemnicka K, et al. Emotional functions in transsexuals after the first step in physical transformation. *Endokrynol Pol*. 2015;**66**(1):47-52.

59. Colton Meier SL, Fitzgerald KM, Pardo ST, Babcock J. The effects of hormonal gender affirmation treatment on mental health in female-to-male transsexuals. *J Gay Lesbian Ment Health*. 2011;**15**(3):281-299.

AR-001566

60. Davis SA, Colton Meier S. Effects of testosterone treatment and chest reconstruction surgery on mental health and sexuality in female-to-male transgender people. *Int J Sex Health*. 2014;**26**(2):113-128.

61. Keo-Meier CL, Herman LI, Reisner SL, Pardo ST, Sharp C, Babcock JC. Testosterone treatment and MMPI-2 improvement in transgender men: a prospective controlled study. *J Consult Clin Psychol*. 2015;**83**(1):143-156.

62. Newfield E, Hart S, Dibble S, Kohler L. Female-to-male transgender quality of life. *Qual Life Res*. 2006;**15**(9):1447-1457.

63. Gooren LJ, Sungkaew T, Giltay EJ, Guadamuz TE. Cross-sex hormone use, functional health and mental well-being among transgender men (Toms) and Transgender Women (Kathoeys) in Thailand. *Cult Health Sex*. 2015;**17**(1):92-103.

64. van Kesteren PJ, Asscheman H, Megens JA, Gooren LJ. Mortality and morbidity in transsexual subjects treated with cross-sex hormones. *Clin Endocrinol (Oxf)*. 1997;**47**(3):337-342.

65. Wiepjes CM, den Heijer M, Bremmer MA, et al. Trends in suicide death risk in transgender people: results from the Amsterdam Cohort of Gender Dysphoria study (1972-2017). *Acta Psychiatr Scand*. 2020;**141**(6):486-491.

AR-001567