**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ALISHEA KINGDOM, *et al.*,

Plaintiffs,

v.

DONALD J. TRUMP, *et al.*,

Defendants.

Civ. A. No. 25-691 (RCL)

**DEFENDANTS' STATEMENT OF MATERIAL FACTS**

Pursuant to Local Civil 7(h)(1), Defendants hereby submit this statement of material facts for which there is no genuine issue.[1]

1.      On January 20, 2025, the President issued Executive Order ("EO") 14,168.  The EO provides in relevant part that "[i]t is the policy of the United States to recognize two sexes, male and female," EO 14,168, § 2, and that "'sex' shall refer to an individual's immutable biological classification as either male or female," *id.* § 2(a).

2.      And, as relevant, section 4(c) of the EO provides: "The Attorney General shall ensure that [BOP] revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex."

3.      Finally, the EO requires that it "be implemented consistent with applicable law."  *Id.* § 8(b).

4.      On February 21, 2025, BOP issued a memorandum implementing EO 14,168.  *See* ECF No. 1-1 (Memorandum: *Compliance with Executive Order "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"*).  The memorandum provides in

---

[1]      Defendants maintain that this is a record-review case but submit this statement out of an abundance of caution

relevant part that BOP will not provide social accommodations for trans-identifying inmates (*e.g.*, binders, hair removal devices, and undergarments). *Id.* at 1–2.

5.      On February 28, 2025, BOP issued a second memorandum regarding compliance with EO 14,168. *See* ECF No. 1-2 (Memorandum: *Executive Order 14168 Compliance*). The memorandum provides that "no Bureau of Prisons funds are to be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." *Id.* It further provides that "[t]his policy is to be implemented in a manner consistent with applicable law[,] including the Eighth Amendment." *Id.*

6.      On February 19, 2026, BOP issued a new policy on treatment of inmates with gender dysphoria, Program Statement 5260.01, *Management of Inmates with Gender Dysphoria.* 2026 Policy (ECF No. 125).

7.      Under the Policy, BOP will provide medical care to each inmate pursuant to an "individualized" plan "tailored to the specific clinical needs of the inmate." *Id.* at 6.

8.      Medical and psychiatric comorbidities will generally be addressed before gender dysphoria treatment proceeds so as to rule them out "as the potential cause of [gender dysphoria]." *Id.*

9.      Gender dysphoria treatment will consist of psychotherapy and psychoeducational group interventions, trauma treatment, and psychotropic medication, among other treatments. *Id.* at 6–7.

10.      Not available to address gender dysphoria, however, are sex trait modification surgeries and social accommodations. *Id.* at 7, 8.

11.      Under the Policy, BOP will not provide cross-sex hormones to inmates not currently receiving them, and inmates who are currently receiving them generally will be tapered off based on individual factors such as the duration the inmate has been receiving hormones. *Id.* at 7–8.

12.      "For inmates who (1) are post sex trait modification surgery[,] or (2) have been receiving hormones to address [gender dysphoria] for an extended period of time and develop severe physiological and psychological withdrawal effects from tapering, it may not be appropriate in all cases

for the initial tapering plan to include cessation of hormones[,]" but such tapering plans "should be reevaluated regularly[.]" *Id.* at 8.

13.    Moreover, inmates may "submit a request for additional medical or mental health care or evaluation if they have acute concerns during the tapering process," and their requests will be evaluated "based on all relevant factors, including security and prison-administration concerns." *Id.*

14.    On March 6, 2026, BOP filed a certified index of the 2026 Policy's administrative record, ECF No. 151, and produced the administrative record to Plaintiffs, which is over 3,000 pages. Ex. 1, 2 (AR excerpts).

15.    In that record, BOP provided extensive discussion—indeed, approximately 47 pages of analysis—of the issues it considered, the evidence it reviewed, and its justification for the 2026 Policy.

16.    The administrative record shows that, in revising its policy for gender dysphoria treatment, BOP conducted extensive reviews of, among other things, relevant medical studies, state correctional policies, pertinent case law, prison administration and security concerns, and expert medical opinions, AR1–4; AR5–47.

17.    Based on this review, BOP determined that the "newer, more rapidly evolving clinical landscape" hampered the identification of a universal standard of care.  AR3; *see also* AR5–8.

18.    BOP also thoroughly examined the "gender affirming care model" advocated by the World Professional Association for Transgender Health ("WPATH"), which had been the standard of care BOP previously followed.  AR3–4; AR5–8.

19.    BOP determined that there are grave "concerns about the body of research and potential research bias" underlying the WPATH model.  AR4; *see also* AR5–8.

20.    BOP further found that many European countries "have distanced themselves from the stance" of WPATH, and that leading organizations in the United States are reevaluating their clinical guidance.  AR4; *see also* AR5–8.

21.     BOP considered systematic reviews of available studies that found insufficient and low strength of evidence as to the safety and efficacy of sex trait modification interventions, including cross-sex hormones.  AR4; AR24–27.

22.     BOP considered the many significant risks of cross-sex hormones, from breast cancer to cardiovascular complications.  AR4; AR24–27; AR2631–36.

23.     The administrative record includes a 2020 review concluding that individuals receiving cross-sex hormones are "at increased risk of adverse cardiovascular outcomes, including myocardial infarction and stroke," AR2859.

24.     The administrative record includes a 2021 systematic review concluding that any association between cross-sex hormones and increased quality of life and decreased depression and anxiety was uncertain because of "high risk of bias in study designs, small sample sizes, and confounding with other interventions," AR1552.

25.     The administrative record includes a 2020 overview explaining that the efficacy of gender affirming modalities are lacking "high-quality scientific data on the effects of this approach," including the lack of randomized prospective trial design, small sample size, recruitment bias, and short study duration, AR1906.

26.     The administrative record includes a 2023 narrative review explaining that studies of suicides following gender affirming care "suffers from a lack of methodological rigor" that increases the risk of error and does not control for "the presence of psychiatric comorbidity, substance use, and other suicide risk-enhancing factors," AR1915, 1927.

27.     BOP considered the safety, security, and prison administration concerns for both the inmates receiving care to address gender dysphoria and for correctional staff.  AR2–3; AR10–13, 18–20, 28–30.

28.     BOP considered the fact that providing sex trait modification surgeries, hormone interventions, and social accommodations jeopardizes the safety, security, and administration of BOP facilities because "inmates receiving these surgeries are at higher risk of harassment due to their appearance."  AR2; *see also* AR11–12, 19, 28–29.

29.    Special treatments associated with sex trait modification interventions also raise fairness concerns and can breed resentment among other inmates, which in turn "can increase the risk of retaliation against the inmate receiving special treatment and cause ripple effects throughout the correctional institution[,] disrupting the delicate prison environment."  AR12, 20, 29.

30.    Moreover, providing "gender affirming" care conflicts with a reasonable prison safety practice of refusing to reward threats of self-harm and may even increase self-harm.  AR12, 20, 29– 30; *see also* AR2648, ¶ 148; AR2649, ¶ 149.

31.    BOP reviewed five different state correctional policies (Florida, California, Kentucky, Oklahoma, and Minnesota) to understand how those states address gender dysphoria in the correctional context.  AR3.

32.    BOP also considered costs, reliance interests, and alternatives.  AR13–16, 21–23, 30– 33.

33.    BOP directly addressed reliance interests over multiple pages and reasonably determined that inmates lack a valid reliance interest in receiving unproven treatments (or at a minimum treatment subject to reasonable debate in the medical community), particularly when the treatments have not been part of a longstanding, formal BOP policy.  AR13–16; AR21–23; AR30–33.

34.    BOP also reasonably determined that even if there were valid reliance interests, those interests were not sufficient to outweigh the benefits of the 2026 Policy.  *See, e.g.*, AR21–22 (social accommodations); AR30–32 (hormones).

35.    And BOP also reasonably considered alternatives of providing these treatments in certain situations or to certain inmates, but in the end, found that it was not prudent to provide interventions that are unproven or are medically controversial; can harm the inmate; can have long-term irreversible effects; and can negatively affect security and prison administration.  AR13–16; AR21–23; AR30–33.

36.    The expert medical opinions that BOP reviewed include the declarations of Plaintiffs' expert previously submitted in this case and the expert report of Dr. Kaliebe, a psychiatrist with over

25 years of experience who has extensively studied the relevant gender dysphoria literature and presented and published articles about gender dysphoria, AR2599–2673.

37.    Dr. Kaliebe discussed the hierarchies of evidence in medicine, the treatment approaches for gender dysphoria, the many weaknesses and risks of "gender affirming care model" advocated by WPATH, and why psychotherapy is the preferred treatment approach, particularly in correctional environments.  AR2607–18.

38.    Dr. Kaliebe also explained that WPATH's guidelines advocating affirmation of a patient's preferred gender should not be used to formulate treatment of gender dysphoria because "WPATH openly engages in ideologically-based political advocacy, systematically misrepresents evidence, and often bases its recommendations, no matter how impactful for the patient, on low-quality supporting evidence."  AR2618–27.

39.    He also explained that other similar guidelines suffer from many of the same issues. AR2624–25, ¶¶ 74, 75.

40.    Dr. Kaliebe opined that cross-sex hormones, social accommodations, and sex trait modification surgery are not medically necessary, particularly in the correctional setting.  AR2599–2673.

41.    Dr. Kaliebe opined that sex trait modifications "have substantial risks, and there is little, if any, reliable data supporting that such surgeries cause meaningful long-term benefits in improving mental health or reducing suicide risks.  This is particularly true in prison settings." AR2637–38, ¶ 118.

42.    Dr. Kaliebe opined that sex trait modification surgery can prolong and worsen gender dysphoria symptoms, undermine other gender dysphoria treatments, and cause other physical and psychological harms, some of which are lifelong.  AR2637–41; *see* AR2640, ¶ 129.

43.    For example, numerous studies showed that individuals who underwent sex trait modification surgery have a significantly higher risk for depression, anxiety, suicidal ideation, and substance abuse disorders. AR2638, ¶ 121; AR2639–40, ¶ 122–26; AR966–74; AR987–93.

44.    Such surgeries can also have "serious complications, some of which are lifelong" and irreversible, including stenosis, nerve damage, chronic pain, and loss of sensation.  AR2640, ¶ 129; *see also* AR975–986; AR3032–39.

45.    As Dr. Kaliebe explained, "with the known harms to healthy tissue, potential increased risk of psychiatric decompensation, technical issues such as wound care, potential surgical complications, potential life-long health complications, and unclear mental health benefits, cross-sex surgeries within the correctional environment are not medical necessary."  AR2641, ¶ 130.

46.    Medical professionals have persuasively explained that social accommodations are not medically necessary.  *See, e.g.*, AR2605, ¶¶ 22, 136.

47.    "There is limited evidence suggesting that allowing cosmetic and clothing items, such [as] binders, undergarments, makeup, wigs, and other accessories and items stereotypically associated with the opposite sex, would improve or resolve symptoms associated with Gender Dysphoria."  AR2643, ¶ 136.

48.    And there is no reliable evidence showing social accommodations address gender dysphoria in prison, given that social transition in the correctional environment is fundamentally different from such concepts outside the environment.  AR2644, ¶ 139; AR2646, ¶¶ 141–43.

49.    At the same time, social accommodations "can prolong the symptoms [of gender dysphoria] and undermine psychotherapy."  AR2643, ¶ 136.

50.    Social transition is also "related to future harms and risks due to increased likelihood of later sex-trait modification."  AR2642, ¶ 133.

51.    The 2026 Policy provides that hormones should generally not be used to address gender dysphoria, subject to certain exceptions.  2026 Policy at 7–8.

52.    In reaching that decision, BOP considered, among other things, Dr. Kaliebe's opinion that hormonal interventions to address gender dysphoria are highly controversial, medically disputed, and unproven by appropriate evidence.  AR1–4; AR24–27; AR2605, ¶ 20; AR2650, ¶ 154; *see also* Ex. 3 (Stahl Decl.), ¶¶ 6, 12–14, 16.

53.     As Dr. Kaliebe opined based on his review of relevant literature, providing hormonal interventions to address gender dysphoria "is not based on guidelines using best practice or systematic reviews of evidence[,]" and there is little (if any) reliable evidence showing that hormones address gender dysphoria.  AR2627, ¶ 83.

54.     For example, "[a] 2020 systematic review of available studies 'found insufficient evidence to determine the efficacy or safety of hormonal treatment approaches for transgender women in transition'—it concluded that '[t]he evidence is very incomplete, demonstrating a gap between current clinical practice and clinical research.'"  AR4 (quoting Haupt et al., *Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women*, 11 Cochrane Database of Systematic Reviews, Art. No. CD013138, at 2, 11 (2020)); AR25.

55.     "Another systematic review of studies concluded that it was 'impossible to draw conclusions about the effects of hormone therapy on death by suicide' because of the 'low' 'strength of evidence.'"  AR4 (quoting Kellan E. Baker, et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, 5 J. Endocrine Soc. 1, 12-13 (2021)); AR25.

56.     Not only is the efficacy of cross-sex hormones to treat gender dysphoria disputed, but there are also indications that hormonal interventions can prolong and worsen symptoms of gender dysphoria, undermine other gender dysphoria treatments, and cause substantial health risks and medical harms.  *See* AR26; AR2631–36, ¶¶ 96–111.

57.     For example, evidence shows that males who are treated with estrogen have twenty-two times the likelihood to develop breast cancer than other males.  AR4 (citing Rakesh R. Gurrala et al., *The Impact of Exogenous Testosterone on Breast Cancer Risk in Transmasculine Individuals*, 90(1) Annals of Plastic Surgery 96 (2023)); AR26.

58.     Cross-sex hormones have also been associated with "a range of cardiovascular complications," including a 1.5 to 2-fold increase in strokes and a 2- to 5-fold increased risk of pulmonary embolisms and deep vein thrombosis.  AR2632, ¶ 98; AR2633, ¶¶ 101, 102.

59.     Additionally, cross-sex hormones affect cholesterol, which can lead to coronary artery disease and atherosclerosis (plaque buildup on artery walls).  AR2633, ¶ 101; AR2634, ¶ 104.

60.     Other substantial risks include Pelvic Floor Dysfunction (94.1% in a cross-section study showed at least one symptom); urinary issues, including urinary incontinence, frequent urination, and bed-wetting (86.7% of participants had an issue); bowel-related issues, including constipation anorectal symptoms, and flatal incontinence (74%); and sexual dysfunction (52.9%).  AR2634–35, ¶¶ 105, 106.

61.     Cross-sex hormones are also linked to cognitive issues, including memory loss, early-onset cognitive impairment, and loss of processing speed.  AR2636, ¶ 110.

62.     Some of the effects of hormonal interventions, such as infertility and low sperm production, might be irreversible.  AR26; AR2635–36, ¶ 109.

63.     BOP determined that a more nuanced approach is warranted for inmates who are already receiving hormones to address gender dysphoria because removing the hormones can cause stress or other side effects.  AR26–27; AR2636–37, ¶ 114.

64.     Many of these concerns are echoed by BOP Medical Director Elizabete Stahl's declaration. Ex. 1 (Stahl Decl).

65.     According to Dr. Stahl, the new policy intensifies psychotherapy, and the utilization of psychotropic medications, which have been validated as appropriate treatment modalities for all the co-existing mental health problems accompanying gender dysphoria, *e.g.*, anxiety, depression, bipolar, personality and posttraumatic stress disorders, etc. *Id.* ¶ 6.

66.     The "standard of care" for treating individuals with gender dysphoria and related disorders with cross-sex hormones and surgery is under a cloud of doubt and uncertainty, especially in carceral environments.  *Id.*

67.     After examining the issue, it is Dr. Stahl's opinion that the medical necessity and long-term benefit of cross-sex surgeries are currently in question and cross-sex hormones only appropriate in a very small subset number of incarcerated individuals with gender dysphoria until tapering can appropriately be considered.  *Id.*

68.     All of BOP's clinical guidance, including guidance on treatment for gender dysphoria, has aimed to reflect the evolving nature of treatment, based on what is considered the "community

9

standard," while translating it to a carceral environment. Such translation is necessary because inmates have higher rates of certain chronic conditions and infectious diseases compared to people living in the community. They have higher rates of hypertension, asthma, arthritis, tuberculosis and others. They also suffer from higher rates of mental illness. *Id.* ¶ 7.

69.     These factors, coupled with the safety and security concerns found in a carceral setting, provide challenges to BOP medical providers that are not present to medical providers who provide treatment outside of a prison setting. *Id.*

70.     The last Transgender Care Clinical Guidance adopted by BOP was in June 2023. Several sources were utilized by BOP in writing the Transgender Care Clinical Guidance, including WPATH. The 2023 guidance noted that significant changes were made "to more closely align with community standards and the [WPATH] Standards of Care for the Health of Transgender and Gender Diverse People, Version 8 published in 2022," referred to as WPATH SOC 8. *Id.* ¶ 8.

71.     WPATH's leaders have admitted to "gaps" in evidence, and WPATH has not been careful, conscientious, or rigorous in reporting systematic reviews of all available evidence when it comes to cross-sex surgeries. *Id.* ¶ 10.

72.     Also concerning is that WPATH has not been transparent; it failed to publish all relevant evidence or at the very least "caution" the target audience and well-intended providers about the gaps in knowledge on potential long-term harms of "gender-affirming" care. *Id.*

73.     The medical associations that have published medical guidelines for purposes of guiding providers, clinicians and patients, followed WPATH's written ideological guidance and effectively abandoned the rigorous scientific review steps required in all other areas of medicine. *Id.* ¶ 11.

74.     Medical evidence demonstrating the long-term benefits of cross-sex surgeries and hormones is scant and even more so if the individual is in a prison setting and has a greater number of co-morbidities. *Id.* ¶ 12.

75.     Published evidence surrounding the long-term effects of cross-sex surgeries is very limited, typically from observational studies with short-term follow-up and highly variable outcomes. *Id.*

76.     For gender dysphoria, one of the many obstacles for medical providers is that there is no universally accepted, fully validated clinical instrument that can isolate and quantify the causal relationship between cross-sex hormone treatment and outcomes in people diagnosed with gender dysphoria receiving such treatment.  *Id.*  ¶ 13.

77.     Cross-sex hormone doses are adjusted based on patient preference and to avoid unsafe physiological hormone ranges, but historically speaking, providers do not have objective or standardized means to determine what is successful treatment for gender dysphoria.  *Id.*

78.     Many of the BOP senior officials who wrote, consulted and applied the previous BOP policy were also responsible for evaluating, implementing, and ultimately formulating the 2026 policy. *Id.*  ¶ 17.


Dated: May 13, 2026                         Respectfully submitted,
                                            BRETT A. SHUMATE
                                            Assistant Attorney General

                                            JEAN LIN
                                            Special Litigation Counsel

                                            /s/ *M. Jared Littman*
                                            M. JARED LITTMAN
                                            ELIZABETH B. LAYENDECKER
                                            Trial Attorneys
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street, NW
                                            Washington D.C. 20005
                                            Jared.littman2@usdoj.gov


11