**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALISHEA KINGDOM, et al., | |
| Plaintiffs, | |
| v. | Case No. 1:25-cv-00691-RCL |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR AN UPDATED
PRELIMINARY INJUNCTION AND TO STAY AGENCY ACTION**

**Table of Contents**

I.    INTRODUCTION ........................................................................................................ 1

II.   SCOPE OF ARGUMENT .......................................................................................... 2

III.  ARGUMENT ............................................................................................................. 3

      A.    The Court Has Jurisdiction to Enjoin Enforcement of the EO. ............................ 3

      B.    Plaintiffs Are Likely to Succeed on the Merits of Their Eighth
            Amendment Claim. ......................................................................................... 7

            1.    Plaintiffs' evidence shows that, absent injunctive relief,
                  Defendants will knowingly subjected patients with gender
                  dysphoria to a substantial risk of serious harm. ........................................ 7

            2.    Defendants' arguments are not persuasive. ............................................. 10

                  a)    Defendants factually err in asserting that there is a debate in
                        the medical community about the efficacy of gender-
                        affirming care, and legally err by asserting that such a
                        debate, were it to exist, would justify categorically banning
                        the treatment. .................................................................................... 11

                        i.    Defendants' categorical prohibition on gender-
                              affirming care would violate the Eighth Amendment
                              even if the medical community were divided on the
                              treatment's efficacy (which it is not). .............................. 11

                        ii.   Gender-affirming care is widely accepted in the
                              medical community. ........................................................... 15

                  b)    There is no evidence that the treatments authorized by the
                        Program Statement are effective ways to address gender
                        dysphoria. ........................................................................................ 18

                  c)    Defendants' asserted security concerns do not justify
                        banning gender-affirming care. ....................................................... 18

      C.    Plaintiffs Are Likely To Succeed on the Merits of Their APA Claims. .............. 20

      D.    Plaintiffs Face Irreparable Harm Absent Injunctive Relief. ............................... 24

      E.    The Balance of Equities and Public Interest Favor Plaintiffs. ............................ 25

IV.   CONCLUSION ......................................................................................................... 25

## I.  INTRODUCTION

As Defendants' opposition brief makes plain, absent an updated preliminary injunction or stay, the Program Statement (ECF 125) will take effect and BOP medical providers will be categorically prohibited from treating gender dysphoria with hormone therapy or social accommodations. Instead, their sole "treatment" options will be psychotherapy (for which Defendants' own expert admits there is no evidence of efficacy in treating gender dysphoria, ECF 179-5, Ex. A ("Kaliebe Tr.") at 46-47 (144:9-145:4), and psychotropic medication (which Defendants' witness, Dr. Stahl, acknowledges treats co-morbidities, ECF 186-3 (Declaration of Elizabete Stahl ("Stahl Decl.")) ¶ 6, not gender dysphoria). The Program Statement is, in effect, the same as the policy that the Court first enjoined last June. That result is unsurprising given that Executive Order 14168 (the "Executive Order" or "EO"), and its bar on BOP's provision of the medications and items needed to deliver gender-affirming care, remains binding on BOP personnel.

Defendants claim that BOP has now independently evaluated the evidence and coincidentally reached the conclusion mandated by the EO. Even if this could be credited, which it cannot be, that would not make the Program Statement any less devastating for Plaintiffs. Under the policy, BOP's doctors have no ability to prescribe hormone therapy or provide social accommodations even if they conclude, based on their medical judgment, that it is the appropriate (or only) way to treat a specific individual's gender dysphoria. Plaintiffs have testified about the severe mental health consequences they experienced the last time Defendants terminated or tapered their hormone therapy, *see* ECF 7-4 ¶¶ 21-22, ECF 179-7 ¶ 3, ECF 179-8 ¶¶ 2-9, and Plaintiff Nichols has testified that he tried the alternatives Defendants plan to use—in the form of seven years of therapy and thirteen different psychotropic drugs—without success; it was hormone therapy that made the difference in his mental health, ECF  179-7 ¶ 5. None of this will matter.

1

The ultimate result of Defendants' policy will be that Plaintiffs and class members will be denied treatments with proven efficacy regardless of their individual circumstances. This policy violates the Eighth Amendment and is arbitrary and capricious under the APA.

Nothing in Defendants' opposition brief undercuts these conclusions. On jurisdiction, Plaintiffs plainly have standing to challenge the enforcement of an Executive Order that bars them from receiving needed medical treatment. On the Eighth Amendment, Defendants primarily attempt to manufacture a debate in the medical community about the efficacy of gender-affirming care. The record shows that the treatment has wide-spread support. Moreover, even if the medical community were divided, the Eighth Amendment would not permit a categorical ban. Finally, as to the APA, Defendants fail in their attempt to use the Program Statement to launder the Executive Order's arbitrary commands.

In adjudicating this motion, the Court essentially faces the same circumstances it encountered when it first enjoined enforcement of the Order and BOP's memoranda implementing it. The same relief should issue here.

## II. SCOPE OF ARGUMENT

Defendants consolidated their opposition to Plaintiffs' motion with a motion for summary judgment on all Plaintiffs' claims. Per the local rules, Plaintiffs have two weeks to respond to Defendants' summary judgment motion, LCvR 7(b), which makes the deadline May 27, 2026. Plaintiffs intend to oppose the summary judgment motion separately; this brief serves exclusively to reply to Defendants' opposition to Plaintiffs' motion for an updated preliminary injunction and stay of agency action. Consequently, this brief responds only to the arguments Defendants advanced that bear on Plaintiffs' pending motion for preliminary relief. That includes the following Argument sections of Defendants' brief, ECF 186 ("Defs.' Br."):

- Part I (the portions concerning jurisdiction over injunctive relief related to the EO)

- Part II (challenging Plaintiffs' Eighth Amendment Claim);

- Part III (challenging Plaintiffs' APA claim);

- Part VI (irreparable harm); and

- Part VII (balance of the equities and the public interest).

Plaintiffs will address the remaining sections of Defendants' brief in their forthcoming filing opposing Defendants' Motion for Summary Judgment. This includes:

- Part I (the portions discussing declaratory relief);

- Part IV (seeking summary judgment on Plaintiffs' equal protection claim); and

- Part V (seeking summary judgment on the rehabilitation act claim).

Additionally, because this brief solely concerns Plaintiffs' preliminary injunction motion, it argues that Plaintiffs are likely to prevail on the merits but does not address the potentially distinct arguments that may arise under the legal standard for summary judgment. Plaintiffs will present any such argumentation in their opposition to Defendants' motion for summary judgment.

### III. ARGUMENT

**A.      The Court Has Jurisdiction to Enjoin Enforcement of the EO.**[1]

Defendants assert that the Court can neither set aside nor enjoin the EO, Defs.' Br. at 24;[2] however, Plaintiffs seek no such relief. Instead, they have asked the Court to enjoin the President's subordinates from implementing the EO. The Court's authority to do that is well-settled. *See*, *e.g.* *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1331 n.4 (D.C. Cir. 1996). Indeed, the Court has already done so in this case. *See* ECF 68 at 2 (enjoining Defendants from enforcing the EO "as

---

[1] Defendants also assert that the Court lacks jurisdiction to hear challenges to the February 2025 policies BOP adopted to effectuate the EO. Plaintiffs excised those challenges through their Supplemental Complaint. Thus, Defendants' arguments on this issue are, themselves, moot.

[2] All citations refer to ECF pagination.

applied to medical hormone therapy and social accommodations for people in the custody of the BOP").

Defendants further err in asserting that Plaintiffs lack standing to invoke that power. Considering the standing requirements in turn, Defendants do not contest that, on Plaintiffs' theory of the merits, they face an injury-in-fact. *See* Defs.' Br at 20-22. Nor could Defendants succeed in challenging this point. Absent relief, Plaintiffs will lose access to hormone therapy and social accommodations, which, as their extensive record evidence shows, puts them at significant risk of serious health consequences, a classic Article III injury. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). This injury is traceable to the Executive Order. Section 4(c) of the EO commands BOP to "ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." When used to treat gender dysphoria, hormone therapy and social accommodations serve the purpose the EO proscribes. *See* ECF 7-2 (Expert Declaration of Dr. Dan Karasic in Support of Plaintiffs' Motion for a Preliminary Injunction ("First Karasic Decl.")) ¶ 80. Thus, the EO compels BOP to strip Plaintiffs of their gender-affirming care, which in turn causes their injury. Finally, redressability and causation are "usually flip sides of the same coin," *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 111 (2025) (citation modified), and that is the case here: Enjoining the EO's enforcement is a necessary condition to prevent Plaintiffs from suffering the harms they complain of.

Defendants' arguments to the contrary are unpersuasive. In attacking redressability, Defendants emphasize that enjoining the EO's enforcement would not, in and of itself, ensure Plaintiffs receive their health care, as the Program Statement "would continue to exist." Defs.' Br. at 24. But Defendants' promulgation of the unlawful Program Statement does not divest the Court

of jurisdiction to review the unlawful Executive Order. Defendants advance this bizarre proposition by misreading *Baz v. U.S. Dep't of Homeland Sec.*, No. 1:18-cv-010132019 WL 5102827 (D.D.C. Oct. 11, 2019). That case applies the well-settled principle that "a plaintiff's injury cannot be redressed by a court order when two independent government actions produce the same harm and *only one is challenged*." *Id.* at *4 (emphasis added). In those circumstances, striking the first government action will not aid the plaintiff because the second action lawfully precludes relief. But here, Plaintiffs contend that two *illegal* government actions produce their injuries and, accordingly, challenge both. The principle from *Baz* simply does not apply to these circumstances, as the government cannot insulate itself from judicial scrutiny by compounding legal wrongs.

On traceability, Defendants err in asserting that Plaintiffs' injuries flow exclusively from the Program Statement. Defs.' Br. at 23. Even if the Program Statement were enjoined, the EO would continue to require that BOP refrain from using federal funds for "any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex," EO § 4(c). Bound by that command, BOP would have no discretion to afford Plaintiffs the medical treatment they need, thereby causing their injuries to persist. Plaintiffs can avoid harm only if the Court enjoins the Program Statement *and* any other actions Defendants may take to enforce the EO. This is precisely the form of the injunction the Court issued in June 2025 and has renewed several times since. *See, e.g.*, ECF 68 (original preliminary injunction order) and ECF 79, 96 and 114 (orders renewing preliminary injunction).

Defendants try to avoid this reasoning by urging an atextual reading of the EO. They invoke the EO's saving clause—which requires that officials implement the EO "consistent with applicable law"—to assert that the EO does not require termination of Plaintiffs' treatments if the

5

Eighth Amendment requires that they persist. Defs.' Br. at 23 (quoting EO § 8(b)). This argument misunderstands how saving clauses operate. These clauses can protect an executive order from judicial scrutiny when they "direct[] a subordinate to achieve some goal, and that goal could be achieved in multiple ways," some of which are lawful. *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 176 (D.D.C. 2025). In those scenarios, courts will construe the order "to direct only permissible action." *Id*. By contrast, when "an executive order unambiguously commands action that a saving clause purports to negate, a reviewing court must ignore the saving clause and read the order's operative provision to mean what it says." *Id.* (cleaned up). Thus, if the order unambiguously commands officials to inflict the injuries of which the plaintiff complains, those injuries are traceable to the order. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 86 (D.D.C. 2026).

This case involves the latter scenario. The EO bars BOP from expending funds on treatments that have the "purpose of conforming an inmate's appearance to that of the opposite sex," EO § 4(c), and it is the denial of treatments serving that purpose that Plaintiffs contend is causing their injury. The EO thus unambiguously commands the injury of which Plaintiffs complain. The saving clause cannot "destroy" that meaning, *Common Cause v. Trump*, 506 F. Supp. 3d 39, 53 n.8 (D.D.C. 2020) (three-judge panel), and therefore Plaintiffs' injuries flow from the Order as well as the Program Statement.

The cases Defendants cite involve executive orders that lack such clear commands. In *Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635 (2025), the challenged executive order "direct[ed] agencies to plan reorganizations and reductions in force consistent with applicable law." *Id.* at 2635 (Sotomayor, J., concurring) (cleaned up) (summarizing the executive order at issue). And *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33

(D.C. Cir. 2002), rejected a challenge to an executive order that neither required nor prohibited specific actions, such that the possibility of unlawful enforcement was speculative. The orders in these cases, when read in light of their saving clauses, could be understood as requiring only lawful action. That is not so here. The President cannot shift blame to his subordinates when he orders them to cause Plaintiffs' harms. The buck stops with him.

> **B.      Plaintiffs Are Likely to Succeed on the Merits of Their Eighth Amendment Claim.**

The Eighth Amendment bars prison officials from denying prisoners necessary treatment for serious medical needs when they know that, by doing so, they create a substantial risk of causing the plaintiff serious harm. *Bernier v. Allen*, 38 F.4th 1145, 1151 (D.C. Cir. 2022). Under this framework, "[i]t is well established" that prison systems may not "deny effective treatment for the serious medical needs of prisoners." *Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011). Defendants do not dispute that gender dysphoria constitutes a serious medical need but assert that the Program Statement provides for effective treatment, notwithstanding its categorical ban on gender-affirming care. This is incorrect. Plaintiffs have demonstrated that Defendants' policy offends the Eighth Amendment (Part III.B.1) and Defendants' counterarguments do not show otherwise (Part III.B.2).

> **1.      Plaintiffs' evidence shows that, absent injunctive relief, Defendants will knowingly subject patients with gender dysphoria to a substantial risk of serious harm.**

Plaintiffs have provided extensive evidence demonstrating that prisoners with gender dysphoria face a substantial risk of serious harm if they are categorically barred from receiving hormone therapy and accommodations to enable them to socially transition. Plaintiffs' evidence demonstrates that:

- A substantial body of research and clinical experience have shown gender-affirming care—including hormone therapy and social transition—to be effective in treating

gender dysphoria, and this conclusion is shared widely in the medical community. ECF 7-2 (First Karasic Decl.") ¶¶ 27, 72-76, 78; ECF 179-2 (Expert Declaration of Dr. Dan Karasic in Support of Plaintiffs' Motion for an Updated Preliminary Injunction ("Third Karasic Decl.")), ¶ 60.

- Hormone therapy and social transition are effective at treating gender dysphoria in the prison setting. ECF 179-2 (Third Karasic Decl.) ¶¶ 37-40. Indeed, many people with gender dysphoria in BOP custody have benefitted from these treatments, experiencing improvements in their mental health and day-to-day functioning. ECF 179-4 (Expert Declaration of Dr. Cathy Thompson in Support of Plaintiffs' Motion for an Updated Preliminary Injunction ("Second Thompson Decl.")) ¶¶ 10, 11.

- The risks of gender-affirming care are manageable and comparable to the risks of many other widely accepted medical treatments. ECF 179-3 (Expert Declaration of Dr. Ole-Petter Hamnvik, in Support of Motion for Updated Preliminary Injunction ("Hamvik Decl.")) ¶¶ 24, 25.

- "For patients for whom gender-affirming medical is indicated, no alternative treatments have been demonstrated to be effective." ECF 7-2 (First Karasic Decl.) ¶ 70.

- "Denying patients with gender dysphoria the ability to socially transition or obtain gender-affirming medical care where indicated predictably will lead to significant deterioration in mental health." *Id.* ¶ 82.

Defendants knew the risks of categorically banning hormone therapies and social accommodations but did so anyway. Plaintiffs provided Defendants with the bulk of the evidence discussed above before they issued the Program Statement, and that evidence gave Defendants notice of the "objectively intolerable risk" of denying hormones and social accommodations to people with gender dysphoria. *See Farmer v. Brennan*, 511 U.S. 825, 846 n. 9 (1994). Moreover, BOP's own doctors regularly prescribed these treatments for patients with gender dysphoria before the Executive Order and these treatments improved patients' mental health. ECF 179-4 (Second Thompson Decl.) ¶ 11. Because Defendants have subjected Plaintiffs and class members to a substantial risk of serious harm, and have done so knowingly, they have violated the Eighth Amendment. *See Bernier,* 38 F.4th at 1151.

8

Additionally, and independently, the EO and Program Statement violate the Eighth Amendment because they deny medical care for "non-medical reasons," which necessarily constitutes deliberate indifference. *Ancata v. Prison Health Servs.*, Inc., 769 F.2d 700, 704 (11th Cir. 1985); *Roe v. Elyea*, 631 F.3d 843, 862–63 (7th Cir. 2011) (similar). With respect to the Executive Order, its reason for banning gender-affirming care is safeguarding "longstanding, cherished legal rights and values" from "an identity-based, inchoate social concept." EO § 1. This is an ideological objective, not a medical one. Indeed, when the Court first reviewed the EO, it noted that the record contained no evidence that "the President consciously took stock of—much less studied—the potentially debilitating effects that the new policies could have on transgender inmates." ECF 67 at 23. The record still contains no evidence that the President considered such factors. Because the President issued the EO for non-medical reasons, Defendants violate the Eighth Amendment by implementing its commands.

The Executive Order's infirmities also infect the Program Statement. The Program Statement flows from the Executive Order: Without it, BOP would have no policy to enforce the President's commands and therefore be at risk of violating them. Further demonstrating its dependence on the EO, the Program Statement itself repeats the key provision of the Executive Order almost verbatim. *See* Program Statement § 8 ("The intent of this policy is for federal funds to not be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex to the maximum extent permitted by law, including the Eighth Amendment to the U.S. Constitution.").

Defendants' assertion that BOP independently determined that it would do what the EO commands rings hollow. Indeed, when drafting the Program Statement, BOP relied on "the *Department of Justice's* psychiatric expert, Dr. Kristopher Kaliebe," ECF 186-3 (Stahl Decl.),

Attach. ¶ 41 (emphasis added). It is unsurprising that this expert was chosen by DOJ and not BOP medical personnel, as it is hard to imagine any medical director who is actually looking for expert guidance on treating gender dysphoria selecting someone who, like Dr. Kaliebe, has virtually no experience serving patients with this condition, ECF 179-5, Ex. A (Kaliebe Tr.) at 9-10 (20:9-21:10).

In sum, the EO and the Program Statement contain two fatal flaws: They categorically bar medical treatment that is necessary for many people with gender dysphoria and do so for non-medical reasons. Each of these defects independently violates the Eighth Amendment.

### 2. Defendants' arguments are not persuasive.

Defendants' opposition brief rests on the incorrect assumption that the Court must defer to prison officials on issues of medicine. In fact, "[i]n deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989). That is particularly true here, where Defendants' evidence comes principally from Dr. Kaliebe, a psychiatrist hired by DOJ to be its "psychiatric expert," ECF 186-3 (Stahl Decl.), Attach. ¶ 41, despite his minimal experience treating people with gender dysphoria, ECF 179-5, Ex. A (Kaliebe Tr.) at 9-10 (20:9-21:10), and Dr. Stahl, who also has little experience treating gender dysphoria, ECF 186-3 (Stahl Decl.) ¶ 13, and who "consult[ed] with" Dr. Kaliebe, *Id.* Attach. ¶ 41. Indeed, to the extent there is a battle of the experts, it is Plaintiffs' witnesses who deserve credence, as they have far more experience actually treating people with gender dysphoria and "logically and persuasively explained the necessity" of gender-affirming care. *See Edmo v. Corizon, Inc.*, 935 F.3d 757, 787 (9th Cir. 2019) (affirming trial court's decision to credit experts with experience treating gender dysphoria over those without).

10

Defendants' arguments, moreover, are substantively flawed. They defend their policy by rehashing three sets of arguments that appear in the Program Statement Memo that Plaintiffs refuted in their opening brief. Specifically, Defendants contend: (1) gender-affirming care is not medically necessary to treat gender dysphoria; (2) psychotherapy and psychotropic medications are appropriate and adequate alternative treatments for gender dysphoria; and (3) "security concerns" support a categorical ban. None of these arguments is valid.

|  | **a)** | **Defendants factually err in asserting that there is a debate in the medical community about the efficacy of gender-affirming care, and legally err by asserting that such a debate, were it to exist, would justify categorically banning the treatment.** |

Defendants are wrong in asserting that there is debate in the medical community about the efficacy of gender-affirming care. The record shows that this is widely accepted treatment for gender dysphoria—one supported by every major medical association in the United States. ECF 179-2 (Third Karasic Decl.) ¶ 33. But, even if the medical community were divided, the Eighth Amendment still would not permit the categorical ban challenged here. Plaintiffs first discuss Defendants' misunderstanding of Eighth Amendment law (Part III.B.2.a.i) and then show that the Defendants' asserted medical debate about gender-affirming care does not exist (Part III.B.2.a.ii.).

|  | i. | *Defendants' categorical prohibition on gender-affirming care would violate the Eighth Amendment even if the medical community were divided on the treatment's efficacy (which it is not).* |

Courts have repeatedly found that blanket bans on medical treatment violate the Eighth Amendment. *See* ECF 179-1 at 38-39 (collecting cases). The reasoning in these decisions does not, as Defendants assert (Defs.' Br. at 37), imply that prisons act unlawfully only if they ban *all* treatments for a particular condition. Rather, these cases recognize that under the Eighth Amendment, "inmate medical care decisions must be fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm and

11

the efficacy of available treatments." *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011). Blanket bans on specific forms of medical care violate this principle by stopping doctors from prescribing the treatment needed to address a prisoner's unique circumstances. Of course, this does not mean that a blanket ban on a purported medical treatment that has *no evidence of efficacy* would violate the Constitution. Rather, the point is that the mere existence of professional debate about a particular form of care does not justify prohibiting its use for everyone.

This Eighth Amendment principle relates to another: Prisons must ensure that incarcerated people receive care consistent with medical providers' professional judgment. This obligation is why prison health care passes constitutional muster when it falls within a range of professional standards, but not when it falls below. *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990). It is also why the Constitution forbids prison officials from "intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). When a prison categorically bans a treatment shown to be effective for at least some individuals, it prevents doctors from providing that care in circumstances where, based on their professional judgment, they deem it necessary.

Defendants' policy betrays these principles. Their categorical ban prevents people with gender dysphoria from receiving care based on an individualized assessment of their medical needs. Relatedly, the policy compels doctors to deny gender-affirming care even when they conclude that for a particular patient, such care is medically necessary and appropriate. In those circumstances, BOP doctors may be forced to render treatment they do not "honestly believe" to be proper, which can constitute an Eighth Amendment violation. *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016).

Nothing in the cases Defendants cite undercuts this analysis. Almost none of those cases involves courts reviewing the constitutionality of blanket bans on care. Instead, most involve

12

challenges to denials of specific treatment afforded to a particular *individual patient* after an assessment of that person's individual medical needs.[3]

*Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020) is illustrative. There, a plaintiff with gender dysphoria challenged a prison's decision to deny her social accommodations, not based on a generalized policy, but, the court found, after a prison medical team conducted an individualized assessment and decided she did not need that treatment. *Id.* at 1274. The court found that the disagreement of Plaintiff and her outside expert with the prison medical team's conclusion "as to the proper course of treatment for [the plaintiff's] gender dysphoria," *id.*, was insufficient to establish an Eighth Amendment violation. The court was not addressing a blanket ban, and noted that courts reviewing "blanket bans on gender-dysphoria treatments—without exception for medical necessity—have held that they evince deliberate indifference to prisoners' medical needs in violation of the Eighth Amendment." *See id.* at 1267. In *Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014) (en banc), another case Defendants cite, the First Circuit similarly made clear that its rejection of a challenge there to an individualized denial of sex-reassignment surgery should not be read to endorse (as Defendants here contend the decision does) that "a de facto ban against [gender-affirming care] as a medical treatment for any incarcerated individual," as "any such policy would conflict with the requirement that medical care be individualized based on a particular prisoner's serious medical needs." *Id.* at 90-91.

---

[3] *DiFraia v. Ransom*, 171 F.4th 622, 627 (3d Cir. 2026) (patient's treatment changed after officials contended he misused it); *Clark v. Valletta*, 157 F.4th 201, 212 n. 8 (2d Cir. 2025) (granting defendants qualified immunity and noting that the plaintiff received "an individualized assessment and . . . adequate care for a serious medical need" (citation modified)); *Bayse v. Ward*, 147 F.4th 1304, 1312-13 (11th Cir. 2025) (medical care denied after individualized assessment) *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021) (same); *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1274 (11th Cir. 2020) (same); *Barr . Pearson*, 909 F.3d 919, 922 (8th Cir. 2018) (same) *Kosilek v. Spencer*, 774 F.3d 63, 91 (1st Cir. 2014) (same).

These decisions do not support Defendants' blanket ban on gender-affirming care. They demonstrate that a "difference of opinion" about a particular *treating decision for a specific patient* does not, without more, establish an Eighth Amendment violation. However, Defendants' authorities do not suggest that the existence of a "difference of opinion" in the medical field about a particular treatment insulates a *blanket ban on that treatment for all patients regardless of their medical needs* from Eighth Amendment challenge. Indeed, courts have specifically recognized the error of this type of reasoning. *See Kosilek*, 774 F.3d at 90 n.12 (it is not sufficient for "correctional administrators wishing to avoid treatment . . . simply to find a single practitioner willing to attest that some well-accepted treatment is not necessary"); *Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (rejecting "difference of opinion" defense when prison officials "ignored the recommendations of treating specialists and instead relied on the opinions of non-specialist and non-treating medical officials who made decisions based on an administrative policy").

The sole circuit case that departs from this well-settled case law is *Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019). That decision held that prisons can categorically bar treatments (and specifically gender-affirming care) where "there is robust and substantial good faith disagreement dividing respected members of the expert medical community" as to "the necessity or efficacy of that care." *Id.* at 220. Other courts have rejected this approach, noting that *Gibson* is an "outlier," *Edmo*, 935 F.3d at 795, and criticizing it for mischaracterizing *Kosilek* as agreeing with its premise when *Kosilek* said just the opposite, *see id.*; *Flack v. Wisc. Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1017 (W.D. Wis. 2019) (same). No other circuit has adopted *Gibson*'s reasoning. And every other federal appellate court that has considered the issue has held that blanket bans on gender-affirming care unconstitutional under the Eighth Amendment. *See Edmo*, 935 F.3d at 795, *Fields*, 653 F.3d at 559; *De'Lonta v. Angelone*, 330 F.3d 630, 636 (4th Cir. 2003).

14

In sum, Defendants' assertion that the purported medical debate around gender-affirming care justifies BOP's categorical ban is legally unsound even if it were factually accurate, which, as discussed below, it is not.

> ii.    *Gender-affirming care is widely accepted in the medical community.*

"[S]ocial transition and hormone therapy for the treatment of adults with gender dysphoria are not the subject of controversy or debate within the medical and mental health fields." ECF 179-2 (Third Karasic Decl.) ¶ 11. "To the extent there is any controversy about these treatments in public discourse, it is limited to the context of pediatric patients with gender dysphoria." *Id.* Case in point, many of the authorities Defendants cite as demonstrating a "medical debate" solely consider health care for youth. This is true of *United States v. Skrmetti*, 605 U.S. 495, 525 (2025), which discussed disagreements only about the proper care for minors, the sole issue before the Court. Likewise, the European countries that imposed limits on gender-affirming medical care for minors have not "distanced themselves from" gender-affirming care for adults.  Defs.' Br. at 18; ECF 179-2 (Third Karasic Decl.) ¶ 35; Ex. A (Fourth Karasic Decl.) ¶ 9.

Nor do Defendants' criticisms of WPATH, Defs.' Br. at 26, establish a debate in the medical community about the efficacy of gender-affirming care. Even if these criticisms had merit, which they do not, ECF 179-2 (Third Karasic Decl.) ¶¶ 55-66, the medical community's support for gender-affirming care is not just based on WPATH Standards of Care or dependent on its analysis. Decades of medical research and clinical experience demonstrate the treatment's efficacy, *id.* ¶ 60. It is this research and experience—not blind faith in WPATH, as Dr. Stahl asserts without support in her declaration, ECF 186-3 (Stahl Decl.) ¶ 11—that has led every major medical and mental health professional organization in the United States to recognize the efficacy of gender-affirming care, including the American Medical Association, the American Psychological

15

Association, the American Psychiatric Association, and the Endocrine Society. ECF 179-2 (Third Karasic Decl.) ¶ 33.

Defendants attempt to challenge the efficacy of this care by suggesting there is insufficient evidence to support this treatment, pointing to a lack of "high quality" research backing gender-affirming care. Defs.' Br. at 19 (citing AR 1552). But as Dr. Karasic explained, "high quality" research is a term of art that generally refers to randomized controlled trials, which provide the greatest certainty; all other types of research are deemed "low quality" by comparison. ECF 179-2 (Third Karasic Decl.) ¶¶ 25-26. Randomized controlled trials are often unfeasible or unethical. *Id.* ¶ 25. For these reasons, many widely accepted medical treatments are supported only by "low quality" evidence such as cross-sectional and longitudinal observational studies, the same type and quality of research demonstrating gender-affirming care's efficacy. *Id.*; ECF 7-2 (First Karasic Decl.) ¶ 74.

Defendants also suggest that gender-affirming care should be prohibited because it is too risky, pointing to potential side effects of hormone therapy. Every medical treatment carries risks, but the ones associated with gender-affirming hormone therapy are manageable and comparable to those associated with other well-accepted medical treatments. ECF 179-3 (Hamnvik Decl.) ¶ 24. Indeed, most of the risks associated with testosterone, estrogen, and anti-androgens are present regardless of whether these medications are used to treat transgender people with gender dysphoria or cisgender people for other conditions. *Id.* ¶¶ 25, 34-39, 51-54, 63, 65. Further, social accommodations pose no risks to health. Dr. Kaliebe asserts otherwise in this case, but, in a deposition in another matter, he admitted that there is no evidence behind his speculation that social accommodations will prolong gender dysphoria or undermine psychotherapy. ECF 179-5, Ex. A (Kaliebe Tr.) at 43-44 (136:20-137:8).

16

Defendants also assert that the efficacy of gender-affirming care in the prison environment is uncertain, Defs.' Br. at 27, but they have no meaningful answer to Plaintiffs' contrary evidence drawn from both the clinical experience of Dr. Karasic, including with incarcerated patients, ECF 7-2 (First Karasic Decl.) ¶¶ 7, 72-73, 76, 83-85, and Dr. Thompson's testimony about the positive impact of gender-affirming care on the mental health of people with gender dysphoria in BOP custody, ECF 179-4 (Second Thompson Decl.) ¶ 11; ECF 7-3 (First Thompson Decl.) ¶ 38. With respect to Dr. Thompson, Defendants attempt to challenge her credibility by suggesting that she does not have the experience to see the impact of this treatment on patients with gender dysphoria, but this argument is meritless.[4] Likewise Dr. Stahl's assertion that the impact of gender-affirming care on patients is unknown to BOP medical staff because there are no validated instruments to measure its efficacy, ECF 186-3 (Stahl Decl.) ¶13, simply cannot be credited: Clinicians "routinely assess the effectiveness of treatment without using validated measurement instruments," instead using clinical exams.  Ex. A (Fourth Karasic Decl.)  ¶¶ 5, 7.

Moreover, despite claiming that patients' response to gender-affirming is unascertainable, Dr. Stahl herself apparently was able to make such an assessment, stating that the "small number of" gender dysphoria patients she treated "rarely saw any sustained mental health improvement"

---

[4] Dr. Stahl asserts that Dr. Thompson served as Acting National Administrator for Psychological Services for only seven months, suggesting she misled the court about her experience.  ECF 186-3 (Stahl Decl.) ¶ 18. Dr. Thompson's declaration was clear that she "frequently" undertook the duties of the Acting Administrator during her years at BOP, and also described how other roles gave her experience with patients with gender dysphoria. ECF 179-4 (Second Thompson Decl.) ¶¶10-11; Ex B (Third Expert Declaration of Dr. Cathy Thompson ("Third Thompson Decl.") ¶¶ 6-7. Further, Defendants' suggestion that Dr. Thompson is not qualified to opine on patient's need for hormone therapy because she is a psychologist and not a physician is meritless. Ex. A (Fourth Karasic Decl.) ¶ 10. Gender dysphoria is a mental health condition, *id.*, and Dr. Thompson is a mental health professional.

17

from gender-affirming care. ECF 186-3 (Stahl Decl.) ¶ 13. This observation ultimately weakens

Defendants' case for a categorical ban, as "rarely" does not mean "never."

In sum, there is no debate in the medical field about the efficacy of gender-affirming care.

To the contrary, its effectiveness is widely supported by practitioners and backed by substantial

evidence.

      **b)**      **There is no evidence that the treatments authorized by the Program Statement are effective ways to address gender dysphoria.**

In place of gender-affirming care, Defendants plan to offer psychotherapy and

psychotropic medication, Defs.' Br. at 27; however, there is no evidence that these treatments

ameliorate gender dysphoria. ECF 179-2 (Third Karasic Decl.) ¶¶ 41-45. Defendants assert

otherwise, but all they point to are statements from Dr. Kaliebe, who admitted in testimony in

another case that there is no evidence showing that psychotherapy effectively treats gender

dysphoria, ECF 179-5, Ex. A (Kaliebe Tr.) at 46-47 (144:9-145:4, 309:17-22), let alone the "high

quality evidence" he suggests is necessary to support treatment. As Dr. Karasic explained,

psychotherapy for gender dysphoria was tried for decades and not found to be effective. ECF 179-

2 (Third Karasic Decl.) ¶ 54.

      **c)**      **Defendants' asserted security concerns do not justify banning gender-affirming care.**

Defendants cannot justify their denial of gender-affirming care as a "reasonable prison

safety practice." Defs.' Br. at 36. While restrictions on incarcerated people's First Amendment

rights can be justified if they are "reasonably related to legitimate penological interests," *Turner*

*v. Safley*, 482 U.S. 78, 89 (1987), the Supreme Court has expressly rejected that test in the Eighth

Amendment context. *See Johnson v. California*, 543 U.S. 499, 511 (2005) ("We judge violations

of [the Eighth] Amendment under the 'deliberate indifference' standard, rather than *Turner's*

18

'reasonably related' standard. This is because the integrity of the criminal justice system depends on full compliance with the Eighth Amendment") (internal citations omitted).  It is thus far from clear that an Eighth Amendment claim for the denial of necessary medical care can be defeated by the invocation of prison security. *See Grenning v. Miller-Stout*, 739 F.3d 1235, 1240 (9th Cir. 2014) ("The precise role of legitimate penological interests is not entirely clear in the context of an Eighth Amendment challenge to conditions of confinement"); *see also Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (recognizing that "the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns").

In any event, Defendants offer no evidence to show that providing gender-affirming care compromises prison safety. Plaintiffs noted in their opening brief that the Program Statement Memo makes no mention of actual security issues during the years BOP operated under its prior policy regarding treatment for gender dysphoria. ECF 179-1 at 40-41. And Defendants still fail to point to any such problems. Dr. Thompson's testimony demonstrates that providing this care did not result in security issues; to the contrary, she testified that it improved institutional safety, ECF 179-4 (Second Thompson Decl.) ¶¶ 12-13. Defendants offer no evidence refuting her conclusions.

Similar reasoning fells Defendants' claim that providing gender-affirming care "can increase the risk of retaliation against the inmate receiving special treatment." Defs.' Br. at 36 (quoting AR 12, 20, 29).  Courts have repeatedly rejected such unadorned speculation, even under the far more deferential *Turner* standard.  *See, e.g., Jordan v. Pugh*, 504 F. Supp. 2d 1109, 1122 (D. Colo. 2007) (rejecting as "undocumented and speculative" BOP officials' claim that allowing a federal prisoner to publish under a byline would cause him to become a "big wheel" and thereby threaten prison security). And once again, even if the law supported Defendants' position, the facts would not. The record contains no support for the proposition that Defendants must deny gender-

19

affirming care to prevent assaults. BOP managed to provide this care without compromising security before the Executive Order. ECF 179-4 (Second Thompson Decl.) ¶¶ 12- 13, and it offers no reasons why it cannot do so now.

*       *       *

In sum, Plaintiffs are likely to prevail in showing that Defendants have violated the Eighth Amendment by categorically proscribing gender-affirming health care.

### C.     Plaintiffs Are Likely To Succeed on the Merits of Their APA Claims.

Defendants' arguments that the Program Statement does not violate the APA and is the product of reasoned decisionmaking are without merit, and BOP's effort to dress up the deficient reasoning by pointing to the administrative record ("AR") fails. The fact that the AR contains "thousands of pages" does not mean that BOP engaged in "reasoned decisionmaking." *S. Cal. v. U.S. Postal Serv.*, 134 F. Supp. 3d 311, 316, 319-27 (D.D.C. 2015). Rather, an agency's decision must be "adequately explained," "supported by agency precedent," *id.* at 326 (quoting *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012)), and have "consider[ed] contradictory . . . evidence where such evidence is precisely on point, *id.* (quoting *Morall v. Drug Enforcement Admin.*, 412 F.3d 165, 167 (D.C. Cir. 2005)). BOP's attempts to provide post hoc justifications for the policy mandated by the EO chiefly rely on the same spurious arguments regarding the treatment of gender dysphoria discussed above, which run counter to the evidence discussed above. Nothing in Defendants' brief or supporting declaration undercuts the four independent ways Plaintiffs demonstrated the current policy to be arbitrary and capricious.

*First*, "the fact that an agency's actions were undertaken to fulfill a presidential directive does not exempt" it from the APA's requirement of reasoned decisionmaking. ECF 67 at 21 (collecting cases). By promulgating a policy based on pretextual reasoning, BOP did not comply with that requirement. The EO remains a binding command for BOP to deny gender-affirming

20

care to individuals in its custody and, after the Court barred BOP's first attempt at obeying that presidential directive, the agency has come forward with a second attempt. Even if the government implemented the EO incompletely at first, as Defendants allege, Defs' Br. at 42, that in no way implies the Program Statement is anything other than an attempt to adhere to a direct command. *See* ECF 179-1 at 43-45.

*Second*, BOP ignored an important aspect of the problem. Its failure to consider evidence about its experience under its prior policy providing gender-affirming care is an obvious omission that independently dooms the analysis. BOP appears to recognize the deficiency in the contemporaneous reasoning put forward to support the Program Statement by seeking to supplement it with the Stahl declaration. ECF 186-3. Defendants rely exclusively on this declaration to argue that the agency "reasonably considered its experience under the prior policy." Defs' Br. at 43 (citing the Stahl Declaration five times to support this argument but not the AR). But *post hoc* defenses during litigation cannot replace the type of reasoned analysis the government must undertake at the front end. *See Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981) ("[T]he post hoc rationalizations of the agency . . . cannot serve as a sufficient predicate for agency action.").

That is true "regardless [of] whether *post hoc* justifications are raised in court by those appearing on behalf of the agency or by agency officials themselves." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 23 (2020). In other words, "if the agency does not offer a timely explanation as to one important aspect of its decision, then the challenged action is unlawful." *Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 2025 WL 833075, at *4 (D.D.C. Mar. 17, 2025).

And even the post hoc justifications offered by Dr. Stahl do not put forward any basis for the court to conclude that the asserted concerns around prison operation or safety and security are anything but "sheer speculation," or that BOP actually considered any information about the impact of gender-affirming care on their patients. *Council of Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 51 (D.D.C. 2019) (quoting *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014)). Dr. Stahl does not refute Dr. Thompson's testimony that providing this care did not create security issues.  And she tries to excuse BOP's failure to consider the outcomes of its own patient population by saying that it is not possible for BOP to evaluate the benefits of gender-affirming care on its patients because "there is not a vetted or validated clinical instrument that measures the success or failure of gender dysphoria treatment." Defs.' Br. at 32 (quoting Stahl Decl. ¶ 16).  But as Dr. Karasic explains, "clinicians routinely assess the effectiveness of treatment without using validated measurement instruments," and instead using clinical exams, Ex. A (Fourth Karasic Decl.) ¶¶ 5, 7, and the AR itself contains a complete lack of even such qualitative information regarding BOP medical providers' evaluation of treatment effectiveness, *see* ECF 151 (Index of Administrative Record); *see also* ECF 179-1 at 48-49.

*Third*, BOP's purported explanation for its new policy is dubious and does not justify the agency's about-face. BOP hangs its hat on stated concerns about WPATH, *see* Defs' Br.at 28-29, 39-40, 43-44, but as discussed above, whatever one thinks about the WPATH standards of care, decades of research and clinical experience show the efficacy of gender-affirming care. *See* ECF 179-2 (Third Karasic Decl.) ¶ 60.  Thus, any purported concerns about WPATH—even if valid (which they are not, *see id.* ¶¶ 60-66; *see also* ECF 72 (First Karasic Decl.) ¶¶ 53-62)—would not be a basis to adopt a policy rescinding this well-supported care.

22

BOP also argues that the Program Statement's requirement that all individuals receiving hormone therapy be tapered off on an "individualized" basis displays a sufficient consideration of patients' reliance interests.  Defs' Br. at 41. But requiring that individuals exhibit significant harm in the form of "severe physiological *and* psychological withdrawal effects" to even consider a *temporary pause* in the full cessation of their prescribed medication, Program Statement § 5(c)(ii), at 8 (emphasis added), is not a consideration of such interests at all. This is no different than BOP saying that because they were *tapering* a diabetic's insulin rather than cutting them off cold turkey, they had sufficiently considered their reliance interests. Rather than point to evidence in the AR refuting Dr. Thompson's characterizations of the effectiveness of gender-affirming care in BOP facilities under BOP policy prior to the EO, Defendants instead attempt to attack her credibility as a declarant. *See* Defs.' Br. at 44. Such attacks are not only inaccurate, *see* Ex. B (Third Thompson Decl.) ¶¶ 6-7, they do not explain or excuse the lack of contemporaneous evidence of BOP's consideration of its own prior policies in its explanation for the Program Statement.

*Fourth*, Dr. Kaliebe's report is a wholly deficient basis on which to base such a drastic change in policy with respect to an objectively serious medical condition that Dr. Kaliebe has very little experience treating. That BOP chose someone without meaningful experience treating gender dysphoria is further evidence that this was not a genuine effort to determine the most appropriate treatment for this condition. While Defendants' assert that "medical professionals" recognize that psychotherapy alone can effectively treat gender dysphoria, Defs.' Br. at 44, even Dr. Kaliebe admits that there is no evidence that psychotherapy is an effective treatment for gender dysphoria. ECF 179-5, Ex. A at 46-47 (144:9-145:4).

For all the reasons stated here, and in Plaintiffs' Motion for Updated Preliminary Injunction, Plaintiffs are likely to succeed on the merits of their APA claim.

**D.    Plaintiffs Face Irreparable Harm Absent Injunctive Relief.**

Plaintiffs and members of the class face a significant risk of serious harm to their health if they do not receive the requested injunctive relief. Plaintiffs have described in detail the harms they have faced during prior instances where BOP denied them hormone therapy. ECF 7-4 ¶¶ 21-22, ECF 179-7 ¶¶ 3, ECF 179-8 ¶¶ 6. Defendants assert that this time will be different because, unlike before, they will provide individualized tapering plans for their hormone therapy along with counseling. *See* Defs.' Br. 52-54. But Defendants plan to confiscate Plaintiffs' accommodations, which itself will cause harm. ECF 179-2 (Third Karasic Decl.) ¶ 9. As for the hormone therapy, even if it is withdrawn through a tapering process," it will "not prevent the predictable serious harms of denying hormone therapy to those who have a medical need for it," *id.* ¶ 19, such as Plaintiffs. "Moreover[,] there is no evidence that withdrawing people from hormone therapy they have been receiving to treat gender dysphoria (with or without a tapering process) can be done safely without causing significant mental health distress. And there is no evidence that provision of psychotherapy would make this safe." *Id.* ¶ 21. Thus, Plaintiffs face a substantial risk of irreparable harm should Defendants proceed with their current plans.

The same is true of the class. The record evidence discussed previously demonstrates that *all* individuals who experience gender dysphoria face a risk of serious harm because the Program Statement categorically denies gender-affirming care regardless of their medical needs. Contrary to Defendants' assertion (Defs.' Br. at 52-53), *Doe v. Blanche*, 172 F.4th 901 (D.C. Cir. 2026), does not require an individualized assessment of each class members' risk. The Court held such fact-finding was required in *Doe* because the plaintiffs disclaimed any argument that the challenged practice would necessarily put each of them in harm's way. *See id.* at 917, 918. Here, Defendants' categorical ban on gender-affirming care—which precludes this care regardless of

24

each individual's medical need for it—puts all class members at risk of being denied medically necessary care.

**E.      The Balance of Equities and Public Interest Favor Plaintiffs.**

In issuing its prior injunction, the Court held that the final two factors were "the most easily resolved," ECF 67 at 25, and Defendants have offered no reason to depart from this conclusion. The government emphasizes its interest in effectuating the administration's agenda, Defs.' Br. at 55, but that consideration is outweighed by the public's interest in the executive's adherence to statutes and the Constitution. The government also raises the specter of prison safety, *id.* at 55-56; however, Defendants have not demonstrated that granting Plaintiffs relief will cause any such problems. This failure is particularly noteworthy given that an injunction requiring essentially the same relief sought here has been in place for nearly a year.

## IV. CONCLUSION

For the reasons stated, Plaintiffs' Motion for an Updated Preliminary Injunction or Stay of Agency Action should be granted.

Dated: May 20, 2026                         *Respectfully submitted,*

                                            */s/ Michael Perloff_____*

25

Li Nowlin-Sohl (*pro hac vice*)
Leslie Cooper (*pro hac vice*)
Shana Knizhnik, D.D.C. Bar No. 120840
James D. Esseks (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: 212-549-2500
lnowlin-sohl@aclu.org
lcooper@aclu.org
sknizhnik@aclu.org
jesseks@aclu.org

David C. Fathi (*pro hac vice*) *
Maria V. Morris, D.C. Bar. No. 1697904
Elisa C. Epstein (*pro hac vice*) *
American Civil Liberties Union Foundation
915 15th Street, N.W.
Washington, D.C. 20005
Tel: 202-393-4930
dfathi@aclu.org
mmorris@aclu.org
eepstein@aclu.org

Corene T. Kendrick (*pro hac vice*)
American Civil Liberties Union Foundation
425 California St., Ste. 700
San Francisco, CA 94104
Tel: 202-393-4930
ckendrick@aclu.org

Michael Perloff, D.C. Bar No. 1601047
Aditi Shah, D.C. Bar No. 90033136
ACLU Foundation of the District of Columbia
529 14th Street NW, Suite 722
Washington, D.C. 20045
Tel: 202-457-0800
mperloff@acludc.org
ashah@acludc.org

Shawn Thomas Meerkamper (*pro hac vice*)
Megan Z. F. Noor (*pro hac vice*)
Dale Melchert (*pro hac vice*)
Transgender Law Center
P.O. Box 70976
Oakland, CA 94612
Tel: 510-587-9696
shawn@transgenderlawcenter.org
megan@transgenderlawcenter.org
dale@transgenderlawcenter.org

Lynly S. Egyes (*pro hac vice*)
Transgender Law Center
594 Dean Street, Suite 11
Brooklyn, NY 11238
Tel: 510-587-9696
lynly@transgenderlawcenter.org

*Counsel for Plaintiff Class*

*Not admitted in D.C.; practice limited to federal courts.*