**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ALISHEA KINGDOM, et al., | |
| Plaintiff, | |
| v. | No. 1:25-cv-00691 (RCL) |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

**PLAINTIFFS' STATEMENT OF FACTS**

Pursuant to Local Civil Rule 7(h)(1), Plaintiffs submit the following Statement of Facts in response to Defendants' Statement of Material Facts (ECF 187-4), as part of Plaintiffs' opposition to Defendants' Motion for Summary Judgment (ECF 187). Each of Defendants' allegedly undisputed facts is copied verbatim below in the order presented by Defendants and is followed by Plaintiffs' response. Plaintiffs state, as an overall response to Defendants' Statement of Material Facts, that Defendants have moved for summary judgment at an unusually early juncture in this litigation, when discovery has not yet occurred. Thus, in addition to identifying the evidence below that is already part of the record in this case that shows that Defendants' asserted facts are genuinely disputed, Plaintiffs also identify facts they intend to obtain through discovery with respect to Defendants' asserted facts.

**I.      Plaintiffs' Responses to Defendants' Statement of Material Facts Not in Dispute**

1.      On January 20, 2025, the President issued Executive Order ("EO") 14,168. The EO provides in relevant part that "[i]t is the policy of the United States to recognize two sexes, male and female," EO 14,168, § 2, and that "'sex' shall refer to an individual's immutable biological classification as either male or female," *id.* § 2(a).

**Response:** Undisputed as to the language in the EO and the date it was issued.

2.      And, as relevant, section 4(c) of the EO provides: "The Attorney General shall ensure that [BOP] revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex."

**Response:** Undisputed as to the language in the EO.

3.      Finally, the EO requires that it "be implemented consistent with applicable law." *Id.* § 8(b).

**Response:** Undisputed that the quoted language appears in the EO, but disputed to the extent that paragraph 3 implies that § 4(c) of the EO or its enforcement is consistent with the law.

4.      On February 21, 2025, BOP issued a memorandum implementing EO 14,168. *See* ECF No. 1-1 (Memorandum: Compliance with Executive Order "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"). The memorandum provides in relevant part that BOP will not provide social accommodations for trans-identifying inmates (e.g., binders, hair removal devices, and undergarments). *Id.* at 1–2.

**Response:** Undisputed as to the language in the February 21, 2025, Implementing Memorandum (ECF 1-1).

5.      On February 28, 2025, BOP issued a second memorandum regarding compliance with EO 14,168. *See* ECF No. 1-2 (Memorandum: *Executive Order 14168 Compliance*). The memorandum provides that "no Bureau of Prisons funds are to be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." *Id.* It further provides that "[t]his policy is to be implemented in a manner consistent with applicable law[,] including the Eighth Amendment." *Id.*

**Response:** Undisputed as to the language in the February 28, 2025, Implementing Memorandum (ECF 1-2).

6.      On February 19, 2026, BOP issued a new policy on treatment of inmates with gender dysphoria, Program Statement 5260.01, *Management of Inmates with Gender Dysphoria. 2026 Policy* (ECF No. 125).

**Response:** Undisputed as to the Program Statement's title and the date it was issued, but disputed that it is a "new policy." Plaintiffs dispute the characterization of the Program Statement as a "new policy" because it continues to prohibit the same treatments prohibited by the Implementing Memoranda and is mandated by EO 14168, which the Program Statement

2

acknowledges, as it states that BOP "will comply with this Executive Order . . . unless compliance . . . is prohibited by court injunction or court order," ECF 125 § 5, and the Program Statement incorporates the EO's prohibition on the use of federal funds to provide gender-affirming care verbatim as its primary "intent," *id.* § 8.

7.      Under the Policy, BOP will provide medical care to each inmate pursuant to an "individualized" plan "tailored to the specific clinical needs of the inmate." *Id.* at 6.

**Response:** Disputed. The Program Statement makes clear that hormone therapy and social accommodations may not be provided. ECF 125 § 5(c)-(d). The Program Statement requires that treatment plans exclude these treatments even if the patient has a clinical need for them. Third Karasic Decl. ¶ 19. The only "individualized" aspect of the Program Statement's version of the EO-mandated ban on hormone therapy is how quickly Plaintiffs' and class members' hormone therapy will be cut off as part of mandatory "tapering plans," regardless of the medical necessity of such treatment for their gender dysphoria. *See* ECF 179-1 at 11 (quoting ECF 125 (Program Statement) at § 5(c)).

8.      Medical and psychiatric comorbidities will generally be addressed before gender dysphoria treatment proceeds so as to rule them out "as the potential cause of [gender dysphoria]." *Id.*

**Response:** Undisputed as to the language of the Program Statement.

9.      Gender dysphoria treatment will consist of psychotherapy and psychoeducational group interventions, trauma treatment, and psychotropic medication, among other treatments. *Id.* at 6–7.

**Response:** Undisputed as to the language of the Program Statement, but disputed to the extent that paragraph 9 implies that these interventions qualify as "gender dysphoria treatment," given "the absence of any evidence that these interventions are effective treatments for this condition." ECF 179-2 (Third Karasic Decl.) ¶ 14; *see also* 179-5, Ex. A (Kaliebe Dep. Tr.) at 144:9-145:4.

10.     Not available to address gender dysphoria, however, are sex trait modification surgeries and social accommodations. *Id.* at 7, 8.

**Response:** Undisputed as to the language of the Program Statement.

11.     Under the Policy, BOP will not provide cross-sex hormones to inmates not currently receiving them, and inmates who are currently receiving them generally will be tapered off based on individual factors such as the duration the inmate has been receiving hormones. *Id.* at 7–8.

**Response:** Undisputed as to the language of the Program Statement.

12.     "For inmates who (1) are post sex trait modification surgery[,] or (2) have been receiving hormones to address [gender dysphoria] for an extended period of time and develop severe physiological and psychological withdrawal effects from tapering, it may not be appropriate in all cases for the initial tapering plan to include cessation of hormones[,]" but such tapering plans "should be reevaluated regularly[.]" *Id.* at 8.

**Response:** Undisputed that the quoted language appears in the Program Statement, but disputed to the extent paragraph 12 implies that the Program Statement is anything short of a categorical ban on hormone therapy. The Program Statement requires regular reevaluation of temporarily paused tapering plans with the explicit goal of "cessation of hormones," and any "adjusted tapering plans must still be consistent with the purpose of th[e] policy," ECF 125 § 5(c), *i.e.*, to ban gender-affirming health care as mandated by, and using language identical to, the EO. *See* ECF 125 § 8; *see also* ECF 179-1 at 34-36.

13.     Moreover, inmates may "submit a request for additional medical or mental health care or evaluation if they have acute concerns during the tapering process," and their requests will be evaluated "based on all relevant factors, including security and prison-administration concerns." *Id.*

**Response:** Undisputed that the quoted language appears in the Program Statement, but disputed to the extent paragraph 13 implies that BOP in fact will evaluate individuals' medical or mental health care requests as the Program Statement represents or that Plaintiffs' or class members' ability to submit requests for medical or mental health care reduces the risk of serious and irreparable harm Plaintiffs and the class will face if the Program Statement goes into effect. *E.g.*, ECF 179-2 (Third Karasic Decl.) ¶¶ 18-23 (discussing the risk of harm to patients' health and

4

well-being if hormone therapy is withdrawn from those who need it); ECF 179-3 (Hamnvik Decl.)

¶ 28 ("In my experience with patients who had to discontinue hormone therapy because of loss of

insurance, they experienced significant distress[.]"); ECF 179-6 (Third Kingdom Decl.) ¶¶ 7-8

(explaining the harm and distress Plaintiff Kingdom would experience if the Program Statement

were to go into effect); ECF 179-7 (Third Nichols Decl.) ¶¶ 5-6 (same for Plaintiff Nichols); ECF

179-8 (Third Kapule Decl.) ¶¶ 9-10 (same for Plaintiff Kapule).

14.    On March 6, 2026, BOP filed a certified index of the 2026 Policy's administrative record, ECF No. 151, and produced the administrative record to Plaintiffs, which is over 3,000 pages. Ex. 1, 2 (AR excerpts).

**Response:** Undisputed that BOP filed the certified index and produced the administrative

record as described, but disputed to the extent the inclusion of "over 3,000 pages" in paragraph 14

implies that the administrative record in any way demonstrates reasoned decisionmaking as

required under the APA. *See* ECF 179-1 at 33-42; ECF 194 at 20-23 (and evidence cited therein).

15.    In that record, BOP provided extensive discussion—indeed, approximately 47 pages of analysis—of the issues it considered, the evidence it reviewed, and its justification for the 2026 Policy.

**Response:** Disputed. Plaintiffs dispute that "BOP provided extensive discussion . . . of the

issues it considered, the evidence it reviewed, and its justification" for the Program Statement.

Although the administrative record contains a 47-page memorandum, Plaintiffs dispute that BOP

genuinely considered relevant evidence to determine an appropriate policy for the treatment of

gender dysphoria; rather, the outcome of the supposed review was predetermined as it was

mandated by the EO. *See* ECF 179-1 at 34-36; ECF 194 at 20-23 (and evidence cited therein).

Indeed, the stated "intent" of the Program Statement is to do exactly what the EO mandates: "for

federal funds to not be expended for any medical procedure, treatment, or drug for the purpose of

conforming an inmate's appearance to that of the opposite sex." ECF 125 § 8. *See also* ECF 151

at 1 (Certification of BOP Medical Director Elizabete Stahl) (describing the Program Statement as

"implemented by the Federal Bureau of Prisons to comply with . . . Section 4(c) of the Executive Order 14168").

Plaintiffs expect that discovery will further demonstrate that Defendants did not genuinely consider evidence as paragraph 15 implies. As Plaintiffs will explain in greater detail in their forthcoming motion for discovery on the Program Statement, the administrative record Defendants produced is insufficient. Defendants have introduced and rely on *post hoc* extra-record evidence in the form of a declaration by Dr. Elizabete Stahl, who asserts that "[m]any of the BOP senior officials who wrote, consulted and applied the previous BOP policy [under which hormone therapy and social accommodations were provided to individuals diagnosed with gender dysphoria where they had a medical need] were also responsible for evaluating, implementing, and ultimately formulating the 2026 Policy." ECF 187-3 (Stahl Decl.) ¶ 17; *see also id.* ¶ 14 ("consult[ing] with others of the BOP clinical team"). The Stahl Declaration, however, is not in the administrative record. Nor are any documents related to the individuals Dr. Stahl claims were involved in forming the Program Statement. Plaintiffs are entitled to discovery, including, among other things, to depose Dr. Stahl, the individuals referenced in her declaration, relevant BOP healthcare providers, and Defendants' other declarants, and to obtain written communications among BOP healthcare providers about the change in BOP policy, as will be detailed in Plaintiffs' forthcoming motion.

16.    The administrative record shows that, in revising its policy for gender dysphoria treatment, BOP conducted extensive reviews of, among other things, relevant medical studies, state correctional policies, pertinent case law, prison administration and security concerns, and expert medical opinions, AR1–4; AR5–47.

**Response:** Disputed. Although Plaintiffs do not dispute that the administrative record includes some studies, correctional policies, and declarations, for the reasons discussed in response to paragraph 15, Plaintiffs dispute that Defendants genuinely considered evidence to determine an appropriate policy for the treatment of gender dysphoria; rather, the outcome of the supposed

review was predetermined as it was mandated by the EO, or the implication in paragraph 16 that the administrative record shows that BOP engaged in reasoned decisionmaking. *See* ECF 179-1 at 34-36; ECF 194 at 20-23 (and evidence cited therein) . For example, Plaintiffs maintain that in forming the Program Statement, Defendants should have considered, but did not adequately consider, BOP's own experience of providing gender-affirming medical care, including hormone therapy and social accommodations, to individuals with gender dysphoria in BOP custody for years prior to the EO. *See generally* ECF 179-4 (Second Thompson Decl.).

In addition, discovery will further demonstrate that this asserted fact and its implications are genuinely contested. The Stahl Declaration, which Defendants submitted in support of their motion for summary judgment but which is *not* part of the administrative record, asserts that BOP took some of its prior experience into consideration in forming the Program Statement, but the administrative record does not reveal the substance of those experiences, which deprives Plaintiffs and the Court of the ability to understand whether those experiences support the Program Statement. Plaintiffs are entitled to depose Dr. Stahl and other BOP officials who have experience under BOP's pre-EO policy for the treatment of gender dysphoria to determine whether those experiences support the Program Statement, as will be detailed in Plaintiffs' forthcoming motion.

17.    Based on this review, BOP determined that the "newer, more rapidly evolving clinical landscape" hampered the identification of a universal standard of care. AR3; *see also* AR5–8.

**Response:** Disputed. For the reasons discussed in response to paragraph 15, Plaintiffs dispute that BOP genuinely considered evidence to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO. *See* ECF 179-1 at 34-36; ECF 194 at 20-23 (and evidence cited therein). Plaintiffs also dispute that there is a "'rapidly evolving clinical landscape'" regarding the provision of gender-affirming medical care for adults with gender dysphoria. ECF 179-2 (Third

7

Karasic Decl.) ¶ 11 ("Contrary to assertions made in the Memorandum and Kaliebe Declaration, social transition and hormone therapy for the treatment of adults with gender dysphoria are not the subject of controversy or debate within the medical and mental health fields. They are widely accepted treatments. To the extent there is any controversy about these treatments in public discourse, it is limited to the context of pediatric patients with gender dysphoria."); ¶ 24 (discussing that the widely accepted treatment for gender dysphoria in adults, including hormone therapy and social transition, is reflected in "research and decades of clinical experience," recognized as far back as "the 1950's"). Plaintiffs expect that discovery—including, among other things, of written communications among BOP healthcare providers about the change from the pre-EO BOP policy to the Program Statement and depositions of people involved in the care of Plaintiffs and class members—will generate further evidence to refute Defendants' assertions.

Plaintiffs also dispute paragraph 17 to the extent it implies that "the identification of a universal standard of care" is relevant to Plaintiffs' claims. Plaintiffs are likely to prevail on their Eighth Amendment claim because, as the evidence submitted in support of Plaintiffs' motion for an updated preliminary injunction demonstrates, gender affirming care such as hormone therapy and social accommodations are medically necessary in at least some cases, *e.g.*, ECF 7-2 (First Karasic Decl. ¶¶ 27, 28, 63, 64, 66, 68, 72, 73, 80-86; ECF 179-2 (Third Karasic Decl.) ¶¶ 22, 24-33; ECF 179-4 (Second Thompson Decl.) ¶ 11,, and the Program Statement violates the Eighth Amendment because it categorically prohibits hormone therapy and social accommodations to treat gender dysphoria. Plaintiffs expect that discovery will further establish, among other things, that BOP officials are aware of the risk of harm to Plaintiffs and class members by depriving them of hormone therapy and social accommodations.

18.    BOP also thoroughly examined the "gender affirming care model" advocated by the World Professional Association for Transgender Health ("WPATH"), which had been the

standard of care BOP previously followed. AR3–4; AR5–8.

**Response**: Disputed. For the reasons discussed in response to paragraph 15, Plaintiffs dispute that BOP genuinely considered evidence to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO. *See* ECF 179-1 at 34-36; ECF 194 at 20-23 (and evidence cited therein).

19.     BOP determined that there are grave "concerns about the body of research and potential research bias" underlying the WPATH model. AR4; *see also* AR5–8.

**Response**: Disputed. For the reasons discussed in response to paragraph 15, Plaintiffs dispute that BOP genuinely considered evidence to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO. *See* ECF 179-1 at 34-36; ECF 194 at 20-23 (and evidence cited therein). In addition, for the reasons discussed in response to paragraph 17, Plaintiffs dispute that there are "'concerns about the body of research and potential research bias'" regarding the research related to the treatment of gender dysphoria in adults, *see* ECF 179-2 (Third Karasic Decl.) ¶¶ 11, 24, and Defendants' characterization of the body of research supporting hormone therapy and social transition accommodations for adults as not effective treatments for gender dysphoria, *see id.* ¶¶ 24-30 (stating that "research and decades of clinical experience demonstrate that social transition and hormone therapy can effectively alleviate gender dysphoria and improve patient mental health and functioning," and that many widely recommended medical treatments are supported by the same type of evidence supporting this treatment).

20.     BOP further found that many European countries "have distanced themselves from the stance" of WPATH, and that leading organizations in the United States are reevaluating their clinical guidance. AR4; *see also* AR5–8.

**Response**: Disputed. For the reasons discussed in response to paragraph 15, Plaintiffs

9

dispute that BOP genuinely considered evidence to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO. *See* ECF 179-1 at 34-36; ECF 194 at 20-23 (and evidence cited therein). In addition, Plaintiffs dispute Defendants' assertion that European countries and leading medical organizations in the United States have distanced themselves from treating adults with gender dysphoria with hormone therapy and social transition. ECF 193-1 (Fourth Karasic Decl.) ¶ 9 ("While a few Western European countries have imposed some limits on access to gender affirming medical care for minors, none have moved away from such treatment for adults with gender dysphoria.") Plaintiffs expect that discovery, including depositions of people involved in the care of gender dysphoria patients in BOP custody and the development of BOP's old and new policies, will generate further evidence to support Plaintiffs' position.

21.    BOP considered systematic reviews of available studies that found insufficient and low strength of evidence as to the safety and efficacy of sex trait modification interventions, including cross-sex hormones. AR4; AR24–27.

**Response:** Disputed. For the reasons discussed in response to paragraph 15, Plaintiffs dispute that BOP genuinely considered evidence to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO. ECF 179-1 at 34-36; ECF 194 at 20-23 (and evidence cited therein). In addition, for the reasons discussed in response to paragraph 17, Plaintiffs dispute Defendants' assertion that there is insufficient evidence about the safety and efficacy of hormone therapy for adults. *See* ECF 179-2 (Third Karasic Decl.) ¶¶ 24-26 (describing the "research and decades of clinical experience" undergirding social transition and hormone therapy as effective treatments for alleviating gender dysphoria and improving patient mental health and functioning, and explaining that many "widely recommended medical treatments" are supported by the same type of evidence supporting this treatment); ECF 179-3 (Hamnvik Decl.) ¶¶ 29-66 (explaining that hormone therapy

is safe and the risks are comparable to other well- accepted medical treatments). Plaintiffs expect that discovery will generate further evidence to support Plaintiffs' position.

22.    BOP considered the many significant risks of cross-sex hormones, from breast cancer to cardiovascular complications. AR4; AR24–27; AR2631–36.

**Response:** Disputed. For the reasons discussed in response to paragraph 15, Plaintiffs dispute that BOP genuinely considered evidence to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO. ECF 179-1 at 34-36; ECF 194 at 20-23 (and evidence cited therein). For the reasons discussed in response to paragraphs 17 and 21, Plaintiffs dispute BOP's characterization of the risks of hormone therapy. *See* ECF 179-3 (Hamnvik Decl.) ¶¶ 29-66 (explaining that hormone therapy is safe and the risks are comparable to other well-accepted medical treatments); *id.* ¶ 65 (noting that hormone therapy aligns transgender women's risk profile more closely with that of cisgender women, and transgender men's risk profile more closely with that of cisgender men); *id.* ¶ 56 (citing studies that the risk of breast cancer for transgender women and transgender men is lower than the risk for cisgender women). Plaintiffs expect that discovery will generate further evidence to support Plaintiffs' position.

23.    The administrative record includes a 2020 review concluding that individuals receiving cross-sex hormones are "at increased risk of adverse cardiovascular outcomes, including myocardial infarction and stroke," AR2859.

**Response:** Disputed to the extent it implies that BOP genuinely considered this material to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO, as discussed in the response to paragraph 15. ECF 179-1 at 34-36; ECF 194 at 20-23 (and evidence cited therein). For the reasons discussed in response to paragraphs 17 and 21, Plaintiffs also dispute BOP's characterization of the risks of hormone therapy. *See* ECF 179-3 (Hamnvik Decl.) ¶¶ 29-

66 (explaining that hormone therapy is safe and the risks are comparable to other well accepted medical treatments); *id.* ¶ 65 (noting that hormone therapy aligns transgender women's risk profile more closely with that of cisgender women, and transgender men's risk profile more closely with that of cisgender men); ¶ 56 (citing studies that the risk of breast cancer for transgender women and transgender men is lower than the risk for cisgender women). Plaintiffs expect that discovery will generate further evidence to support Plaintiffs' position.

24.     The administrative record includes a 2021 systematic review concluding that any association between cross-sex hormones and increased quality of life and decreased depression and anxiety was uncertain because of "high risk of bias in study designs, small sample sizes, and confounding with other interventions," AR1552.

**Response:** Disputed to the extent that paragraph 24 implies that BOP genuinely considered this material to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO, as discussed in the response to paragraph 15. ECF 179-1 at 34-36; ECF 194 at 20-23 (and evidence cited therein). For the reasons discussed in response to paragraphs 17 and 21, Plaintiffs also dispute BOP's characterization of the research. *See* ECF 179-2 (Third Karasic Decl.) ¶ 27 (explaining that a 2021 systematic review concluded that "gender-affirming hormone therapy is likely associated with improvements in [quality of life], depression and anxiety"). Plaintiffs expect that discovery will generate further evidence to support Plaintiffs' position.

25.     The administrative record includes a 2020 overview explaining that the efficacy of gender affirming modalities are lacking "high-quality scientific data on the effects of this approach," including the lack of randomized prospective trial design, small sample size, recruitment bias, and short study duration, AR1906.

**Response:** Disputed to the extent that paragraph 25 implies that BOP genuinely considered this material to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO, as discussed in the response to paragraph 15. ECF 179-1 at 34-36; ECF 194 at 20-23 (and evidence

cited therein). For the reasons discussed in response to paragraphs 17 and 21, Plaintiffs also dispute

BOP's characterization of the body of research on gender affirming health care and the quality of

data supporting this standard of care. ECF 179-2 (Third Karasic Decl.) ¶¶ 25-27 (explaining that

many "widely recommended medical treatments" are supported by the same type of evidence

supporting this treatment and that the studies cited by BOP "do not suggest in any way that the

research is unreliable"); *id.* at ¶ 27 (emphasizing that the 2020 study described in paragraph 25

explicitly expressed that "non-controlled cohort studies . . . provide the highest quality evidence

currently available in this field.") (quoting Claudia Haupt et al, *Antiandrogen or Estradiol*

*Treatment or Both During Hormone Therapy in Transitioning Transgender Women*, 11 Cochrane

Database Syst. Revs., Art. No. CD013138, at 2.2 (2020),

https://doi.org/10.1002/14651858.CD013138.pub2). Plaintiffs expect that discovery will generate

further evidence to support Plaintiffs' position.

26.    The administrative record includes a 2023 narrative review explaining that studies
of suicides following gender affirming care "suffers from a lack of methodological rigor" that
increases the risk of error and does not control for "the presence of psychiatric comorbidity,
substance use, and other suicide risk-enhancing factors," AR1915, 1927.

**Response:** Disputed to the extent that paragraph 25 implies that BOP genuinely considered

this material to determine an appropriate policy for treatment of gender dysphoria as opposed to

reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO, as

discussed in the response to paragraph 15. ECF 179-1 at 34-36; ECF 194 at 20-23 (and evidence

cited therein). For the reasons discussed in response to paragraphs 17 and 21, Plaintiffs also dispute

BOP's characterization of the body of research supporting gender-affirming health care. *See* ECF

179-2 (Third Karasic Decl.) ¶ 28 (emphasizing that the study on suicidality cited by the BOP only

compared transgender people who had medically transitioned to the general population, not to

transgender people who had not transitioned); *id.* at ¶ 43 n.5 (citing research showing that "patients

who had already been receiving mental health care treatment prior to hormone therapy for suicidality, depression, and anxiety saw significant improvement in those symptoms after being treated with hormone therapy") (citing Riittakerttu Kaltiala et al., *Adolescent Development and Psychosocial Functioning After Atarting Cross-Sex Hormones for Gender Dysphoria*, 74 Nord J Psychiatry 213–219 (2020), https://doi.org/10.1080/08039488.2019.1691260). Plaintiffs expect that discovery will generate further evidence to support Plaintiffs' position.

27.    BOP considered the safety, security, and prison administration concerns for both the inmates receiving care to address gender dysphoria and for correctional staff. AR2–3; AR10–13, 18–20, 28–30.

**Response:** Disputed. As discussed in response to paragraph 15, Plaintiffs dispute that BOP genuinely considered relevant evidence to determine an appropriate policy for the treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO. Plaintiffs further dispute that BOP considered safety, security, and prison administration concerns for the "inmates receiving care to address gender dysphoria," which include Plaintiffs and class members. The administrative record contains no discussion of BOP's security and administration experiences while providing gender-affirming care, including hormone therapy and social accommodations, to treat gender dysphoria for years before the EO. Conversely, Plaintiffs have proffered evidence that the Program Statement will cause them harm and will not ensure their safety or security. *E.g.*, ECF 179-2 (Third Karasic Decl.) ¶ 19 (explaining that "[b]y prohibiting and withdrawing social accommodations and hormone therapy from individuals with gender dysphoria, the Program Statement puts [Plaintiffs] at the same risk of significant harm to their health and well-being as the Implementing Memoranda did" and that "[p]atients who are stripped of this medically necessary care would be expected to see a resumption of the distress and other symptoms they experienced from gender dysphoria prior to treatment"); ECF 179-6 (Third Kingdom Decl.) ¶¶ 7-8 (explaining the harm and distress Plaintiff Kingdom would experience if

14

the Program Statement were to go into effect); ECF 179-7 (Third Nichols Decl.) ¶¶ 5-6 (explaining the harm and distress Plaintiff Nichols would experience if the Program Statement were to go into effect); ECF 179-8 (Third Kapule Decl.) ¶¶ 9-10 (explaining the harm and distress Plaintiff Kapule would experience if the Program Statement were to go into effect, and the initial distress experienced by Plaintiff upon the Statement's announcement); ECF 179-1 at 28-30 and evidence cited therein; *id*. at 30-31 and evidence cited therein (harm to class members). Moreover, Dr. Cathy Thompson, a former high-level BOP official who was involved in the creation of the Transgender Offender Manual ("TOM") and was a member of the Transgender Executive Committee ("TEC"), submitted testimony in this case that the pre-EO BOP policies and procedures were put in place precisely to ensure the safety and security of incarcerated people with gender dysphoria, as "part of operating safe facilities." ECF 7-3 (First Thompson Decl.) ¶ 17; *see also id.* at ¶¶ 12, 18-21, 24-38; ECF 179-4 (Second Thompson Decl.) ¶ 12 ("During my years at BOP when hormone therapy and social transition accommodations were available to individuals with gender dysphoria, I did not hear of it creating any security or prison-administration problems, including the security issues referenced in the Memorandum."); *id*. ¶ 13 ("Rather than creating security or administrative challenges, providing this care improved institutional safety."); *id.* ¶¶ 14-30.

Additionally, Plaintiffs have propounded discovery requests and plan to request additional discovery pursuant to their forthcoming motion to refute that any such problems resulting from the provision of hormone therapy and social accommodations, including during the many years that BOP provided this care under the policy in place prior to the EO.

28.    BOP considered the fact that providing sex trait modification surgeries, hormone interventions, and social accommodations jeopardizes the safety, security, and administration of BOP facilities because "inmates receiving these surgeries are at higher risk of harassment due to their appearance." AR2; *see also* AR11–12, 19, 28–29.

**Response:** Disputed. Plaintiffs dispute this contention for the reasons discussed in response

to paragraph 27, which they incorporate in full and by reference.

29.    Special treatments associated with sex trait modification interventions also raise fairness concerns and can breed resentment among other inmates, which in turn "can increase the risk of retaliation against the inmate receiving special treatment and cause ripple effects throughout the correctional institution[,] disrupting the delicate prison environment." AR12, 20, 29.

**Response:** Disputed. Plaintiffs dispute this contention for the reasons discussed in response to paragraph 27, which they incorporate in full and by reference.

30.    Moreover, providing "gender affirming" care conflicts with a reasonable prison safety practice of refusing to reward threats of self-harm and may even increase self-harm. AR12, 20, 29–30; *see also* AR2648, ¶ 148; AR2649, ¶ 149.

**Response:** Disputed. Plaintiffs dispute this contention for the reasons discussed in response to paragraph 27, which they incorporate in full and by reference.

31.    BOP reviewed five different state correctional policies (Florida, California, Kentucky, Oklahoma, and Minnesota) to understand how those states address gender dysphoria in the correctional context. AR3.

**Response:** Disputed. As discussed in response to paragraph 15, Plaintiffs dispute that BOP genuinely considered relevant evidence to determine an appropriate policy for the treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO. Plaintiffs dispute this contention for the reasons discussed in response to paragraph 27, which they incorporate in full and by reference. Indeed, the stated "intent" of the Program Statement is to do exactly what the EO mandates: "for federal funds to not be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." ECF 125 § 8. *See also* ECF 151 at 1 (Certification of BOP Medical Director Elizabete Stahl) (describing the Program Statement as "implemented by the Federal Bureau of Prisons to comply with [§ 4(c) of the EO]").

32.    BOP also considered costs, reliance interests, and alternatives. AR13–16, 21–23, 30–33.

**Response:** Disputed. As discussed in response to paragraph 15, Plaintiffs dispute that BOP

16

genuinely considered relevant evidence to determine an appropriate policy for the treatment of

gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined

outcome mandated by the EO. Plaintiffs dispute this contention for the reasons discussed in

response to paragraph 27, which they incorporate in full and by reference. In addition to the

anticipated discovery described in response to paragraph 27, Plaintiffs plan to seek discovery as to

this policy change, including but not limited to communications among BOP health care providers

and leadership about the change in policy, patient medical records, and depositions of health care

staff providing treatment to Plaintiffs and class members.

33.     BOP directly addressed reliance interests over multiple pages and reasonably determined that inmates lack a valid reliance interest in receiving unproven treatments (or at a minimum treatment subject to reasonable debate in the medical community), particularly when the treatments have not been part of a longstanding, formal BOP policy. AR13–16; AR21–23; AR30–33.

**Response:** Disputed. Plaintiffs dispute this contention for the reasons discussed in response

to paragraphs 27 and 32, which they incorporate in full and by reference. Plaintiffs further dispute

this contention for the reasons discussed in response to paragraphs 17, 19-21, and 24-26, which

they also incorporate in full and by reference. *See also* ECF 179-2 (Third Karasic Decl.) ¶¶ 24-35.

34.     BOP also reasonably determined that even if there were valid reliance interests, those interests were not sufficient to outweigh the benefits of the 2026 Policy. *See, e.g.*, AR21–22 (social accommodations); AR30–32 (hormones).

**Response:** Disputed. Plaintiffs dispute this contention for the reasons discussed in response

to paragraphs 27 and 32, which they incorporate in full and by reference.

35.     And BOP also reasonably considered alternatives of providing these treatments in certain situations or to certain inmates, but in the end, found that it was not prudent to provide interventions that are unproven or are medically controversial; can harm the inmate; can have long-term irreversible effects; and can negatively affect security and prison administration. AR13–16; AR21–23; AR30–33.

**Response:** Disputed. As discussed in response to paragraph 15, Plaintiffs dispute that BOP

genuinely considered relevant evidence to determine an appropriate policy for the treatment of

gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO. Plaintiffs dispute this contention for the reasons discussed in response to paragraphs 27 and 32, which they incorporate in full and by reference. Plaintiffs further dispute this contention for the reasons discussed in response to paragraphs 17, 19-21, and 24-26, which they incorporate in full and by reference. *See also* ECF 179-2 (Third Karasic Decl.) ¶¶ 24-35. In addition, for the reasons discussed in response to paragraph 15, Plaintiffs dispute that BOP genuinely considered evidence to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO. ECF 179-1 at 34-36; ECF 194 at 20-23 (and evidence cited therein).

36.    The expert medical opinions that BOP reviewed include the declarations of Plaintiffs' expert previously submitted in this case and the expert report of Dr. Kaliebe, a psychiatrist with over 25 years of experience who has extensively studied the relevant gender dysphoria literature and presented and published articles about gender dysphoria, AR2599–2673.

**Response:** Undisputed that the administrative record includes these materials, but disputed the extent that paragraph 36 implies that BOP genuinely considered evidence to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO, as discussed in the response to paragraph 15. ECF 179-1 at 34-36; ECF 194 at 20-23 (and evidence cited therein). Plaintiffs also dispute Defendants' characterization of Dr. Kaliebe's experience related to the treatment of gender dysphoria. *See* ECF 179-2 (Third Karasic Decl.) ¶¶ 50-59 (explaining that "Dr. Kaliebe's declaration reflects a lack of understanding of gender dysphoria and its treatment"). Indeed, Dr. Kaliebe has very little experience treating gender dysphoria and almost all of his publications on the topic were letters to the editor and other opinion pieces. *See* ECF 179-5, Ex. A (Kaliebe Dep. Tr.) at 15:14-16:10, 20:9-21:10, 24:11-25:21, 26:16-20, 27:6-12, 28:3-22, 32:4-18, 35:22-36:6, 38:3-40:1, 41:7-14, 48:1-21, 53:1-9; 72:10-73:4, 74:8-19.

18

37.     Dr. Kaliebe discussed the hierarchies of evidence in medicine, the treatment approaches for gender dysphoria, the many weaknesses and risks of "gender affirming care model" advocated by WPATH, and why psychotherapy is the preferred treatment approach, particularly in correctional environments. AR2607–18.

**Response:** Undisputed that Dr. Kaliebe's declaration includes what is described in this paragraph, but disputed to the extent that this paragraph implies that these assertions are true. The evidence demonstrates that they are not, ECF 179-2 (Third Karasic Decl.) ¶¶ 24-35 (explaining the evidence proving the efficacy of gender affirming care); ECF No. 179-3 (Hamnvik Decl.)  ¶¶ 29-66 (explaining that hormone therapy is safe and the risks are comparable to other well- accepted medical treatments); ECF 179-2 (Third Karasic Decl.) ¶¶ 51-53; 42-48 (there is no evidence that psychotherapy can alleviate gender dysphoria), and Dr. Kaliebe himself admits that there is no evidence that psychotherapy can alleviate gender dysphoria. *See* ECF 179-5, Ex. A (Kaliebe Dep. Tr.) at 133:4-11, 146:20-137:4. Plaintiffs also dispute this paragraph to the extent it implies that BOP genuinely considered evidence to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO, as discussed in the response to paragraph 15. ECF 179-1 at 34-36; ECF 194 at 20-23 (and evidence cited therein).

38.     Dr. Kaliebe also explained that WPATH's guidelines advocating affirmation of a patient's preferred gender should not be used to formulate treatment of gender dysphoria because "WPATH openly engages in ideologically-based political advocacy, systematically misrepresents evidence, and often bases its recommendations, no matter how impactful for the patient, on low-quality supporting evidence." AR2618–27.

**Response:** Undisputed that Dr. Kaliebe's declaration includes what is described in this paragraph, but disputed to the extent that this paragraph implies that these assertions are true. Plaintiffs dispute the suggestion that WPATH's guidelines are the only basis of support for hormone therapy and social transition as treatment for gender dysphoria and that the evidence supporting such care is inadequate. *E.g.*, ECF 179-2 (Third Karasic Decl.) ¶ 65 ("The provision of

19

gender-affirming care for adults around the world is not based solely on WPATH's guidelines; it has been practiced globally for decades, even preceding the first WPATH Standards of Care in 1979. This care has been provided and considered beneficial for over 70 years, and fabricated controversies about WPATH does not change this fact."); ¶¶ 24-31 (discussing evidence proving efficacy of treatments), ¶¶ 60-66 (explaining that critiquing WPATH does not change the existence of research and clinical experience supporting this care, and why such critiques are also baseless). Plaintiffs also dispute this paragraph to the extent it implies that BOP genuinely considered evidence to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO, as discussed in the response to paragraph 15. ECF 179-1 at 34-36; ECF 194 at 20-23 (and evidence cited therein). Plaintiffs expect that discovery will generate further evidence to show that Dr. Kaliebe's assertions are baseless.

39.    He also explained that other similar guidelines suffer from many of the same issues. AR2624–25, ¶¶ 74, 75.

**Response:** Undisputed that Dr. Kaliebe's declaration includes what is described in this paragraph, but disputed to the extent that this paragraph implies that these assertions are true. The evidence shows that they are not. *E.g.*, ECF 179-2 (Third Karasic Decl.) ¶¶ 24-35 (discussing evidence proving efficacy of treatments); ¶ 60 ("decades of research and clinical experience demonstrate the effectiveness of gender-affirming care at alleviating gender dysphoria"), ¶ 64. Plaintiffs also dispute this paragraph to the extent it implies that BOP genuinely considered evidence to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO, as discussed in the response to paragraph 15. ECF 179-1 at 34-36; ECF 194 at 20-23 (and evidence cited therein). Plaintiffs expect that discovery will generate further evidence to show that Dr.

Kaliebe's assertions are baseless.

40.     Dr. Kaliebe opined that cross-sex hormones, social accommodations, and sex trait modification surgery are not medically necessary, particularly in the correctional setting. AR2599–2673.

**Response:** Undisputed that Dr. Kaliebe's declaration includes what is described in this paragraph, but disputed to the extent that this paragraph implies that these assertions are true. They are not. *E.g.*, ECF 179-2 (Third Karasic Decl.) ¶ 23 (explaining that treatments prohibited by the EO and Program Statement are medically necessary care that, if withdrawn, would likely cause a mental health crisis for many incarcerated individuals with gender dysphoria), ¶¶ 37-40 (clarifying that this care is no less medically necessary in correctional settings); *see also* ECF 179-4 (Second Thompson Decl.) ¶ 11. For the reasons also discussed in response to paragraphs 17, 19, 21, 25-27, 32, and 36-38, Plaintiffs dispute the assertion that gender-affirming health care is never medically necessary to treat gender dysphoria, as would be necessary for a blanket ban on this care not to be deliberately indifferent to a serious medical need under the Eighth Amendment.

41.     Dr. Kaliebe opined that sex trait modifications "have substantial risks, and there is little, if any, reliable data supporting that such surgeries cause meaningful long-term benefits in improving mental health or reducing suicide risks. This is particularly true in prison settings." AR2637–38, ¶ 118.

**Response:** Undisputed that Dr. Kaliebe's declaration includes what is described in this paragraph, but disputed to the extent that this paragraph implies that these assertions are true. The evidence shows that they are not. ECF 179-2 (Third Karasic Decl.) ¶¶ 24-31 (explaining efficacy of gender affirming care); ECF 179-3 (Hamnvik Decl.) ¶¶ 29-66 (explaining that hormone therapy is safe and the risks are comparable to other well accepted medical treatments). For the reasons discussed in response to Paragraphs 17, 19, 21-27, 32, and 36-38, Plaintiffs also dispute the assertion that the risks of gender-affirming heath care outweigh the benefits, and that this care is never medically necessary to treat gender dysphoria, as would be necessary for a blanket ban on

this care not to be deliberately indifferent to a serious medical need under the Eighth Amendment.

42.    Dr. Kaliebe opined that sex trait modification surgery can prolong and worsen gender dysphoria symptoms, undermine other gender dysphoria treatments, and cause other physical and psychological harms, some of which are lifelong. AR2637–41; *see* AR2640, ¶ 129.

**Response:** Undisputed that Dr. Kaliebe's declaration includes what is described in this paragraph, but disputed to the extent that this paragraph implies that these assertions are true. For the reasons set forth in response to paragraph 36, which are incorporated in full and by reference, Plaintiffs dispute Dr. Kaliebe's purported expertise to opine upon these topics. Plaintiffs expect that discovery will generate further evidence to demonstrate that this paragraph is incorrect.

43.    For example, numerous studies showed that individuals who underwent sex trait modification surgery have a significantly higher risk for depression, anxiety, suicidal ideation, and substance abuse disorders. AR2638, ¶ 121; AR2639–40, ¶ 122–26; AR966–74; AR987–93.

**Response:** Undisputed that Dr. Kaliebe's declaration includes what is described in this paragraph, but disputed to the extent that this paragraph implies that these assertions are true. For the reasons set forth in response to paragraph 36, which are incorporated in full and by reference, Plaintiffs dispute Dr. Kaliebe's purported expertise to opine upon these topics. Plaintiffs expect that discovery will generate further evidence to demonstrate that this paragraph is incorrect.

44.    Such surgeries can also have "serious complications, some of which are lifelong" and irreversible, including stenosis, nerve damage, chronic pain, and loss of sensation. AR2640, ¶ 129; *see also* AR975–986; AR3032–39.

**Response:** Undisputed that Dr. Kaliebe's declaration includes what is described in this paragraph, but disputed to the extent that this paragraph implies that these assertions are true. For the reasons set forth in response to paragraph 36, which are incorporated in full and by reference, Plaintiffs dispute Dr. Kaliebe's purported expertise to opine upon these topics. Plaintiffs expect that discovery will generate further evidence to demonstrate that this paragraph is incorrect.

45.    As Dr. Kaliebe explained, "with the known harms to healthy tissue, potential increased risk of psychiatric decompensation, technical issues such as wound care, potential surgical complications, potential life-long health complications, and unclear mental health

benefits, cross-sex surgeries within the correctional environment are not medical necessary." AR2641, ¶ 130.

**Response:** Undisputed that Dr. Kaliebe's declaration includes what is described in this paragraph, but disputed to the extent that this paragraph implies that these assertions are true. For the reasons set forth in response to paragraph 36, which are incorporated in full and by reference, Plaintiffs dispute Dr. Kaliebe's purported expertise to opine upon these topics. Plaintiffs expect that discovery will generate further evidence to demonstrate that this paragraph is incorrect.

46.    Medical professionals have persuasively explained that social accommodations are not medically necessary. *See, e.g.*, AR2605, ¶¶ 22, 136.

**Response:** Disputed. There is no evidence supporting the notion that social accommodations are never medically necessary to treat gender dysphoria, as would be necessary for a blanket ban on this care not to be deliberately indifferent to a serious medical need under the Eighth Amendment. To the contrary, the evidence shows that social transition—which requires accommodations for that to be possible in prison settings—is medically necessary for many people with gender dysphoria. *See* ECF No. 7-2 (First Karasic Decl.) ¶¶ 64-65, 72; ECF No. 179-2 (Third Karasic Decl.) ¶ 31.

47.    "There is limited evidence suggesting that allowing cosmetic and clothing items, such [as] binders, undergarments, makeup, wigs, and other accessories and items stereotypically associated with the opposite sex, would improve or resolve symptoms associated with Gender Dysphoria." AR2643, ¶ 136.

**Response:** Disputed. Contrary to the assertion in this paragraph, there is evidence showing that social transition is effective for treating gender dysphoria and alleviating its symptoms. ECF 7-2 (First Karasic Decl.) ¶¶ 64-65, 72; ECF 179-2 (Third Karasic Decl.) ¶ 31.

48.    And there is no reliable evidence showing social accommodations address gender dysphoria in prison, given that social transition in the correctional environment is fundamentally different from such concepts outside the environment. AR2644, ¶ 139; AR2646, ¶¶ 141–43.

**Response:** Disputed. There is no evidence to support the assertion in this paragraph that

23

social transition is any less effective or medically necessary to treat gender dysphoria for people who are incarcerated or the assertion that necessity of social transition somehow operates in a "fundamentally different" way in a carceral setting. ECF 179-2 (Third Karasic Decl.) ¶¶ 13, 37-40.

49.     At the same time, social accommodations "can prolong the symptoms [of gender dysphoria] and undermine psychotherapy." AR2643, ¶ 136.

**Response:** Disputed. There is no evidence to support this assertion. ECF 179-2 (Third Karasic Decl.) ¶¶ 48 n.6, 51-53. In contrast, there is evidence that being able to socially transition alleviates symptoms of gender dysphoria. ECF 7-2 (First Karasic Decl.) ¶¶ 72-79. And Dr. Kaliebe himself admits there is no evidence supporting this speculation that gender affirming treatment can prolong gender dysphoria and undermine psychotherapy. *See* ECF 179-5, Ex. A (Kaliebe Dep. Tr.) 133:4-11, 136:20-137:4.

50.     Social transition is also "related to future harms and risks due to increased likelihood of later sex-trait modification." AR2642, ¶ 133.

**Response:** Disputed. There is no evidence to support this assertion. Plaintiffs also dispute this paragraph to the extent it implies that sex-trait modification or social transition are inherently harmful or risky or that the risks outweigh the benefits. ECF 179-3 (Hamnvik Decl.) ¶¶ 29-66 (explaining that hormone therapy is safe and the risks are comparable to other well-accepted medical treatments); ECF 7-2 (First Karasic Decl.) ¶¶ 28, 64, 66, 72, 73 (explaining that hormone therapy and social transition can alleviate gender dysphoria).

51.     The 2026 Policy provides that hormones should generally not be used to address gender dysphoria, subject to certain exceptions. 2026 Policy at 7–8.

**Response:** Disputed to the extent that this implies that the Program Statement is anything short of a categorical ban on hormone therapy. The Program Statement prohibits initiation of hormone therapy for all class members who are not already receiving hormone therapy and

24

requires discontinuation of hormone therapy for those already receiving it. ECF 125 § 5(c). Although the Program Statement provides a narrow exception to immediate and complete cessation of hormone therapy for people in BOP custody who "are post sex trait modification surgery" or have been on hormones "for an extended period of time and develop severe physiological *and* psychological withdrawal effects from tapering," this exception applies only to the "initial tapering plan" and the Program Statement provides that the tapering plans even for this narrow subset of individuals "should be *reevaluated regularly with respect to cessation* of hormones." *Id.* § 5(c)(ii) (emphasis added). The goal of the Program Statement is clear: the explicit intent—as the EO requires—is "for federal funds to not be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex," *id.* § 8, and that includes cessation of hormones, *see id.* § 5.

52.    In reaching that decision, BOP considered, among other things, Dr. Kaliebe's opinion that hormonal interventions to address gender dysphoria are highly controversial, medically disputed, and unproven by appropriate evidence. AR1–4; AR24–27; AR2605, ¶ 20; AR2650, ¶ 154; *see also* Ex. 3 (Stahl Decl.), ¶¶ 6, 12–14, 16.

**Response:** Disputed. For the reasons discussed in response to paragraph 15, Plaintiffs dispute that BOP genuinely considered evidence to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO. ECF 179-1 at 34-36; ECF 194 at 20-21 (and evidence cited therein). Plaintiffs also dispute Dr. Kaliebe's purported expertise to opine on these topics for the reasons set forth in the response to paragraph 36, which are incorporated in full and by reference. For the reasons discussed in the responses to paragraphs 17-26 and 35-45, which are incorporated in full and by reference, Plaintiffs also dispute the assertion that "hormonal interventions to address gender dysphoria are highly controversial, medically disputed, and unproven by appropriate evidence." *E.g.*, ECF 179-2 (Third Karasic Decl.) ¶ 11 ("Contrary to assertions made in the

Memorandum and Kaliebe Declaration, social transition and hormone therapy for the treatment of adults with gender dysphoria are not the subject of controversy or debate within the medical and mental health fields.  They are widely accepted treatments. To the extent there is any controversy about these treatments in public discourse, it is limited to the context of pediatric patients with gender dysphoria.").

53.     As Dr. Kaliebe opined based on his review of relevant literature, providing hormonal interventions to address gender dysphoria "is not based on guidelines using best practice or systematic reviews of evidence[,]" and there is little (if any) reliable evidence showing that hormones address gender dysphoria. AR2627, ¶ 83.

**Response:** Undisputed that Dr. Kaliebe's declaration includes what is described in this paragraph, but disputed to the extent that this paragraph implies that these assertions are true. The evidence shows that they are not. *E.g.*, ECF 179-2 (Third Karasic Decl.) ¶¶ 25-30, 33-35; ECF 7-2 (First Karasic Decl.) ¶¶ 53-62. Plaintiffs also dispute Dr. Kaliebe's purported expertise to opine on these topics for the reasons set forth in the response to paragraph 36, which are incorporated in full and by reference.

54.     For example, "[a] 2020 systematic review of available studies 'found insufficient evidence to determine the efficacy or safety of hormonal treatment approaches for transgender women in transition'—it concluded that '[t]he evidence is very incomplete, demonstrating a gap between current clinical practice and clinical research.'" AR4 (quoting Haupt et al., *Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women*, 11 Cochrane Database of Systematic Reviews, Art. No. CD013138, at 2, 11 (2020)); AR25.

**Response:** Disputed. ECF 179-2 (Third Karasic Decl.) ¶ 27 (addressing the review referenced in this paragraph and explaining why the administrative record memorandum's reliance on it "is misplaced").

55.     "Another systematic review of studies concluded that it was 'impossible to draw conclusions about the effects of hormone therapy on death by suicide' because of the 'low' 'strength of evidence.'" AR4 (quoting Kellan E. Baker, et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, 5 J. Endocrine Soc. 1, 12-13 (2021)); AR25.

**Response:** Undisputed that the administrative record includes the referenced material, but

disputed that this review supports banning hormone therapy. *See* ECF 179-2 (Third Karasic Decl.) ¶ 27 (addressing the review referenced in this paragraph and explaining why the administrative record memorandum's reliance on it "is misplaced" because it concluded that "gender-affirming hormone therapy is likely associated with improvements in [quality of life], depression and anxiety.").

56.    Not only is the efficacy of cross-sex hormones to treat gender dysphoria disputed, but there are also indications that hormonal interventions can prolong and worsen symptoms of gender dysphoria, undermine other gender dysphoria treatments, and cause substantial health risks and medical harms. *See* AR26; AR2631–36, ¶¶ 96–111.

**Response:** Disputed for the reasons stated in the responses to paragraphs 22 and 42, which are incorporated in full and by reference. *See also, e.g.*, ECF 179-2 (Third Karasic Decl.) ¶¶ 51-53; ECF 179-3 (Hamnvik Decl.) ¶¶ 29-66. And Dr. Kaliebe himself admits there is no evidence supporting this speculation that gender-affirming treatment can prolong gender dysphoria or undermine other treatments. *See* ECF 179-5, Ex. A (Kaliebe Dep. Tr.) at 133:4-11, 136:20-137:4.

57.    For example, evidence shows that males who are treated with estrogen have twenty-two times the likelihood to develop breast cancer than other males. AR4 (citing Rakesh R. Gurrala et al., *The Impact of Exogenous Testosterone on Breast Cancer Risk in Transmasculine Individuals*, 90(1) Annals of Plastic Surgery 96 (2023)); AR26.

**Response:** Disputed to the extent this implies that hormone therapy creates risk of breast cancer for transgender women above the risk facing cisgender women.. The evidence shows that hormone therapy aligns transgender women's risk profile more closely with that of cisgender women, and transgender men's risk profile more closely with that of cisgender men, ECF 179-3 (Hamnvik Decl.) ¶¶ 56, 65 and that the risk of breast cancer for transgender women and transgender men is lower than the risk for cisgender women. *Id.*

58.    Cross-sex hormones have also been associated with "a range of cardiovascular complications," including a 1.5 to 2-fold increase in strokes and a 2- to 5-fold increased risk of pulmonary embolisms and deep vein thrombosis. AR2632, ¶ 98; AR2633, ¶¶ 101, 102.

**Response:** Disputed to the extent this implies that these risks of hormone therapy are high

27

or that they are higher when these medications are used to treat gender dysphoria than for other purposes. ECF 179-3 (Hamnvik Decl.) ¶¶ 34-37, 51-54, 64.

59.    Additionally, cross-sex hormones affect cholesterol, which can lead to coronary artery disease and atherosclerosis (plaque buildup on artery walls). AR2633, ¶ 101; AR2634, ¶ 104.

**Response:** Disputed to the extent this implies that these risks of hormone therapy are high or that they are higher when these medications are used to treat gender dysphoria than for other purposes. ECF 179-3 (Hamnvik Decl.) ¶¶ 34-37, 51-54, 64.

60.    Other substantial risks include Pelvic Floor Dysfunction (94.1% in a cross-section study showed at least one symptom); urinary issues, including urinary incontinence, frequent urination, and bed-wetting (86.7% of participants had an issue); bowel-related issues, including constipation anorectal symptoms, and flatal incontinence (74%); and sexual dysfunction (52.9%). AR2634–35, ¶¶ 105, 106.

**Response:** Disputed. The evidence Plaintiffs submitted in support of their motion for an updated preliminary injunction rebuts these assertions. ECF 179-3 (Hamnvik Decl.) ¶ 40.

61.    Cross-sex hormones are also linked to cognitive issues, including memory loss, early-onset cognitive impairment, and loss of processing speed. AR2636, ¶ 110.

**Response:** Disputed. The evidence Plaintiffs submitted in support of their motion for an updated preliminary injunction rebuts these assertions. ECF 179-3 (Hamnvik Decl.) ¶ 57.

62.    Some of the effects of hormonal interventions, such as infertility and low sperm production, might be irreversible. AR26; AR2635–36, ¶ 109.

**Response:** Disputed to the extent this implies that hormone therapy necessarily impairs fertility. The evidence Plaintiffs submitted in support of their motion for an updated preliminary injunction shows that hormone therapy can potentially but not necessarily impair fertility, and as with other medications that can impair fertility, this is discussed with patients and they and their doctor weigh this risk against the benefits of treatment. ECF 179-3 (Hamnvik Decl.) ¶¶ 41, 58.

63.    BOP determined that a more nuanced approach is warranted for inmates who are already receiving hormones to address gender dysphoria because removing the hormones can cause stress or other side effects. AR26–27; AR2636–37, ¶ 114.

28

**Response:** Disputed. For the reasons discussed in response to paragraph 15, Plaintiffs dispute that BOP genuinely considered evidence to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO. ECF 179-1 at 34-36; ECF 194 at 20-21 (and evidence cited therein). Plaintiffs also dispute the characterization of the Program Statement as offering a "more nuanced approach" to imply that the Program Statement is anything short of a categorical ban on hormone therapy to treat gender dysphoria for the reasons stated in response to paragraph 51, which are incorporated in full and by reference. *See also* ECF 179-2 (Third Karasic Decl.) ¶¶ 18-23.

64.     Many of these concerns are echoed by BOP Medical Director Elizabete Stahl's declaration. Ex. 1 (Stahl Decl).

**Response:** Undisputed that Dr. Stahl's declaration includes the referenced material, but disputed to the extent that this paragraph implies that BOP genuinely considered evidence to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO, as discussed in the response to paragraph 15. ECF 179-1 at 34-36; ECF 194 at 20-21 (and evidence cited therein). Plaintiffs also require discovery, including to depose Dr. Stahl, to test her declaration, which is *post hoc* evidence Defendants introduced and rely on in support of their motion for summary judgment that was not included in the administrative record.

65.     According to Dr. Stahl, the new policy intensifies psychotherapy, and the utilization of psychotropic medications, which have been validated as appropriate treatment modalities for all the co-existing mental health problems accompanying gender dysphoria, e.g., anxiety, depression, bipolar, personality and posttraumatic stress disorders, etc. *Id.* ¶ 6.

**Response:** Undisputed that Dr. Stahl's declaration includes the referenced material or that psychotherapy and psychotropic medications are appropriate treatment modalities for co-existing mental health problems, but disputed to the extent that this paragraph implies that psychotherapy and psychotropic medications are appropriate to treat *gender dysphoria*, which is distinct from the

other mental health conditions listed in the paragraph. ECF 179-2 (Third Karasic Decl.) ¶¶ 41-48

(explaining that there is no evidence that psychotherapy or psychotropic medications are effective

to treat gender dysphoria). Plaintiffs also dispute this paragraph to the extent it implies that BOP

genuinely considered evidence to determine an appropriate policy for treatment of gender

dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome

mandated by the EO, as discussed in the response to paragraph 15. ECF 179-1 at 34-36; ECF 194

at 20-21 (and evidence cited therein). Plaintiffs also require discovery, including to depose Dr.

Stahl, to test her declaration, which is *post hoc* evidence Defendants introduced and rely on in

support of their motion for summary judgment that was not included in the administrative record.

66.     The "standard of care" for treating individuals with gender dysphoria and related disorders with cross-sex hormones and surgery is under a cloud of doubt and uncertainty, especially in carceral environments. *Id.*

**Response:** Disputed. There is no such "cloud of doubt and uncertainty' as to the efficacy

of social transition and hormone therapy to treat gender dysphoria in adults, including adults who

are incarcerated. ECF 179-2 (Third Karasic Decl.) ¶¶ 32-35. Plaintiffs also dispute this paragraph

to the extent it implies that BOP genuinely considered evidence to determine an appropriate policy

for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a

predetermined outcome mandated by the EO, as discussed in the response to paragraph 15. ECF

179-1 at 34-36; ECF 194 at 20-21 (and evidence cited therein). Plaintiffs also require discovery,

including to depose Dr. Stahl, to test her declaration, which is *post hoc* evidence Defendants

introduced and rely on in support of their motion for summary judgment that was not included in

the administrative record.

67.     After examining the issue, it is Dr. Stahl's opinion that the medical necessity and long-term benefit of cross-sex surgeries are currently in question and cross-sex hormones only appropriate in a very small subset number of incarcerated individuals with gender dysphoria until tapering can appropriately be considered. *Id.*

**Response:** Undisputed that Dr. Stahl's declaration includes the referenced opinion, but disputed to the extent that this paragraph implies that the opinion is true. ECF 179-2 (Third Karasic Decl.) ¶¶ 32-34; ECF 179-4 (Second Thompson Decl.) ¶ 11. Plaintiffs also dispute this paragraph to the extent it implies that BOP genuinely considered evidence to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO, as discussed in the response to paragraph 15. ECF 179-1 at 34-36; ECF 194 at 20-21 (and evidence cited therein). Plaintiffs also require discovery, including to depose Dr. Stahl, to test her declaration, which is *post hoc* evidence Defendants introduced and rely on in support of their motion for summary judgment that was not included in the administrative record.

68.    All of BOP's clinical guidance, including guidance on treatment for gender dysphoria, has aimed to reflect the evolving nature of treatment, based on what is considered the "community standard," while translating it to a carceral environment. Such translation is necessary because inmates have higher rates of certain chronic conditions and infectious diseases compared to people living in the community. They have higher rates of hypertension, asthma, arthritis, tuberculosis and others. They also suffer from higher rates of mental illness. *Id.* ¶ 7.

**Response:** Disputed to the extent that this paragraph implies that purported "higher rates of certain chronic conditions and infectious diseases" make gender-affirming care any less necessary or appropriate to treat gender dysphoria, including in the carceral setting. ECF 179-2 (Third Karasic Decl.) ¶¶ 37-40; ECF 179-4 (Second Thompson Decl.) ¶¶ 11-12. Plaintiffs also dispute this paragraph to the extent it implies that BOP genuinely considered evidence to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO, as discussed in the response to paragraph 15. ECF 179-1 at 34-36; ECF 194 at 20-23 (and evidence cited therein). Plaintiffs also require discovery, including to depose Dr. Stahl, to test her declaration, which is *post hoc* evidence Defendants introduced and rely on in support of their motion for summary judgment that was not

included in the administrative record.

69.    These factors, coupled with the safety and security concerns found in a carceral setting, provide challenges to BOP medical providers that are not present to medical providers who provide treatment outside of a prison setting. *Id.*

**Response:** Disputed. There is no evidence showing there are any relevant "safety and security concerns" with providing gender-affirming care to treat gender dysphoria. Indeed, the evidence shows that gender-affirming care such as hormone therapy and social accommodations can be effectively and safely provided in carceral settings, just as BOP provided for years per its pre-EO policy. ECF 179-4 (Second Thompson Decl.) ¶¶ 11-12. The evidence also shows that BOP does not deny medically necessary care that it knows does pose security concerns. *Id.* ¶¶ 14-15. Plaintiffs also dispute this paragraph to the extent it implies that BOP genuinely considered evidence to determine an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated rationale to reach a predetermined outcome mandated by the EO, as discussed in the response to paragraph 15. ECF 179-1 at 34-36; ECF 194 at 20-23 (and evidence cited therein). Plaintiffs also require discovery, including to depose Dr. Stahl, to test her declaration, which is *post hoc* evidence Defendants introduced and rely on in support of their motion for summary judgment that was not included in the administrative record.

70.    The last Transgender Care Clinical Guidance adopted by BOP was in June 2023. Several sources were utilized by BOP in writing the Transgender Care Clinical Guidance, including WPATH. The 2023 guidance noted that significant changes were made "to more closely align with community standards and the [WPATH] Standards of Care for the Health of Transgender and Gender Diverse People, Version 8 published in 2022," referred to as WPATH SOC 8. *Id.* ¶ 8.

**Response:** Undisputed that the last Transgender Care Clinical Guidance ("TCCG") adopted by BOP was in June 2023, that the BOP used WPATH among other sources in writing the TCCG, and that the 2023 guidance noted what is referenced in the paragraph, but disputed to the extent this paragraph implies that the TCGG referencing the WPATH standards implies that they were deficient or inadequate in any way. ECF 179-2 (Third Karasic Decl.) ¶¶ 60-66. Plaintiffs also

32

dispute this paragraph to the extent it implies that BOP genuinely considered evidence to determine

an appropriate policy for treatment of gender dysphoria as opposed to reverse engineering its stated

rationale to reach a predetermined outcome mandated by the EO, as discussed in the response to

paragraph 15. ECF 179-1 at 34-36; ECF 194 at 20-23. Plaintiffs also require discovery, including

to depose Dr. Stahl, to test her declaration, which is *post hoc* evidence Defendants introduced and

rely on in support of their motion for summary judgment that was not included in the administrative

record.

71.     WPATH's leaders have admitted to "gaps" in evidence, and WPATH has not been careful, conscientious, or rigorous in reporting systematic reviews of all available evidence when it comes to cross-sex surgeries. *Id.* ¶ 10.

**Response:** Disputed. The evidence shows that these assertions about WPATH are baseless.

*E.g.*, ECF 179-2 (Third Karasic Decl.) ¶¶ 60-66.

72.     Also concerning is that WPATH has not been transparent; it failed to publish all relevant evidence or at the very least "caution" the target audience and well-intended providers about the gaps in knowledge on potential long-term harms of "gender-affirming" care. *Id.*

**Response:** Disputed. The evidence shows that these assertions about WPATH are baseless.

*See* ECF 179-2 (Third Karasic Decl.) ¶¶ 60-66.

73.     The medical associations that have published medical guidelines for purposes of guiding providers, clinicians and patients, followed WPATH's written ideological guidance and effectively abandoned the rigorous scientific review steps required in all other areas of medicine. *Id.* ¶ 11.

**Response:** Disputed. "The provision of gender-affirming care for adults around the world

is not based solely on WPATH's guidelines; it has been practiced globally for decades, even

preceding the first WPATH Standards of Care in 1979. This care has been provided and considered

beneficial for over 70 years, and fabricated controversies about WPATH does not change this

fact." ECF 179-2 (Third Karasic Decl.) ¶ 65. *See also id.* ¶ 61, ¶ 64 (refuting that WPATH dictates

guidelines for other groups to follow, rather, WPATH's guidelines are developed based on the

expertise of members of the relevant fields, including endocrinology and psychology.).

74.     Medical evidence demonstrating the long-term benefits of cross-sex surgeries and hormones is scant and even more so if the individual is in a prison setting and has a greater number of co-morbidities. *Id.* ¶ 12.

**Response:** Disputed. The evidence shows that gender-affirming treatments are supported by decades of research and clinical experience, and that it is no less needed or effective for individuals who are incarcerated, ECF 179-2 (Third Karasic Decl.) ¶¶ 24-35, 37-40. Plaintiffs expect that discovery will generate further evidence to demonstrate that this paragraph is incorrect.

75.     Published evidence surrounding the long-term effects of cross-sex surgeries is very limited, typically from observational studies with short-term follow-up and highly variable outcomes. *Id.*

**Response:** Plaintiffs expect that discovery will generate further evidence to demonstrate that this paragraph is incorrect.

76.     For gender dysphoria, one of the many obstacles for medical providers is that there is no universally accepted, fully validated clinical instrument that can isolate and quantify the causal relationship between cross-sex hormone treatment and outcomes in people diagnosed with gender dysphoria receiving such treatment. *Id.* ¶ 13.

**Response:** Disputed. The evidence rebuts the assertions in this paragraph regarding the purported need for a validated instrument to assess whether treatment is effective for patients, and also rebuts the lack of a validated clinical instrument to measure outcomes for gender dysphoria treatments. ECF 193-1 (Fourth Karasic Decl.) ¶¶ 5-7.

77.     Cross-sex hormone doses are adjusted based on patient preference and to avoid unsafe physiological hormone ranges, but historically speaking, providers do not have objective or standardized means to determine what is successful treatment for gender dysphoria. *Id.*

**Response:** Disputed for the reasons stated in response to paragraph 76. In addition, the evidence shows that hormone dosing is based on bringing the hormone level into the range of individuals with their gender and to induced physical changes to better align the body with the patient's gender identity. ECF 179-3 (Hamnvik Decl.) ¶¶ 32, 33, 50.

78.     Many of the BOP senior officials who wrote, consulted and applied the previous BOP policy were also responsible for evaluating, implementing, and ultimately formulating the 2026 policy. *Id.* ¶ 17.

**Response:** Disputed. Plaintiffs have not yet had the opportunity to depose Dr. Stahl or the other individuals she references in her declaration, or to obtain relevant documents to test this assertion in her declaration.

## II.     Plaintiffs' Statement of Disputed Material Facts

In addition to the disputed material facts Plaintiffs identified above in their responses to Defendants' Statement of Facts, which Plaintiffs incorporate in full and by reference here, Plaintiffs state the following material facts as to which there are genuine issues.

1.     Gender-affirming care, including hormone therapy and social accommodations, is medically necessary to treat gender dysphoria for some individuals diagnosed with gender dysphoria. *E.g.*, ECF 7-2 (First Karasic Decl. ¶¶ 27-29, 63, 64, 66, 68, 72, 73, 80-86; ECF 179-2 (Third Karasic Decl.) ¶¶ 19, 22, 24-33; ECF 179-4 (Second Thompson Decl.) ¶11.

2.     Hormone therapy and social accommodations are medically necessary to treat Plaintiffs' gender dysphoria. ECF 7-4 (First Kingdom Decl.) ¶ 8; ECF 7-5 (First Nichols Decl.) ¶ 7; ECF 7-6 (First Kapule Decl.) ¶ 5.

3.     Depriving Plaintiffs of hormone therapy and social accommodations to treat their gender dysphoria has caused and would cause them to experience significant distress, including depression, anxiety, and/or thoughts of self-harm, and other symptoms. *E.g.*, ECF 7-4 (First Kingdom Decl.) ¶¶ 21–22; ECF 179-6 (Third Kingdom Decl.) ¶¶ 6-8; ECF 179-7 (Third Nichols Decl.) ¶¶ 3-6; ECF 179-8 (Third Kapule Decl.) ¶¶ 6-10.

4.     There is no evidence that psychotherapy and psychotropic medications are effective treatments for gender dysphoria. ECF 179-2 (Third Karasic Decl.) ¶¶ 41-45; ECF 179-5, Ex. A (Kaliebe Dep. Tr.) at 144:9-145:4.

5.      The Program Statement, by prohibiting and withdrawing hormone therapy and social accommodations from individuals diagnosed with gender dysphoria, puts Plaintiffs and class members at risk of significant harm to their health and well-being. *E.g.*, ECF 179-2 (Third Karasic Decl.) ¶¶ 18-23; ECF 179-3 (Hamnvik Decl.) ¶ 28; ECF 179-6 (Third Kingdom Decl.) ¶¶ 7-8; ECF 179-7 (Third Nichols Decl.) ¶¶ 5-6; ECF 179-8 (Third Kapule Decl.) ¶¶ 9-10.

6.      Substantial evidence of the type routinely relied on in the medical field shows the efficacy of hormone therapy and social transition to treat gender dysphoria. ECF 7-2 (First Karasic Decl.) ¶¶ 72-76; ECF 179-2 (Third Karasic Decl.) ¶¶ 24-35.

7.      Hormone therapy is safe and the risks are comparable to other well accepted medical treatments. ECF 179-3 (Hamnvik Decl.) ¶¶ 29-66.

8.      Hormone therapy aligns transgender women's risk profile more closely with that of cisgender women, and transgender men's risk profile more closely with that of cisgender men. ECF 179-3 (Hamnvik Decl.) ¶ 65.

9.      Gender affirming care, including hormone therapy and social transition, is widely accepted in the medical community as effective treatment for gender dysphoria and supported by every major medical and mental health professional organization in the United States, including the American Medical Association, the American Psychiatric Association, the American Psychological Association, and the Endocrine Society. ECF 179-2 (Third Karasic Decl.) ¶ 33.

10.     Gender affirming care, including social transition and hormone therapy, to treat gender dysphoria in adults is not the subject of controversy or debate in the medical and mental health fields. ECF 179-2 (Third Karasic Decl.) ¶¶ 11, 24-31.

11.     The critiques of WPATH and its Standards of Care in the Kaliebe Declaration are incorrect and unsupported. *E.g.*, ECF 179-2 (Third Karasic Decl.) ¶¶ 55-57, 60-66.

36

12.     Regardless of the WPATH Standards of Care, the provision of gender-affirming care for adults is widely accepted in the medical community and has been practiced globally for decades, even before the WPATH Standards of Care. ECF 179-2 (Third Karasic Decl.) ¶¶ 33, 65.

13.     The fact that social accommodations do not require a prescription in the community does not mean they are not medically necessary. ECF 179-2 (Third Karasic Decl.) ¶¶ 12, 36.

14.     The fact that an individual diagnosed with gender dysphoria is incarcerated does not remove their medical need to socially transition or be treated with hormone therapy and does not make such care ineffective. ECF 179-2 (Third Karasic Decl.) ¶¶ 37-40; ECF 179-4 (Second Thompson Decl.) ¶¶ 14-15.

15.     Providing hormone therapy and social accommodations to treat gender dysphoria promotes institutional safety rather than creating security or administration challenges. ECF 179-4 (Second Thompson Decl.) ¶ 13; ECF 7-3 (First Thompson Decl.) ¶¶ 38, 45.

16.     Providing hormone therapy and social accommodations to treat gender dysphoria for people in BOP custody has not created the security problems speculated by BOP in the Program Statement Memorandum. ECF 179-4 (Second Thompson Decl.) ¶¶ 12, 16-30.

17.     Providing hormone therapy and social accommodations to treat gender dysphoria for people in BOP custody cannot be supported by purported fairness concerns as BOP regularly provides accommodations for medical or religious reasons such as a low bunk pass or alternative work assignment. ECF 179-4 (Second Thompson Decl.) ¶ 23.

18.     Defendants' asserted concern regarding the risk of people in BOP custody concealing contraband if social accommodations are provided is unsupported because it "has no conceivable connection to many of the social transition accommodations that are available, e.g. hygiene items and makeup." ECF 179-4 (Second Thompson Decl.) ¶ 26.

19.    Defendants' assertion that access to social accommodations would increase the risk of people in BOP custody escaping or hindering investigations "is based on extreme speculation rather than any documented instance of this happening in federal custody," and does not explain why all accommodations, including undergarments and hygiene products, are prohibited. ECF 179-4 (Second Thompson Decl.) ¶ 27.

20.    There is no basis for the assertion in the Kaliebe Declaration that making gender-affirming care available to those who need it would reward threats of self-harm and that prohibiting such care may reduce self-harm. ECF 179-2 (Third Karasic Decl.) ¶ 49; ECF 179-4 (Second Thompson Decl.) ¶¶ 28-30.

Dated: June 17, 2026

Respectfully submitted,

David C. Fathi† (*pro hac vice*)
Maria V. Morris, D.C. Bar No. 1697904
Elisa C. Epstein† (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, N.W.
Washington, D.C. 20005
Tel: 202-393-4930
dfathi@aclu.org
mmorris@aclu.org
eepstein@aclu.org

_____ /s/ Aditi Shah _____
Aditi Shah, D.C. Bar No. 90033136
Michael Perloff, D.C. Bar No. 1601047
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
Tel: 202-457-0800
ashah@acludc.org
mperloff@acludc.org

Corene T. Kendrick (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California St., Ste. 700
San Francisco, CA 94104
Tel: 202-393-4930
ckendrick@aclu.org

Shawn Thomas Meerkamper (*pro hac vice*)
Megan Z. F. Noor (*pro hac vice*)
Dale Melchert (*pro hac vice*)
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Tel: 510-587-9696
shawn@transgenderlawcenter.org
megan@transgenderlawcenter.org
dale@transgenderlawcenter.org

Li Nowlin-Sohl* (*pro hac vice*)
Leslie Cooper (*pro hac vice*)
Shana Knizhnik, DDC Bar ID 120840
James D. Esseks (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

Lynly S. Egyes (*pro hac vice*)
TRANSGENDER LAW CENTER
594 Dean Street, Suite 11

125 Broad Street, 18th Floor
New York, NY 10004
Tel: 212-549-2500
lnowlin-sohl@aclu.org
lcooper@aclu.org
sknizhnik@aclu.org
jesseks@aclu.org

Brooklyn, NY 11238
Tel: 510-587-9696
lynly@transgenderlawcenter.org

*Not admitted in New York
† Not admitted in D.C.; practice limited to federal courts

Counsel for Plaintiff class