**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ALISHEA KINGDOM, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | Civ. A. No. 25-691 (RCL) |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
STATEMENT OF DISPUTED MATERIAL FACTS**

Pursuant to Local Civil 7(h)(1), Defendants hereby submit this opposition to Plaintiffs' Statement of Disputed Material Facts (ECF No. 219-1, at 35–38).

1.      Gender-affirming care, including hormone therapy and social accommodations, is medically necessary to treat gender dysphoria for some individuals diagnosed with gender dysphoria. *E.g.*, ECF 7-2 (First Karasic Decl. ¶¶ 27-29, 63, 64, 66, 68, 72, 73, 80-86; ECF 179-2 (Third Karasic Decl.) ¶¶ 19, 22, 24-33; ECF 179-4 (Second Thompson Decl.) ¶11.

RESPONSE:   Plaintiffs hereby concede that "gender-affirming" care is not medically necessary to treat gender dysphoria for at least some individuals, and indeed, BOP has assessed that it is better to treat gender dysphoria through individualized treatment plans with long-established, well-studied, and effective approaches of psychotherapy, psychoeducational group interventions, trauma treatment, and psychotropic medication. *See, e.g.*, AR1–4; AR5-47; AR2613–18; Stahl Decl., ¶ 6, ECF No. 186-3.  Plaintiffs disregard that BOP has determined the "gender affirming" care advocated by Plaintiffs is fraught with serious risks—including long-term harm—and are uncertain to deliver any benefits, especially in the correctional context.   AR1–4;  AR5-47;  AR2627–36;  AR2642–43.

Additionally, this statement is mismatched with the relief that they seek—to permanently enjoin the 2026 Policy, in what amounts to a facial challenge to the 2026 Policy. *See* Defs. Reply at 7–8.

2.      Hormone therapy and social accommodations are medically necessary to treat Plaintiffs' gender dysphoria. ECF 7-4 (First Kingdom Decl.) ¶ 8; ECF 7-5 (First Nichols Decl.) ¶ 7; ECF 7-6 (First Kapule Decl.) ¶ 5.

RESPONSE:  See response to #1.

3.      Depriving Plaintiffs of hormone therapy and social accommodations to treat their gender dysphoria has caused and would cause them to experience significant distress, including depression, anxiety, and/or thoughts of self-harm, and other symptoms. *E.g.*, ECF 7-4 (First Kingdom Decl.) ¶¶ 21–22; ECF 179-6 (Third Kingdom Decl.) ¶¶ 6-8; ECF 179-7 (Third Nichols Decl.) ¶¶ 3-6; ECF 179-8 (Third Kapule Decl.) ¶¶ 6-10.

RESPONSE:  This assertion is entirely speculative.  Defs. Mem. at 41–43.  BOP determined—with the support of medical expert opinion—that such "gender-affirming" interventions are fraught with serious risks, are uncertain to deliver any benefits, and are inferior to a safer and more measured approach for addressing gender dysphoria.  AR1–4; AR5-47; AR2607–45.

4.      There is no evidence that psychotherapy and psychotropic medications are effective treatments for gender dysphoria. ECF 179-2 (Third Karasic Decl.) ¶¶ 41-45; ECF 179-5, Ex. A (Kaliebe Dep. Tr.) at 144:9-145:4.

RESPONSE:  As the administrative record compiled in this case demonstrates, BOP has assessed that it is better to treat gender dysphoria through individualized treatment plans with long-established, well-studied, and effective approaches of psychotherapy, psychoeducational group interventions, trauma treatment, and psychotropic medication.  *See, e.g.*, AR2613–18 (Dr. Kaliebe explaining that psychotherapy is a better treatment approach for gender dysphoria, particularly within correctional environments and relying on, *inter alia*, Withers et al., *Transgender medicalization and the*

*attempt to evade psychological distress*, 65 J. of Analytical Psychology, 865 (2020)); Stahl Decl., ¶ 6; *see also K.C. v. Individual Members of the Med. Licensing Bd. of Ind.*, 121 F.4th 604, 610–11 (7th Cir. 2024) ("Social support and psychotherapy are widely recognized approaches" for gender dysphoria (citing Anderson et al., *Gender Dysphoria and Its Non-Surgical and Surgical Treatments*, 10 Health Psych. Rsch., at 4 (2022))), *rehearing and rehearing en banc denied by*, No. 23-2366, 2025 WL 848427 (7th Cir. Mar. 18, 2025). In contrast, BOP has determined the "gender affirming" care advocated by Plaintiffs is fraught with serious risks and are uncertain to deliver any benefits, especially in the correctional context. AR1–4; AR5-47; AR2607–45; *see also Marcum v. Crews*, No. 5:25-cv-238-GFVT, 2025 WL 2630922, at \*7 (D. Ky. Sept. 12, 2025) (finding that Kentucky statute that banned public funds from being used to pay for cross-sex hormones for inmates did not constitute deliberate indifference because "there remains significant disagreement about whether the side effects and the negative consequences of [cross-sex hormones] outweigh the positive benefits," particularly when "there are other ways to care for an individual diagnosed with Gender Dysphoria"), *aff'd*, No. 25-5840, Dkt. 26 at 6 (6th Cir. Oct. 23, 2025).

5.      The Program Statement, by prohibiting and withdrawing hormone therapy and social accommodations from individuals diagnosed with gender dysphoria, puts Plaintiffs and class members at risk of significant harm to their health and well-being. *E.g.*, ECF 179-2 (Third Karasic Decl.) ¶¶ 18-23; ECF 179-3 (Hamnvik Decl.) ¶ 28; ECF 179-6 (Third Kingdom Decl.) ¶¶ 7-8; ECF 179-7 (Third Nichols Decl.) ¶¶ 5-6; ECF 179-8 (Third Kapule Decl.) ¶¶ 9-10.

RESPONSE: Defendants dispute Plaintiffs' characterization of the 2026 Policy. Under the Policy, BOP will not provide cross-sex hormones to inmates not currently receiving them, and inmates who are currently receiving them generally will be tapered off based on individual factors such as the duration the inmate has been receiving hormones. 2026 Policy, at 7–8. "For inmates who (1) are post sex trait modification surgery[,] or (2) have been receiving hormones to address [gender dysphoria]

3

for an extended period of time and develop severe physiological and psychological withdrawal effects from tapering, it may not be appropriate in all cases for the initial tapering plan to include cessation of hormones[,]" but such tapering plans "should be reevaluated regularly[.]"  *Id.* at 8.  Moreover, inmates may "submit a request for additional medical or mental health care or evaluation if they have acute concerns during the tapering process," and their requests will be evaluated "based on all relevant factors, including security and prison-administration concerns."  *Id.*  In contrast, Plaintiffs' preferred "gender-affirming" approach "puts Plaintiffs and class members at risk of significant harm to their health and well-being," Pls.' Statement ¶ 5, which the 2026 Policy seeks to remedy.

6.      Substantial evidence of the type routinely relied on in the medical field shows the efficacy of hormone therapy and social transition to treat gender dysphoria. ECF 7-2 (First Karasic Decl.) ¶¶ 72-76; ECF 179-2 (Third Karasic Decl.) ¶¶ 24-35.

RESPONSE:  Incorrect.  *See* AR1–4; AR5-47; AR2618–27; AR2643–46; Stahl Decl. ¶¶ 6–14. "There is limited evidence suggesting that allowing cosmetic and clothing items, such [as] binders, undergarments, makeup, wigs, and other accessories and items stereotypically associated with the opposite sex, would improve or resolve symptoms associated with Gender Dysphoria."  AR2643, ¶ 136.  And there is no reliable evidence showing social accommodations address gender dysphoria in prison, given that social transition in the correctional environment is fundamentally different from such concepts outside the environment.  AR2644, ¶ 139; AR2646, ¶¶ 141–43.

Additionally, hormonal interventions to address gender dysphoria are highly controversial, medically disputed, and unproven by appropriate evidence. AR1–4; AR24–27; AR2605, ¶ 20; AR2650, ¶ 154; *see also* Stahl Decl., ¶¶ 6, 12–14, 16; *Marcum*, 2025 WL 2630922, at *7 ("[T]here remains significant disagreement about whether the side effects and the negative consequences of [cross-sex hormones] outweigh the positive benefits.").  As Dr. Kaliebe opined based on his review of relevant literature, providing hormonal interventions to address gender dysphoria "is not based on guidelines

using best practice or systematic reviews of evidence[,]" and there is little (if any) reliable evidence showing that hormones address gender dysphoria. AR2627, ¶ 83. For example, "[a] 2020 systematic review of available studies 'found insufficient evidence to determine the efficacy or safety of hormonal treatment approaches for transgender women in transition'—it concluded that '[t]he evidence is very incomplete, demonstrating a gap between current clinical practice and clinical research.'" AR4 (quoting Haupt et al., *Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women*, 11 Cochrane Database of Systematic Reviews, Art. No. CD013138, at 2, 11 (2020)); AR25. "Another systematic review of studies concluded that it was 'impossible to draw conclusions about the effects of hormone therapy on death by suicide' because of the 'low' 'strength of evidence.'" AR4 (quoting Kellan E. Baker, et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, 5 J. Endocrine Soc. 1, 12-13 (2021)); AR25.

Moreover, many medical professionals, including Dr. Kaliebe, have recognized the shortcomings of the WPATH guidelines, rendering them an unreliable basis for guidance on treatment of gender dysphoria. *See, e.g.*, Stahl Decl., ¶ 11; AR1178 (Dep't of Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, at 157 (Nov. 19, 2025) (peer reviewed article discussing that WPATH guidelines are "rated among the lowest in quality and have not been recommended implementation by systematic reviews (SRs) of guidelines[,]" but "[d]espite their lack for trustworthiness, for more than a decade WPATH guidelines have served as the foundation of the healthcare infrastructure for gender dysphoric (GD) youth in the United States.")); *Skrmetti*, 605 U.S. at 543 (Thomas, J., concurring) ("Recent revelations suggest that WPATH . . . bases its guidance on insufficient evidence and allows politics to influence its medical conclusions." (citation omitted)); *K.C.*, 121 F.4th at 611 ("Some have expressed doubt about whether WPATH's guidelines actually reflect medical consensus as to treatments for gender dysphoria.").

7.      Hormone therapy is safe and the risks are comparable to other well accepted medical treatments. ECF 179-3 (Hamnvik Decl.) ¶¶ 29-66.

RESPONSE:  Incorrect.  Not only is the efficacy of cross-sex hormones to treat gender dysphoria disputed, but there are also indications that hormonal interventions can prolong and worsen symptoms of gender dysphoria, undermine other gender dysphoria treatments, and cause substantial health risks and medical harms. *See* AR26; AR2631–36.  For example, evidence shows that males who are treated with estrogen have twenty-two times the likelihood to develop breast cancer than other males.  AR4 (citing Rakesh R. Gurrala et al., *The Impact of Exogenous Testosterone on Breast Cancer Risk in Transmasculine Individuals*, 90(1) Annals of Plastic Surgery 96 (2023)); AR26.  Cross-sex hormones have also been associated with "a range of cardiovascular complications," including a 1.5 to 2-fold increase in strokes and a 2- to 5-fold increased risk of pulmonary embolisms and deep vein thrombosis. AR2632, ¶ 98; AR2633, ¶¶ 101, 102.  Additionally, cross-sex hormones affect cholesterol, which can lead to coronary artery disease and atherosclerosis (plaque buildup on artery walls).  AR2633, ¶ 101; AR2634, ¶ 104.  Other substantial risks include Pelvic Floor Dysfunction (94.1% in a cross-section study showed at least one symptom); urinary issues, including urinary incontinence, frequent urination, and bed-wetting (86.7% of participants had an issue); bowel-related issues, including constipation anorectal symptoms, and flatal incontinence (74%); and sexual dysfunction (52.9%).  AR2634–35, ¶¶ 105, 106.  Cross-sex hormones are also linked to cognitive issues, including memory loss, early-onset cognitive impairment, and loss of processing speed.  AR2636, ¶ 110.  Some of the effects of hormonal interventions, such as infertility and low sperm production, might be irreversible.  AR26; AR2635–36, ¶ 109.

8.      Hormone therapy aligns transgender women's risk profile more closely with that of cisgender women, and transgender men's risk profile more closely with that of cisgender men. ECF 179-3 (Hamnvik Decl.) ¶ 65.

RESPONSE:  See response to #7.

9.      Gender affirming care, including hormone therapy and social transition, is widely accepted in the medical community as effective treatment for gender dysphoria and supported by every major medical and mental health professional organization in the United States, including the American Medical Association, the American Psychiatric Association, the America Psychological Association, and the Endocrine Society. ECF 179-2 (Third Karasic Decl.) ¶ 33.

RESPONSE:  In revising its policy for gender dysphoria treatment for inmates in the correctional environment, BOP conducted extensive reviews of, among other things, relevant medical studies, state correctional policies, pertinent case law, prison administration and security concerns, and expert medical opinions, AR1–4; AR5–47, including the expert report of Dr. Kaliebe, a psychiatrist with over 25 years of experience who has extensively studied the relevant gender dysphoria literature and presented and published articles about gender dysphoria, AR2599–2673.  Based on this review, BOP determined that the "newer, more rapidly evolving clinical landscape" hampered the identification of a universal standard of care.  AR3; *see also* AR5–8.  BOP also thoroughly examined the "gender affirming care model" advocated by WPATH, which had been the standard of care BOP previously followed.  AR3–4; AR5–8.  BOP determined that there are grave "concerns about the body of research and potential research bias" underlying the WPATH model.  AR4; *see also* AR5–8.  BOP further found that many European countries "have distanced themselves from the stance" of WPATH, and that leading organizations in the United States are reevaluating their clinical guidance. AR4; *see also* AR5–8.  BOP considered systematic reviews of available studies that found insufficient and low strength of evidence as to the safety and efficacy of sex trait modification interventions, including cross-sex hormones.  AR4; AR24–27.  BOP considered the many significant risks of cross-sex hormones, from breast cancer to cardiovascular complications.  AR4; AR24–27; AR2631–36.

Many of these concerns are echoed in BOP Medical Director Elizabete Stahl's declaration. Stahl Decl ¶¶ 5–14.

10.     Gender affirming care, including social transition and hormone therapy, to treat gender dysphoria in adults is not the subject of controversy or debate in the medical and mental health fields. ECF 179-2 (Third Karasic Decl.) ¶¶ 11, 24-31.

RESPONSE:  Just as the WPATH guidelines have been contested in the context of juvenile treatment, their validity has likewise been questioned in the context of treatment for adults, especially in the correctional environment.  *See* AR2618–27 (Dr. Kaliebe's discussion of WPATH); *see also Skrmetti*, 605 U.S. at 543 (Thomas, J., concurring) ("Recent revelations suggest that WPATH . . . bases its guidance on insufficient evidence and allows politics to influence its medical conclusions.") (citation omitted); *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1249 (11th Cir. 2024) (Lagoa, J., concurring in the denial of en banc) (noting that internal WPATH documents revealed that "WPATH officials are aware of the risks of cross-sex hormones and other procedures yet are mischaracterizing and ignoring information about those risks"); *id.* at 1261 ("[R]ecent revelations indicate that WPATH's lodestar is ideology, not science."); *Edmo*, 949 F.3d at 497 (O'Scannlain, J., dissenting) (describing the WPATH standards as "merely criteria promulgated by a controversial private organization with a declared point of view"); *Gibson v. Collier*, 920 F.3d 212, 222–23 (5th Cir. 2019) (WPATH standards are not "politically neutral" (quoting *Kosilek*, 774 F.3d at 78)).  Moreover, Plaintiffs fail to acknowledge the unique considerations presented by treatment in a carceral setting, where prison administrators and prison medical providers are best positioned to weigh the safety and efficacy of different approaches.

11.     The critiques of WPATH and its Standards of Care in the Kaliebe Declaration are incorrect and unsupported. *E.g.*, ECF 179-2 (Third Karasic Decl.) ¶¶ 55-57, 60-66.

8

RESPONSE:  WPATH guidelines, upon which BOP previously heavily relied in formulating its policy on "gender affirming" care, are flawed in numerous respects.  *See* AR2618–27 (Dr. Kaliebe's discussion of WPATH); *see also Skrmetti*, 605 U.S. at 543 (Thomas, J., concurring) ("Recent revelations suggest that WPATH . . . bases its guidance on insufficient evidence and allows politics to influence its medical conclusions.") (citation omitted); *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1249 (11th Cir. 2024) (Lagoa, J., concurring in the denial of en banc) (noting that internal WPATH documents revealed that "WPATH officials are aware of the risks of cross-sex hormones and other procedures yet are mischaracterizing and ignoring information about those risks"); *id.* at 1261 ("[R]ecent revelations indicate that WPATH's lodestar is ideology, not science."); *Edmo*, 949 F.3d at 497 (O'Scannlain, J., dissenting) (describing the WPATH standards as "merely criteria promulgated by a controversial private organization with a declared point of view"); *Gibson v. Collier*, 920 F.3d 212, 222–23 (5th Cir. 2019) (WPATH standards are not "politically neutral" (quoting *Kosilek*, 774 F.3d at 78)).  Significantly, BOP's Medical Director Dr. Stahl explained that she had "relied heavily" on WPATH's guidelines and "trusted that the guidance was based on the best evidence to date," Stahl Decl., ¶ 9, but that changed following the public disclosure of significant deficiencies in WPATH's recommendations, *id.* ¶¶ 9–11.  That led BOP to examine the issue and to conclude that "due to the high variability in study design and outcomes reported, lack of long-term follow-up and small study size, the long-term effects of cross-sex surgery and hormones in incarcerated patients who are diagnosed with gender dysphoria cannot be determined and is insufficient to deem these treatment modalities as 'medically necessary.'"  *Id.* ¶ 14.

12.     Regardless of the WPATH Standards of Care, the provision of gender-affirming care for adults is widely accepted in the medical community and has been practiced globally for decades, even before the WPATH Standards of Care. ECF 179-2 (Third Karasic Decl.) ¶¶ 33, 65.

RESPONSE:  See response to #9.

13.     The fact that social accommodations do not require a prescription in the community does not mean they are not medically necessary. ECF 179-2 (Third Karasic Decl.) ¶¶ 12, 36.

RESPONSE:   BOP concluded that social accommodations are not medically necessary to address gender dysphoria.   AR16–17.   Prescription or not, medical professionals have persuasively explained that social accommodations are not medically necessary.  *See, e.g.*, AR2605, ¶¶ 22, 136; *Bayse v. Ward*, 147 F.4th 1304, 1313 (11th Cir. 2025) (holding that growing long hair and wearing makeup, earrings, and nail polish, while perhaps "psychologically pleasing" to trans-identifying prisoner, are not medically necessary per prisoner's psychological treatment team); *Keohane*, 952 F.3d at 1274–75 (inmate's treatment team, Florida Department of Corrections' chief clinical officer, and retained expert opining that social accommodations of wearing long hair, makeup, and female undergarments are not medically necessary for the inmate plaintiff).   "There is limited evidence suggesting that allowing cosmetic and clothing items, such [as] binders, undergarments, makeup, wigs, and other accessories and items stereotypically associated with the opposite sex, would improve or resolve symptoms associated with Gender Dysphoria."  AR2643, ¶ 136.  And there is no reliable evidence showing social accommodations address gender dysphoria in prison, given that social transition in the correctional environment is fundamentally different from such concepts outside the environment.  AR2644, ¶ 139; AR2646, ¶¶ 141–43.  At the same time, social accommodations "can prolong the symptoms [of gender dysphoria] and undermine psychotherapy."  AR2643, ¶ 136.  Social transition is also "related to future harms and risks due to increased likelihood of later sex-trait modification."  AR2642, ¶ 133; *supra* at 19–20.

14.     The fact that an individual diagnosed with gender dysphoria is incarcerated does not remove their medical need to socially transition or be treated with hormone therapy and does not make such care ineffective. ECF 179-2 (Third Karasic Decl.) ¶¶ 37-40; ECF 179-4 (Second Thompson Decl.) ¶¶ 14-15.

10

RESPONSE:  See response to #9.

15.    Providing hormone therapy and social accommodations to treat gender dysphoria promotes institutional safety rather than creating security or administration challenges. ECF 179-4 (Second Thompson Decl.) ¶ 13; ECF 7-3 (First Thompson Decl.) ¶¶ 38, 45.

RESPONSE:  BOP reasonably considered safety, security, and prison administration concerns in developing the 2026 Policy and balanced those concerns along with medical considerations.  AR2–3; AR10–13, 18–20, 28–30.   For example, BOP considered the fact that providing sex trait modification surgeries jeopardizes the safety, security, and administration of BOP facilities because "inmates receiving these surgeries are at higher risk of harassment due to their appearance."  AR2; *see also* AR11–12; *Keohane*, 952 F.3d at 1263 (holding that sex trait modification interventions endanger "the prison employees who would have to step in to protect" the inmate and will require expending already limited resources to address these risks); *Kosilek*, 774 F.3d at 93 ("Recognizing that reasonable concerns would arise regarding a postoperative, male-to-female transsexual being housed with male prisoners takes no great stretch of the imagination.").  The same is true with hormone interventions and social accommodations.  *See* AR2, 19, 28–29; *Keohane*, 952 F.3d at 1275 (noting the "obvious[]" consequence of permitting a male inmate to dress and be groomed as a female "would inevitably become a target for abuse in an all-male prison").

Special treatments associated with sex trait modification interventions also raise fairness concerns and can breed resentment among other inmates, which in turn "can increase the risk of retaliation against the inmate receiving special treatment and cause ripple effects throughout the correctional institution[,] disrupting the delicate prison environment."  AR12, 20, 29.  Moreover, providing "gender affirming" care conflicts with a reasonable prison safety practice of refusing to reward threats of self-harm and may even increase self-harm.  AR12, 20, 29–30; *see also* AR2648, ¶ 148; AR2649, ¶ 149.

16.    Providing hormone therapy and social accommodations to treat gender dysphoria for people in BOP custody has not created the security problems speculated by BOP in the Program Statement Memorandum. ECF 179-4 (Second Thompson Decl.) ¶¶ 12, 16-30.

RESPONSE:  See response to #15.  BOP's considerations are reasonable and entitled to significant deference.

17.    Providing hormone therapy and social accommodations to treat gender dysphoria for people in BOP custody cannot be supported by purported fairness concerns as BOP regularly provides accommodations for medical or religious reasons such as a low bunk pass or alternative work assignment. ECF 179-4 (Second Thompson Decl.) ¶ 23.

RESPONSE:  See response to #15.  Also, fairness concerns are just one variable considered in assessing requested accommodations.

18.    Defendants' asserted concern regarding the risk of people in BOP custody concealing contraband if social accommodations are provided is unsupported because it "has no conceivable connection to many of the social transition accommodations that are available, e.g. hygiene items and makeup." ECF 179-4 (Second Thompson Decl.) ¶ 26.

RESPONSE:  In BOP's judgment, sex trait modification interventions increase the risk of inmates concealing dangerous contrabands.  As Thompson concedes, this consideration is warranted with respect to at least some social accommodations.

19.    Defendants' assertion that access to social accommodations would increase the risk of people in BOP custody escaping or hindering investigations "is based on extreme speculation rather than any documented instance of this happening in federal custody," and does not explain why all accommodations, including undergarments and hygiene products, are prohibited. ECF 179-4 (Second Thompson Decl.) ¶ 27.

RESPONSE:  In BOP's judgment, sex trait modification interventions endanger the inmate receiving the intervention, imperil the prison officials charged with protecting the inmate, and increase the risk of inmates concealing dangerous contraband, among other security and prison administration concerns.  By limiting access to sex trait modification interventions, the 2026 Policy mitigates these concerns, while still allowing BOP to provide individualized care to address gender dysphoria.  As Thompson concedes, the security considerations of escape and hindering investigations are warranted with respect to at least some social accommodations.

20.      There is no basis for the assertion in the Kaliebe Declaration that making gender-affirming care available to those who need it would reward threats of self-harm and that prohibiting such care may reduce self-harm. ECF 179-2 (Third Karasic Decl.) ¶ 49; ECF 179-4 (Second Thompson Decl.) ¶¶ 28-30.

RESPONSE:  Providing "gender affirming" care conflicts with a reasonable prison safety practice of refusing to reward threats of self-harm and may even increase self-harm.  AR12, 20, 29–30; *see also* AR2648, ¶ 148; AR2649, ¶ 149.


Dated: July 8, 2026                              Respectfully submitted,
                                                 BRETT A. SHUMATE
                                                 Assistant Attorney General

                                                 MARIANNE F. KIES

                                                 Assistant Branch Director

                                                 /s/ *M. Jared Littman*
                                                 M. JARED LITTMAN
                                                 ELIZABETH B. LAYENDECKER
                                                 Trial Attorneys
                                                 U.S. Department of Justice
                                                 Civil Division, Federal Programs Branch
                                                 1100 L Street, NW
                                                 Washington D.C. 20005
                                                 Jared.littman2@usdoj.gov