# ATTACHMENT A

Case 1:25-cv-00691-RCL Document 158 (Court only) Filed 03/23/26 Page 1 of 6

IN THE United States District COURT
For the District of Columbia

ALISHEA KINGDOM, et Al.,
Robert E. SPiKer (Class member)

V. CASE No: 1:25-CV-00691-RCL

DONALD J. TRUMP, et Al.,

RECEIVED
MAILROOM
MAR 23 2026
Angela D. Caesar, Clerk
U.S. District & Bankruptcy Courts
for the District of Columbia

Class members MOTION For Preliminary/Permanent injunction and Protection order

I, Robert E. Spiker (a/k/a: Melissa Anne Spiker) Federal Register No: 57409-018 am identified as a class member in this instant case and move for a Preliminary/Permanent injunction and protective order to be Granted by this court to be directed at the "Federal Bureau of Prisons", and its staff and employee's.

this court issued a Protective order on February 19, 2026 (Document 124) stating "No actions shall be taken that harass, intimidate or otherwise retaliate against any class members or other witnesses who provide counsel for Plaintiffs, or the court,

cont...

with information related to the substance of this litigation".

I, Robert E. Spiker, am being harassed, discriminated and retaliated against by United States Penitentiary-Tucson staff and employee's in the following ways:

1.) Institutional transfer being unreasonably delayed. my paperwork was allegedly started routing for transfer @ January 13, 2026 this was told to me by LT. Espinosa, the Head of Special Investigation Services (S.I.S.)

2.) my unit team: counselor Maerk; Case manager Vega; unit manager Diaz, Have been denying me access to administrative Remedy forms and indigent postage to write Shawn T. Meerkamper of the Transgender Law Center, one of the Plantiffs counsels, And to this court, forcing me to sell artwork, food and sexual favors to obtain stamps and writing supplies to do so.

3.) I have a Heart Problem, I want to see a specialist at Pima Heart & Vascular in Tucson, Arizona on January 27, 2026,

the Cardiologist ordered me a holter monitor to be worn for @ eight days and an ultrasound on my heart, neither has been done to date, I haven't been seen by my care provider concerning this to date, all requests to medical as well as my sick calls are being ignored; I have been sent to an outside hospital @ 8-9 times for my heart via ambulance, admitted at least 5 time's, my heart condition is severe.

4.) I am housed in the special Housing unit, on December 27, 2025, I was raped by my cell mate and reported it on December 28, 2025. I was sent to tucson medical center - a rape kit was done - findings by Dr. Hennessey determined I had bruises on my left buttock as well as fingernail marks (lacerations) with the aid of blue iodine dye, found microscopic tears in my anus that only come from forceful penetration, yet, S.I.S. deemed the incident unsubstantiated claiming the can't prove I was raped. Dr. Hennessy kept a copy of the report.

~~IN THE UNITED STATES~~

on December 29, 2025, I was placed into Administrative Protective custody, between January 12-16, 2026, S.I.S. recieved proof of a Verified threat to my Physical safety, yet, I am not placed on any "House and Recreate Alone" status or housed with other Protective custody inmates, Rather my life and safety is being placed at risk being housed with inmates in the shu from the General population.

I am requesting for an injunction (Preliminary/Permanent) be Granted, removing me from Federal custody/supervision and be transfered to state custody preferably to:

1.) California Dept. of Corrections.
2.) Iowa Dept. of Corrections.
3.) Massachusetts Dept. of corrections.

As these are the top three transgender friendly places.

I, Robert E. Spiker, #57409-018, do hereby declare the above statement to be true and correct under Penalties of Perjury on this 17th day of February 2026

[signature]

Case 1:25-cv-00691-RCL Document 158 (Court only) Filed 03/23/26 Page 5 of 6

Robert E. Spiker # 57409-018
United States Penitentiary - Tucson
P.O. Box 24550
Tucson, AZ. 85734-4550

Robert E. Spiker #57409-018
United States Penitentiary - Tucson
P.O. Box 24550
Tucson, AZ. 85734-4550

PHOENIX AZ 852
20 MAR 2026 PM 8 L




★ LEGAL-MAIL ★

United States District Court
Clerks Office
333 Constitution Ave., N.W.
Washington, D.C. 20001

20001-283700

# ATTACHMENT B

Case 1:25-cv-00691-RCL Document 165 (Court only) Filed 04/06/26 Page 1 of 2

RECEIVED
MAILROOM
APR - 6 2026
Angela D. Caesar, Clerk
U.S. District & Bankruptcy Courts
for the District of Columbia

MARRISSA HUNT #10092-097

Kingdom v. Trump, No. 25-CV-691-RCL (DDC) 4-1-2026

Requesting An Emergency Legal Call

To The Hon. Judge R.C. Lamberth,

Last night I was taken out of restraints. I was placed in restraints (Belly chain + Handcuffs + Shackles) because I refused to stay in the cell with a Male (inmate Abraham) who had Clearly told Prison Officials he did not want to be in the cell with me and threaten me that if the gaurds left him in the cell with me he would physically and sexually-assault me. So I refused to stay in the cell with him. This inmate was adamant that he didn't want to be in the cell with a Transgender. So I was in fear for my safety. And although CFR 552.20 expressively prohibits the use of restraints as a punishment this is a common practice here at McCreary-USP.

So today, I was taken out of the restraint room and given another cellmate, this cellmate came into the cell and was loudly adamant that he didn't want to be in the cell with no "Tranny" (Transgender). Me and the cellmate was taken out of the cell to Holding Cells where he told Lt. Garland that he did not want to be in the cell with me, and told him that he would fuck me up most likely if forced to stay in the cell with me. Lt. Garland said he didn't care and took us back to the cell. This guy is in here doing drugs and acting erratic. I'm sending this tonight, out through regular mail.

Marrissa Hunt

MAURICE "MARRISSA" Hunt
70092-097
United States Penitentiary
McCreary-USP
P.O. Box 3000
Pine Knot, KY
42635

KNOXVILLE TN 377
3 APR 2026 AM 2 L

Clerk
U.S. Court House Rm 1225
333 Constitution Ave
Washington, DC
20001

001-280299

RECEIVED
MAILROOM
APR - 6 2026
Angela D. Caesar, Clerk
U.S. District & Bankruptcy Courts
for the District of Columbia

Kingdom v. Trump
No. 25-cv-691-RCL
Doe v McHenry
No. 25-cv-286-RCL

3-29-26
Pg #1 of 2
#70092-097

Dear Hon Judge R.C. Lamberth,

I write as a Transgender who suffers from Gender Dysphoria. I have previously sent this Court a Motion for Preliminary Injunction and or TRO requesting among other things a Transfer to a Womens Prison. I laid out details how my transfer to a Womens Prison was imminent until Executive Order 14168 put it to a halt.

I'm requesting to be told of the status of of my filed Preliminary Injunction and/or TRO (It was Handwritten) that was sent to this Court on or about 3-22-26.

I arrived at McCreary-USP on 3-4-26 as to today date I have not received any Social Accomoda-tions despite my constant requests to Staff here. I've requested feminine clothing, and hygien/make up. I've requested to only be celled/housed with Women or other Transgenders. I've requested Hormone The-rapy, Binders, and use of female Pronouns.

MARRISSA HUNT #70012-019

Pg. #2 of 2

None of my Social Accomodations or Hormonal Therapy requests have even been entertain by Medical or Prison Officials here. I'm constantly told by Psychologist Young; that theirs no such thing as Gender Dysphoria and they don't treat it here.

Yesterday (3-23-26) I received a new cellmate after my old cellmate Michael Word #37070-001 went home. This new cellmate is a member of the Bloods Gang. When C/o Ellis put my new cellmate in the cell I immediately told him I was a Transgender (It my experience thats it's best to say it up front) The new cellmate then told C/o Ellis that he didn't want to be in the cell with a "Tranny". C/o Ellis told him that he knew what to do to get out the cell ( he would have to assault me ). About 15 min. later Lt. Garland came to the door to serve him a Incident Rpt. (Cellmate) at this time my Cellmate told Lt. Garland to move him out the cell, I also told Lt. Garland I feared for my safety and wanted out. Lt. Garland then said he didn't care what happen to me and walked away, Later that night my cellmate sexually-assaulted me (made me orally-copulate him) I need immediate Help. Gaurds place me in this situation all the time as retaliation / intimidation

MAURICE HUNT
70092-097
McCreary-USP
P.O BOX 3000
P.K., KY
42635
United States
Penitentiary

KNOXVILLE TN 377
1 APR 2026 AM 4 L



clerk, Rm 1225
U.S. Courthouse
333 Constitution Ave
Washington DC.
20001

Legal Mail

20001-289999

**ATTACHMENT C**

Marrissa Hunt
#70092-097

4-16-26

Kingdom v Trump
25-CV-691-RCL

Dear Clerk,

Here's my change of Address

"Marrissa Hunt #70092-097
Canaan-USP
P.O. Box 300
Waymart, PA.
18472"

RECEIVED
MAILROOM
MAY - 4 2026
Angela D. Caesar, Clerk
U.S. District & Bankruptcy Courts
for the District of Columbia

Marrissa Hunt

RECEIVED
MAILROOM
MAY - 4 2026
Angela D. Caesar, Clerk
U.S. District & Bankruptcy Courts
for the District of Columbia

...ISSA HUNT #70042-047
Kingdom v. Trump 25-cv-691-RCL

4-19-26

Dear Judge Lamberth, Pg #1 of 1

I was transfered on 4-15-26 from McCreary-USP to Canaan-USP. En Route to this Prison I was sexually assaulted by the transport officer. Once I arrived at Canaan-USP, I was told by Lt. Rivera that theirs no Social Accomodations here and my bras and panties would be confiscated. This caused my Gender Dysphoria and I was placed on Suicide Watch. The next morning the Psychologist Norcross told me that my bra and panties should'nt have been taken and she gave the set I was wearing back to me. I was then taken to DR. Keelen office for a PREA Exam where the SIS Lieutenant was present I detailed to them how I was sexually assaulted by the transport officer on the way here. When this was concluded I asked DR. Keelen to start my Hormone meds and he told me while I'm at Canaan-USP I will not receive Gender Affirming Care. I asked why, he said "I have a Religious exemp-

MARRISA HUNT
70092-097

Pg #2 of 2

tion!" I then told him I would file a grievance on the matter and he said they don't do grievances in Canaan and from what he hears they have some special cellmates lined up for me.

I was then taken to R+D for initial in-take processing. Afterwards I was taken to the SHU for Protective Custody

Once in the SHU I talked to SHU Lt. Gallota about feminine clothing. The Lt. told me that he was told to let me keep what I had on but their would be no exchanges or laundry services provided. That I would have to wash by hand but no soap would be provided for that purpose, so I'm allowed to keep my bra and panties but can't wash them.

I was then placed in cell #117 with inmate Stevens. Once inmate Stevens saw I was a Transgender he adamantly told the gaurds (c/o Price) he didn't want to cell with me. That if forced too he would assault me. c/o Price said he didn't care. All weekend he's been physically and sexually assaulting me.

Marrisa Hunt

MARRISSA HUNT #70092-097
Kingdom v. Trump, No. 25-cv-691-RCL (DDC)

I need Help!

RECEIVED
MAILROOM
MAY - 4 2026
Angela D. Caesar, Clerk
U.S. District & Bankruptcy Courts
for the District of Columbia

4-13-2026
Pg. # 1 of 4

To THE HON. Judge R.C. Lamberth,

First, I want to inform you that I received a "Legal Call" from an Attorney identifying herself as "Megan" from the "Transgender Law Center" in Oakland, CA.. This legal call appeared to be prompted by my attempts to file a motion in this Court requesting a Preliminary Injunction and/or TRO (Ordering the BOP to Transfer me to a Women's Prison) I'm assuming that (Ms. Megan/First Name) saw some of my filings in the Kingdom case and this prompted her to contact me. In any event, Ms. Megan appeared to only be interested in-if "Social Accomodations" and "Gender Affirming Care" was being provided to me - starting back when I was at Coleman-USP-2 to present. She, was not interested in my safety as it related to my detailed-account how I felt BOP Correctional Officers were retaliating upon me, by continously placing me in the cell with Sexual Predators or inmates who are Anti-Trans, because of my advocacy for "Social Accomodations" and/or "Gender Affirming Care", with BOP Staff.

Which brings me to a current update. I believe my last letter to you detailed that BOP/Staff placed an inmate in the cell with me who was doing drugs and aggressive towards me and upon entering the cell, told the C/o's that

MARRISSA HUNT #70092-097



he did not want to be in a cell with a Transgender for a cellmate.

The next morning (4-1-2026) cellmate Hildago #397401512 (PAC. No) became disruptive during the breakfast feeding and demanded to be removed from the cell with me and threatened to assault me. Several %'s were present, heard the threats and indicated they did not care what he did to me. However, inmate Hildago held the food-port door and prevented staff from closing it, forcing them to remove us from the cell. We were brought out and put into a shower holding cell together. About 1hr. later the SHU %'s came, placed us back in the same cell #150, and again inmate Hildago threaten to assault me in their presence if left in the cell with me. The %'s then removed his handcuffs thru the food-tray port and ordered me to give up my restraints. I refused and told the %'s I was in fear for my safety and requested a different cellmate. The %'s told me it wasn't going to happen and went to get their Lieutenant (Name intentionally withheld for Safety-Concerns) When the Lt. arrived he demanded I give up the handcuffs, I refused. He then began to yell and accussed me of bringing problems onto myself by being Transgender and making all kinds of faggot requests. I told the Lt. I feared for my safety and needed to be moved for my safety. This fustrated the Lt. and he told his staff to open the cell door. At this point the cell door was opened and the Lt. and another % entered the cell snatched me out of my wheelchair, threw me to the ground

MARKISSA HUNT #70072-097
Kingdom v. Trump, No. 25-cv-691-RCL

Pg. #3 of 4

(On 4-15-26 I was transfered to Canaan-USP. On 4-19-26 I resumed this letter)

while the Lieutenant grabbed my genitilia ~~afea~~ ~~are~~ another C/o had forced my pants down and rammed #4 four fingers into my rectum back and forth while telling my cellmate Hildago "This is how you treat a Bitch". While this was happenning the Lt. removed the handcuffs and my cellmate immediately raped me in the presence of the two gaurds - who stood and watched for about 1-2 minutes, then stepped out the cell and had the cell locked. My cellmate continue to rape me for about 5-10 min. (Some details omitted)

Around 2:00-3:00 pm I covered the cell door window prompting Lt. Garland (P.M. shift Lt.) to come to the cell. I told Lt. Garland that I've been raped and I fear for my safety. The Lt. then removed us from the cell and placed me and my cellmate in Holding Cages.

About 1 hr. later Lt. Garland asked me if I wanted to take a shower (since 3-4-26 till 4-1-26 I was housed in non-handicap accessible cells and unable to shower - this was the first oppurtunity given to shower by Prison-Officials)

MARRISSA HUNT #70012-097

Pg. #4 of 4

I was then moved to the C-range shower cell.
After about 1 hr. Lt. Garland returned and asked me why wasn't I showering, I told him, again, that I had been raped and evidence needed to be collected.

Lt. Garland became irate and told me no rape happened, that I was going back in the cell with same cellmate. I told him no I wasn't. He walked away. About 5:30 PM Lt. Garland returned to the C-range shower and ordered me to return to the same cell with the same cellmate. I refused

Lt. Garland then assembled a Use-of-Force Team, I was extracted from the shower, placed in a Hard Cell, in metal 4-point restraints for 8 hrs.

While in restraints I was able to report to Psychologist Lemon that I've been raped by two staff and cellmate. He said he would implement the PREA Protocols.

The next day 4-2-26 I was transported to an outside Hospital where a rape exam was conducted.

Since my stay at McCreary-USP I was denied any Grievance Forms to address the lack of Social Accomodations and Gender Affirming Care and the harrassing, intimidating conduct of using cellmate assaults as retaliation.

MARRISSA HUNT #70042-097
Kingdom v. Trump, No. 25-CV-691-RCL (D.D.C.)

Pg. #1 of 2

4-23-2026

RECEIVED
MAILROOM
MAY - 4 2026
Angela D. Caesar, Clerk
U.S. District & Bankruptcy Courts
for the District of Columbia

# CHilling-Effect On Speech

To THE HON. Judge Lamberth,

I don't believe the attorney's representing the Kingdom case fully understand the various tactics that the BOP is using against me and other Transgenders in-order to silence us from openly participating in the Judicial System.

While, at times, the focus is through the PLRA requirement that Prisoners must "Exhaust" it's remedies. Or contact and describe such non-compliance with this Court's Orders so that this Court can understand what's happening. Most of the time this is not easy to do or nearly-impossible to do this.

For an actual-example, as this Court already knows, Freedom of Speech, only exist in the forum where freedom exist's. I am not free to openly communicate with this Court or the represented attorney's as Prison Officials have a vested-interest in silencing me based on their Political-views and ideology. Their hate towards "My kind" cause them to take actions, suchas, placing other inmates in the cell with me who have like-minded interest and views as the Prison Official who wishes to silence me. It is very hard and downright dangerous to communicate my requests to BOP Staff for "Social Accomodations" or "Gender Affirming Care" when staff are indicating their dislike or disdain for what I'm saying and my cellmate feels exactly like the BOP Staff, and, when their not around starts to "Hit" me and verbally/psychologically/sexually assaults me be-cause of the things he overhears me say to staff or simply he seeks

MARRISSA Hunt #78092-097
Kingdom v. Trump, No. 25-CV-691-RCL

Pg.#2 of 2.

to curry-favor with Prison Officials by indicating through his speech or violence that he agrees with Prison Officials position. This Stockholm Syndrome is a reality and it's stiffling my speech.

From Prison to Prison, Prison Officials keep placing inmates in the cell with me who are Anti-LGBTQ with the expected-result that they will take actions-detrimental- against US. It doesn't matter if theirs a verbal-agreement between the cellmate and the Prison Official. It's enough that they see things the same, for the cellmate to do harms toward me. these harms make me feel that I shouldn't communicate my "Gender Dysphoria Symptoms" to Prison Officials or this Court(s), in-order to avoid such harms. And Prison Officials are wise-enough to play this dangerous game. But the hard-reality of Prisons are, theirs staff all the way-up the chain of command ~~who~~ are corrupt. Previous, Warden Ray Garcia of Dublin-FCI, was convicted in the "Rape Club" scandal and numerous other C/o's.

This Court must (I request) impose more actions/orders that protects and prohibits Prison Officials from using other prisoners by Proxy to intimidate, harass, or retaliate against me for excersising Speech. My last #3 USP-Prisons I have been repeatedly placed in the cell with other inmates who are Anti-Trans and have repeatedly attacked me physically or sexually and Prison Officials (previously and currently) have ignored my request's to be celled alone or with other Transgenders, because to do so will deprive them of a "Chilling Effect Tool" needed to silence me.

Respectfully, Marrissa Hunt

Case 1:25-cv-00691-RCL Document 184-1 (Court only) Filed 05/04/26 Page 3 of 4

MARRISSA HUNT #70092-097
Kingdom v. Trump, No. 25-CV-691-RCL (D.D.C.) Pg. #1 of 2

4-23-2026

This is my 3rd letter sent from Canaan-USP!

RECEIVED
MAILROOM
MAY - 4 2026
Angela D. Caesar, Clerk
U.S. District & Bankruptcy Courts
for the District of Columbia

To The Hon. Judge R.C. Lamberth,

Yesterday, 4-22-2026, was what they call SHU Rounds and all Executive Staff and Departmental Heads were suppose to walk through the SHU (I'am currently in the SHU for Protective Custody). Amazingly, neither the Warden or Assoc. Wardens walk thru the SHU. However, I had a chance to talk with my Unit Mang. a Ms. Waters. At this time I gave her a "Cop-Out" detailing my request for several "Grievances" I intended to file regarding the non-compliance with this Court's Preliminary Injunction and Protective Orders. Ms. Waters immediately became standoffish and threaten me by telling me that if I think I was gonna come to Canaan and start filing all kinds of complaints my stay at Canaan would be hell. I explained to her I was not receiving any "Social Accomodations" or "Gender Affirming Care" and the SHU staff had placed an aggressive cellmate in the cell with me who was being physically and sexually-abusive towards me. Ms. Waters told me that USP-Canaan doesn't provide anything for Transgenders and the doctor here has a religious exemption and thats why I won't receive Gender Affirming Care and whatever my cellmate is doing towards me is because he knows I'm a "Snitch" and I bring all this on myself being a Transgender. I continue asking for Grievance forms and she said I don't need them because she "I addressed all your issue's".

Just like Coleman-USP II and Canaan-USP, and McCreary-USP none of these Prisons (all in Politically contraversial areas) are in

MARRISSA HUNT #70092-097
Kingdom v. Trump, No. 25-CV-691-RCL-(D.DC.)

Pg.#2of2

Compliance with any of this Court's Orders, irrespective of what they tell this Court, through the DOJ attorney's.

My Constitutional Medical Care and Safety has been rendered down to a "Political Belief" if I receive it or not.

If I'am in a Federal Prison located in a Democratic-liberal voting area I'am likely to receive "Social Accomodations" and "Gender Affirming Care" and safety from aggressive cellmates. On the other hand if I'am in a Replican-Cons. area, I'm met with ignorance regarding if a Judge's Orders actually-exist (I believe Prison Officials are intentionally-delaying compliance in hope that a Appeal my change their need to comply with this Court's Orders), or I'm being sexually-assaulted because the Court Orders allow for me to wear Panties and Bra's and Make-Up in the cell with a Sex-deprived Male and I need to blame this Court (But Prison Officials refuse to provide a safe environment for me and other Transgenders in-light of our appearance), or they claim they have a religious-exemption from complying with this Court's Orders (I don't understand for the life of me what my Gender Identity has anything to do with how another Person practices his religion-however, I'am not receiving Gender Affirming Care because DR. Keelen here feels it's against his religion to prescribe Hormone Meds, or Binders or any care related to my need to confirm my appearance with how I feel inside)

In any event, this Court is going to have to get tough, an order to not do something without a threat of consequences, appears to be hollow. My Medical Care and Safety requires a more effective-Measured approach.

Marrissa Hunt

**ATTACHMENT D**

MARRISSA HUNT #[illegible]
* Kingdom v. Trump, No. 25-CV-691-RCL 4-29-2026
* Doe v. Bondi, 1 No. 25-CV-286-RCL Pg. #1 of 3

RECEIVED
MAILROOM
MAY 11 2026
Angela D. Caesar, Clerk
U.S. District & Bankruptcy Courts
for the District of Columbia

This is my (4th) Fourth letter sent to you from Canaan-USP

Dear Hon. Judge R.C. Lamberth,

I write to inform you of the recent developments related to the above cited cases, as well as the lack of compliance with this Court's Preliminary Injunction and TRO as well as the Protective Order.

The Executive Officials here at Canaan-USP are not complying with this Court's Preliminary Inj. orders and appeared to have no desire too. Every Executive Staff I've talked to appears to be unaware of Kingdom v. Trump or Doe v. Bondi. I've been having daily conversations with the Trust Fund Supv. Milani (Correct spelling Unknown) regarding why their's no "**Social Accomodations**" suchas, feminine undergarments, hygein, or Make-Up, provided to the Transgenders. (He) told me that he's receiving "Mixed-Signals" from different Executive Staff as to if he should be expending money towards Social Accomo. for the transg.. He also told me that he was told I am the only Transgender here at Canaan-USP. (indicating that it may not be worth it to spend-funds on compliance). During my conversations with the Trust Fund Supv. he was very vocal about Pres. Trump's E.O. and his support of it thereof. I've been here (2) two wks. and have received no "Soc. Accomo."

As to the Gender Affirming Care, this is also none-existant. Yesterday 4-28-26 I had a Conversation with the Medical-Provider (MR.) Keelen about my "GAC." He reiterated to me that he had a religious exemption from providing me GAC because I am a Transg.. I reminded him that he told me that the next day I got here he

MARRISSA HUNT#7



would advance the matter to the Northeast Regional Medical-Doctor to prescribe me Hormone-Treatment as well as my other request's for "facial feminization surgery, voice and communication speech therapy, professional facial hair removal and consultation with a gender dysphoria specialist". MR. Keelen responds was " The Regional Medical Doctor doesn't give a f--- what happens at USP-Canaan and you most likely won't receive any [GAC] while at Canaan".

I'am requesting this Court to "Specifically" order the BOP to provide me with "Soc. Accomo." and "GAC" in-light of "Buckingham V. Federal Bureau of Prisons, 2025 U.S. Dist. Lexis 222718 (Case No. C25-701-RSM-DWC, Nov. 12, 2025)

As to this Court's "Protective Order" related to Class-Members and witnesses. USP-Canaan is not in-compliance. I continue to be "harassed, intimidated, and retaliated" upon for requesting grievances to complain about the non-compliance's of this Court's very orders. Last week on Wedn. I gave Unit Mang. Waters request's for grievances and Standard 95 forms (FTCA-TORT) and still haven't received any. Also, on 4-25-2026 my-then-cellmate W. Stevens attacked me in the cell by punching me and telling me to get out the cell as he couldn't take any more of my complaining to the staff about "Faggot Shit." He then forced me to pack-up all my stuff and get on the door and con-vince the gaurds to get me out the cell with him. Several minutes later the Nurse appeared at the cell door to give me my evening Medication I immediately informed her that my cellmate had

MARRISSA HUNT #70092-097



attacked me and I needed to get out the cell for my safety. (SHE) then contacted the SHU staff and I was removed from the cell placed in a holding cell. When SHU staff asked me what happened I told them and two staff, shu staff, told me it was my fault because I am a Transgender and that I need to learn how to fight. I believe that SHU staff are intentionally placing Anti-Trans inmates in the cell with me so that I can be harmed and deterred from filing grievances or verbal complaints to Executive staff about the lack of "Soc. Accomo." and "GAC". This practice of placing aggressive inmates in the cell continues and my request's to be housed with other transgenders or singled cell are ignored. And I am continously in-fear for my safety.

Also, I have now written four request's to the warden, requesting to be Transferred to a Women's Prison. I have received no response. I have previously exhausted my administrative-remedies for my request to be housed at a Women's Prison and it was denied based on the Pres. Trump's Executive Order. I am again, requesting this Court to order my transfer to a Women's Prison as it is clear that the BOP can't keep me safe in a Male-Prison.

Respectfully,

Marrissa Hunt

MARRISSA HUNT #70092-097
UNITED STATES PENITENTIARY
Canaan-USP
P.O. BOX 300
Waymart, PA.
18472

HARRISBURG PA 171
9 MAY 2026 PM 2 L




Clerk, Rm 1225
U.S. Courthouse
333 Constitution Ave
Washington, DC.
20001

20001-289999

**ATTACHMENT E**

From: MARRISSA HUNT #70092-097
Kingdom v. Trump, No. 25-cv-691-RCL

RECEIVED
MAIL ROOM
MAY 26 2026
Angela D. Caesar, Clerk
U.S. District & Bankruptcy Courts
for the District of Columbia

5-20-2026

To The Hon. Judge R.C. Lamberth,

I arrived at Canaan-USP on 4-15-2026! After repeated request's to Warden Gaza I have still not received;

1. Any "Social Accomodations"

2. Any "Gender Affirming Care"

or any reason why their is no compliance with this Court's Kingdom Orders.

I'am at lost, as to what to do! My numerous letters to the Transgender Law Center in Oakland, CA. have not been responded too, and the BOP refuses to update their electronic law library (Lexis Nexis System) for the last (7) seven months, so inmates are unaware of any recent District, Appellate, or Supreme Court law developed Related to the treatment of Transgenders in Federal Prisons.

Lastly, Canaan-USP Prison Officials refuses to provide me Grievances to litigate the above issue's

Troubled,
Marrissa Hunt

**ATTACHMENT F**

Emergency Motion Pursuant To The Protective Order In Kingdom v. Trump

CASE # 1:25-cv-691-RCL

MS. NASH, pro-se, requests enforcement of a Process for Resolution Brought Pursuant to the 4/16/2026 Protective Order in Kingdom v. Trump, Case No . 1:25-cv-691-RCL, at # 173-1 (D.D.C. 2026). The court in the Kingdom case entered An Order establishing the Process for Resolution of Retaliation. It provides A three-stage process for resolution of allegations of retaliation. Ms. NASH asserted that Defendants have failed to comply with the first stage because Warden E.K. Carlton has refused to provide provide Ms. Nash with requested "Administrative remedy forms" (Attachment A). Further, MS. NASH asserts that because the allegations involve A credible urgent threat of serious harm to the witness the court should order the parties to proceed to stage three of the Process for Resolution of Retaliation. Specifically, Defendants policies And practice, places Nash at A

substantial risk of serious harm because they permit sexual assaults to occur, do not provide effective reporting mechanisms, fails to impose Accountability, A facilitate retaliation. Accordingly, ms Nash request the following relief.

#1) Require the parties to meet And confer with class counsel within one business day.

#2) Require that if parties meet And confer, that Plaintiffs shall allow BOP one business day to address And resolve the dispute

#3.) Require that if the disputes remains unresolved after the Above procedures, the parties Are directed to submit A joint status report to the kingdom Court summarizing the dispute, the efforts made to resolve it, And the respective positions of the parties.

#4.) Require BOP to turn over Any and all documents, exhibits, And video footage of the violent retaliAtory Attack taken in response to Nash's protected Activity at OSCAR CONTRERAS AGUILAR v. Trump, # 5:25-cv-396-MSS-PRL, Dkt # 74.

X [signature]
Pro-Se.

31505-001
Coleman II
U.S. Penitentiary
P.O. Box 1034
Coleman, FL 33521

# ATTACHMENT

Oscar Contreras Aguilar
90039-053
Coleman II
U.S. Penitentiary
P.O. Box 1034
Coleman, FL 33521

The following document(s) are associated with this transaction:
Document description: Main Document
Original filename: n/a
Electronic document Stamp:
[STAMP dcecfStamp_ID=1069447731 [Date=5/22/2026] [FileNumber=27248004-0]
[7a9fbf2aa559ce449185a8884a9a9bec19877825d13ae60f0af1b2da395be65ac54b05e2973b24f
48cfc8917849c7e28d7cffcdf139b0f163739bbc17776082e]]

Document description: Exhibit Motion Regarding a Revised Protective Order
in Kingdom
Original filename: n/a
Electronic document Stamp:
[STAMP dcecfStamp_ID=1069447731 [Date=5/22/2026] [FileNumber=27248004-1]
[4470bbb7174470be157244981294f2728ca589096721e022f8446fb8ffc57b0ea1cac58288eafc6
9387608931eb560db3ed51a209a8fce20c9f729372e93f089]]

#1: In retaliation for her complaints concerning the institutions noncompliance with the Kingdom injunction the defendants' not only denied NASH earned federal time credits, And assigned her to locations which exposed her to physical And sexual Assault, but prison guards physically And sexually assaulted Ms. Nash (or allowed other inmates to do so). Ms. Nash set forth those Arguments in considerable detail And with legal support in her Emergency Motion for Protective Order filed in the Middle district of Florida. NASH request that class cloonsel review those documents And supplemental motions, And replies. see. OSCAR CONTRERAS AGUILAR v. Trump, # 5:25-cv-396-MSS-PRL, NASH Motion Doc # 70. Also see video footage, medical records And other exhibits related to the violent Attack immediately following Nash's testimony concerning noncompliance with the Kingdom injunction at Doc# 74.

**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION**

**OSCAR CONTRERAS AGUILAR,**

**Plaintiff,**

**v.** **Case No: 5:25-cv-396-MSS-PRL**

**DONALD J. TRUMP, ATTORNEY GENERAL OF THE UNITED STATES, WILLIAM K. MARSHALL, E. K. CARLTON and SHANNON D. WITHERS,**

**Defendants.**

---

**ORDER**

**THIS CAUSE** comes before the Court for consideration of Darnell Nash's Motion Regarding a Revised Protective Order in Kingdom (the "Motion"). (Dkt. 85) Upon consideration of the foregoing, the Court hereby **ORDERS** as follows:

The Motion is **DENIED WITHOUT PREJUDICE**. Ms. Nash requests enforcement of a Process for Resolution of Retaliation Brought Pursuant to the 4/16/2026 Protective Order in Kingdom v. Trump, Case No. 1:25-cv-691-RCL (the "Process for Resolution of Retaliation"). See Kingdom v. Trump, Case No. 1:25-cv-691-RCL, at ECF Nos. 173, 173-1 (D.D.C. 2026). The court in the Kingdom case entered an Order establishing the Process for Resolution of Retaliation. It provides a three-stage process for resolution of allegations of retaliation. Id. Ms. Nash alleges that Defendants have failed to comply with the first stage because "Warden E. K. Carlton

has refused to provide Ms. Nash with requested Administrative remedy forms." (Dkt. 85 at 2) The Process for Resolution of Retaliation prescribes that class counsel engage in the second and third stages on behalf of a complaining witness. Kingdom v. Trump, Case No. 1:25-cv-691-RCL, at ECF Nos. 173, 173-1 (D.D.C. 2026). Thus, a witness's request to enforce the Process for Resolution of Retaliation may be filed by class counsel in the Kingdom case. See id. Accordingly, Ms. Nash must seek the relief she requests in the Kingdom case, with the assistance of class counsel, rather than in this case. A copy of this Order and the Motion will be furnished to the below-noted class counsel in the Kingdom case.

**DONE** and **ORDERED** in Tampa, Florida this 22nd day of May 2026.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of record
Ms. Megan Noor, Esq., megan@transgenderlawcenter.org
Mr. Michael Perloff, Esq., mperloff@acludc.org
Any unrepresented party

Motion Regarding A Revised Protective Order in Kingdom

CASE # 5:25-cv-00396-MSS-PRL

OSCAR CONTRERAS AGUILAR
v
DONALD J. TRUMP
#5:25-cv-00396-MSS-PRL

MAY 21 2026 11:34
FILED - USDC - FLMD - TPA

On April 16, 2026, the Federal District Court for the District of Colombia Issued An order in A class Action lawsuit challenging BOP's implementation of Executive Order 14168, And directed the parties to comply with the courts prescibed process for resolution of allegations of retaliation brought pursuant to the 4/16/2026 Protective Order in Kingdom v. Trump, Case No. 1:25-cv-691-RCL.

In accordance with Revised Protective ORDER in Kingdom v. Trump ms Nash respectfully request that the court order defendants to comply with the court prescribed process regarding resolution of Allegations of retaliation.

A.) The Kingdom v. Trump court prescribed A three step process for resolution of Allegations of Retaliation brought Pursuant to the 4/16/2026 Protective Order in Kingdom v. Trump. Stage one: BOP Administrative Remedies; Stage two: Good-Faith Informal Resolution Between Counsel; STAGE Three: Relief From The Court. (See Kingdom v. Trump, # 1:25-cv-00691-RCL, Dkt # 173-1, (4-16-2026). Here, ms. NASH request that the court order the defendants to proceed to Stage 2 and 3 of the process for resolution of retaliation;

• STAGE 1; BOP Administrative Remedies
In order to cover-up egregious law breaking by employees of the BOP the defendant warden E.K. Carlton has refused to provide MS. NASH with requested Administrative remedy forms. Rather than allow this strategy to bear fruit the court should order the 'parties' to proceed to stage two.

The point is the Kingdom court required "Individuals alleging retaliation under

this order must submit A formal writen Administrative Remedy Request"(Id at page Id # 1) Here, because defendants have failed to implement An adequate grievance procedure through which inmates could make complaints without fear of retribution, And which included serious investigation And response the court should order the parties to proceed to stage two - Good-Faith INformal Resolution Between Counsel

• Emergency Relief Request
The kingdom court ordered that Plaintiffs may " seek immediate relief from the court without meeting And conferring because the allegation involves a credible urgent threat of serious harm to the witness" (see Id at page Id # 4) Here, prison guards physically and sexually assaulted ms. NASH (or allowed other inmates to do so). Nevertheless, defendAnts refuse to use the tools at their disposal to ensure ms. NASH is in A safe environment free from rape, retaliation, And discrimination.

concerning non-compliance with the Kingdom v. Trump injunction the court should order the parties to proceed to stage three.

Conclusion

The Kingdom court ordered " If class counsel deciedes to seek relief from the Court, they shall request A meet And confer with Defendant's counsel, unless the allegation involves A credible urgent threat of serious harm to the witness. If Defendants do not respond to A request for A meet And confer within one business day of A request involving An emergency, or three (3) business days for A non-emergency, Plaintiffs may seek relief from the Court. The meet And confer must take place within one business day of Defendants' response, if the request involves An emergency, And within three (3) business days otherwise. If the parties meet And confer, then Plaintiffs shall allow BOP time to address And

The point is the Kingdom court ordered class counsel "shall request A meet And confer with Defendants' counsel, unless the allegation involves A credible urgent threat of serious harm to the witness" Here, And in Accordance with that emergency provision, the court should order defendants to proceed to stage 3 of the process for resolution of retaliation brought pursuant to the 4/16/2026 Protective Order in Kingdom v. Trump.

The bottom line is this: Defendants policies And practices places NASH at A substantial risk of harm because they permit sexual assaults to occur, do not provide effective reporting mechanisms, fails to impose Accountability, And facilitate retaliation. Defendants have known About sexual abuse And harmful condition at USP Coleman 2 for years And deliberately elected not to remedy them. Because deficiencies in jail Administration leading to sexual assaults of NASH was A means to retaliate Against her for complaints

3) Require defendants' to meet and confer with class counsel within one business day

4.) Require that if parties meet and confer, then Plaintiffs shall allow BoP one (1) business day to address and resolve the dispute

5) Require that if the dispute remains unresolved after the above procedures, the parties are directed to submit A joint status report to the Kingdom Court summarizing the dispute, the efforts made to resolve it, and the respective positions of the parties.

6) Require the if A status report is submitted to the Kingdom court, that A copy is forwarded to the court.

X [signature]
Pro-Se

(TURN OVER)

resolve the dispute before seeking relief from the Court'. At least one (1) business day for emergencies And three (3) business day for non-emergencies" (see Id page Id #4)
Here, And in accordance with the Above procedures, Mr Nash respectfully request that the court order the following:

Because Mr Nash allegation invole allegations of retaliation that immediately threatens Nash's health And safety the court should:

1.) Require defendants' to forward A copy of Nash's Emergency motion(s) for Protective Order to the Kingdom class counsel.

2) Require defendants' to forward copies of the ten exhibits at Dkt # 74 to class counsel. Note! The Kingdom court ordered that "Plaintiffs' counsel may request in writing from Defendants' counsel the relevant medical, disciplinary, And other records" (See: Kingdom, 1:25-cv-00691-RCL, Dkt # 173-1, pageId # 3)

Note: As stated, the Kingdom court ordered prisoner witnesses to submit A Administrative Remedy Request. Here, Ms Nash filed An Administrative Remedy with the warden And A written statement of all material evidence substantiating the claim that she was denied early release because she complained About non-compliance with the Kingdom injunction. Nonetheless, And in a caculated move to avoid discovery, Defendants' refused to help NASH if she continued to file lawsuits based on retaliation by prison staff, And refused to appropriately Address NASH's remedy, as such, NASH seeked Administrative review by filing An appeal with the Central Office of the BoP (EXH A).

The point is BoP had Actual, And detailed knowledge of the retaliatory Acts as a result of NASH's complaints regarding BoP's non-compliance with the Kingdom injunction. Nevertheless the BoP has proceeded sluggishly with intentional disregard of NASH's constitutional rights despite being fully apprised of the situation for A year. As such, Class counsel can proceed to stage 2.

Department Of Justice
Federal Bureau of Prisons

## Request For Administrative Remedy

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

| From: NASH Darnell | 31505001 | K-1 | USP Coleman II |
|---|---|---|---|
| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A- INMATE REQUEST** MS. NASH IS being denied early release in retaliation
r reporting Sexual misconduct And retaliation by employees of the BOP.
he factors the warden relied on to deny Nash's FSA request Are prohibited
the PREA Act. (1.) LACK of Programing: In retaliation for bringing her PREA
omplaints BOP staffers denied NASH Access to recidivism reduction programs, still
e warden held NASH responsible for the harm done to her, In violation of PREA,
.) THE HISTORY OF PROHIBITED ACTS: MS. NASH met the burden of showing that the
cident reports were false but the warden took no corrective Action, In violation of
EA. (3) HIGH Recidivism: the rapes And the coordinated cover-ups that followed
ach assault adversely affected And compromised Nash's Ability to participate in
D programs Aimed At reducing recidivism. Here, the failure to protect Nash from
fe And the resultant loss of FSA time credits violated 18 U.S.C. § 3632 (a)(5)(A),
hich provides that all prisoners "At each risk level [must] have A meaningful
pportunity to reduce their classification during the period of incarceration.
ash request the Application of earned FSA time credits.

11-13-2025
DATE

SIGNATURE OF REQUESTER [signature]

**Part B - RESPONSE**

Recv'd 11·21·25

DATE

WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

**ORIGINAL: RETURN TO INMATE** CASE NUMBER: 1260839-F1

**Part C - RECEIPT**

CASE NUMBER: ____

Return to: ____
LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION

SUBJECT: ____

DATE

RECIPIENT'S SIGNATURE (STAFF MEMBER)

FPI-PEPR BP-229(13)

EMERGENCY PREA

Case 1:25-cv-00691-RCL Document 214 (Court only) Filed 06/12/26 Page 16 of 91

U.S. Department of Justice

SEXUAL ABUSE BY STAFF **Central Office Administrative Remedy Appeal**

Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: Darnell NASH (LAST NAME, FIRST, MIDDLE INITIAL) 31505001 (REG. NO.) 14-1 (UNIT) USP Coleman (INSTITUTION)

**Part A - REASON FOR APPEAL** MS. NASH was sexually And physically assaulted by prison staff And was A victim of daily retaliatory measures - including the retaliAtory denial of earned federal time credits (Exh A). Nevertheless, the Institution PREA compliance manager refuse to comply with PREA's requirement for monitoring After sexual assault complaint. (28 C.F.R. 115.67, agency protection Against retaliation.) In other words, USP PREA staff contends that it has the authority to thumb it noise at the PREA Act And refuse to comply with its directives. Relief sought: Ms. NASH request that the National PREA coordinator identify And remediate Acts of retaliation by using the BP-A1176, INmate Retaliation Monitoring Form. Note: In order to conceal officer misconduct the Institution PREA Compliance Manager refuse to fill out the BP-A1176 Form And refuse to reverse the wardens retaliatory denial of earned federal time credits.

4-26-2026
DATE

[signature]
SIGNATURE OF REQUESTER

**Part B - RESPONSE**

DATE

GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE

CASE NUMBER: ________

**Part C - RECEIPT**

CASE NUMBER: ________

Return to: LAST NAME, FIRST, MIDDLE INITIAL / REG. NO. / UNIT / INSTITUTION

SUBJECT:

DATE

SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

UPN LVN

PRINTED ON RECYCLED PAPER

BP-231(13)
JUNE 2002

EMERGENCY [illegible]

U.S. Department of Justice

Federal Bureau of Prisons

**Regional Administrative Remedy Appeal**

Sexual Abuse BY STAFF

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: NASH Darnell D — 31505001 — H-1 — USP Coleman II
LAST NAME, FIRST, MIDDLE INITIAL — REG. NO. — UNIT — INSTITUTION

**Part A - REASON FOR APPEAL** On 2-23-2026 Ms. NASH was sexually assaulted by PREA staff in the Lieutenants holding cell. Nevertheless, And in order to conceal officer misconduct, the institution PREA Compliance Manager refuse to comply with the Antiretaliation regulations of the PREA Act. Specifically, in retaliation for her PREA complaints And her testimony Against executive staff in Plaintiff's Aguilar's lawsuit prison staff not only denied Nash earned federal time credits but prison guards physically And sexually assaulted Ms. NASH (or allowed other inmates to do so) see: OSCAR CONTRERAS AGUILAR v. DONALD J. TRUMP, case # 3-25-cv-396-MSS-PRL, Doc # 70 (Nash's Motion for Injunction order Protection for Prisoner witness. Relief sought: Ms. NASH request that the Regional PREA coordinator identify AND remediate Acts of retAliation by using the NEW BP-A1176 Inmate Monitoring Form (P.S. 5333.01. Also the Regional PREA coordinator should reverse the retaliatory denial of Nash's earned Federal time credits.

4-15-2026 — [signature]
DATE — SIGNATURE OF REQUESTER

**Part B - RESPONSE**

DATE — REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE — CASE NUMBER: ____

**Part C - RECEIPT**

CASE NUMBER: ____

Return to: ____
LAST NAME, FIRST, MIDDLE INITIAL — REG. NO. — UNIT — INSTITUTION

SUBJECT: ____

DATE — SIGNATURE, RECIPIENT OF REGIONAL APPEAL

FPI-PEPR — PRINTED ON RECYCLED PAPER — BP-230(13) JUNE 2002

The Prison Rape Elimination Act (PREA) marked a critical step in condemning and curbing sexual assault and harassment in prisons. Sadly, Ms Nash has been raped by inmates and sexually assaulted by BOP staffers. This level of disregard for human dignity cannot be tolerated.

A) Ms. Nash has been raped over 200 times in BOP custody, and this figure is increasing every month. Nevertheless, PREA staff refuse to review any threats to safety experienced by Nash. Under 28 C.F.R 115.42 (d) placement and programming assignments for each transgender or intersex inmate shall be assessed at least twice each year to review any threats to safety experienced by the inmate." Also, A transgender or intersex inmates own views with respect to his or her own safety shall be given serious consideration"

3) Despite repeatedly requesting protection from rape and retaliation which are required under PREA, they are not being provided. NASH has been raped at knife point, raped in retaliation for reporting sexual misconduct, and raped by two prison guards" (see United States v Nash, # 1:13-CR-00467, DOC # 309, PgID # 1852 N.D. OHIO)

) Ms Nash is in imminent danger because her PREA complaints re being ignored. Indeed, such stonewalling has persisted espite a court of Appeals ruling "BASED ON THE MORE THAN JE-HUNDRED RAPES AND SEXUAL ASSAULTS [NASH] HAS JFFERED AT THE HANDS OF PRISON GUARDS AND FELLOW NMATES WHILE INCARCERATED IN MEN'S PRISONS" (E: US. V. NASH, Sixth Circuit, case # 23-2635, DKT 18.1 pageId # 7)

) Ms. Nash is being denied early release in retaliation for porting sexual misconduct and retaliation by employees f the BOP

DATE RECEIVED
FEDERAL BUREAU OF PRISONS
OFFICE OF THE REGIONAL COUNSEL

APR 29 2026

NERO - PHILADELPHIA

Guards refused to [illegible] her for sex, then
from prisoners And staff pursuing her
retaliated Against when she filed complaints. Here, the
PREA compliance manager was required to protect MS NASH
from the erroneous deprivation of earned Federal time
credits due to retaliation when she reported the Abuse
Nonetheless, the PREA compliance manager refuse to comply
with PREA's requirements for monitoring after sexual
assault complaints to prevent retaliation. As A result, Ms.
NASH has lost over two years Federal time credits.

The point is. PREA staff have in their possession court
documents finding "more than one-hundred rapes And sexual
assaults [NASH] has suffered at the hands of prison guards
And fellow Inmates while Incarcerated in men's prisons"
That leaves only one question which is why; why is PREA staff
monitoring such a dedicated offensive against Nash's
efforts to seek corrective Action under PREA? "since she
began serving her sentence ten years Ago ms NASH has
been brutally raped And assaulted by both inmates
And prison guards on 196 occasions" (See' United states v.
NASH, case # 1:13-cR-00467, Doc # 309, Page 10 # 1865 )

- E.) under PREA, section 115.67, agency protection against
retaliation, incarcerated victims can request remedial measures
after sexual assault complaints to prevent retaliation. Here,
MS. NASH was denied her constitutional right to safe confinement
And protection from retaliation, which in turn, led to the loss
of earned FSA credits. Nonetheless, PREA staff refuse to take
corrective Action, saying the President signed An executive order
which instructed the BOP to cease Any recognition of trans
people. But that's Not true - The executive order does not
supersede or change the BOP's obligation to comply with
the PREA [illegible] section 115.67 [illegible]
[illegible].

[illegible]
[illegible] to the BOP uniform is prized Above all else, but
sexually assaulting prisoners - And covering for each other too -
is A violation of federal law - including the PREA Act. For these reasons
Any retalitory conduct that rendered Nash ineligible to Apply earned
federal time credits must be corrected under PREA. Please help.

[illegible]

# ATTACHMENT

MS. NaSH must seek the relief she request in the kingdom case, with the assistance of class counsel. For these reasons, MS. NaSH has Attached An outline summarizing the dispute, the efforts made to resolve it, And the respective positions of the parties.

Note: The exhibits refrenced in the Attached document Are not included, but will be supplied to class counsel upon request And filed with the court once Nash is Able to make copies of the originals.

EMERGNCY REQUEST FOR PROTECTIVE ORDER

ALISHEA KINGDOM v. DONALD J. TRUMP — CASE No. 1:25-CV-691-RCL

Pursuant to Process for Resolution of Allegations of Retaliation brought pursuant to the 4/16/2026 protective order in Kingdom v. Trump Ms. NASH, pro-se, respectfully request an protective order.

(A•) Any judicial finding of inadequacy under STAGE ONE of the Kingdom v. Trump Retaliation Process Should be decieded in MS NASH'S FAVOR.

The WArden engaged in conduct prejudicial to the Administration of the courts proscribed process for resolution of Allegations of retaliation brought pursuant to the protective order in Kingdom v. Trump.

First, the court ordered that "individuals alleging retaliation under this order must submit A formal written Administrative remedy request, on the Appropriate form (BP-9)". Neverthe less, prison officals refuse to provide NASH with requested Administrative remedy forms.

Second Prison RApe Elimination Act (PREA) staff refuse to help ms. NASH if she continued to file complaints based on retaliation by prison staff, And refused to Appropriately Address Nash's grievances, as such, she Sought administrative review by filings An appeal with the Cenlral Office of the BOP (EXh ___ )

The point is BOP had Actual, detailed knowledge of the retaliAtory Acts taken in response to Nash's complaints concerning her institutions non-compliance with the Kingdom v. Trump injunction. Still, the BOP has proceeded slugishly with intentional disregard of Nash's constitutional rights despite being fully Apprised of the situation for A year.

Finally, in retaliation for her complaints concerning noncompliance with the Kingsdom v. Trump injunction the warden intentionally rejected Nash's complaints on An improper basis

For purposes of thwarting any accountAbility Warden E.K. Carlton came up with obtuse And irrational reasons to stonewall the resolution of Nash's complaints concerning noncompliance with the Kingdom v. Trump protective order.

For example: on 4/26/2026 Ms. NASH sent An inmate-to-staff email request to the warden requesting better protection from staff retaliation, but the warden took no action stating "you were not specific in your allegations" (Exh___). Here, only An extreme And intentionally obtuse reading of Nash's complaint could lead the warden to that conclusion. Indeed, Nash specifically complained that 1.) the warden has vested responsibility for

PREA compliance in unqualified administrators And supervisory staff"; 2.) "the warden denied ms. Nash's earned federal time credits In retaliation for her testimony on behalf of Another prisoner"; 3.) "the Institution PREA Compliance Manager refuse to fill out And submit the new BP-A1176, Inmate Retaliation Monitoring Form"; And (4.) "institution PREA staff should recuse from Any pending or future matters involving NASH"

Bottom line: The wardens response "you were not specific in your allegation" is A perfectly transparent case of duplicity, intentional evasion, And refusal to make Any explanation of the facts connected to Nash's complaint.

Because Coleman II failed to implement An adequate grievance procedure through which NASH could make complaints without fear of retaliation, And which include serious investigation And response the court should find that NASH exhausted her Administrative remedies.

(•B) EMERGENCY RELIEF REQUEST

MS. NASH is incarcerated in An environment where rape, And other forms of sexual

assault And retaliation Are prevelent And tolerated. Here, ms. NASH may "seek immediate relief from the court without meeting And conferring because the allegations involve A credible urgent threat of serious harm to [NASH]". See Kingdom v. Trump, # 1:25-cv-00691-RCL, Doc # 173-1, page Id #4.

- The repeated rapes And assaults ms. NASH had experience (And expected to keep experiencing

The Prison Rape Elimination Act (PREA) marked A critical step in condemning And curbing sexual assault And harassment in prison. Still, the BOP sits idly by And watch while the number of rapes Against ms. NASH increase. "Since she began serving her sentence ten years Ago, ms. NASH has been brutally raped And assaulted by both inmates And A prison guard on 196 occasions". See Exh ___ page Id 1856

The point is ms. NASH was raped over And over Again while in BOP custody. The BOP knew ms NASH was in danger, yet no one - not ever PREA staff - lifted A finger in support. Here, the facilities failure to respond to Nash's complaints And the threats And intimidation used to silence NASH not only amounted to condoning, acquiescing to, consenting to, or even tacitly

Approving longstanding Abuse, but demonstrate that Nash's retaliation allegations concern an emergency.

- Prison guards physically and sexually assaulted ms. NASH (or allowed other inmates to do so)

In retaliation for her complaints concerning noncompliance with the Kingdom v. Trump injunction the institution refused to protect MS Nash from Anticipated Attacks. A couple of examples illustrate the point.

#1: on 2-23-2026 PREA staff sexually assaulted ms. NASH in the Lieutenants holding cell, Nevertheless, And in A caculated move to avoid discovery, the facility refused to initiate the BOP's Sexual Abuse Prevention Protocol.

#2: on 2-25-2026 MS Nash's cellmate violently assaulted her while prison staff watched but did nothing to intervene as NASH cried out for help. (Note: At coleman II potential sexual Aggressors Are celled with potential sexual Abuse victims, in violation of PREA, as A means to penalize those who report staff misconduct, Indeed, Nash's was not only intentionally housed with A sexually assaultive, mentally ill, prisoner who had prior violent incidents, but the registered sexual predAtor forced Nash to perform

oral sex under threats of assaulting her.

#3: on 2-26-2026 ms NASH was physically And sexually assaulted by A correctional officer, resulting in severe injuries. Here, the institution was required to promptly investigate the allegations And report the outcome to NASH. She was Also owed protection from further Attacks And seperation from her Abuser. Despite that, the institution failed to investigate her reports or take protective measures. (Note: ms. Nash, as of todays date, is still being confined at At institution with inmates and correctional officers who have violently sexually assaulted her.)

In sum, the back-to-back assaults by inmates And staff Abusers not only is proof of the inadequacy of BOP policies purporting to prevent And respond to the problem of Sexual assault in prison, but shows that Nash's request concern an emergency.

- The warden ordered his subordinates to target MS. NASH for punishment And retribution as A means to retaliate Against NASH

On 2-2-2026 ms NASH was subpoenaed to appear And testify At A hearing concerning BOP's noncompliance with the Kingdom v. Trump injunction (Exh __). Warden E. K. Carlton And Associate Warden

M. Barber were present in the courtroom when Judge Mary S. Scriven ordered defendants' not to retaliate. Nevertheless, Defendant Warden E.K. Carlton and Associate Warden M. Barber ordered Lieutenant Berry to violently Attack NASH in retaliation for her testimony.

Specifically, video captured MS. NASH (handcuffed And nonviolent) being escorted to A surviellance camera blindspot by Lieutenant Berry, who was joined by five other male officers. Minutes later, A surviellance camera then captured ms. Nash being dragged out of the surviellance camera blind spot unconscious And covered in blood. Afterwards, MS NASH was transported to A hospital where she recieved five staples to close A head wound. (Note: Video footage, medical information, And other exhibits were filed at OSCAR Contreras Aguilar v. Trump, # 5-25-cv-00396-MSS-PRL, Doc # 80, . See Also, (Exh____ ).

To summarize, Lieutenant Berry pushed NASH to the ground - even though she was handcuffed And not resisting - And then bit NASH on the face And breast, taunting NASH by Screaming "Rape, Rape, Rape", "That BLACK bitch judge can't protect you Now", And "I know what you said in court".

Here, the unwarranted attach by guards that left ms. Nash unconscious and in a pool of her own blood not only demonstrate that Nash's request concerns an emergency, but the statement "I know what you said in court" proves that the retaliatory attach was "motivated primarily by act of providing information to the court or class counsel". In fact, Plaintiffs' counsel, Megan Noor, was present in the courtroom and recieved oral testimony from Nash concerning noncompliance with the Kingdom v. Trump Injunction.

- Lieutenant Berry beat ms Nash to such a degree, that when the EMT arrived they believed Nash to be dead.

Ms. Nash sustained extensive and serious bodily injury during the course of the assault asserted to be in retaliation for her oral testimony concerning noncompliance with the Kingdom v. Trump injunction. In fact, ms. Nash's injuries required medical intervention, including numerous sutures to close lacerations of her face and scalp.

In sum, the court should conclude from Nash's medical records and referral to an outside hospital that Nash not only suffered a serious injury as a result of her protected activity, but the wardens use of retaliatory violence upon ms. Nash constitute retaliation that

immediately threatens Nash's health and safety.

• The willingness to misreport and cover-up instances of staff sexual abuse threatens Nash's immediate health and safety.

Lieutenant Berry pinned NASH to the floor than bit Nash's face and breast saying "I know what you said in court". Here, the DNA evidence of Lieutenant Berry's Attack would have been crucial in substantiating the sexual assault.

The point is the Sexual Assault Nurse Examiner found signs of injury and trauma to Nash's body consistent with Nash's sexual assault report. But rather than meticulously investigate the case PREA staff tried to cover-up the crime. First, Lieutenant Berry thought that rubbing Nash's face and breast in blood after the assault would provide no forensic evidence or signs of trauma. Second, Associate Warden Barber asked the SANE Nurse to alter her clinical findings so as to falsely inculpate Lieutenant Berry and cover-up his sexual misconduct. Here, the cultural tolerance, orchestrated cover-ups, and organizational reprisals against ms. NASH threaten Nash's immediate health and safety and supports a finding of imminent danger

- Ms. Nash bled so much that guards had to pull out the mop and buckets

The terms of PREA specify that BOP "shall follow a uniform evidence protocol that maximizes the potential for obtaining usable physical evidence for administrative proceedings and criminal prosecutions." 28. CFR 115.21

Here, Ms. Nash was bitten as part of the sexual assault. Nevertheless, and in direct opposition to PREA's investigation standards, prison guards destroyed physical evidence by mopping up Nash's blood. Specifically, immediately after the sexual assault BOP survielence cameras caught prison staff tampering with evidence by mopping up Nash's blood.

The point is the pool of blood and other blood spatter evidence clearly indicate and were consistent with Nash's sexual assault report. Still, prison staff deliberately destroyed the evidence, further impending the truth finding process.

- In retaliation for her complaints concerning noncompliance with the Kingdom v. Trump injunction the warden refuse to implement Nash's earned First Step Act Release Credits.

The retaliatory denial of Nash's earned federal time credits creates A continuing And unacceptable high risk that she will suffer physical And Sexual Abuse at the hands of other inmates And prison officals. This heightened risk, combined with the BOP's repeated refusal to end these rapes And other retaliAtory Acts shows that Nash's request concerns an emergency.

Further, overdetaining NASH in a all male high security prison, the most dangerous setting for Trans women, has perpetuated A significant, extended And continuing cycle of harm.. Here, keeping ms. Nash in prison long after she's eligible for release not only was retaliatory but expose Nash to A substantial risk of serious hArm.

- An Increased risk of self harm And suicide

The BOP, despite bearing responsibility for ms. Nash's sexual Abuse by one of its own staff has provided very little, if Any, treatment to address the affects of this Abuse. Here, the failure to provide counseling And support services shows that NASH's request concerns An emergency.

- Despite dangerous And unconstitutional conditions at Coleman II along with high levels of sexual violence, ms. NASH has no tools at her disposal to remedy the situation.

The warden has ceded control of his prison to rapists employees. Nevertheless, the warden has forbid Nash's unit team And psychology services from making individualized housing placement decisions, in violation of PREA.

The institutions Abdication of its responsibilities in "assessing and reassing risk of victimization" under Program Statement 533301 shows that Nash's request concerns an emergency.

The bottom line is this: Ms. Nash has been raped over 200 times in BOP custody, that number, undoubtedly, would've been smaller had the BOP complied with PREA which require Assement of "Any threats to safety experienced by Nash. 28 C.F.R. 115.41 (a). Also see BOP's Sexually Abusive Behavior Prevention and Intervention Program Manual 533301.

- Ms. Nash has been sexually assaulted by PREA staff - the very people charged with stopping this Abuse.

Institution PREA staff took Ms. Nash to A BOP surveillance camera blind spot, forced her to strip Naked And took pictures of her uncovered breast, then shared them with other male correctional officers. Here, forcing Ms Nash to strip Naked without permissible purpose And under threats of violence constitute sexual assault.

Because all members of the PREA investigation team Are Acting As contractors under the wardens criminal orders the court should grant Nash's repuest for emergency relief.

- The warden fails to ensure officers Are Accountable or disciplined for their misconduct

Example: Pursuant to PREA investigation policy, when an inmate makes A PREA complaint it must be immediately investigated And the victim And the Abuser must be separated. 28. C.F.R.

Here, before Lieutenant Berry violently assaulted NASH, he began his Abuse by sexually harassing Ms. NASH. Specifically, in Addition to persistent verbal sexual harassment And propositioning Lieutenant Berry spoke in vulguar language to NASH, engaged in sexually suggestive behavior towards her, And told NASH " I want to see your boobs"

Ms. Nash immediately reported being coerced into sex with threats of violence, but the guards did nothing to prevent the Attack saying " I know what you said in court"

Because USP Coleman has its own network of enablers - officers who work behind the scenes to cover-up Abuse or simply look the other way the court should find that

Nash's request concerns an emergency. Indeed, the incident would not have escalated to this point, indeed it would not have occurred oat all, but for staffs initial misconduct in failing to separate Nash from Lieutenant Berry, in violation of PREA.

Example: Lieutenant Berry has a long history of participating in and promoting violence and abuse against inmates. Indeed, the attached affidavits demonstrate that Lieutenant Berry consistently and over a long period of time violated the constitutional rights of inmates. Note: Prior to the attack against Nash, inmate Shelton and Castaneda were both violently attacked by Lieutenant Berry

The bottom line: First, Mr Nash posed no objective threat and Lieutenant Berry had no reasonable perception of danger. Still, Lieutenant Berry violently attacked Nash as fellow guards looked on. At no point did any of the officers recognize or act upon the affirmative duty to stop the assault. In fact, the guards can be overheard braggin that they "wasn't afraid to take a bitch down".

Another thing: Despite the assaults on Mr. Sheldon and Castaneda, which should have served as a wake up call, the warden not only failed to discipline or supervise Lieutenant Berry despite his long history of Abusing

inmates, but the warden told NASH that he would back up his officers "one-hundred percent" making clear that any effort to file a grievance would be futile. That lackadaisical attitude towards his responsibilities constitute an emergency.

• The BOP's unresponsiveness to the crisis unfolding at USP Coleman enabled both inmates and staff to commit worse and worse atrocities.

As stated, the warden ordered Lieutenant Berry to violenty attack Nash in retaliation for her complaints concerning noncompliance with Kingdom v. Trump injunction. Disturbingly, this is not the first such case - in fact it seems to be a trend.

For example: In 2019 ms. NASH was placed in protective custody lockdown due to being raped in the general population at Coleman II. However, when Nash arrived in the SHU prison guards not only denied her request to collect evidence or have a rape kit completed, but prison staff dragged ms. NASH - handcuffed and defenseless - into a SHU cell with an unhandcuffed inmate and left her there to be raped over 2 hours (Exh ___ )

The point is the rapes occurred and was allowed to continue without staff intervention

because the warden has endorsed harsh treatment of Trans women. Indeed, despite overt and frequent indicators that prison staff was preying on Trans females at USP Coleman from 2019-to-present, the institution took no action other than to violently assault Nash in retaliation for reporting misconduct.

- Coleman staffers used pepper spray to hose rape victims between the legs

Sexually assaulting Nash in retaliation for reporting noncompliance with the Kingdom v. Trump injunction is not an isolated incident but rather flows directly from the lawless prison conditions.

More specifically, Warden E.K. Carlton has fostered a corrupt culture of misconduct and impunity so peruasive that prison staff are pepper spraying rape victims between there legs.

As an example: on March 20, 2024, Edward Gladney, an incarcerated person at USP Coleman II, who identifies as Transgender, was raped by her cellmate in the SHU. Afterwards, "officer Morales and other unidentified officers kicked Gladney to the ground and sprayed pepper spray on Gladney's naked genitals and buttocks

while she screamed" (Exh )

The point is the retaliatory Attacks Against NASH And other incarcerated Trans women at Coleman II exposes long-standing systemic violations stemming from complete indifference And disregard of the safety And security of Trans people.

- Retaliatory measures taken in response to Nash's complaints concerning noncompliance with the Kingdom v. Trump injunction continues unabated to this day

4/13/2026 ms. NASH sat for an interview with the the Institution PREA Compliance Manager. Throughout the interview, PREA staff tried to prevent NASH from pursuing her complaint, pressured her to drop her complaints, And threatened her regarding the complaint. Specifically, PREA staff told NASH that if she didn't stop filing complaints she would be assaulted And written false misconduct reports by the staff And denied medical treatment to cover-up such Abuse. Ms NASH again contacted the warden to report ongoing Abuse, And pleaded with prison officals for A higher level of protection, but to no avail.

Conclusion

Because USP Coleman II permit sexual assaults to occur, do not provide effective reporting mechanisms, fails to impose Accountability, And facilitate retaliation the court should grant Nash's request for emergency relief.

B.) The court can infer retaliation based solely on the proximity between Nash's protected Activity And adverse Action.

Ms. Nash has Articulated A connection, either temporal or otherwise, between the alleged retaliation And her protected Activities. A few examples illustrate the point.

- 9-4-2025 Ms Nash filed A complaint concerning the institutions noncompliance with the kingdom injunction stating " The president signed An executive order which instructed the BOP to cease Any recognition of trans people. The executive order, however, does not supersede or change the BOP's obligation to comply with the PREA Act - including section 115.67, agency protection against retaliation." (Exh ___ )

Afterwards, the warden retaliated by refusing to implement Nash's earned First Step Act Release Credits. Here, the close temporal proximity between Nash's complaints And the retaliatory denial of Nash's earned federal time credits suggest causation

- on 9-20-2025 ms. NASH filed A complaint concerning the institutions noncompliance with the Kingdom injunction stating "thanks to the misuse of President Trump's EO the officers efforts At retaliation has had its desired effect — —Namely, keeping ms. NASH in prison long after she's eligible for release". Nevertheless, And just 30 days later the Institution PREA Compliance Manager retaliated by refusing to comply with PREA's requirement to prevent retaliation.

Here, again, ms. Nash adequately pled causation where Among other reasons, Approximately 20 days after her report was filed, the PREA staff retaliated by refusing to protect NASH from the wardens retaliatory denial of earned federal time credits. In order to realize And conceal his retaliatory denial of NASH's earned federal time credits the warden first falsely claimed that President Trump's Executive order prohibited PREA protections for Transgender women And also prohibited the institution PREA Compliance Manager from taking corrective action, in violation of PREA. But, in reality, the warden desired to punish NASH because she filed grievances concerning the institutions noncompliance with the Kingdom v. Trump injunction.

- MS. NASH testified at A 2-2-2026 evidentiary hearing concerning the institutions noncompliance with the Kingdom injunction (Exh ___). Afterwards, the warden not only ordered A subordinate

Case 1:25-cv-00691-RCL Document 214 (Court only) Filed 06/12/26 Page 40 of 91

to attack Nash, but fraudulently manipulated PREA procedures in order to guide the results of any PREA retaliation monitoring.

First and foremost, the retaliatory actions that occurred after Nash testified is actionable under this courts order. Indeed, not only did the hearing concern noncompliance with the Kingdom v. Trump injunction, but class counsel, Megan Z.F. Noor, was present in the courtroom and recieved oral testimony concerning access to hormone therapy and/or social accomodations since the Kingdom v. Trump injunction. (Exh __).

Second, Ms. Nash suffered two (2) retaliatory harms immediately following her oral testimony. First, the warden ordered a hit on Nash, and second, the warden - in order to conceal his retaliatory intent - not only refuse to allow the Institution PREA Compliance Manager to carry out the function of his office - going as far as reassigning him - but ordered the NEW Institution PREA Compliance Manager to recant the prior PREA manager's efforts to reverse his retaliatory denial of Nash's earned federal time credits. How transparently corrupt is that? The warden selected his PREA staff on the basis of their obediance to him rather than their acting in good faith and in service of the PREA Act.

page 11)

The bottom line is this, just 13 days after Nash returned from testifying at evidentiary hearing concerning the institutions noncompliance with the Kingdom v. Trump injunction Ms Nash was subjected to retaliatory Acts. Here, temporal proximity supports A finding of causation.

- Ms. Nash's verbal complaints constitute protected speech.

The institution refused to follow federal law, including the Eight Amendment, The PREA Act, and any court orders that pertain to Nash's access to gender affirming care and/or social accommodations saying "Trump won".

As such, during the period spanning from 10-11-2025 -to- 10-26-2025 Ms. Nash made several verbal complaints to Warden E.K. Carlton. Afterwards, and approximately A week after Nash's last oral complaint, the warden issued his retaliatory denial of Nash's earned Federal Time Credits.

First, oral complaints by A prisoner can form the basis of A retaliation claim within the prison context

Second, Due to Nash's complaints concerning his noncompliance with the Kingdom v. Trump injunction the warden was literally caught red handed violating the rules and laws governing hormone therapy and social accommodations. In other words, the warden had a terrific motive to retaliate.

ms. Nash didn't just file complaints, Rather, the warden and his executive staff were hauled into court to answer for their wrongdoing and Nash's testimony was key to their unravaling.

Third, recent congressional investigations found that BOP "largely tolerated and ignored inmates' complaints of sexual abuse" (Exh __ ). In other words, because the BOP failed to follow PREA protocol it was impossible for the warden to ensure fairness in determinining Nash's suitability for application of earned federal time credits. Nevertheless, the warden refused to conduct any independant investigation into the correctness of the findings and conclusions stating "Trump won", "This isn't the time to be a tranny" and "Im taking your FSA credits"

In sum, the statement "Im taking your FSA credits" and "Trump won" shows that warden E.K. Carlton is biased and has predetermined the outcome of any investigation into retaliation.

Conclusion

The tempral proximity between the protected activity and the retaliatory action is unusually suggestive and create an inference of causality.

(C.) The retaliatory Acts had no basis in fact.

The PREA Act directs that monitoring should be conducted to ensure A complaining inmate does not expierence retaliation. The warden, however, did nothing to protect NASH from retallation, And instead conspired with staff to retaliate Against MS. NASH

Here, the myriad violations of the PREA ACT is proof positive that the warden's Actions had no basis in fAct or law. Indeed, if the warden actions were legitimate And nonretaliatory then why did he need to violate PREA? The Answer: The warden's Actions were simply A pretext to deflect And conceal his retaliAtory motive. A few examples illustrate the point.

• 115.67 Agency Protection Against Retaliation

1.) In retaliation for her complaints concernins the institutions noncompliance with the Kingdom v. Trump injunction the warden denied NASH's earned federal time credits. Here, the PREA compliance manager was required to protect MS. NASH from the erroneous deprivation of earned federal time credits due to retaliation when she reported the institutions noncompliance with the Kingdom v. Trump injunction. Nevertheless, And in connivance with the warden, the PREA Compliance Manager refused to provide NASH A PREA retaliation assessment, thereby demonstrating that he knew that what he

was doing was wrong.

2.) The fact that the PREA Compliance Manager committed a willful act in the use of the process not proper in the regular conduct of the proceedings shows retaliatory motive.

The warden vigrously defends his actions implying that he properly would have performed the challenge action anyway – even if Nash had not engaged in protected activity. But that's not true.

Specifically, it was impossible for the warden to have reached the same decision because PREA mandates that the institution MUST monitor the conduct and treatment of NASH, for possible changes that may suggest retaliation. Also, the relevant policy clearly states that PREA staff "shall act promptly to remedy any such retaliation" See 28 C.F.R. 115.67. There are two points here.

First, had the BOP investigated after recieving the reports, and taken appropriate action, as required by Section 115.67, ms. Nash may have been spared her current First Step Act predictment Indeed, instead of performing "periodic status checks", to look for changes that may suggest possible retaliation and acting "promptly to remedy any such retaliation," the PREA manager instead refused to implement the 90 day monitoring period. Here, the PREA manager's departure from normal procedure were obvious red flags suggesting retaliation

Last, Anyone who reports sexual Abuse has A right to be free from retaliation for reporting. Nevertheless, And despite the antiretaliation regulations of the PREA Act, the PREA manager refuse to provide A retaliation assessment. Here, the court may infere A defendant's knowledge that conduct was wrongful from his efforts to coneal his conduct.

- 115.71 Criminal And Administrative Agency Investigations

"When An agency conducts its own investigation into allegations of sexual Abuse And harassment it shall do so promtly, thoroughly, And objectively for all allegations" (28 C.F.R. 115.71.). Here, again, the warden was motivated by a desire to punish NASH for complaining About noncompliance with the kingdom injunction And so manipulated the process And violated PREA to realize And conceal that goAl.

First, the PREA standards made provisions for victims of sexual assault, but BOP facilities Are not Adhereing to reporting stAndArds, investigation stAndArds, or providing access to medical forensic examinations, Access to outside confidential Support services And advocacy.

The point here is if A prisoner has been sexually victimized, the law provides specific Actions for staff to respond to ensure that victims Accesr necessary services. Here, the failure to comply with PREA StAndArds shows that the impartiality of the proceedins was compromised.

Second, The policy and rules for handling inmate complaints of sexual assault and retaliation leaves BOP officals no discretion as to whether to follow those procedures. Nevertheless, the warden made a conscious effort to disregard the ample evidence of retaliation in Nash's case, with a conscious purpose to avoid learning the truth - indeed, the institution did not implement a 90 day monitoring period after she reported.

The point: the BOP denied Nash's sexual assault report and denied her request to speak to PREA staff. The warden, therefore, is unable to say with any degree of certainty that his denial of Nash's request was not a product of retaliation. Indeed, the refusal to monitor for retaliation was retaliatory and a tactical maneuver meant to dramactically distort the First Step Act process and paints an inaccurate picture of Nash's risk of recidivism.

Third, Despite repeatedly requesting protection from rape and retaliation, which is required under PREA, institution staff keep ignoring these reports. Indeed, such stonewalling has persisted despite a federal court of Appeals ruling "BASED ON THE MORE THAN ONE-HUNDRED RAPES AND SEXUAL ASSAULTS SHE HAS SUFFERED AT THE HANDS OF PRISON GUARDS AND FELLOW INMATES WHILE INCARCERATED IN MEN'S PRISONS". SEE: UNITED STATES V. NASH, case # 23-3635, 2024 WL 1979067 (6th cir). see also: US V. NASH, case # 1:13-cr-00467, Dkt #309, PageID 1856-1862 (N.D. OHIO)

Here, again, what legitimate nonretaliatory reason could the warden articulate for failing to consider judicial findings of inadequacy. Indeed, the federal court already ruled that NASH was subjected to rape and retaliation, and therefore the PREA compliance manager could not have held that opposite way without violating PREA's investigation standard. (Exh___)

The bottom line is this: Ms. Nash's assertions regarding rape and retaliation are not inherently unbelievable and do not otherwise raise concerns about their reliability. Indeed, NASH is saying the same thing that more courts than can be cited have already found as facts.

115.72 Evidentiary Standard for Administrative Investigations

PREA mandates "the agency shall impose no standard higher than a preponderance of the evidence. in determining whether allegations of sexual abuse are substantiated".

The point is the willful and deliberate refusal to apply the correct evidentiary standard under PREA is the only way PREA staff could deny Nash's request for corrective action regarding her earned federal time credits. Therefore, here, it is unsurprising that PREA staff would raise the standard of proof to an unattainable level.

• 115.21 Evidence protocol And forensic medical examinations

PREA mandates that the victim Advocate "shall Accompany and support the victim through the forensic meadical examination process, And investigatory interviews, And shall provide emotional support, crisis interventions, information And referrals. Nevertheless, And in order to realize and conceal his retaliatory Actions, the warden prevented the victim Advocate from taking corrective Actions, even though the Action was fraudulent And should be corrected.

The point is the institution must monitor "inmate disciplinary reports, housing, program changes, And negative performance reviews" for possible changes that may suggest retaliation. 28 C.F.R. 115.67. Here, instead of monitoring housing, programming And incident reports recieved the warden chose rather to Apply the false retaliatory changes to deny Nash's First Step Act request. The victim Advocate, had one been present, would've been under A duty to prevent the warden from proceeding on such A false basis.

• Staff training includes A component on crime scene preservation.

- First, the denial of A rape kit after A report of sexual Abuse is clearly the type of conduct And treatment "that may suggest retaliation (ID at 115.67). Indeed, the terms of PREA specify that BOP "shall follow A

uniform evidence protocol that maximizes the potential for obtaining usable physical evidence for Administrative proceedings and criminal prosecution" 28 C.F.R. 115.21 (A)

-Second, Ms. Nash's First STep Act request must be decieded on A correct set of facts not the fraudulent And inaccurate ones which the warden relied on as A means to conceal his retaliatory actions. Indeed, the BOP concealed vitAl evidence by refusing to provide A rape kit or DNA testing, which means that Nash's PREA case files Are rife with factual inaccuracies And gave A distorted view of the incident.

-Third, In case file After case file there was no investigation that might have uncovered guards misconduct. Therefore, the PREA case files, And all documents related to it, were not Admissible evidence. The lesitimacy And significance of this argument is demonstrated by the BOP's zero tolerance policy

-Fourth, if the BOP did nothing wrong then why did they deny Nash A rape kit And issue her incident reports ONLY after she filed complaints. Here, the repeated similar Acts of retaliatory conduct taken in response to Nash's complaints supports A findings of retaliation

The bottom line: Despite the lack of evidence that BOP complied with PREA investigation standards, And the evidence that in fact they repeatedly covered-up Abuse, the warden refuses to acknowledge the obvious fact that Nash was subject to retaliation.

• 115.52 Exhaustion of Administrative Remedies

Under PREA " the agency shall not require An inmate to use any informal grievance process, or to otherwise attempt to resolve with staff and alleged incident of sexual Abuse " 115.52

Here, the warden disapproves of All things Transgender And so he not only consciously violated the law by disregarding the Kingdom v Trump injunction And continue in unlawful conduct that endangers Nash's safety, but he retaliated Against NASH because she filed complaints concerning the institutions noncompliace - including denying NASH early release. Neverethelesr, And in A caculated move to avoid discovery, the warden forced Nash to use an informal grievence process stating " This has been previously Answered at the Institution level. Please see your unit manager for further guidance on the next step in this process." (Exh __ )

(page 16)

The point is in order to realize And conceal his retaliatory denial of Nash's earned federal time credits the warden And his PREA staff subjected Ms. Nash to An entirely separate shadow legal system - one in which law And logic plays no role.

- An impartial decision maker is A requirement of PREA.

- First, in retaliation for her complaints concerning the institutions noncompliance with the Kingdom v. Trump injunction the warden 1.) refuse to implement Nash's First Step Act Release Credits; 2) ordered A hit on Nash; And 3) ridiculed And belittled Nash by telling her that she is A "tranny" And that she needs to hang herself, And if she doesn't they will her And do it themselves.

- Second, PREA's protection Against retaliation is not so lax As to let stand the decision of A biased warden who dishonestly suppresses evidence of Nash's innocence. Specifically, prior to his 10-20-2025 denial of Nash's First Step Act request Nash expressed concerns regarding the potential erroneous deprivations of First Step Act release credits due to rape And retaliation. But instead of conducting An in-depth investigation, as required by PREA, the warden simply stated that his Actions were "Appropriate." (Exh _). In other words, the initial inaction And superficial investigation into retaliatory discipline, housing, And programming changes was not reasonably calculated to uncover the truth.

The point is the warden does not view rape and retaliation as a serious offense and as a result. the institution conducted a superficial investigation, which it closed without doing any real investigation in violation of PREA.

Third, in order to prevent or impede Transgender individuals from adhereing to their Transgender identity the warden defied court orders and BoP directives, Specifically, the warden denied NASH a bra (Exh __); denied NASH soap to wash blood and semen out of her hair (Exh __); issued her false incident report to discourage her from complaining (Exh __); discontinued her house alone status and celled her with a sex offender (Exh); and referring to Ms. NASH as "MR NASH" (Exh __). This pattern of Antagonism towards NASH demonstrate a retaliation motive on the part of the warden and tends to show causation between NASH's protected Activity and the denial of Nash's earned federal time credits.

- Fourth, defiance of court orders reveal a profound disrespect for the law. Indeed, the court may infere that because the warden committed an illegal action once, he must have also committed another similiar act when he unlawfully retaliated by denying Nash early release.

Specifically, after entry of the Kingdom v. Trump injunction the warden unlawfully retaliated by refusing to provide gender-affirming surgery as part of medically necessary treatment for Gender Dysphoria; refuse to

accommodate And facilitate social transition for NASH, such as failing to allow access to gender-affirming clothing And grooming items, failing to make individualized housing placement decisions, And permitting cross-gender strip searches.

The point is if the warden ordered A hit on NASH in retaliation for her protected Activity, he must have also committed Another similiar Act when he denied NASH's earned federal time credits in retaliation for her complaints concerning noncompliance with the Kingdom v Trump injunction.

The bottom line: The warden was angry with Ms. NASH for complaining, discourage her from doing so, And behaved in A way that would suggest he resented NASH for complaining, all of which shows that the impartiality of the proceedings was compromised, in violation of PREA.

- The court orders blocking President Trump's Executive Order shows that warden stated reasons for his Adverse Actions were pretext - A phony reason meant to cover-up A disallowed reason

Guards refused to Act when NASH sought protection from prisoners And staff pursuing her for sex, then retaliated Against her when she filed complaints. Nevertheless, the warden refuse to Act stating "Trump won", "you Are either male or female", "there Are X chromosomes And

there are Y chromosomes" and the warden told Nash that trans women "had no rights that he was bound to respect". (Exh___)

Here, NASH contends that the nonretaliatory reasons for the denial of her earned federal time credits, that President Trump's Executive Order (PTEO) barred PREA's Agency protection Against retaliation is a smoke screen to hide retaliation.

First, the false retaliatory discipline, housing, and programming changes that rendered Nash ineligible to apply earned federal time credits MUST be corrected under PREA, section 115.67, agency protection Against retaliation. Indeed, PREA states "Items the agency should monitor include changes in housing, programming, and incident reports recieved. An Application of those standards to Nash's case clearly supports the conclusion that Nash is entitled to remedial measures - including Approval of her FSA release credits.

Second, PTEO is not only being used to disguise the horrific treatment of NASH, but is A dishonest way to circumvent the antiretaliation regulations of the PREA Act

The point is gratuitously allowing the beating and rape of NASH is not authorized by PTEO. Indeed, the BOP, itself, said "The Executive Order does not supersede or change the BOP's obligation to comply with Federal laws and regulations,

including the Prison Rape Elimination Act and corresponding regulations" (Exh __ )

Third, under the policy that existed before PTEO incarcerated victims could request remedial measures after sexual assault complaints to prevent retaliation. Here, the PREA manager did not find (and given the record before him could not have found) that Nash was afforded her constitutional right to safe confinement and protection from retaliation. Nevertheless, the PREA manager refused to preverse the warden's retaliatory denial of Nash's earned federal time credits saying "Trump won" and that "the President signed an executive order which instructed the BOP to cease any recognition of Trans people" (Exh _ )

Here, again, the absence of good faith with respect to the legal position the PREA manager relies on in support of his denial shows retaliatory intent. Indeed, PTEO has been enjoined and the denial of early release in retaliation for reporting misconduct is not authorized by PREA or PTEO. Rather, the failure to adequately treat Ms. Nash, protect her from harm, and the retaliatory denial of early release would not have occurred but for the wardens unlawful conduct in continuing to implement and enforce PTEO.

Conclusion

The manner in which the warden and his PREA staff effectuated, and then manipulated the Agency's protection against retaliation to its benefit, thereafter, was retaliatory and a tactical maneuver meant to deflect and conceal their retaliatory motives. Similarly, the failure entirely to follow standard 115.21, proper evidence protocol for forensic medical exams; 115.22, referrals of allegations for investigations; 115.34, specialized investigations training; 115.61 staff and agency reporting duties; 115.71, protection against retaliation; 115.71, criminal investigations; 115.72, using the correct evidentiary standard; and 115.81 mental and medical health screenings. Are symptomatic of the reasons prison staff was able to violate criminal laws, court orders, BOP policies, and PREA guidelines without being discovered. Finally, the failure entirely to adhere to PREA standards, cumulatively, reflect an overall scheme to guide the results of any PREA retaliation assessment. Indeed, the components of the manipulation include the denial of a victim advocate, a PREA retaliation assessment, requested administrative remedy forms, the use of retaliatory violence, and the illegal implementation and enforcement of PTEO.

D.) Lack of Programming, history of prohibited Acts, And High Recidivism risk score was insufficient to motivate the Action

• "Ms. Nash has been raped at knifepoint, raped in retaliation for reporting misconduct, And raped by A prison guard" See United States v. Nash, case # 1:13-00467, Dkt # 309, page ID 185-9

The BOP failed to protect Nash from rape and from prison employees falsifying disciplinary reports. Here, the wardens explotation of that illegality was A means to retaliate Against Nash for her complaints concerning noncompliance with the Kingdom v. Trump Injunction.

- First, retaliatory discipline, housing and programming changes cannot serve as A basis to deny Nash's earned federal time credits.

Specifically, as part of their effort to determine possible retaliation the PREA manager monitors "disciplinary reports, housing or program changes, and negative performance reviews". 28 C.F.R 115.67. Here, rather than monitor the conduct And treatment of Nash to see if there are any changes that may suggest retaliation And "Acting promptly to remedy any such retaliation" (ID). The warden, instead went Ahead And applied the false retaliatory discipline, housing And program changes, in violation of PREA, this convenient but

Case 1:25-cv-00691-RCL Document 214 (Court only) Filed 06/12/26 Page 58 of 91

obvious manipulation of the PREA Act had two goals. Goal #1 was to continue the campaign of harassment and retaliation initiated by prison staff. Goal #2 was to bury the the illegal action; to create the cover-up needed to deny NASH's FSA request.

Second, the warden exceeded his legal authority under PREA, acted unconstitutionally, and failed to follow BOP regulations, which means he cannot establish a nonretaliatory reason for his conduct.

Ms. NASH was sexually abused by prison staff and retaliated against when she filed complaints. Nevertheless, the warden used the false retaliatory discipline, housing, and program changes to discredit NASH and support his denial of Nash's FSA request. This is exactly the type of conduct the PREA Act aimed to deter.

In combination, the denial of a PREA retaliation assessment and the application of false retaliatory discipline, housing, and program changes was merely an attempt to realize and conceal the existence of an illegal conspiracy to retaliate against NASH.

Third, despite Nash's many request that they do so, the BOP has Never implemented the 90 day monitoring period after a report. In other words, the wardens conduct is based upon an extensively and materially false record, in

which Nash had no opportunity to correct. THAT WAS HIS PURPOSE.

Here, there is no serious question that Nash's claimed LACK of Programming, History of Prohibited Acts, And High Recidivism Risk Score is the immediate And direct byproduct of the BOP's own failure to protect NASH from retaliAtory discipline, housing, And program changes. Again, the BOP has Never once implemented the 90 day monitoring period. In fact, PREA staff refuse to fill out the BP-A1176, INmate Retaliation Monitoring Form (Exh ___ )

The bottom line is the BOP ignores its own failure to protect NASH from rapists employees And inmates, as well as its failure to monitor for retaliation, And instead focus Soley on the end result of their own Seditious Actions. To permit the BOP to escape the effects of their own handiwork in the mAnner now sought would Not only result in A miscarriage of just, but violate the BOP's zero tolerance policy.

Fourth, Ms. Nash has been raped over 200 times in BOP custody. see US v. Nash, case # 1:13-CR-00467, Dkt 309, PageID 1856-1862 (N.D. OHIO, Nov 11, 2024) Here, it is plain that A PREA retaliation assessment was needed, And if it had been Conducted properly, the denial of Nash's FSA request would not have occurred.

The point is the federal courts ruled that NASH was not afforded her constitutional right to protection of safe confinement And protection from retaliation, as such, the statutory requirement for establishing retaliation under PREA's protection Against retaliation Are essentially Already met.

Fifthly, the BOP waited until Nash's injuries healed to conduct A PREA sexual assault medical examination (Exh ___). Here, again, these facts Are ignored And replaced with the conclusions of their own handy work. The BOP orchestrated cover-ups consisting of the BOP's refusal to provide sexual assault medical examination, the failure to preserve physical evidence of sexual assault, the failure to adhere to reporting And investigation standards of PREA, And the crushing physical And psychological consequences of being raped over 200 times in BOP custody.

The point is if the BOP denied Nash A rape kit to cover-up misconduct, then its likely they also refused to monitor for retaliation after the reports, And if they refused to monitor for retaliation, its likely because Ms. Nash was being subject to retaliation. This is A critical truth.

Finally, in retaliation for her complaints concerning noncompliance with the Kingdom v. Trump injunction the warden allowed himself to serve as a conduit of other officers improper, retaliatory motives.

Specifically, the warden recieved discipline, housing, and programming information tainted by impermissible retaliatory motives. Rather, than "Act promptly to remedy any such retaliation" 28 C.F.R 115.67 the warden used the retaliatory reports to realize and conceal his own retaliatory motives. An example may be helpful.

On 4-15-2024 Officer white sexually assaulted ms. Nash and scrawled "fuck fags" and "niggers" on Nash's cell wall. (Exh__). The sexual assault and the false report he wrote attempting to cover-up his misconduct was not properly investigated. Still, the warden capatalized on the officers' wrongdoing by using the false reports to deny Nash's earned federal time credits. The court, however, should refuse to grant the BOP immunity for failing to comply with PREA's repuirements to monitor for retaliation. After all, the entire reason for this problem is the BOP's own efforts to silence and discredit Nash. There are four points here.

First, the retaliatory intent of rapist employees can be imputed on the warden if he acted as a conduit of the rapist employees retaliatory measures. Essentially, the wardens conduct was nothing more than a means to camouflage illegal retaliation.

Second, the failure entirely to monitor for retaliation required Coleman's PREA staff to make an independant investigation into the correctness of the findings and conclusions. Because the warden never conducted a retaliation assessment the causual link between the officers retaliatory measures and the ultimate FSA decision was not broken. In fact, the warden was a mere conduit - a rubber stamp- for officers retaliatory measures.

Third, knowingly refusing to terminate a series of retaliatory acts by others, which the warden knew or reasonably should have known would cause NASH to lose earned federal time credits violated BOP zero tolerance policy.

The bottom line: but for an unconstitutional retaliatory motive the warden would not have acquiesced in the officers' improper motives.

( ) The BOP repeatedly failed to follow proper procedure under PREA And BOP policy implementing PREA, which means there is A complete Abscence of probative facts to support the wardens denial of Nash's earned federal time credits.

~ ~ ~ ~ ~ ~.

- Everyone involved in permitting retaliation Against Nash knew they were participating in An illegal, unconstitutional cover-up. Indeed, the three factors the warden relied on to deny NASH - lack of programming, history of prohibited Acts, And High Recidivism risk score - Are all explicitly prohibited by PREA, section 115.67, Agency protection Against retaliation. (Exh )

LACK OF PROGRAMMING

Nash's purported lack of programming did not Arise from Nash's own wrongdoing, but rather arose out of the retaliatory conduct of prison staff.

Specifically, after each sexual assault report ms. NASH was placed in the SHU in violation of PREA. During this time, BOP officals denied NASH Access to programming that would have been available to her if she had not been in Administrative segregation. BOP officals did not solicit or consider Nash's views regarding her personal safety And housing, did not review he placement in Administrative segregation, And did not

consider alternatives to administrative segregation. 28 C.F.R. 115.43 (b).

The point is when an inmate is placed in the SHU involuntarily access to programs, privileges, education, or work should not be interrupted, to the extent possible. If they are limited, the chief of correctional services ensures that documentation exists reflecting the limitation, duration, and rationale for limitation.

Here, the warden cannot and will not show any documentation explaining why the BOP denied Nash access to programming or the reason why no alternative means of separation can be arranged, which means that there was an insufficient basis to deny Nash. Indeed, evidence based recidivism reduction programs, psychology programs, and vocational and occupational training are limited or nonexistent in the SHU. This lack of access to programming (not laziness or lack of initiative) not only resulted in fewer opportunities to earn and apply credits towards early release, but the BOP's failure entirely to comply with restrictions that PREA place on the use of administrative segregation opened the door for the warden to realize and conceal his retaliatory conduct.

Something else: Because of the rapes and subsequent placement in secure housing for her own protection and her repeated transfers to different facilities Ms. Nash was

involuntarily withdrawn from eleven (11) courses (Exh ___). Still, the warden used the BOP's own wrongdoing as a crudgel against Ms. Nash saying "LACK OF PROGRAMMING".

The bottom line: Putting Nash in segregated and other isolation housing after she has suffered assaults or threats by other inmates and staff was retaliatory, and a tatical maneuver meant to ensure adverse "housing and program changes" in violation of PREA, and, therefore, a longer sentence for Nash.

At its core, blaming Nash for failing to complete programs when she was being raped and denied programming in retaliation for her PREA complaints constitute improper victim blaming and is functionally an attemet to exculpate the BOP for its own wrongdoing.

HISTORY OF PROHIBITED

The disciplinary tickets were written in retaliation for her complaints against staff and inmates.

1.) BOP policy specify that an inmate needs only to remain Incident report free for three (3) years to approve application of FSA release credits for applicants with High Recidivism Risk Score. Nevertheless, and to realize and conceal his goal of falsely imprisoning Nash, the warden appeared to have applied any and all incident reports

from NASH's period of incarceration. Here, however, that conduct should be set Aside As retaliatory because Its contrary to law And outside the window established by BOP policy.

The point: is the BOP failed to follow PREA Protocol; as such, it has forefeited its right to Apply the challenged incident reports under PREA, section 115.67.

2.) The BOP has failed to make Any showing why it should not be considered the cause of Nash's FSA predicAment or how it is without fault in creating the crisis that NASH claims Now require this courts intervention. Indeed, using fAlse retaliAtory reports from Correctional officers who sexually assaulted NASH to deny Nash's FSA request by itself constitutes retaliation And bad faith gAmesmAnship

For example: Officer white sexually assaulted MS. NASH then, issued her A fAlse incident report to obtain A finding of guilt before the disciplinAry officer, And, thereby increasing the lenght of Nash's sentence. Not just that, the federal court ruled that "DefendAnt had been sexually assaulted by Officer white And the incident was covered-up" See U.S. v. NASH, #1:13-cr-00467-BYP, Doc# 332, PageID 2421-2422 (Footnote #10)

Nevertheless, the warden Applied the incident report to deny Nash's early release. This shows how obssed they are with retaliating Against Ms. Nash. Indeed, the Institution PREA managers failure entirely to monitor for retaliation, And the failure to investigate fairly And without bias defaulted the agencies protection Against retaliation. The BOP knows that, but somehow, they don't seem to care.

3) Senate investigations into BOP expose "National disgrace" (Exh ___).

First, Former BOP Officer Chikosi Leggins repeatedly raped Nash (Exh ___) And officer White sexually assaulted Nash. In other words, ms Nash has been raped And sexually assaulted by staff, the very people charged with stopping this Abuse. This is An Added concern for the Application of PREA's Agency protection Against retaliation. After all, the more serious An officals violation of the law, the greater An incentive they have to retaliate to keep the truth from coming out.

Second, if the BOP failed to protect Nash from over 200 rapes then common sense tells us that they also failed to protect Nash from prison employees falsifying disciplinary reports. Indeed, prior similar Acts of misconduct can be used to infer guilty

intent And this case does involve evidence of repeated substantially similiar Acts relevant to intent. Nevertheless, the warden engaged in "willful blindness", that is, he deliberately closed his eyes to the obvious fact that NASH was subject to retaliation.

Finally, the senate investigations determined that "managment failures enabled continued sexual Abuse And instead of holding employees Accountable BOP failed to detect, prevent, And respond to sexual Abuse of female prisoners in its custody".

The bottom line: MS. Nash's claims of rape And retaliation Are not unsubstantiated because they describe in detail the retaliatory Attacks with specifics that were not internally inconsistent nor inconsistent with recent congressional investigations that found BOP "largely tolerated And ignored inmates complaints of sexual Abuse"

- As stated, the retaliatory conduct that rendered NASH ineligible to Apply earned federal time credits must be corrected under PREA, section 115.67. Here, MS. NASH showed that her history of prohibited Acts were false, but the warden took no corrective Action, in violation of PREA.

Specifically, MS. NASH, in AN inmate-to-staff email, filed A PREA complaint with the PREA manager And A written statement of all

material evidence substantiating the claims concerning the false incident reports (Exh ___), but the PREA manager took no Action stating "Trump won".

The point is Ms. Nash has Assembled A moutain of documentation that clearly - chronicled 10 years of Abuse And retaliation, Every fact And fragment And its context was supported with black And while documents - that is, the BOP's own records -. Still, the warden pretends that the incident reports Are valid. The wardens goal was not only to keep all Actions against Nash going, but also to bury all the illegal Actions. We must realize this.

- The purposeful disregard of binding case law And attempt to menipulate the law to reach A desired result shows retaliatory intent.

Ms. Nash's retaliation claim must be assessed in A manner consistent with Applicable law. Specifically, Section 115.67, agency protection Against retaliation provides the conditions that must be met to establish retaliation. Here, An Application of these standards in the content of the present proceeding required the warden to refrain from Applying the challeged incident reports. Nevertheless, And in order to conceal officer misconduct, the warden not only refused to assess Nash in A manner consistent with Applicable law, but called his exploitation

of that illegality "Appropriate" (Exh __ ).

The point is the warden deserves A lifetime Achievement Award for his gravity-defying Ability to explain Away retaliatory Actions As "Appropriate". Indeed, under PREA Nash must be afforded process in Addition to that provided by the ordinary disciplinary hearing. Nevertheless, the warden and his PREA staff reached A conspiratorial Agreement to rig the assessment by applying A much more strigent and all toghter different legal standard than the one required by PREA law.

The bottom line is Ms was raped and issued bogus incident reports to cover it up, And the warden and his PREA manager not only permitted it but used their power to cover it up And made it much harder to prove. Indeed, by bypassing the PREA Act's criteria for establishing retaliation the BOP ensured the outcome will be biased in their favor.

Conclusion

Ms Nash's case is the most well documented victim of Abuse case to come out of the BOP. Indeed, in some case where inmates alleges sexual misconduct A prison officals may not be Able to determine what happened due to lack of evidence other than prisoner And staff statements. Here, however, the complaint Against Warden E.K. Carlton

filed by ms. Nash document in granular detail who did what to her, when, how, And where. Yet, At every turn Nash's efforts have consistently been circumvented by ingenious evasions which deflect and conceal the wardens retaliatory motives. (Exh___).

• HIGH RECIDIVISM RISK SCORE

1.) The categorical rejection of inmates with High Recidivism Risk Scores is not authorized by law, And is Accordingly unlawful.

Specifically, inmates classified as having A high recidivism risk score can petition their Warden under section 3624(g)(1)(D)(i), Here, the wardens purposeful disregard of federal law And attempt to manipulate the law to reach A desired result was merely A smoke screen to hide retaliation.

2.) Ms. Nash's High Recidivism Risk Score is A product of retaliation and institutional bias Against transgender people, And therefore is not relevant to the warden's FSA determination.

First, issuing incident report ONLY After Nash filed her PREA complaints constitute proximity usually suggestive of retaliatory motive. Here, ms. Nash showed A sufficient inference of causal connection by evidence of the time span between the complaint And issuance of the

false incident report. Still, the warden refused to take corrective action. In other words, the warden intentionally treated NASH incorrectly in order to obtain a findings of "High Recidivism Score", And conceal his retaliatory motives

Second, The BOP cannot and will not show that it has proceeded in compliance with department policy or federal law - including the PREA ACT, Indeed, the wardens finding of "High Recidivism Score" is based entirely on false information provided to him by officers who sexually Abused NASH - would A bias source like that have A motivation to lie? Here, again, using false incident reports from guards, who themselves, Are accused of sexually Abusing NASH to deny NASH'S FSA request is just Another scheme to falsely depict NASH as dangerous, And conceal his retaliatory motives

The point is NASH'S "High Recidivism Score" does not display A propensity for violence. Rather, It shows the trauma And injustice of being violently raped, retaliated Against, And penalized for reporting sexual misconduct, As well as opposing And complaining About institutional bias against Transgender people. Therefore, Ms. Nash's prison record simply does not speak to the question of "High Recidivism Score"

- MS. NASH'S "High Recidivism Score" did not Arise from Nash's own wrongdoing but rather Arised out of Actions taken by BOP staff in preventing retaliation assessments.

The record is entirely devoid of any evidence supporting A finding that BOP complied with PREA's requirement for monitoring after sexual assault complaints to prevent retaliation. The undisputed evidence supports the exact opposite conclusion – specifically, that the warden leveraged false retaliatory discipline and programming changes to falsely depict NASH as dangerous, in violation of PREA.

The bottom line: Coleman PREA staff have in their possession legal documents finding "more than one-hundred rapes And sexual assaults [NASH] has suffered At the hands of prison guards And fellow inmates while incarcerated in men's prison" see Sixth Circuit, # 23-3635, Dkt 18-1. Yet still, The Prea manager refuse to conduct A PREA retaliation assessment, refuse to provide NASH A victim Advocate, and refuse to process Nash's emergency Administrative Remedies. This was part of A deliberate, planned effort to realize And conceal the wardens retaliatory conduct.

- The BOP Abdicated its oversight obligation to protect NASH from rape, retaliation, And other physical assaults And violence.

1.) Ms. Nash is sexually abused by both inmates And staff while the warden did nothing. Here, Nash's "High Recidivism Score" did not Arise from Nash's own wrongdoing. Rather, the rapes And the coordinated cover-ups that followed each assault adversely affected and compromised Nash's Ability to participate in BOP programs Aimed At reducing recidivism.

2.) Retaliation by inmate And staff Abusers violated 18 U.S.C. Section 3632 (a)(5)(A), which provides that all prisoners "at each risk level [must] have a meaningful opportunity to reduce their classification during the period of incarceration

3.) The BOP's failure to implement the PREA Act According to its plain language violated the rights of NASH who should be returning to the community but remain incarcerated.

The BOP has been consistent And methodical in failing to ensure Nash's safety, And provide protection Against retaliation. Nevertheless, And despite repeated And continued instances of sexual violence, "Ms. Nash has earned 365 days towards early release to Supervision And 375 days towards Residential Re-entry Center / Home Confinement Placement" In short, if the BOP had followed PREA protocol we would be having A fundamentally different discussion - indeed, there would

5:25-cv-396-MSS-PRL

# Memorandum

#1:) Subjecting MS. NASH to unjustified incarceration in retaliation for her participation in Plaintiff's lawsuit

The defendants reached A conspiratorial Agreement to deny NASH early release in retaliation for her participation in Plaintiff's lawsuit. Specifically, the Prison Rape Elimination Act (PREA coordinator) initially Agreed to reverse the wardens retaliatory denial of Nash's earned federal time credits, but after Nash testified, the PREA coordinator reversed its prior position on the Applicability of PREA's Agency protection Against retaliation. (28. C.F.R 115.67.) saying he had "changed his mind" And "you snitched on the warden"

Here, MS. NASH indicates that defendants Abrupt reversal of position with regard to Nash's earned federal time credits And the canceling of the scheduled meeting to finalize documents for finding Nash eligible for protection Against retaliation. (Exh A), immediately following Nash's participation in Plaintiff's lawsuit, reveals defendant's retaliatory motives.

#2) Ms. Nash is incarcerated in environment where rapes, And other forms of sexual assault And retaliation Are prevelent And tolerated.

USP Coleman II permits sexual assaults to occur, do not provide effective reporting mechanisms, fails to impose Accountability And facilitate retaliation.

Specifically, BOP staffers collaborated with Another inmate to rape Ms Nash (Exh B
Desepite the BOP's zero tolerance policy, C-leman II took no disciplinary Action Against the officers And the prison failed to respond to Any Administrative Appeals.

Not just that: Defendants have fostered A corrupt culture of misconduct And impunity so pervasive that prison staff Are pepper spraying rape victims between their legs. As A example, on March 20, 2025 Edward Gladney, An incarcerated person at USP Coleman II, who identified As Transgender, was raped by her cellmate in the SHU. Afterwards "officer Morales And other unidentified officers kicked Gladney to the ground And sprayed pepper spray on Gladney's Naked genitals And buttocks while she screamed" (see Exh C )

Exh A-1



---

FROM: 31505001
TO: Associate Warden Unicor
SUBJECT: ***Request to Staff*** NASH, DARNELL, Reg# 31505001, CLP-K-A
DATE: 02/25/2026 02:17:52 PM

To: PREA (T.D AVERY )
Inmate Work Assignment: First PREA Meeting email

This muti-page email memorandum strives to set forth the top line items for the February 2026 PREA retaliation assessment meeting with Coleman 2 PREA staff.

A.) BOP POLITICS

it is true loyalty to the BOP uniform is prized above all else. However, here, a favorable action or decision in Nash's case will have no civil or criminal implication for any employee of the BOP.

Specifically, the agency protection against retaliation is triggered by the report, not the substantiation of the complaint. Indeed, the question under 115.67 is not whether the claims of abuse are substantiated, rather the focus of the inquiry under PREA is whether the BOP's failure to follow PREA investigation standards supports a finding of retaliation. It does. The BOP repeatedly ignored PREA protocol and the law with impunity--including denying Nash access to sexual assault forensic medical examinations. Here, the optics, if not the substance, were beyond improper by any legal and ethical standards.

The bottom line is this: the BOP's departure from normal procedure were obvious red flags suggesting retaliation. thus, the entire process seemed distorted and illegitimate from the outset, as if the investigation was nothing more than subterfuge designed to cover-up illegality.

B. PREA PROCEDURE WERE IGNORED, RESULTING IN A COVER-UP OF THE SEXUAL ASSAULT INCIDENTS.

The BOP concealed vital evidence by refusing to provide a rape kit or DNA testing, which means that Nash's PERA case files are rife with factual inaccuracies and gave a distorted view of the incidents. The point is it would be puzzling, suspicious, and counterintuitive to the law to require Nash to substantiate her claims of abuse and retaliation. Indeed, the BOP repeatedly denied Nash a rape kit which means that Nash's reports of abuse could not be determined or substantiated. Here, the BOP's failure to comply with the PREA Act cannot be used by warden E.K Carlton to deny Nash earned federal time credits.

The bottom line is this: In the past, PREA staff have deliberately refused to utilize the correct evidentiary standard for PREA investigations, including twisting the language and the statute to create the appearance that no harm was done. Here, however, rewriting the law and reshaping the facts to exonerate the BOP of any wrongdoing will be properly viewed as retaliation, and a tactile maneuver meant to simultaneously compromise the integrity and effectiveness of the agencies protection against retaliation. This cannot be correct. Note: In some cases where inmates alleges retaliation and sexual misconduct by employees of the BOP Prea staff may not be able to determine what happened due to lack of evidence other than prisoner and staff statements. But that's not what happened here. Indeed, in a complaint against Warden E.K. Carlton filed by Ms. Nash, Nash has assembled a mountain of documentation that clearly chronicled 10 years of abuse and retaliation. Every fact and fragment and its context was supported with black and white documents. The point is: The antiretaliation regulations of the PREA act is meant to ensure that retaliation for reporting sexual abuse is NOT exploited to the inmates detriment by staff.

This is the end of the first email.

Exh A-3

TRULINCS 31505001 - NASH, DARNELL - Unit: CLP-H-A

-----------------------------------------------------------------------------------------------------------------

FROM: 31505001
TO: Associate Warden PEN 2
SUBJECT: ***Request to Staff*** NASH, DARNELL, Reg# 31505001, CLP-K-A
DATE: 02/25/2026 06:14:46 PM

To: T.D. AVERY
Inmate Work Assignment: 3rd PREA MEETING EMAIL

D.) THE FEDERAL COURTS RULING OF "MORE THAN 100 RAPES" MEETS THE LEGAL REQUIREMENTS SUPPORTING A FINDING OF RETALIATION UNDER PREA, SECTION 115.67

The federal courts ruled that Nash had been retaliated against "based on the more than one-hundred rapes and sexual assaults she has suffred at the hands of prison guards and fellow inmates while incarcerated in men's prisons"

The bottom line: Ms. Nash's assertions regarding rape and retaliation are not inherently unbelievable and do not otherwise raise concerns about their reliability. Indeed, Nash is saying the same thing that more courts than can be cited have found as facts. On these facts, the Prea compliance manager should draw the inference that Nash's claims of retaliation are "probably true" as the law demands.

E.) THE FACT THAT THE BOP'S OWN RECORDS UNDERLIE THE COURTS RULINGS OF RAPE AND RETALIATION SHOWS THAT THE FINDINGS OF RETALIATION WERE ACCURATE AND THE CONCLUSIONS REACHED WERE SOUND

Retaliation by inmates and staff abusers precipitated a chain of events that had a serious and harmful impact on Nash-- including the denial of earned federal time credits. Here, it would impossible for PREA staff to rationalize not helping Nash because, after all, the BOP's own records underlie the courts rulings of rape and retaliation.

PREA, section 115.67, agency protection against retaliation only requires PREa staff to assess it POSSIBLE that retaliation occurred. Here, again, how is it possible that PREA staff did not have such a reasonable belief. They must have. First, the federal courts rulings of rape and retaliation were supported by the BOP's own records. PREA staff knew this and, therefore, had reason to believe that Nash was POSSIBLY subject to retaliation. Second, the BOP's failure to comply with the PREA ACT gives sustenance to the inescapable conclusion that Nash was subject to retaliation. If the BOP did nothing wrong then why did they deny Nash a rape kit?

The bottom line is distorting the law to uphold dishonest acts by employees of the BOP would, by itself, constitute retaliation, in violation of PREA.

F.) Like his counterparts in the BOP, federal district court judge Nugent sat idly by and watched while the number of rapes against Ms. Nash increased. Accordingly, the sixth circuit court to appeals granted Nash's request to disqualify district court judge Nugent.

the point is the recusal of district court judge Nugent not only demonstrate the volume and strength of the evidence of rape and retaliation in Nash's case but underscores the need for PREa staff to determine Nash's legal status in a fair and neutral manner.

something else: the Sixth Circuit court of appeals acknowledged that the authority to recuse a federal judge is "extraordinary" and "should be rarely invoked". here, if the volume and strength of the evidence of rape and retaliation was such that it justified the recusal of a federal judge then that adjudication should be equally sufficient to satisfy the preponderance of the evidence standard established by PREa. Finally, the denial of Nash's earned federal time credits, compiled by a bias and discredited source, must be reversed. Specifically, the warden E.K. Carlton, under oath, testified that he denied Nash Prea protections due to his "religious beliefs". As such, the warden presents a disqualifying conflict of interest.

---

FROM: Associate Warden PEN 2
TO: 31505001
SUBJECT: RE:***Inmate to Staff Message***
DATE: 02/26/2026 07:32:02 AM

Thank you for your email and concerns.
We will have a sit down meeting with you so you can present all your concerns in the AW's complex. See me at mainline for confirmation and date and time for this meeting.
Thanks,
AW Avery

---

From: ~^! NASH, ~^!DARNELL <31505001@inmatemessage.com>
Sent: Wednesday, February 25, 2026 7:16 PM
Subject: ***Request to Staff*** NASH, DARNELL, Reg# 31505001, CLP-K-A

To: t.d. avery
Inmate Work Assignment: Last email

G.) MS NASH PROVIDED TESTIMONY OF 200 RAPES THAT WENT UNANSWERED BY THE GOVERNMENT

on 2.2.26 , in a federal courtroom in Tampa Florida, MS Nash (under oath) gave testimony regarding rape and retaliation at the hands of inmate an staff abusers stating "i have been raped at knifepoint, raped in retaliation for reporting abuse, and raped by two prison guards". Also that, "the warden was actively retaliating against [her] due to reporting misconduct and retaliation by employees of the BOP. nevertheless, and despite the opportunity to do so , the government never rebutted Nash's claims of retaliation. Here, the failure to rebut Nash's claims of rape and retaliation was an implicit admission that retaliation, indeed, occurred in Nash's case.

think about it: the federal government (and the warden and his executive staff who were present in the courtroom) had ample opportunity to disprove Nash's claim of rape and retaliation, but did not do so. Indeed, the government attorney or the warden and his executive staff did not submit testimony under oath from witnesses with personal knowledge directed towards Nash's allegation of rape and retaliation. Note: Coleman 2 PREA staff did not even bother to show up for the court hearing, which only reinforces the impressing that impropriety and concealment continued at the highest levels of the department.

the bottom line: when Nash makes factual allegations about issues of rape and retaliation and the government does not provide evidence within its control to rebut those claims, this failure can raise an inference that the evidence will support the victims factual assertions. it is a factor to take into account.

H ) Nash's Judges Recommendation for maximum amount of halfway house

at Coleman 2 vulnerable victims have two choices 1.) submit to sexual abuse or 2.) get raped in retaliation for reporting abuse. the point is because of staffs failure to take basic steps to ensure a safe environment free from rape, retaliation, and discrimination the federal court ruled that Nash should transition into a residential reentry center during the end of her term of incarceration and the beginning of her term of supervised release stating " Defendants placement in a residential reentry center will assist defendant in transitioning into the community and equip her with stability and skills that should minimize her risk of recidivism. (see: us v. Nash, case # 1:13-cr-00467, doc# 343, pageid # 2553, (N.D. OHIO 2.6.2026). Nevertheless, the warden refused to comply with the judges recommendation to transition Nash into a half way house. this conduct give rise to an impressible appearance of retaliation and suggest that the wardens intentions and motivations were purely vindictive. as such, the PREA compliance manager should be sensitive to assure that no action is taken which may appear to be retaliatory for Nash having testified against executive staff-- including denying the judges recommendation to place Nash in a halfway house.

conclusion: Ms. Nash was advised that PREa staff would conduct a full ,complete, and objective evaluation of these matters in a manner that is consistent with the law and facts. And MS Nash -- at least currently-- has reason to believe those assertions. Thank you.

---

FROM: 31505001
TO: Associate Warden PEN 2
SUBJECT: ***Request to Staff*** NASH, DARNELL, Reg# 31505001, CLP-K-A
DATE: 09/20/2025 07:09:53 PM

To: PREA COORDINATOR (PREA
Inmate Work Assignment: N/A

2. The disciplinary tickets were written in retaliation for Nash's complaints against staff and inmates

Ms.Nash is plainly trapped in a vicious cycle of rape and retaliation. It works like this: 1.) Ms. Nash is raped 2.) Nash is placed in segregated housing as a form of punishment. and 3.) BOP staffers -- in order to justify a transfer of Ms. Nash--either falsely accurse Ms. Nash of a high severity disciplinary infraction or falsify a threat assessment. The evidence is overwhelming.

4-15-2024 Officer White sexually assaulted Nash, six hours AFTER Nash filed her sexual assault report, Officer White issued Nash a false incident report #3923073

9-18-2024 Ms. Nash was raped by Inmate Dylan Deling, 48 hours later, AFTER the BOP failed to perform a forensic rape examination, she was issued false incident reports #3998445, #3998057, #3998055

March 2023 Nash reported "that a prisoner sexually abused her on at least five occasions, including on March 20,2023. 72 hours later, AFTER Nash filed her report, Nash was issued a false incident report #3748684

The bottom line is Ms. Nash has been raped by over a dozen different inmates. Yet, Ms. Nash has never been accused of or found guilty of either fighting, carrying a weapon, or threatening other incarcerated persons. Still, the BOP has repeatedly accused Nash of threatening staff. Does that sound right to anybody? If Ms. Nash has never exhibited the slightest tendency of aggression towards the men who raped here why would she threaten or assault staff?

Another thing: why would a victim --in the immediate aftermath of a violent rape or sexual assault- threaten staff, when doing so will likely result in additional abuse.

For example, Former Federal Bureau of Prisons guard Miguel Hidalgo plead guilty on January 2.2024 to assaulting a handcuffed prisoner and breaking his ribs at the Federal Correctional Complex in Coleman. See United States v. Hidalgo, USDC (M.D. FLA), Case #5-23-cr-00053. Video captured Hidalgo entering a prisoners cell, pushing him to the floor and striking him, even though the prisoner and his cellmate were both handcuffed at the time. The guard then left only to reenter the cell and assault the prisoner again. Why? Hidalgo's attorney said that the prisoner "threatened" Hidalgo.)

The bottom line is this: Ms. Nash's disciplinary record does not display a propensity for violence. Rather, it shows the trauma and injustice of being violently raped, retaliated against, and penalized for reporting sexual misconduct, as well as opposing and complaining about institutional bias against Trans people. And the temporal proximity between Nash's sexual assault report and the retaliatory action suggest a causal link. For these reasons, Nash FSA request should be granted.

TRULINCS 31505001 - NASH, DARNELL - Unit: CLP-K-A

---

FROM: 31505001
TO: Associate Warden PEN 2
SUBJECT: ***Request to Staff*** NASH, DARNELL, Reg# 31505001, CLP-K-A
DATE: 09/20/2025 06:24:42 PM

To: PREA COORDINATOR (PREA REQUEST)
Inmate Work Assignment: n/a

... retaliatory conduct that rendered Nash ineligible to apply earned FSA credits must be corrected under PREA, section ...67

The Prea Coordinator is precluded from arguing there was no retaliation because multiple federal courts have already made ... determination. Accordingly, Nash's FSA request should be decided without regard to Incident report #3923073, #3998057, #3998055, #3748684, and #4109141.

... not logical to reject Nash's request for corrective action when multiple federal courts have found rape and retaliation to cover ... such abuse.

... her legal filings Nash argued that the BOP failed to investigate Nash's sexual assault reports and protect her from prison employees falsifying disciplinary reports.

... respect to Incident report # 3923073 Nash argued before the district court that "on April 15, 2024 Ms. Nash was sexually assaulted by Officer White. Ms. Nash requested the BOP collect evidence of the assault, but the BOP waited two months to conduct a sexual assault forensic examination . by that time, all forensic evidence was lost. (see United State v. Nash, case # 1:13-cr-00467, DKt, #309, PageId 1859 (N.D. OHIO 7-3-2024)

... respect to incident report # 3998445, 3998057, 3998055 Nash argued that "on September 19, 2024 Ms. Nash reported to ... prison officials that she had been raped. she was supposed to be transported to a local hospital for a sexual assault ... examination but instead she was placed on suicide watch and denied transport" see United States v. Nash, case # 1:13-cr-...467, DOC # 322, PageId 2310

... regard to Incident report # 3748684 Nash argued "that a prisoner sexually abased her on at least five occasions, including ... March 20,2023 when the prisoner repeatedly slapped and penetrated Nash anus with his fingers and pulled her hair, forced ... to perform oral sex on him after she refused to do so, and forced Nash to engage in sexual intercourse. (see Sixth Circuit, case # 23-3635, DKT 18-1, PageID 1)

... just that, Pursuant to Prea investigation policy, when an inmate makes a prea complaint it must be immediately investigated ... the victim and abuser must be separated . Here, Ms. Nash not only "attached a copy of her request to be in a different ... form a prisoner who had repeatedly raped and sexually abused her" but "also attached a letter from another prisoner ... had informed a correctional officer that Nash had been sexually assaulted" (Sixth Circuit, Case #23-3635)

Nonetheless, and despite it obligation to do so, the BOP did nothing to intervene.

... regard to incident report # 410914, Nash argued that "Inmate Farrington forced Nash to perform oral sex then sodmozied ... and threatened to kill her if she reported the rape". Nonetheless, the BOP did nothing but issue Nash a false Incident report.

... should be clear by now. the failure to adhere to PREA standards not only resulted in a never ending series of sexual assaults against Ms. Nash , but provided a terrific motive to lie. Indeed, if the officers refused to perform a rape kit in retaliation ... her PREA complaints, its likely they also falsified an Incident report to cover up the misconduct.

TO: T.D Avery
From: NASH # 31565001
Re: Agency Protection Against Retaliation

The three factors that the warden relied on to deny NASH earned federal time credits (FTC) — 1) LACK OF PROGRAMMING 2) HISTORY OF PROHIBITED ACTS, AND 3) HIGH RECIDIVISM RISK SCORE - Are All explicitly prohibited by PREA, section 115.67. agency protection against retaliation. Indeed, as part of his effort to determine if retaliation is taking place the institution PREA compliance manager monitor 1) Disciplinary reports, 2) housing or program changes, and 3) negative performance reviews. (Id 115.67)

1.) The Antiretaliation Regulation of the PREA Act

) The BoP failed to protect Ms. NASH from rape And from prison employees falsifying disciplinary reports. Not just that; The rapes and the coordinated cover-ups that followed each assault adversely affected and compromised Nash's Ability to participate in BoP programs Aimed At reducing recidivism. Here, the exploitation of that illegality to deny NASH earned federal time credits constitute retaliation under PREA After all, the whole purpose of the Antiretaliation regulation And policies of the PREA ACT is to ensure that retaliation for reporting sexual abuse is NOT exploited to the inmates detriment by staff.

2.) The BoP failed to investigate Nash's sexual Assault reports And denied her request to speak to PREA staff. Therefore the PREA case file, And all documents relating to it, were not Admissible evidence.

The point is the procedure adopted by the warden - namely the Application of compromised PREA case files - permits A presentation of only part of the facts which may be necessary for a full And fair understanding And determination of the issue. The willingness to misreport And cover-up rape And retaliation by inmate And staff Abuse could by itself constitute retaliation under PREA.

The point is PREA dictates that "the inmate in segregated housing should retain Access to programs, privileges, education, And work opportunties to the extent possible" see 28 C.F.R. Section 115.43(b). Here, the refusal to comply with PREA's restrictions on the use of solitARY confinement may not be exploited to the inmates detriment. Although the warden shifts focus Away from Accountability And onto judgment, the PREA Act requires recognizing that hARM is caused by the offender, not by the person who was victimized.

inally, Because of the rapes And subsequent placement in ecure housing for her own protection And her repeated transfers to different facilities Nash has not been Able to complete necessARY programming. Still, the warden used the BOP's own wrongdoings as A crudgel against ms NASH - It means having your legs cut off And then being condemned for being crippled.

At its core, blaming NASH for failing to complete programs when she was being raped And denied programming in retaliation for her PREA complaints constitutes improper victim blaming And is Functionally An Attempt to exculpate the BOP for its own wrongdoings.

## C.) Prohibited Acts

The disciplinARY reports were written in retaliation for NASH's complaint Against inmate And staff. Here, Again, the exploitation of that illegality to deny NASH earned federal time credits constitute retaliation.

As An initial matteR, inmates with high or medium PATTERN recidivism risk levels must demonstrate A good faith effort to lower their recidivism risk by maintaining clear conduct for three (3) ears from the date of request. Accordingly, IR # 3923073, 3998445, 3998057, 3998055, 3748694, And 418914 Are the only incident reports that the warden CAn rely on to deny NASH eArneD Federal time credits any effort to Apply incident reports outside the three (3) yeAR window established by P.S. 5410.01 would constitute A blatAnt Attempt

evidentiary basis from which an inference of retaliation can be drawn. Here, Mr. Nash showed a sufficient inference of causal connection by evidence of the time span between the complaint and issuance of the false incident report. Still, the PREA compliance manager refuse to take corrective action, in violation of PREA.

hird, the failure to preserve physical evidence of sexual abuse neans that Nash's conviction was procured through fraud. -ikewise, the failure to provide a rape kit denied Nash the due process right to marshall facts in her defense and present the evidence in her First Step Act Assessment.

eport # 3923073 ; on April, 15 2024 Ms Nash was sexually issaulted by officer White. Mr. Nash requested the BoP collect vidence of the assault, but the BoP waited two months to conduct a sexual assault forensic examination. By that time, all evidence was lost. (See Nash, 1:13-cr-00467, Doc # 309, pageId # 1856

leport # 3998057 , 3998055, And 3993455 Ms. Nash was raped by inmate Deling. Despite this, the officers did not take Ms Nash to health services, nor take a statement, nor make a report or facilitate a rape kit. PREA protections are not so lax as to let stand the decisions of biased officers who dishonestly suppresses evidence of Nash's victimization.

The bottom line: By failing to provide a rape kit the BoP forfeited its right to utilize incident reports # 3923073, # 3998057, # 3998055 And 3998455. If officials denied Nash a rape kit in retaliation for her PREA complaints then its likely they issued Nash a false incident report to cover up such abuse. Note: Had PREA staff followed the substantive evidentiary standard of proof that would apply to PREA retaliation investigations Ms. Nash would've been spared her current federal time credit predicament. Indeed, the standard of proof in this proceeding is preponderance of the evidence, meaning that a victim must show that what is claimed is "more likely" than not or "probably true".

Coleman II staff still issued NASH A false Incident report

#3) There was no staff investigation to verify NASH's need for protection in SHU; Here, Again, the exploitAtion of that illegality to deny NASH earned federal time credits constitute retaliation under PREA. Indeed, no other explanation could account for staff's failure to verify NASh's need for placement in the SHU as A protection case. Note: under Section 541.27(a)(c) An inmate "may be placed in administrative detention status as A protection case when, among other things, she Is "being threatened by other Inmates.. OR "when she refuse to enter the general population because of alleged pressure or threats."

4) The assaults, sexual Abuse, And rape faced by Ms. NASH CAN only be described as Acts of torture. Still, Coleman II PREA staff found no justification to verify NASh's need for protection. That reveals something spectacular About PREA Staff thinking- Namely, that PREA staff does not perceive rape And assault as A serious offense -otherwise why fail to protect NASh from Anticipated Attacks.

The point is ordering NASH, transgender, And previously repeatedly raped, to return to general population were inmates Are waiting to stAb her is not only an Abuse of the protective custody process, but constitute retaliation, in violation of PREA.

5) Ms. NASH was found non-culpable in A PREA investigation surrounding inmate Farrigton's rape. Specifically, the mental health treatment coordinator found that NASH's mental health symptoms affected her responsibility for the incidents

The point: The mentAl health treatment coordinator Already found NASH "Not responsible for Actions" regarding assaults And threats by inmate Farrigton, And therefore the PREA compliance manager could not have held the opposite way when considering NAsh's disciplinARy history under PREA, section 115.67.

The point is putting NASH in segregated and other isolation housing after she has suffered assaults or threats by other inmates And staff was retalitory, And A tActical maneuver meant to ensure adverse "housing And program" changes, in violation of PREA, section 115.67. As such, the BOP has failed to make any showings why it should not be considered the cause of NASH's federal time credit predicament or how it is without fault in creating the crisis that NASH claims now requires corrective Action under PREA, section 115.67, agency protection against retaliation. Note: Officer Ray was clear in the body of her written report that she observed ms. NASH being raped, officer Ray also documented NASH's sexual assault report writing "As I was escorting inmate NASH to the T.V. room he stated that he was raped", Nevertheless, And despite its obligation Not to do so, PREA staff placed NASH in involuntARY segregation. This Action Appear to be taken in retaliation for filing her PREA complaint. Indeed, solitARY confinement was not necessARY for ms. NASH's own protection, given that the 3 men who raped her were being held at different prisons.

#4 Gratuitously allowing the beating and rape of NASH will <u>NOT</u> afford Nash the education And training necessARY to prepare her to rejoin society. PREA recognizes that "victims of prison rape suffer severe physical And psychological effects that hinder their Ability to integrate into the community And maintain stable employment upon their release from prison" (See

As stated, the inquiry involved in A ruling on Nash's compassionate release motions necessarily implicates the substantive evidentiary standard of proof that would Apply to PREA retaliation assessments. Indeed, the evidentiary standard and criteria to establish retaliation are essentially Already met based on the federal courts ruling of "more than one-hundred rapes" NASH has suffered.,

The bottom line is the PREA compliance manager has in his possession court documents finding more than "one-hundred rapes and sexual assaults" Against ms. NASH. That leaves only one question, which is why? why is PREA staff mounting such A dedicated offensive against ms. Nash's efforts to seek corrective Action under PREA, including ignoring the Applicable evidentiary standard for PREA investigations.? Think About it! the federal court Already found that NASH was subjected to rape And retaliation, And therefore the PREA compliance manager could not have held the opposite way without violating PREA's investigations standards. In fact, the evidentiary standard involved in Nash's court cases is higher than the preponderance of the evidence standard Applicable to PREA investigations Note: To prove something by A preponderance of the evidence means to prove only that it is more likely true than not true. It is determined by considering all of the evidence, including the cited federal court rulings, which Are probative in the legal Analysis required here.

Conclusion

For far too long, the BOP has Actively conceled rapes And sexual assaults Against mr NASH, And shiled both inmate And staff predators from Accountability At every turn. This is an injustice that needs to cease. Please Apply Nash earned federal time credits And comply with her judges recommendation for the maximum term of half way house.

# ATTACHMENT

In some cases where inmates alleges retaliation A prison offical may not be Able to determine what happened due to lACK of evidence other than prisoner And staff statements. Here, however, the complaint Against WArden E. K. Carlton filed by ms. NASH document in granulAr detail who did what to her, when, how, And where. Yet, At every turn Nash's efforts have consistently been circumvented circumvented by igenious evasions which deflect And conceal the wardens retaliAtory motives. For thse reasons, Ms. NASH request that class counsel review the complaint Against WArden E. K. CArlton, Donald J. Trump filed by MS. NASH

OCAP-1

**U.S. District Court**
**Middle District of Florida (Ocala)**
**CIVIL DOCKET FOR CASE #: 5:25-cv-00717-AGM-PRL**
**Internal Use Only**

Nash v. Trump et al
Assigned to: Judge Anne-Leigh Gaylord Moe
Referred to: Magistrate Judge Philip R. Lammens
Cause: 42:1983 Prisoner Civil Rights

Date Filed: 11/12/2025
Jury Demand: None
Nature of Suit: 550 Prisoner: Civil Rights
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Darnell Nash**

represented by **Darnell Nash**
31505-001
Coleman II
U.S. Penitentiary
P.O. Box 1034
Coleman, FL 33521
PRO SE

V.

**Defendant**

**President Donald J. Trump**

**Defendant**

**Warden E. K. Carlton**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/12/2025 | 1 | COMPLAINT against E. K. Carlton, Donald J. Trump filed by Darnell Nash. (Attachments: # 1 Exhibit A-L, # 2 Mailing Envelope) (No fees paid, no service copies) (MGB) (Entered: 11/12/2025) |
| 11/12/2025 | 2 | Emergency MOTION for Temporary Restraining Order and Preliminary Injunction by Darnell Nash. (Attachments: # 1 Mailing Envelope)(MGB) (Entered: 11/12/2025) |
| 11/12/2025 | 3 | **STANDING ORDER for all incarcerated pro se litigants. Signed by Magistrate Judge Philip R. Lammens on 11/12/2025. (MGB)** (Entered: 11/12/2025) |
| 11/12/2025 | | (Court only) ***COPIES mailed to Parties: Darnell Nash ; re 3 Standing Order Pro Se Litigants. (MGB) (Entered: 11/12/2025) |
| 11/12/2025 | | (Court only) ***Set OCAP-1, flag(s). (KLS) (Entered: 11/12/2025) |
| 11/17/2025 | 4 | MOTION to Proceed In Forma Pauperis by Darnell Nash. (MGB) Motions referred to Magistrate Judge Philip R. Lammens. (Entered: 11/18/2025) |

Case 1:25-cv-00691-RCL Document 214 (Court only) Filed 06/12/26 Page 90 of 91

Alishea Kingdom v. Trump

Case # 1:25-cv-691-RCL

Dear Clerk of Court,

1.) Please see enclosed an Emergency Motion For Protective Order.

2.) The courts proscribed process for resolution of retaliation brought pursuant to the protective order in Kingdom v. Trump requires the assistance of class counsel. As such, can the clerk please forward a copy of the complaint to class counsel for Plaintiffs in the Alishea Kingdom case

3.) May I please have a copy of the docket sheet for the above captioned case.

Thank you.

[signature]

RECEIVED
Mailroom
JUN 12 2026
Angela D. Caesar, Clerk of Clerk
U.S. District Court, District of Columbia

Darnell Nash #31505001
Federal Correctional Complex
United States Penitentiary Coleman II
P.O. Box 1034
Coleman, FL 33521




Tampa/St. Pete FL 336
TUE 09 JUN 2026 PM

United States Courthouse
333 Constitution Ave, N.W Room 5523
Washington, DC 20001